1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

8
9
10
11
12
13
14
15
16
17
18
19
20

TAYLOR ANDERS, HENNESSEY EVANS, ABBIGAYLE ROBERTS, MEGAN WALAITIS, and TARA WEIR, individually and on behalf of all those similarly situated,

        Plaintiffs,

    vs.

CALIFORNIA STATE UNIVERSITY, FRESNO; TERRENCE TUMEY, in his official capacity as Director of Athletics at California State University, Fresno; JOSEPH CASTRO, in his official capacity as former President of California State University, Fresno; and DR. SAÚL JIMÉNEZ-SANDOVAL, in his official capacity as Interim President of California State University, Fresno,

        Defendants.

CASE: 1:21-cv-179-AWI-BAM

**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

(Doc. No. 2)

21
22
23
24
25
26
27
28

        In the 2020-21 academic year, Defendant California State University, Fresno ("Fresno State") sponsored eight varsity sports for men (baseball, basketball, cross country, football, golf, tennis, outdoor track and wrestling) and 13 varsity sports for women (basketball, cross country, equestrian, golf, lacrosse, soccer, softball, swimming and diving, tennis, indoor track, outdoor track, volleyball and water polo). Doc. No. 19 at 8:14-18;[1] Doc. No. 19-2 at 19. Each of these sports is segregated by sex. Doc. No. 19-2 at 19. On October 16, 2020, Fresno State announced it

_____

[1] Unless otherwise indicated, all page citations to documents filed electronically with the Court are to the page numbers in the CM/ECF stamp at the top of each page.

1    would stop offering men's wrestling, men's tennis and women's lacrosse at the end of the current

2    2020-21 academic year. Doc. No. 2-1 at 6:13-18.

3           On February 12, 2021, five current members of Fresno State's women's lacrosse team

4    ("Plaintiffs") filed a putative class action against Fresno State and certain Fresno State

5    administrators (collectively, "Defendants") alleging that Defendants violated Title IX of the

6    Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* ("Title IX") and implementing

7    regulations by failing to provide female students an equal opportunity to participate in varsity

8    athletics; failing to provide female athletes with an equal allocation of financial aid; and failing to

9    provide female athletes with benefits comparable to those provided to male athletes. Doc. No. 1.

10          On February 12, 2021, Plaintiffs also filed the instant motion seeking a preliminary

11   injunction barring Fresno State from cutting women's lacrosse—or any other women's team—and

12   a preliminary injunction requiring Fresno State "to treat the women's lacrosse team and its

13   members fairly" during the pendency of this litigation. Doc. No. 2-1 at 6:5-9.

14          The Court deemed the motion suitable for decision without oral argument pursuant to

15   Local Rule 230(g) and took the motion under submission on March 19, 2021. Doc. No. 27. Having

16   thoroughly reviewed all filings relating to the motion, including briefs, expert reports and

17   declarations, the Court will deny the motion in part and grant the motion in part for the reasons set

18   forth below.[2]

19                                    **LEGAL FRAMEWORK**

20   **I.      Injunctive Relief**

21          "A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v.

22   Natural Res. Def. Council, 555 U.S. 7, 24 (2008); Alliance for the Wild Rockies v. Cottrell, 632

23   F.3d 1127, 1131 (9th Cir. 2011) (a preliminary injunction is issued at the discretion of the district

24   court). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on

25   the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

26   balance of equities tips in his favor, and that an injunction is in the public interest." Winter, 555

27   _____

28   [2] Defendants filed a motion to dismiss on April 19, 2021. Doc. No. 33. The Court has reviewed that motion. It has no bearing on this order.

1  U.S. at 20; Angelotti Chiropractic v. Baker, 791 F.3d 1075, 1081 (9th Cir. 2015). The party

2  seeking an injunction "has the general burden of establishing the elements necessary to obtain

3  injunctive relief." Klein v. City of San Clemente, 584 F.3d 1196, 1201 (9th Cir. 2009).

4          The Ninth Circuit applies the preliminary injunction factors using a "sliding scale"

5  approach, in which "a stronger showing of one element may offset a weaker showing of another."

6  hiQ Labs, Inc. v. LinkedIn Corp., 938 F.3d 985, 992 (9th Cir. 2019). A court may therefore issue a

7  preliminary injunction where a movant shows merely "that serious questions are raised" as to the

8  merits of a claim if the movant also shows that "the balance of hardships tips sharply in his favor."

9  Martin v. Int'l Olympic Comm., 740 F.2d 670, 675 (9th Cir. 1984); see also, Angelotti, 791 F.3d

10  at 1081. Even where the balance of hardships tips sharply in favor of the moving party, however,

11  "it must be shown as an irreducible minimum that there is a fair chance of success on the merits."

12  Martin, 740 F.2d at 675; see also, Doe #1 v. Trump, 984 F.3d 848, 870 (9th Cir. 2020) ("[e]ven

13  when the balance of hardships tips sharply in the plaintiff's favor, the plaintiff still must

14  demonstrate serious questions going to the merits"). Likelihood of success on the merits is the

15  "most important" preliminary injunction factor; if a movant fails to meet this "threshold inquiry,"

16  a court need not consider the other factors, in the absence of "serious questions going to the

17  merits." Disney Enterprises, Inc. v. VidAngel, Inc., 869 F.3d 848, 856 (9th Cir. 2017) (citations

18  and internal quotation marks omitted); see also, Trump, 984 F.3d at 870; California v. Azar, 911

19  F.3d 558, 575 (9th Cir. 2018).

20  **II.     Title IX**

21          Title IX provides that "[n]o person in the United States shall, on the basis of sex, be

22  excluded from participation in, be denied the benefits of, or be subjected to discrimination under

23  any education program or activity receiving Federal financial assistance …." 20 U.S.C. § 1681(a).

24          At the direction of Congress, the Department of Health, Education and Welfare (the

25  predecessor of today's Department of Education) issued regulations for Title IX that took effect in

26  1975.[3] See 34 C.F.R. § 106.1. Title IX regulations specific to athletics are set forth at 34 C.F.R. §

27  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

28  [3] The Department of Health, Education, and Welfare was divided into the Department of Health and Human Services and the Department of Education after Title IX was passed. Roberts v. Colorado State Bd. of Agric., 998 F.2d 824,

106.41. 34 C.F.R. § 106.41(c) states that school receiving federal funds "shall provide equal athletic opportunity for members of both sexes" and that the following factors, among others, are to be considered "[i]n determining whether equal opportunities are available":

> (1) Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;

> (2) The provision of equipment and supplies;

> (3) Scheduling of games and practice time;

> (4) Travel and per diem allowance;

> (5) Opportunity to receive coaching and academic tutoring;

> (6) Assignment and compensation of coaches and tutors;

> (7) Provision of locker rooms, practice and competitive facilities;

> (8) Provision of medical and training facilities and services;

> (9) Provision of housing and dining facilities and services;

> (10) Publicity.

34 C.F.R. § 106.41(c)(1)-(10).

The Ninth Circuit interprets these regulations as establishing "two components of Title IX's equal athletic opportunity requirement: 'effective accommodation' and 'equal treatment.' " Mansourian v. Regents of Univ. of California, 602 F.3d 957, 964 (9th Cir. 2010) ("Mansourian II"). The "effective accommodation" requirement derives from 34 C.F.R. § 106.41(c)(1). Id. at 965 ("an institution may violate Title IX solely by failing to accommodate effectively the interests and abilities of student athletes of both sexes, even if the benefits provided athletes of both sexes are equivalent" (citation and internal quotation marks omitted)); Roberts, 998 F.2d at 828 ("Although § 106.41(c) goes on to list nine other factors that enter into a determination of equal opportunity in athletics, an institution may violate Title IX simply by failing to accommodate effectively the interests and abilities of student athletes of both sexes."). The "equal treatment"

---

828 n.3 (10th Cir. 1993). The Department of Education is the federal agency now charged with administering Title IX. Id. For the sake of simplicity, this order refers to the Department of Education in discussion of Title IX regulations and related guidance.

1   standard, for its part, derives from 34 C.F.R. § 106.41(c)(2)-(10), which have collectively been

2   interpreted to require "equivalence in the availability, quality and kinds of other athletic benefits

3   and opportunities provided male and female athletes." <u>Mansourian II</u>, 602 F.3d at 965. "Effective

4   accommodation claims thus concern the opportunity to participate in athletics, while equal

5   treatment claims allege sex-based differences in the schedules, equipment, coaching, and other

6   factors affecting participants in athletics." <u>Id.</u> at 966.

7       The Department of Education has issued a considerable amount of guidance with respect to

8   Title IX regulations, including "A Policy Interpretation; Title IX and Intercollegiate Athletics," 44

9   Fed. Reg. 71,413 (Dec. 11, 1979) ("1979 Policy Interpretation"); "Clarification of Intercollegiate

10  Athletics Policy Guidance: The Three–Part Test" (Jan. 16, 1996) ("1996 Clarification"), available

11  at http://www.ed.gov/about/offices/list/ocr/docs/clarific.html; and "Further Clarification of

12  Intercollegiate Athletics Policy Guidance Regarding Title IX Compliance" (July 11, 2003) ("2003

13  Further Clarification"), available at

14  https://www2.ed.gov/about/offices/list/ocr/title9guidanceFinal.html. The Ninth Circuit has held

15  that the regulations set forth by the Department of Education with respect to Title IX are entitled

16  to "controlling weight" and that "federal courts are to defer substantially" to the Department of

17  Education's interpretations of those regulations. <u>See</u> <u>Neal v. Bd. of Trustees of California State</u>

18  <u>Universities</u>, 198 F.3d 763, 770-71 (9th Cir. 1999) (citing <u>Martin v. Occupational Safety & Health</u>

19  <u>Review Comm'n</u>, 499 U.S. 144, 150 (1991) and <u>Chevron USA v. NRDC</u>, 467 U.S. 837, 843–44

20  (1984)); <u>see</u> <u>also</u>, <u>Cohen v. Brown Univ.</u>, 991 F.2d 888, 895 (1st Cir. 1993) ("[W]e must accord

21  [the Department of Education's] interpretation of Title IX appreciable deference."); <u>Horner v.</u>

22  <u>Kentucky High Sch. Athletic Ass'n</u>, 43 F.3d 265, 273 (6th Cir. 1994) ("The Policy Interpretation

23  is a 'considered interpretation' of the applicable regulations, and is entitled to substantial

24  deference by the courts.").

25  **ANALYSIS**

26      This motion involves both an effective accommodation claim under 34 C.F.R.

27  §106.41(c)(1) and an equal treatment claim under 34 C.F.R. § 106.41(c)(2)-(10). The Court will

28  analyze each claim in turn, starting with the effective accommodation claim.

5

**I.      Effective Accommodation Claim**

      **A.      Applicable Law**

The 1979 Policy Interpretation sets forth a three-part test ("Three-Part Test") for satisfying the effective accommodation requirement in 34 C.F.R § 106.41(c)(1):

> (1) Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or
>
> (2) Where the members of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or
>
> (3) Where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

44 Fed. Reg. at 71,418. Meeting any one of these three prongs is sufficient to comply with the effective accommodation component of Title IX's equal opportunity mandate. See 1996 Policy Clarification (institutions "need to comply only with any one part of the three-part test in order to provide nondiscriminatory participation opportunities for individuals of both sexes"); see also, Mansourian II, 602 F.3d at 966 ("Funding recipients can satisfy any of the three options to comply with Title IX."). Thus, a university has "three individual avenues to choose from when determining how it will provide individuals of each sex with nondiscriminatory opportunities to participate in intercollegiate athletics." 1996 Policy Clarification. This discussion will focus on the first prong ("Prong One") of the Three-Part Test because Defendants do not contend that Fresno State satisfies either the second prong ("Prong Two") or the third prong ("Prong Three").

Under Prong One of the Three-Part Test, providing athletic participation opportunities for male and female students in numbers substantially proportionate to their respective undergraduate enrollments provides a "safe harbor" and keeps universities on "on the sunny side" of Title IX's effective accommodation requirement. Horner, 43 F.3d at 275 (quoting Cohen, 991 F.2d at 897–98) (internal quotation marks omitted); accord Roberts, 998 F.2d at 829. Title IX plaintiffs bear the burden of proving a defendant's failure to satisfy Prong One's substantial proportionality

1  requirement by showing an actionable "disparity" in participation opportunities by sex. Horner, 43

2  F.3d at 275 (citing Roberts, 998 F.2d at 830–31 and Cohen, 991 F.2d at 901).

3      The Prong One analysis "begins with a determination of the number of participation

4  opportunities afforded to male and female athletes in the intercollegiate athletic program" offered

5  by a defendant. 1996 Policy Clarification; see also, Biediger v. Quinnipiac Univ., 691 F.3d 85, 93

6  (2d Cir. 2012) ("Biediger III"). "Participation opportunities" are determined by the number of

7  athletes who "actually participate" in athletics. Mansourian II, 602 F.3d at 966. Specifically, the

8  1979 Policy Interpretation defines "participants" as athletes:

> a.  Who are receiving the institutionally-sponsored support normally provided
>     to athletes competing at the institution involved, e.g., coaching, equipment,
>     medical and training room services, on a regular basis during a sport's
>     season; and
>
> b.  Who are participating in organized practice sessions and other team
>     meetings and activities on a regular basis during a sport's season; and
>
> c.  Who are listed on the eligibility or squad lists maintained for each sport, or
>
> d.  Who, because of injury, cannot meet a, b, or c above but continue to receive
>     financial aid on the basis of athletic ability.

16  44 Fed. Reg. at 71,415.

17      "[A]ll athletes who are listed on a team's squad or eligibility list and are on the team as of

18  the team's first competitive event are counted as participants," and "an athlete who participates in

19  more than one sport will be counted as a participant in each sport in which he or she participates."

20  1996 Clarification. Moreover, the Title IX participant count includes "those athletes who do not

21  receive scholarships (e.g., walk-ons)" and "those athletes who practice but may not compete."

22  Notwithstanding these inclusive criteria, however, Prong One requires "genuine participation

23  opportunities," and it is "unacceptable for a university to set roster numbers at unsustainably high

24  levels, well above average NCAA squad sizes and the individual coaches' need, in order to 'make

25  the numbers' for purposes of claiming to have achieved substantial proportionality." Biediger v.

26  Quinnipiac Univ., 616 F. Supp. 2d 277, 297 (D. Conn. 2009) ("Biediger I").

27      Substantial proportionality determinations "depend[] on [an] institution's specific

28  circumstances and the size of its athletic program" and thus are made "on a case-by-case basis,

1  rather than through use of a statistical test." 1996 Policy Clarification. The Department of

2  Education "consider[s] opportunities to be substantially proportionate when the number of

3  opportunities that would be required to achieve [strict] proportionality would not be sufficient to

4  sustain a viable team, i.e., a team for which there is a sufficient number of interested and able

5  students and enough available competition to sustain an intercollegiate team."[4] Id. "[T]he average

6  size of teams offered for the underrepresented sex"—which varies by institution—can be used as a

7  "frame of reference" in making that determination. Id.

8        Further, regulatory guidance does not provide a threshold figure, but courts have held that

9  a disparity of 2% or less between the underrepresented sex's percentage of participation

10  opportunities and the underrepresented sex's percentage of enrollment is "proof that an

11  educational institution falls within the substantial proportionality safe harbor." Biediger v.

12  Quinnipiac Univ., 728 F. Supp. 2d 62, 111 (D. Conn. 2010), aff'd, 691 F.3d 85 (2d Cir. 2012)

13  ("Biediger II") (finding that "a 3.62 percent difference [wa]s, by itself, a relatively thin basis for

14  finding that [defendant] was out of compliance" with Title IX); see also, Miami Univ. Wrestling

15  Club v. Miami Univ., 302 F.3d 608, 611, 615–16 (6th Cir.2002) (less than 2% disparity

16  acceptable); Boulahanis v. Bd. of Regents, 198 F.3d 633, 636, 638–39 (7th Cir.1999) ("athletic

17  participation … within three percentage points of enrollment" is substantial proportionality);

18  Balow v. Michigan State Univ., 2021 WL 650712, at *11 (W.D. Mich. Feb. 19, 2021) ("Plaintiffs

19  have not cited, and the Court is not aware, of any case where a gap lower than 2% failed to satisfy

20  the test for substantial proportionality."); Portz v. St. Cloud State Univ., 196 F. Supp. 3d 963, 975

21  (D. Minn. 2016) ( "a deviation of less than 3.5 percentage points typically keeps the ratios

22  substantially proportionate"); Equity in Athletics, Inc. v. Dep't of Educ., 675 F. Supp. 2d 660,

23  682–83 (W.D. Va. 2009) (finding no case in which a disparity of two percentage points was held

24  to constitute a lack of substantial proportionality).

25  —————————————————

26  [4] The difference between the number of participation opportunities required for strict proportionality (which the Court
    refers to infra as the "strict proportionality threshold") and the actual number of participation opportunities provided

27  to the underrepresented sex—in other words, "the number of participation opportunities that a school would have to
    add for [the underrepresented sex] to achieve actual proportionality"—is commonly referred to as the "participation

28  gap." See Mansourian v. Bd. of Regents of Univ. of California at Davis, 816 F. Supp. 2d 869, 887 (E.D. Cal. 2011)
    ("Mansourian I").

Finally, "Title IX is a dynamic statute" that "envisions continuing progress toward the goal of equal opportunity for all athletes" and "does not bar remedial actions designed to achieve substantial proportionality between athletic rosters and student bodies." Neal, 198 F.3d at 769, 771. Specifically, Title IX allows for "the use of [] gender-conscious remedies," id. at 767, including the elimination of participation opportunities for the overrepresented sex (typically males), where participation opportunities for the underrepresented sex (typically females) are held constant or reduced to a lesser extent. Cohen, 991 F.2d at 898–99 n.15 (a university can "bring itself into compliance with the first benchmark of the accommodation test by subtraction and downgrading, that is, by reducing opportunities for the overrepresented gender while keeping opportunities stable for the underrepresented gender (or reducing them to a much lesser extent)"); see also, Neal, 198 F.3d at 770 ("If a university wishes to comply with Title IX by leveling down programs instead of ratcheting them up … Title IX is not offended.").

### B.   Parties' Arguments

Plaintiffs argue that Fresno State should be barred from eliminating women's lacrosse (or any other women's team) while this litigation is pending because female participation in athletics is not substantially proportionate to female enrollment at Fresno State and Fresno State cannot show it has a history of expanding participation opportunities for women or that it "fully and effectively" accommodates the "interests and abilities" of female students with respect to athletics.

Defendants do not claim that Fresno State satisfies Prong Two or Prong Three of the Three-Part Test but contend that Fresno State satisfies Prong One because the concurrent elimination of men's wrestling, men's tennis and women's lacrosse will leave a small and legally permissible gap between female enrollment and female participation opportunities at Fresno State. Further, Defendants argue at the threshold that the Three-Part Test for effective accommodation does not provide a private cause of action; that Plaintiffs have not shown the intentional discrimination required for a Title IX claim; and that a heightened standard should apply because Plaintiffs seek mandatory relief through an order compelling Fresno State to reinstate women's

1 lacrosse, as opposed to prohibitory relief barring Fresno State from cutting women's lacrosse.[5]

2   The Court will first address Defendants' threshold arguments and then proceed to the

3 merits of Plaintiffs' effective accommodation claim.

**C.**   **Threshold Issues**

**1.**   **Private Cause of Action Under Prong One of the Three-Part Test**

6   Defendants argue based on *Alexander v. Sandoval*, 532 U.S. 275 (2001), that Prong One of

7 the Three-Part Test does not provide a private cause of action because it "requires institutions to

8 do more than refrain from intentional discrimination prohibited by" the Title IX statute. Doc. No.

9 19 at 30:16-20, 32:14-20. Specifically, Defendants assert that Plaintiffs improperly "ask this []

10 Court to conclude there is intentional discrimination solely based on a supposed lack of substantial

11 proportionality." Id. at 32:20-21.

12   Defendants' argument is without merit because substantial proportionality is not the

13 standard for a Title IX violation under the Three-Part Test. Substantial proportionality provides a

14 "safe harbor" under Prong One of the Three-Part Test, but the other two prongs of the Three-Part

15 Test allow for "program expansion" to meet the "developing interest and abilities" of the

16 underrepresented sex and showing that "the interests and abilities of the [underrepresented sex]

17 have been fully and effectively accommodated by the present program," regardless of whatever

18 imbalance in participation opportunities may exist between sexes. See Roberts, 998 F.2d at 829;

19 see also, 1979 Policy Interpretation, 44 Fed. Reg. at 71,418. Thus, "a Title IX violation may not be

20 predicated solely on a disparity between the gender composition of an institution's athletic

21 program and the gender composition of its undergraduate enrollment," as Defendants claim.

22 Roberts, 998 F.2d at 831; Kelley v. Bd. of Trustees, 35 F.3d 265, 271 (7th Cir. 1994) (stating

23 Three-Part Test does not "mandate statistical balancing"). "[T]he policy interpretation merely

24 creates a presumption that a school is in compliance with Title IX and the applicable regulation

25 when it achieves such a statistical balance." Kelley, 35 F.3d at 271. "Even if substantial

26 proportionality has not been achieved, a school may establish that it is in compliance by

27

---

28 [5] Defendants also argue that Plaintiffs' claims are time-barred, to some extent. That argument has no apparent applicability to this motion and, therefore, is not addressed in this order.

1  demonstrating either that it has a continuing practice of increasing the athletic opportunities of the

2  underrepresented sex or that its existing programs effectively accommodate the interests of that

3  sex." Id.; Roberts, 998 F.2d at 831.

4      The Court therefore finds that "the implementing regulations and policy guidance

5  effectuate, rather than expand upon, Title IX's ban on intentional discrimination" and that,

6  consequently, *Sondoval* does not bar Plaintiffs' effective accommodation claim. Mayerova v. E.

7  Michigan Univ., 346 F. Supp. 3d 983, 991 (E.D. Mich. 2018); see also, Equity In Athletics, Inc. v.

8  Dep't of Educ., 639 F.3d 91, 102–03 (4th Cir. 2011) (finding that the Three-Part Test did not

9  exceed the "permissive bounds" of the Title IX statute); Kelley, 35 F.3d at 272 ("neither the

10  regulation nor the policy interpretation run afoul of the dictates of Title IX").

11          **2.     Intentional Discrimination**

12      Defendants next contend that Plaintiffs cannot show women's lacrosse was treated

13  differently based on sex (as required for an intentional discrimination claim) because Fresno State

14  simultaneously cut two men's teams collectively accounting for a larger number of participation

15  opportunities than the women's lacrosse team. Defendants also assert that "Plaintiffs' argument

16  that Fresno State violated Title IX when it failed to insulate women lacrosse players from budget

17  cuts is squarely foreclosed" by Title IX because Title IX prohibits preferential treatment based on

18  sex. Doc. No. 19 at 29:24-28; see 20 U.S.C. § 1681(b). Plaintiffs, for their part, cite several cases

19  in which courts have granted preliminary injunctions protecting women's teams where both men's

20  and women's teams had been cut, and take the position that "if a school is violating Title IX by

21  eliminating a women's team, whether it is also eliminating one or more men's team is irrelevant"

22  because "[t]he elimination of the women's team—*knowing* the team is made up of women—is

23  illegal, intentional sex discrimination." Doc. No. 24 at 36:10-24 (emphasis original).[6]

24      "Title IX does not establish a right to participate in any particular sport in one's college,"

25  Equity in Athletics, Inc. v. Dep't of Educ., 504 F. Supp. 88, 100 (W.D. Va. 2007), aff'd sub

---

26

27  [6] Plaintiffs also point to evidence of discrimination in connection with per diem allowances, tutoring, practice
28  facilities and such. See Doc. No. 2-3 ¶¶ 8-10; Doc. No. 2-5 ¶¶ 13-15; and Doc. No. 2-6 ¶¶ 10-15, 20-22. That evidence
goes to Plaintiffs' equal treatment claim—not their effective accommodation claim—and will be addressed separately
*infra*.

1    nom. Equity in Athletics, Inc. v. U.S. Dep't of Educ., 291 F. App'x 517 (4th Cir. 2008), and as

2    noted above, the Ninth Circuit has held that Title IX permits "gender-conscious remedies"—

3    including the strategic elimination of teams *because of* sex—in order to achieve substantial

4    proportionality. Neal, 198 F.3d at 770 (stating that it would be "imprudent to argue" that Title IX

5    bars "gender-conscious remedies"). Thus, Defendants are correct that the mere fact that Fresno

6    State cut the women's lacrosse team—and took sex into account in selecting the women's lacrosse

7    team for elimination—does not itself give rise to a Title IX claim.

8          The question here, however, is not whether Fresno State singled out the women's lacrosse

9    team for elimination based on sex. The question here is whether participation opportunities by sex

10   will be substantially proportionate to enrollment by sex after cuts to women's lacrosse (and

11   concurrent cuts to men's wrestling and men's tennis) take effect. See Ohlensehlen v. Univ. of

12   Iowa, 2020 WL 7651974, at *5 (S.D. Iowa Dec. 24, 2020) ("The parties agree the only question

13   before the Court on the merits is whether the University of Iowa will comply with Title IX under

14   Prong One of the Three-Part Test in 2021–22 after eliminating the women's swimming and diving

15   team alongside three men's teams."). If males, as the overrepresented sex prior to cuts, continue to

16   enjoy a disproportionate share of participation opportunities (that falls outside Prong One's

17   "substantial probability" tolerances) after cuts are made, there could be an intentional

18   discrimination claim because sex is necessarily a factor in allocating athletic participation

19   opportunities. See Neal, 198 F.3d at 773 n.8 (universities must decide "how many athletic

20   opportunities they will allocate to each sex" because "athletic teams are gender segregated").

21   Defendants' contention that Plaintiffs cannot show intentional discrimination in connection with

22   the elimination of Fresno State's women's lacrosse team is therefore without merit.

23          **3.     Preliminary Injunction Standard**

24          Defendants argue that Plaintiffs' request for injunctive relief is improper because requiring

25   Fresno State to reinstate women's lacrosse would go beyond merely preserving the status quo and

26   that, at a minimum, a "heightened burden applies." Doc. No. 19, Part III.B. Plaintiffs argue that

27   binding Ninth Circuit precedent establishes that, for purposes of a preliminary injunction, the

28   status quo is the situation that existed before the action in controversy was taken—as opposed to

1   the state of affairs resulting from the action in controversy—and that, consequently, the injunction
2   they seek in connection with their effective accommodation claim would merely "preserve," not
3   "reinstate," women's lacrosse. Doc. No. 24, Part II.

4        The Court agrees with Plaintiffs. A preliminary injunction can take two forms. A
5   prohibitory injunction bars a party from taking action and "preserve[s] the status quo pending a
6   determination of [an] action on the merits." Chalk v. U.S. Dist. Court, 840 F.2d 701, 704 (9th Cir.
7   1988). A mandatory injunction, on the other hand, "goes well beyond simply maintaining the
8   status quo" and "orders a responsible party to take action." Marlyn Nutraceuticals, Inc. v. Mucos
9   Pharma GmbH & Co., 571 F.3d 873, 879 (9th Cir. 2009). "In general, mandatory injunctions are
10   not granted unless extreme or very serious damage will result and are not issued in doubtful cases
11   or where the injury complained of is capable of compensation in damages." Id.

12        For purposes of injunctive relief, status quo means "the last uncontested status which
13   preceded the pending controversy." Regents of Univ. of California v. Am. Broad. Companies,
14   Inc., 747 F.2d 511, 514 (9th Cir. 1984) (citation and internal quotation marks omitted); see also,
15   Hecox v. Little, 479 F. Supp. 3d 930, 971–72 (D. Idaho 2020) ("status quo" means "the legally
16   relevant relationship between the parties before the controversy arose"). The controversy here
17   arises from the cutting of women's lacrosse, which necessarily means that in the relevant status
18   quo, women's lacrosse had not yet been cut. Consequently, Plaintiffs merely seek a prohibitory
19   injunction to "preserve" women's lacrosse, which does not trigger the heightened standard
20   applicable to mandatory injunctions. See Marlyn Nutraceuticals, Inc., 571 F.3d at 879.

21        With those threshold issues resolved, the Court now turns to the first and most important
22   element of the preliminary injunction analysis—probability of success on the merits.

23       **D.**    **Probability of Success on the Merits**
24           **1.**    **Relevant Background**

25        As set forth above, this action was triggered by Fresno State's October 16, 2020
26   announcement that men's wrestling, men's tennis and women's lacrosse would no longer be
27   offered after the end of the current 2020-21 academic year.

28        On December 3, 2020, counsel for Plaintiffs sent Fresno State a letter asserting that Fresno

1   State was in violation of Title IX because Fresno State's Equity in Athletics Disclosure Act

2   ("EADA") filings for the 2018-19 academic year showed "a 3.75% gap between the women's

3   undergraduate enrollment rate and their intercollegiate athletic participation rate." Doc. No. 2-11

4   at 3. The letter further stated that "Fresno State would have needed to add 54 women to its

5   athletic program to be providing equitable participation opportunities for women" in the 2018-19

6   academic year and that, even with the cuts to October 2020 cuts, there would be a 2.37% gap

7   between female enrollment and athletic participation at Fresno State, such that Fresno State

8   would have to add "approximately 30 women to reach gender equity under Title IX." Id.

9       On December 10, 2020, counsel for Fresno State sent a letter to Plaintiffs' counsel stating

10  that once the cuts to men's wrestling, men's tennis and women's lacrosse took effect, "the overall

11  proportion of men-to women in [Fresno State's] athletic program [would be] less than two

12  percent higher than the overall ratio of men-to-women in the University's general student

13  population" and that there would be "no 30 student-athlete gap." Doc. No. 2-13 at 2-3.

14      On December 11, 2020, Plaintiffs' counsel sent a letter to counsel for Fresno State seeking,

15  *inter alia*, details supporting Fresno State's projections as to the size of its participation gap

16  following the elimination of men's wrestling, men's tennis and women's lacrosse. Doc. No. 2-14

17  at 3.

18      On December 22, 2020, counsel for Fresno State sent Plaintiffs' counsel a letter noting that

19  the EADA data on which Plaintiffs' December 3, 2020 letter was based was from the 2018-19

20  academic year and providing "updated EADA numbers" for the 2019-20 academic year. Doc. No.

21  2-15 at 2. The letter also stated that EADA numbers for 2020-21 were not yet available because

22  some sports are still in season. Id. at 3.

23      The EADA data attached to Fresno State's December 22, 2020 letter showed: (i) that males

24  and females accounted for 40.40% and 59.60% of Fresno State's enrollment respectively in the

25  2019-20 academic year; (ii) that males accounted for 251 athletic participants and females

26  accounted for 332 athletic participants in the 2019-20 academic year under EADA counting

27  protocols; and (iii) that deducting 31 male wrestlers, 10 male tennis players, and 31 female

28  lacrosse players would result in 210 male athletic participants and 301 female athletic

participants, under EADA counting protocols, after cuts took effect. Id. According to Fresno

State, strict proportionality required 309 female participants, resulting in a female participation

gap of 8, according to EADA counts. Id. at 2. Finally, Fresno State took the position that this

participation gap constituted substantial proportionality between female enrollment and female

participation in athletics and that Fresno State therefore satisfied Prong One of the Three-Part

Test for effective accommodation. Id. at 3.

### 2.    Parties' Arguments

Plaintiffs argue in their opening brief that EADA counting protocols differ from Title IX

counting protocols, and that analysis conducted by their expert, Dr. Donna Lopiano, shows that

the EADA data used by Fresno State in pre-litigation correspondence overestimates female

participation opportunities relative to proper Title IX counts.[7] Specifically, Plaintiffs assert that

EADA filings inherently overstate female participation in athletics because they count male

practice players as female participants and do not properly account for attrition after the first day

of competition (which, according to Plaintiffs, is more likely to affect females than males). In

---

[7] There is no dispute in this action that EADA participant counting methodology differs from Title IX counting methodology. For purposes of EADA reports, 34 C.F.R. § 668.47(b)(3) provides:

  (i) Participants means students who, as of the day of a varsity team's first scheduled contest -
      (A) Are listed by the institution on the varsity team's roster;
      (B) Receive athletically related student aid; or
      (C) Practice with the varsity team and receive coaching from one or more varsity coaches.
  (ii) Any student who satisfies one or more of the [foregoing] criteria … is a participant, including a student on a
      team the institution designates or defines as junior varsity, freshman, or novice, or a student withheld from
      competition to preserve eligibility (i.e., a redshirt), or for academic, medical, or other reasons.

34 C.F.R. § 668.47(b)(3).

As set forth above, the 1979 Policy Interpretation for Title IX's implementing regulations defines "participants" as athletes:

  a.  Who are receiving the institutionally-sponsored support normally provided to athletes competing at the
      institution involved, e.g., coaching, equipment, medical and training room services, on a regular basis
      during a sport's season;
  b.  Who are participating in organized practice sessions and other team meetings and activities on a regular
      basis during a sport's season; and
  c.  Who are listed on the eligibility or squad lists maintained for each sport, or
  d.  Who, because of injury, cannot meet a, b, or c above but continue to receive financial aid on the basis of
      athletic ability.

1979 Policy Interpretation, 44 Fed. Reg. at 71,415.

1  addition, Plaintiffs contend that Fresno State artificially inflated female participation on its

2  women's equestrian team, women's cross country team, women's indoor track team and women's

3  outdoor track team, while strategically eliminating men's indoor track to further reduce the female

4  participation gap.

5      According to Plaintiffs, adjusting for the inherent tendency in EADA filings to overcount

6  female participation and various measures taken by Fresno State to inflate female participant

7  counts (and minimize male participant counts) results in a female participation gap of at least 40,

8  which is large enough to sustain a viable team (including, specifically, the women's lacrosse team)

9  and thus precludes Fresno State from qualifying for the substantial proportionality "safe harbor"

10  under Prong One of the Three-Part Test. Doc. No. 2-1 at 14:26-15:16; Doc. No. 2-9 at 64.

11      In their opposition, Defendants argue that Lopiano's analysis of EADA data is flawed in

12  multiple respects and that actual Title IX counts for the 2019-20 academic year (the most recent

13  academic year for which Title IX counts are available, according to Defendants) show that Fresno

14  State will fall within Prong One's substantial proportionality "safe harbor" after the cuts to men's

15  wresting, men's tennis and women's lacrosse take effect. Specifically, Defendants argue that

16  cutting men's wrestling, men's tennis and women's lacrosse will reduce the female participation

17  gap from 50 participation opportunities in the 2019-20 academic year to "at most 17 female

18  student-athletes" in the 2021-22 academic year—less than the average size of women's teams at

19  Fresno State. Doc. No. 19 at 22:24-23:16. Defendants also argue that the participation gap will

20  come to less than 2% in percentage terms, which is "in line with the percentages Courts have held

21  would not constitute a Title IX violation." Id. at 23:17-24:22. In short, Fresno State contends that

22  Plaintiffs are improperly seeking to bar lawful remedial action that will bring Fresno State into

23  Title IX compliance under Prong One of the Three-Part Test.[8] Doc. Id. at 25:9-12.

24      Plaintiffs argue in reply that, assuming they are accurate, the Title IX counts provided in

25  Defendants' opposition provide an independent basis for finding that Plaintiffs are likely to prevail

26  on the merits of their effective accommodation claim and therefore reduce the need for Plaintiffs

27  _____

28  [8] Fresno State does not assert it can establish Title IX compliance under Prong Two or Prong Three of the Three-Part Test.

to rely on Lopiano's modifications to EADA counts. Plaintiffs also argue that the average size of

women's teams is not the appropriate benchmark for testing participation gaps for substantial

proportionality and take the position that Fresno State's participation gap should be evaluated

against the size of the women's lacrosse team, as an example of a viable team for Title IX

purposes. Finally, Plaintiffs argue that comparing Title IX participation counts provided by Fresno

State for the 2019-20 academic year to projected undergraduate enrollment for the coming 2021-

22 academic year shows that Fresno State will have a participation gap of 31—exceeding the size

of the women's lacrosse team as well as the average size of women's teams at Fresno State and

thus showing that Fresno State does not fall within Prong One's substantial proportionality safe

harbor.

Plaintiffs therefore make effective accommodation arguments based on two different sets

of evidence: (i) Lopiano's analysis of the EADA data provided by Fresno State in pre-litigation

correspondence; and (ii) Title IX data for the 2019-20 academic year provided by Defendants in

opposition to this motion. Although Plaintiffs focus primarily on Fresno State's Title IX data in

their reply, they have not disclaimed the first argument. The Court will therefore examine both.

### 3.   EADA Data

#### a)   Fresno State's Objections to the Lopiano Report

In broad strokes, the report prepared by Plaintiffs' expert (the "Lopiano Report") has three

components: (i) a discussion of Title IX's statutory, regulatory and sub-regulatory framework; (ii)

analysis purporting to show, in essence, that Fresno State's EADA filings understate the female

participation gap relative to valid Title IX counts; and (iii) opinions relating to various aspects of

Title IX compliance and preliminary injunction requirements. See Doc. No. 2-9.

Fresno State objects to the Lopiano Report on the grounds that it is based on EADA data

that does not accurately reflect Title IX participation opportunities at Fresno State and on the

grounds that the methods Lopiano employs to "reverse-engineer" Title IX participation

opportunities from EADA filings—such as comparing EADA data to web rosters and competition

logs—are speculative, inaccurate, legally unsound and predicated on practices at schools other

than Fresno State. Doc. No. 21, Part II.A.-D. Further, Fresno State contends that the Lopiano

1  Report impermissibly draws legal conclusions with respect to Fresno State's Title IX compliance

2  and preliminary injunction factors, including, for example, the nature of the harms Plaintiffs

3  would suffer if this motion were denied. Id., Part II.E.

4        The Court has a duty to act as a "gatekeeper" for expert testimony by assessing its

5  admissibility. See Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 145, 147 (1999); Daubert v.

6  Merrell Dow Pharm., Inc., 509 U.S. 579, 592 (1993); Fed. R. Evid. 104(a) ("The court must

7  decide any preliminary question about whether a witness is qualified, a privilege exists, or

8  evidence is admissible."). This inquiry is governed in part by Rule 702 of the Federal Rules of

9  Evidence,[9] which provides:

10       A witness who is qualified as an expert by knowledge, skill, experience, training, or
         education may testify in the form of an opinion or otherwise if:
11

12       (a) the expert's scientific, technical, or other specialized knowledge will help the
             trier of fact to understand the evidence or to determine a fact in issue;
         (b) the testimony is based on sufficient facts or data;
13       (c) the testimony is the product of reliable principles and methods; and
         (d) the expert has reliably applied the principles and methods to the facts of the
14           case.

15  Fed. R. Evid. 702. At bottom, a court must ensure that expert testimony "both rests on a reliable

16  foundation and is relevant to the task at hand." Daubert, 509 U.S. at 597.

17       Consistent with Rule 702, which only allows testimony that will "help the trier of fact to

18  understand the evidence or to determine a fact in issue," experts may not provide opinions

19  regarding the law or legal conclusions. Nationwide Transp. Fin. v. Cass Info. Sys., Inc., 523 F.3d

20  1051, 1058 (9th Cir. 2008) ("an expert witness cannot give an opinion as to her *legal conclusion*,

21  i.e., an opinion on an ultimate issue of law") (emphasis in original); United States v. Scholl, 166

22  F.3d 964, 973 (9th Cir. 1999), as amended on denial of reh'g (Mar. 17, 1999) (experts "do not

23  testify about the law because the judge's special legal knowledge is presumed to be sufficient").

24       Portions of the Lopiano Report relating to the structure and application of Title IX are

25  plainly in the vein of legal briefing, not expert testimony, see Portz v. St. Cloud State University,

26  297 F. Supp. 3d 929, 953 (D. Minn. 2018) (finding that portions of Lopiano's report in that case

27

28  [9] Unless otherwise indicated, "Rule," as used herein, refers to the Federal Rules of Evidence.

were "just a summary" of Title IX regulations and that "Lopiano may not testify regarding the requirements of law"), and the Court agrees with Defendants that many of the opinions set forth in the Lopiano Report are legal conclusions that fall well outside the proper scope of expert testimony. See Smith v. Pac. Bell Tel. Co., 662 F. Supp. 2d 1199, 1219 (E.D. Cal. 2009) ("Testimony calling for a legal conclusion is an inappropriate matter for expert testimony.") That includes, for example, Lopiano's opinions that Fresno State: "has not complied with its obligation to assess the interests and abilities of male and female athletes," Doc. No. 2-9 at 46; "has not complied with its Title IX obligation to ensure that the selection of sports offered in the current program and proposed for the 2021-22 restructured program equally meets the interests and abilities of men and women," id. at 48; and "should not be allowed to proceed with reducing female participation opportunities based on an assertion of current or future Title IX compliance after programs are eliminated." Id. at 55. The Court, therefore, will not consider such content in deciding this motion. See Portz, 297 F. Supp. 3d at 953 (concluding Lopiano inappropriately offered opinions about "'whether federal law was contravened'" and excluding Lopiano's testimony "about the legal requirements of Title IX or whether [the defendant] ha[d] complied with those requirements").

That essentially leaves the question of whether Lopiano's analysis of EADA data can be of assistance to the Court in assessing the likelihood that Plaintiffs will prevail on their effective accommodation claim. The Court will examine each element of that analysis in turn, starting with Lopiano's opinions regarding EADA's inherent tendency to overcount female participation and then turning to the ways in which Lopiano believes Fresno State is further inflating female participation counts.

*b)  EADA Tendency to Overcount Female Participation*

Lopiano asserts that EADA filings inherently overstate female participation opportunities (and understate female participation gaps) by: (i) counting male practice players as females; and (ii) failing to account for the disproportionate impact on females of attrition after the first day of competition. To make these points, Lopiano sets forth a table comparing the number of players on Fresno State's web roster for women's basketball to the number of players in Fresno State's

1   EADA filings for women's basketball from the 2004-05 academic year through the 2019-20

2   academic year. Doc. No. 2-9 at 31. The table also compares the number of players on Fresno

3   State's web roster for women's volleyball to the number of players in Fresno State's EADA filings

4   for women's volleyball over the same period.[10] The comparison shows that, in all but a couple of

5   years, the number of players in EADA filings exceeds the number of players on web rosters, in

6   amounts ranging from one to seven players per year for each sport. Lopiano states that disparities

7   of "3 or more []" indicate a need to further investigate the EADA count for the use of male practice

8   players," especially since, according to Lopiano, Fresno State's web rosters for women's

9   basketball and women's volleyball are "consistently lower than the average NCAA Division 1

10  roster size for [each] sport." Id.

11      Lopiano also sets forth a table comparing the total number of male athletes on Fresno

12  State's web rosters to the total number of male athletes in Fresno State's EADA filings for each

13  academic year from 2006-07 through 2019-20. Doc. No. 2-9 at 33. The table provides the same

14  annual comparisons for female athletes. Id. EADA counts exceed web roster counts for both sexes,

15  but the amount by which the EADA count exceed the web roster count each year is always higher

16  for females than it is for males, both in absolute terms and (with a couple of exceptions) in

17  percentage terms. Lopiano states that the web roster "almost always more closely approximates

18  the Title IX participant count, not only because it does not include male practice players, but

19  because players are removed from the Web roster when they quit or become ineligible for other

20  reasons, just as they would be required to be removed under Title IX counting instructions." Doc.

21  No. 2-9 at 32.

22      Lopiano's statement that the difference between EADA numbers and web roster numbers

23  "most likely reveals the counting of male practice players as female players" in years showing a

24  spread of three or more in a given sport is speculation inconsistent with evidence showing that

25  Fresno State only used one male practice player in the 2019-20 academic year, even though

26  Lopiano's analysis shows a combined 10-athlete gap between EADA data and web roster data for

27

28  [10] Lopiano states that women's basketball and women's volleyball are the two sports most likely to make use of male practice players.

20

1   volleyball and basketball that year. Doc. No. 2-9 at 31-32; Doc. No. 19-2 at 7:18-25. Moreover,

2   Lopiano expressly acknowledges that discovery "will be required to accurately determine the

3   exact numerical impact" of male practice players on EADA counts. Id. at 31-32.

4           The disparity between EADA filings and web rosters reflected in Lopiano's analysis does

5   appear to show higher rates of attrition for female athletes than male athletes after the first day of

6   competition. The Court notes, however, that averaged over the period from 2006-07 to 2019-20

7   (the period of time covered by Lopiano's table), the EADA filings show females making up 57.2%

8   of Fresno State's student athletes while the web rosters show females making up 56.5% of Fresno

9   State's student athlete population—a disparity of just .7%. Lopiano does not show why such a

10  seemingly small disparity is significant or even that it can be attributed entirely to females who do

11  not legitimately qualify as Title IX participants. Further, in four (roughly one third) of the 13

12  academic years covered by Lopiano's analysis (2008-09, 2010-11, 2011-12 and 2016-17),

13  calculations based on web rosters show females as a slightly *higher* percentage of participation

14  opportunities at Fresno State than calculations based on the EADA filings, which is inconsistent

15  with Lopiano's assertion that EADA counts have systemic sex bias and inherently understate the

16  female participation gap relative to web rosters. Lopiano does not address either this issue either.

17  The Court therefore cannot conclude that EADA filings inherently overstate female participation

18  opportunities in material numbers—let alone reliably quantify the impact of such bias on Fresno

19  State's participation counts—based on the Lopiano Report.

20                          *c)   Counts for Equestrian Team*

21          Lopiano opines that Fresno State may be inflating the participant count for its equestrian

22  team because Fresno State "increased the size of the equestrian team significantly, from 29 to 30

23  riders in the previous 5 years to 38 in 2018-2019 and 2019-20." Doc. No. 2-9 at 34. She further

24  states that the current size of Fresno State's equestrian team is "highly suspect" because "the

25  official conference travel size is just 32 riders and the NCAA average team size is 35." Id. at 34.

26  Finally, she states that competition participation statistics for 2019-20 show that only 25 riders

27  "actually participated in a competition." Id.

28          Lopiano's own data, however, appear to show that in five of the seven years immediately

1  prior to and including 2019-20 (the most recent year for which data is included in the Lopiano

2  Report), Fresno State's equestrian team was smaller than the NCAA average, and that Fresno

3  State's equestrian team has been considerably smaller in recent years than it was for the ten-year

4  period from 2003-04 through 2012-13. Doc. No. 2-9 at 35. Further, without data regarding

5  variance in the size of equestrian teams across schools (or other such information), the Court

6  cannot draw any reliable inferences as to the significance of the fact that the Fresno State

7  equestrian team appears to have exceeded the NCAA average by 2.7 riders in recent years (which

8  strikes the Court as a relatively small variance that likely falls in the normal range). Finally,

9  Lopiano provides no basis for the Court to infer anything from the fact that only 25 of the 38

10  riders on Fresno State's EADA report participated in competition in the 2019-20 academic year,

11  since "bench warming" is a fact of life in most sports, see Doc. No. 19-22 ¶¶ 27-28 (football team

12  travels with only 74 of its 113 members, and in 2019-20, 37 of 113 football players did not play in

13  a single game), and participation in competition is not required for inclusion in Title IX participant

14  counts. See Balow, 2021 WL 650712, at *7 (noting Lopiano's acknowledgment that "participation

15  in a competition is not required in order to count as a participant" under Title IX); see also,

16  Biediger III, 691 F.3d at 93 ("It is not necessary for an athlete to meet minimum criteria of playing

17  time or athletic ability to count as a participant.").

18      The Court therefore cannot conclude from Lopiano's analysis that Fresno State has padded

19  the roster for the equestrian team, let alone draw an actionable inference as to the impact of such

20  padding on Fresno State's EADA counts or Title IX participation gap.

*d)  Counts for Cross Country and Track*

22      Lopiano states that cross country, indoor track and outdoor track are sports "in which

23  schools typically artificially inflate women's rosters by encouraging women on campus or

24  recruited athletes in other sports to come tryout for the team and keep them on the team through

25  the first day of competition, which is the day of the official EADA participant count, and then,

26  following the first day of competition, they do not continue to participate." Doc. No. 2-9 at 37.

27      Lopiano sets forth data showing that large numbers of female cross country, indoor track

28  and outdoor track athletes did not participate in competition over a period of several seasons, Doc.

No. 2-9 at 38, 41 and 43, and asserts such data indicates that "female participants are being overcounted and inaccurately counted." Id. at 41-43. Further, Lopiano "opine[s] that the reconfiguration of the [Fresno State's] men's athletic program to drop the men's indoor track schedule in 2003 had a sex-based motivation to eliminate the need to add at least one, if not two new women's sports." Id. at 39. According to Lopiano, "Title IX counts indoor and outdoor track separately even though the same male and female athletes compete in each season," such that the elimination of indoor track for males essentially results in double counting female track athletes relative to their male counterparts. Id.

The Court agrees that the number of female athletes who do not participate in competition each year is surprisingly high in comparison to male athletes. As noted above, however, participation in competition is not required for inclusion in Title IX counts, and Lopiano's opinion that Fresno State is luring female students to tryouts only to cut them later as part of an improper roster management scheme is sheer conjecture. Moreover, Title IX permits "leveling down" by cutting men's teams—as Lopiano surmises Fresno State did with men's indoor track—to achieve substantial proportionality. See Neal, 198 F.3d at 770. It also allows for counting indoor track and outdoor track participation opportunities separately, even where they involve the same athletes. See 1996 Clarification ("an athlete who participates in more than one sport will be counted as a participant in each sport in which he or she participates").

In short, Lopiano's analysis of cross country and track involves speculation and questionable application of Title IX rules with respect to counting and roster management. The Court therefore finds that the Lopiano Report identifies issues that may merit further investigation in discovery but that it is not sufficiently reliable to be helpful in assessing participation opportunities at Fresno State for purposes of this motion.

e)  *Conclusion Regarding EADA Data*

EADA data for the 2019-20 academic year set forth by Fresno State in pre-litigation correspondence shows a female participation gap of 8, after cuts to men's wrestling, men's tennis and women's lacrosse are taken into account. That 8-athlete participation gap is smaller than the average size of Fresno State's women's teams in 2019-20, as well as Fresno State's women's

lacrosse team. The Court, therefore, cannot find based on Fresno State's EADA data alone that Plaintiffs are likely to prevail on their effective accommodation claim or that Plaintiffs have raised serious questions about Fresno State's compliance with Title IX requirements as to the allocation of participation opportunities between sexes. See 1996 Policy Clarification (stating that the Department of Education "consider[s] opportunities to be substantially proportionate when the number of opportunities that would be required to achieve [strict] proportionality would not be sufficient to sustain a viable team" and that "the average size of teams offered for the underrepresented sex" can be used as a "frame of reference" in making that determination).

Further, Lopiano's analysis does not provide a sound basis for extrapolating Title IX participation counts from Fresno State's EADA data or, for that matter, make a creditable showing that Fresno State's EADA filings understate the female participation gap. It may be, for example, that relatively low rates of participation in competition among female cross country and track athletes are indicative of roster padding, but the Court cannot conclude from the Lopiano Report that Fresno State is "purposefully inflating" its women's track roster by coaxing female students to tryout only to cut them after the first day of competition, as Lopiano opines. Doc. No. 2-9 at 37; see Biediger II, 728 F. Supp. 2d at 69–70 (finding after trial that defendant "engaged in minimal undercounting of male athletes and no overcounting of female athletes, and that the discrepancies between the plaintiffs' and defendant's calculations were attributable to facts about individual athletes of which Lopiano was unaware"). Lopiano raises several questions that may merit further exploration in discovery as additional documents relevant to Title IX counts become available, but her analysis, which relies heavily on speculation and is sometimes at odds with established Title IX protocols with respect to participation counts and roster management, does not help Plaintiffs carry their burden on this motion. See Balow, 2021 WL 650712, at *9 (finding that Lopiano's opinion "depend[ed] upon imperfect data, flawed assumptions, contradictory reasoning, and a skewed analysis").

Having addressed EADA counts, the Court will now examine whether Plaintiffs have shown a likelihood of prevailing on their effective accommodation claim based on Title IX counts set forth in Defendants' opposition.

1              **4.      Title IX Counts**

2                      *a)  Relevant Background*

3              Defendants argue in the opposition that Fresno State's "gender-neutral decision to

4    eliminate two men's and one women's varsity athletic teams at the conclusion of the 2020-21

5    season …. brings it squarely into compliance with Title IX." Doc. No. 19 at 7:2-15. In making that

6    argument, Fresno State sets forth data showing that its enrollment was 40.40% male and 59.60%

7    female and that there were 246 male and 313 female participation opportunities, applying Title IX

8    counting protocols, in the 2019-20 academic year. Doc. No. 19-2 at 19. Crediting these numbers

9    for the limited purpose of deciding this motion, that indicates a total of 559 participation

10   opportunities, 56% of which were for females and 44% of which were for males. Id. That, in turn,

11   indicates a 3.6% disparity between females as a percentage of total enrollment and females as a

12   percentage of student-athletes, and a participation gap of 50. Id. Defendants concede that these

13   numbers to not satisfy the substantial proportionality requirement in Prong One of the Three-Part

14   Test and that consequently Fresno State was not in compliance with Title IX in the 2019-20

15   academic year. Id.

16           According to Fresno State, Title IX participation counts for the current 2020-21 academic

17   year cannot be finalized until all sports seasons have concluded, but the cuts Fresno State

18   announced in October 2020 would eliminate 32 men's wrestling participants, 9 men's tennis

19   participants and 30 women's lacrosse participants based on Title IX participation counts for the

20   2019-20 academic year. Doc. No. 19-2 at 19. Fresno State projects that enrollment will be 39.5%

21   male and 60.5% female (as it was in the 2020-21 academic year) and that males will account for

22   205 participation opportunities and females will account for 297 participation opportunities in the

23   2021-22 academic year. Id. at 21. Assuming these figures are correct, 40.8% of participation

24   opportunities will be for males and 59.2% of participation opportunities will be for females in the

25   2021-22 academic year, indicating a participation gap of 8 and a 1.34% disparity between female

26   enrollment and female participation opportunities. Id.

27           Defendants argue based on the foregoing analysis that these numbers show Fresno State

28   will be in the Title IX "safe harbor" next year. Doc. No 19, Part III.V.1(ii). Plaintiffs, for their

                                                        25

1   part, argue that Defendants' own figures confirm Fresno State was not in Title IX compliance in

2   2019-20 and that the same can be assumed for the current 2020-21 academic year (for which

3   Fresno State has not finished compiling data). Doc. No. 24, Part III.C. Further, Plaintiffs contend

4   these numbers show that Fresno State will remain in violation of Title IX next year given the

5   projected increase in females from 59.6% to 60.5% of undergraduate enrollment and that, in any

6   event, mere projections are not sufficient to establish Title IX compliance. Id., Part III.C.-D.

7               *b)   Discussion*

8           The law plainly allows for remedial action by defendants who are otherwise in violation of

9   Title IX, Neal, 198 F.3d at 771 (Title IX "does not bar remedial actions designed to achieve

10  substantial proportionality between athletic rosters and student bodies"); see also, Roberts, 998

11  F.2d at 830 (stating that institutions may "comply with Title IX by cutting athletic programs such

12  that men's and women's athletic participation rates become substantially proportionate to their

13  representation in the undergraduate population"), and courts routinely take projected impacts into

14  account when determining whether action to reconfigure athletic programs comports with Title

15  IX.[11] Thus, the Court sees no merit in Plaintiffs' objection to the use of projections in evaluating

16  Fresno State's cuts. In any event, whatever their theoretical differences might be, the approaches

17  Plaintiffs and Defendants take to assessing Fresno State's cuts are quite similar in practice,

18  mooting the issue.

19          Plaintiffs assert that the data on which the substantial proportionality analysis should be

20  based comprises: (i) participation opportunities from the 2019-20 academic year (as the most

21  _____

22  [11] See, e.g., Kelley, 35 F.3d at 269–70 (finding that the defendant university "could [] eliminate the men's swimming
     program without violating Title IX since even after eliminating the program, men's participation in athletics would
23  continue to be more than substantially proportionate to their presence in the [] student body"); Biediger I., 616 F.
     Supp. 2d at 294 (analyzing "proposed 2009-2010 athletic department budget" where defendant university argued that
24  "combination of roster management, elimination of the men's golf, men's outdoor track, and women's volleyball
     teams, and the elevation of women's competitive cheer to varsity status" would bring it into Title IX compliance
25  under Prong One of the Three-Part Test for the "upcoming 2009–2010 academic year"); Portz, 196 F. Supp. 3d at 977
     (issuing preliminary injunction on finding that defendant university's "athletics-program ratio of women-to-men
26  might not be substantially proportionate to the ratio in the student body" in the coming academic year); Barrett v. W.
     Chester Univ. of Pennsylvania of State Sys. of Higher Educ., 2003 WL 22803477, at *7 (E.D. Pa. Nov. 12, 2003)
27  (barring elimination of women's gymnastics team on finding that "the elimination of both the men's lacrosse and
     women's gymnastics teams" would only reduce the participation gap from about 16% to about 12% in percentage
28  terms); Favia v. Indiana Univ. of Pennsylvania, 7 F.3d 332, 342 (3d Cir. 1993) (assessing the projected impact of
     "substituting soccer for gymnastics" on women's participation in athletics).

1  recent year for which complete Title IX data are available) and (ii) enrollment percentages for

2  2020-21 (as the most recent year for which actual enrollment data are available). Doc. No. 24 at

3  18:23-20:5. According to Defendants' opposition, there were 246 male participation opportunities

4  and 313 female participation opportunities in the 2019-20 academic year applying Title IX

5  counting protocols. Deducting participation opportunities for men's wrestling, men's tennis and

6  women's lacrosse leaves 205 male participation opportunities and 283 female participation

7  opportunities. These are the participation opportunities Plaintiffs argue should be used in the

8  substantial proportionality analysis, assuming the Title IX count in Defendants' opposition is

9  credited.

10       Plaintiffs then state that 314 female participation opportunities are required for strict

11  proportionality based on female enrollment in 2020-21. Notably, Plaintiffs take this figure directly

12  from Fresno State's projections for 2021-22 because the female share of undergraduate enrollment

13  at Fresno State is projected to be the same in 2021-22 as it was in 2020-21—60.5%.[12] Thus,

14  Plaintiffs conclude the female participation gap that should be used in deciding this motion is 31

15  (314-283=31), which exceeds the number of athletes required for a viable women's team and

16  therefore precludes Fresno State from qualifying for the Prong One substantial proportionality

17  "safe harbor."

18       Defendants' 2021-22 "projections," for their part, also set male participation opportunities

19  at 205 and also use 314 as the number of female participation opportunities required for strict

20  proportionality (on the assumption that 60.5% of Fresno State's enrollment in 2021-22 will be

21  female, as it was in 2020-21). See Doc. No. 19-2 at 21. Thus, three out of the four inputs used in

22  Defendants' analysis of substantial proportionality in the "post-cut" world—male participation

23  opportunities (205), Fresno State's female enrollment percentage (60.5%) and the strict

24  proportionality threshold (314)—are identical to the numbers used in Plaintiffs' analysis. The only

25  difference is the figure used for female participation opportunities. Defendants use a projection

26  (based on NCAA averages, input from coaches and such), while Plaintiffs use total 2019-20

27  _____

28  [12] Female enrollment is stated as 60.49% in some records. The difference between 60.5% and 60.49% is not material
    to this analysis or the Court's findings.

female participation opportunities less the 2019-20 female participation opportunities attributable to women's lacrosse.

The fatal flaw in Plaintiffs' approach is that it mixes apples and oranges by testing actual 2019-20 participation opportunities against a strict proportionality threshold based not on 2019-20 enrollment but on 2020-21 enrollment. The records before the Court on this motion show the following enrollment for Fresno State in 2019-20 and 2020-21, respectively:

### 2019-20 Fresno State Undergraduate Enrollment[13]

| TYPE OF METRIC | MALE | FEMALE |
|---|---|---|
| Count | 7,609 | 11,209 |
| Percentage | 40.43% | 59.57% |

### 2020-21 Fresno State Undergraduate Enrollment[14]

| TYPE OF METRIC | MALE | FEMALE |
|---|---|---|
| Count | 7,580 | 11,606 |
| Percentage | 39.51% | 60.49% |

As these tables reflect, females as a percentage of Fresno State's enrollment climbed from 59.57% in 2019-20 to 60.49% in 2020-21 because male enrollment dropped by 29 while female enrollment increased by 397, expanding the gap between male enrollment and female enrollment at Fresno State by an additional 426 students. Ignoring the impact of increased female enrollment (and, to a lesser extent, decreased male enrollment) on participation opportunities while nonetheless using a female enrollment percentage based on those very changes to set—and raise—the strict compliance threshold is obviously improper.

---

[13] Doc. No. 19-7 at 19.
[14] Doc. No. 19-7 at 38.

Plaintiffs, in other words, cannot have it both ways. To the extent Plaintiffs wish to rely on 2019-20 data to test the impact of Fresno State's cuts, they must use 2019-20 data across the board:[15] 246 total men's participation opportunities; 313 total women's participation opportunities; 32 men's participation opportunities from men's wresting; 9 men's participation opportunities from men's tennis; 30 women's participation opportunities from women's lacrosse; and 59.57% female enrollment. Deducting the 2019-20 participation counts for men's wrestling, men's tennis and women's lacrosse results in 205 participation opportunities for men and 283 participation opportunities for women. Thus, had the cuts at issue in this case been implemented in 2019-20, males and females would have accounted for 42% and 58% of participation opportunities respectively, indicating a 1.57% disparity between females as a percentage of participation opportunities and females as a percentage of Fresno State's undergraduate enrollment.[16] Further, the strict proportionality threshold would have been 302, resulting in a participation gap of 19.[17] The Court is aware of no decisions finding that such margins do not constitute substantial proportionality under Prong One of the Three-Part Test for effective accommodation. See Balow, 2021 WL 650712, at *11 ("Plaintiffs have not cited, and the Court is not aware, of any case where a gap lower than 2% failed to satisfy the test for substantial proportionality.").

Finally, the Court cannot agree with Plaintiffs' contention that Fresno State's projections with respect to participation opportunities for females are suspect. Excluding women's lacrosse, women's participation opportunities as a percentage of female enrollment were 2.53% in the 2019-20 academic year.[18] Fresno State's projection of 297 female participation opportunities relative to 11,606 female undergraduates in 2021-22 generates a virtually identical result—2.56%—and it does not strike the Court as unreasonable to expect that nearly 400 new female graduates will collectively account for 14 additional participation opportunities (bringing the total up from 283 to

---

[15] Testing participation opportunities from a year with relatively low female enrollment against a strict proportionality threshold based on a year with relatively high female enrollment, as Plaintiffs have done here, is no more valid than testing participation opportunities from a year with relatively high female enrollment against a strict proportionality threshold based on a year with relatively low female enrollment. One approach overstates the female participation gap while the other understates the female participation gap, but they are both wrong.

[16] 59.57%-58%=1.57%.

[17] 302-283=19.

[18] 283/11,209=2.53%.

297), particularly since a single athlete can be counted more than once under established Title IX counting protocols.[19] Defendants' 2021-22 projections show a participation gap of 8, and a 1.34% disparity between the female percentage of participation opportunities and the female percentage of undergraduate enrollment. These narrow margins constitute substantial proportionality. See Biediger II, 728 F. Supp. 2d at 111 (stating that courts have held "that a disparity within two percentage points is proof that an educational institution falls within the substantial proportionality safe harbor").

c) *Conclusion Regarding Title IX Counts*

Plaintiffs' analysis of the Title IX counts in Plaintiffs' opposition improperly combines data from two different years and fails to take growth in female enrollment into account in estimating participation opportunities, even while using growth in female enrollment to set (and raise) the strict proportionality threshold used to measure the Title IX participation gap. Correcting this analytical flaw shows Fresno State would be in Title IX compliance using 2019-20 data for all inputs (including male participation opportunities, female participation opportunities, cut participation opportunities, sex-based rates of enrollment and the strict proportionality threshold). Finally, Defendants' analysis indicates that Fresno State will be in Title IX compliance after the cuts at issue in this case take effect, using reasonable assumptions as to the impact of rising female enrollment on female participation opportunities. The Court therefore finds Plaintiffs have failed to demonstrate a likelihood of prevailing on their effective accommodation claim—or raised serious questions as to that claim—based on the Title IX data provided in Defendants' opposition.

**E.   Conclusion Regarding Effective Accommodation Claim**

For the foregoing reasons, the Court finds Plaintiffs have failed to demonstrate a likelihood of prevailing on their effective accommodation claim or raised serious questions as to the merits

---

[19] Even if less than 2% of Fresno State's new female students participate in athletics, Fresno State would still apparently fall within the Prong One safe harbor. 2% x 397 = 7.94. Rounding that down to 7 would bring actual participation up from 283 in 2019-20 to 290 in 2021-22. 290 female participation opportunities + 205 male participation opportunities =495 total participation opportunities. 290/495 = 58.6%, resulting in a participation gap of 1.9% (60.5%-58.6%). Also, the number of additional female participation opportunities required for strict proportionality under this scenario would be 24, which is less than the size of Fresno State' women's lacrosse team and less than the average size of the Fresno State's women's teams.

of that claim. It is therefore unnecessary for the Court to consider the other preliminary injunction factors, see Trump, 984 F.3d at 870; Azar, 911 F.3d at 575; Disney Enterprises, Inc., 869 F.3d at 856, and Plaintiffs' motion will be denied as to Plaintiffs' effective accommodation claim. The Court will now address Plaintiffs' equal treatment claim.

## II.     <u>Equal Treatment Claim</u>

In addition to seeking an order enjoining Fresno State from eliminating the women's lacrosse team (or any other women's team) during the pendency of this action, Plaintiffs seek an order "requir[ing] Fresno State to treat members of the women's lacrosse team [] fairly—the way it treats other student-athletes on other varsity teams." Doc. No. 2-1 at 22:17-22. Specifically, Plaintiffs seek an order requiring Fresno State "to provide a dedicated locker room and practice space, equip the team for competition, and provide it funding and benefits on par with existing varsity teams." Doc. No. 2-1 at 6:9-12.

As set forth above, Title IX equal treatment claims come under 34 C.F.R. § 106.41(c)(2)-(10), which address matters such as equipment and supplies, per diem allowances, coaching, tutoring, locker rooms and training facilities. The 1979 Policy Interpretation states that §106.41(c)(2)-(10) create "general athletic program requirements" that call for "comparing the availability, quality and kinds of benefits, opportunities, and treatment afforded members of both sexes" and states that "[i]nstitutions will be in compliance if the compared program components are equivalent." 44 Fed. Reg. at 71,415. In addition, the 1979 Policy Interpretation states that "identical benefits, opportunities or treatments are not required, provided the overall effect of any differences is negligible"; sets forth factors for consideration where "comparisons of program components reveal that treatment, benefits or opportunities are not equivalent"; and provides that "differences in particular program components will be found to be justifiable" where "sport-specific needs are met equivalently in both men's and women's programs." Id. at 71,415-71,416. Finally, the 1979 Policy Interpretation states that compliance with 34 C.F.R. § 106.41(c) will be determined based on:

a. Whether the policies of an institution are discriminatory in language or effect; or

b. Whether disparities of a substantial and unjustified nature in the benefits, treatment, services, or opportunities afforded male and female athletes exist in the institution's program as a whole; or

c. Whether disparities in individual segments of the program with respect to benefits, treatment, services, or opportunities are substantial enough in and of themselves to deny equality of athletic opportunity.

44 Fed. Reg. at 71,418.

Neither party provides briefing of consequence on the law applicable to "equal treatment" claims, but the foregoing guidance indicates that "equal treatment" claims under Title IX generally require a showing of a program-wide imbalance in the allocation of benefits between sexes, or alternatively, "substantial" disparities in the treatment afforded to comparable male and female teams. See Landow v. Sch. Bd. of Brevard County, 132 F. Supp. 2d 958, 962–66 (M.D. Fla. 2000) (holding that disparities between boys' baseball and girls' softball programs violated Title IX); Daniels v. Sch. Bd. of Brevard County, 985 F. Supp. 1458, 1460–63 (M.D. Fla. 1997) (holding that female varsity softball players were entitled to a preliminary injunction on their claim that their high school denied them the benefits given to the boys' varsity baseball team).

Plaintiffs set forth declarations from members of the women's lacrosse team stating, *inter alia*, that: women's lacrosse gets a smaller per diem than "[c]ertain men's teams," Doc. No. 2-3 ¶ 9; the tutors provided to the women's lacrosse team are "far less qualified" than the "great" tutors provided to men's teams, id.; the football team was given preferential access to training facilities that was denied to the women's lacrosse team, id. ¶ 10; men's teams get t-shirts that women's lacrosse does not get, Doc. No. 2-4 ¶ 16; academic counselors treat women's teams as a "afterthought," id. ¶ 18; women's teams are deprived of meals, one-on-one training and locker room facilities provided to men's teams, id. ¶ 18; men's teams get massages on demand, but women's teams do not, id. ¶ 20; women's lacrosse does not have a designated practice field, whereas "men's teams enjoy pristine fields and dedicated practice space," Doc. No. 2-5 ¶ 15; and in contrast to men's teams, women's lacrosse "lack[s] full and qualified coaching staff." Doc. No. 2-6 ¶ 10.

1  Given the lack of response from Defendants to this evidence, the Court can only conclude
2  that Plaintiffs can likely show unequal allocation of benefits by sex at the program level, disparate
3  treatment specific to the women's lacrosse team substantial enough in its own right to "deny
4  equality of athletic opportunity," or both. Further, the Court finds a likelihood of irreparable harm
5  given the fleeting nature of college athletics and the insult that comes from unequal treatment. See
6  Daniels, 985 F. Supp. at 1462; see also, Mayerova, 346 F. Supp. 3d at 998 (noting presumption of
7  irreparable injury where plaintiff shows violation of a civil rights statute). Finally, the Court sees
8  nothing burdensome or inequitable about requiring Fresno State to comply with applicable law
9  and "upholding the goals of Title IX" is plainly in the public interest. See, Mayerova, 346 F. Supp.
10  3d at 999.

11  The Court will therefore grant the motion as to Plaintiffs' equal treatment claim and order
12  Fresno State to provide a dedicated locker room and practice space for the women's lacrosse team;
13  equip the women's lacrosse team for competition; and provide the women's lacrosse team with
14  funding and benefits on par with the average provided to existing varsity teams for the remainder
15  of the 2020-21 academic year. See Doc. No. 2-1 at 6:9-12. The Court further finds that Plaintiffs
16  need not post a bond for the preliminary injunction to take effect because Fresno State has made
17  no showing that it will sustain "costs and damages" if later "found to have been wrongfully
18  enjoined or restrained." Fed. R. Civ. P. 65(c); see Portz, 196 F. Supp. 3d at 978–79.

19  **III.**   **CONCLUSION**

20  The Court will deny Plaintiffs' motion as to the effective accommodation claim under 34
21  C.F.R. § 106.41(c)(1) because the evidence currently before the Court from Fresno State's 2018-
22  19 EADA filings and 2019-20 Title IX counts indicate that Fresno State will satisfy the substantial
23  proportionality standard in Prong One of the Three-Part Test when cuts to men's wrestling, men's
24  tennis and women's lacrosse take effect in the coming 2021-22 academic year. Additional
25  evidence regarding that issue, in the form of NCAA Squad Lists and NCAA Hour Limitation
26  Records, see Doc. No. 23 at 11:1-20, are likely to become available in the course of discovery and,
27  thus, this denial is without prejudice.

28  The Court will grant Plaintiffs' motion as to the equal treatment claim under 34 C.F.R. §

106.41(c)(2)-(10) because Plaintiffs have set forth uncontroverted evidence that inequalities in the treatment of women's lacrosse in comparison to men's teams at Fresno State are substantial enough to deprive members of the women's lacrosse team equal athletic opportunity.

### **ORDER**

Accordingly, IT IS HEREBY ORDERED that:

1. Plaintiffs' motion for preliminary injunction (Doc. No. 2) is GRANTED IN PART and DENIED IN PART WITHOUT PREJUDICE as follows:

   a. Plaintiffs' motion is GRANTED as to Plaintiffs' equal treatment claim under 34 C.F.R. § 106.41(c)(2)-(10); and

   b. Plaintiffs' motion is DENIED WITHOUT PREJUDICE as to Plaintiffs' effective accommodation claim under 34 C.F.R. § 106.41(c)(1);

2. For the remainder of the 2020-21 academic year, Defendants shall provide a dedicated locker room and practice space for the women's lacrosse team; equip the women's lacrosse team for competition; and provide the women's lacrosse team with funding and benefits on par with the average in each respect provided to Fresno State's existing varsity teams;

3. The foregoing preliminary injunction shall issue without bond, take effect immediately and remain in full force and effect through—and automatically expire at the end of— Fresno State's 2020-21 academic year unless modified by the Court;

4. This action is referred back to the magistrate judge for further proceedings consistent with this order.

IT IS SO ORDERED.

Dated:   April 21, 2021      _____

                            SENIOR  DISTRICT  JUDGE