1
2
3
4

# UNITED STATES DISTRICT COURT

5

# EASTERN DISTRICT OF CALIFORNIA

6
7
8
9
10

TAYLOR ANDERS, HENNESSEY EVANS, ABBIGAYLE ROBERTS, MEGAN WALAITIS, TARA WEIR, and COURTNEY WALBURGER, individually and on behalf of all those similarly situated,

11              Plaintiffs,
                   vs.

12
13

CALIFORNIA STATE UNIVERSITY, FRESNO and BOARD OF TRUSTEES OF CALIFORNIA STATE UNIVERSITY,

14
15              Defendants.

16
17

CASE: 1:21-cv-00179-AWI-BAM

**ORDER ON MOTION TO DISMISS FIRST AMENDED COMPLAINT**

(Doc. No. 42)

18      On February 12, 2021, Plaintiffs Taylor Anders, Hennessey Evans, Abbigayle Roberts,

19   Megan Walaitis and Tara Weir filed this putative class action alleging several violations of Title

20   IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. ("Title IX") against California

21   State University, Fresno ("Fresno State"); Fresno State's athletic director Terrence Tumey; Fresno

22   State's former president Joseph Castro; and Fresno State's interim president, as of January 4,

23   2021, Saul Jiménez-Sandoval. Doc. No. 1. On May 12, 2021, the Court denied a motion to dismiss

24   the Complaint as moot because Plaintiffs had filed a First Amended Complaint ("FAC") on May

25   3, 2021. Doc. Nos. 36 & 41.

26      The FAC adds Courtney Walburger, who was also a member of Fresno State's women's

27   lacrosse team during the 2020-21 academic years as a Plaintiff and alleges three Title IX claims

28   against Fresno State and the California State University Board of Trustees (the "Board" and

1  together with Fresno State, "Defendants").[1] Doc. No. 36. On May 17, 2021, the Board brought a

2  motion to dismiss the FAC in its entirety.[2] The motion has been fully briefed and the Court has

3  deemed it suitable for decision without oral argument pursuant to Local Rule 230(g). See Doc. No.

4  47. After thoroughly reviewing all relevant filings, the Court will deny the motion in part and

5  grant the motion in part.

6  **BACKGROUND[3]**

7  In the 2020-21 academic year, Fresno State sponsored men's baseball, basketball, track,

8  football, golf, tennis, and wrestling teams. Doc. No. 36 ¶ 101. During the same period, Fresno

9  State sponsored women's basketball, track, equestrian, golf, lacrosse, soccer, softball, swimming

10  and diving, tennis, and water polo teams. Id. Each of these sports is segregated based on sex. Id.

11  On October 16, 2020, Fresno State announced it would eliminate women's lacrosse, men's tennis

12  and men's wrestling, with effect at the end of the 2020-21 academic year. Id. ¶ 2.

13  Fresno State's athletic program is subject to Title IX because Fresno State receives federal

14  funding. Doc. No. 36 ¶ 5. All Plaintiffs were members of Fresno State's women's lacrosse team

15  during the 2020-21 academic year. Id. ¶¶ 31, 37, 42, 52, 58 and 63. Plaintiffs allege Fresno State

16  has not provided females with opportunities to participate in intercollegiate athletics that are

17  substantially proportionate to their undergraduate enrollment for years and that the condition will

18  persist after the elimination of women's lacrosse, men's tennis and men's wrestling takes effect.

19  Id. ¶¶ 84, 116. They further allege Fresno State has failed to provide adequate funding for

20  women's athletic scholarships relative to the funding provided for men's athletic scholarship and

21

22

23  [1] Original pleadings are treated as "non-existent" after amendment. Ferdik v. Bonzelet, 963 F.2d 1258, 1262 (9th Cir. 1992). Thus, if an amended complaint omits or drops a defendant who was named in the original complaint, that defendant is dismissed and no longer a part of the action. Jones v. TW & Co., 2011 WL 4055721, at *2 n.1 (E.D. Cal. Sept. 12, 2011) (Ishii, J.) (collecting cases). Thus, Tumey, Castro and Jiménez-Sandoval will be dismissed from this case.

25  [2] The Board asserts that suing Fresno State in addition to suing the Board is erroneous because the Board is "the State of California acting in its higher education capacity." Doc. No. 42 at 9:2-5. The question of who is properly named as a defendant was not briefed by the parties in any meaningful fashion and does not affect the disposition of this motion. The Court, therefore, will not address it here. For purposes of this order, the Court will use the term "Defendants" to refer collectively to Fresno State and the Board as the entities named as defendants in the FAC, and use "Fresno State" or "Board" when referring specifically to one entity or the other.

28  [3] This section is a brief summary of allegations in the FAC. Additional allegations are addressed in sections of this order specific to each of Plaintiffs' three Title IX claims.

1 that the women's lacrosse team has been treated worse than men's teams in several respects

2 ranging from facilities to coaching. Id. ¶¶ 16-24.

3      Based on these allegations, Plaintiffs bring putative class action claims against Defendants

4 for: (i) failure "to provide female students an equal opportunity to participate in varsity

5 intercollegiate athletics in violation of Title IX and 34 C.F.R. §106.41(c)(1)," Doc. No. 36 ¶ 228;

6 (ii) failure to "provide female student-athletes at Fresno State with an equal allocation of athletic

7 financial assistance" in violation of Title IX and 34 C.F.R. § 106.37, id. ¶ 245; and (iii) failure to

8 "provide female student-athletes at Fresno State with an equal allocation" of athletic benefits (such

9 as equipment, supplies and uniforms) in violation of Title IX and 34 C.F.R. § 106.41(c)(2)-(10).

10 Id. ¶ 251.

11      In the motion at bar, the Board seeks dismissal of these claims for failure to state a claim

12 under Rule 12(b)(6)[4] of the Federal Rules of Civil Procedure and, to some extent, for lack of

13 standing under Rule 12(b)(1). See Doc. No. 42.

14 **LEGAL FRAMEWORK**

15 **I.**     **Federal Rule of Civil Procedure 12(b)(6)**

16      Under Federal Rule of Civil Procedure 12(b)(6), a cause of action may be dismissed where

17 a plaintiff fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

18 Dismissal under Rule 12(b)(6) may be based on the lack of a cognizable legal theory or on the

19 absence of sufficient facts alleged under a cognizable legal theory. Conservation Force v. Salazar,

20 646 F.3d 1240, 1242 (9th Cir. 2011); Johnson v. Riverside Healthcare Sys., LP, 534 F.3d 1116,

21 1121−22 (9th Cir. 2008). To survive a Rule 12(b)(6) motion for failure to allege sufficient facts, a

22 complaint must include a "short and plain statement of the claim showing that the pleader is

23 entitled to relief." Fed. R. Civ. P. 8(a)(2). Compliance with this rule ensures that the defendant has

24 "fair notice of what the ... claim is and the grounds upon which it rests." Bell Atl. Corp. v.

25 Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)) (internal

26 quotation marks omitted). Under this standard, a complaint must contain sufficient factual matter

27

28    [4] Unless otherwise specified, "Rule" as used herein refers to the Federal Rules of Civil Procedure.

1   to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)

2   (internal citations omitted). A claim has facial plausibility when the plaintiff pleads factual content

3   that allows the court to draw the reasonable inference that the defendant is liable for the alleged

4   misconduct. Id. at 663.

5        In reviewing a complaint under Rule 12(b)(6), all allegations of material fact are taken as

6   true and construed in the light most favorable to the nonmoving party. Mollett v. Netflix, Inc., 795

7   F.3d 1062, 1065 (9th Cir. 2015); Marceau v. Blackfeet Hous. Auth., 540 F.3d 916, 919 (9th Cir.

8   2008). But the Court is "not 'required to accept as true allegations that contradict exhibits attached

9   to the Complaint or matters properly subject to judicial notice, or allegations that are merely

10  conclusory, unwarranted deductions of fact, or unreasonable inferences.' " Seven Arts Filmed

11  Entm't, Ltd. v. Content Media Corp. PLC, 733 F.3d 1251, 1254 (9th Cir. 2013) (citation omitted).

12  Complaints that offer no more than "labels and conclusions" or "a formulaic recitation of the

13  elements of a cause of action will not do." Iqbal, 556 U.S. at 678; Johnson v. Fed. Home Loan

14  Mortg. Corp., 793 F.3d 1005, 1008 (9th Cir. 2015). Rather, "for a complaint to survive a motion to

15  dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must

16  be plausibly suggestive of a claim entitling the plaintiff to relief." Moss v. U.S. Secret Serv., 572

17  F.3d 962, 969 (9th Cir. 2009) (quoting Iqbal, 556 U.S. at 678). If a motion to dismiss is granted, "a

18  district court should grant leave to amend even if no request to amend the pleading was made,

19  unless it determines that the pleading could not possibly be cured by the allegation of other facts."

20  Henry A. v Willden, 678 F.3d 991, 1005 (9th Cir. 2012) (citation omitted).

21  **II.   Federal Rule of Civil Procedure 12(b)(1)**

22       "[T]hose who seek to invoke the jurisdiction of the federal courts must satisfy the

23  threshold requirement imposed by Article III of the Constitution by alleging an actual case or

24  controversy." Maya v. Centex Corp., 658 F.3d 1060, 1067 (9th Cir. 2011) (quoting City of Los

25  Angeles v. Lyons, 461 U.S. 95, 101 (1983)). "[T]o satisfy Article III's standing requirements, a

26  plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and

27  (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the

28  challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the

4

injury will be redressed by a favorable decision." Id. (quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 180–81 (2000)). "[L]ack of Article III standing requires dismissal for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1)." Id. (citing Simmonds v. Credit Suisse Sec. (USA) LLC, 638 F.3d 1072, 1087 n.6 (9th Cir.2011)).

## III.   Title IX

Title IX states: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance …." 20 U.S.C. § 1681(a). At the direction of Congress, the Department of Health, Education and Welfare (the predecessor of today's Department of Education) issued regulations for Title IX that took effect in 1975.[5] See 34 C.F.R. §106.1.

Regulations applying Title IX to athletics are set forth at 34 C.F.R. § 106.37(c)(1) and 34 C.F.R. § 106.41. These regulations establish a "bipartite regulatory framework" for athletics that requires educational institutions receiving federal funds to provide members of both sexes (1) equal athletic financial assistance (scholarships) and (2) equal athletic opportunity. Biediger v. Quinnipiac Univ., 928 F. Supp. 2d 414, 435 (D. Conn. 2013) ("Biediger I").

34 C.F.R. § 106.37(c)(1), which applies to athletic financial assistance, states:

> To the extent that a recipient [of federal funding] awards athletic scholarships or grants-in-aid, it must provide reasonable opportunities for such awards for members of each sex in proportion to the number of students of each sex participating in interscholastic or intercollegiate athletics.

34 C.F.R. § 106.41(c), which applies to athletic opportunity, states that recipients of federal funds that operate athletic programs "shall provide equal athletic opportunity for members of both sexes" and that the following factors, among others, are to be considered "[i]n determining whether equal opportunities are available":

(1) Whether the selection of sports and levels of competition effectively accommodate the

---

[5] After Title IX was passed, the Department of Health, Education, and Welfare was divided into the Department of Health and Human Services and the Department of Education ("DOE"). The latter, acting through its Office for Civil Rights ("OCR"), is now the agency charged with administering Title IX. See Roberts v. Colorado State Bd. of Agric., 998 F.2d 824, 828 n.3 (10th Cir. 1993).

interests and abilities of members of both sexes;

(2) The provision of equipment and supplies;

(3) Scheduling of games and practice time;

(4) Travel and per diem allowance;

(5) Opportunity to receive coaching and academic tutoring;

(6) Assignment and compensation of coaches and tutors;

(7) Provision of locker rooms, practice and competitive facilities;

(8) Provision of medical and training facilities and services;

(9) Provision of housing and dining facilities and services;

(10) Publicity.

The equal athletic opportunity requirement under 34 C.F.R. § 106.41(c) is further subdivided into two component parts: "effective accommodation" and "equal treatment." Mansourian v. Regents of Univ. of California, 602 F.3d 957, 964 (9th Cir. 2010) ("Mansourian I"); see also, Biediger I, 928 F. Supp. 2d at 436. The "effective accommodation" requirement is based on 34 C.F.R. § 106.41(c)(1). Mansourian I, 602 F.3d at 965; Roberts, 998 F.2d at 828 ("Although § 106.41(c) goes on to list nine other factors that enter into a determination of equal opportunity in athletics, an institution may violate Title IX simply by failing to accommodate effectively the interests and abilities of student athletes of both sexes."). The "equal treatment" requirement, for its part, is based on 34 C.F.R. § 106.41(c)(2)-(10), which have collectively been interpreted to require "equivalence in the availability, quality and kinds of other athletic benefits and opportunities provided male and female athletes." Mansourian I, 602 F.3d at 964. "Effective accommodation claims thus concern the opportunity to participate in athletics, while equal treatment claims allege sex-based differences in the schedules, equipment, coaching, and other factors affecting participants in athletics." Id. at 965; see also, Boucher v. Syracuse Univ., 164 F.3d 113, 115 n.1–2 (2d Cir. 1999) (distinguishing effective-accommodation claims from equal-treatment claims). " '[A]n institution may violate Title IX solely by failing to accommodate effectively the interests and abilities of student athletes of both sexes,' " even if athletic benefits are provided on an equal basis, and vice versa. Mansourian I, 602 F.3d at 965 (quoting Kelley v.

1  Bd. of Trustees, 35 F.3d 265, 268 (7th Cir. 1994)).

2      Thus, as applied to intercollegiate athletics, Title IX regulations promulgated by the DOE

3  provide for a "triumvirate of compliance-related claims": (1) "financial aid"—or "scholarship"—

4  claims, see 34 C.F.R. § 106.37(c); (2) "effective-accommodation" claims, see 34 C.F.R. §

5  106.41(c)(1); and (3) "equal-treatment" claims, see 34 C.F.R. § 106.41(c)(2)–(10). See Biediger I,

6  928 F. Supp. 2d at 436. Each of these is "a separate and distinct type of claim, to be analyzed

7  separately." Beasley v. Alabama State Univ., 966 F. Supp. 1117, 1122 (M.D. Ala. 1997) (citations

8  omitted).

9      Finally, the DOE has issued guidance with respect to Title IX regulations, including, for

10 example, "A Policy Interpretation; Title IX and Intercollegiate Athletics," 44 Fed. Reg. 71,413

11 (Dec. 11, 1979) ("1979 Policy Interpretation"); "Clarification of Intercollegiate Athletics Policy

12 Guidance: The Three–Part Test" (Jan. 16, 1996) ("1996 Clarification"), available at

13 http://www.ed.gov/about/offices/list/ocr/docs/clarific.html; and "Further Clarification of

14 Intercollegiate Athletics Policy Guidance Regarding Title IX Compliance" (July 11, 2003) ("2003

15 Further Clarification"), available at

16 https://www2.ed.gov/about/offices/list/ocr/title9guidanceFinal.html. The Ninth Circuit has held

17 that the regulations set forth by the DOE with respect to Title IX are entitled to "controlling

18 weight" and that "federal courts are to defer substantially" to the DOE's interpretation of those

19 regulations. See Neal v. Bd. of Trustees of California State Universities, 198 F.3d 763, 770-71

20 (9th Cir. 1999) (citing Martin v. Occupational Safety & Health Review Comm'n, 499 U.S. 144,

21 150 (1991) and Chevron USA v. NRDC, 467 U.S. 837, 843–44 (1984)); see also, Cohen v. Brown

22 Univ., 991 F.2d 888, 895 (1st Cir. 1993) ("[W]e must accord [the DOE's] interpretation of Title

23 IX appreciable deference."); Horner v. Kentucky High Sch. Athletic Ass'n, 43 F.3d 265, 273 (6th

24 Cir. 1994) ("The Policy Interpretation is a 'considered interpretation' of the applicable regulations,

25 and is entitled to substantial deference by the courts.")

26                                    **DISCUSSION**

27      The Board moves to dismiss all three of the claims set forth in the FAC. The Court will

28 address each claim in turn, starting with the effective accommodation claim and then turning to the

                                           7

1 | equal treatment and equal financial aid claims.

2 | **I.**      **Effective Accommodation Claim**

3 |      **A.**      **Applicable Law**

4 |     The 1979 Policy Interpretation sets forth a three-part test ("Three-Part Test") for satisfying

5 | the effective accommodation requirement in 34 C.F.R § 106.41(c)(1):

> (1) Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or
>
> (2) Where the members of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or
>
> (3) Where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

14 | 44 Fed. Reg. 71,413, 71,418. Meeting any one of these three prongs is sufficient to comply with

15 | the effective accommodation component of Title IX's equal opportunity mandate. See 1996 Policy

16 | Clarification (institutions "need to comply only with any one part of the three-part test in order to

17 | provide nondiscriminatory participation opportunities for individuals of both sexes"); see also,

18 | Mansourian I, 602 F.3d at 965 ("Funding recipients can satisfy any of the three options to comply

19 | with Title IX."). Thus, a university has "three individual avenues to choose from when

20 | determining how it will provide individuals of each sex with nondiscriminatory opportunities to

21 | participate in intercollegiate athletics." 1996 Policy Clarification. The analysis here will solely

22 | address compliance under Prong One of the Three-Part Test because the Board does not contend

23 | that Fresno State satisfies either of the other prongs. See Doc. No. 42.

24 |     Under Prong One of the Three-Part Test, providing athletic participation opportunities for

25 | male and female students in numbers substantially proportionate to their respective undergraduate

26 | enrollments provides a "safe harbor" and keeps universities on "on the sunny side" of Title IX's

27 | effective accommodation requirement. Horner, 43 F.3d at 275 (quoting Cohen, 991 F.2d at 897–

28 | 98) (internal quotation marks omitted); accord Roberts, 998 F.2d at 829. Title IX plaintiffs bear

the burden of proving a defendant's failure to satisfy Prong One's substantial proportionality

requirement by showing an actionable "disparity" in participation opportunities by sex. Horner, 43

F.3d at 275 (citing Roberts, 998 F.2d at 830–31 and Cohen, 991 F.2d at 901).

The Prong One analysis "begins with a determination of the number of participation

opportunities afforded to male and female athletes in the intercollegiate athletic program" offered

by a defendant. 1996 Policy Clarification; see also, Biediger v. Quinnipiac Univ., 691 F.3d 85, 93

(2d Cir. 2012) ("Biediger II"). "Participation opportunities" are determined by the number of

athletes who "actually participate" in athletics. Mansourian I, 602 F.3d at 966. Specifically, the

1979 Policy Interpretation defines "participants" as athletes:

    a.  Who are receiving the institutionally-sponsored support normally provided
         to athletes competing at the institution involved, e.g., coaching, equipment,
         medical and training room services, on a regular basis during a sport's
         season; and

    b.  Who are participating in organized practice sessions and other team
         meetings and activities on a regular basis during a sport's season; and

    c.  Who are listed on the eligibility or squad lists maintained for each sport, or

    d.  Who, because of injury, cannot meet a, b, or c above but continue to receive
         financial aid on the basis of athletic ability.

44 Fed. Reg. 71,413, 71,415.

"[A]ll athletes who are listed on a team's squad or eligibility list and are on the team as of

the team's first competitive event are counted as participants," and "an athlete who participates in

more than one sport will be counted as a participant in each sport in which he or she participates."

1996 Clarification. Moreover, the Title IX participant count includes "those athletes who do not

receive scholarships (e.g., walk-ons)" and "those athletes who practice but may not compete." Id.

Substantial proportionality determinations "depend[] on [an] institution's specific

circumstances and the size of its athletic program" and thus are made "on a case-by-case basis,

rather than through use of a statistical test." 1996 Policy Clarification. The DOE "consider[s]

opportunities to be substantially proportionate when the number of opportunities that would be

required to achieve [strict] proportionality would not be sufficient to sustain a viable team, i.e., a

team for which there is a sufficient number of interested and able students and enough available

competition to sustain an intercollegiate team."[6] Id.

The Board argues that Plaintiffs' effective accommodation claim must be dismissed because: (i) Plaintiffs cannot show the injury required for Article III standing; (ii) the FAC lacks factual allegations supporting a plausible inference that Fresno State will not provide substantially proportionate participation opportunities after the elimination of women's lacrosse, men's tennis and men's wrestling takes effect; and (iii) the conduct alleged in the FAC does not constitute "intentional discrimination." The Court will address each of these arguments in turn.

## B.   Standing

As noted above, Article III standing requires a party seeking relief to show: (1) an injury in fact that is (a) concrete and particularized and (b) actual or imminent; (2) causation; and (3) a likelihood that a favorable decision will redress the injury. Maya, 658 F.3d at 1067.

The Board argues that Plaintiffs cannot show the injury required for standing prior to the elimination of the women's lacrosse team because Plaintiffs were able to participate in their chosen sport during that period. Doc. No. 42 at 18:10-23.[7] This argument is irrelevant because, as the Court understands it, Plaintiffs' effective accommodation claim turns on the allocation of participation opportunities after the elimination of women's lacrosse takes effect.[8] See Doc. No. 46 at 11:14-18 ("Here, the only question is whether Plaintiffs have plausibly alleged that Fresno State will fail to offer substantially proportional opportunities to female student-athletes as

---

[6] The difference between the number of participation opportunities required for strict proportionality (which the Court sometimes refers to as the "strict proportionality threshold") and the actual number of participation opportunities provided to the underrepresented sex—in other words, "the number of participation opportunities that a school would have to add for [the underrepresented sex] to achieve actual proportionality"—is commonly referred to as the "participation gap." See Mansourian v. Bd. of Regents of Univ. of California at Davis, 816 F. Supp. 2d 869, 887 (E.D. Cal. 2011) ("Mansourian II").

[7] Page citations to documents filed with the Court electronically are to the page numbers in the CM/ECF stamp at the top of each page.

[8] Plaintiffs set forth numerous allegations regarding Fresno State's failure to comply with Title IX prior to the elimination of women's lacrosse, but as the Court reads the FAC, these allegations are merely intended to: (i) establish that substantial proportionality under Prong One of the Three-Part Test is the only way for Fresno State to comply with Title IX; (ii) corroborate Plaintiffs' contention that female participation opportunities will not be proportionate to female undergraduate enrollment once women's lacrosse is eliminated; and (iii) show that the alleged discrimination at issue here was intentional. This reading of the FAC appears to be consistent with Plaintiffs' other filings to date, including the opposition to this motion. See Doc. No. 46 at 23:4-7 ("although it does not form the basis for any independent cause of action, [] historical information remains useful in assessing the plausibility of the allegations in the Amended Complaint").

1    required by the first prong of the three-part test."); cf. Ohlensehlen v. Univ. of Iowa, 509 F. Supp.

2    3d 1085, 1094 (S.D. Iowa 2020) ("The parties agree the only question before the Court on the

3    merits is whether the University of Iowa will comply with Title IX under Prong One of the Three-

4    Part Test in 2021–22 after eliminating the women's swimming and diving team alongside three

5    men's teams.").

6         Plaintiffs contend that the alleged injury required for standing to bring an effective

7    accommodation claim became "imminent when Fresno State *announced* the elimination of the

8    women's lacrosse team." Doc. No. 46 at 11:5-10 (emphasis original). The Court agrees with that

9    formulation and therefore finds no defect in Plaintiffs' Article III standing with respect to the

10   effective accommodation claim. See Pederson v. Louisiana State Univ., 213 F.3d 858, 871 (5th

11   Cir. 2000) ("to establish standing under a Title IX effective accommodation claim, a party need

12   only demonstrate that she is 'able and ready' to compete for a position on [an] unfielded team");

13   see also, Equity in Athletics, Inc. v. Dep't of Educ., 639 F.3d 91, 100 (4th Cir. 2011) ("Equity I")

14   ("EIA has shown that the injuries suffered by its members were fairly traceable to [defendant

15   university's] decision to eliminate teams ….").

16        **C.    Adequacy of Substantial Proportionality Allegations**

17        Since the Board does not contend that Fresno State satisfies either Prong Two or Prong

18   Three of the Three-Part Test, see Doc. No. 46 at 11:14-18 & n.2, Plaintiffs can state an effective

19   accommodation claim merely by setting forth factual allegations plausibly showing a lack of

20   substantially proportionate participation opportunities for females after the elimination of

21   women's lacrosse takes effect, in violation of Prong One.

22        Plaintiffs set forth four clusters of allegations relating to the question of substantial

23   proportionality: (i) a cluster of allegations relating to Equity in Athletics Disclosure Act

24   ("EADA") data, Doc. No. 36 ¶¶ 117-25; (ii) a cluster of allegations relating to Fresno State's

25   claimed Titled IX counts for the 2019-20 academic year, id. ¶¶ 126-36; (iii) a cluster of allegations

26   relating to Fresno State's enrollment and participation projections for the 2021-22 academic year,

27   id. ¶¶ 146-62; and (iv) a cluster of allegations relating to counts prepared by the Board's expert,

28   Timothy O'Brien, for the 2020-21 academic year. Id. ¶¶ 137-45. Plaintiffs contend that these

1  allegations are sufficient to state an effective accommodation claim because they show that the

2  proposed elimination of women's lacrosse, men's tennis and men's wrestling "will leave a female

3  participation gap of either twenty-seven or thirty-one, both of which are large enough to sustain a

4  viable women's team." Doc. No. 46 at 12:3-7.

5          The Court will address each cluster of allegations and corresponding arguments in turn.

6                              **1.    EADA Data**

7          The first relevant cluster of allegations in the FAC has to do with Fresno State's initial

8  determination in October 2020 that eliminating women's lacrosse would not violate Title IX. <u>See</u>

9  Doc. No. 36 ¶ 2. The FAC states that Fresno State used data collected for purposes of EADA

10  compliance to determine whether cutting women's lacrosse, men's tennis and men's wrestling

11  would result in a Title IX violation. <u>Id.</u> ¶ 10. Plaintiffs further allege that EADA data overcounts

12  female participation opportunities relative to counts conducted according to Title IX protocols

13  ("Title IX counts"), <u>id.</u> ¶ 12, and that Fresno State improperly used enrollment data from the 2019-

14  20 academic year in its compliance analysis, even though female enrollment increased in 2020-21

15  and female enrollment was not expected to decline in the 2021-22 academic year. <u>Id.</u> ¶¶ 11, 121.

16          The Board argues that EADA counts differ from Title IX counts and, therefore, cannot be

17  used to show a Title IX violation. Doc. No. 42 at 19:22-20:4. Further, it asserts that Fresno State

18  did not rely on EADA data in making its Title IX compliance determination in 2020 and that, in

19  any event, the "inputs" relied upon in making that determination "do not matter if, in the end,

20  Fresno State is Title IX-compliant." <u>Id.</u> at 20:4-13.

21          In broad strokes, the Court agrees with the Board that Plaintiffs' allegations regarding the

22  use of EADA counts—as opposed to Title IX counts—in assessing the prospective impact of

23  eliminating women's lacrosse, men's tennis and men's wrestling on Title IX compliance are not

24  sufficient to state an effective accommodation claim. As an initial matter, the Ninth Circuit has

25  specifically recognized that EADA counts may be used in assessing substantial proportionality

26  under Title IX, as have other courts. <u>See</u> <u>Mansourian I</u>, 602 F.3d at 968 (finding defendant

27  educational institution's "EADA reports contain[ed] ample data demonstrating that it could not

28  satisfy the substantial proportionality option"); <u>see also</u>, <u>Robb v. Lock Haven Univ. of</u>

1  Pennsylvania, 2019 WL 2005636, at \*7–8 (M.D. Pa. May 7, 2019) (noting that "EADA reports are

2  regularly relied upon in Title IX cases"); Biediger v. Quinnipiac Univ., 616 F. Supp. 2d 277, 297

3  (D. Conn. 2009) ("Biediger III") ("an EADA report can be used to make a prima facie showing of

4  substantial proportion[ality]"). Thus, the Court sees nothing inherently improper about using them

5  in the manner alleged in the FAC.

6          Further, although Plaintiffs take issue with Fresno State's use of outdated enrollment rates,

7  the Court sees no allegation that Fresno State's EADA analysis showed a lack of substantial

8  proportionality. Indeed, the FAC expressly alleges that "Fresno State concluded that it could cut

9  the women's lacrosse team without violating Title IX" based on the EADA analysis. Doc. No. 36

10  ¶ 12. The Court can see how a finding of noncompliance based on EADA data might support a

11  plausible inference of a Title IX violation, see Mansourian I, 602 F.3d at 968, particularly in light

12  of Plaintiffs' allegation that EADA data systemically overstates female participation, but the Court

13  cannot infer a Title IX violation from an EADA test that apparently showed compliance.

14          The Court therefore finds that allegations regarding Fresno State's EADA analysis are

15  insufficient to state an effective accommodation claim.

16                    **2.      Title IX Counts for the 2019-20 Academic Year**

17          The second cluster of allegations has to do with analysis based on Title IX counts (as

18  opposed to EADA counts) for the 2019-20 academic year. Plaintiffs allege that Title IX counts

19  furnished by Fresno State showed 246 male participants and 313 female participants in the 2019-

20  20 academic year. Doc. No. 36 ¶¶ 128-29. According to Plaintiffs, subtracting 30 participants for

21  women's lacrosse, 9 participants for men's tennis and 32 participants for men's wrestling thus

22  "yields an expectation of 205 male participants [] (i.e., 246-9-32) and 283 female participants (i.e.,

23  313-30)" in 2020-21 on teams that were not selected for elimination. Id. ¶ 130. Further, females

24  accounted for 60.5% of Fresno State's undergraduate enrollment in the 2020-21 academic year

25  and are expected to account for 60.5% of Fresno State's undergraduate enrollment in the 2021-22

26  academic year. Id. ¶ 131. Consequently, Plaintiffs allege 314 female participation opportunities

27  will be required for strict proportionality, assuming men's tennis and men's wrestling are cut. Id.

28  If the women's lacrosse team were not cut, Fresno State would provide 313 of the 314

1  participation opportunities required for strict proportionality, resulting in substantial
2  proportionality and Title IX compliance. Id. ¶ 132. By cutting the women's lacrosse team and
3  providing only 283 female participation opportunities, however, Fresno State has created a female
4  participation gap of 31 (i.e., 314 - 283). Id. ¶ 133. According to Plaintiffs, 31 is large enough to
5  support at least one viable women's team at Fresno State and exceeds the average size of women's
6  teams at Fresno State, therefore showing that cutting women's lacrosse violates Title IX. Id. ¶¶
7  134-36.

8         The Court addressed this line of reasoning in its order on Plaintiffs' preliminary injunction
9  motion. See Doc. No. 35 at 25. The framework for assessing Title IX compliance under Prong
10 One of the Three-Part Test creates a direct relationship between participation opportunities for the
11 underrepresented gender and the underrepresented gender's share of undergraduate enrollment by
12 automatically increasing the number of participation opportunities required for the
13 underrepresented gender as the underrepresented gender grows as a percentage of an
14 undergraduate population (absent an offsetting drop in participation on the part of the
15 overrepresented gender). Thus, it is no more valid to show a Title IX violation by applying a strict
16 proportionality threshold based on an undergraduate population that is 60.5% female to a
17 participation count based on an undergraduate population that is 59.5% female (as Plaintiffs
18 purport to do here) than it is to show Title IX compliance by applying a strict proportionality
19 threshold based on an undergraduate population that is 59.5% female to a participation count
20 based on an undergraduate population that is 60.5% female.

21        The Court therefore finds that allegations regarding Fresno State's putative Title IX counts
22 for the 2019-20 academic year are insufficient to state an effective accommodation claim.

23                    **3.    2021-22 Enrollment and Participation Projections**

24        A third cluster of allegations has to do with Fresno State's projections regarding
25 enrollment and participation opportunities in the 2021-22 academic year. Fresno State projects 205
26 male participation opportunities, 297 female participation opportunities, and undergraduate
27 enrollment that is 60.5% female / 39.5% male in the 2021-22 academic year, collectively
28 indicating a female participation gap of 17. Doc. No. 36 ¶¶ 147-48, 156-57. Plaintiffs do not

dispute the enrollment projection, but contend that the participation-opportunity projections cannot

be credited because, *inter alia*, Fresno State's coaches are not required to hit the projections;

Fresno State has provided no evidence to substantiate the projections; Fresno State offers no

explanation as to why men's participation is expected to remain flat while female participation

increases; and Fresno State has proven to be an unreliable predictor of female participation in the

past. Id. ¶¶ 154-61. Moreover, Plaintiffs contend that if Fresno State's 2021-22 projections are

"off in the same way and by the same margin they were in 2019-20, its projected female

participation gap will grow from 17 to 31 in the 2021-22 academic year." Id. ¶ 162. According to

Plaintiffs, 31 is large enough to sustain a viable women's team—including, specifically, the

women's lacrosse team—and is larger than the average size of women's teams at Fresno state,

thus showing a Title IX violation. Id. ¶¶ 162-63.

The Board argues that judicial determinations regarding Title IX compliance are routinely

based on projections and that "Plaintiffs do not include any facts to support their belief that Fresno

State will be unable to provide substantially proportionate participation opportunities [i]n 2021-

22." Doc. No. 42 at 22:12-23.

The Court agrees with the Board that Plaintiffs' allegations with respect to Fresno State's

projected participation opportunities for the 2021-22 academic year are not sufficient to state an

effective accommodation claim for two reasons. First, calling out defects in Fresno State's

projections may prove to be effective in undercutting Fresno State's evidence as this case

progresses, but it does not itself constitute an allegation as to the size of Fresno State's

participation gap from which the Court can draw an inference of a Title IX violation. And second,

Plaintiffs' use of 2019-20 participation counts to impute a participation gap of 31 in 2021-22 fails

to account for significant growth in the female undergraduate population (that neither side

disputes) after the 2019-20 academic year. In the Court's view, Plaintiffs' allegation that female

participation will be the same in 2021-22 (when Plaintiffs themselves assume females will account

for 60.5% of undergraduate enrollment) as it was in 2019-20 (when females accounted for 59.5%

of undergraduate enrollment), see Doc. No. 36 ¶¶ 121, 148, is implausible, particularly since

Plaintiffs do not allege any cap on female participation opportunities in the various women's

1   sports Fresno State will continue to offer after the elimination of women's lacrosse takes effect.

2   See Doc. No. 36 ¶ 156. The Court therefore finds that allegations regarding Plaintiffs' 2021-22

3   projections are insufficient to state an effective accommodation claim.

4            **4.      O'Brien Counts for the 2020-21 Academic Year**

5            The final cluster of allegations has to do with counts conducted by the Board's expert for

6   the 2020-21 academic year. Doc. No. 36 ¶ 137. O'Brien counts 205 male participation

7   opportunities and 287 female participation opportunities and calculates a female participation gap

8   of 27 in the 2020-21 academic year, with females accounting for 60.5% of Fresno State's

9   undergraduate enrollment. Id. ¶ 138-141. According to Plaintiffs, this shows a Title IX violation

10  because 27 is large enough to accommodate at least one viable women's team at Fresno State—

11  including, specifically, the women's lacrosse team—and exceeds the average size of women's

12  teams at Fresno State. Id. ¶¶ 142-44.

13           The Board argues that O'Brien's hypothetical finding as to a female participation gap of 27

14  in 2020-21 is irrelevant because the cuts at issue in this case were not actually implemented in

15  2020-21. Further, the Board argues that Plaintiffs ignore O'Brien's findings that Fresno State "can

16  reasonably expect a participation gap that is Title IX-compliant" after cuts take effect in 2021-22.

17  Doc. No. 42 at 20:13-21, 22:12-14. Finally, the Board argues that the "average size" of Fresno

18  State's women's teams—not the size of the women's lacrosse team or just "any viable team"—is

19  the proper benchmark for determining substantial proportionality. Id. at Doc. No. at 9:1-12:3.

20           There is nothing in the FAC to indicate that O'Brien's 2020-21 counts were bona fide Title

21  IX counts. That said, they were generated by the Board's own expert; the methodology O'Brien

22  uses to calculate the 2020-21 participation gap appears valid in that all the inputs (male

23  participation opportunities, female participation opportunities and the female percentage of

24  undergraduate enrollment) are from the same year; and the female percentage of undergraduate

25  enrollment is projected to be the same in 2021-22 as it was in 2020-21. Thus, the Court finds

26  that—whether or not they ultimately prove to be accurate— O'Brien's counts are creditable for

27  pleading purposes and provide a valid basis for drawing inferences, under Rule 8 pleading

28  standards, regarding Title IX compliance after the cuts at issue in this case take effect.

Further, the Court cannot agree with the Board that O'Brien's findings as to a participation gap of 27 in 2020-21 are negated, or otherwise rendered irrelevant, by Fresno State's projections showing a female participation gap of 17 in 2021-22, as validated by O'Brien. The Court will not weigh evidence on a motion to dismiss under Rule 12(b)(6).  See Joseph v. J.M. Smucker Co., 2019 WL 1219708, at *3 (C.D. Cal. Mar. 13, 2019). As noted above, female enrollment is expected to be the same in 2021-22 as it was in 2020-21. O'Brien's participation gap findings for 2020-21 can therefore support a plausible inference as to a lack of substantial proportionality in the 2021-22 academic year, even if other facts (or opinions) cut in the opposite direction. The question, then, is whether the female participation gap of 27 O'Brien found for 2020-21 can be construed to show a Title IX violation.

a.     Benchmarks for Substantial Proportionality Determinations

Plaintiffs assert, based on the 1996 Clarification and an amicus brief filed by the United States in Balow v. Michigan State University, see Doc. No. 46-1, "that participation opportunities are not substantially proportionate when the participation gap is sufficient to sustain a viable team, even if that team is smaller than the average team's size and regardless of the percentage disparity" between the female share of participation opportunities and the female share of undergraduate enrollment. Doc. No. 46 at 12, n.3.

The 1996 Clarification, however, appears to allow for finding substantial proportionality under Prong One based solely on percentages, with no apparent consideration of the absolute size of participation gaps. For example, it offers the following "[a]s an example of a determination under part one":

> If an institution's enrollment is 52 percent male and 48 percent female and 52 percent of the participants in the athletic program are male and 48 percent female, then the institution would clearly satisfy part one. However, OCR recognizes that natural fluctuations in an institution's enrollment and/or participation rates may affect the percentages in a subsequent year. For instance, if the institution's admissions the following year resulted in an enrollment rate of 51 percent males and 49 percent females, while the participation rates of males and females in the athletic program remained constant, the institution would continue to satisfy part one because it would be unreasonable to expect the institution to fine tune its program in response to this change in enrollment.

It also states:

As another example, over the past five years an institution has had a consistent enrollment rate for women of 50 percent. During this time period, it has been expanding its program for women in order to reach proportionality. In the year that the institution reaches its goal--i.e., 50 percent of the participants in its athletic program are female--its enrollment rate for women increases to 52 percent. Under these circumstances, the institution would satisfy part one.

Further, the 1996 Clarification expressly characterizes the absolute size of a participation gap as an additional—not exclusive—method of making substantial proportionality determinations under Prong One, stating that the OCR "would *also* consider opportunities to be substantially proportionate when the number of opportunities that would be required to achieve proportionality would not be sufficient to sustain a viable team." 1996 Clarification (emphasis added).

Moreover, the 1996 Clarification expressly provides—in the plainest possible terms—that the "OCR *may consider the average size of teams* offered for the underrepresented sex" in determining substantial proportionality. 1996 Clarification (emphasis added). And Defendants set forth six OCR letters from the past five years—including a letter from 2020—in which the OCR does just that. See Doc. No. 48 at 10 n.3.

Finally, the Court notes that numerous courts have relied solely on percentage disparities in making substantial proportionality determinations. See, e.g., Balow v. Michigan State Univ., 2021 WL 650712, at *11 (W.D. Mich. Feb. 19, 2021) ("Plaintiffs have not cited, and the Court is not aware, of any case where a gap lower than 2% failed to satisfy the test for substantial proportionality."); Portz v. St. Cloud State Univ., 196 F. Supp. 3d 963, 975 (D. Minn. 2016) ( "a deviation of less than 3.5 percentage points typically keeps the ratios substantially proportionate"); Equity in Athletics, Inc. v. Dep't of Educ., 675 F. Supp. 2d 660, 682–83 (W.D. Va. 2009), aff'd, 639 F.3d 91 (4th Cir. 2011). ("Equity II") (finding no "authority to support the proposition that a disparity as low as 2% is substantially disproportionate as a matter of law"); Miami Univ. Wrestling Club v. Miami Univ., 302 F.3d 608, 611, 615–16 (6th Cir. 2002) (less than 2% disparity acceptable); Boulahanis v. Bd. of Regents, 198 F.3d 633, 636, 638–39 (7th Cir. 1999) (finding "athletic participation … within three percentage points of enrollment" constitutes substantial proportionality).

Of these cases, the Court finds *Equity in Athletics v. Department of Education* particularly instructive on this motion to dismiss. There, James Madison University ("JMU") approved the

1    elimination of seven men's teams and three women's teams to satisfy the substantial
2    proportionality requirement in Prong One of the Three-Part Test. Equity II, 675 F. Supp. 2d at
3    666-67. At the time the cuts were approved, males accounted for 39% of undergraduate enrollment
4    but 49.3% of athletics participation, while females accounted for 61% of undergraduate enrollment
5    but just 50.7% of athletics participation. Id. at 667. JMU asserted that participation would "move
6    to 61 percent female and 39 percent male"—in line with JMU's undergraduate enrollment—once
7    the cuts took effect. Id.

8        Equity in Athletics ("EIA") brought an action against the DOE, JMU and various other
9    defendants alleging, _inter alia_, that the cuts discriminated against males in violation of Title IX.
10   Equity II, 675 F. Supp. at 681. Specifically, EIA alleged that "men became the 'underrepresented
11   gender' by 2% as a result of the elimination of the men's athletic teams"—making up 39.1% of
12   JMU's undergraduate population but only 37.1% of university athletes—and that, consequently,
13   JMU was in violation of Prong One of the Three-Part Test. Id. The district court granted JMU's
14   motion to dismiss, stating that it was aware of no "authority to support the proposition that a
15   disparity as low as 2% is substantially disproportionate as a matter of law"; citing cases finding
16   that disparities in the range of 1.4% to 3% constituted substantial proportionality for Title IX
17   purposes; and finding that the mere fact that men were underrepresented by 2% was insufficient to
18   state a plausible claim for relief under Title IX. Id. at 683.

19       In affirming the dismissal, the Fourth Circuit questioned whether the disparity was 2% or
20   1.15% but found that substantial proportionality determinations under the first prong of the Three–
21   Part Test are to be made on a case-by-case basis and that "the district court correctly noted that the
22   gap created by JMU's attempts to comply with the proportionality prong of the Three–Part Test,
23   regardless of whether it was one or two percent, was insufficient by itself to establish a violation
24   under Title IX." Equity I, 639 F.3d at 110. The Fourth Circuit also noted that other courts had
25   "found educational institutions to be in compliance with Title IX where the sex disparity was
26   similar to that alleged by EIA." Id.

27       In light of the foregoing, the Court cannot agree with Plaintiffs' narrow prescription with
28   respect to substantial proportionality analysis. Relevant authority provides that substantial

1  proportionality determinations are to be made on a case-by-case basis and does not appear to limit

2  courts' flexibility in deciding which approach to take. The Court will therefore look at the

3  allegations regarding Fresno State's female imputed 2020-21 participation gap from multiple

4  angles to see what inferences emerge.

5                      b.       Substantial Proportionality Analysis Applying 2020-21 Counts

6          Starting with percentage disparity, allegations based on the O'Brien counts indicate

7  females made up 60.5% of Fresno State's undergraduate population but only accounted for 58.3%

8  of participation opportunities (excluding the three sports selected for elimination) in the 2020-21

9  academic year, resulting in a 2.2% disparity. In light of the Fourth Circuit's decision in *Equity in*

10 *Athletics* and other cases squarely finding that disparities in this range do not show a lack of

11 substantial proportionality, the Court cannot find that Plaintiffs have stated an effective

12 accommodation claim based on percentage disparity. See Equity I, 639 F.3d at 110.

13         Next, Plaintiffs assert that the participation gap of 27 that O'Brien imputed for the 2020-21

14 academic year is "large enough to sustain a viable team—namely, the very women's lacrosse team

15 Fresno State plans to cut." Doc. No. 46 at 6:1-4. The FAC actually alleges that the women's

16 lacrosse team had 30 members prior to the decision to eliminate it, Doc. No. 46 ¶ 129, but the

17 numbers are close enough, in the Court's view, to support a plausible inference under Rule 8(a)(2)

18 that a participation gap of 27 is large enough to support a viable women's team.

19         Finally, the FAC alleges that 27 "exceeds the average size of women's teams at Fresno

20 State." Doc. No. 36 at 23 ¶ 143. The FAC does not specifically allege the average size of women's

21 teams at Fresno State, but the allegation that 27 exceeds the average size of women's teams at

22 Fresno State is plausible without reference to other parts of the record. Consistent with guidance in

23 the 1996 Clarification stating that the average size of teams for the underrepresented sex can be

24 used as a point of reference in making substantial proportionality determinations, the Court finds

25 that this allegation supports a plausible inference that the female participation gap O'Brien

26 calculated for the 2020-21 academic year is large enough to accommodate a viable women's team

27 and therefore evidences a Title IX violation.

28         For the foregoing reasons, the Court finds that Plaintiffs have adequately alleged an

1  effective accommodation claim based on O'Brien's 2020-21 counts and participation gap

2  calculation.

3  **D.   Intentional Discrimination**

4  The Board next argues that Plaintiffs' effective accommodation claim fails because Title

5  IX only provides a private right of action for intentional discrimination and Plaintiffs have not

6  alleged facts showing intentional discrimination. Doc. No. 42 at 23:21-26:16. The crux of this

7  argument is that Title IX provides no special protection to female student-athletes and that the

8  conduct in question here—the concurrent elimination of women's lacrosse, men's tennis and

9  men's wrestling—cannot be said to involve intentional discrimination because it affected more

10 males than females and thus, women were (at a minimum) "treated the same" as men. Id.

11 In addition, the Board contends that Plaintiffs are seeking to establish a Title IX violation

12 based on a lack of preferential protection from budget cuts for women's lacrosse and that such a

13 claim is at odds with Section 901(b) of Title IX, Doc. No. 42 at 24:8-25:5, which states that Title

14 IX shall not be "interpreted to require any educational institution to grant preferential or disparate

15 treatment to the members of one sex on account of an imbalance which may exist with respect to

16 the total number or percentage of persons of that sex participating in or receiving the benefits of

17 any federally supported program or activity …." 20 U.S.C. § 1681(b). The notion that Plaintiffs

18 are seeking preferential treatment is underscored, according to the Board, by the fact that Plaintiffs

19 are focused narrowly on the reinstatement of women's lacrosse, without regard for the interests of

20 "female students who may wish to participate in sports other than lacrosse" or the flexibility Title

21 IX provides to educational institutions in the management of their affairs. Doc. No. 42 at 25:5-12.

22 The Board's argument is not without merit. "Title IX does not establish a right to

23 participate in any particular sport in one's college," Gonyo v. Drake Univ., 837 F. Supp. 989, 994

24 (S.D. Iowa 1993), and Title IX plainly allows for cutting women's teams (or, more broadly,

25 participation opportunities allocated to the underrepresented gender) to achieve compliance, even

26 where such cuts are expressly predicated on sex. See Neal, 198 F.3d at 770 (stating that it would

27 be "imprudent to argue" that Title IX bars "gender-conscious remedies"); Cohen, 991 F.2d at 898.

28 Thus, the Court agrees with the Board that Title IX cannot be read to give the women's lacrosse

1   team a right to remain in existence and that the mere fact that Fresno State cut the women's

2   lacrosse team—and took sex into account in doing so—does not itself give rise to a Title IX claim.

3    In the Court's view, however, it is not, strictly speaking, the elimination of women's

4   lacrosse that constitutes the alleged violation of Title IX's effective accommodation requirement.

5   The violation is the unequal "barrier" Fresno State has allegedly imposed to female participation

6   in athletics by providing proportionately fewer participation opportunities for females than males.

7   See Pederson, 213 F.3d at 871. The elimination of women's lacrosse gives Plaintiffs standing for a

8   Title IX effective accommodation claim because it shows that they are " 'able and ready' to

9   compete for a position on [an] unfielded team," id.; see also, Thomas v. Regents of Univ. of

10  California, 2020 WL 3892860, at *10 (N.D. Cal. July 10, 2020), but the Title IX effective

11  accommodation violation alleged here arises from a program-wide imbalance in participation

12  opportunities. See Beasley, 966 F. Supp. at 1125–26 ("Only when the institution, in a broad-

13  spectrum inquiry, is first found to be in violation of Title IX … does the question of individual or

14  group causes-of-action for relief properly arise."). Moreover, reinstatement of women's lacrosse is

15  but one of the remedies the Court could impose to ensure the proper allocation of participation

16  opportunities between males and females should Plaintiffs prevail on their claim. See Pederson,

17  213 F.3d at 865 (noting that the district court ordered defendant to submit a Title IX compliance

18  plan). Plaintiffs seek reinstatement of women's lacrosse but that remedy in particular is by no

19  means necessitated by their claim.

20   The Court therefore finds that the Board's argument that Plaintiffs' claim is not a claim for

21  intentional discrimination is without merit.

22    **E.** **Conclusion Regarding Effective Accommodation Claim**

23   For the foregoing reasons, the motion to dismiss will be denied as to the effective

24  accommodation claim.

25  **II.** **Equal Treatment Claim**

26    **A.** **Applicable Law**

27   As set forth above, Title IX equal treatment claims arise under 34 C.F.R. § 106.41(c)(2)-

28  (10), which address athletics-related benefits such as equipment and supplies, per diem

allowances, coaching, tutoring, locker rooms and training facilities.

The 1979 Policy Interpretation states that §106.41(c)(2)-(10) create "general athletic program requirements" that call for "comparing the availability, quality and kinds of benefits, opportunities, and treatment afforded members of both sexes" and that "[i]nstitutions will be in compliance if the compared program components are equivalent." 44 Fed. Reg. 71,413, 71,415. In addition, the 1979 Policy Interpretation states that "identical benefits, opportunities or treatments are not required, provided the overall effect of any differences is negligible" and that "differences in particular program components will be found to be justifiable" where "sport-specific needs are met equivalently in both men's and women's programs." Id. at 71,415-71,416.

Finally, the 1979 Policy Interpretation states that compliance with 34 C.F.R. § 106.41(c) will be determined based on:

a. Whether the policies of an institution are discriminatory in language or effect; or

b. Whether disparities of a substantial and unjustified nature in the benefits, treatment, services, or opportunities afforded male and female athletes exist in the institution's program as a whole; or

c. Whether disparities in individual segments of the program with respect to benefits, treatment, services, or opportunities are substantial enough in and of themselves to deny equality of athletic opportunity.

44 Fed. Reg. 71,413, 71,418.

Courts have construed 34 C.F.R. § 106.41(c)(2)-(10) and applicable regulatory guidance to mean that "equal treatment" claims under Title IX can be based on a program-wide imbalance in the allocation of benefits between sexes, or alternatively, "substantial" disparities in the treatment afforded to comparable male and female teams. See Landow v. Sch. Bd. of Brevard County, 132 F. Supp. 2d 958, 962–66 (M.D. Fla. 2000) (holding that disparities between boys' baseball and girls' softball programs violated Title IX); Daniels v. Sch. Bd. of Brevard County, 985 F. Supp. 1458, 1460–63 (M.D. Fla. 1997) (holding that female varsity softball players were entitled to a preliminary injunction on their claim that their high school denied them the benefits given to the boys' varsity baseball team).

1    **B.    <u>Parties' Arguments</u>**

2    The Board argues that Plaintiffs' equal treatment claim should be dismissed for failure to

3    state a claim because the pleadings compare the treatment of the women's lacrosse team to the

4    treatment of "other varsity teams" (a category that includes women's teams as well as men's

5    teams) without specifically comparing treatment received by women's lacrosse to treatment

6    received by men's varsity teams. Doc. No. 42 at 28:23-29:7. Further, the Board argues that

7    Plaintiffs' allegations are "formulaic" and "conclusory," and that Plaintiffs' "failure to provide

8    facts concerning unfavorable treatment of any other women's team foils their claim of gender

9    discrimination" because "[b]eing a member of the women's lacrosse team is not a protected

10   category." <u>Id.</u> at 29:8-20. In other words, the Board takes the position that mistreatment of the

11   women's lacrosse team alone is not sufficient and that "Plaintiffs must show facts demonstrating

12   that *women's* teams have been treated less favorably as compared to men's teams" to state an

13   unequal treatment claim under Title IX. Doc. No. 48 at 14:2-5.

14   **C.    <u>Discussion</u>**

15   The FAC contains numerous allegations as to how women's lacrosse was treated worse

16   than "men's teams." Specifically, the FAC alleges:

17   • Women's lacrosse was not provided a "return-to-play plan" in the wake of COVID,
18   even though such plans "were provided to men's teams";

19   • "Unlike men's varsity teams at Fresno State," the women's lacrosse team was
20   "forced to use outdated gear," was not "provided proper practice jerseys or gear
21   that designate the team's sport, was limited in its participation at media day, and
22   was not issued cold weather gear until after the season had begun";

23   • "[N]o men's team is required to clean … its practice field," but women's lacrosse
24   had to clean its practice field of "bottle caps, glass, food, and other trash" from
25   tailgating before practice;

26   • "[W]omen's lacrosse [] struggled with [a] lack of proper coaching staff … for
27   many months," which did not "happen with men's teams";

28   • "[W]omen's lacrosse team players were kicked out of their locker room, did not

24

receive uniforms until the season had already begun, and [we]re forced to used old, outdate equipment," even though "[n]o men's team has been treated this way";

- "[M]embers of men's varsity teams" were provided housing and three meals a day during COVID quarantine, but women's lacrosse was not; and

- "[M]en's teams were allowed to bring everyone on the team" to media day, but women's lacrosse "was permitted only to have four of its seven seniors there and no other players."

Doc. No. 36 ¶¶ 17-23, 182-87.

Reviewing these allegations, they do not appear to fall neatly into either category of "equal treatment" violations recognized by the 1979 Policy Interpretation or applicable case law, in that they do not posit a program-level imbalance between the treatment afforded to men's teams and the treatment afforded to women's teams or directly compare the treatment received by women's lacrosse to treatment received by a comparable men's team in the same "segment" of Fresno State's athletic program. Still, the allegations indicate, in several instances, that no men's team at all was subject to the mistreatment (with respect to locker room access, equipment, cleaning duties and such) inflicted on women's lacrosse. Moreover, the disparity in treatment alleged appears to be substantial. Thus, the Court finds that the allegations in the FAC are sufficient to state an equal treatment claim at the segment level since it can plausibly be inferred that male counterpart(s) to the women's lacrosse team (whatever team or teams that may turn out to be) received at least some benefits of consequence that were not furnished to women's lacrosse. See 44 Fed. Reg. 71,413, 71,418 (addressing "disparities in individual segments" of athletic programs).

The motion to dismiss will therefore be denied as to the equal treatment claim.

## III.   **Financial Aid Claim**

### A.   **Applicable Law**

As noted above, 34 C.F.R. § 106.37(c)(1) states:

To the extent that a recipient [of federal funding] awards athletic scholarships or grants-in-aid, it must provide reasonable opportunities for such awards [of financial assistance] for members of each sex in proportion to the number of students of each sex participating in interscholastic or intercollegiate athletics.

Guidance regarding this regulation is set forth in the 1979 Policy Interpretation, which states, in pertinent part, as follows:

> The [DOE] will examine compliance with this provision … primarily by means of a financial comparison to determine whether proportionately equal amounts of financial assistance (scholarship aid) are available to men's and women's athletic programs. The [DOE] will measure compliance with this standard by dividing the amounts of aid available for the members of each sex by the numbers of male or female participants in the athletic program and comparing the results. Institutions may be found in compliance if this comparison results in substantially equal amounts or if a resulting disparity can be explained by adjustments to take into account legitimate, nondiscriminatory factors.

44 Fed. Reg.71,413, 71,415.

In contrast to an effective accommodation claim, "it is irrelevant what the overall participation rates of men and women in [] athletic programs are, relative to their enrollment." Beasley, 966 F. Supp. at 1122 (citing 44 Fed. Reg. 71,413, 71,415). "What matters is simply whether 'the total amounts of scholarship aid made available to men and women [are] substantially proportionate to their participation rates.' " Id. The total dollar value of individual scholarships made available to men and women are not directly compared. Id. If per capita financial aid for male student-athletes exceeds per capita financial aid for female student athletes by more than 1%, there is a strong presumption of a Title IX violation that must be justified, if at all, by nondiscriminatory factors (such as the higher cost of tuition for student-athletes from out of state). See Beasley, 966 F. Supp. at 1122–23.

## B.    Parties' Arguments

The Board contends that Plaintiffs' financial aid claim should be dismissed because Plaintiffs' conclusory allegations do not make a plausible showing that males receive a disproportionate amount of scholarship funding after taking into account nondiscriminatory factors such as the higher cost of tuition for out-of-state athletes. Doc. No. 42 at 27:11-28:22. Further, Defendants contend that financial aid claims arising from events prior to February 12, 2019 are time-barred by the applicable two-year statute of limitations, id. at 28:15-22, and that Plaintiffs have failed to "plead that *they* were harmed by any alleged Title IX violation with respect to financial assistance," as required for standing. Id. (emphasis original). According to

1   Defendants, allegations that Plaintiff Roberts receives a partial scholarship and that Plaintiff

2   Walburger will not receive a scholarship after she finishes her undergraduate degree "are tied to

3   the elimination of lacrosse"—not to "alleged inequities in the allocation of financial assistance"—

4   and therefore do not provide standing for a scholarship claim. Id. at 27, n.8.

5       Plaintiffs contend that they have adequately stated a scholarship claim based on allegations

6   that "Fresno State has been offering female student-athletes hundreds of thousands of dollars less

7   than they should have received (if they were offered aid in proportion to their participation) each

8   year for each of the last sixteen years" and allegations that the disparity between the scholarship

9   budget for men and the scholarship budget for women is greater than 1%. Doc. No. 46 at 17:12-

10  18:5. Further, Plaintiffs allege that "Fresno State has shorted its female athletes by more than $5.3

11  million in financial aid over the last sixteen years," including 2018-19 (the most recent year for

12  which relevant data is publicly available) in which "female student-athletes at Fresno State should

13  have received $285,000 more than they did based on their percentage representation in the

14  athletics program; that this "unbroken pattern" is "expected to continue this year, next year, and

15  for the foreseeable future"; and that "[t]hese problems are [] exacerbated by the unequal

16  participation opportunities alleged in Count I because the inequities build on each other." Id. at

17  18:11-19:6.

18      As to standing, Plaintiffs contend that "allegations of discrimination in financial aid

19  allocation in the years that [they] played lacrosse for Fresno State [] support the inference that

20  they, too, were harmed by these inequalities—particularly those who receive less than full

21  scholarships and those who will have their scholarships pulled next year." Doc. No. 46 at 19:2-6.

22  Further, Plaintiffs contend that standing can be inferred from allegations that they "receive varying

23  degrees of financial aid, ranging from full scholarships to partial scholarships, see Doc. No. 36 ¶¶

24  33, 40, 43, 55 and 65, and that "Plaintiffs would have received more in scholarship funds" and

25  "more female athletes at Fresno State would have received financial aid" if Fresno State had

26  complied with its Title IX obligations. Doc. No. 46 at 19:6-17. Finally, Plaintiffs allege that

27  "Fresno State informed Plaintiff Walburger that it will not honor her scholarship after the school

28  eliminates the lacrosse team—despite previous and express promises to do so." Doc. No. 46 at

1    19:7-17.

2    **C.    Discussion**

3        As an initial matter, the Court does not agree with the Board's contention that Plaintiffs'

4    financial aid claim is time-barred because the FAC contains allegations regarding the 2018-19

5    academic year, at least part of which falls within the two-year statute of limitations that the Board

6    contends is applicable to Title IX claims. See Doc. No. 48 at 12, n.10 ("Plaintiffs filed their

7    original Complaint on February 19, 2021, after the Spring 2021 semester had commenced. Since

8    their figures only refer to athletic aid awarded prior to the 2018-19 season, Count II is time-

9    barred.").

10   The Board is correct, however, that the allegations in the FAC fail to state a scholarship claim.

11   Plaintiffs allege, for example, that "[i]n 2018-19 … Fresno State offered female student-athletes

12   $285,000 less than they should have been offered based on their percentage in the athletics

13   program." This allegation—like the allegation that female student-athletes "received over $5.3

14   million less in athletic financial aid … than they should have received" from 2003-04 through

15   2018-19—is no more than a legal conclusion with garnish. Plaintiff must allege facts that enable

16   the Court to conduct its own assessment and draw a plausible inference that participation-adjusted

17   scholarship funding for male student-athletes exceeds participation-adjusted scholarship funding

18   for female student-athletes by 1% or more in a year that falls within the Title IX statute of

19   limitations. Slapping an aggregate dollar amount—with no point of reference—on what is

20   otherwise a mere restatement of an essential element of a financial aid claim does not satisfy that

21   requirement. Indeed, the allegations in the FAC do not allow the Court to make any determination

22   regarding the percentage disparity between men's scholarship funding and women's scholarship

23   funding, whether or not adjusted for participation. The test for a Title IX scholarship violation in

24   applicable regulatory guidance entails dividing the male scholarship budget by the number of male

25   student-athletes, performing the same calculation for females, and comparing the results. See 44

26   Fed. Reg.71,413, 71,415; Beasley, 966 F. Supp. at 1122–23. At a minimum, something allowing

27   the Court to approximate this analysis is required to state a scholarship claim.

28       Further, the Court finds that the allegations in the FAC are insufficient to show standing.

1    Title IX "affords … no individual right to a scholarship," so standing to assert a scholarship claim

2    hinges not only "on overall disproportionate provision of support funds to athletes of each gender"

3    (which Plaintiffs have not adequately alleged) but also on whether a plaintiff "can show a

4    relationship of causation" between an alleged funding disparity and the lack—or diminution—of

5    his or her scholarship award. See Beasley, 966 F. Supp. at 1126. The FAC alleges, in pertinent

6    part, that Anders was "awarded an athletic scholarship" to attend Fresno State, Doc. No. 36 ¶ 33;

7    that Abbigayle Roberts was awarded a "partial scholarship for her participation on the women's

8    lacrosse team," id. ¶ 43; that Megan Walaitis was "awarded a full scholarship to Fresno State," id.

9    ¶ 55; and that Courtney Walburger received a four-year scholarship in her second year at Fresno

10   State and was told she could use the fourth year toward graduate school if she remained at Fresno

11   State to play women's lacrosse. Id. ¶ 65. Further, the FAC alleges that Walburger was recently

12   informed that Fresno State "will not honor her scholarship once she earns here undergraduate

13   degree" because the women's lacrosse team has been cut. Id. ¶ 69. No scholarship-related

14   allegations are made as to the other two Plaintiffs, Hennessey Evans and Tara Weir.

15          Even assuming Plaintiffs had adequately alleged an actionable sex-based imbalance in

16   scholarship funding, the Court could not infer from these allegations which Plaintiffs, if any, were

17   deprived of a scholarship—or which Plaintiffs, if any, received a diminished scholarship—as a

18   result of such a Title IX violation. Indeed, without context, the fact that four of six Plaintiffs

19   received a scholarship of some sort appears to cut against inferring a dearth of scholarship funding

20   for women's lacrosse, and the FAC does not allege that any of the Plaintiffs was improperly

21   deprived of scholarship funding. Moreover, while the Court does not mean to minimize the impact

22   of losing a scholarship unexpectedly, the allegation regarding the cancellation of Walburger's

23   scholarship following the discontinuation of lacrosse is irrelevant because, by its terms, 34 C.F.R.

24   § 106.37(c)(1) only pertains to scholarships for students "participating in interscholastic or

25   intercollegiate athletics."

26          The Court therefore finds that Plaintiffs have failed to state or allege standing for a

27   financial aid claim under Title IX.

28   //

**CONCLUSION**

For the foregoing reasons, the motion to dismiss the FAC will be denied as to Plaintiffs' effective accommodation claim and equal treatment claim and granted as to Plaintiffs' financial aid claim. Since the defects in the financial aid claim could be cured with additional factual allegations, the Court will grant leave to amend the financial aid claim. See Willden, 678 F.3d at 1005.

**ORDER**

Accordingly, IT IS HEREBY ORDERED that:

1. The motion to dismiss the First Amended Complaint (Doc. No. 42) is DENIED IN PART and GRANTED IN PART as follows:

   a. The motion is DENIED as to the effective accommodation claim and the equal treatment claim;

   b. The motion is GRANTED as to the financial aid claim;

2. Plaintiffs' are GRANTED leave to file a Second Amended Complaint amending the financial aid claim within 21 days of the date of electronic service of this order;

3. Terrence Tumey, Joseph Castro and Saul Jiménez-Sandoval are dismissed from this case by virtue of being omitted from the First Amended Complaint;

4. This case is referred back to the Magistrate Judge for further proceedings consistent with this order.

IT IS SO ORDERED.

Dated: ___July 22, 2021___                    _____
                                              SENIOR DISTRICT JUDGE