No.

# In the United States Court of Appeals
# for the Ninth Circuit

TAYLOR ANDERS, HENNESSEY EVANS, ABBIGAYLE ROBERTS,
MEGAN WALAITIS, TARA WEIR, and COURTNEY WALBURGER, Individually
and on behalf of all those similarly situated,

*Plaintiffs-Petitioners,*

V.

CALIFORNIA STATE UNIVERSITY, FRESNO, and
BOARD OF TRUSTEES OF CALIFORNIA STATE UNIVERSITY.,

*Defendants-Respondents.*

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA
FRESNO DIVISION
1:21-CV-00179-AWI-BAM
Honorable Judge Anthony W. Ishii

## PETITION FOR PERMISSION TO APPEAL PURSUANT TO
## FED. R. CIV. P. 23(f)

Arthur H. Bryant (SBN 208365)
Bailey & Glasser, LLP
1999 Harrison Street, Suite 660
Oakland, CA 94612
(510) 272-8000
abryant@baileyglasser.com

Joshua I. Hammack
Bailey & Glasser LLP
1055 Thomas Jefferson Street NW, Suite 540
Washington, DC 20007
(202) 463-2101
jhammack@baileyglasser.com
*Counsel for Plaintiffs-Petitioners*

December 6, 2022

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ iii

I.    INTRODUCTION ........................................................................... 1

II.   FACTS AND PROCEDURE ............................................................ 3

III.  ISSUES PRESENTED ..................................................................... 8

IV.   STANDARD ................................................................................... 8

V.    ARGUMENT .................................................................................. 9

   A.  A right to sport-specific advocacy makes no sense for these Title IX claims because liability is assessed on a program-wide basis and, even upon a finding of liability, schools are given discretion as to how to come into compliance. .......... 9

   B.  The district court's decision is contrary to Ninth Circuit precedent holding that potential conflicts are speculative as a matter of law. .................................. 17

   C.  The district court disregarded the facts of this case, which prove there is no conflict. .................................................................................................... 19

VI.   CONCLUSION .............................................................................. 21

# TABLE OF AUTHORITIES

**Cases**

*A. B. v. Hawaii State Dep't of Educ.*,

30 F.4th 828 (9th Cir. 2022) ......................................................................10

*A.B. by C.B. v. Hawaii State Dep't of Educ.*,

334 F.R.D. 600 (D. Haw. 2019) .......................................................... 9, 18

*Amchem Prods., Inc. v. Windsor*,

521 U.S. 591 (1997)...................................................................................14

*Balow v. Michigan State Univ.*,

24 F.4th 1051 (6th Cir. 2022) ...................................................................13

*Blackie v. Barrack*,

524 F.2d 891 (9th Cir. 1975) .............................................................. 17, 18

*Boucher v. Syracuse Univ.*,

164 F.3d 113 (2d Cir. 1999).......................................................................19

*Brust v. Regents of the University of California*,

No. 2:07-cv-01488, 2008 WL 11512299 (E.D. Cal. Oct. 24, 2008) .......10

*Bryant v. Colgate Univ.*,

No. 93-cv-1029, 1996 WL 328446 (N.D.N.Y. June 11, 1996) ...............19

*Chamberlan v. Ford Motor Co.*,

402 F.3d 952 (9th Cir. 2005) ..................................................................8, 9

*Cohen v. Brown Univ.*,

16 F.4th 935 (1st Cir. 2021)......................................................................13

*Cohen v. Brown Univ.*,

991 F.2d 888 (1st Cir. 1993) ............................................................. 10, 13

*Cummings v. Connell*,

316 F.3d 886 (9th Cir. 2003) ............................................................. 17, 18

*Foltz v. Delaware State Univ.*,

  269 F.R.D. 419 (D. Del. 2010) ................................................................10

*Gunnells v. Healthplan Servs., Inc.*,

  348 F.3d 417 (4th Cir. 2003) ................................................................18

*McCormick v. Sch. Dist. of Mamaroneck*,

  370 F.3d 275 (2d Cir. 2004) ........................................................... 11, 12

*Miller v. Univ. of Cincinnati*,

  241 F.R.D. 285 (S.D. Ohio 2006) ..........................................................19

*Neal v. Bd. of Trustees of California State Univs.*,

  198 F.3d 763 (9th Cir. 1999) ......................................................... 11, 12

*Parker v. Franklin Cnty. Cmty. Sch. Corp.*,

  667 F.3d 910 (7th Cir. 2012) ......................................................... 11, 12

*Portz v. St. Cloud State Univ.*,

  16 F.4th 577 (8th Cir. 2021) ......................................................... 11, 12

*Portz v. St. Cloud State Univ.*,

  297 F. Supp. 3d 929 (D. Minn. 2018) ....................................................10

*Robb v. Lock Haven University of Pennsylvania*,

  No. 4:17-cv-00964, 2019 WL 2005636 (M.D. Pa. May 7, 2019) ..........................19

*Soc. Servs. Union, Loc. 535, Serv. Emps. Int'l Union, AFL-CIO v. Santa Clara*

  *Cnty.*, 609 F.2d 944 (9th Cir. 1979)............................................. 17, 18

*T.W. v. Shelby Cnty. Bd. of Educ.*,

  818 Fed. App'x 453 (6th Cir. 2020) ................................................ 11, 12

*Williams v. Sch. Dist. of Bethlehem, Pa.*,

  998 F.2d 168 (3d Cir. 1993)..................................................................11

**Rules**

FED. R. CIV. P. 23(c)(4) ..................................................................2

FED. R. CIV. P. 23(f) .......................................................................8

**Regulations**

OCR, Policy Interpretation, 44 Fed. Reg. 71413 (Dec. 11, 1979) .................. 11, 12

## I.    INTRODUCTION

In this Title IX action, Petitioners—members of the now-eliminated women's lacrosse team at Fresno State—sought to represent a class of all female student-athletes, advancing claims for equal participation opportunities and equal treatment. Determining liability for these claims will require program-wide comparisons of the opportunities and benefits extended to all women and all men in the varsity athletics program. The district court denied class certification for a single reason: It held, *sua sponte*, that, as a matter of federal constitutional law, Petitioners cannot represent women on any other team, much less all female student-athletes. This holding was based on the court's view that student-athletes have a "due process right to vigorous and single-minded advocacy *specific to their sports*" that precludes anything other than a team-specific class. In addition, the court held that this constitutionally guaranteed right to sport-specific advocacy applies to *all stages of litigation*, preventing certification of an all-female-student-athletes class even as to the limited issue of liability. These holdings would eviscerate Title IX's protections against sex discrimination in sports. They are manifestly errors of law.

*First*, the court's holding that all student-athletes have a "due process right to vigorous and single-minded advocacy specific to their respective sports" ignores how Title IX actually works. In particular, liability on Title IX equal opportunities and treatment claims, like those Petitioners advance here, hinges on consideration of

the opportunities and treatment extended to *all* women as compared to *all* men—regardless of their teams. There can be no inherent conflict between members of various teams, much less a constitutional one, because the claims *never* involve sport-specific liability. Moreover, the court's analysis ignored that, even once liability is established, Petitioners cannot dictate how a school comes into compliance with the statute. Instead, even then, schools retain significant discretion and generally submit their own compliance plans. This remedy would obviate any potential remedy-stage conflict.

*Second*, the district court erred by holding that the right to sport-specific advocacy applies to all stages of litigation and prevents certification of a liability-only class. Here, the decision ignores Rule 23(c)(4), which expressly authorizes class certification for limited issues. As discussed above, even if members of different teams might eventually prefer different remedies, they can *never* have a conflict as to liability. This aspect of the decision also ignores Ninth Circuit precedent holding that potential remedy-stage conflicts are speculative and *not* a reason to deny certification. And they are particularly speculative where, as here, the school is generally afforded discretion over *how* to come into compliance.

*Third*, the district court erred by ignoring relevant evidence submitted by Petitioners showing that no conflict even arguably exists in this case. Indeed, despite focusing on potential remedy-stage conflicts, the court ignored that all the relief

2

Petitioners have ever sought in this case would have, if granted, protected the entire class.

Accordingly, this Court should permit Petitioners to appeal the order denying class certification now. Otherwise, these issues could easily evade end-of-the-case review. The court invited a motion to certify a lacrosse-only class because there is a "need to litigate this case as a class action, if only to preserve standing for a period that may exceed the remaining time that named Plaintiffs are enrolled at Fresno State." But the last Petitioner currently enrolled at Fresno State will graduate with a bachelor's degree in the next six months. Unless review is granted now, the decision may effectively end the litigation before the merits of Petitioners' claims are resolved—particularly as the court (at Fresno State's urging) has held that merits discovery is premature pending the certification outcome. *See* Order, ECF No. 106. Indeed, the parties do not even have a scheduling order yet that provides deadlines for discovery, dispositive motions, or a trial. It is nearly impossible that Petitioners will be able to litigate their claims fully, potentially through trial, in the next six months. In this respect, the order may also serve as a death knell.

## II.    FACTS AND PROCEDURE

In October 2020, Fresno State announced its plan to eliminate women's lacrosse, men's tennis, and men's wrestling, effective at the end of the 2020-21 academic year. *See* Order, ECF No. 93 (attached as Exhibit 1), at 1–2. On February

3

12, 2021, Petitioners filed a complaint alleging that Fresno State violated Title IX in two separate ways: (1) by failing to provide female students athletic participation opportunities that were substantially proportionate to their undergraduate enrollment (*i.e.*, the equal accommodation claim), and (2) by failing to provide equal treatment and benefits to female student-athletes (*i.e.*, the equal treatment claim). *See id.* at 2.[1]

That same day, Petitioners sought a preliminary injunction prohibiting Fresno State from eliminating the women's lacrosse team or any other women's team (*i.e.*, preserving the status quo ante) while the parties litigated the underlying Title IX claims. *See id.* The district court denied this motion, clearing the way for Fresno State to eliminate women's lacrosse. *See id.* Fresno State did so at the conclusion of the 2020-21 academic year. *See id.* In July 2021, the district court denied Fresno State's motion to dismiss the equal accommodation and equal protection claims. *See id.* (discussing ECF No. 57).

In February 2022, Petitioners filed a motion for class certification. *See id.* Consistent with how classes are typically defined in Title IX cases involving intercollegiate athletics, Petitioners sought to represent classes consisting of all current and future female student-athletes at Fresno State as to both the equal

---

[1] Plaintiffs also alleged that Fresno State failed to offer female student-athletes equal financial aid. After subsequent amendments, that claim was dismissed with prejudice in October 2021. *See* Order, ECF No. 73. It is not at issue here.

accommodation and equal treatment claims.[2] Despite holding that Petitioners satisfied the requirements of numerosity, commonality, and typicality, *id.* at 10–17, the district court denied that motion, without prejudice, on August 16, 2022.

The court's sole basis for denying certification was that "there are evidently conflicts between the interests of the [proposed] class representatives [*i.e.*, Taylor Anders and Courtney Walburger], as former members of the women's varsity lacrosse team, and current and future female students at Fresno State who were not members of the women's varsity lacrosse team and who are not able and ready to play lacrosse." *Id.* at 20. The court made this finding even though the operative complaint sought "an injunction barring Fresno State from eliminating *any* women's varsity intercollegiate athletic opportunities until it achieves Title IX compliance," and even though both proposed class representatives had filed declarations stating "that they are bringing this action not just for the lacrosse team but to secure injunctive relief on behalf of *all* female athletes at Fresno State." *Id.* at 19 (emphases added). The court likewise acknowledged Petitioners' motion for preliminary injunction had sought "to bar Fresno State from eliminating the women's lacrosse

---

[2] *See infra* at 10 (string citation of cases certifying classes of all female student-athletes). The court changed the proposed class definitions based on its review of the case law. *See* Ex. 1 at 10. Petitioners do not challenge those definitions.

team *or any other women's sport* during the pendency of this case." *Id.* (internal

quotation marks and citations omitted; emphasis added).[3]

Fourteen days later, on August 30, 2022, Petitioners filed a renewed motion

for class certification or, in the alternative, reconsideration of the order denying class

certification. Order, ECF No. 107 (attached as Exhibit 2), at 3. This motion sought

to supplement and correct the record regarding the perceived conflict the court held

prevented certification, including with declarations from Ms. Anders and

Ms. Walburger stating:

> [T]he principal purpose of this case was not and is not to protect or
> restore women's varsity lacrosse. It was and is to require Fresno State
> to comply with Title IX, stop discriminating against female student-
> athletes and potential student-athletes, and provide equal opportunities
> to participate and equal treatment of women in its varsity intercollegiate
> athletic program.

Anders Decl., ECF No. 94-2, at ¶ 6; Walburger Decl., ECF No. 94-3, at ¶ 6; *see also*

*generally* Brief, ECF No. 94-1. In the alternative, the motion requested certification

on the limited issue of Title IX liability (as opposed to remedies). Brief, ECF No.

94-1, at 17–18 (discussing Rule 23(c)(4)).

On November 22, 2022, the district court denied Petitioners' motion. *See*

*generally* Ex. 2. In that order, the court reaffirmed its view that there was a conflict

---

[3] Ms. Walburger was not added as a plaintiff until May 3, 2021, *see* Am. Compl.,
ECF No. 36, *after* the motion for preliminary injunction had been denied, *see* Order,
ECF No. 35 (entered on April 19, 2021).

between the class representatives, as former members of the women's lacrosse team, and members of the class who participate or might participate on other teams. *See id.* For example, the court explained its view that different sports at Fresno State competed for the school's limited financial resources and that Fresno State could comply with Title IX only "through a lopsided allocation of resources that benefits some women's sports more than others." *Id.* at 11; *see also id.* at 15, 18. And the court believed "there is no remedy the Court could apply to prevent that conflict from materializing (or to make it go away)." *Id.* at 11.

The court then held that Ms. Anders's and Ms. Walburger's neutrality was irrelevant because they "do[] not provide female student-athletes who are 'ready and able' to participate in varsity sports other than women's lacrosse with the 'structural assurance of fair and adequate representation' to which they are entitled in class actions as a matter of due process." *Id.* at 15 (citation omitted). Having previously found Ms. Anders and Ms. Walburger inadequate representatives because it thought they *favored* their team, the court now held their *neutrality* rendered them inadequate—because members of the class are constitutionally entitled to "sport-specific advocacy." *Id.* at 16; *see also id.* at 18 ("Also, neutrality on the part of the proposed class representatives would deprive student-athletes (including lacrosse players) of their due process right to vigorous and *single-minded advocacy specific to their respective sport*." (emphasis added)).

Finally, the court declined to certify a liability-only class because "liability and remedies cannot neatly be separated from one another in this case." *Id.* at 17. More to the point, the court held that "due process rights to vigorous sport-specific representation apply at *all stages* of this litigation." *Id.* at 18 (emphasis added).

On December 6, 2022, fourteen days after this order was entered, Petitioners timely filed this petition for interlocutory review.

## III.    ISSUES PRESENTED

Whether the district court committed manifest error when it held that, in a Title IX class action seeking equal opportunities and treatment in athletics, members of one women's team cannot adequately represent a class of all female student-athletes because class members have "due process rights to vigorous sport-specific representation . . . at all stages of . . . litigation."

## IV.    STANDARD

Under Rule 23(f), this Court has "unfettered discretion" to grant a party permission to pursue an interlocutory appeal of a district court's order denying class certification based on "any consideration that [it] finds persuasive." *Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 957 (9th Cir. 2005) (citation omitted); FED. R. CIV. P. 23(f) (containing no limitation on this discretion).

This Court has explained that immediate review under Rule 23(f) is "most appropriate" when (1) "the district court's decision is manifestly erroneous"; (2) "the

certification decision presents an unsettled and fundamental issue of law relating to class actions, important both to the specific litigation and generally, that is likely to evade end-of-the-case review"; or (3) "there is a death-knell situation for either the plaintiff or defendant that is independent of the merits of the underlying claims, coupled with a class certification decision . . . that is questionable." *Chamberlan*, 402 F.3d at 959. These categories, however, "do not constitute an exhaustive list of factors." *Id.* at 960. Nor are they "a rigid test." *Id.* Instead, they are "merely guidelines," and it remains possible "that a petition that does not fit within any of the foregoing situations may be worthy of an interlocutory appeal." *Id.*

## V.    ARGUMENT

### A. A right to sport-specific advocacy makes no sense for these Title IX claims because liability is assessed on a program-wide basis and, even upon a finding of liability, schools are given discretion as to how to come into compliance.

The district court's first manifest legal error was its holding that there is a constitutional right to sport-specific advocacy in Title IX litigation, based on its view that there is an inherent conflict between members of one team and individuals of the same sex on other teams. *See* Ex. 2 at 15–16, 18. Petitioners are aware of *no court*, anywhere, that has ever held that Title IX plaintiffs have such a right. To the contrary, courts routinely certify classes of all female student-athletes with representatives from one or two teams. *See, e.g.*, *A.B. by C.B. v. Hawaii State Dep't of Educ.*, 334 F.R.D. 600, 611 (D. Haw. 2019), *rev'd and remanded sub nom. A. B.*

*v. Hawaii State Dep't of Educ.*, 30 F.4th 828 (9th Cir. 2022) (certifying a class of all present and future female student-athletes, with representatives from women's swimming and water polo); *Cohen v. Brown Univ.*, 991 F.2d 888, 893 (1st Cir. 1993) (certifying a class of "all present and future Brown university women students . . . who participate, seek to participate, and/or are deterred from participating in intercollegiate athletics," with representatives from women's volleyball and gymnastics); *Brust v. Regents of the University of California*, No. 2:07-cv-01488, 2008 WL 11512299, at *2, 7 (E.D. Cal. Oct. 24, 2008) (certifying a class of "current, prospective, and future women students . . . who seek to participate in and/or who are deterred from participating in intercollegiate athletics," with representatives from women's field hockey).[4]

This legal error is perhaps clearest as to liability. For equal accommodation and equal treatment claims, there can be no conflict as to liability between members of different sports—and no need or place for sport-specific advocacy—because Title IX liability can *never* be established as to a specific sport. It is well-established, as to both equal accommodation and equal treatment claims, that Title IX liability hinges on program-wide comparisons. For example, the Seventh Circuit has explained that—for equal treatment claims—courts "look to the overall effect of any

---

[4] *See also Portz v. St. Cloud State Univ.*, 297 F. Supp. 3d 929, 943–50 (D. Minn. 2018) (similar); *Foltz v. Delaware State Univ.*, 269 F.R.D. 419, 424–25 (D. Del. 2010) (similar).

differences on a program-wide, not sport-specific basis," meaning that "disadvantaging one sex in one part of a school's athletic program can be offset by a comparable advantage to that sex in another area." *Parker v. Franklin Cnty. Cmty. Sch. Corp.*, 667 F.3d 910, 922 (7th Cir. 2012). As this Court has explained, the same is true of equal accommodation claims—"determining whether discrimination exists in athletic programs *requires* gender-conscious, group-wide comparisons." *Neal v. Bd. of Trustees of California State Univs.*, 198 F.3d 763, 772 n.8 (9th Cir. 1999).[5]

Here, for Petitioners' equal accommodation claim, liability is assessed based on "whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments." *Neal*, 198 F.3d at 767–68. There can be no "sport-specific advocacy"

---

[5] Courts across the country agree on these basic points. *See, e.g.*, *Portz v. St. Cloud State Univ.*, 16 F.4th 577, 584 (8th Cir. 2021) ("[The district court] should have focused on program-wide benefits and opportunities rather than on a smaller subdivision of the program (*e.g.*, sports, tiers of sports, etc.)."); *T.W. v. Shelby Cnty. Bd. of Educ.*, 818 Fed. App'x 453, 462 (6th Cir. 2020) (noting that courts "look to the overall effect of any differences on a program-wide, not sport-specific basis, meaning that a disadvantage to girls in one sport might be made up for by a relative advantage in another" (internal quotation marks and citations omitted)); *McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 293 (2d Cir. 2004) (same); *Williams v. Sch. Dist. of Bethlehem, Pa.*, 998 F.2d 168, 174–75 (3d Cir. 1993) ("If Congress had intended the inquiry into 'athletic opportunities' to be limited to a 'particular sport,' it would have so stated . . . . We believe the district court was correct in implicitly rejecting the plaintiffs' sport-specific interpretation, and in looking instead to the overall athletic opportunities."); OCR, Policy Interpretation, 44 Fed. Reg. 71413, 71422 (Dec. 11, 1979) (noting Title IX "frames the general compliance obligations of recipients in terms of program-wide benefits and opportunities" and protects "the individual as a student-athlete, not as a basketball player, or a swimmer").

on this question—nor conflict regarding it—precisely because the question can never be answered in a sport-specific way. The test itself requires consideration of the opportunities offered to *all* women and *all* men participating in *all* sports. *See id.* at 772 n.8.

Similarly, liability for Petitioners' equal treatment claim depends on a program-wide analysis. *See* Policy Interpretation, 44 Fed. Reg. at 71422; *Portz*, 16 F.4th at 584; *T.W.*, 818 Fed. App'x at 462; *Parker*, 667 F.3d at 922; *McCormick*, 370 F.3d at 293. To assess liability, the court must consider the treatment of *all* female student-athletes compared to *all* male student-athletes for benefits like equipment, coaching, and academic support, not just whether women playing a particular sport have been shortchanged. Once again, the test itself precludes "sport-specific advocacy" on the issue of liability. Accordingly, there cannot be even an arguable conflict between class representatives from one sport and class members from another.

The district court also erred by holding that members of different teams have an intractable conflict as to remedies in Title IX litigation. *See* Ex. 2 at 11 (holding "there is no remedy the Court could apply to prevent that conflict from materializing (or to make it go away)"). In fact, as the First Circuit recently explained, there is no conflict as to remedies in Title IX litigation because "every varsity team, regardless of gender, play[s] at [the school's] pleasure, knowing that Title IX does not require

institutions to fund any particular number or type of athletic opportunities." *Cohen v. Brown Univ.*, 16 F.4th 935, 949–51 (1st Cir. 2021), *cert. denied sub nom. Walsh v. Cohen*, 142 S. Ct. 2667 (2022). Given institutional discretion about how to comply with Title IX, a liability determination will usually result in an order requiring the school to propose a compliance plan. *See, e.g.*, *Cohen v. Brown Univ.*, 991 F.2d 888, 906 (1st Cir. 1993) (holding that, if the district court ultimately "finds Brown's athletic program to violate Title IX, it will initially require the University to propose a compliance plan rather than mandate the creation or deletion of particular athletic teams"); *see also Balow v. Michigan State Univ.*, 24 F.4th 1051, 1061 (6th Cir. 2022) (holding that orders maintaining the status quo may be appropriate at the preliminary-injunction stage "even though, as a more permanent matter, a school may be entitled to determine its own method for achieving statutory compliance" (internal quotation marks and citation omitted)).[6] The same result is likely to obtain here.

Indeed, the district court previously acknowledged this reality. *See* Order, ECF No. 57, at 22 (noting that reinstatement of the women's lacrosse team was "by

---

[6] As *Balow* suggests and *Cohen* makes clear, a sport-specific remedy may be appropriate at the preliminary-injunction stage, when Title IX plaintiffs seek to preserve the status quo, and not at the case's ultimate conclusion on the merits, where schools are typically granted more discretion about how to come into compliance. *Cohen*, 991 F.2d at 906 (cautioning that sport-specific relief awarded at the preliminary-injunction stage may not "be suitable at trial's end if the Title IX charges prove out against Brown").

no means necessitated by [Petitioners'] claim" and citing a case that "ordered defendant to submit a Title IX compliance plan"). The compliance-plan remedy would "prevent th[e perceived] conflict from materializing (or . . . make it go away)." Ex. 2 at 11. Put simply, there can be no intra-class conflict over a remedy that Fresno State, and not Petitioners, could control.

The district court's ruling to the contrary was based at least in part on its misreading of *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997). There, the Supreme Court confronted Rule 23(a)(4)'s adequate-representation requirement in the context of a settlement-only class of present and future asbestos victims arising under Rule 23(b)(3). *See id.* at 615–20, 625–28. The Court explained that the "named parties with diverse medical conditions sought to act on behalf of a single giant class rather than on behalf of discrete subclasses" and that "the interests of those within the single class are not aligned." *Id.* at 626. For example, "for the currently injured, the critical goal is generous immediate payments." *Id.* But "[t]hat goal tugs against the interest of exposure-only [*i.e.*, currently uninjured] plaintiffs in ensuring an ample, inflation-protected fund for the future." *Id.* Meanwhile, "the terms of the settlement reflect[ed] essential allocation decisions designed to confine compensation and to limit defendants' liability. *Id.* at 627.

This case is very different. To start, *Amchem* analyzed conflicts in the concrete context of an agreed-upon "global settlement." There was no proposed settlement

class here. Instead, the district court analyzed hypothetical conflicts that *may* (or may not) materialize at the remedy stage. In addition, *Amchem* did not involve the kind of Rule 23(b)(2) class involved here, where an actor's conduct is necessarily directed at the entire class.

In this case, all class members share an identical goal of proving Fresno State violated Title IX by depriving them of equal participation opportunities and treatment. There is no putative class member known to have even a remedial goal that differs from Petitioners' goals here. But the hypothetical existence of such a class member can be addressed, if necessary, via subclassing at the remedy stage (or potentially via a compliance-plan remedy).[7]

Most fundamentally, *Amchem* did not create or impose a new due process right—and does not support the district court's creation of one. It did not hold that, as a matter of due process, current asbestos victims cannot represent future asbestos

---

[7] The court took issue with the fact that Petitioners initial settlement offer mentioned only reinstatement of lacrosse. Ex. 2 at 14–15. But this offer betrays no conflict. To start, the March 2021 settlement offer (made before the motion for preliminary injunction was fully briefed and while the women's lacrosse team was playing what became its final season) did not mention the "reinstatement" of any other team, *id.* at 14, precisely because Fresno State had not threatened to eliminate any other women's team. Instead, in this offer, Petitioners sought to protect the entire class's interests by requiring Fresno State to "develop and implement a gender equity plan" that would "get all aspects of its intercollegiate athletic department into compliance with Title IX in the next year or two." *Id.* A subsequent offer—in March 2022— again sought to require this broad equity plan and specifically mentioned the possible addition of a non-lacrosse women's team. *See id.* at 13, 15; ECF No. 94-6.

victims. Instead, based on the facts of that case, it held that these current asbestos victims could not represent this class of future asbestos victims under Rule 23(a)(4). The district court here, however, created a new due process right to vigorous and single-minded single-sport advocacy, constitutionally barring athletes on one team from representing athletes on other teams in Title IX cases. *Amchem* provides no basis for that holding.

In sum, the district court's application of *Amchem* was wrong as a matter of law. In this respect, it is revealing that no other court has ever recognized a due process right to sport-specific advocacy at *any* stage of Title IX litigation, let alone at *all* stages of litigation. This novel issue is unsettled and, at the very least, satisfies the second prong of the *Chamberlan* test discussed above. Such a right would mean that Petitioners could only represent a class of former players on a now-eliminated team. More generally, it would mean that no member of an individual team could ever represent all female student-athletes or members of any other team, in contrast to the way Title IX litigation has been conducted since the statute's enactment fifty years ago. *See supra* at 10 (collecting cases certifying such classes). It would also mean that each team could—or perhaps must—pursue a separate class action, with separate counsel, alleging a violation of law that necessarily turns on program-wide comparisons. Such a rule would make Title IX litigation unmanageable and its promises of equity impossible to achieve.

16

### B. The district court's decision is contrary to Ninth Circuit precedent holding that potential conflicts are speculative as a matter of law.

The district court also committed manifest legal error by disregarding binding Ninth Circuit precedent that potential intra-class conflicts are, as a matter of law, speculative and will not bar certification. *See, e.g.*, *Cummings v. Connell*, 316 F.3d 886, 896 (9th Cir. 2003) ("[T]his circuit does not favor denial of class certification on the basis of speculative conflicts."); *Soc. Servs. Union, Loc. 535, Serv. Emps. Int'l Union, AFL-CIO v. Santa Clara Cnty.*, 609 F.2d 944, 948 (9th Cir. 1979) ("Mere speculation as to conflicts that *may* develop at the remedy stage is insufficient to support denial of initial class certification." (emphasis added)); *Blackie v. Barrack*, 524 F.2d 891, 909 (9th Cir. 1975) ("It is for the district judge, after becoming aware of the nature of the case, to determine the appropriate measure of damages in the first instance; the *possible* creation of *potential* conflicts by that decision does not render the class inappropriate now. The Rule provides the mechanism of subsequent creation of subclasses to deal with latent conflicts which may surface as the suit progresses." (emphases added; citation omitted)).

Indeed, the district court's view that there is a constitutional right to sport-specific advocacy hinged on its view that there were potential conflicts between various teams concerning remedies. *See, e.g.*, Ex. 2 at 11 (noting that Fresno State has "limited athletic resources" and "can achieve full Title IX compliance . . . through a lopsided allocation of resources that benefits some women's teams more

than others"); *id.* at 18 ("[D]ifferent sports necessarily compete for limited resources at Fresno State and . . . one or more women's sports will benefit more than others if Plaintiffs prevail on one or more of their claims.").

Under this Circuit's law, these *potential* remedy-stage conflicts are speculative and insufficient to deny class certification. *See, e.g.*, *Cummings*, 316 F.3d at 896; *Soc. Servs. Union, Loc. 535*, 609 F.2d at 948; *Blackie*, 524 F.2d at 909. The proper course is to certify the class, and then reassess the potential for conflicts, if and when necessary, as the case progresses. *See, e.g.*, *Blackie*, 524 F.2d at 909, 911 (noting that the district court retains "constant supervision" and can "create sub-classes," if necessary, at later stages "to assure fairness of representation"); *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 431 n.7 (4th Cir. 2003) ("[P]otential conflicts relating to relief issues which would arise only if the plaintiffs succeed on common claims of liability on behalf of the class will not bar a finding of adequacy."); *A.B.*, 334 F.R.D. at 611 (holding the same conflict the district court held precluded certification was a "speculative, potential conflict" that "does not give rise to a finding of inadequate representation").

The district court failed to follow these precedents and, instead, "agree[d] with the reasoning," Ex. 2 at 12, of out-of-circuit courts that—contrary to Ninth Circuit law—declined to certify all-female-student-athletes classes based on the existence of *potential* remedy-stage conflicts. *See, e.g.*, *Boucher v. Syracuse Univ.*, 164 F.3d

18

113, 119 (2d Cir. 1999) (holding that there were "*potential* conflicts between members of a class that included both women interested in playing varsity lacrosse and women who wished to play varsity softball" (emphasis added)); *Miller v. Univ. of Cincinnati*, 241 F.R.D. 285, 290 (S.D. Ohio 2006) (focusing solely on conflicts over potential remedies); *Robb v. Lock Haven University of Pennsylvania*, No. 4:17-cv-00964, 2019 WL 2005636, at *12 (M.D. Pa. May 7, 2019) (basing the decision on what the named plaintiff "would likely advocate"); *Bryant v. Colgate Univ.*, No. 93-cv-1029, 1996 WL 328446, at *6 (N.D.N.Y. June 11, 1996) (holding "it would seem" that remedy-stage interests of players on one team could be antagonistic to those on other teams, which "could render plaintiffs' representation inadequate").

That reliance was error, particularly in this case, where any potential remedy-stage conflicts are especially speculative and might be avoided entirely by an order requiring Fresno State, upon a finding of liability, to submit a compliance plan. If the court approves such a plan, the potential conflicts would vaporize.

### C. The district court disregarded the facts of this case, which prove there is no conflict.

Finally, the district court compounded the foregoing errors by disregarding the facts of this case, where the proposed class representatives clarified their intention to advocate on the entire class's behalf. Indeed, the district court purported to *credit* Petitioners' unrebutted testimony and declarations that they would advocate for all female student-athletes. *See* Ex. 1 at 20; Ex. 2 at 14. The truth of those

declarations should have been clear from the start, as the operative complaint was not focused on the lacrosse team alone and, instead, sought "an injunction barring Fresno State from eliminating *any women's varsity intercollegiate athletics opportunities* until it achieves Title IX compliance." *See* Ex. 1 at 19. Likewise, the motion for preliminary injunction, denied a year and a half ago, sought "to bar Fresno State from eliminating *the women's lacrosse team or any other women's sport* during the pendency of this case." *Id.* (emphases added; internal quotation marks omitted). The same is true of Petitioners' settlement offers. *See supra* n.7.

Paying little heed to these facts, the district court focused on the existence of lacrosse-specific allegations in the operative complaint, declarations presented with the motion for preliminary injunction that spoke to Petitioners' personal experiences as lacrosse players, *see* Ex. 1 at 19, the number of times the operative complaint contains the word "lacrosse" (*i.e.*, the only eliminated women's team and the team on which all Petitioners participated), and the fact that the proposed class representatives viewed reinstatement as "a goal" or a "bonus" and would be "sad" or "disappointed" if it did not occur, Ex. 2 at 14. This evidence says nothing about the kind of remedies Petitioners might seek if Fresno State were ultimately held liable—even assuming they could influence such remedies. Elevating this irrelevant evidence above Petitioners' sworn statements and the relief they actually sought was manifest error warranting immediate review.

## VI.   CONCLUSION

For the foregoing reasons, the Court should grant the petition.

Respectfully submitted,

*/s/ Arthur H. Bryant*
Arthur H. Bryant
Bailey & Glasser, LLP
1999 Harrison Street, Suite 660
Oakland, CA 94612
Tel.: (510) 272-8000
Fax: (510) 436-0291
E-mail: abryant@baileyglasser.com

*/s/ Joshua I. Hammack*
Joshua I. Hammack
Bailey & Glasser LLP
1055 Thomas Jefferson Street NW, Suite 540
Washington, DC 20007
Tel: (202) 463-2101
Fax: (202) 463-2103
E-mail:jhammack@baileyglasser.com

Lori Bullock
Bailey & Glasser LLP
309 East 5th Street
Suite 202B
Des Moines, IA 50309
Tel: (515) 416-9051
Fax: (304) 342-1110
E-mail: lbullock@baileyglasser.com

Michael A. Caddell
Cynthia B. Chapman
Amy E. Tabor
Caddell & Chapman
P.O. Box 1311
Monterey, CA 93942
Tel.: (713) 751-0400
Fax: (713) 751-0906
E-mail: mac@caddellchapman.com
E-mail: cbc@caddellchapman.com
E-mail: aet@caddellchapman.com

*ATTORNEYS FOR PLAINTIFFS-PETITIONERS*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 5(c)(l) and Circuit R. 32-3(2) because this brief contains 5,151 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). Pursuant to Circuit R. 32-3, the word count divided by 280 does not exceed the designated limit of 20 pages.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman type.

DATED: December 6, 2022

*/s/ Arthur H. Bryant*
Arthur H. Bryant
Counsel for Plaintiffs-Petitioners

# Exhibit 1

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| TAYLOR ANDERS, et al., | Case No. 1:21-cv-00179-AWI-BAM |
| Plaintiffs, | **ORDER DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |
| v. | |
| CALIFORNIA STATE UNIVERSITY, FRESNO, et al., | (Doc. No. 88) |
| Defendants. | |

Plaintiffs Taylor Anders, Hennessey Evans, Abbigayle Roberts, Megan Walaitis, Tara Weir and Courtney Walburger (together, "Plaintiffs") bring a motion for class certification under Rules[1] 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure. Doc. No. 88. The motion has been fully briefed and deemed suitable for decision without oral argument under Local Rule 230(g). Doc. No. 92. Having thoroughly reviewed the parties' briefing and other relevant portions of the record, the Court will deny the motion without prejudice.

## **BACKGROUND**

In the 2020-21 academic year, Defendant California State University, Fresno ("Fresno State") sponsored eight varsity sports for men and 13 varsity sports for women. Doc. No. 19 at 8:14-18;[2] Doc. No. 19-2 at 19. Each of these sports is segregated by sex. Doc. No. 19-2 at 19. On October 16, 2020, Fresno State announced it would stop offering men's wrestling, men's tennis

---

[1] Unless otherwise indicated, "Rule" refers to the Federal Rules of Civil Procedure.
[2] Page citations to documents on the Court's electronic docket are to the page number in the CM/ECF stamp at the top of each page.

1 and women's lacrosse at the end of the current 2020-21 academic year. Doc. No. 2-1 at 6:13-18.

2       On February 12, 2021, Anders, Evans, Roberts, Walaitis and Weir filed this class action

3 (as members of Fresno State's women's varsity lacrosse team) against Fresno State and certain

4 Fresno State administrators (collectively, "Defendants") alleging that Defendants violated Title IX

5 of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. ("Title IX") and implementing

6 regulations by failing to provide female students an equal opportunity to participate in varsity

7 athletics (the "effective accommodation" claim); failing to provide female athletes with an equal

8 allocation of financial aid (the "financial aid" claim); and failing to provide female athletes with

9 benefits comparable to those provided to male athletes (the "equal treatment" claim). Doc. No. 1.

10 On February 12, 2021, Plaintiffs also filed a motion seeking a preliminary injunction barring

11 Fresno State from cutting women's lacrosse—or any other women's team—and requiring Fresno

12 State "to treat the women's lacrosse team and its members fairly" during the pendency of this

13 litigation. Doc. No. 2-1 at 6:5-9. The Court granted the motion as to equal treatment of the

14 women's lacrosse team but did not bar elimination of the women's lacrosse team. Doc. No. 35.

15       On May 3, 2021, a First Amended Complaint ("FAC") was filed, adding Walburger as a

16 sixth Plaintiff. See Doc. No. 36 & 41. On May 15, 2021, Defendants filed a motion to dismiss the

17 FAC in its entirety—including the effective accommodation claim, the financial aid claim, and the

18 equal treatment claim. Doc. No. 42. The motion was granted, with leave to amend, as to the

19 financial aid claim and denied as to the effective accommodation claim and the equal treatment

20 claim. Doc. No. 57 at 30.

21       Plaintiffs filed a Second Amended Complaint ("SAC") on August 12, 2021 seeking to state

22 a financial aid claim, Doc. No. 59, and on October 29, 2021, the Court granted, with prejudice,

23 Defendants' motion to dismiss the financial aid claim on a finding that, properly construed, data

24 cited by the Plaintiffs showed that female student-athletes received a disproportionate share of

25 athletic scholarships at Fresno State. Doc. Nos. 60 & 73.

26       Defendants answered the SAC on November 19, 2021, Doc. No. 74, and on February 25,

27 2022, Plaintiffs brought the instant motion for class certification. Doc. No. 88.

28 //

**PLAINTIFFS' MOTION**

In this motion, Plaintiffs seek certification under Rules 23(a) and 23(b)(2) of the Federal

Rules of Civil procedure of a class defined as follows:

> All present and future women students and potential students at Fresno State who
> participate, seek to participate, and/or are deterred from participating in
> intercollegiate athletics there.

Doc. No. 88 at 2:15-20. Further, they seek appointment of two Plaintiffs—Anders and

Walburger—as class representatives and appointment of Bailey & Glasser, LLP as class counsel.

Id. at 2:8-12.

Plaintiffs argue, in the main, that class certification is warranted because the sex

discrimination alleged in this action is "inherently class-based" and that "the proposed class

representatives will fairly, adequately, and vigorously represent the interests of the class." See

Doc. No. 88-1 at 22:17-20, 25:22-24. Defendants argue that the proposed class is overbroad and

that none of the four prerequisites for class certification under Rule 23(a) have been satisfied. See

Doc. No. 90.

**LEGAL STANDARD**

A class action is "an exception to the usual rule that litigation is conducted by and on

behalf of the individual named parties only." Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1432

(2013) (quoting Califano v. Yamasaki, 442 U.S. 682, 700-701 (1979)) (internal quotation marks

omitted). In a class action, one or more class members may "litigate on behalf of many absent

class members, and those class members are bound by the outcome of the representative's

litigation." 1 Newberg on Class Actions § 1:1 (5th ed.) (citing Supreme Tribe of Ben Hur v.

Cauble, 255 U.S. 356, 363 (1921)).

Class actions are governed by Rule 23 of the Federal Rules of Civil Procedure, which sets

forth a two-part framework for deciding whether a class may be certified for representative

litigation. See Kanawi v. Bechtel Corp., 254 F.R.D. 102, 107 (N.D. Cal. 2008).

First, Rule 23(a) asks whether a proposed class action satisfies each of the following four

requirements: (1) the class is so numerous that joinder of all members is impracticable; (2) there

are questions of law or fact common to the class; (3) the claims or defenses of the representative

3

1  parties are typical of the claims or defenses of the class; and (4) the representative parties will

2  fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a).

3        Assuming all four of the Rule 23(a) prerequisites are satisfied, the second step of the

4  analysis addresses whether the proposed class satisfies the requirements of Rule 23(b)(1), Rule

5  23(b)(2), or Rule 23(b)(3). See Kanawi, 254 F.R.D. at 107. Here, Plaintiff seeks certification

6  under Rule 23(b)(2), which allows for a class action to be maintained where "the party opposing

7  the class has acted or refused to act on grounds that apply generally to the class, so that final

8  injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."

9  Fed.R.Civ.P. 23(b)(2).

10        A court must conduct a "rigorous analysis" to determine whether all applicable

11  requirements of Rule 23(a) and Rule 23(b) have been satisfied. General Telephone Co. of

12  Southwest v. Falcon, 457 U.S. 147, 161 (1982). The merits of the class members' substantive

13  claims are generally irrelevant to this analysis, Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177–

14  78 (1974), but courts are "at liberty to consider evidence which goes to the requirements of Rule

15  23 even though the evidence may also relate to the underlying merits of the case." Hanon v.

16  Dataproducts Corp., 976 F.2d 497, 509 (9th Cir. 1992) (citation and internal quotation marks

17  omitted). A court takes "the substantive allegations of the complaint as true," Blackie v. Barrack,

18  524 F.2d 891, 901 n.17 (9th Cir. 1975), and a court is not limited to considering only admissible

19  evidence in deciding a motion for class certification. Sali v. Corona Reg'l Med. Ctr., 909 F.3d

20  996, 1005-06 (9th Cir. 2018), cert. dismissed, 139 S. Ct. 1651 (2019).

21        Courts apply a preponderance of the evidence standard in deciding motions for class

22  certification, Martin v. Sysco Corporation, 325 F.R.D. 343, 354 (E.D. Cal. 2018) (citations

23  omitted), and the proponent of class treatment bears the burden of affirmatively demonstrating that

24  class certification is warranted. See Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011); see

25  also, Kanawi, 254 F.R.D. at 107 ("The party seeking certification must provide facts sufficient to

26  satisfy the requirements of Rule 23(a) and (b)." (citing Doninger v. Pac. Northwest Bell, Inc., 564

27  F.2d 1304, 1308–09 (9th Cir. 1977)).

28        If a court decides to certify a class, the court must issue a certification order defining "the

4

1  class and the class claims, issues, or defenses, and must appoint class counsel" under Rule 23(g) of

2  the Federal Rules of Civil Procedure. Fed.R.Civ.P. 23(c)(1)(A)-(B).

**DISCUSSION**

**A.**    **Scope of the Proposed Class**

5       When "a class is defined so broadly as to include a great number of members who for

6  some reason could not have been harmed by the defendant's allegedly unlawful conduct, the class

7  is defined too broadly to permit certification." Olean Wholesale Grocery Coop., Inc. v. Bumble

8  Bee Foods LLC, 31 F.4th 651, 669 (9th Cir. 2022) (quoted source and internal quotation marks

9  omitted). The Court will therefore begin by reviewing the scope of the proposed class. See Portz v.

10 St. Cloud State Univ., 297 F. Supp. 3d 929, 942 (D. Minn. 2018) ("The Court must first decide

11 whether Plaintiffs' proposed class definition is acceptable."); see also, Bryant v. Colgate Univ.,

12 1996 WL 328446, at *6 (N.D.N.Y. June 11, 1996) (assessing proper scope of class in light of

13 allegations in the complaint prior to conducting point-by-point Rule 23 analysis); Lundquist v.

14 Security Pacific Automotive Financial Services Corp., 993 F.2d 11, 14 (2d Cir. 1993) (stating that

15 courts are "not bound by the class definition proposed in the complaint" (quoting Robidoux v.

16 Celani, 987 F.2d 931, 937 (2d Cir. 1993)).

17      Defendants argue that the "proposed class definition sweeps far too broadly" because: (i) it

18 "includes no requirement that a class member have experienced any actual harm from Fresno

19 State's athletic policies or practices"; and (ii) " 'potential' 'future' students who 'are deterred

20 from' enrolling at Fresno State and participating in intercollegiate athletics there" are not

21 "reasonably ascertainable." Doc. No. 89 at 12:15-14:4. Plaintiffs argue that "[c]ourts have

22 routinely recognized the class-based nature of Title IX claims and have certified classes almost

23 identical to the proposed class here, including classes that consist of present, prospective, future,

24 and deterred female students." Doc. No. 90 at 3:7-10. Further, they argue that Defendants'

25 approach to defining the class would result in an improper "fail safe" class "defined to include

26 only those individuals who were injured by the allegedly unlawful conduct." Id. at 4:2-18.

27      Reviewing relevant case law, the Court finds three Title IX decisions to be particularly

28 instructive as to threshold determinations regarding the proper scope of a class under facts similar

1  to those in this case: *Biediger v. Quinnipiac Univ.*, Case No. 3:09cv621 (SRU), 2010 WL 2017773

2  (D. Conn. May 20, 2010); *Portz v. St. Cloud State Univ.*, 297 F. Supp. 3d 929 (D. Minn. 2018);

3  and *Bryant v. Colgate Univ.*, Case No. No. 93-CV-1029, 1996 WL 328446 (N.D.N.Y. June 11,

4  1996). The Court will briefly summarize relevant aspects of each decision and then discuss their

5  applicability here.

6          In *Biediger*, the named plaintiffs were members of the Quinnipiac University

7  ("Quinnipiac") women's volleyball team who were enrolled at Quinnipiac at the time the action

8  was brought. Biediger, 2010 WL 2017773 at *5. They moved under Rule 23(b)(2) to certify a

9  class defined as follows:

10           … [A]ll present, prospective, and future female students … harmed by and want to
             end [Quinnipiac's] sex discrimination in: (1) the allocation of athletic participation
11           opportunities; (2) the allocation of athletic financial assistance; and (3) the
             allocation of benefits provided to varsity athletes ….
12
13  Biediger, 2010 WL 2017773 at *2. In addition, they sought relief on behalf of "females …

14  deterred from enrolling at [Quinnipiac] because of the sex discrimination in its athletic program,

   including its failure to offer the varsity sports in which they want to participate …." Id.
15
16          Quinnipiac argued, *inter alia*, that the class was not ascertainable due to the inclusion of

17  future and prospective students. Id. The court found that the "mere inclusion of future students

   does not cause a class to be unascertainable" and that given the proposed definition of the class
18
19  (which was limited to female students who were "harmed by" Quinnipiac's sex discrimination)

   any "future female students" in the class would necessarily face the "imminent threat of injury"
20
21  required for standing. Biediger, 2010 WL 2017773 at *3. The court, however, rejected the

22  proposition that the class properly included females who were deterred from enrolling at

23  Quinnipiac due to alleged sex discrimination in athletics, in part because standing was

   questionable and in part because, as enrolled students, the class representatives had not suffered
24
25  the same injury as females who were not enrolled at Quinnipiac. Id. at *5.

26          In *Portz*, members of St. Cloud State University's ("SCSU") varsity women's tennis and

27  Nordic skiing teams moved for certification of a class defined as:

28           All present and future St. Cloud State University female students who participate,
             seek to participate, or have been deterred from participating in intercollegiate

1    athletics at St. Cloud State University.

2    _Portz_, 297 F. Supp. 3d at 942. The court found—as the _Biediger_ court had—that the inclusion of

3    future students in the class was not improper, id. at 943, but that the class was overbroad because

4    it included student-athletes who had been "effectively accommodated by SCSU's athletic

5    programming." Id. at 942. Thus, the court redefined the class as follows:

6        All present, prospective, and future female students at St. Cloud State University
         who _are harmed by_ and want to end St. Cloud State University's sex discrimination
7        in: (1) the allocation of athletic participation opportunities; (2) the allocation of
         athletic financial assistance; and (3) the allocation of benefits provided to varsity
8        athletes.

9    Id. at 943 (emphasis added).

10       Finally, in _Bryant_, ten members of the women's club ice hockey team at Colgate

11   University ("Colgate") sought to certify a class defined as:

12       … [A]ll present and future Colgate University women students and potential
         students who participate, seek to participate, and/or are deterred from participating
13       in Colgate's intercollegiate athletics program.

14   _Bryant_, 1996 WL 328446 at *1. The court found that that "the proposed class [was] not an

15   appropriate class for certification" because it improperly included student athletes "whose interests

16   and abilities [were] satisfied by Colgate's [existing] slate of women's varsity teams." Id. at *6.

17   Based on this finding, the court redefined the class as "all present and future female students of

18   Colgate University who are interested in and able to play varsity ice hockey, but are unable to do

19   because it is not a women's varsity sport." Id.

20       Plaintiffs argue that the class definition in _Portz_ is improper because it creates a "fail safe"

21   class "defined to include only those individuals who were injured by the allegedly unlawful

22   conduct." Doc. No. 90 at 4:8-12 (quoting Olean, 31 F.4th at 669). The Court takes Plaintiffs' point

23   with respect to the "are harmed by" language, but _Portz_—as well as _Biediger_ and _Bryant_—

24   nonetheless underscore that "a class must be defined in such a way that anyone within it would

25   have standing." Gonzales v. Comcast Corp., 2012 WL 10621, at *7 (E.D. Cal. Jan. 3, 2012), report

26   and recommendation adopted, 2012 WL 217708 (E.D. Cal. Jan. 23, 2012) (collecting cases).[3]

27   _____

28   [3] See, e.g., Dukes, 564 U.S. at 365 (acknowledging the need to exclude putative class members seeking injunctive
     relief who were no longer employed by Wal–Mart because those absent class members "lack[ed] standing to seek

                                                    7

As noted above, Plaintiffs allege two claims: (i) an effective accommodation claim; and (ii) an unequal treatment claim. " … [T]o establish standing under a Title IX effective accommodation claim, a party need [] demonstrate that she is 'able and ready' to compete for a position on the unfielded team." Pederson v. Louisiana State Univ., 213 F.3d 858, 871 (5th Cir. 2000); see also Beal v. Midlothian Indep. Sch. Dist. 070908 of Ellis Cnty., 2002 WL 1033085, at *3 (N.D. Tex. May 21, 2002) (finding plaintiffs lacked standing for an effective accommodation claim under Title IX because, *inter alia*, they failed to allege that they were "able and ready" to participate in an athletic opportunity that was not offered by the defendant academic institution). And to have standing for an unequal treatment claim, a plaintiff must show that they experienced unequal treatment while participating in athletics or, perhaps, that they "able and ready" to pursue participation in athletics at the defendant institution but were deterred from doing so "because of perceived unequal treatment of female [] athletes." See Pederson, 213 F.3d 872 (allowing for the possibility that "a female student who was deterred from competing for a spot on an existing varsity team because of perceived unequal treatment of female varsity athletes" may have standing for an equal treatment claim under Title IX).[4]

The Court reviewed the decisions Plaintiffs cite in opposition to Defendants' contention that the proposed class is overbroad, including *Cohen v. Brown University*, 991 F.2d 888 (1st Cir. 1993), *Favia v. Indiana University of Pennsylvania*, 7 F.3d 332 (3rd Cir. 1993), and *Haffer v. Temple University*, 678 F. Supp. 517 (E.D. Pa. 1987). See Doc. No. 90 at 3:6-18. The classes in

---

injunctive or declaratory relief against [Wal–Mart's current] employment practices."); Amchem Prods., Inc., v. Windsor, 521 U.S. 591, 612–13 (1997) (instructing district courts to be "mindful that Rule 23's requirements must be interpreted in keeping with Article III constraints."); Denney v. Deutsche Bank AG, 443 F.3d 253, 264 (2d Cir.2006) ("[N]o class may be certified that contains members lacking Article III standing."); Burdick v. Union Sec. Ins. Co., 2009 WL 4798873, at *4 (C.D. Cal., Dec. 9, 2009) ("absent class members lacking justiciable claims under Article III should be excised from the case").

[4] The parties have not briefed the question of whether mere deterrence can provide standing for an equal treatment claim. The Court allows for that possibility for purposes of this motion, subject to revisiting the issue (and potentially re-scoping the equal treatment class) as the case progresses. See Fed.R.Civ.P. 23(c)(1)(C) ("An order that giants or denies class certification may be altered or amended before final judgment."); see also Wang v. Chinese Daily News, Inc., 737 F.3d 538, 546 (9th Cir. 2013) ("Rule 23 provides district courts with broad authority at various stages in the litigation to revisit class certification determinations and to redefine or decertify classes as appropriate."); Armstrong v. Davis, 275 F.3d 849, 872 n.28 (9th Cir. 2001) ("Where appropriate, the district court may redefine the class ... may excise portions of a plaintiffs class allegations, and may even decertify the class.").

*Favia* and *Haffer*, however, are limited to enrolled students (whether current or future) who were deterred not from enrolling at the educational institutions in question, but from participating in intercollegiate athletics after they had enrolled. See Favia, 7 F.3d at 335–36 (class of "all present and future women students at [Indiana University of Pennsylvania] who participate, seek to participate, or are deterred from participating in intercollegiate athletics at the University"); Haffer, 678 F. Supp. at 521 (class of "all current women students at Temple University who participate, or who are or have been deterred from participating because of sex discrimination in Temple's intercollegiate athletic program."). Thus, the Court does not read either of these cases to justify including mere "potential" students in the class at issue here.

*Cohen*, for its part, differs from *Favia* and *Haffer*—and appears to favor Plaintiffs' proposed class definition—in that it allows for inclusion of "potential students," defining the class as "all present and future Brown University women students and potential students who participate, seek to participate, and/or are deterred from participating in intercollegiate athletics funded by Brown." See Cohen, 991 F.2d at 893. The decision cited by Plaintiffs, however, does not explain why it was deemed proper to include "potential students" in the class. In the Court's view, the amorphous "potential students" category not only fails to account for the "able and ready" standing requirement for Title IX claims, but also fails to satisfy baseline Article III standing requirements in that it comprises persons whose connections with a given academic institution are too "conjectural or hypothetical" to allow a finding of concrete harm (whether actual or imminent) due to alleged sex discrimination by a defendant institution. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (for an injury to satisfy Article III, it "must be concrete and particularized and actual or imminent, not conjectural or hypothetical"), see also South Carolina v. United States, 912 F.3d 720, 731 (4th Cir. 2019) (finding plaintiff lacked Article III standing where claims for injunctive relief "rest[ed] upon a highly attenuated chain of possibilities" (quoted source and internal quotation marks omitted).

Further, the Court finds that the term "intercollegiate" in Plaintiffs' proposed class definition is ambiguous in that it could conceivably refer to club as well as varsity athletics. The Court notes that the class allegations in the Complaint refer to "varsity intercollegiate" athletics,

see Doc. No. 59 ¶¶ 1, 232, 235, 238, 242, 247, 252, 254, as does the prayer for relief. Id. at 45:21-46:8. Further, the proposed class representatives (and the other named Plaintiffs) are former members of a varsity team, and the Court sees no basis to infer that the allegations in the Complaint extend to club sports or that class representatives have standing to bring claims on behalf of participants in club sports. See id. ¶ 247 ("… Defendants have acted or refused to act on grounds generally applicable to the class—denying female student-athletes at Fresno State equal opportunity to participate in varsity intercollegiate athletics, including, but not limited to, women's varsity lacrosse …."). The class, therefore, must be limited to "varsity intercollegiate athletics."

Finally, the Court sees no single class that can encompass both the effective accommodation claim and the equal treatment claim without running afoul of standing requirements. See Denney, 443 F.3d at 264 ("[N]o class may be certified that contains members lacking Article III standing.") The Court therefore finds that each claim requires its own class definition. As to the equal treatment claim, the Court will define the class as current and future female Fresno State students who: (i) participate or have participated in women's varsity intercollegiate athletics at Fresno State; and / or (ii) are able and ready to participate in women's varsity intercollegiate athletics at Fresno State but have been deterred from doing so by the treatment received by female varsity intercollegiate student-athletes at Fresno State. And as to the effective accommodation claim, the Court will define the class as current and future female Fresno State students who: (i) have lost membership on a women's varsity intercollegiate athletics team at Fresno State; (ii) have sought but not achieved membership on a women's varsity intercollegiate athletics team at Fresno State; and / or (iii) are able and ready to seek membership on a women's varsity intercollegiate athletics team at Fresno State but have not done so due to a perceived lack of opportunity.

**B.**    **Rule 23(a) Factors**

The Court will now address the four Rule 23(a) factors as to each of the classes identified above. See Fed.R.Civ.P. 23(a).

**1.**    **Numerosity**

Rule 23(a)(1) requires a showing that "the class is so numerous that joinder of all members

1    is impracticable." Fed.R.Civ.P. 23(a)(1). "The standard does not require that joinder be

2    impossible, only that joinder would result in litigation hardship or inconvenience." Brust v.

3    Regents of the Univ. of California, 2008 WL 11512299, at *4 (E.D. Cal. Oct. 24, 2008) (citations

4    omitted). There is no strict numerical test for determining when a class is so numerous that joinder

5    is impracticable, In re Beer Distribution Antitrust Litigation, 188 F.R.D. 557, 561 (N.D. Cal.

6    1999), but generally speaking, 40 or so individuals in a proposed class is sufficient to satisfy the

7    numerosity requirement. See, e.g., Ries v. Ariz. Beverages USA LLC, 287 F.R.D. 523, 536 (N.D.

8    Cal. 2012) ("While there is no fixed number that satisfies the numerosity requirement, as a general

9    matter, a class greater than forty often satisfies the requirement, while one less than twenty-one

10   does not." (citing Californians for Disability Rights, Inc. v. Cal. Dep't of Transp., 249 F.R.D. 334,

11   346 (N.D.Cal.2008)). Further, "where declaratory or injunctive relief is sought, the numerosity

12   requirement may be relaxed 'so that even speculative or conclusory allegations regarding

13   numerosity are sufficient to permit class certification.' " Brust, 2008 WL 11512299 at *4 (quoting

14   5 Moore's Federal Practice § 23.22[3][b] (3d Ed. Supp. 2008) and citing Goodnight v. Shalala,

15   837 F. Supp. 1564, 1582 (D. Utah 1994)); see also A. B. v. Hawaii State Dep't of Educ., 30 F.4th

16   828, 837 (9th Cir. 2022) (the "practical value" of joinder is diminished where "the class seeks only

17   prospective injunctive and declaratory relief").

18          Plaintiffs assert that "Fresno State has over 250 women participating in its intercollegiate

19   athletic program annually—some different and some the same each year" and that "class size is

20   even larger when all prospective, future, and deterred female students are considered." Doc. No.

21   88-1 at 17:20-27. Further, Plaintiffs contend that joinder is impracticable because the identities of

22   many class members are not known, id. at 18:5-18, due to the "inherently fluid nature" of the class

23   (which changes with quits, transfers, graduation, new enrollment and such). Id. at 19:11-16.

24   Defendants argue that Plaintiffs have failed to meet their burden to show numerosity because they

25   improperly rely on "vague and conclusory generalizations about the size of the proposed class"

26   Doc. No. 89 at 14:11-20, 15:10-12, and that Plaintiffs fail to "come forward with statistics and

27   surveys regarding high school athletic participation and interest, surveys of current university

28   students regarding athletic interest, and data regarding athletic participation." Id. 14:25-27.

1       The class definitions set forth above do not allow for "potential students," but they include

2  future female students, as well as female students currently enrolled at Fresno State, for purposes

3  of both the effective accommodation claim and the equal treatment claim. As to the equal

4  treatment claim, Plaintiffs show that there are more than 250 female student-athletes participating

5  in varsity intercollegiate athletics at Fresno State in any given year, all of whom could be

6  subjected to some form of unequal treatment in violation of Title IX. See Doc. No. 88-2. And as to

7  the effective accommodation claim, it appears that Fresno State has approximately 10,000 to

8  11,000 female students enrolled at any given time, see Doc. No. 2-1 at 16:3-16, and that 70 or so

9  positions on women's varsity intercollegiate teams are filled each year. See Doc. No. at 88-1 at

10  19:11-27. Even assuming a high percentage of aspiring student-athletes are accommodated by

11  Fresno State's athletic program, it is hard to imagine that joinder of "able and ready" female

12  students who encounter actionable barriers to participation in varsity intercollegiate athletics each

13  year would be practicable. Indeed, as Plaintiffs point out, the discontinued lacrosse team alone

14  could account for a large percentage of the class members required to satisfy Rule 23(a)(1). See

15  Doc. No. 90 at 6:10-13 (stating that the lacrosse team carried 22 roster spots). The Court therefore

16  finds that the numerosity requirement is satisfied as to both the equal treatment claim and the

17  effective accommodation claim.

18       **2.    Commonality**

19       Rule 23(a)(2) provides that a class action can be maintained only where "there are

20  questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). A common issue is one

21  where "the same evidence will suffice for each member to make a prima facie showing," Tyson

22  Foods, Inc. v. Bouaphakeo, 136 S. Ct. 1036, 1048 (2016) (citation omitted); see also In re Nassau

23  County Strip Search Cases, 461 F.3d 219, 227 (2d Cir. 2006) (a common issue is one that is

24  "susceptible to generalized, class-wide proof"), whereas an individual issue is one where

25  "members of a proposed class will need to present evidence that varies from member to member."

26  Tyson Foods, 136 S. Ct. at 1045 (citation and internal quotation marks omitted).

27       A single common question of fact or law can suffice to satisfy Rule 23(a)(2), see Dukes,

28  564 U.S. at 359, but the party seeking class certification must show that determination of that

1  question will resolve an issue "central to the validity" of the claims of all members of a putative

2  class "in one stroke." Id. at 350, 359; see also Wang, 737 F.3d at 544 (remanding for the district

3  court to "determine whether the claims of the proposed class depend upon a common contention ...

4  of such a nature that it is capable of classwide resolution"). At bottom, "[w]hat matters to class

5  certification ... is not the raising of common 'questions'—even in droves—but, rather the capacity

6  of a class-wide proceeding to generate common *answers* apt to drive the resolution of the

7  litigation." Dukes, 564 U.S. at 350 (citation and internal quotation marks omitted, emphasis

8  original).

9       Plaintiffs contend that "the claims of all proposed class members include the same legal

10  questions: whether Fresno State engages in sex discrimination and violates Titles IX in (1) the

11  allocation of athletic participation opportunities, and (2) the allocation of benefits to varsity

12  athletes." Doc. No. 88-1 at 22:13-18. Further, Plaintiffs contend that the claims involve common

13  questions of fact, including, for example, the number of athletic participation opportunities

14  available to male and female students and differences in the benefits received by male student-

15  athletes and female student-athletes (with respect to equipment, coaching, facilities and such) at

16  Fresno State. Id. at 22:22-23:9.

17       Defendants, for their part, argue that such questions cannot be resolved on a class-wide

18  basis because coaches "set[] roster sizes" and make "individualized, sport-specific decisions about

19  allocation of resources" based on their respective "preferences." Doc. No. 89 at 16:25-17:3. The

20  operating model of the athletic department, however, is irrelevant. Even assuming, as Defendants

21  claim, that substantially all relevant decision-making is made by coaches at the team level,

22  participation opportunities and resource allocation at Fresno State must square with Title IX in the

23  aggregate. See Anders v. California State Univ., Fresno, 2021 WL 3115867, at *3 (E.D. Cal. July

24  22, 2021) (Ishii, J.) (stating 34 C.F.R. § 106.41(c)(1) requires "equal opportunity in athletics" and

25  that 34 C.F.R. § 106.41(c)(2)-(10) collectively require "equivalence in the availability, quality and

26  kinds of other athletic benefits and opportunities provided male and female athletes" (quoting

27  Mansourian v. Regents of Univ. of California, 602 F.3d 957, 964 (9th Cir. 2010) (internal

28  quotation marks omitted)). Resolution of threshold questions as to the allocation of benefits and

1  opportunities between male student-athletes and female student-athletes at the athletic department

2  level are of general applicability to the class because they go directly to determining whether there

3  has been a Title IX violation with respect to effective accommodation, equal treatment or both.

4  The commonality requirement is therefore satisfied as to the effective accommodation claim and

5  as to the equal treatment claim. See Brust, 2008 WL 11512299 at *5.

6  **3.    Typicality**

7  Under Rule 23(a)(3), class certification is proper only where "claims or defenses of the

8  representative parties are typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(3).

9  "The purpose of the typicality requirement is to assure that the interest of the named representative

10  aligns with the interests of the class." Hanon, 976 F.2d at 508 (citation omitted). Similarly,

11  "typicality determines whether a sufficient relationship exists between the injury to the named

12  plaintiff and the conduct affecting the class so that the court may properly attribute a collective

13  nature to the challenged conduct." 1 Newberg on Class Actions § 3:29 (5th ed.) (citations

14  omitted).

15  The Ninth Circuit's test of typicality is (1) "whether other members have the same or

16  similar injury"; (2) "whether the action is based on conduct which is not unique to the named

17  plaintiffs"; and (3) "whether other class members have been injured by the same course of

18  conduct." Wolin v. Jaguar Land Rover North America, LLC, 617 F.3d 1168, 1175 (9th Cir. 2010)

19  (citation and internal quotation marks omitted). The representative plaintiff's claims need not be

20  identical to those of the class, but rather need only be "reasonably co-extensive with those of

21  absent class members," Hanlon v. Chrysler Corp., 150 F.3d 1011, 1020 (9th Cir. 1998), such that

22  the claims of the putative class are "fairly encompassed by the named plaintiff's claims." Falcon,

23  457 U.S. at 156 (internal quotation marks omitted).

24  Plaintiffs argue that they "and all members of the proposed class are subject to or soon will

25  be subjected to and harmed by the same systemic, ongoing sex-discrimination in Fresno State's

26  athletic department," and that all members of the proposed class, including Plaintiffs themselves,

27  have claims "based upon the same legal theories and the same actions of the Defendants," in that

28  "[a]ll want to participate in varsity intercollegiate athletics and receive the same [] benefits that the

1 | men's teams already receive." Doc. No. 88 at 24:19-25:4.

2 |      Defendants argue that the proposed class representatives—Anders and Walburger—are

3 | differentiated from the rest of the class because they are "former members of Fresno State's now-

4 | discontinued lacrosse team, seeking reinstatement of that team." Doc. No. 89 at 17:12-14. Further,

5 | Defendants contend that Anders is differentiated in that she does not attribute the mistreatment of

6 | the women's lacrosse team to sex discrimination, and that Walburger is differentiated because her

7 | goal is to maintain her scholarship and she does not purport to have experienced unequal treatment

8 | herself. Id. at 89 at 17:14-24. Finally, Defendants argue that Anders and Walburger lack standing

9 | because, with the termination of lacrosse, they are no longer varsity student-athletes at Fresno

10 | State and that the other named Plaintiffs lack standing because they are no longer enrolled at

11 | Fresno State. Id. at 17:25-18:8.

12 |      In other words, Defendants make two arguments: a differentiation argument and a standing

13 | argument. As to the differentiation argument, the record shows that Anders and Walburger assert

14 | that they have been discriminated against with respect to both participation opportunities and

15 | benefits, which puts them squarely in alignment with class members who have effective

16 | accommodation and equal treatment claims. See Doc. Nos. 88-3 & 88-4. Further, Anders and

17 | Walburger can show not only that they participated in varsity intercollegiate athletics and lost

18 | membership on a varsity intercollegiate team, but also that they are able and ready to participate in

19 | varsity intercollegiate athletics at Fresno State should the opportunity to do so arise. One wrinkle

20 | is that it does not appear that either Anders or Walburger can necessarily show that they have been

21 | deterred from pursuing participation due to unequal treatment of female varsity student-athletes

22 | with respect to benefits. Even assuming that is the case, however, they have suffered the same

23 | alleged injury as deterred students (a discriminatory barrier to participation in varsity

24 | intercollegiate athletics) due to the same alleged course of conduct (discriminatory imbalance in

25 | resource allocation) on the part of Fresno State.[5] See Wolin, 617 F.3d at 1175. Finally,

26 | Defendants' arguments as to the proposed class representatives' reasons for participating in this

27 |

28 | [5] Again, the Court allows for the possibility that deterrence can provide a basis for an equal treatment claim but does not decide that question here.

1  litigation go not to typicality but to adequacy, which is addressed below. Thus, the Court finds that

2  the claims of the proposed class representatives are "reasonably co-extensive with those of absent

3  class members" with respect to each of the claims in this case. Hanlon, 150 F.3d at 1020.

4       As to standing, Defendants rely on decisions in *Pederson v. Louisiana State University* and

5  *Boucher v. Syracuse University.* See Doc. No. 89 at 18:18-25. In *Pederson*, members of the

6  women's club soccer team at Louisiana State University ("LSU") brought claims involving

7  alleged Title IX violations at the varsity level. Pederson, 213 F.3d at 870. The court addressed

8  standing for effective accommodation claims and equal treatment claims separately. As to

9  effective accommodation claims, the court held "that to establish standing under a Title IX

10  effective accommodation claim, a party need only demonstrate that she is 'able and ready' to

11  compete for a position on the unfielded team," id. at 871, and implicitly recognized, through its

12  analysis of mootness, that former student-athletes who have lost their team due to an alleged Title

13  IX violation have standing to seek injunctive relief if they remain eligible for participation in

14  athletics at the defendant institution. See id. at 874. As to equal treatment claims, the court found a

15  lack of standing because no named plaintiff had been a member of varsity (as opposed to club)

16  team at LSU (and the named plaintiffs apparently did not advance the theory that class members

17  had been deterred from pursuing varsity athletics due to the treatment received by female athletes).

18  See id., 213 F.3d at 872 n.13. *Boucher*, for its part, did not address standing for effective

19  accommodation claims but found, as the *Pederson* court did, that club athletes lacked standing for

20  a claim based on the treatment of varsity athletes because, as non-varsity athletes, they had not

21  suffered the requisite injury-in-fact. See Boucher v. Syracuse Univ., 164 F.3d 113, 116, 120 (2d

22  Cir. 1999) ("Boucher I").

23       In short, *Pederson* indicates that a plaintiff has standing for injunctive relief on an effective

24  accommodation claim if that plaintiff remains eligible to participate in the relevant tier of athletics

25  at the defendant institution, and both *Pederson* and *Boucher* found lack of standing for equal

26  treatment claims because the plaintiffs had never been varsity athletes (not because they no longer

27  were varsity athletes). Here, Anders and Walburger once played at the varsity level and therefore

28  were subject to unequal treatment as alleged in the SAC. Moreover, they both remain eligible to

16

1     participate in varsity intercollegiate athletics at Fresno State. See Doc. No. 88-3 at 3 (Anders is

2     enrolled at Fresno State and had three years of eligibility remaining when the lacrosse team was

3     eliminated); Doc. No. 88-4 at 3 (Walburger is currently enrolled at Fresno State and has two years

4     of eligibility remaining). Defendants' arguments as to standing are, therefore, without merit and

5     the Court finds that the typicality requirement is satisfied.[6]

6         **4.**    **Adequacy**

7         Rule 23(a)(4) states "the representative parties will fairly and adequately protect the

8     interests of the class." Fed.R.Civ.P. 23(a)(4). This requires that "[p]laintiffs are represented by

9     qualified and competent counsel" and that "the proposed representative [p]laintiffs do not have

10    conflicts of interest with the proposed class." Dukes v. Wal-Mart, Inc., 509 F.3d 1168, 1175 (9th

11    Cir. 2007), on reh'g en banc sub nom. Dukes v. Wal-Mart Stores, Inc., 603 F.3d 571 (9th Cir.

12    2010), rev'd on other grounds, 564 U.S. 338 (2011). Conflicts between representative parties and

13    the proposed class undermine the indispensable "structural assurance of fair and adequate

14    representation for the diverse groups and individuals affected" by the class-action litigation or

15    settlement. Amchem, 521 U.S. at 627. This concern has constitutional underpinnings because "the

16    Due Process Clause ... requires that the named plaintiff at all times adequately represent the

17    interests of the absent class members." Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 812 (1985);

18    see Hanlon, 150 F.3d at 1020 ("As the Ninth Circuit has stated, serious conflicts of interest can

19    impair adequate representation by the named plaintiffs, yet leave absent class members bound to

20    the final judgment, thereby violating due process." (citing Hansberry v. Lee, 311 U.S. 32, 42-43

21    (1940)).

22         Plaintiffs contend the proposed class representatives will fairly and adequately represent

23    the interests of the proposed class, and that they do not have interests antagonistic to the interests

24    of the members of the proposed class because the proposed class representatives "want to compel

25    Fresno State to increase participation opportunities for female students until the school reaches

26

27    ―――――――――――――
    [6] The Court does not address the standing of named Plaintiffs other than the proposed class representatives since that

28    issue has not been fully briefed and is not necessary to deciding this motion.

1  equity under Title IX—even if lacrosse is not reinstated." Doc. No. 90 at 11:8-23. Defendants

2  argue that Plaintiffs' proffered class representatives cannot adequately represent the proposed

3  class because they are both "former members of the lacrosse team, seeking reinstatement of the

4  lacrosse team." Doc. No. 89 at 19:5-6. According to Defendants, this conflicts with the interests of

5  other class members who would benefit more if resources were directed to other sports and who

6  could be harmed by remedies favoring the lacrosse team. Id. at 19:8-12.

7          "In the arena of Title IX athletics litigation, courts have taken divergent views on the issue

8  of intra-class conflicts among collegiate sports teams." Cohen v. Brown Univ., 16 F.4th 935, 949

9  (1st Cir. 2021), cert. denied sub nom. Walsh v. Cohen, 142 S. Ct. 2667 (2022). In *Robb v. Lock*

10 *Haven University of Pennsylvania*, for example, the court proposed separating members of the

11 women's varsity field hockey team, members of the women's varsity swim team and members of

12 the women's club rugby team into separate subclasses to reflect their disparate interests with

13 respect to team status and the allocation of limited resources. 2019 WL 2005636, at *13 (M.D. Pa.

14 May 7, 2019). And in *Bryant*, similarly, the court found that interests of the women's club ice

15 hockey team "would be antagonistic to those of other interested and able athletes who might desire

16 elevation of their own sport" and that "[s]uch circumstances could render plaintiffs' representation

17 inadequate under Rule 23(a)." 1996 WL 328446, at *6 (N.D.N.Y. June 11, 1996); see also S.G. by

18 & through Gordon v. Jordan Sch. Dist., 2018 WL 4899098, at *2 (D. Utah Oct. 9, 2018) (splitting

19 females seeking a football team and females seeking more athletic opportunities into separate

20 subclasses to avoid conflicts); Miller v. Univ. of Cincinnati, 241 F.R.D. 285, 290 (S.D. Ohio

21 2006) (finding "inherent conflict" between members of women's rowing team and other female

22 student-athletes because Title IX compliance could be achieved by "bestowing" resources

23 allocated to women's rowing on "other women's varsity sports").

24          In *Portz*, on the other hand, the court rejected defendant SCSU's contention that the named

25 plaintiffs—members of SCSU's varsity women's tennis and Nordic skiing teams—were

26 "antagonistic toward the class members who participate on different women's sports teams" on

27 findings that such conflict was "merely speculative" and the named plaintiffs had expressly

28 affirmed their intention to provide representation to all female athletes. Portz, 297 F. Supp. 3d at

947. And in *Foltz v. Delaware State University*, similarly, the court found that members of the women's equestrian team were adequate to represent a class encompassing multiple sports because the conflicts identified by the defendant were "merely … speculative, potential conflicts" and several named plaintiffs had "testified expressly that they [were] motivated to obtain equal opportunities for all female students at [Delaware State University], not just to preserve the equestrian team." 269 F.R.D. 419, 424-25 (D. Del. 2010).

Here, the proposed class representatives—Anders and Walburger—filed declarations in support of the class certification motion stating, in pertinent part, that they are bringing this action not just for the lacrosse team but to secure injunctive relief on behalf of all female athletes at Fresno State. Doc. No. 88-3 ¶¶ 6-8; Doc. No. 88-4 ¶¶ 6-8. Further, the Court notes that the SAC seeks an injunction barring Fresno State from eliminating any women's varsity intercollegiate athletic opportunities until it achieves Title IX compliance. Doc. No. 59 at 34:25-35:6. While the SAC contains numerous allegations, however, as to wrongs allegedly inflicted on the lacrosse team, see Doc. No. 59 ¶¶ 1-3, 7-9, 15-25, 206-210, there are no comparable allegations in the SAC as to other women's teams. Similarly, the five declarations filed by named Plaintiffs in support of their preliminary injunction motion—which is framed as a motion to bar Fresno State from eliminating the women's lacrosse team or "any other women's sport during the pendency of this case"—speak almost exclusively (with only the most minute exceptions) to the named Plaintiffs' interests as members of the women's lacrosse team, with no reference of consequence to the implications of alleged Title IX violations for other female students at Fresno State. See Doc. Nos. 2-3 through 2-7. And finally, the expert report filed in support of the preliminary injunction motion expressly takes aim at other women's teams at Fresno State, asserting, for example, that the equestrian team, the cross country team and the track team have inflated rosters with " 'ghost' participants" who are "not really [] legitimate members" of the teams. Doc. No. 2-9 at 36-38, 42, 43.

Title IX actions seeking injunctive relief are unique in that "institutions are only obligated to accommodate athletic interests and abilities until the 'goal of gender parity between its athletic program and its student body' is attained." Boucher v. Syracuse Univ., 1996 WL 328441, at *4

(N.D.N.Y. June 12, 1996), vacated in different part, 164 F.3d 113 (2d Cir. 1999) ("Boucher II");
see also Pederson, 912 F. Supp. at 905. "[R]esources available for intercollegiate athletic programs
are finite," Bryant, 1996 WL 328446 at *6, and "hence [Title IX] compliance might well be
achieved by the elevation of one sport and not the other." Boucher I, 164 F.3d at 116. The Court
does not doubt that the proposed class representatives have the intentions they claim in bringing
this action, but as plead and developed to date, this case is fundamentally about women's lacrosse
and there are discernable conflicts—reflected in filings—between the interests of the proposed
class representatives as former members of the women's varsity lacrosse team and other members
of Fresno State's female student population who are not represented in this action as currently
configured. The Court therefore finds that the proposed class representatives do not satisfy Rule
23(a)(4) as to either the effective accommodation claim or the equal treatment claim.[7]

## CONCLUSION

As set forth above, the Court finds that the numerosity, typicality and commonality
requirements of Rule 23(a) are satisfied as to the classes defined by the Court in this order. The
Court further finds, however, that the proposed class representatives do not satisfy the Rule
23(a)(4) adequacy requirement because there are evidently conflicts between the interests of the
class representatives, as former members of the women's varsity lacrosse team, and current and
future female students at Fresno State who were not members of the women's varsity lacrosse
team and who are not able and ready to play lacrosse. Similarly, the record plainly indicates that
the principal purpose this action is to protect (or restore) women's varsity lacrosse and that other
considerations are secondary to that.

The Court will therefore deny the motion for class certification without prejudice to
another motion for certification consistent with the findings in this order.

//

//

---

[7] In light of this finding, the Court will not address at this time whether Baily & Glasser, LLP can provide adequate
representation as class counsel. See Fed.R.Civ.P. 23(g).

# **ORDER**

For the foregoing reasons, IT IS HEREBY ORDERED that Plaintiffs' motion for class certification (Doc. No. 88) is DENIED without prejudice.

IT IS SO ORDERED.

Dated: __August 16, 2022__     _____

SENIOR  DISTRICT  JUDGE

21

# Exhibit 2

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TAYLOR ANDERS, et al.,<br><br>       Plaintiffs,<br><br>  v.<br><br>CALIFORNIA STATE UNIVERSITY, FRESNO, et al.<br><br>       Defendants. | CASE: 1:21-cv-179-AWI-BAM<br><br>**ORDER DENYING PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION AND, IN THE ALTERNATIVE, MOTION FOR RECONSIDERATION**<br><br>(Doc. No. 94) |

Plaintiffs bring a renewed motion for class certification and in the alternative, motion for reconsideration. Doc. No. 94-1. The motion has been fully briefed and deemed suitable for decision without oral argument pursuant to Local Rule 230(g). For the reasons set forth below, the motion will be denied.

## **BACKGROUND**

Plaintiffs bring this putative class action against California State University, Fresno ("Fresno State") for alleged violations of Title IX of the Education Amendments of 1972 in connection with women's athletics. See Doc. No. 59. The operative pleading is the Second Amended Complaint ("SAC"), which the Court has found to state an effective accommodation claim and an equal treatment claim.[1] Doc. No. 59. The contours of these claims—as wells as facts and allegations relevant to each claim—are addressed at length in other orders, as are relevant

---

[1] The financial aid claim set forth in the SAC was dismissed with prejudice on October 29, 2021. See Doc. No. 73.

aspects of Title IX law and law governing class certification.[2]

On February 25, 2022, Plaintiffs filed a motion proposing two former members of Fresno State's varsity women's lacrosse team—Taylor Anders and Courtney Walburger—as class representatives and seeking certification of the following class for both the effective accommodation claim and the equal treatment claim:

> All present and future women students and potential students at Fresno State who participate, seek to participate, and/or are deterred from participating in intercollegiate athletics there.

Doc. No. 88-1 at 12:26-28.

On August 16, 2022, the Court issued an order finding that the proposed class was too broad, and positing, for purposes of analysis, a separate class for each claim, calibrated to reflect applicable law. For the equal treatment claim, the Court framed the class as:

> [C]urrent and future female Fresno State students who: (i) participate or have participated in women's varsity intercollegiate athletics at Fresno State; and / or (ii) are able and ready to participate in women's varsity intercollegiate athletics at Fresno State but have been deterred from doing so by the treatment received by female varsity intercollegiate student-athletes at Fresno State.

Doc. No. 93 at 10:9-23. And for the effective accommodation claim, the Court framed the class as:

> [C]urrent and future female Fresno State students who: (i) have lost membership on a women's varsity intercollegiate athletics team at Fresno State; (ii) have sought but not achieved membership on a women's varsity intercollegiate athletics team at Fresno State; and / or (iii) are able and ready to seek membership on a women's varsity intercollegiate athletics team at Fresno State but have not done so due to a perceived lack of opportunity.

Id. at 10:17-23.[3] Further, the Court denied class certification under Rule 23(a)(4) of the Federal Rules of Civil Procedure on a finding that there was a disqualifying conflict between the proposed class representatives, as former members of Fresno State's varsity women's lacrosse team, and putative class members who do not play (and are not "able and ready" to play) lacrosse. Id. at 20:4-11; 20:13-21 (stating that "there are evidently conflicts between the interests of the class

---

[2] See, e.g., Doc. Nos. 35, 57, 58, 73 & 93.

[3] Fresno State disagrees with aspects of the class formulations used by the Court in deciding Plaintiffs' initial motion for class certification. See Doc. No. 95 at 14:5. That issue is not addressed in this order but Fresno State may raise it again later in these proceedings to the extent doing so is warranted by circumstances and otherwise permissible.

1  representatives, as former members of the women's varsity lacrosse team, and current and future

2  female students at Fresno State who were not members of the women's varsity lacrosse team and

3  who are not able and ready to play lacrosse").

4        On August 30, 2022, Plaintiffs filed the instant motion, styled as a renewed motion for

5  class certification and in the alternative, a motion for reconsideration of the Court's August 16,

6  2022 order denying class certification. Doc. No. 94; Doc. No. 94-1 at 8:12-14.

7  **PLAINTIFFS' MOTION**

8  *Plaintiffs' Opening Memorandum*

9        Plaintiffs adopt the class definitions fashioned and used by the Court in deciding Plaintiffs'

10  first class-certification motion, but purport, in this motion, "to supplement and correct the record,

11  show that there are no conflicts between the proposed class representatives and the class members,

12  and demonstrate that the proposed class representatives fully satisfy the requirements of Rule

13  23(a)(4)." Doc. No. 94-1 at 6:15-19. Plaintiffs argue that "both proposed class representatives

14  have now submitted supplemental declarations" stating that "the principal purpose of this case" is

15  to ensure Title IX compliance at Fresno State ("not to protect or restore women's varsity

16  lacrosse") and that both Anders and Walburger testified in deposition that "they agreed to (and

17  did) make an offer to settle this case by having Fresno State add a women's varsity team *other*

18  *than women's lacrosse*." Id. at 7:3-6 (emphasis original). Further, Plaintiffs argue that "under

19  established Ninth Circuit law … any conflicts between the proposed class representatives and the

20  class members [in this case] should properly be viewed as speculative" and that "the conflict

21  argument" underlying the Court's August 16, 2022 order "has been found to be particularly

22  unpersuasive when the named plaintiffs affirm their commitment to representing the class as a

23  whole, as the proposed class representatives have done here." Id. at 7:17-8:7. Finally, Plaintiffs

24  request class certification solely for the purpose of determining liability in the event the Court

25  finds (despite the newly supplemented, corrected and clarified record) that there would be a non-

26  speculative conflict in the remedy phase of this litigation between the proposed class

27  representatives and non-lacrosse class members. Id. at 8 n.1.

28  //

3

*Defendant's Opposition*

Fresno State argues that the motion at bar is properly construed as a motion for reconsideration (not as a "renewed motion" for class certification) because it makes the same arguments as Plaintiffs' first motion for class certification and that Plaintiffs have failed to show that reconsideration is warranted under Rule 60(b).[4] Doc. No. 95 at 5:2-5; 11:24-12:26. Further, Fresno State argues that the class definitions posited by the Court (in deciding the first motion) and adopted by Plaintiffs (for purposes of this motion) are "overly broad," id. at 5:9; that the supplemental declarations submitted by the proposed class representatives are "self-serving," id. at 5:8-12, 8:13-15; and that neither Anders nor Walburger can serve as an adequate class representative because they have both "testified to their clear preference and goal of supporting lacrosse above other women's sports and have admitted during their deposition s that they have no knowledge of how any other women's team (or most men's teams) were treated in terms of athletic benefits at Fresno State." Id. at 5:14-18. Finally, Fresno State argues that certification should not be granted solely as to liability because certification of a so-called "issues class" requires satisfaction of all Rule 23(a) factors and the Court cannot properly ignore a disqualifying conflict "found to exist at the class certification stage." Id. at 22:11-26.

*Plaintiffs' Reply*

In addition to reiterating various arguments with respect to conflict and such, Plaintiffs argue on reply that this motion should not be construed as a motion for reconsideration because their first motion for class certification was denied without prejudice. Doc. No. 97 at 20:10-21:2. Further, Plaintiffs argue that this motion should be granted based on the "clarified and supplemented record" regardless of how it is classified because Rule 60(b)(6) allows reconsideration for any reason justifying relief. Id. at 21:3-8.

## DISCUSSION

The Court will first address the parties' arguments with respect to the proper classification of this motion and the merits of the motion under standards governing reconsideration in the Ninth

---

[4] Unless otherwise indicated, "Rule," as used herein, refers to the Federal Rules of Civil Procedure.

Circuit. The Court will then address the merits of the motion assuming, for the sake of analysis, that it was properly filed pursuant to leave of Court in the August 16, 2022 order on Plaintiffs' initial motion for class certification.

**A.**     <u>**Motion for Reconsideration**</u>

As set forth above, the Court denied Plaintiffs' motion for class certification "without prejudice to another motion for certification consistent with the findings in [the Court's August 16, 2022] order." Doc. No. 93 at 20:13-23. The August 16, 2022 order states that "the proposed class representatives do not satisfy the Rule 23(a)(4) adequacy requirement because there are evidently conflicts between the interests of the class representatives, as former members of the women's varsity lacrosse team, and current and future female students at Fresno State who were not members of the women's varsity lacrosse team and who are not able and ready to play lacrosse." Id. The August 16, 2022 order also states that "as plead[ed] and developed to date, this case is fundamentally about women's lacrosse" and that "the record plainly indicates that the principal purpose this action is to protect (or restore) women's varsity lacrosse." Id. at 20:4-21.

Plaintiffs' current motion, for its part, is dedicated almost entirely to demonstrating that there is no conflict between the proposed class representatives and other prospective class members because the proposed class representatives have sworn that reinstating lacrosse is not the "principal purpose of this case" and in essence, that they will not favor women's lacrosse over other women's sports in fighting for Title IX compliance.

Plaintiffs' arguments are self-evidently contrary to—and in no way "consistent with"—the August 16, 2022 order.[5] Thus, the instant motion is not authorized by Court order and must be

---

[5] The introduction to the opening memorandum in support of this motion comprises seven paragraphs. The second of these seven paragraphs reads in its entirety as follows:

> Consistent with the Court's findings, Plaintiffs bring this motion to supplement and correct the record, show that there are no conflicts between the proposed class representatives and the class members, and demonstrate that the proposed class representatives fully satisfy the requirements of Rule 23(a)(4). After briefly reviewing the relevant facts and class claims, Plaintiffs first discuss the adequate representation issue below and then turn to Rule 23's other provisions.

Doc. No. 94-1 at 6:14-20. The first sentence in the third paragraph states: "On the adequate representation point, to make the record clear, both proposed class representatives have now submitted supplemental declarations addressing the relevant issues and the Court's concerns." Id. at 6:20-23. Paragraph five, for its

1    entertained, if at all, as a motion for reconsideration under Rule 60(b).[6] See Doc. No. 94-1 at 8 n.2.

2        "[A] motion for reconsideration should not be granted, absent highly unusual

3    circumstances, unless the district court is presented with newly discovered evidence, committed

4    clear error, or if there is an intervening change in the controlling law." Marlyn Nutraceuticals, Inc.

5    v. Mucos Pharma GmbH & Co., 571 F.3d 873, 880 (9th Cir. 2009) (quoted source and internal

6    quotation marks omitted). "A motion for reconsideration 'may *not* be used to raise arguments or

7    present evidence for the first time when they could reasonably have been raised earlier in the

8    litigation.' " Id. (quoting Kona Enters., Inc. v. Estate of Bishop, 229 F.3d 877, 890 (9th Cir.

9    2000)). Similarly, Local Rule 230(j) of the District Court for the Eastern District of California

10    requires that a party seeking reconsideration set forth "what new or different facts or

11    circumstances are claimed to exist which did not exist or were not shown upon such prior motion"

12    or "why the facts or circumstances were not shown at the time of the prior motion." E.D. Cal. L.R.

13    230(j). As a general matter, a motion for reconsideration "should not be used to ask the court to

14

---

15    part, begins as follows: "The new declarations submitted by Plaintiffs and the additional evidence discussed

16    in this brief demonstrate that the cases that concerned the Court do not apply to the facts in this case." Id. at 7:16-17. And in paragraph seven, Plaintiffs write: "After explaining that the class representatives satisfy Rule 23(a)(4), Plaintiffs adopt the class definitions in the Court's order of August 16, 2022; accept the Court's

17    findings on Rule 23 (a)(1)-(3); and show that both the Rule 23(a)(4) class counsel adequate representation requirement and the Rule 23(b)(2) class certification requirement are met in this case." Id.

18

19    In other words, Plaintiffs purport to address "the Court's concerns" on "the adequate representation point" and "explain[]" to the Court that there are "no conflicts between the proposed class representatives and the

20    class members," by making the "record clear" and showing that cases upon which the Court relied "do not apply to the facts in this case." Plaintiffs' assertion that the motion is "[c]onsistent with the Court's findings" in the August 16, 2022 order is sheer cheek.

21

22    [6] Plaintiffs have not taken the position that the Court can entertain this motion under Rule 23(c)(1)(C), which provides that "[a]n order that grants or denies class certification may be altered or amended before final judgment."

23    Fed.R.Civ.P. 23(c)(1)(C). In any event, courts have held that Rule 23(c)(1)(C) does not provide a "separate mechanism" for challenging certification orders, see, e.g., Daniel F. v. Blue Shield of California, 2015 WL 3866212, at *3 (N.D. Cal. June 22, 2015), and that motions contesting denial of class certification are properly treated as

24    motions for reconsideration unless otherwise provided by court order. See, e.g., Stemmelin v. Matterport, Inc., 2022 WL 4843089, at *1 (N.D. Cal. Oct. 3, 2022) ("Our court of appeals has not yet ruled on a specific standard for review

25    of serial motions for class certification, but some judges in our district have used the reconsideration standard." (collecting cases)); Williams v. Warner Music Grp. Corp., 2021 WL 7448496, at *4–5 (C.D. Cal. Dec. 14, 2021) ("In

26    line with the majority of courts to have considered the issue, the Court applies a motion for reconsideration standard to the instant Motion."); Garcia v. Shasta Beverages, Inc., 2021 WL 1502917, at *1–2 (C.D. Cal. Feb. 25, 2021) ("a

27    renewed motion for class certification is properly analyzed [] as one for reconsideration") Eng. v. Apple Inc, 2016 WL 1108929, at *5 (N.D. Cal. Mar. 22, 2016) ("[C]ourts in this circuit faced with motions to reconsider orders denying

28    class certification have routinely applied the ordinary standards for reconsideration." (collecting cases)).

1  rethink what the court ha[s] already thought through— rightly or wrongly." U.S. v. Rezzonico, 32

2  F.Supp.2d 1112, 1116 (D. Ariz. 1998) (internal quotation marks and citation omitted).

3      Plaintiffs make no argument specific to reconsideration in their opening memorandum[7] and

4  devote just three sentences to reconsideration in their reply memorandum, asserting in boilerplate

5  fashion that the Court should grant reconsideration "on the basis of the current, supplemented

6  record" because "[t]he Federal Rules broadly permit courts to grant motions for reconsideration

7  for 'any reason … justifying relief' " under Rule 60(b)(6). Doc. No. 97 at 21:3-6 (citing

8  Fed.R.Civ.P. 60(b)(6)).

9      Reconsideration is properly denied in this case for the mere reason that reconsideration is

10  not substantively addressed in the opening memorandum. See Zamani v. Carnes, 491 F.3d 990,

11  997 (9th Cir. 2007) (a court "need not consider arguments raised for the first time in a reply

12  brief"). Further, Plaintiffs fail to show anything approximating the "highly unusual[]

13  circumstances" required for relief under Rule 60(b)(6), Sch. Dist. No. 1J, Multnomah Cnty., Or. v.

14  ACandS, Inc., 5 F.3d 1255, 1263 (9th Cir. 1993); United States v. Alpine Land & Reservoir Co.,

15  984 F.2d 1047, 1049 (9th Cir. 1993) (explaining that Rule 60(b)(6) relief is used "sparingly" and

16  requires "extraordinary circumstances"); and make no attempt at all to show that any of the more

17  common grounds for reconsideration apply. Similarly, Plaintiffs fail to explain why the deposition

18  testimony, settlement proposal and new declarations offered to correct, clarify and supplement the

19  record on this motion were not offered in support of the initial class certification motion, which

20  was not fully briefed until May 9, 2022 and which had a May 16, 2022 hearing date. See E.D. Cal.

21  L.R. 230(j); Doc. Nos. 90 & 92. And finally, Plaintiffs do not account for the fact that the Court

22  assumed in deciding the first motion that the proposed class representatives intend to be neutral,

23  which is the crux of what their new evidence is apparently supposed to show. See Doc. No. 93

24  ("The Court does not doubt that the proposed class representatives have the intentions they claim

25  in bringing this action ….").

26      In sum, Plaintiffs' motion is wholly lacking as far as reconsideration is concerned, and

27

28  _____

[7] The opening motion does not even address the standard for reconsideration. See Doc. No. 94.

1    reconsideration will therefore be denied. The Court will now address the merits of the motion,

2    assuming that it was somehow authorized by the Court's August 16, 2022 order.

3    **B.**     <u>**Alternative Analysis of Plaintiffs' Motion**</u>

4        As set forth above, Plaintiffs argue that class certification should be granted (using the

5    class definitions furnished by the Court in the August 16, 2022 order) because: (i) the conflict

6    between the proposed class representatives and putative class members who do not play lacrosse is

7    merely "speculative"; and (ii) the fact that the proposed class representatives have effectively

8    sworn not to favor lacrosse over other sports obviates any conflict that might otherwise exist.

9    Further, Plaintiffs argue that, even if the Court again finds that there is a conflict between the

10    proposed class representatives and other putative class members, class certification should at least

11    be granted as to liability since the supposed conflict only affects remedies. The Court addresses

12    each of these arguments in turn.[8]

13        1.    <u>Conflict Among Different Women's Sports</u>

14        Plaintiffs argue that "under established Ninth Circuit law, on the current record, any

15    conflicts between the proposed class representatives and the class members should properly be

16    viewed as speculative" and thus do not bar class certification. Doc. No. 94-1 at 7:16-8:7.

17        Plaintiffs cite two decisions from within the Ninth Circuit on the question of "speculative"

18    conflict: *A.B. by C.B. v. Hawaii State Department of Education*, 334 F.R.D. 600 (D. Haw. 2019),

19    *rev'd and remanded sub nom. A. B. v. Hawaii State Department of Education*, 30 F.4th 828 (9th

20    Cir. 2022) and *Cummings v. Connell*, 316 F.3d 886 (9th Cir. 2003). Doc. No. 94-1 at 7:16-27.

21        *A.B. by C.B.* states that conflict between "groups that play different sports within [a] class"

22    is "speculative" in a Title IX context but provides no explanation for that finding. See <u>A.B. by</u>

23    <u>C.B.</u>, 334 F.R.D. at 611. The decision therefore sheds little, if any, light on the merits of Plaintiffs'

24    argument.

25        *Cummings*, for its part, involved nonunion members who brought a class action against a

26    labor union claiming that the union provided insufficient notice of so-called "fair share" fees—an

27

28        [8] For discussion of the law governing class certification as applied by the Court to this case, see Doc. No. 93 at 10-20.

assessment nonunion members had to pay the union for collective bargaining even though they were not themselves union members. 316 F.3d at 889. The district court certified a class comprising all "fee payers" who were not members of the union and granted summary judgment in favor of the class, ordering the union to return a certain portion of the "fair share" fees paid by members of the certified class, including those who did not object to notice. Id. at 890. The union appealed class certification, arguing, in essence, that the class representatives sought to weaken the union for ideological reasons and thus, had a conflict with nonunion fee payers who wanted a strong union (despite their lack of union membership) and thus did not favor "full restitution" of "fair share" fees, as sought by the class representatives. Id. at 895-96.

The Ninth Circuit affirmed class certification for two reasons. First, it found that there was no "potential conflict … truly present in th[e] case" because Ninth Circuit case law precluded the " 'punitive' remedy of full restitution." Cummings, 316 F.3d at 896. Second, the Ninth Circuit found that the conflict was "speculative" (and, thus, disfavored as a basis for denying class certification under Ninth Circuit law) because the union "produced no evidence that class members actually possess[ed] opposing views regarding the pursuit of the punitive [full restitution] remedy." Id.

The Court has also reviewed two other Ninth Circuit decisions addressing "speculative" conflict: Social Services Union, Local 535, Service Employees' International Union, AFL-CIO v. Santa Clara County., 609 F.2d 944 (9th Cir. 1979) and Blackie v. Barrack, 524 F.2d 891 (9th Cir. 1975).

In Social Services, the Ninth Circuit found that the district court had erred in denying class representative status to union plaintiffs based on a supposed "conflict between the economic interests of [] male and female members" because the district court could not assume, based merely on "the general budgetary constraints" of local government, that "male union members would suffer pecuniary injury if the pay of female employees [was] raised." 609 F.2d at 948. There was "no evidence that the economic interests of male union members would in fact suffer … because of relief that might be obtained in th[e] action" and thus, the Ninth Circuit concluded that "any potential economic conflict between male and female employees [was] too amorphous

1   and speculative to disqualify the unions from representing the class." Id.

2        In *Blackie*, similarly, defendants argued on appeal that the district court should not have

3   granted class certification in a securities fraud case because there was a conflict between early

4   investors, who would get greater out-of-pocket damages by maximizing the deflationary effect of

5   corrective disclosures on stock prices, and later investors, who would get greater out-of-pocket

6   damages by downplaying the effect of corrective disclosures and maximizing price inflation at the

7   time of their purchases. Blackie, 524 F.2d at 908. The Ninth Circuit found that the conflict was

8   "speculative"—and thus did not bar class certification—because the district court had the

9   "discretion" to apply a rescissory measure of recovery rather than an out-of-pocket measure of

10  recovery, and that applying a rescissory measure of recovery would eliminate the conflict

11  completely. Id. at 909. In other words, the Ninth Circuit found that a conflict arising solely from a

12  measure of damages that had not yet been applied—and might never be applied—"d[id] not render

13  the class inappropriate" at the time of class certification. Id.

14       Thus, to summarize, *Blackie* held that the conflict was "speculative" at the time of class

15  certification because the conflict would not materialize at all if the court exercised its discretion to

16  apply a rescissory measure of damages. In *Social Services*, the conflict was deemed "speculative"

17  because defendants failed to adduce evidence that the government could not afford to increase

18  female wages without inflicting economic injury on males. And in *Cummings*, both these issues

19  were at play: the Ninth Circuit found that the conflict was "speculative" because defendants did

20  not provide evidence showing that class members had different viewpoints as to the union and

21  because applicable law did not allow the "full restitution" remedy that supposedly gave rise to the

22  conflict.

23       Here, however, the record shows that Fresno State's athletic department has an average

24  annual operating deficit of approximately $2.2 million, and that it cut teams in 2020 in part

25  because that operating deficit was projected to triple to $6.6 million in the 2020-21 academic year.

26  Doc. No. 19 at 12:22-26. Further, the record shows that the cuts necessitated by rising deficits did

27  not affect all sports (or student-athletes) equally, in that Fresno State eliminated more than 70

28  subscribed participation opportunities in men's wrestling, men's tennis and women's lacrosse,

1   while sparing sports such as baseball, basketball and football on the men's side and basketball,

2   softball and volleyball on the women's side. Doc. No. 35 at 25:16-20. Finally, Title IX bars

3   universities that receive federal funds from favoring one sex over the other in athletics, so once

4   Title IX parity has been established, a university generally cannot add a significant number of

5   participation opportunities (or otherwise make expenditures of consequence) for one sex if it does

6   not have the wherewithal to do the same for the other sex—further reducing flexibility in the

7   funding of athletics as to a given sex. See id., Analysis, Part I.A.

8        Thus, the conflicting interests of different sports in Fresno State's limited athletic

9   resources—as well as the constraints (both financial and legal) that make it impossible for Fresno

10  State to fully accommodate all female students who are "able and ready" to participate in varsity

11  sports, see Pederson v. Louisiana State Univ., 213 F.3d 858, 871 (5th Cir. 2000)—are clearly

12  evidenced in this case. Similarly, there is no dispute that Fresno State can achieve full Title IX

13  compliance—and, realistically, can only achieve full Title IX compliance—through a lopsided

14  allocation of resources that benefits some women's sports more than others, while leaving many

15  women's sports completely unserved. In other words, there is no evidentiary deficit as to the

16  conflict in this case, and there is no remedy the Court could apply to prevent that conflict from

17  materializing (or to make it go away). Thus, the Court finds that the conflict here is not

18  "speculative" as that concept is applied in Ninth Circuit case law pertaining to class certification.

19       Moreover, several courts—including the Court of Appeals for the Second Circuit—have

20  found that circumstances such as those present here create a conflict that precludes certification of

21  multi-sport classes represented solely by student-athletes from a single sport.

22       In *Boucher v. Syracuse University*, for example, the district court found a conflict between

23  club lacrosse players and club softball players that precluded aggregate class certification because

24  defendant Syracuse University "could possibly comply with Title IX by elevating only one of the

25  teams to the varsity level" and "budget constraints" might preclude elevating both teams. 1996

26  WL 328441, at *4 (N.D.N.Y. June 12, 1996), vacated in different part, 164 F.3d 113 (2d Cir.

27  1999). On appeal, the Second Circuit affirmed in that respect, stating that "[d]istrict judges have

28  broad discretion over class definition" and finding that "the district court correctly found potential

conflicts between members of a class that included both women interested in playing varsity lacrosse and women who wished to play varsity softball." <u>Boucher v. Syracuse Univ.</u>, 164 F.3d 113, 119 (2d Cir. 1999).

In *Bryant v. Colgate University*, the court found that a proposed class encompassing all female sports was not appropriate for certification in an action brought by members of the women's club ice hockey team because "plaintiffs interests would be antagonistic to those of other interested and able athletes" due to "finite" resources and limits on "the number of programs available." 1996 WL 328446, at *6 (N.D.N.Y. June 11, 1996).

In *Robb v. Lock Haven University of Pennsylvania*, the district court denied certification of a multi-sport class on findings that "Title IX, to some extent, does not care *who* receives [] benefits, as long as they go to the underrepresented sex" and that the named plaintiff—a member of the women's rugby team—"would likely advocate" for women's rugby at the expense of other women's sports. 2019 WL 2005636, at *12 (M.D. Pa. May 7, 2019).

And in *Miller v. University of Cincinnati*, the court found that there was an "an inherent conflict" between members of the women's rowing team and the proposed class (comprising "[a]ll present, prospective and future participants in the women's athletics program at the University of Cincinnati") because "compliance could conceivably be achieved, in part, by taking away the allegedly paltry resources allocated to women's rowing, and bestowing them along with new resources on other women's varsity sports." 241 F.R.D. 285, 290 (S.D. Ohio 2006); <u>see also</u> <u>S.G. by & through Gordon v. Jordan Sch. Dist.</u>, 2018 WL 4899098, at *2 (D. Utah Oct. 9, 2018) (finding that "the remedies the class and subclass seek could conflict with each other in a way that would render [named plaintiffs'] representation inadequate").

The Court agrees with the reasoning in these cases[9] and finds—consistent with the

---

[9] Plaintiffs point to several Title IX cases from outside the Ninth Circuit in which district courts found that conflict among sports was merely "speculative." In *Portz v. St. Cloud State University*, 297 F. Supp. 3d 929 (D. Minn. 2018), for example, the court found that a supposed conflict between the proposed class representatives and class members who participated in different sports was "merely speculative" because the proposed class members "filed declarations stating that their primary goal [was] 'to force SCSU to provide sex-based equality in athletics overall" and "expressed a desire to end the alleged sex discrimination for all women's sports." Id. at 948. In *Foltz v. Delaware State University*, 269 F.R.D. 419 (D. Del. 2010), similarly, defendant argued that the class, if certified at all, should be limited to the equestrian team because there was a conflict between the named plaintiffs—whose primary goal was to

1   principles set forth by the Ninth Circuit in *Cummings*, *Social Services* and *Blackie*—that the

2   conflict evidenced by undisputed aspects of the record in this case is not speculative and properly

3   bars class certification for lack of adequate representation under Rule 23(a)(4).[10] Cf. In re

4   Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig., 895 F.3d 597, 607 (9th Cir.

5   2018) (stating that "[t]he initial inquiry in assessing adequacy of representation … is whether 'the

6   named plaintiffs and their counsel have any conflicts of interest with other class members' " and

7   recognizing "evident structural conflicts" contravening Rule 23(a)(4) where subgroups "have

8   differing, even adversarial, interests in the allocation of limited settlement funds" (quoted sources

9   omitted)).

10          2.      Neutrality of Proposed Class Representatives

11          Plaintiffs next argue that whatever conflict might otherwise exist among different women's

12  sports has been obviated in this case because Anders and Walburger have sworn in supplemental

13  declarations that:

14          the principal purpose of this case was not and is not to protect or restore women's
            varsity lacrosse. It was and is to require Fresno State to comply with Title IX, stop
15          discriminating against female student-athletes and potential student-athletes, and
            provide equal opportunities to participate and equal treatment of women in its
16          varsity intercollegiate athletic program.

17  Doc. No. 94-1 at 13:8-15. Similarly, Plaintiffs state that "[b]oth class representatives testified

18  under oath that they would agree to a settlement wherein Fresno State comes into compliance with

19  Title IX by adding women's participation opportunities without reinstating the lacrosse team," id.

20  at 16:1-5, and set forth evidence showing a proposed settlement in which Fresno State would

21  "reinstate the women's lacrosse team or add another women's team or teams to reach substantial

22

23  _____

24  preserve the women's equestrian team—and "the broader interests of the proposed class." Id. at 424. The court
    rejected that argument, finding that the conflict was "speculative" because "several of the named plaintiffs ha[d]
25  testified expressly that they were motivated to obtain equal opportunities for all female students." Id. The court
    respectfully disagrees with the reasoning and conclusions in those cases for the reasons set forth in this order.

26  [10] Like the parties' briefing, the Court's analysis focuses primarily on participation opportunities and Plaintiffs' equal
    accommodation claim. The rationale and findings, however, apply to class certification in connection with
27  Plaintiffs' equal treatment claim. See Robb, 2019 WL 2005636, at *12 (stating that the conflict analysis applicable to
    equal accommodation claims "applies to equal treatment claims, since Title IX often does not care how a university
28  chooses to remedy unequal overall treatment").

1  proportionality." <u>Id.</u> at 16:1-9; Doc. No. 94-6 at 3. Fresno State argues that the supplemental

2  declarations, deposition testimony and settlement proposal should not be given weight because

3  they are contradicted by the SAC and various evidence indicating that this action is first and

4  foremost about women's lacrosse. Doc. No. 95 at 8:8-18; 16:14-19:2.

5      The Court is inclined to credit the proposed class representatives' sworn statements as to

6  their intentions with respect to neutrality but nonetheless finds Plaintiffs' line of argument

7  unpersuasive for two reasons.

8      First, the Court is not convinced that Plaintiffs' good intentions (however earnest) are

9  sufficient to offset the fact that this action has primarily been about the reinstatement of women's

10  lacrosse, as pleaded and prosecuted to date. The SAC, for example, contains 128 references to

11  "lacrosse," compared to three or fewer references to each of the other women's varsity sports at

12  Fresno State. <u>See</u>, <u>generally</u>, Doc. No. 59. Anders testified in deposition that reinstatement of

13  women's lacrosse was "of course" a "a goal" of the lawsuit; that it would be a "bonus" to have

14  women's lacrosse reinstated; and that she would be "disappointed … if the Fresno State women's

15  lacrosse team was not reinstated." Doc. No. 94-4 at 6:11-18; 7:8-25. Walburger testified that it

16  would be "sad" if women's lacrosse were not reinstated because there were "certain opportunities

17  taken away" from members of the women's lacrosse team, such as the opportunity to "play in an

18  alumni game." Doc. No. 94-5 at 11:2-9. On March 4, 2021, an attorney for Plaintiffs, Arthur

19  Bryant, sent a settlement proposal to an attorney for Fresno State, Scott Eldridge, expressly calling

20  for reinstatement of women's lacrosse—with no reference to the addition or reinstatement of any

21  other women's sport. Doc. No. 95-5. Specifically, Mr. Bryant wrote to Mr. Eldridge as follows:

22          To be clear, ***we would be wil[l]ing – and are offering – to settle this case, as we
           did with [East Carolina University] and the other schools that recently eliminated
23          women's teams, if Fresno State agrees to (1) reinstate, continue, and treat the
           women's lacrosse team as a varsity team,*** (2) develop and implement a gender
24          equity plan to get all aspects of its intercollegiate athletic department into
           compliance with Title IX in the next year or two, and (3) pay our clients' costs and
25          attorneys' fees.

26          I can develop and give you more detail (the ECU settlement agreement has most of
           it), but there is no sense in wasting your or my time. (Fresno State will be paying
27          for both.)

28  <u>Id.</u> at 2 (emphasis added); <u>see also</u> <u>id.</u> at 6 (email from Plaintiffs' counsel to Fresno State attaching

1  a "settlement agreement [] recently entered into with East Carolina University" and stating that

2  Plaintiffs "would be willing to agree to a settlement along these lines with Fresno State"). And

3  even the March 18, 2022 settlement proposal Plaintiffs cite to show their new-found neutrality

4  reflects a bias in favor of women's lacrosse in that lacrosse is discussed at length and the only

5  women's sport mentioned by name. Doc. No. 94-6 at 2-3 (calling for a commitment that "Fresno

6  State will reinstate the women's lacrosse team or add another women's team or teams to reach

7  substantial proportionality"). At bottom, it appears Fresno State could achieve Title IX

8  compliance—the proposed class representatives' stated goal—by reinstating or adding one or two

9  women's sports if Plaintiffs prevail in this action. The Court cannot conclude, in light of facts such

10 as those set forth above (and others like them elsewhere on the record), that other women's sports

11 would be on fully equal footing with women's lacrosse if and when the time comes to select sports

12 for addition or reinstatement. See Doc. 94-1 at 6:20-7:15.

13     Second, and more fundamentally, mere neutrality on the part of the proposed class

14 representatives does not provide female student-athletes who are "ready and able" to participate in

15 varsity sports other than women's lacrosse with the "structural assurance of fair and adequate

16 representation" to which they are entitled in class actions as a matter of due process. Amchem

17 Prod., Inc. v. Windsor, 521 U.S. 591, 627 (1997).

18     In our adversarial system, litigants are supposed to act in their self-interest, see Jay

19 Tidmarsh, Rethinking Adequacy of Representation, 87 Tex.L.Rev. 1137, 1142 (2009) ("The

20 American version of adversarialism embodies another principle: In making basic decisions

21 regarding the structure and prosecution of a case, a plaintiff is entitled to be guided by self-

22 interest."), and anyone bound by this action has a constitutional right to representatives who

23 "understand that their role is to represent solely the members of their respective subgroups,"

24 Amchem, 521 U.S. at 627 (quoted source and internal quotation marks omitted), and who will

25 "exclusively advance[]" their "particular interests." In re Literary Works in Elec. Databases

26 Copyright Litig., 654 F.3d 242, 250 (2d Cir. 2011). In Amchem Products Inc. v. Windsor, for

27 example, the Supreme Court affirmed a Third Circuit order rejecting a "global compromise" in an

28 asbestos class action, finding that Rule 23(a)(4) had not been satisfied where the "named parties

1   … each served generally as representative for the whole, not for a separate constituency," with no

2   showing that "the named plaintiffs operated under a proper understanding of their representational

3   responsibilities." <u>Amchem</u>, 521 U.S. at 626-27; <u>see also</u> <u>In re Literary Works</u>, 654 F.3d at 250

4   (adopting the reasoning in *Amchem* to affirm a district court order denying class certification); <u>c.f.</u>

5   <u>Juris v. Inamed Corp.</u>, 685 F.3d 1294, 1324–25 (11th Cir. 2012) (finding that "the structural

6   protections put in place were sufficient to meet the demands of due process" because the Eleventh

7   Circuit was "confident that the class settlement, as well as the plan for distribution, was achieved

8   only by the consent of those who understood that their role was to advocate on behalf of their

9   respective subgroups").

10      Here, the putatively neutral proposed class representatives do not purport to offer sport-

11  specific advocacy (to the contrary, they swear not to take sides) and thus cannot meet "the

12  requirement of structural protection recognized in *Amchem*" and other Supreme Court cases. <u>Ortiz</u>

13  <u>v. Fibreboard Corp.</u>, 527 U.S. 815, 857 (1999). The Court therefore finds that Rule 23(a)(4) has

14  not been satisfied, even considering the various materials Plaintiffs set forth to correct, clarify and

15  supplement the record.

16          3.      <u>Class Certification for Liability Only</u>

17      Plaintiffs argue that if "the Court finds that a conflict truly exists," it should "certify … as

18  to liability," instead of denying class certification "outright."[11] Doc. No. 94-1 at 22:11-13.

19  According to Plaintiffs, conflict among different women's sports could arise only if Plaintiffs

20  prevail on liability and could be addressed, to the extent necessary, through the creation of

21  subclasses specific to different sports at the remedy stage. <u>Id.</u> at 22:10-23:7.

22      As Fresno State points out, however, due process requires that class representatives

23  adequately represent the interest of absent class members "at all times." <u>Phillips Petroleum Co. v.</u>

24  <u>Shutts</u>, 472 U.S. 797, 812 (1985). The record in this case shows that Plaintiffs have already made

25  two settlement proposals in this action, one calling solely for reinstatement lacrosse and the other

26

27  ───────────────
    [11] Rule 23(c)(4) provides that, "[w]hen appropriate, an action may be brought or maintained as a class action with
28  respect to particular issues." Fed.R.Civ.P. 23(c)(4). Thus, for example, Rule 23(c)(4) may be used "to separate the
    issue of liability from damages." <u>In re Nassau County Strip Search Cases</u>, 461 F.3d 219, 226 (2d Cir. 2006).

calling for reinstatement of lacrosse while also allowing for the possible addition of some other unspecified women's sport (or sports) instead. Thus, liability and remedies cannot neatly be separated from one another in this case, and the Court has no interest in sanctioning an arrangement that could well lead to an unenforceable settlement that has to be undone due to a Rule 23(a)(4) violation that is fully evident now—at the class certification stage. See Amchem, 521 U.S. at 627 (different groups "cannot be bound to a settlement except by consents given by those who understand that their role is to represent solely the members of their respective subgroups" (quoted source and internal quotation marks omitted)). Further, Plaintiffs have not shown that bifurcated certification would "materially advance the litigation," cf. In re Motor Fuel Temperature Sales Pracs. Litig., 279 F.R.D. 598, 610 (D. Kan. 2012) ("the Court must determine … whether certifying issue classes will materially advance the resolution of the litigation"), or provided creditable assurances, of any kind, that actions taken and decisions made in connection with litigating liability (for example, development of the factual record) would not influence remedies in a way that late-stage creation of sport-specific subclasses cannot fully rectify. The Court therefore declines to grant class certification as to liability only. See Cason v. Nissan Motor Acceptance Corp., 212 F.R.D. 518, 523 (M.D. Tenn. 2002) (finding that "certifying a class for purposes of liability only" would not be "fair," "practical" or "in the interest of judicial economy").

## **CONCLUSION**

To summarize, Plaintiffs' motion is properly construed as a motion for reconsideration because it exceeds the scope of leave granted by the Court for a second class-certification motion and Rule 60(b) is the only other basis Plaintiffs provide (or could provide) for bringing the motion. In the Court's view, reconsideration is not warranted because all substantive argument as to reconsideration is made for the first time on reply and regardless, Plaintiffs make no discernable attempt to show that any reconsideration standards have been satisfied.

Assuming the motion could somehow be construed as having been authorized by Court order, the Court finds that there is an unacceptable Rule 23(a)(4) conflict between the proposed

1   class representatives and the all-inclusive class of student-athletes they seek to represent because

2   different sports necessarily compete for limited resources at Fresno State and given the nature of

3   Title IX remedies, one or more women's sports will benefit more than others if Plaintiffs prevail

4   on one or more of their claims. Further, the Court finds that the professed neutrality of the

5   proposed class representatives does resolve the conflict in question or otherwise make class

6   certification appropriate because it does not convincingly offset the disproportionate emphasis on

7   lacrosse in this case to date. Also, neutrality on the part of the proposed class representatives

8   would deprive student-athletes (including lacrosse players) of their due process right to vigorous

9   and single-minded advocacy specific to their respective sport. Finally, the Court declines to grant

10  class certification for liability only because due process rights to vigorous sport-specific

11  representation apply at all stages of this litigation; Plaintiffs have failed to show how liability-only

12  certification would materially advance resolution of this case; and particularly in light of the

13  settlement efforts that have been made to date, the Court is not satisfied that liability and remedies

14  can be bifurcated in this case.

15         Plaintiffs' motion will therefore be denied in its entirety.

16         The Court recognizes, however, the potential need to litigate this case as a class action, if

17  only to preserve standing for a period that may exceed the remaining time that named Plaintiffs are

18  enrolled at Fresno State. See Beasley v. Alabama State Univ., 3 F. Supp. 2d 1325, 1344 (M.D.

19  Ala. 1998) ("where, as here, a plaintiff enjoys only inherently transient standing, she may preserve

20  her claims for prospective relief by obtaining class certification, because under such circumstances

21  'the termination of a class representative's claim does not moot the claims of unnamed members

22  of the class.' " (quoted source omitted)); Cook v. Colgate Univ., 992 F.2d 17, 19 (2d Cir. 1993)

23  (noting the possibility that a student's claim may not be rendered moot by graduation if he or she

24  sued in a representational capacity). Further, the Court notes that it is not uncommon for courts to

25  certify a class—or subclass—specific to a single sport. See, e.g., Boucher, 164 F.3d at 119 ("We

26  conclude that although the district court correctly found potential conflicts between members of a

27  class that included both women interested in playing varsity lacrosse and women who wished to

28  play varsity softball, it should have certified two sub-classes—one for each sport …."). The Court

will therefore grant Plaintiffs leave to bring a motion for class certification specific to women's lacrosse. To the extent Plaintiffs bring a motion that exceeds the scope of this leave in any material respect, the motion will be decided under a reconsideration standard or stricken.

In light of the foregoing, it is not necessary for the Court to address the various collateral issues raised by the parties in connection with this motion, including, for example, the propriety of the class definitions set forth by the Court in its August 16, 2022 order. Such issues can be raised as necessary in future briefing involving class certification to the extent they are not otherwise barred.

## <u>ORDER</u>

Accordingly, IT IS HEREBY ORDERED that:

1.  Plaintiffs' renewed motion for class certification and in the alternative, motion for reconsideration (Doc. No. 94) is DENIED WITHOUT PREJUDICE to a motion for class certification specific to women's lacrosse;

2.  To the extent Plaintiffs bring a motion that exceeds the scope of this leave in any material respect, the motion will either be stricken or decided exclusively under a reconsideration standard; and

3.  This case is referred back to the magistrate judge for further proceedings consistent with this order.

IT IS SO ORDERED.

Dated:   November 22, 2022          _____

                                                SENIOR  DISTRICT  JUDGE

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 15. Certificate of Service for Electronic Filing

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form15instructions.pdf

**9th Cir. Case Number(s)**

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**

☐ I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are NOT Registered for Electronic Filing:**

☒ I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

Scott Eldridge: eldridge@millercanfield.com
Brian Schwartz: schwartzb@millercanfield.com
Erica Giroux: giroux@millercanfield.com
Ashley Higginson: higginson@millercanfield.com
Jennifer Santa Maria: jennifer.santamaria@doj.ca.gov

**Description of Document(s)** *(required for all documents)*:

PETITION FOR PERMISSION TO APPEAL PURSUANT TO
FED. R. CIV. P. 23(f)

**Signature**  s/ Arthur Bryant     **Date**  12/6/2022

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 15**                                                              *Rev. 12/01/2018*