# *Exhibit 6*

🇺🇸 An official website of the United States government   Here's how you know

U.S. Department of Education

HOME  /   ABOUT US  /   OFFICES  /   LIST  /   OFFICE FOR CIVIL RIGHTS (OCR)  /   DOCS

# A Policy Interpretation: Title IX and Intercollegiate Athletics

[OCR-00005]

Federal Register, Vol. 44, No. 239 - Tuesday, Dec. 11, 1979

Intercollegiate athletics policy interpretation; provides more specific factors to be reviewed by OCR under program factors listed at 34 C.F.R. Section 106.41 of the Title IX regulation; explains OCR's approach to determining compliance in intercollegiate athletics; adds two program factors, recruitment and support services, to be reviewed; clarifies requirement for athletic scholarships - 34 C.F.R. Section 106.37(c). The document contains dated references, and footnote 6 is out of date; however, the policy is still current.

**Federal Register** / Vol. 44, No. 239 / Tuesday, December 11, 1979 / Rules and Regulations

**DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE**
**Office for Civil Rights**

**Office of the Secretary**

**45 CFR Part 86**

**Title IX of the Education Amendments of 1972; a Policy Interpretation; Title IX and Intercollegiate Athletics**

**AGENCY:** Office for Civil Rights, Office of the Secretary, HEW.

**ACTION:** Policy interpretation.

**SUMMARY:** The following Policy Interpretation represents the Department of Health, Education, and Welfare's interpretation of the intercollegiate athletic provisions of Title IX of the Education Amendments of 1972 and its implementing regulation. Title IX prohibits educational programs and institutions funded or otherwise supported by the Department from discriminating on the basis of sex. The Department published a proposed Policy Interpretation for public comment on December 11, 1978. Over 700 comments reflecting a broad range of opinion were received. In addition, HEW staff visited eight universities during June and July, 1979, to see how the proposed policy and other suggested alternatives would apply in actual practice at individual campuses. The final Policy Interpretation reflects the many comments HEW received and the results of the individual campus visits

**EFFECTIVE DATE:** December 11, 1979

**FOR FURTHER INFORMATION CONTACT:** Colleen O'Connor, 330 Independence Avenue, Washington, D.C. (202) 245–6671

**SUPPLEMENTARY INFORMATION:**

**1. Legal Background**

*A. The Statute*

Section 901(a) of Title IX of the Education Amendments of 1972 provides:

- No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

Section 844 of the Education Amendments of 1974 further provides:

- The Secretary of [of HEW] shall prepare and publish ... proposed regulations implementing the provisions of Title IX of the Education Amendments of 1972 relating to the prohibition of sex discrimination in federally assisted education programs which shall include with respect to intercollegiate athletic activities reasonable provisions considering the nature of particular sports.

Congress passed Section 844 after the Conference Committee deleted a Senate floor amendment that would have exempted revenue-producing athletics from the jurisdiction of Title IX.

*B. The Regulation*

The regulation implementing Title IX is set forth, in pertinent part, in the Policy Interpretation below. It was signed by President Ford on May 27, 1975, and submitted to the Congress for review pursuant to Section 431(d)(1) of the General Education Provisions Act (GEPA).

During this review, the House Subcommittee on Postsecondary Education held hearings on a resolution disapproving the regulation. The Congress did not disapprove the regulation within the 45 days allowed under GEPA, and it therefore became effective on July 21, 1975.

Subsequent hearings were held in the Senate Subcommittee on Education on a bill to exclude revenues produced by sports to the extent they are used to pay the costs of those sports. The Committee, however, took no action on this bill.

The regulation established a three year transition period to give institutions time to comply with its equal athletic opportunity requirements. That transition period expired on July 21, 1978.

## II. Purpose of Policy Interpretation

By the end of July 1978, the Department had received nearly 100 complaints alleging discrimination in athletics against more than 50 institutions of higher education. In attempting to investigate these complaints, and to answer questions from the university community, the Department determined that it should provide further guidance on what constitutes compliance with the law. Accordingly, this Policy

Interpretation explains the regulation so as to provide a framework within which the complaints can be resolved, and to provide institutions of higher education with additional guidance on the requirements for compliance with Title IX in intercollegiate athletic programs.

## III. Scope of Application

This Policy Interpretation is designed specifically for intercollegiate athletics. However, its general principles will often apply to club, intramural, and interscholastic athletic programs, which are also covered by regulation.[1] Accordingly, the Policy Interpretation may be used for guidance by the administrators of such programs when appropriate.

This policy interpretation applies to any public or private institution, person or other entity that operates an educational program or activity which receives or benefits from financial assistance authorized or extended under a law administered by the Department. This includes educational institutions whose students participate in HEW funded or guaranteed student loan or assistance programs. For further information see definition of "recipient" in Section 86.2 of the Title IX regulation.

## IV. Summary of Final Policy Interpretation

The final Policy Interpretation clarifies the meaning of "equal opportunity" in intercollegiate athletics. It explains the factors and standards set out in the law and regulation which the Department will consider in determining whether an institution's intercollegiate athletics program complies with the law and regulations. It also provides guidance to assist institutions in determining whether any disparities which may exist between men's and women's programs are justifiable and nondiscriminatory. The Policy Interpretation is divided into three sections:

- *Compliance in Financial Assistance (Scholarships) Based on Athletic Ability:* Pursuant to the regulation, the governing principle in this area is that all such assistance should be available on a substantially proportional basis to the number of male and female participants in the institution's athletic program.

- *Compliance in Other Program Areas (Equipment and supplies; games and practice times; travel and per diem, coaching and academic tutoring; assignment an compensation of coaches and tutors; locker rooms, and practice and compe facilities; medical and training facilities; housing and dining facilities; publicity;*

*recruitment, and support services*: Pursuant to the regulation, the governing principle is that male and female athletes should receive equivalent treatment, benefits, and opportunities.

- *Compliance in Meeting the Interests and Abilities of Male and Female Students:* Pursuant to the regulation, the governing principle in this area is that the athletic interests and abilities of male and female students must be equally effectively accommodated.

## V. Major Changes to Proposed Policy Interpretation

The final Policy Interpretation has been revised from the one published in proposed form on December 11, 1978. The proposed Policy Interpretation was based on a two-part approach. Part I addressed equal opportunity for participants in athletic programs. It required the elimination of discrimination in financial support and other benefits and opportunities in an institution's existing athletic program. Institutions could establish a presumption of compliance if they could demonstrate that:

- "Average per capita" expenditures for male and female athletes were substantially equal in the area of "readily financially measurable" benefits and opportunities or, if not, that any disparities were the result of nondiscriminatory factors, and
- Benefits and opportunities for male and female athletes, in areas which are not financially measurable, "were comparable."

Part II of the proposed Policy Interpretation addressed an institution's obligation to accommodate effectively the athletic interests and abilities of women as well as men on a continuing basis. It required an institution either:

- To follow a policy of development of its women's athletic program to provide the participation and competition opportunities needed to accommodate the growing interests and abilities of women, or
- To demonstrate that it was effectively (and equally) accommodating the athletic interests and abilities of students, particularly as the interests and abilities of women students developed.

While the basic considerations of equal opportunity remain, the final Policy Interpretation sets forth the factors that will be examined to determine an institution's actual, as opposed to presumed, compliance with Title IX in the area of intercollegiate athletics.

The final Policy Interpretation does not contain a separate section on institutions' future responsibilities. However, institutions remain obligated by the Title IX regulation to accommodate effectively the interests and abilities of male and female students with regard to the selection of sports and levels of competition available. In most cases, this will entail development of athletic programs that substantially expand opportunities for women to participate and compete at all levels.

The major reasons for the change in approach are as follows:

(1) Institutions and representatives of athletic program participants expressed a need for more definitive guidance on what constituted compliance than the discussion of a presumption of compliance provided. Consequently the final Policy Interpretation explains the meaning of "equal athletic opportunity" in such a way as to facilitate an assessment of compliance.

(2) Many comments reflected a serious misunderstanding of the presumption of compliance. Most institutions based objections to the proposed Policy Interpretation in part on the assumption that failure to provide compelling justifications for disparities in per capita expenditures would have automatically resulted in a finding of noncompliance. In fact, such a failure would only have deprived an institution of the benefit of the presumption that it was in compliance with the law. The Department would still have had the burden of demonstrating that the institution was actually engaged in unlawful discrimination. Since the purpose of issuing a policy interpretation was to clarify the regulation, the Department has determined that the approach of stating actual compliance factors would be more useful to all concerned.

(3) The Department has concluded that purely financial measures such as the per capita test do not in themselves offer conclusive documentation of discrimination, except where the benefit or opportunity under review, like a scholarship, is itself financial in nature. Consequently, in the final Policy Interpretation, the Department has detailed the factors to be considered in assessing actual compliance. While per capita breakdowns and other devices to examine expenditure patterns will be used as tools of analysis in the Department's investigative process, it is achievement of "equal opportunity" for which recipients are responsible and to which the final Policy Interpretation is addressed.

A description of the comments received, and other information obtained through the comment/consultation process, with a description of Departmental action in response to the major points raised, is set forth at Appendix "B" to this document.

## VI. Historic Patterns of Intercollegiate Athletics Program Development and Operations

In its proposed Policy Interpretation of December 11, 1978, the Department published a summary of historic patterns affecting the relative status of men's and women's athletic programs. The Department has modified that summary to reflect additional information obtained during the comment and consultation process. The summary is set forth at Appendix A to this document.

## VII. The Policy Interpretation

This Policy Interpretation clarifies the obligations which recipients of Federal aid have under Title IX to provide equal opportunities in athletic programs. In particular, this Policy Interpretation provides a means to assess an institution's compliance with the equal opportunity requirements of the regulation which are set forth at 45 CFR 86.37(c) and 86.41(c).

*A. Athletic Financial Assistance (Scholarships)*

1. *The Regulation*—Section 86.37(c) of the regulation provides:

[Institutions] must provide reasonable opportunities for such award [of financial assistance] for member of each sex in proportion to the number of students of each sex participating in * * * inter-collegiate athletics.2

2. *The Policy*—The Department will examine compliance with this provision of the regulation primarily by means of a financial comparison to determine whether proportionately equal amounts of financial assistance (scholarship aid) are available to men's and women's athletic programs. The Department will measure compliance with this standard by dividing the amounts of aid available for the members of each sex by the numbers of male or female participants in the athletic program and comparing the results. Institutions may be found in compliance if this comparison results in

substantially equal amounts or if a resulting disparity can be explained by adjustments to take into account legitimate, nondiscriminatory factors. Two such factors are:

a. At public institutions, the higher costs of tuition for students from out-of-state may in some years be unevenly distributed between men's and women's programs. These differences will be considered nondiscriminatory if they are not the result of policies or practices which disproportionately limit the availability of out-of-state scholarships to either men or women.

b. An institution may make reasonable professional decisions concerning the awards most appropriate for program development. For example, team development initially may require spreading scholarships over as much as a full generation (four years) of student athletes. This may result in the award of fewer scholarships in the first few years than would be necessary to create proportionality between male and female athletes.

3. *Application of the Policy*—a. This section does not require a proportionate number of scholarships for men and women or individual scholarships of equal dollar value. It does mean that the total amount of scholarship aid made available to men and women must be substantially proportionate to their participation rates.

b. When financial assistance is provided in forms other than grants, the distribution of non-grant assistance will also be compared to determine whether equivalent benefits are proportionately available to male and female athletes. A disproportionate amount of work-related aid or loans in the assistance made available to the members of one sex, for example, could constitute a violation of Title IX.

*Definition*—For purposes of examining compliance with this Section, the participants will be defined as those athletes:

a. Who are receiving the institutionally-sponsored support normally provided to athletes competing at the institution involved, e.g., coaching, equipment, medical and training room services, on a regular basis during a sport's season; and

b. Who are participating in organized practice sessions and other team meeting activities on a regular basis during a sport's season: and

c. Who are listed on the eligibility or squad lists maintained for each sport, or

d. Who, because of injury, cannot meet a, b, or c above but continue to receive financial aid on the basis of athletic ability.

*B. Equivalence in Other Athletic Benefits and Opportunities*

1. *The Regulation*—The Regulation requires that recipients that operate or sponsor interscholastic, intercollegiate, club or intramural athletics. "provide equal athletic opportunities for members of both sexes." In determining whether an institution is providing equal opportunity in intercollegiate athletics the regulation requires the Department to consider, among others, the following factors:

(1) [3]

(2) Provision and maintenance of equipment and supplies;

(3) Scheduling of games and practice times;

(4) Travel and per diem expenses;

(5) Opportunity to receive coaching and academic tutoring;

(6) Assignment and compensation of coaches and tutors;

(7) Provision of locker rooms, practice and competitive facilities;

(8) Provision of medical and training services and facilities;

(9) Provision of housing and dining services and facilities; and

(10) Publicity

Section 86.41(c) also permits the Director of the Office for Civil Rights to consider other factors in the determination of equal opportunity. Accordingly, this Section also addresses recruitment of student athletes and provision of support services.
This list is not exhaustive. Under the regulation, it may be expanded as necessary at the discretion of the Director of the Office for Civil Rights.[4]

2. *The Policy*—The Department will assess compliance with both the recruitment and the general athletic program requirements of the regulation by comparing the availability, quality and kinds of benefits, opportunities, and treatment afforded members of both sexes. Institutions will be in compliance if the compared program components are equivalent, that is, equal or equal in effect. Under this standard, identical benefits, opportunities, or treatment are not required, provided the overall effects of any differences is negligible.

If comparisons of program components reveal that treatment, benefits, or opportunities are not equivalent in kind, quality or availability, a finding of compliance may still be justified if the differences are the result of nondiscriminatory factors. Some of the factors that may justify these differences are as follows:

a. Some aspects of athletic programs may not be equivalent for men and women because of unique aspects of particular sports or athletic activities. This type of distinction was called for by the "Javits' Amendment" 5 to Title IX which instructed HEW to make "reasonable (regulatory) provisions considering the nature of particular sports" in intercollegiate athletics.

Generally, these differences will be the result of factors that are inherent to the basic operation of specific sports. Such factors may include rules of play, nature/replacement of equipment, rates of injury resulting from participation, nature of facilities required for competition, and the maintenance/ upkeep requirements of those facilities. For the most part, differences involving such factors will occur in programs offering football, and consequently these differences will favor men. If sport-specific needs are met equivalently in both men's and women's programs, however, differences in particular program components will be found to be justifiable.

b. Some aspects of athletic programs may not be equivalent for men and women because of legitimately sex-neutral factors related to special circumstances of a temporary nature. For example, large disparities in recruitment activity for any particular year may be the result of annual fluctuations in team needs for first-yr

athletes. Such differences are justifiable to the extent that they do not reduce overall equality of opportunity.

c. The activities directly associated with the operation of a competitive event in a single-sex sport may, under some circumstances, create unique demands or imbalances in particular program components. Provided any special demands associated with the activities of sports involving participants of the other sex are met to an equivalent degree, the resulting differences may be found nondiscriminatory. At many schools, for example, certain sports—notably football and men's basketball—traditionally draw large crowds. Since the costs of managing an athletic event increase with crowd size, the overall support made available for event management to men's and women's programs may differ in degree and kind. These differences would not violate Title IX if the recipient does not limit the potential for women's athletic events to rise in spectator appeal and if the levels of event management support available to both programs are based on sex-neutral criteria (e.g., facilities used, projected attendance, and staffing needs).

d. Some aspects of athletic programs may not be equivalent for men and women because institutions are undertaking voluntary affirmative actions to overcome effects of historical conditions that have limited participation in athletics by the members of one sex. This is authorized at § 86.3(b) of the regulation.

3. *Application of the Policy—General Athletic Program Components—*

a. *Equipment and Supplies (§ 86.41(c)(2))*. Equipment and supplies include but are not limited to uniforms, other apparel, sport-specific equipment and supplies, general equipment and supplies, instructional devices, and conditioning and weight training equipment.

Compliance will be assessed by examining, among other factors, the equivalence for men and women of:

(1) The quality of equipment and supplies;

(2) The amount of equipment and supplies;

(3) The suitability of equipment and supplies;

(4) The maintenance and replacement of the equipment and supplies; and

(5) The availability of equipment and supplies.

b. *Scheduling of Games and Practice Times (§ 86.41(c)(3))*. Compliance will be assessed by examining, among other factors, the equivalence for men and women of:

(1) The number of competitive events per sport;

(2) The number and length of practice opportunities;

(3) The time of day competitive events are scheduled;

(4) The time of day practice opportunities are scheduled; and

(5) The opportunities to engage in available pre-season and post-season competition.

c. *Travel and Per Diem Allowances (§ 86.41(c)(4))*. Compliance will be assessed by examining, among other factors, the equivalence for men and women of:

(1) Modes of transportation;

(2) Housing furnished during travel;

(3) Length of stay before and after competitive events;

(4) Per diem allowances; and

(5) Dining arrangements.

d. *Opportunity to Receive Coaching and Academic Tutoring (§ 86.41(c)(5))*.

(1) Coaching—Compliance will be assessed by examining, among other factors:

(a) Relative availability of full-time coaches;

(b) Relative availability of part-time and assistant coaches; and

(c) Relative availability of graduate assistants.

(2) Academic tutoring—Compliance will be assessed by examining, among other factors, the equivalence for men and women of:

(a) The availability of tutoring; and

(b) Procedures and criteria for obtaining tutorial assistance.

e. *Assignment and Compensation of Coaches and Tutors (§ 86.41(c)(6)).*6 In general, a violation of Section 86.41(c)(6) will be found only where compensation or assignment policies or practices deny male and female athletes coaching of equivalent quality, nature, or availability.

Nondiscriminatory factors can affect the compensation of coaches. In determining whether differences are caused by permissible factors, the range and nature of duties, the experience of individual coaches, the number of participants for particular sports, the number of assistant coaches supervised, and the level of competition will be considered.

Where these or similar factors represent valid differences in skill, effort, responsibility or working conditions they may, in specific circumstances, justify differences in compensation. Similarly, there may be unique situations in which a particular person may possess such an outstanding record of achievement as to justify an abnormally high salary.

(1) Assignment of Coaches—Compliance will be assessed by examining, among other factors, the equivalence for men's and women's coaches of:

(a) Training, experience, and other professional qualifications;

(b) Professional standing.

(2) Assignment of Tutors—Compliance will be assessed by examining, among other factors, the equivalence for men's and women's tutors of:

(a) Tutor qualifications;

(b) Training, experience, and other qualifications.

(3) Compensation of Coaches—Compliance will be assessed by examining, among other factors, the equivalence for men's and women's coaches of:

(a) Rate of compensation (per sport, per season);

(b) Duration of contracts;

(c) Conditions relating to contract renewal;

(d) Experience;

(e) Nature of coaching duties performed;

(f) Working conditions; and

(g) Other terms and conditions of employment.

(4) Compensation of Tutors—Compliance will be assessed by examining, among other factors, the equivalence for men's and women's tutors of:

(a) Hourly rate of payment by nature subjects tutored;

(b) Pupil loads per tutoring season;

(c) Tutor qualifications;

(d) Experience;

(e) Other terms and conditions of employment.

f. *Provision of Locker Rooms, Practice and Competitive Facilities (§ 86.41(c)(7)).* Compliance will be assessed by examining, among other factors, the equivalence for men and women of:

(1) Quality and availability of the facilities provided for practice and competitive events;

(2) Exclusivity of use of facilities provided for practice and competitive events;

(3) Availability of locker rooms;

(4) Quality of locker rooms;

(5) Maintenance of practice and competitive facilities; and

(6) Preparation of facilities for practice and competitive events.

g. *Provision of Medical and Training Facilities and Services (§ 86.41(c)(8))*. Compliance will be assessed by examining, among other factors, the equivalence for men and women of:

(1) Availability of medical personnel and assistance;

(2) Health, accident and injury insurance coverage;

(3) Availability and quality of weight and training facilities;

(4) Availability and quality of conditioning facilities; and

(5) Availability and qualifications of athletic trainers.

h. *Provision of Housing and Dining Facilities and Services (§ 86.41(c)(9))*. Compliance will be assessed by examining, among other factors, the equivalence for men and women of:

(1) Housing provided;

(2) Special services as part of housing arrangements (e.g., laundry facilities, parking space, maid service).

i. *Publicity (§ 86.41(c)(10))*. Compliance will be assessed by examining, among other factors, the equivalence for men and women of:

(1) Availability and quality of sports information personnel;

(2) Access to other publicity resources for men's and women's programs; and

(3) Quantity and quality of publications and other promotional devices featuring men's and women's programs.

4. *Application of the Policy—Other Factors (§ 86.41(c))*. a. *Recruitment of Student Athletes*.[7] The athletic recruitment practices of institutions often affect the overall provision of opportunity to male and female athletes. Accordingly, where equal athletic opportunities are not present for male and female students, compliance will be assessed by examining the recruitment practices of the athletic programs for both sexes to determine whether the provision of equal opportunity will require modification of those practices.

Such examinations will review the following factors:

(1) Whether coaches or other professional athletic personnel in the programs serving male and female athletes are provided with substantially equal opportunities to recruit;

(2) Whether the financial and other resources made available for recruitment in male and female athletic programs are equivalently adequate to meet the needs of each program; and

(3) Whether the differences in benefits, opportunities, and treatment afforded prospective student athletes of each sex have a disproportionately limiting effect upon the recruitment of students of either sex.

b. *Provision of Support Services*. The administrative and clerical support provided to an athletic program can affect the overall provision of opportunity to male and female athletes, particularly to the extent that the provided services enable coaches to perform better their coaching functions.

In the provision of support services, compliance will be assessed by examining, among other factors, the equivalence of:

(1) The amount of administrative assistance provided to men's and women's programs;

(2) The amount of secretarial and clerical assistance provided to men's and women's programs.

5. *Overall Determination of Compliance*. The Department will base its compliance determination under ' 86.41(c) of the regulation upon an examination of the follc

a. Whether the policies of an institution are discriminatory in language or effect; or

b. Whether disparities of a substantial and unjustified nature exist in the benefits, treatment, services, or opportunities afforded male and female athletes in the institution's program as a whole; or

c. Whether disparities in benefits, treatment, services, or opportunities in individual segments of the program are substantial enough in and of themselves to deny equality of athletic opportunity.

*C. Effective Accommodation of Student Interests and Abilities.*

1. *The Regulation.* The regulation requires institutions to accommodate effectively the interests and abilities of students to the extent necessary to provide equal opportunity in the selection of sports and levels of competition available to members of both sexes.

Specifically, the regulation, at § 86.41(c)(1), requires the Director to consider, when determining whether equal opportunities are available—

Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes.

Section 86.41(c) also permits the Director of the Office for Civil Rights to consider other factors in the determination of equal opportunity. Accordingly, this section also addresses competitive opportunities in terms of the competitive team schedules available to athletes of both sexes.

2. *The Policy.* The Department will assess compliance with the interests and abilities section of the regulation by examining the following factors:

a. The determination of athletic interests and abilities of students;

b. The selection of sports offered; and

c. The levels of competition available including the opportunity for team competition.

3. *Application of the Policy—Determination of Athletic Interests and Abilities.*

Institutions may determine the athletic interests and abilities of students by nondiscriminatory methods of their choosing provided:

a. The processes take into account the nationally increasing levels of women's interests and abilities;

b. The methods of determining interest and ability do not disadvantage the members of an underrepresented sex;

c. The methods of determining ability take into account team performance records; and

d. The methods are responsive to the expressed interests of students capable of intercollegiate competition who are members of an underrepresented sex.

4. *Application of the Policy—Selection of Sports.*

In the selection of sports, the regulation does not require institutions to integrate their teams nor to provide exactly the same choice of sports to men and women. However, where an institution sponsors a team in a particular sport for members of one sex, it may be required either to permit the excluded sex to try out for the team or to sponsor a separate team for the previously excluded sex.

a. Contact Sports—Effective accommodation means that if an institution sponsors a team for members of one sex in a contact sport, it must do so for members of the other sex under the following circumstances:

(1) The opportunities for members of the excluded sex have historically been limited; and

(2) There is sufficient interest and ability among the members of the excluded sex to sustain a viable team and a reasonable expectation of intercollegiate competition for that team.

b. Non-Contact Sports—Effective accommodation means that if an institution sponsors a team for members of one sex in a non-contact sport, it must do so for members of the other sex under the following circumstances:

(1) The opportunities for members of the excluded sex have historically been limited;

(2) There is sufficient interest and ability among the members of the excluded sex to sustain a viable team and a reasonable expectation of intercollegiate competition for that team; and

(3) Members of the excluded sex do not possess sufficient skill to be selected for a single integrated team, or to compete actively on such a team if selected.

5. *Application of the Policy—Levels of Competition.*

In effectively accommodating the interests and abilities of male and female athletes, institutions must provide both the opportunity for individuals of each sex to participate in intercollegiate competition, and for athletes of each sex to have competitive team schedules which equally reflect their abilities.

a. Compliance will be assessed in any one of the following ways:

(1) Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or

(2) Where the members of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or

(3) Where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

b. Compliance with this provision of the regulation will also be assessed by examining the following:

(1) Whether the competitive schedules for men's and women's teams, on a program-wide basis, afford proportionally similar numbers of male and female athletes equivalently advanced competitive opportunities; or

(2) Whether the institution can demonstrate a history and continuing practice of upgrading the competitive opportunities available to the historically disadvantaged sex as warranted by developing abilities among the athletes of that sex.

c. Institutions are not required to upgrade teams to intercollegiate status or otherwise develop intercollegiate sports absent a reasonable expectation that intercollegiate competition in that sport will be available within the institution's normal competitive regions. Institutions may be required by the Title IX regulation to actively encourage the development of such competition, however, when overall athletic opportunities within that region have been historically limited for the members of one sex.

6. *Overall Determination of Compliance.*

The Department will base its compliance determination under § 86.41(c) of the regulation upon a determination of the following:

a. Whether the policies of an institution are discriminatory in language or effect; or

b. Whether disparities of a substantial and unjustified nature in the benefits, treatment, services, or opportunities afforded male and female athletes exist in the institution's program as a whole; or

c. Whether disparities in individual segments of the program with respect to benefits, treatment, services, or opportunities are substantial enough in and of themselves to deny equality of athletic opportunity.

## VIII. The Enforcement Process

The process of Title IX enforcement is set forth in § 86.71 of the Title IX regulation, which incorporates by reference the enforcement procedures applicable to Title VI of the Civil Rights Act of 1964.[8] The enforcement process prescribed by the regulation is supplemented by an order of the Federal District Court, District of Columbia, which establishes time frames for each of the enforcement steps.[9]

According to the regulation, there are two ways in which enforcement is initiated:

- *Compliance Reviews*—Periodically the Department must select a number of recipients (in this case, colleges and universities which operate intercollegiate

athletic programs) and conduct investigations to determine whether recipients are complying with Title IX (45 CFR 80.7(a))

- *Complaints*—The Department must investigate all valid (written and timely) complaints alleging discrimination on the basis of sex in a recipient's programs. (45 CFR 80.7(b))

The Department must inform the recipient (and the complainant, if applicable) of the results of its investigation. If the investigation indicates that a recipient is in compliance, the Department states this, and the case is closed. If the investigation indicates noncompliance, the Department outlines the violations found.

The Department has 90 days to conduct an investigation and inform the recipient of its findings, and an additional 90 days to resolve violations by obtaining a voluntary compliance agreement from the recipient. This is done through negotiations between the Department and the recipient, the goal of which is agreement on steps the recipient will take to achieve compliance. Sometimes the violation is relatively minor and can be corrected immediately. At other times, however, the negotiations result in a plan that will correct the violations within a specified period of time. To be acceptable, a plan must describe the manner in which institutional resources will be used to correct the violation. It also must state acceptable time tables for reaching interim goals and full compliance. When agreement is reached, the Department notifies the institution that its plan is acceptable. The Department then is obligated to review periodically the implementation of the plan.

An institution that is in violation of Title IX may already be implementing a corrective plan. In this case, prior to informing the recipient about the results of its investigation, the Department will determine whether the plan is adequate. If the plan is not adequate to correct the violations (or to correct them within a reasonable period of time) the recipient will be found in noncompliance and voluntary negotiations will begin. However, if the institutional plan is acceptable, the Department will inform the institution that although the institution has violations, it is found to be in compliance because it is implementing a corrective plan. The Department, in this instance also, would monitor the progress of the institutional plan. If the institution subsequently does not completely implement its plan, it will be found in noncompliance.

When a recipient is found in noncompliance and voluntary compliance attempts are unsuccessful, the formal process leading to termination of Federal assistance will be begun. These procedures, which include the opportunity for a hearing before an administrative law judge, are set forth at 45 CFR 80.8–80.11 and 45 CFR Part 81.

## IX. Authority

(Secs. 901, 902, Education Amendments of 1972, 86 Stat. 373, 374, 20 U.S.C. 1681, 1682; sec. 844, Education Amendments of 1974, Pub. L. 93–380, 88 Stat. 612; and 45 CFR Part 86)

Dated December 3, 1979.

**Roma Stewart,**

*Director, Office for Civil Rights, Department of Health, Education, and Welfare.*

Dated December 4, 1979.

**Patricia Roberts Harris,**

*Secretary, Department of Health, Education, and Welfare.*

**Appendix A—**Historic Patterns of Intercollegiate Athletics Program Development

1. Participation in intercollegiate sports has historically been emphasized for men but not women. Partially as a consequence of this, participation rates of women are far below those of men. During the 1977–78 academic year women students accounted for 48 percent of the national undergraduate enrollment (5,496,000 of 11,267,000 students).[1] Yet, only 30 percent of the intercollegiate athletes are women.[2]

The historic emphasis on men's intercollegiate athletic programs has also contributed to existing differences in the number of sports and scope of competition offered men and women. One source indicates that, on the average, colleges and universities are providing twice the number of sports for men as they are for women.[3]

2. Participation by women in sports is growing rapidly. During the period from 19__ 1978, for example, the number of female participants in organized high school sp___s

increased from 294,000 to 2,083,000—an increase of over 600 percent.4 In contrast, between Fall 1971 and Fall 1977, the enrollment of females in high school decreased from approximately 7,600,000 to approximately 7,150,000 a decrease of over 5 percent.5

The growth in athletic participation by high school women has been reflected on the campuses of the nation's colleges and universities. During the period from 1971 to 1976 the enrollment of women in the nation's institutions of higher education rose 52 percent, from 3,400,000 to 5,201,000.6 During this same period, the number of women participating in intramural sports increased 108 percent from 276,167 to 576,167. In club sports, the number of women participants increased from 16,386 to 25,541 or 55 percent. In intercollegiate sports, women's participation increased 102 percent from 31,852 to 64,375.7 These developments reflect the growing interest of women in competitive athletics, as well as the efforts of colleges and universities to accommodate those interests.

3. The overall growth of women's intercollegiate programs has not been at the expense of men's programs. During the past decade of rapid growth in women's programs, the number of intercollegiate sports available for men has remained stable, and the number of male athletes has increased slightly. Funding for men's programs has increased from $1.2 to $2.2 million between 1970–1977 alone.8

4. On most campuses, the primary problem confronting women athletes is the absence of a fair and adequate level of resources, services, and benefits. For example, disproportionately more financial aid has been made available for male athletes than for female athletes. Presently, in institutions that are members of both the National Collegiate Athletic Association (NCAA) and the Association for Intercollegiate Athletics for Women (AIAW), the average annual scholarship budget is $39,000. Male athletes receive $32,000 or 78 percent of this amount, and female athletes receive $7,000 or 22 percent, although women are 30 percent of all the athletes eligible for scholarships.9

Likewise, substantial amounts have been provided for the recruitment of male athletes, but little funding has been made available for recruitment of female athletes. Congressional testimony on Title IX and subsequent surveys indicates that discrepancies also exist in the opportunity to receive coaching and in other bene...

and opportunities, such as the quality and amount of equipment, access to facilities and practice times, publicity, medical and training facilities, and housing and dining facilities.10

5. At several institutions, intercollegiate football is unique among sports. The size of the teams, the expense of the operation, and the revenue produced distinguish football from other sports, both men's and women's. Title IX requires that "an institution of higher education must comply with the prohibition against sex discrimination imposed by that title and its implementing regulations in the administration of any revenue producing intercollegiate athletic activity."11 However, the unique size and cost of football programs have been taken into account in developing this Policy Interpretation.

## Appendix B—Comments and Responses

The Office for Civil Rights (OCR) received over 700 comments and recommendations in response to the December 11, 1978 publication of the proposed Policy Interpretation. After the formal comment period, representatives of the Department met for additional discussions with many individuals and groups including college and university officials, athletic associations, athletic directors, women's rights organizations and other interested parties. HEW representatives also visited eight universities in order to assess the potential of the proposed Policy Interpretation and of suggested alternative approaches for effective enforcement of Title IX.

The Department carefully considered all information before preparing the final policy. Some changes in the structure and substance of the Policy Interpretation have been made as a result of concerns that were identified in the comment and consultation process.

Persons who responded to the request for public comment were asked to comment generally and also to respond specifically to eight questions that focused on different aspects of the proposed Policy Interpretation.

*Question No. 1:* Is the description of the current status and development of intercollegiate athletics for men and women accurate? What other factors should be considered?

*Comment A:* Some commentors noted that the description implied the presence of intent on the part of all universities to discriminate against women. Many of these same commentors noted an absence of concern in the proposed Policy Interpretation for those universities that have in good faith attempted to meet what they felt to be a vague compliance standard in the regulation.

*Response:* The description of the current status and development of intercollegiate athletics for men and women was designed to be a factual, historical overview. There was no intent to imply the universal presence of discrimination. The Department recognizes that there are many colleges and universities that have been and are making good faith efforts, in the midst of increasing financial pressures, to provide equal athletic opportunities to their male and female athletes.

*Comment B:* Commentors stated that the statistics used were outdated in some areas, incomplete in some areas, and inaccurate in some areas.

*Response:* Comment accepted. The statistics have been updated and corrected where necessary.

*Question No. 2:* Is the proposed two-stage approach to compliance practical? Should it be modified? Are there other approaches to be considered?

*Comment:* Some commentors stated that Part II of the proposed Policy Interpretation "Equally Accommodating the Interests and Abilities of Women" represented an extension of the July 1978, compliance deadline established in § 86.41(d) of the Title IX regulation.

*Response:* Part II of the proposed Policy Interpretation was not intended to extend the compliance deadline. The format of the two stage approach, however, seems to have encouraged that perception; therefore, the elements of both stages have been unified in this Policy Interpretation.

*Question No. 3:* Is the equal average per capita standard based on participation rates practical? Are there alternatives or modifications that should be considered?

*Comment A:* Some commentors stated it was unfair or illegal to find noncomplia solely on the basis of a financial test when more valid indicators of equality of

*Response:* The equal average per capita standard was not a standard by which noncompliance could be found. It was offered as a standard of presumptive compliance. In order to prove noncompliance, HEW would have been required to show that the unexplained disparities in expenditures were discriminatory in effect. The standard, in part, was offered as a means of simplifying proof of compliance for universities. The widespread confusion concerning the significance of failure to satisfy the equal average per capita expenditure standard, however, is one of the reasons it was withdrawn.

*Comment B:* Many commentors stated that the equal average per capita standard penalizes those institutions that have increased participation opportunities for women and rewards institutions that have limited women's participation.

*Response:* Since equality of average per capita expenditures has been dropped as a standard of presumptive compliance, the question of its effect is no longer relevant. However, the Department agrees that universities that had increased participation opportunities for women and wished to take advantage of the presumptive compliance standard, would have had a bigger financial burden than universities that had done little to increase participation opportunities for women.

*Question No. 4:* Is there a basis for treating part of the expenses of a particular revenue producing sport differently because the sport produces income used by the university for non-athletic operating expenses on a non-discriminatory basis? If, so, how should such funds be identified and treated?

*Comment:* Commentors stated that this question was largely irrelevant because there were so few universities at which revenue from the athletic program was used in the university operating budget.

*Response:* Since equality of average per capita expenditures has been dropped as a standard of presumed compliance, a decision is no longer necessary on this issue.

*Question No. 5:* Is the grouping of financially measurable benefits into three cate___s practical? Are there alternatives that should be considered? Specifically, should

recruiting expenses be considered together with all other financially measurable benefits?

*Comment A:* Most commentors stated that, if measured solely on a financial standard, recruiting should be grouped with the other financially measurable items. Some of these commentors held that at the current stage of development of women's intercollegiate athletics, the amount of money that would flow into the women's recruitment budget as a result of separate application of the equal average per capita standard to recruiting expenses, would make recruitment a disproportionately large percentage of the entire women's budget. Women's athletic directors, particularly, wanted the flexibility to have the money available for other uses, and they generally agreed on including recruitment expenses with the other financially measurable items.

*Comment B:* Some commentors stated that it was particularly inappropriate to base any measure of compliance in recruitment solely on financial expenditures. They stated that even if proportionate amounts of money were allocated to recruitment, major inequities could remain in the benefits to athletes. For instance, universities could maintain a policy of subsidizing visits to their campuses of prospective students of one sex but not the other. Commentors suggested that including an examination of differences in benefits to prospective athletes that result from recruiting methods would be appropriate.

*Response:* In the final Policy Interpretation, recruitment has been moved to the group of program areas to be examined under § 86.41(c) to determine whether overall equal athletic opportunity exists. The Department accepts the comment that a financial measure is not sufficient to determine whether equal opportunity is being provided. Therefore, in examining athletic recruitment, the Department will primarily review the opportunity to recruit, the resources provided for recruiting, and methods of recruiting.

*Question No. 6:* Are the factors used to justify differences in equal average per capita expenditures for financially measurable benefits and opportunities fair? Are there other factors that should be considered?

*Comment:* Most commentors indicated that the factors named in the proposed Policy Interpretation (the "scope of competition" and the "nature of the sport") as justifications

for differences in equal average per capita expenditures were so vague and ambiguous as to be meaningless. Some stated that it would be impossible to define the phrase "scope of competition", given the greatly differing competitive structure of men's and women's programs. Other commentors were concerned that the "scope of competition" factor that may currently be designated as "nondiscriminatory" was, in reality, the result of many years of inequitable treatment of women's athletic programs.

*Response:* The Department agrees that it would have been difficult to define clearly and then to quantify the "scope of competition" factor. Since equal average per capita expenditures has been dropped as a standard of presumed compliance, such financial justifications are no longer necessary. Under the equivalency standard, however, the "nature of the sport" remains an important concept. As explained within the Policy Interpretation, the unique nature of a sport may account for perceived inequities in some program areas.

*Question No 7:* Is the comparability standard for benefits and opportunities that are not financially measurably fair and realistic? Should other factors controlling comparability be included? Should the comparability standard be revised? Is there a different standard which should be considered?

*Comment:* Many commentors stated that the comparability standard was fair and realistic. Some commentors were concerned, however, that the standard was vague and subjective and could lead to uneven enforcement.

*Response:* The concept of comparing the non-financially measurable benefits and opportunities provided to male and female athletes has been preserved and expanded in the final Policy Interpretation to include all areas of examination except scholarships and accommodation of the interests and abilities of both sexes. The standard is that equivalent benefits and opportunities must be provided. To avoid vagueness and subjectivity, further guidance is given about what elements will be considered in each program area to determine the equivalency of benefits and opportunities.

*Question No. 8:* Is the proposal for increasing the opportunity for women to participate in competitive athletics appropriate and effective? Are there other procedures th

should be considered? Is there a more effective way to ensure that the interest and abilities of both men and women are equally accommodated?

*Comment:* Several commentors indicated that the proposal to allow a university to gain the status of presumed compliance by having policies and procedures to encourage the growth of women's athletics was appropriate and effective for future students, but ignored students presently enrolled. They indicated that nowhere in the proposed Policy Interpretation was concern shown that the current selection of sports and levels of competition effectively accommodate the interests and abilities of women as well as men.

*Response:* Comment accepted. The requirement that universities equally accommodate the interests and abilities of their male and female athletes (Part II of the proposed Policy Interpretation) has been directly addressed and is now a part of the unified final Policy Interpretation.

## Additional Comments

The following comments were not responses to questions raised in the proposed Policy Interpretation. They represent additional concerns expressed by a large number of commentors.

(1) *Comment:* Football and other "revenue producing" sports should be totally exempted or should receive special treatment under Title IX.

*Response:* The April 18, 1978, opinion of the General Counsel, HEW, concludes that "an institution of higher education must comply with the prohibition against sex discrimination imposed by that title and its implementing regulation in the administration of any revenue producing activity". Therefore, football or other "revenue producing" sports cannot be exempted from coverage of Title IX.

In developing the proposed Policy Interpretation the Department concluded that although the fact of revenue production could not justify disparity in average per capita expenditure between men and women, there were characteristics common to most revenue producing sports that could result in legitimate nondiscriminatory diffe
in per capita expenditures. For instance, some "revenue producing" sports requi

expensive protective equipment and most require high expenditures for the management of events attended by large numbers of people. These characteristics and others described in the proposed Policy Interpretation were considered acceptable, nondiscriminatory reasons for differences in per capita average expenditures.

In the final Policy Interpretation, under the equivalent benefits and opportunities standard of compliance, some of these non-discriminatory factors are still relevant and applicable.

(2) *Comment:* Commentors stated that since the equal average per capita standard of presumed compliance was based on participation rates, the word should be explicitly defined.

*Response:* Although the final Policy Interpretation does not use the equal average per capita standard of presumed compliance, a clear understanding of the word "participant" is still necessary, particularly in the determination of compliance where scholarships are involved. The word "participant" is defined in the final Policy Interpretation.

(3) *Comment:* Many commentors were concerned that the proposed Policy Interpretation neglected the rights of individuals.

*Response:* The proposed Policy Interpretation was intended to further clarify what colleges and universities must do within their intercollegiate athletic programs to avoid discrimination against individuals on the basis of sex. The Interpretation, therefore, spoke to institutions in terms of their male and female athletes. It spoke specifically in terms of equal, average per capita expenditures and in terms of comparability of other opportunities and benefits for male and female participating athletes.

The Department believes that under this approach the rights of individuals were protected. If women athletes, as a class, are receiving opportunities and benefits equal to those of male athletes, individuals within the class should be protected thereby. Under the proposed Policy Interpretation, for example, if female athletes as a whole were receiving their proportional share of athletic financial assistance, a university would have been presumed in compliance with that section of the regulation. T Department does not want and does not have the authority to force universities to offer

identical programs to men and women. Therefore, to allow flexibility within women's programs and within men's programs, the proposed Policy Interpretation stated that an institution would be presumed in compliance if the average per capita expenditures on athletic scholarships for men and women, were equal. This same flexibility (in scholarships and in other areas) remains in the final Policy Interpretation.

(4) *Comment:* Several commentors stated that the provision of a separate dormitory to athletes of only one sex, even where no other special benefits were involved, is inherently discriminatory. They felt such separation indicated the different degrees of importance attached to athletes on the basis of sex.

*Response:* Comment accepted. The provision of a separate dormitory to athletes of one sex but not the other will be considered a failure to provide equivalent benefits as required by the regulation.

(5) *Comment:* Commentors, particularly colleges and universities, expressed concern that the differences in the rules of intercollegiate athletic associations could result in unequal distribution of benefits and opportunities to men's and women's athletic programs, thus placing the institutions in a posture of noncompliance with Title IX.

*Response:* Commentors made this point with regard to § 86.6(c) of the Title IX regulation, which reads in part:

"The obligation to comply with (Title IX) is not obviated or alleviated by any rule or regulation of any * * * athletic or other * * * association * * *"
Since the penalties for violation of intercollegiate athletic association rules can have a severe effect on the athletic opportunities within an affected program, the Department has reexamined this regulatory requirement to determine whether it should be modified. Our conclusion is that modification would not have a beneficial effect, and that the present requirement will stand.

Several factors enter into this decision. First, the differences between rules affecting men's and women's programs are numerous and change constantly. Despite this, the Department has been unable to discover a single case in which those differences require members to act in a discriminatory manner. Second, some rule differences permit decisions resulting in discriminatory distribution of benefits and opportunities to

men's and women's programs. The fact that institutions respond to differences in rules by choosing to deny equal opportunities, however, does not mean that the rules themselves are at fault; the rules do not prohibit choices that would result in compliance with Title IX. Finally, the rules in question are all established and subject to change by the membership of the association. Since all (or virtually all) association member institutions are subject to Title IX, the opportunity exists for these institutions to resolve collectively any wide-spread Title IX compliance problems resulting from association rules. To the extent that this has not taken place, Federal intervention on behalf of statutory beneficiaries is both warranted and required by the law. Consequently, the Department can follow no course other than to continue to disallow any defenses against findings of noncompliance with Title IX that are based on intercollegiate athletic association rules.

(6) *Comment:* Some commentors suggested that the equal average per capita test was unfairly skewed by the high cost of some "major" men's sports, particularly football, that have no equivalently expensive counterpart among women's sports. They suggested that a certain percentage of those costs (e.g., 50% of football scholarships) should be excluded from the expenditures on male athletes prior to application of the equal average per capita test.

*Response:* Since equality of average per capita expenditures has been eliminated as a standard of presumed compliance, the suggestion is no longer relevant. However, it was possible under that standard to exclude expenditures that were due to the nature of the sport, or the scope of competition and thus were not discriminatory in effect. Given the diversity of intercollegiate athletic programs, determinations as to whether disparities in expenditures were nondiscriminatory would have been made on a case-by-case basis. There was no legal support for the proposition that an arbitrary percentage of expenditures should be excluded from the calculations.

(7) *Comment*: Some commentors urged the Department to adopt various forms of team-based comparisons in assessing equality of opportunity between men's and women's athletic programs. They stated that well-developed men's programs are frequently characterized by a few "major" teams that have the greatest spectator appeal, earn the greatest income, cost the most to operate, and dominate the program in other ways. They suggested that women's programs should be similarly constructed

and that comparability should then be required only between "men's major" and "women's major" teams, and between "men's minor" and "women's minor" teams. The men's teams most often cited as appropriate for "major" designation have been football and basketball, with women's basketball and volleyball being frequently selected as the counterparts.

*Response:* There are two problems with this approach to assessing equal opportunity. First, neither the statute nor the regulation calls for identical programs for male and female athletes. Absent such a requirement, the Department cannot base noncompliance upon a failure to provide arbitrarily identical programs, either in whole or in part.

Second, no subgrouping of male or female students (such as a team) mat be used in such a way as to diminish the protection of the larger class of males and females in their rights to equal participation in educational benefits or opportunities. Use of the "major/minor" classification does not meet this test where large participation sports (e.g., football) are compared to smaller ones (e.g., women's volleyball) in such a manner as to have the effect of disproportionately providing benefits or opportunities to the members of one sex.

(8) *Comment:* Some commenters suggest that equality of opportunity should be measured by a "sport-specific" comparison. Under this approach, institutions offering the same sports to men and women would have an obligation to provide equal opportunity within each of those sports. For example, the men's basketball team and the women's basketball team would have to receive equal opportunities and benefits.

*Response:* As noted above, there is no provision for the requirement of identical programs for men and women, and no such requirement will be made by the Department. Moreover, a sport–specific comparison could actually create unequal opportunity. For example, the sports available for men at an institution might include most or all of those available for women; but the men's program might concentrate resources on sports not available to women (e.g., football, ice hockey). In addition, the sport–specific concept overlooks two key elements of the Title IX regulation.

First, the regulation states that the selection of sports is to be representative of student interests and abilities (86.41(c)(1)). A requirement that sports for the members of one sex be available or developed solely or the basis of their existence or development in the program for members of the other sex could conflict with the regulation where the interests and abilities of male and female students diverge.

Second, the regulation frames the general compliance obligations of recipients in terms of program-wide benefits and opportunities (86.41(c)). As implied above, Title IX protects the individual as a student–athlete, not all a basketball player, or swimmer.

(9) *Comment:* A coalition of many colleges and universities urged that there are no objective standards against which compliance with Title IX in intercollegiate athletics could be measured. They felt that diversity is so great among colleges and universities that no single standard or set of standards could practicably apply to all affected institutions. They concluded that it would be best for individual institutions to determine the policies and procedures by which to ensure nondiscrimination in intercollegiate athletic programs.

Specifically, this coalition suggested that each institution should create a group representative of all affected parties on campus.

This group would then assess existing athletic opportunities for men and women, and, on the basis of the assessment, develop a plan to ensure nondiscrimination. This plan would then be recommended to the Board of Trustees or other appropriate governing body.

The role foreseen for the Department under this concept is:

(a) The Department would use the plan as a framework for evaluating complaints and assessing compliance;

(b) The Department would determine whether the plan satisfies the interests of the involved parties; and

(c) The Department would determine whether the institution is adhering to the p'

These commenters felt that this approach to Title IX enforcement would ensure an environment of equal opportunity.

*Response:* Title IX is an antidiscrimination law. It prohibits discrimination based on sex in educational institutions that are recipients of Federal assistance. The legislative history of Title IX clearly shows that it was enacted because of discrimination that currently was being practiced against women in educational institutions. The Department accepts that colleges and universities are sincere in their intention to ensure equal opportunity in intercollegiate athletics to their male and female students. It cannot, however, turn over its responsibility for interpreting and enforcing the law. In this case, its responsibility includes articulating the standards by which compliance with the Title IX statute will be evaluated.

The Department agrees with this group of commenters that the proposed self-assessment and institutional plan is an excellent idea. Any institution that engages in the assessment/planning process, particularly with the full participation of interested parties as envisioned in the proposal, would clearly reach or move well toward compliance. In addition, as explained in Section VIII of this Policy Interpretation, any college or university that has compliance problems but is implementing a plan that the Department determines will correct those problems within a reasonable period of time, will be found in compliance.

[FR Doc. 79-37965 Filed 12-10-79; 8:45 am)

**BILLING CODE 4110-12-M**

Top

---

1 *The regulation specifically refers to club sports separately from intercollegiate athletics. Accordingly, under this Policy Interpretation, club teams will not be considered to be intercollegiate teams except in those instances where they regularly participate in varsity competition.*
2 *See also § 86.37(a) of the regulation.*
3 *86.41(c)(1) on the accommodation of student interests and abilities, is covered detail in the following Section C of this policy Interpretation.*

4 See also § 86.41(a) and (b) of the regulation.

5 Section 844 of the Education Amendments of 1974, Pub. L 93-380, Title VIII, (August 21, 1974) 88 Stat. 612.

6 The Department's jurisdiction over the employment practices of recipients under Subpart E, §§ 86.51–86.61 of the Title IX regulation has been successfully challenged in several court cases. Accordingly, the Department has suspended enforcement of Subpart E. Section 86.41(c)(6) of the regulation, however, authorizes the Department to consider the compensation of coaches of men and women in the determination of the equality of athletic opportunity provided to male and female athletes. It is on this section of the regulation that this Policy Interpretation is based.

7 Public undergraduate institutions are also subject to the general anti-discrimination provision at § 86.23 of the regulation, which reads in part:

"A recipient * * * shall not discriminate on the basis of sex in the recruitment and admission of students. A recipient may be required to undertake additional recruitment efforts for one sex as remedial action * * * and may choose to undertake such efforts as affirmative action * * *"

Accordingly, institutions subject to § 86.23 are required in all cases to maintain equivalently effective recruitment programs for both sexes and, under § 86.41(c), to provide equivalent benefits, opportunities, and treatment to student athletes of both sexes.

8 Those procedures may be found at 45 CFR 80.6—80.11 and 45 CFR Part 8.

9 WEAL v. Harris, Civil Action No. 74-1720 (D.D.C., December 29, 1977).

---

1 The Condition of Education 1979, National Center for Education Statistics, p. 112.

2 Figure obtained from Association for Intercollegiate Athletics for Women (AIAW) member survey, AIAW Structure Implementation Survey Data Summary, October 1978, p. 11.

3 U.S. Commission on Civil Rights, Comments to DHEW on proposed Policy Interpretation; Analysis of data supplied by the National Association of Directors of Collegiate Athletics.

4 Figures obtained from National Federation of High School Associations (NFHSA) data.

5 Digest of Education Statistics 1977–78, National Center for Education Statistic     3), Table 40, at 44. Data, by sex, are unavailable for the period from 1971 to 1977;

*consequently, these figures represent 50 percent of total enrollment for that period. This is the best comparison that could be made based on available data.*

[6] *Ibid, p. 112.*

[7] *These figures, which are not precisely comparable to those cited at footnote 2, were obtained from Sports and Recreational Programs of the Nation's Universities and Colleges, NCAA Report No. 5, March 1978. It includes figures only from the 722 NCAA member institutions because comparable data was not available from other associations.*

[8] *Compiled from NCAA Revenues and Expenses for Intercollegiate Athletic Programs, 1978.*

[9] *Figures obtained from AIAW Structure Implementation Survey Data Summary, October, 1978, p. 11.*

[10] *121 Cong. REc. 29791–95 (1975) (remarks of Senator Williams); Comments by Senator Bayh, Hearings on S. 2106 Before the Subcommittee on Education of the Senate Committee on Labor and Public Welfare, 94th Congress, 1st Session 48 (1975); "Survey of Women's Athletic Directors," AIAW Workshop (January 1978).*

[11] *See April 18,1979, Opinion of General Counsel, Department of Health, Education, and Welfare, page 1.*

**Office for Civil Rights (OCR)**

Page Last Reviewed: November 4, 2024

# Related Content

## Avoiding the Discriminatory Use of Artificial Intelligence

The Department of Education's (Department's) Office for Civil Rights (OCR) provides resources to assist school communities with ensuring that artificial intelligence (AI) is used in a nondiscriminatory manner in the nation's schools.

NOVEMBER 19, 2024

The Office for Civil Rights enforces several Federal civil rights laws that prohibit discrimination in programs or activities that receive federal financial assistance from the Department of Education.

OCTOBER 3, 2024

## Guidance on Sexual Harassment Issues

OCR enforces several Federal civil rights laws that prohibit discrimination in programs or activities that receive federal financial assistance from the Department of Education.

OCTOBER 3, 2024

**Pay for College**

Fill out the FAFSA

529 Plans

Loan Forgiveness

1098 Tax Forms

**Educational Resources**

504 Plans

FERPA

IEPs (Individualized Education Program)

**Teaching Resources**

Become a Teacher

Professional Resources

School Safety and Security

Teaching Abroad

**File a Report**

Report Fraud, Waste, or Abuse

Report a Civil Rights Violation

**About Us**

Contact Us

ED Offices

Overview of ED

Frequently Asked Questions (FAQs)

Jobs at ED

**News**

Press Releases

Homeroom Blog

Subscriptions

**Site Notices and Privacy Policies**

Accessibility Support

**ED Archive**

# U.S. Department of Education

     

ES

## Contact Us
### 1-800-USA-LEARN

 **www.ed.gov**

**An official website of the Department of Education**

<u>About Dept of Education</u>        <u>Accessibility Support</u>        <u>No FEAR Act data</u>

000040

Office of the Inspector General   Performance reports   FOIA   Privacy Policy

ED Archive

Looking for U.S. government information and services? **Visit USA.gov**