# *Exhibit 7*

Unpublished Decisions

2020 WL 5796763
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

IN RE ALLERGAN PLC SECURITIES
LITIGATION

No. 18 Civ. 12089 (CM)(GWG)
|
Signed 09/29/2020

**DECISION AND ORDER DENYING PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION and
GRANTING IN PART AND DENYING IN PART
THE PARTIES' RESPECTIVE MOTIONS FOR
PERMISSION TO FILE UNDER SEAL**

McMahon, C.J.:

**\*1** On April 19, 2019, Lead Plaintiff Boston Retirement
System (hereinafter referred to as "BRS" or "Plaintiff")
filed the Consolidated Amended Class Action Complaint
("CAC") against Defendant Allergan PLC ("Allergan" or
the "Company") and certain of its executives (the
"Executive Defendants"), alleging that Defendants had
made materially false and misleading statements and
omitted to make necessary disclosures about an alleged
link between breast implant-associated anaplastic large cell
lymphoma ("BIA-ALCL" or "ALCL") and the variety of
silicone-gel breast implants manufactured by the
Company. (CAC, Apr. 19, 2019, Dkt. No. 58.) Plaintiff
now seeks to certify a class of all individuals and entities
that purchased or otherwise acquired Allergan preferred
stock between January 30, 2017 and December 19, 2018—
the period during which Defendants' alleged misstatements
and omissions caused the price of Allergan stock to
artificially inflate.

There is absolutely no question that this action should
proceed as a class action. It is a garden-variety securities
fraud suit, a type of action particularly well suited to class
treatment.

What has become clear, however, is that BRS is not the
plaintiff who should be controlling the representation of the
class. Because BRS is an inadequate representative of the
class, its motion for class certification is DENIED.

The parties also move to seal certain exhibits to their briefs
in support of and in opposition to Plaintiff's motion for
class certification. That motion is GRANTED IN PART
and DENIED IN PART, for the reasons stated in Section
II, below.

This opinion shall be filed without redaction. While this
opinion refers to matters that the parties wish to remain
sealed, to that extent the court is denying the motion to file
under seal, so the information that one or both parties
would like to keep confidential is not, in the opinion of this
court, confidential or proprietary.

**Relevant Factual Background**

The allegations of the CAC are accepted as true for
purposes of the instant motion. *See Waggoner v. Barclays
PLC*, 875 F.3d 79, 86 n.5 (2d Cir. 2017), *cert. denied*, 138
S. Ct. 1702, (2018) (citing *Shelter Realty Corp. v. Allied
Maintenance Corp.*, 574 F.2d 656, 661 n.15 (2d Cir.
1978)). The Court presumes the parties' familiarity with
the facts of this case, which this Court recited in detail in
its earlier Decision and Order Granting in Part and Denying
in Part Defendants' Motion to Dismiss (Op. Granting in
Part and Denying in Part Mot. to Dismiss, Sept. 20, 2019,
Dkt. No. 81 ("MTD Order").) The following provides a
summary of facts that the parties have deemed pertinent to
class certification.

**a. Allergan's Breast Implants & ALCL**
Allergan is a global pharmaceutical and medical products
company that develops, manufactures, and sells, among
other things, breast implants. Allergan's Natrelle
BIOCELL line of breast implants is the subject of this
lawsuit. (CAC ¶ 2, 7.)

BIA-ALCL – a rare form of non-Hodgkin's lymphoma that
typically occurs in the scar tissue surrounding the breast
implant – was first reported in 1997. (CAC ¶¶ 3, 7, 64, 92,
111.) Since, a parade of medical studies and regulatory
alerts have outlined the progression of BIA-ALCL-related
knowledge, including several linking ALCL specifically to
breast implants with a textured outer shell. (CAC ¶¶ 63-

117.)

**\*2** Plaintiff alleges that Defendants misrepresented the relative strength of the link between reported cases of BIA-ALCL and Allergan's textured silicone-gel filled breast implants as compared to other manufacturers. (*See generally* CAC.)

### b. Incidence Reports

Beginning in 2015, scientists began to report that a disproportionately high number of cases of ALCL were linked to Allergan's textured breast implants. That March, a team of doctors published a study that identified 173 cases of BIA-ALCL. 97 of those cases (56%) named women who had Allergan's Biocell textured implants. (CAC ¶ 75.)

The studies and media reports that followed during the class period took varying forms. Many indicated that Allergan's implants were more closely associated with the incidence of BIA-ALCL than other breast implants on the market. For example:

    • In April 2017, two doctors from the M.D. Anderson Cancer Center in Houston published an article that found that, of the total number of BIA-ALCL cases reported to the University of Southern California's ALCL Tracking Reporting system, 56% of them involved Allergan/Inamed/McGhan implants, while of the total number of BIA-ALCL cases reported to the FDA MAUDE database, 80.3% involved Allergan/Inamed/McGhan implants. (CAC ¶ 91.)

    • In October 2017, another team of researchers who analyzed all cases of BIA-ALCL in Australia and New Zealand from 2007 to 2016 found that Allergan's Biocell salt textured implants accounted for 58.7% of the implants used, which meant that the risk of developing BIA-ALCL when one used Biocell implants was 14.11 times greater than when a leading competitor's textured implants were used. (CAC ¶¶ 100–01.)

    • On January 4, 2018, another team of researchers from the Netherlands found that, between 1990 to 2016, there were twenty-three known cases of BIA-ALCL—twenty-two of which involved Allergan/Inamed/McGhan implants. (CAC ¶ 103.)

### c. Allegedly Misleading Statements and Omissions

Plaintiff alleges that Allergan was well-aware of the studies that found a higher incidence of BIA-ALCL in patients with Allergan's textured breast implants. (CAC ¶ 78.) Nonetheless, Plaintiff alleges, Defendants continued to downplay the strength of the link between its product and the illness. This took the form of both misstatements and omissions of information concerning the relative risk of developing BIA-ALCL after receiving Allergan textured implants as compared to other manufacturers' implants.

For example, on January 30, 2017 *ABC News* published an article reporting the cancellation of an Allergan post-approval study of textured breast implants. The article included a statement from Defendant Mark Marmur that "BIA-ALCL has been reported in patients with textured breast implants *from all manufacturers*." (CAC ¶ 84 (emphasis added).) Plaintiff alleges that Allergan and its representatives made other similar remarks to the public during 2017 and 2018. (CAC ¶¶ 126, 159.)

Allergan continued to reaffirm the safety of its breast implants in its 2016 and 2017 annual reports filed on February 24, 2017, and February 26, 2018, respectively. The reports repeat the same stock phrase regarding incidences of BIA-ALCL: that "a breast implant manufacturer *that is not affiliated with the Company*" was subject to "negative reports from regulatory authorities in Europe." (CAC ¶¶ 134, 152 (emphasis added).)

**\*3** Plaintiff alleges that these and other similar statements and omissions made during the class period (1) gave the impression that Allergan's textured breast implants were no more closely associated with ALCL than implants made by other manufacturers, and (2) concealed the risk that Allergan's products could be recalled because of a possible link to BIA-ALCL, thereby causing Allergan's stock price to drop. (*See* MTD Order at 53-54.)

### d. Materialization of the Risk

On December 14, 2018, "GMED," the European regulatory body responsible for certifying the manufacture of medical devices in Europe, opted not to re-certify Allergan's breast implant portfolio, which was set to expire, and requested additional data from the manufacturer.

Four days later, on December 18, 2018, France's National Agency for the Safety of Medicines & Health Products ("ANSM") ordered the recall of textured breast implants manufactured by Allergan from the European market, announcing that the implants "have been linked to a rare

form of cancer," referring to ALCL. (CAC ¶ 164.) The announcement reported that a committee of experts would interview patients, healthcare professionals and other stakeholders, after which it would make a decision on the use of textured-envelope breast implants in aesthetic and reconstructive surgery.

Allergan complied with the ANSM recall the following day. It released a statement stating that it had "suspended sales of textured breast implants and tissue expanders and [was] withdrawing any remaining supply in European markets." (CAC ¶ 165.) Plaintiff alleges that this disclosure was the first time that Allergan acknowledged that its prior statements to investors communicating that its breast implants were not reported to be linked to ALCL in Europe were inaccurate. (CAC ¶ 166.)

Plaintiff alleges that, following the materialization of these previously concealed risks, Allergan's stock price fell $10.20, or nearly 7%, to close at $136.56 on December 19, 2018.

**Relevant Procedural Background**

The first of two lawsuits alleging securities fraud on the facts outlined above was filed on December 20, 2018. After the expiration of the 60-day period for filing actions prescribed by the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. § 78u-4(a)(3)(A)(i)(II), five potential class representatives made motions to serve as lead plaintiffs, and to designate their lawyers as lead counsel. One motion was withdrawn and the Court considered the other four.

On March 21, 2019, the Court appointed BRS to serve as lead plaintiff. (Dec. and Order Appointing Lead Plaintiff, Consolidating Cases, and Setting Schedule, Mar. 21, 2019, Dkt. No. 49 ("Lead Plaintiff Order").) The only real contest was between BRS and another institutional plaintiff, DeKalb. I concluded, on the information then available, that BRS had the largest holding, which is the statutory tie-breaker for deciding who should serve as lead plaintiff if all other considerations are equal – and it appeared that they were. The only serious objection to the selection of BRS was that it was already the lead plaintiff in a number of class actions; the PSLRA provides that a party should not be lead plaintiff in more than five securities fraud actions during a three year period, and BRS would have run afoul of that rule, were there not an exception generally recognized for institutional investors. 15 U.S.C. § 78u-4(a)(3)(B)(vi); *see Iron Workers Local No. 25 Pension Fund v. Credit-Based Asset Servicing & Securitization,*

*LLC*, 616 F. Supp. 2d 461, 467 (S.D.N.Y. 2009) (hereinafter "*Iron Workers*").

**\*4** The Court imposed one condition on the appointment of BRS as lead plaintiff. BRS was represented by two law firms – Pomerantz LLP ("Pomerantz") and the Thornton Law Firm ("Thornton") – and it proposed that they serve as co-lead counsel. This I was unwilling to do – a fact that I made perfectly clear:

> However, this court is not interested in appointing co-lead counsel in this matter. Unless there is some special reason why the services of two firms are needed, the appointment of co-lead counsel tends to inflate legal fees – a result this court is particularly anxious to avoid. No reason for having two law firms rather than one is suggested in BRS' moving papers. Since both the Pomerantz and Thornton firms would ably represent the class, and there is nothing to choose between them, BRS should select one of the two of them to serve as lead counsel.

(Lead Plaintiff Order at 5.) The following day, BRS submitted a letter designating Pomerantz as Lead Counsel. (Dkt. No. 50.)

A month later, BRS filed the CAC, the operative complaint in this action, and on September 20, 2019, this Court granted in part and denied in part Defendants' motion to dismiss. (MTD Order.) The surviving claim alleges that Defendants' disclosures gave investors a false impression that Allergan's implants were no more linked with BIA-ALCL than those of other implants.

Plaintiff now moves to certify a class of:

> All individuals and entities that purchased or otherwise acquired Allergan preferred stock or common stock between January 30, 2017 and December 19, 2018, inclusive (the "Class Period"), and who were damaged thereby. Excluded from the Class are the Defendants; the officers, directors, and affiliates of Allergan, at all relevant times; Allergan's employee retirement or benefit plan(s) and their participants or beneficiaries to the extent they purchased or acquired Allergan common stock through any such plan(s); any entity in which Defendants have or had controlling interest; immediate family members of any excluded person; and the legal representatives, heirs, successors, or assigns of any excluded person or entity.

In connection with Plaintiff's motion for class certification, the parties move to seal certain exhibits that they assert contain commercially sensitive and proprietary information. (Dkt. Nos. 125, 143.) In response to the motion to seal that accompanied Defendants' Opposition

Brief, the Court ordered the parties to redact out references to material that has been designated as confidential and to explain why the information is confidential, rather than file the entire motion under seal. (Dkt. No. 136.) Accordingly, the parties have filed their class certification briefs with redactions and filed the unredacted versions under seal. (*See* Dkt. No. 137.)

## I. The Motion for Class Certification Is Denied

### 1. Legal Standard

Plaintiff's motion for class certification is governed by the requirements of Fed. R. Civ. P. 23. Certification under Rule 23 is appropriate only if: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). As the Supreme Court has observed, the Rule 23(a) requirements "ensure[ ] that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate," and "effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011) (internal quotation marks and citations omitted).

**\*5** Plaintiff must also satisfy one of the prongs of Rule 23(b). Because Plaintiff moves for class certification under Rule 23(b)(3), it must demonstrate "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

In addition to the express requirements of Rule 23, the Second Circuit has recognized an implied requirement that the class be "ascertainable." *See, e.g.*, *In re Petrobras Sec.*, 862 F.3d 250, 264 (2d Cir. 2017).

If, after a "rigorous analysis" the Court finds that each of the requirements of Rule 23 are met, the Court may, in its discretion, certify the class. *See In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006); *see also Wal-Mart Stores, Inc.*, 564 U.S. at 351.

A motion for class certification should not extend into a protracted mini-trial of substantial portions of the underlying litigation, and courts must refrain from examining the underlying merits of the case unless they are relevant to the class certification requirements. *See id.; see also Eisen v. Carlisle & Jacquelin*, 41 U.S. 156, 177–78 (1974). Nonetheless, because the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the cause of action, the analysis may require the courts to "probe behind the pleadings" and consider issues that "overlap with the merits of the plaintiff's underlying claim." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33–34 (2013) (internal quotation marks and citations omitted).

Plaintiff bears the burden of showing that Rule 23's requirements are satisfied by at least a preponderance of the evidence. *See In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 117 (2d Cir. 2013). "The Second Circuit has directed courts to adopt a liberal interpretation of Rule 23 in order to maximize the benefits to private parties and, in cases such as this one involving alleged manipulation of public markets, to maximize the benefits to the public provided by class actions." *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 423 (S.D.N.Y. 2014) (internal citation omitted). In determining the appropriateness of class certification, the Court may consider the parties' declarations and appended supporting materials. *See, e.g.*, *Heredia v. Americare, Inc.*, No. 17 Civ. 6219 (WHP), 2018 WL 2332068, at \*2 (S.D.N.Y. May 23, 2018).

### 2. BRS Has Failed to Demonstrate That It Would Adequately Represent the Class

Defendants do not contest that Plaintiff meets the Rule 23(a)(1) and (a)(2) requirements of numerosity and commonality, and there is no question that those requirements are satisfied. Instead, Defendants contend that BRS is an atypical and inadequate class representative. (Memo of Law in Opposition to Mot. to Certify Class, July 28, 2020, Dkt. No. 128. ("Defs' Opp. Br.") at 21–32.) As I agree that BRS and its counsel have failed to demonstrate that they would adequately represent the class, I decline to certify on that basis.

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). In evaluating whether a proposed class representative has met this requirement, courts consider whether (1) plaintiff's interests are antagonistic to those of the class, and (2) plaintiff's attorneys are qualified, experienced, and able to conduct the litigation. *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60

(2d Cir. 2000); *see also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625–26 (1997).

**\*6** Class certification may be denied on adequacy grounds where the proposed class representative is "unwilling or unable to protect the interests of the class against the possibly competing interests of the attorneys." *Baffa*, 222 F.3d at 61. As my colleague Judge Buchwald explained in *In re IMAX Securities Litigation*, 272 F.R.D. 138, 155 (S.D.N.Y. 2010):

> A key element in the determination of whether a plaintiff's interests are antagonistic to those of other members of the class is the relationship between the class representative and the class counsel. The rationale behind cases in which class certification has been denied because of the relationship between the class representative and class counsel is clear: courts are concerned that when a class representative is closely associated with class counsel, he or she may permit a settlement less favorable to the interests of absent class members.

(Internal citations and quotation marks omitted.) In evaluating the interests of and relationship between the proposed class representative and class counsel, "the possibility of inadequacy and impropriety are sufficient [ ] to deny certification of a class." *Id.* at 157.

That possibility has been demonstrated here.

When I appointed BRS as lead plaintiff, I gave an explicit instruction that there was to be one and only one law firm serving as lead counsel. It is this court's experience (and I have quite a bit of it) that the involvement of multiple firms tends to inflate legal fees to the detriment of the other class members. This is a result I am particularly anxious to avoid. (*See* Lead Plaintiff Order at 5.) So I directed that BRS select one law firm to serve as lead counsel. BRS selected Pomerantz to act as lead counsel. I expected BRS to do the work of lead counsel. And I expected it to do all of the work of lead counsel.

I have now learned that Thornton has not only remained involved in this litigation, albeit under the rubric of "additional counsel," but that it has effectively played the role of co-lead counsel – to the point that BRS' corporate representative has testified under oath that Thornton's responsibilities did not change *at all* in response to the lead plaintiff order. (Defs' Opp. Br. Ex. 43 at 183:24-184:4.) It is clear that Thornton has been fully involved in every aspect of this case to date. It has duplicated the efforts of Pomerantz by working on the CAC (it signed the pleading, so it has to have worked on it) and the motions to dismiss and for class certification (ditto), by joining in meet and confer sessions with defense counsel, participating in

depositions, and by getting (and so obviously reviewing) all correspondence. (Defs' Opp. Br. at 27 & Ex. 42, 43 at 2:13-22.)

Moreover, I have learned, in connection with the prosecution of this motion, that the Pomerantz and Thornton firms have entered into an agreement to split any fee earned from the prosecution of this lawsuit almost down the middle. The agreement calls for the fee earned by lead counsel to be split with 55% going to Pomerantz and 45% to Thornton – a division that is so close to the firms' original agreement of a 50-50 split, reached at a time when they anticipated being appointed co-lead counsel as to be a rather transparent substitute for co-lead counsel status. (*See* Declaration of Anna F. Connolly, July 28, 2020, Dkt. No. 129 ("Connolly Decl."), Ex. 45; Connolly Decl. at 44.) This amended agreement between the two firms was dated six days after BRS designated Pomerantz as lead counsel. (*See id.*) The court was not informed about this arrangement, by BRS or anyone else.

**\*7** This Court is not fooled by the rebranding of Thornton as "additional counsel." When I ruled that there could not be co-lead counsel, I did not authorize the retention of "additional counsel" to assist lead counsel. Frankly, this lawsuit is not so complicated as to require more than one competent law firm to prosecute it. Had Pomerantz indicated that it was incapable of handling the lawsuit on its own, or that it was too busy with other matters to do so without assistance (an argument that was made by other potential class representatives, and rejected – erroneously, is seems – by the Court), I would have concluded that BRS was not an adequate class representative and appointed De Kalb – a perfectly competent institutional investor with a significant investment in Allergan that was represented by just one law firm – as the class representative.

The whole point of preferring institutional investors over individuals as lead plaintiffs is to prevent securities class actions from being "lawyer driven" lawsuits. *In re Initial Pub. Offering Sec. Litig.*, 214 F.R.D. 117, 123 (S.D.N.Y. 2002) (citing S.Rep. No. 104–98 at 4 (1995), U.S. Code Cong. & Admin. News 1995, at 679, 683); *Iron Workers*, 616 F. Supp. 2d at 463 (citing *In re Doral Fin. Corp. Sec. Litig.*, 414 F. Supp. 2d 398, 401 (S.D.N.Y. 2006); *In re Pfizer Inc. Sec. Litig.*, 233 F.R.D. 334, 337 (S.D.N.Y. 2005)); *In re Oxford Health Plans, Inc., Sec. Litig.*, 182 F.R.D. 42, 43-44 (S.D.N.Y. 1998) (quoting H.R. Conf. Rep. No. 104-369).[1] The undisclosed arrangement between the two law firms, Pomerantz and Thornton, is the quintessential example of a "lawyer driven" arrangement. I said I would not appoint co-lead counsel, so I certainly will not tolerate lead counsel's privately appointing co-lead counsel – which is what Pomerantz has done by entering into its arrangement with Thornton. (*See* Connolly Decl.

Ex. 43 (Deposition Tr. of Mr. Smyth) at 182:18-33.)

Plaintiff calls Allergan's argument against certification a "smear campaign," and contends that the division of work between Pomerantz and Thornton will save the class significant expense. (Reply Memo of Law in Support of Mot. to Certify Class, Aug. 20, 2020, Dkt. No. 145 ("Pl. Reply Br.") at 18.) But I disagree with the premise that two firms can litigate as cheaply as one, and I expressly rejected that premise when I declined to appoint co-lead counsel. My views on this subject were essential to my ruling on the lead plaintiff motion. BRS did not seek reargument on that question (not that reargument would have been granted); instead, it and its lawyers devised a secret workaround to my ruling. They thereby placed the interests of counsel ahead of those of the class. *See Plummer v. Chem. Bank*, 668 F.2d 654, 658 (2d Cir. 1982) (observing that "the interest of lawyer and class may diverge"). No matter how competent the lawyers from these law firms are at securities litigation – and I admit that they know their stuff – their behavior renders them inadequate to serve as class counsel. *See Creative Montessori Learning Centers v. Ashford Gear LLC*, 662 F.3d 913, 918 (7th Cir. 2011) ("Misconduct by class counsel that creates a serious doubt that counsel will represent the class loyally requires denial of class certification.").

**\*8** Counsel also argue that BRS has been fully transparent about Thornton's participation in the litigation, as evidenced by Thornton's presence on pleadings and motions and by its appearance on the docket.

I probably should have noticed Thornton's name on the CAC and called plaintiff's counsel out at that point. I admit that I rarely, if ever, look at the cover pages of briefs, or focus on signature blocks at the end of pleadings, although it seems that I had better start doing so, at least in securities class actions.

But so what? Full transparency required advising the Court that, despite its ruling, two law firms intended to continue working on this matter, and had entered into a fee-sharing arrangement. It required advising the court that lawyers from both firms were attending conferences and reviewing pleadings (matters about which I could not possibly know anything) – even though I specifically said there could not be co-lead counsel and explained that duplication of effort was the reason why. It required notifying the court that Thornton's role in the conduct of this lawsuit had not changed one iota as a result of my order directing that there not be two lead counsel, as BRS' corporate representative candidly testified. It is undisputed that the court was not notified of any of this by BRS, or by Pomerantz, or by Thornton. That is unacceptable. *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 566 (S.D.N.Y. 2018).

Plaintiff's argument that Thornton's role will be limited to tasks related to discovery, class certification, and other discrete matters is (1) a lie, in light of the testimony of its corporate representative; and (2) utterly disingenuous. The preparation and defense of pleadings, discovery and class certification constitutes the entirety of representing a class plaintiff in almost every case, since few securities class actions actually go as far as summary judgment and fewer still go to trial. Thornton has plainly been involved in class discovery and class certification. By "other discrete matters," Thornton apparently means the preparation and defense of the CAC, since its lawyers had an ethical obligation to be involved in the preparation and review of those documents before putting the firm's name to them. (Pl. Reply Br. at 18.) That means Thornton has been involved in *every aspect of this matter* – a conclusion confirmed by the nearly equal fee splitting arrangement reached by the lawyers, and a practice that leads to precisely the sort of double billing that this Court hoped to guard against by appointing just one firm to serve as lead counsel. There is nothing "limited" about Thornton's representation. The arrangement between Pomerantz and Thornton violates both the letter and the spirit of the Court's order. And BRS's acquiescence in the arrangement renders hollow its promise to review the lawyers time records carefully.[2]

**\*9** BRS's agreement that just one of its two proposed firms could represent the plaintiff class was a condition of its being appointed lead plaintiff. BRS selected Pomerantz, with which it has a long-term standing arrangement regarding representation in securities fraud class actions. (Connolly Decl. Ex. 48). I interpreted its designation of Pomerantz as a sign that it agreed to the court's terms. Either BRS did not really acquiesce in my directive, or it is incapable of controlling its lawyers when they prove unwilling to abide by rulings of the court concerning who could serve as lead counsel. It doesn't matter which of those two things is true: either renders BRS an inadequate class representative, notwithstanding its significant holdings in Allergan and its status as an institutional investor. *See Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1077 (2d Cir. 1995) ("Both class representatives and class counsel have responsibilities to absent members of the class.").

I appreciate that Defendants are not making any argument of the sort that typically have given rise to a finding of a conflict between the interests of a named plaintiff or class counsel and the class as a whole.[3] *See, e.g., IMAX*, 272 F.R.D. at 156-57. But the conduct of BRS and its counsel raises issues sufficient for this Court to deny certification of a class with BRS as its representative. *See id. at 157*

(citing *In re Discovery Zone Sec. Litig.*, 169 F.R.D. 104, 109 (N.D. Ill. 1996)). As a result, it is not necessary to address any of Allergan's other arguments about why BRS is an inadequate class plaintiff – or to address its arguments addressed to the issue of typicality.

The question then becomes what to do next. BRS is of course free to prosecute its claim individually, hiring (at its own expense) as many law firms as it likes, on whatever terms it wishes, including a contingency arrangement. Or it may be that some other putative class member will step up and seek to replace BRS as lead plaintiff; I will leave open that possibility for 30 days.

## II. The Motions to Seal Are Granted in Part and Denied in Part

The common law right of public access to judicial documents is a critical facet of the judicial system. As the Second Circuit has explained:

> The presumption of access is based on the need for federal courts ... to have a measure of accountability and for the public to have confidence in the administration of justice ... Although courts have a number of internal checks, ... professional and public monitoring is an essential feature of democratic control. Without monitoring, [ ] the public could have no confidence in the conscientiousness, reasonableness, or honesty of judicial proceedings. Such monitoring is not possible without access to testimony and documents that are used in the performance of Article III functions.

*United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995).

For that reason, when parties to cases before me enter into protective orders – as is routinely done in securities fraud class actions – they must include an addendum acknowledging that documents that are not really confidential are often designated as such, and that this Court, which takes a dim view of such over-designation, reserves the right to decide whether documents really are confidential or not, and to direct that the documents be filed publicly if they are not. The pendency of these motions to seal requires me to engage in this exercise.

**\*10** To determine whether it is appropriate to allow documents to be filed under seal, courts undertake a two-part inquiry. First, the court must decide if a document is a "judicial document," with reference to its role in the judicial process. If so, it is subject to a presumption of public access. In determining whether a document is

"judicial," courts examine the "relevance of the document's specific contents to the nature of the proceeding." *Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, 814 F.3d 132, 139 (2d Cir. 2016) (internal quotation marks omitted). Once a court has determined that a document constitutes a judicial document, it must balance the common law presumption of access against competing comparisons, including "the privacy interests of those resisting disclosure." *Lugosch*, 435 F.3d at 120.

Here, BRS seeks to seal the following information: exhibits outlining the fee arrangement between Thornton and Pomerantz (Connolly Decl. Ex. 44, 45); exhibits consisting of any agreements between BRS and its counsel (Connolly Decl. Ex. 48, 50, 62, 64); testimony of and documents concerning the strategies used by BRS's investment manager (Connolly Decl. Ex. 40, 41; Declaration of Jeremy A. Lieberman in Support of Mot. to Certify Class, Aug. 20, 2020, Dkt. No. 146 ("Lieberman Decl."), Ex. 35); most of the testimony of BRS's corporate representative (Connolly Decl. Ex. 43; Lieberman Decl. Ex. 34); and the rebuttal report of Plaintiff's expert, Dr. Zachary Nye, who testified about the issue of predominance of individual issues over class-wide issues – a matter that the Court did not reach in deciding not to certify the class. (*See* Pl. Memo of Law in Support of Defs' Mot. to Seal, July 30, 2020, Dkt. No. 134; Pl. Memo of Law in Support of Mot. to Seal, Aug. 19, 2020, Dkt. No. 144.)

Defendants seek to seal the following information: six lines from its communications with GMED, the European regulatory body that decided not to re-certify Allergan's breast implants (Connolly Decl. Ex. 13, 14); five lines from the declaration of Plaintiff's confidential witness (Connolly Decl. Ex. 63); and 40 other internal Allergan documents, (Lieberman Decl. Ex. 2-22, 27-28, 31, 38[4]-52, 54) fifteen of which Defendants also wish to strike from the record on the basis that they are irrelevant to the issue of class certification (Lieberman Decl. Ex. 5, 7-13, 18-22, 27-28). (*See* Defs' Memo of Law in Support of Mot. to Seal, July 28, 2020, Dkt. No. 126; Defs' Response to Pl. Mot. to Seal, Aug. 20, 2020, Dkt. No. 149.)

The parties also seek to seal the portions of their briefs that rely on those underlying documents.

All of these exhibits were submitted to the court in connection with the class certification motion. They are, therefore, presumptively "judicial documents," since they were meant to be considered by the court in deciding the motion. And most of them address issues that really are relevant to class certification, although it was not necessary for the court to reach all such issues in this case.

The motions are decided as follows:

*Plaintiff's Motion to Seal*
(1) Exhibits 43, 44, and 45 to Defendants' Opposition Brief may not be filed under seal. These documents outline the fee arrangements (which have varied over time) between Pomerantz and Thornton. There is nothing secret or proprietary about the fee sharing arrangement between the two law firms, so there is no privacy interest against which to do any balancing. I understand why the firms want these documents kept secret – it is embarrassing to be caught out in an effort to evade a court order. But in a securities fraud class action, or any class action, the public and class members have the right to know about fee arrangements. Fee awards are matters of public record and information relating to the fees of class counsel is supposed to be transparent.

**\*11** Moreover, as this particular fee arrangement is the basis for refusing to certify the class, sealing these documents would mean issuing a secret ruling on the motion for class certification, because it would be impossible for anyone to make sense of the court's ruling if information about the fee arrangement were redacted from this opinion. I do not issue secret opinions, especially relating to matters that implicate the interests of absent class members, who have only the public docket of the court to give them information about what is indisputably "their" lawsuit.

(2) Documents relating to the arrangements between BRS and Pomerantz concerning their longer-term relationship may not be filed under seal. This includes the Retainer Agreement pursuant to which Pomerantz monitors BRS's portfolio of investments for potential violations of securities laws (Connolly Decl. Ex. 48), BRS's Request for Proposals for Portfolio Monitoring & Securities Litigation Services (Connolly Decl. Ex. 62), Pomerantz's response to the RFP (Connolly Decl. Ex. 50), and a standard engagement letter between BRS and Pomerantz (Connolly Decl. Ex. 64). The fact of representation and nature of a fee arrangement between an attorney and his client are not privileged. *Bernstein*, 815 F.3d at 145 (citing *In re Grand Jury Subpoenas*, 803 F.2d 493, 496 (9th Cir. 1986)). These documents, too, need to be transparent so that absent class members can understand the arrangements that are pertinent to the representation of their interests as absent parties, and so that class actions are not "lawyer-driven." It is certainly no secret that law firms that routinely handle securities fraud class actions have "stables" of regular (primarily institutional) clients who engage those firms on

a long-term basis for the purpose of identifying potential cases and representing them in those cases. That has been well known for decades.

(3) Defendants argued that BRS was not a typical class member because its investment adviser used an algorithm to make investment decisions, which rendered it susceptible to the unique defense of lack of reliance. The court did not need to reach that issue to decide the motion. However, it is hardly a secret that institutional investors invest with advisers who use algorithms to make investment decisions; there are quite a few decisions out there discussing whether that fact renders named plaintiffs appropriate class representatives. *See, e.g.*, *City of Livonia Emps.' Ret. Sys. V. Wyeth*, 284 F.R.D. 173, 180 (S.D.N.Y. 2012); *In re Symbol Techs., Inc. Sec. Litig.*, No. 05-CV-3923 (DRH)(AKT), 2015 WL 3915477, at \*9 (E.D.N.Y. June 25, 2015); *Iron Workers*, 616 F. Supp. 2d at 466.

However, any details about the algorithm used by BRS' investment adviser would constitute trade secrets; and while those details may someday be relevant to BRS' ability to prove that it was defrauded, they are utterly unnecessary to a decision on a motion for class certification – and would have been unnecessary even if I had reached the issue. Therefore, BRS may file the following exhibits – Exhibits 40 and 41 to Defendants' Opposition Brief and Exhibit 35 to Plaintiff's Reply Brief – under seal – and may file any brief containing references to those exhibits under seal. However, BRS must place redacted versions of all these documents and briefs on the public record; redactions are limited to references to the details (as opposed to the fact) of the algorithm.

(4) Portions of the deposition testimony of the BRS corporate representative, which is excerpted in two exhibits – Exhibit 43 to Defendants' Opposition Brief and Exhibit 34 to Plaintiff's Reply Brief – may not be filed under seal. Although BRS has redacted every word of Exhibit 34 to Plaintiff's Reply Brief, as well as the last twelve pages of Exhibit 43 to Defendants' Opposition Brief, it does not identify anything on any of these pages that qualifies as confidential or proprietary information.

**\*12** There is no question that the following information in these documents cannot be filed under seal: information pertaining to the circumstances under which BRS became Lead Plaintiff, Pomerantz's retainer and monitoring agreement with BRS, the Lead Plaintiff Order, Thornton's role in this lawsuit, and the fee arrangement with Thornton. However much the class action Bar would like to think otherwise, those matters are not trade secrets; they are, however, very pertinent to whether BRS and its lawyers can adequately represent the plaintiff class. It was not, and would not be, possible to decide the motion for class

certification without referring to these documents.

The remainder of the redacted information in Exhibit 43 to Defendants' Opposition Brief relates to Defendants' allegation that BRS's counsel made political donations, and a confidential witness statement (described below in category (6)) that Defendants argue demonstrates BRS's inability to control its counsel. The information about political contributions may be redacted. The degree to which BRS confirmed the accuracy of the confidential witness statement prior to the filing of the CAC is not confidential information and may not be filed under seal. The remainder of Exhibit 34 to Plaintiffs' Reply Brief relates to BRS's knowledge of and involvement in the litigation. That information may also not be filed under seal. It is not confidential or secret; it relates squarely to whether BRS would have been an adequate class representative.

(5) Finally, Plaintiff seeks to file a redacted version of the rebuttal report of Plaintiff's expert, Dr. Zachary Nye (Lieberman Decl. Ex. 1). Plaintiff asserts that it redacted the document because the report references and includes materials that Defendants designated as confidential, but that it takes no position of the propriety of the information; Defendants make no argument about the sealing of this exhibit.

Dr. Nye's report is not in itself confidential or proprietary. Allergan has not argued that it needs to be sealed. It should be filed publicly.

*Defendants' Motion to Seal*

(6) Defendants' request to seal portions of its communications with the GMED (Connolly Decl. Ex. 13 and 14) is denied unless, within five days, Allergan can point the court to some law that requires it to keep the reasoning of GMED for decertifying the implants a secret. The six lines that Defendants redacted report the GMED's reasons for decertifying Allergan's breast implants. Defendants placed the impact of the GMED's decision and subsequent ANSM recall at issue on this class certification motion, by arguing about the applicability of the fraud-on-the-market theory of reliance to this lawsuit and whether the ANSM recall was actually related to the alleged fraud. (*See* Defs' Opp. Br. at 14.) The European regulatory ruling is not an Allergan trade secret, nor is it proprietary to Allergan. While the applicability of the fraud on the market theory turned out to be irrelevant to the ultimate decision on class certification, the issue of the European decertification of its breast implants is very much a part of

this lawsuit. Unless some European law bars this court from making public the reasoning of the European regulatory body, that information – which is analogous to a public record in this country – cannot and will not be kept secret.

(7) Allergan's motion to redact a portion of Exhibit 63 to Defendants' Opposition Brief - the declaration of BRS's confidential witness – is denied. Defendants cited the declaration in support of their argument that BRS was not an adequate class representative because it failed to oversee its counsel. This portion of the witness's statement describes the objectives of Allergan's "New Texture" project. Defendants have not convinced the Court that these general statements of purpose reveal any confidential corporate information or trade secrets.

**\*13** (8) Defendants also move to seal a number of Allergan's internal documents (Lieberman Decl. Ex. 2-22, 27-28, 31, 38-52, 54), including: (a) presentations reporting on the safety of Allergan's textured breast implants and incidence rates of ALCL (Ex. 2, 5, 14, 15, 19, 47); (b) intra-company emails discussing incidence rates of ALCL and the risks associated with Allergan's textured breast implants (Ex. 3, 4, 7, 17, 18, 20, 44, 50, 54); (c) drafts of and reactions to communications with the FDA, ANSM, and GMED (Ex. 6, 13, 16, 21, 38, 40, 41, 42, 45, 46, 52); (d) drafts of Allergan press releases concerning ALCL and guidance for employees responding to media inquiries (Ex. 12, 31, 39, 49); (e) reports on and communications regarding an ANSM hearing on Allergan's overrepresentation among French ALCL cases (Ex. 27, 28); (f) other Allergan documents reporting on the safety of its textured breast implants (Ex. 8, 11, 22, 43, 51) and its share of the breast implant market (Ex. 9, 10); and (g) an ANSM report on BIA-ALCL.

To the extent that these exhibits were relevant at all on a motion for class certification, they did not ending up making any difference to the court's determination of the class certification motion; they were cited by the parties solely because of their relevance to the applicability of the fraud-on-the-market presumption of reliance should apply, an issue that was not necessary to address. They will inevitably be relevant once discovery concludes and the parties brief motions for summary judgment, but Allergan wants to keep them under seal for now.

Defendants have not even tried to demonstrate that the information contained in these exhibits constitutes trade secrets or is otherwise confidential, or that disclosure would put Allergan at a competitive disadvantage. Some of the information contained in some of these exhibits might be harmful to Allergan's reputation with the public, but, "the fact that business documents are secret or that their

disclosure might result in adverse publicity does not automatically warrant a protective order." *See In re Parmalat Sec. Litig.*, 258 F.R.D. 236, 244, 257 (S.D.N.Y. 2009).

In their memorandum of law in response to Plaintiff's motion to file under seal, Defendants ask the Court to strike a subset of these exhibits (Lieberman Decl. Ex. 5, 7-13, 18-22, 27-28) on the basis of their purported irrelevancy to the class certification motion. This is not the proper way to make a motion. However, the only apparent use of these exhibits was as citations in the "Relevant Facts" section of Plaintiff's reply brief, which, to Allergan, suggests that they were added to the record for an improper purpose and so can be stricken under Fed. R. Civ. P. 12(f) as "immaterial" matter. Unfortunately for Allergan, that rule is specifically directed to pleadings, not materials submitted in connection with a motion. *See Granger v. Gill Abstract Corp.*, 566 F. Supp. 2d 323, 334-35 (S.D.N.Y. 2008); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Hicks, Muse, Tate & Furst, Inc.*, No. 02, Civ. 1334(SAS), 2002 WL 1482625, at *6 (S.D.N.Y. July 10, 2002).

I direct that the exhibits that Allergan seeks to strike from the record be filed under seal, but only temporarily, until the point at which they do become relevant to a decision the court needs to make. At that point, they will almost

certainly have to be unsealed.

As for the remaining Allergan documents, I will give Defendants ten days to point out what in those documents constitutes it believes constitutes proprietary information (as they did with Item (7) above), identifying that information line by line and explaining why it qualifies as a secret under decisional law.

## CONCLUSION

Plaintiff's motion to certify a class is denied in accordance with this opinion. Plaintiff's motion to seal is granted in part and denied in part.

The Clerk of Court is respectfully directed to close Dkt. Nos. 91 and 143.

It is so ordered.

## All Citations

Not Reported in Fed. Supp., 2020 WL 5796763

Footnotes

1    The Seventh Circuit aptly described the risk attendant to lawyer-driven class actions in deciding an appeal of a class wide settlement:

Class counsel rarely have clients to whom they are responsive. The named plaintiffs in a class action, though supposed to be the representatives of the class, are typically chosen by class counsel; the other class members are not parties and have no control over class counsel. The result is an acute conflict of interest between class counsel, whose pecuniary interest is in their fees, and class members, whose pecuniary interest is in the award to the class.

*Pearson v. NBTY, Inc.*, 772 F.3d 778, 787 (7th Cir. 2014).

2    This Court's confidence in BRS's ability to supervise its counsel's time records is undermined by another court's recent admonishment of Thornton and another law firm, which the court discovered had deliberately submitted false timesheets and encouraged double billing. *See Ark. Teacher. Ret. Sys. v. State St. Bank & Tr. Co.*, C.A. No. 11-10230-MLW, 2020 WL 949885, at **7, 23 (D. Mass Feb. 27, 2020). In a 160-page order, Judge Wolf wrote, "This case demonstrates that not all lawyers can be trusted when they are seeking millions of dollars in attorneys' fees and face no real risk that the usual adversary process will expose misrepresentations that they make." *Id.* at *11. Of course, those findings do not mean that Thornton would engage in similar practices during the course of this lawsuit. But they highlight the importance of a class representative that is actually driving the conduct of the litigation. A class representative who starts by ignoring the terms of the court's order appointing it as lead plaintiff cannot be trusted to monitor a law firm that was found guilty of double billing in another case.

3    Defendants suggest that the portfolio monitoring agreement between BRS and Pomerantz is evidence of an inappropriate business relationship between the two. While I do not need to address this argument in order to rule on the motion, I note that courts routinely appoint institutional investors who are subject to monitoring agreements as class representative. *See, e.g., Iron Workers*, 616 F. Supp. 2d at 466; *City of Livonia Emps.' Ret. Sys. V. Wyeth*, 284 F.R.D. 173, 180 (S.D.N.Y. 2012); *In re Symbol Techs., Inc. Sec. Litig.*, No.

In re Allergan PLC Securities Litigation, Not Reported in Fed. Supp. (2020)

05-CV-3923 (DRH)(AKT), 2015 WL 3915477, at *9 (E.D.N.Y. June 25, 2015).

4   Neither party moved to file Exhibit 38 to Plaintiff's Reply Brief under seal. However, because Exhibit 38 was, in fact, filed under seal and is an internal Allergan document stamped "Highly Confidential," the Court assumes that Defendants intended to so move.

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 3115867
Only the Westlaw citation is currently available.
United States District Court, E.D. California.

Taylor ANDERS, Hennessey Evans,
Abbigayle Roberts, Megan Walaitis, Tara
Weir, and Courtney Walburger,
individually and on behalf of all those
similarly situated, Plaintiffs,
v.
CALIFORNIA STATE UNIVERSITY,
FRESNO and Board of Trustees of
California State University, Defendants.

Case: 1:21-cv-00179-AWI-BAM
|
Signed 07/22/2021

**Attorneys and Law Firms**

Arthur H. Bryant, Bailey Glasser, LLP, Oakland, CA, Cary Joshi, PHV, Pro Hac Vice, Joshua I. Hammack, PHV, Pro Hac Vice, Bailey & Glasser, LLP, Washington, DC, Nicole Louise Ballante, PHV, Pro Hac Vice, Bailey & Glasser, LLP, St. Petersburg, FL, Amy Elizabeth Tabor, Cynthia B. Chapman, Michael A. Caddell, Caddell & Chapman, Houston, TX, for Plaintiffs.

Ashley Higginson, PHV, Pro Hac Vice, Scott R. Eldridge, PHV, Pro Hac Vice, Miller, Canfield, Paddock & Stone, PLC, Lansing, MI, Brian Schwartz, PHV, Pro Hac Vice, Erika L. Giroux, PHV, Pro Hac Vice, Miller, Canfield, Paddock & Stone, PLC, Detroit, MI, Marc Bradley Koenigsberg, Office of the Attorney General Department of Justice, Sacramento, CA, for Defendants.

**ORDER ON MOTION TO DISMISS FIRST AMENDED COMPLAINT**

Anthony W. Ishii, SENIOR DISTRICT JUDGE

**\*1** On February 12, 2021, Plaintiffs Taylor Anders, Hennessey Evans, Abbigayle Roberts, Megan Walaitis and

Tara Weir filed this putative class action alleging several violations of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. ("Title IX") against California State University, Fresno ("Fresno State"); Fresno State's athletic director Terrence Tumey; Fresno State's former president Joseph Castro; and Fresno State's interim president, as of January 4, 2021, Saul Jiménez-Sandoval. Doc. No. 1. On May 12, 2021, the Court denied a motion to dismiss the Complaint as moot because Plaintiffs had filed a First Amended Complaint ("FAC") on May 3, 2021. Doc. Nos. 36 & 41.

The FAC adds Courtney Walburger, who was also a member of Fresno State's women's lacrosse team during the 2020-21 academic year as a Plaintiff and alleges three Title IX claims against Fresno State and the California State University Board of Trustees (the "Board" and together with Fresno State, "Defendants").[1] Doc. No. 36. On May 17, 2021, the Board brought a motion to dismiss the FAC in its entirety.[2] The motion has been fully briefed and the Court has deemed it suitable for decision without oral argument pursuant to Local Rule 230(g). See Doc. No. 47. After thoroughly reviewing all relevant filings, the Court will deny the motion in part and grant the motion in part.

**BACKGROUND**[3]

In the 2020-21 academic year, Fresno State sponsored men's baseball, basketball, track, football, golf, tennis, and wrestling teams. Doc. No. 36 ¶ 101. During the same period, Fresno State sponsored women's basketball, track, equestrian, golf, lacrosse, soccer, softball, swimming and diving, tennis, and water polo teams. Id. Each of these sports is segregated based on sex. Id. On October 16, 2020, Fresno State announced it would eliminate women's lacrosse, men's tennis and men's wrestling, with effect at the end of the 2020-21 academic year. Id. ¶ 2.

**\*2** Fresno State's athletic program is subject to Title IX because Fresno State receives federal funding. Doc. No 36 ¶ 5. All Plaintiffs were members of Fresno State's women's lacrosse team during the 2020-21 academic year. Id. ¶¶ 31, 37, 42, 52, 58 and 63. Plaintiffs allege Fresno State has not provided females with opportunities to participate in intercollegiate athletics that are substantially proportionate to their undergraduate enrollment for years and that the condition will persist after the elimination of women's lacrosse, men's tennis and men's wrestling takes effect. Id. ¶¶ 84, 116. They further allege Fresno State has failed to

provide adequate funding for women's athletic scholarships relative to the funding provided for men's athletic scholarship and that the women's lacrosse team has been treated worse than men's teams in several respects ranging from facilities to coaching. Id. ¶¶ 16-24.

Based on these allegations, Plaintiffs bring putative class action claims against Defendants for: (i) failure "to provide female students an equal opportunity to participate in varsity intercollegiate athletics in violation of Title IX and 34 C.F.R. § 106.41(c)(1)," Doc. No. 36 ¶ 228; (ii) failure to "provide female student-athletes at Fresno State with an equal allocation of athletic financial assistance" in violation of Title IX and 34 C.F.R. § 106.37, id. ¶ 245; and (iii) failure to "provide female student-athletes at Fresno State with an equal allocation" of athletic benefits (such as equipment, supplies and uniforms) in violation of Title IX and 34 C.F.R. § 106.41(c)(2)-(10). Id. ¶ 251.

In the motion at bar, the Board seeks dismissal of these claims for failure to state a claim under Rule 12(b)(6)[4] of the Federal Rules of Civil Procedure and, to some extent, for lack of standing under Rule 12(b)(1). See Doc. No. 42.

## LEGAL FRAMEWORK

### I. Federal Rule of Civil Procedure 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), a cause of action may be dismissed where a plaintiff fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Dismissal under Rule 12(b)(6) may be based on the lack of a cognizable legal theory or on the absence of sufficient facts alleged under a cognizable legal theory. Conservation Force v. Salazar, 646 F.3d 1240, 1242 (9th Cir. 2011); Johnson v. Riverside Healthcare Sys., LP, 534 F.3d 1116, 1121−22 (9th Cir. 2008). To survive a Rule 12(b)(6) motion for failure to allege sufficient facts, a complaint must include a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Compliance with this rule ensures that the defendant has "fair notice of what the ... claim is and the grounds upon which it rests." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)) (internal quotation marks omitted). Under this standard, a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal citations omitted). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the alleged misconduct. Id. at 663.

In reviewing a complaint under Rule 12(b)(6), all allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. Mollett v. Netflix, Inc., 795 F.3d 1062, 1065 (9th Cir. 2015); Marceau v. Blackfeet Hous. Auth., 540 F.3d 916, 919 (9th Cir. 2008). But the Court is "not 'required to accept as true allegations that contradict exhibits attached to the Complaint or matters properly subject to judicial notice, or allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences.' " Seven Arts Filmed Entm't, Ltd. v. Content Media Corp. PLC, 733 F.3d 1251, 1254 (9th Cir. 2013) (citation omitted). Complaints that offer no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Iqbal, 556 U.S. at 678; Johnson v. Fed. Home Loan Mortg. Corp., 793 F.3d 1005, 1008 (9th Cir. 2015). Rather, "for a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." Moss v. U.S. Secret Serv., 572 F.3d 962, 969 (9th Cir. 2009) (quoting Iqbal, 556 U.S. at 678). If a motion to dismiss is granted, "a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." Henry A. v Willden, 678 F.3d 991, 1005 (9th Cir. 2012) (citation omitted).

### II. Federal Rule of Civil Procedure 12(b)(1)

**\*3** "[T]hose who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Article III of the Constitution by alleging an actual case or controversy." Maya v. Centex Corp., 658 F.3d 1060, 1067 (9th Cir. 2011) (quoting City of Los Angeles v. Lyons, 461 U.S. 95, 101 (1983)). "[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Id. (quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 180–81 (2000)). "[L]ack of Article III standing requires dismissal for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1)." Id. (citing Simmonds v. Credit Suisse Sec. (USA) LLC, 638 F.3d 1072, 1087 n.6 (9th Cir.2011)).

## III. **Title IX**

Title IX states: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance ...." 20 U.S.C. § 1681(a). At the direction of Congress, the Department of Health, Education and Welfare (the predecessor of today's Department of Education) issued regulations for Title IX that took effect in 1975.[5] See 34 C.F.R. § 106.1.

Regulations applying Title IX to athletics are set forth at 34 C.F.R. § 106.37(c)(1) and 34 C.F.R. § 106.41. These regulations establish a "bipartite regulatory framework" for athletics that requires educational institutions receiving federal funds to provide members of both sexes (1) equal athletic financial assistance (scholarships) and (2) equal athletic opportunity. Biediger v. Quinnipiac Univ., 928 F. Supp. 2d 414, 435 (D. Conn. 2013) ("Biediger I").

34 C.F.R. § 106.37(c)(1), which applies to athletic financial assistance, states:

> To the extent that a recipient [of federal funding] awards athletic scholarships or grants-in-aid, it must provide reasonable opportunities for such awards for members of each sex in proportion to the number of students of each sex participating in interscholastic or intercollegiate athletics.

34 C.F.R. § 106.41(c), which applies to athletic opportunity, states that recipients of federal funds that operate athletic programs "shall provide equal athletic opportunity for members of both sexes" and that the following factors, among others, are to be considered "[i]n determining whether equal opportunities are available":

> (1) Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;

> (2) The provision of equipment and supplies;

> (3) Scheduling of games and practice time;

> (4) Travel and per diem allowance;

> (5) Opportunity to receive coaching and academic tutoring;

> (6) Assignment and compensation of coaches and tutors;

> (7) Provision of locker rooms, practice and competitive facilities;

> (8) Provision of medical and training facilities and services;

> (9) Provision of housing and dining facilities and services;

> (10) Publicity.

The equal athletic opportunity requirement under 34 C.F.R. § 106.41(c) is further subdivided into two component parts: "effective accommodation" and "equal treatment." Mansourian v. Regents of Univ. of California, 602 F.3d 957, 964 (9th Cir. 2010) ("Mansourian I"); see also, Biediger I, 928 F. Supp. 2d at 436. The "effective accommodation" requirement is based on 34 C.F.R. § 106.41(c)(1). Mansourian I, 602 F.3d at 965; Roberts, 998 F.2d at 828 ("Although § 106.41(c) goes on to list nine other factors that enter into a determination of equal opportunity in athletics, an institution may violate Title IX simply by failing to accommodate effectively the interests and abilities of student athletes of both sexes."). The "equal treatment" requirement, for its part, is based on 34 C.F.R. § 106.41(c)(2)-(10), which have collectively been interpreted to require "equivalence in the availability, quality and kinds of other athletic benefits and opportunities provided male and female athletes." Mansourian I, 602 F.3d at 964. "Effective accommodation claims thus concern the opportunity to participate in athletics, while equal treatment claims allege sex-based differences in the schedules, equipment, coaching, and other factors affecting participants in athletics." Id. at 965; see also, Boucher v. Syracuse Univ., 164 F.3d 113, 115 n.1–2 (2d Cir. 1999) (distinguishing effective-accommodation claims from equal-treatment claims). " '[A]n institution may violate Title IX solely by failing to accommodate effectively the interests and abilities of student athletes of both sexes,' " even if athletic benefits are provided on an equal basis, and vice versa. Mansourian I, 602 F.3d at 965 (quoting Kelley v. Bd. of Trustees, 35 F.3d 265, 268 (7th Cir. 1994)).

**\*4** Thus, as applied to intercollegiate athletics, Title IX regulations promulgated by the DOE provide for a "triumvirate of compliance-related claims": (1) "financial aid"—or "scholarship"— claims, see 34 C.F.R. § 106.37(c); (2) "effective-accommodation" claims, see 34 C.F.R. § 106.41(c)(1); and (3) "equal-treatment" claims, see 34 C.F.R. § 106.41(c)(2)–(10). See Biediger I, 928 F. Supp. 2d at 436. Each of these is "a separate and distinct type of claim, to be analyzed separately." Beasley v. Alabama State Univ., 966 F. Supp. 1117, 1122 (M.D. Ala. 1997) (citations omitted).

Finally, the DOE has issued guidance with respect to Title IX regulations, including, for example, "A Policy

Interpretation; Title IX and Intercollegiate Athletics," 44 Fed. Reg. 71,413 (Dec. 11, 1979) ("1979 Policy Interpretation"); "Clarification of Intercollegiate Athletics Policy Guidance: The Three–Part Test" (Jan. 16, 1996) ("1996 Clarification"), available at http://www.ed.gov/about/offices/list/ocr/docs/clarific.html ; and "Further Clarification of Intercollegiate Athletics Policy Guidance Regarding Title IX Compliance" (July 11, 2003) ("2003 Further Clarification"), available at

https://www2.ed.gov/about/offices/list/ocr/title9guidance Final.html. The Ninth Circuit has held that the regulations set forth by the DOE with respect to Title IX are entitled to "controlling weight" and that "federal courts are to defer substantially" to the DOE's interpretation of those regulations. See Neal v. Bd. of Trustees of California State Universities, 198 F.3d 763, 770-71 (9th Cir. 1999) (citing Martin v. Occupational Safety & Health Review Comm'n, 499 U.S. 144, 150 (1991) and Chevron USA v. NRDC, 467 U.S. 837, 843–44 (1984)); see also, Cohen v. Brown Univ., 991 F.2d 888, 895 (1st Cir. 1993) ("[W]e must accord [the DOE's] interpretation of Title IX appreciable deference."); Horner v. Kentucky High Sch. Athletic Ass'n, 43 F.3d 265, 273 (6th Cir. 1994) ("The Policy Interpretation is a 'considered interpretation' of the applicable regulations, and is entitled to substantial deference by the courts.")

## DISCUSSION

The Board moves to dismiss all three of the claims set forth in the FAC. The Court will address each claim in turn, starting with the effective accommodation claim and then turning to the equal treatment and equal financial aid claims.

## I. Effective Accommodation Claim

### A. Applicable Law

The 1979 Policy Interpretation sets forth a three-part test ("Three–Part Test") for satisfying the effective accommodation requirement in 34 C.F.R § 106.41(c)(1):

(1) Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or

(2) Where the members of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or

(3) Where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

44 Fed. Reg. 71,413, 71,418. Meeting any one of these three prongs is sufficient to comply with the effective accommodation component of Title IX's equal opportunity mandate. See 1996 Policy Clarification (institutions "need to comply only with any one part of the three-part test in order to provide nondiscriminatory participation opportunities for individuals of both sexes"); see also, Mansourian I, 602 F.3d at 965 ("Funding recipients can satisfy any of the three options to comply with Title IX."). Thus, a university has "three individual avenues to choose from when determining how it will provide individuals of each sex with nondiscriminatory opportunities to participate in intercollegiate athletics." 1996 Policy Clarification. The analysis here will solely address compliance under Prong One of the Three-Part Test because the Board does not contend that Fresno State satisfies either of the other prongs. See Doc. No. 42.

**\*5** Under Prong One of the Three-Part Test, providing athletic participation opportunities for male and female students in numbers substantially proportionate to their respective undergraduate enrollments provides a "safe harbor" and keeps universities on "on the sunny side" of Title IX's effective accommodation requirement. Horner, 43 F.3d at 275 (quoting Cohen, 991 F.2d at 897– 98) (internal quotation marks omitted); accord Roberts, 998 F.2d at 829. Title IX plaintiffs bear the burden of proving a defendant's failure to satisfy Prong One's substantial proportionality requirement by showing an actionable "disparity" in participation opportunities by sex. Horner, 43 F.3d at 275 (citing Roberts, 998 F.2d at 830–31 and Cohen, 991 F.2d at 901).

The Prong One analysis "begins with a determination of the number of participation opportunities afforded to male and female athletes in the intercollegiate athletic program" offered by a defendant. 1996 Policy Clarification; see also, Biediger v. Quinnipiac Univ., 691 F.3d 85, 93 (2d Cir. 2012) ("Biediger II"). "Participation opportunities" are determined by the number of athletes who "actually participate" in athletics. Mansourian I, 602 F.3d at 966.

Specifically, the 1979 Policy Interpretation defines "participants" as athletes:

> a. Who are receiving the institutionally-sponsored support normally provided to athletes competing at the institution involved, e.g., coaching, equipment, medical and training room services, on a regular basis during a sport's season; and

> b. Who are participating in organized practice sessions and other team meetings and activities on a regular basis during a sport's season; and

> c. Who are listed on the eligibility or squad lists maintained for each sport, or

> d. Who, because of injury, cannot meet a, b, or c above but continue to receive financial aid on the basis of athletic ability.

44 Fed. Reg. 71,413, 71,415.

"[A]ll athletes who are listed on a team's squad or eligibility list and are on the team as of the team's first competitive event are counted as participants," and "an athlete who participates in more than one sport will be counted as a participant in each sport in which he or she participates." 1996 Clarification. Moreover, the Title IX participant count includes "those athletes who do not receive scholarships (e.g., walk-ons)" and "those athletes who practice but may not compete." Id.

Substantial proportionality determinations "depend[ ] on [an] institution's specific circumstances and the size of its athletic program" and thus are made "on a case-by-case basis, rather than through use of a statistical test." 1996 Policy Clarification. The DOE "consider[s] opportunities to be substantially proportionate when the number of opportunities that would be required to achieve [strict] proportionality would not be sufficient to sustain a viable team, i.e., a team for which there is a sufficient number of interested and able students and enough available competition to sustain an intercollegiate team."[6] Id.

**\*6** The Board argues that Plaintiffs' effective accommodation claim must be dismissed because: (i) Plaintiffs cannot show the injury required for Article III standing; (ii) the FAC lacks factual allegations supporting a plausible inference that Fresno State will not provide substantially proportionate participation opportunities after the elimination of women's lacrosse, men's tennis and men's wrestling takes effect; and (iii) the conduct alleged in the FAC does not constitute "intentional discrimination." The Court will address each of these arguments in turn.

### B. Standing

As noted above, Article III standing requires a party seeking relief to show: (1) an injury in fact that is (a) concrete and particularized and (b) actual or imminent; (2) causation; and (3) a likelihood that a favorable decision will redress the injury. Maya, 658 F.3d at 1067.

The Board argues that Plaintiffs cannot show the injury required for standing prior to the elimination of the women's lacrosse team because Plaintiffs were able to participate in their chosen sport during that period. Doc. No. 42 at 18:10-23.[7] This argument is irrelevant because, as the Court understands it, Plaintiffs' effective accommodation claim turns on the allocation of participation opportunities after the elimination of women's lacrosse takes effect.[8] See Doc. No. 46 at 11:14-18 ("Here, the only question is whether Plaintiffs have plausibly alleged that Fresno State will fail to offer substantially proportional opportunities to female student-athletes as required by the first prong of the three-part test."); cf. Ohlensehlen v. Univ. of Iowa, 509 F. Supp. 3d 1085, 1094 (S.D. Iowa 2020) ("The parties agree the only question before the Court on the merits is whether the University of Iowa will comply with Title IX under Prong One of the Three-Part Test in 2021–22 after eliminating the women's swimming and diving team alongside three men's teams.").

Plaintiffs contend that the alleged injury required for standing to bring an effective accommodation claim became "imminent when Fresno State *announced* the elimination of the women's lacrosse team." Doc. No. 46 at 11:5-10 (emphasis original). The Court agrees with that formulation and therefore finds no defect in Plaintiffs' Article III standing with respect to the effective accommodation claim. See Pederson v. Louisiana State Univ., 213 F.3d 858, 871 (5th Cir. 2000) ("to establish standing under a Title IX effective accommodation claim, a party need only demonstrate that she is 'able and ready' to compete for a position on [an] unfielded team"); see also, Equity in Athletics, Inc. v. Dep't of Educ., 639 F.3d 91, 100 (4th Cir. 2011) ("Equity I") ("EIA has shown that the injuries suffered by its members were fairly traceable to [defendant university's] decision to eliminate teams ....").

### C. Adequacy of Substantial Proportionality Allegations

**\*7** Since the Board does not contend that Fresno State satisfies either Prong Two or Prong Three of the Three-Part Test, see Doc. No. 46 at 11:14-18 & n.2, Plaintiffs can state an effective accommodation claim merely by setting forth factual allegations plausibly showing a lack of substantially proportionate participation opportunities for females after the elimination of women's lacrosse takes effect, in violation of Prong One.

Plaintiffs set forth four clusters of allegations relating to the question of substantial proportionality: (i) a cluster of allegations relating to Equity in Athletics Disclosure Act ("EADA") data, Doc. No. 36 ¶¶ 117-25; (ii) a cluster of allegations relating to Fresno State's claimed Titled IX counts for the 2019-20 academic year, id. ¶¶ 126-36; (iii) a cluster of allegations relating to Fresno State's enrollment and participation projections for the 2021-22 academic year, id. ¶¶ 146-62; and (iv) a cluster of allegations relating to counts prepared by the Board's expert, Timothy O'Brien, for the 2020-21 academic year. Id. ¶¶ 137-45. Plaintiffs contend that these allegations are sufficient to state an effective accommodation claim because they show that the proposed elimination of women's lacrosse, men's tennis and men's wrestling "will leave a female participation gap of either twenty-seven or thirty-one, both of which are large enough to sustain a viable women's team." Doc. No. 46 at 12:3-7.

The Court will address each cluster of allegations and corresponding arguments in turn.

### 1. EADA Data

The first relevant cluster of allegations in the FAC has to do with Fresno State's initial determination in October 2020 that eliminating women's lacrosse would not violate Title IX. See Doc. No. 36 ¶ 2. The FAC states that Fresno State used data collected for purposes of EADA compliance to determine whether cutting women's lacrosse, men's tennis and men's wrestling would result in a Title IX violation. Id. ¶ 10. Plaintiffs further allege that EADA data overcounts female participation opportunities relative to counts conducted according to Title IX protocols ("Title IX counts"), id. ¶ 12, and that Fresno State improperly used enrollment data from the 2019-20 academic year in its compliance analysis, even though female enrollment increased in 2020-21 and female enrollment was not expected to decline in the 2021-22 academic year. Id. ¶¶ 11, 121.

The Board argues that EADA counts differ from Title IX counts and, therefore, cannot be used to show a Title IX

violation. Doc. No. 42 at 19:22-20:4. Further, it asserts that Fresno State did not rely on EADA data in making its Title IX compliance determination in 2020 and that, in any event, the "inputs" relied upon in making that determination "do not matter if, in the end, Fresno State is Title IX-compliant." Id. at 20:4-13.

In broad strokes, the Court agrees with the Board that Plaintiffs' allegations regarding the use of EADA counts— as opposed to Title IX counts—in assessing the prospective impact of eliminating women's lacrosse, men's tennis and men's wrestling on Title IX compliance are not sufficient to state an effective accommodation claim. As an initial matter, the Ninth Circuit has specifically recognized that EADA counts may be used in assessing substantial proportionality under Title IX, as have other courts. See Mansourian I, 602 F.3d at 968 (finding defendant educational institution's "EADA reports contain[ed] ample data demonstrating that it could not satisfy the substantial proportionality option"); see also, Robb v. Lock Haven Univ. of Pennsylvania, 2019 WL 2005636, at *7–8 (M.D. Pa. May 7, 2019) (noting that "EADA reports are regularly relied upon in Title IX cases"); Biediger v. Quinnipiac Univ., 616 F. Supp. 2d 277, 297 (D. Conn. 2009) ("Biediger III") ("an EADA report can be used to make a prima facie showing of substantial proportion[ality]"). Thus, the Court sees nothing inherently improper about using them in the manner alleged in the FAC.

**\*8** Further, although Plaintiffs take issue with Fresno State's use of outdated enrollment rates, the Court sees no allegation that Fresno State's EADA analysis showed a lack of substantial proportionality. Indeed, the FAC expressly alleges that "Fresno State concluded that it could cut the women's lacrosse team without violating Title IX" based on the EADA analysis. Doc. No. 36 ¶ 12. The Court can see how a finding of noncompliance based on EADA data might support a plausible inference of a Title IX violation, see Mansourian I, 602 F.3d at 968, particularly in light of Plaintiffs' allegation that EADA data systemically overstates female participation, but the Court cannot infer a Title IX violation from an EADA test that apparently showed compliance.

The Court therefore finds that allegations regarding Fresno State's EADA analysis are insufficient to state an effective accommodation claim.

### 2. Title IX Counts for the 2019-20 Academic Year

The second cluster of allegations has to do with analysis based on Title IX counts (as opposed to EADA counts) for

the 2019-20 academic year. Plaintiffs allege that Title IX counts furnished by Fresno State showed 246 male participants and 313 female participants in the 2019-20 academic year. Doc. No. 36 ¶¶ 128-29. According to Plaintiffs, subtracting 30 participants for women's lacrosse, 9 participants for men's tennis and 32 participants for men's wrestling thus "yields a target of 205 male participants [ ] (i.e., 246-9-32) and 283 female participants (i.e., 313-30)" in 2020-21 on teams that were not selected for elimination. Id. ¶ 130. Further, females accounted for 60.5% of Fresno State's undergraduate enrollment in the 2020-21 academic year and are expected to account for 60.5% of Fresno State's undergraduate enrollment in the 2021-22 academic year. Id. ¶ 131. Consequently, Plaintiffs allege 314 female participation opportunities will be required for strict proportionality, assuming men's tennis and men's wrestling are cut. Id. If the women's lacrosse team were not cut, Fresno State would provide 313 of the 314 participation opportunities required for strict proportionality, resulting in substantial proportionality and Title IX compliance. Id. ¶ 132. By cutting the women's lacrosse team and providing only 283 female participation opportunities, however, Fresno State has created a female participation gap of 31 (i.e., 314 - 283). Id. ¶ 133. According to Plaintiffs, 31 is large enough to support at least one viable women's team at Fresno State and exceeds the average size of women's teams at Fresno State, therefore showing that cutting women's lacrosse violates Title IX. Id. ¶¶ 134-36.

The Court addressed this line of reasoning in its order on Plaintiffs' preliminary injunction motion. See Doc. No. 35 at 25. The framework for assessing Title IX compliance under Prong One of the Three-Part Test creates a direct relationship between participation opportunities for the underrepresented gender and the underrepresented gender's share of undergraduate enrollment by automatically increasing the number of participation opportunities required for the underrepresented gender as the underrepresented gender grows as a percentage of an undergraduate population (absent an offsetting drop in participation on the part of the overrepresented gender). Thus, it is no more valid to show a Title IX violation by applying a strict proportionality threshold based on an undergraduate population that is 60.5% female to a participation count based on an undergraduate population that is 59.5% female (as Plaintiffs purport to do here) than it is to show Title IX compliance by applying a strict proportionality threshold based on an undergraduate population that is 59.5% female to a participation count based on an undergraduate population that is 60.5% female.

**\*9** The Court therefore finds that allegations regarding Fresno State's putative Title IX counts for the 2019-20

academic year are insufficient to state an effective accommodation claim.

### 3. 2021-22 Enrollment and Participation Projections

A third cluster of allegations has to do with Fresno State's projections regarding enrollment and participation opportunities in the 2021-22 academic year. Fresno State projects 205 male participation opportunities, 297 female participation opportunities, and undergraduate enrollment that is 60.5% female / 39.5% male in the 2021-22 academic year, collectively indicating a female participation gap of 17. Doc. No. 36 ¶¶ 147-48, 156-57. Plaintiffs do not dispute the enrollment projection, but contend that the participation-opportunity projections cannot be credited because, *inter alia*, Fresno State's coaches are not required to hit the projections; Fresno State has provided no evidence to substantiate the projections; Fresno State offers no explanation as to why men's participation is expected to remain flat while female participation increases; and Fresno State has proven to be an unreliable predictor of female participation in the past. Id. ¶¶ 154-61. Moreover, Plaintiffs contend that if Fresno State's 2021-22 projections are "off in the same way and by the same margin they were in 2019-20, its projected female participation gap will grow from 17 to 31 in the 2021-22 academic year." Id. ¶ 162. According to Plaintiffs, 31 is large enough to sustain a viable women's team—including, specifically, the women's lacrosse team—and is larger than the average size of women's teams at Fresno state, thus showing a Title IX violation. Id. ¶¶ 162-63.

The Board argues that judicial determinations regarding Title IX compliance are routinely based on projections and that "Plaintiffs do not include any facts to support their belief that Fresno State will be unable to provide substantially proportionate participation opportunities [i]n 2021-22." Doc. No. 42 at 22:12-23.

The Court agrees with the Board that Plaintiffs' allegations with respect to Fresno State's projected participation opportunities for the 2021-22 academic year are not sufficient to state an effective accommodation claim for two reasons. First, calling out defects in Fresno State's projections may prove to be effective in undercutting Fresno State's evidence as this case progresses, but it does not itself constitute an allegation as to the size of Fresno State's participation gap from which the Court can draw an inference of a Title IX violation. And second, Plaintiffs' use of 2019-20 participation counts to impute a participation gap of 31 in 2021-22 fails to account for significant growth in the female undergraduate population

Anders v. California State University, Fresno, Not Reported in Fed. Supp. (2021)

(that neither side disputes) after the 2019-20 academic year. In the Court's view, Plaintiffs' allegation that female participation will be the same in 2021-22 (when Plaintiffs themselves assume females will account for 60.5% of undergraduate enrollment) as it was in 2019-20 (when females accounted for 59.5% of undergraduate enrollment), see Doc. No. 36 ¶¶ 121, 148, is implausible, particularly since Plaintiffs do not allege any cap on female participation opportunities in the various women's sports Fresno State will continue to offer after the elimination of women's lacrosse takes effect. See Doc. No. 36 ¶ 156. The Court therefore finds that allegations regarding Plaintiffs' 2021-22 projections are insufficient to state an effective accommodation claim.

### 4. O'Brien Counts for the 2020-21 Academic Year

**\*10** The final cluster of allegations has to do with counts conducted by the Board's expert for the 2020-21 academic year. Doc. No. 36 ¶ 137. O'Brien counts 205 male participation opportunities and 287 female participation opportunities and calculates a female participation gap of 27 in the 2020-21 academic year, with females accounting for 60.5% of Fresno State's undergraduate enrollment. Id. ¶ 138-141. According to Plaintiffs, this shows a Title IX violation because 27 is large enough to accommodate at least one viable women's team at Fresno State— including, specifically, the women's lacrosse team—and exceeds the average size of women's teams at Fresno State. Id. ¶¶ 142-44.

The Board argues that O'Brien's hypothetical finding as to a female participation gap of 27 in 2020-21 is irrelevant because the cuts at issue in this case were not actually implemented in 2020-21. Further, the Board argues that Plaintiffs ignore O'Brien's findings that Fresno State "can reasonably expect a participation gap that is Title IX-compliant" after cuts take effect in 2021-22. Doc. No. 42 at 20:13-21, 22:12-14. Finally, the Board argues that the "average size" of Fresno State's women's teams—not the size of the women's lacrosse team or just "any viable team"—is the proper benchmark for determining substantial proportionality. Id. at Doc. No. at 9:1-12:3.

There is nothing in the FAC to indicate that O'Brien's 2020-21 counts were bona fide Title IX counts. That said, they were generated by the Board's own expert; the methodology O'Brien uses to calculate the 2020-21 participation gap appears valid in that all the inputs (male participation opportunities, female participation opportunities and the female percentage of undergraduate enrollment) are from the same year; and the female

percentage of undergraduate enrollment is projected to be the same in 2021-22 as it was in 2020-21. Thus, the Court finds that—whether or not they ultimately prove to be accurate— O'Brien's counts are creditable for pleading purposes and provide a valid basis for drawing inferences, under Rule 8 pleading standards, regarding Title IX compliance after the cuts at issue in this case take effect.

Further, the Court cannot agree with the Board that O'Brien's findings as to a participation gap of 27 in 2020-21 are negated, or otherwise rendered irrelevant, by Fresno State's projections showing a female participation gap of 17 in 2021-22, as validated by O'Brien. The Court will not weigh evidence on a motion to dismiss under Rule 12(b)(6). See Joseph v. J.M. Smucker Co., 2019 WL 1219708, at \*3 (C.D. Cal. Mar. 13, 2019). As noted above, female enrollment is expected to be the same in 2021-22 as it was in 2020-21. O'Brien's participation gap findings for 2020-21 can therefore support a plausible inference as to a lack of substantial proportionality in the 2021-22 academic year, even if other facts (or opinions) cut in the opposite direction. The question, then, is whether the female participation gap of 27 O'Brien found for 2020-21 can be construed to show a Title IX violation.

a.    Benchmarks   for   Substantial   Proportionality Determinations

Plaintiffs assert, based on the 1996 Clarification and an amicus brief filed by the United States in *Balow v. Michigan State University*, see Doc. No. 46-1, "that participation opportunities are not substantially proportionate when the participation gap is sufficient to sustain a viable team, even if that team is smaller than the average team's size and regardless of the percentage disparity" between the female share of participation opportunities and the female share of undergraduate enrollment. Doc. No. 46 at 12, n.3.

**\*11** The 1996 Clarification, however, appears to allow for finding substantial proportionality under Prong One based solely on percentages, with no apparent consideration of the absolute size of participation gaps. For example, it offers the following "[a]s an example of a determination under part one":

> If an institution's enrollment is 52 percent male and 48 percent female and 52 percent of the participants in the athletic program are male and 48 percent female, then the institution would clearly satisfy part one. However, OCR recognizes that natural fluctuations in an institution's enrollment and/or participation rates may

affect the percentages in a subsequent year. For instance, if the institution's admissions the following year resulted in an enrollment rate of 51 percent males and 49 percent females, while the participation rates of males and females in the athletic program remained constant, the institution would continue to satisfy part one because it would be unreasonable to expect the institution to fine tune its program in response to this change in enrollment.

It also states:

> As another example, over the past five years an institution has had a consistent enrollment rate for women of 50 percent. During this time period, it has been expanding its program for women in order to reach proportionality. In the year that the institution reaches its goal--i.e., 50 percent of the participants in its athletic program are female--its enrollment rate for women increases to 52 percent. Under these circumstances, the institution would satisfy part one.

Further, the 1996 Clarification expressly characterizes the absolute size of a participation gap as an additional—not exclusive—method of making substantial proportionality determinations under Prong One, stating that the OCR "would *also* consider opportunities to be substantially proportionate when the number of opportunities that would be required to achieve proportionality would not be sufficient to sustain a viable team." 1996 Clarification (emphasis added).

Moreover, the 1996 Clarification expressly provides—in the plainest possible terms—that the "OCR *may consider the average size of teams* offered for the underrepresented sex" in determining substantial proportionality. 1996 Clarification (emphasis added). And Defendants set forth six OCR letters from the past five years—including a letter from 2020—in which the OCR does just that. See Doc. No. 48 at 10 n.3.

Finally, the Court notes that numerous courts have relied solely on percentage disparities in making substantial proportionality determinations. See, e.g., Balow v. Michigan State Univ., 2021 WL 650712, at *11 (W.D. Mich. Feb. 19, 2021) ("Plaintiffs have not cited, and the Court is not aware, of any case where a gap lower than 2% failed to satisfy the test for substantial proportionality."); Portz v. St. Cloud State Univ., 196 F. Supp. 3d 963, 975 (D. Minn. 2016) ("a deviation of less than 3.5 percentage points typically keeps the ratios substantially proportionate"); Equity in Athletics, Inc. v. Dep't of Educ., 675 F. Supp. 2d 660, 682–83 (W.D. Va. 2009), aff'd, 639 F.3d 91 (4th Cir. 2011). ("Equity II") (finding no "authority to support the proposition that a disparity as low as 2% is

substantially disproportionate as a matter of law"); Miami Univ. Wrestling Club v. Miami Univ., 302 F.3d 608, 611, 615–16 (6th Cir. 2002) (less than 2% disparity acceptable); Boulahanis v. Bd. of Regents, 198 F.3d 633, 636, 638–39 (7th Cir. 1999) (finding "athletic participation ... within three percentage points of enrollment" constitutes substantial proportionality).

**\*12** Of these cases, the Court finds *Equity in Athletics v. Department of Education* particularly instructive on this motion to dismiss. There, James Madison University ("JMU") approved the elimination of seven men's teams and three women's teams to satisfy the substantial proportionality requirement in Prong One of the Three-Part Test. Equity II, 675 F. Supp. 2d at 666-67. At the time the cuts were approved, males accounted for 39% of undergraduate enrollment but 49.3% of athletics participation, while females accounted for 61% of undergraduate enrollment but just 50.7% of athletics participation. Id. at 667. JMU asserted that participation would "move to 61 percent female and 39 percent male"—in line with JMU's undergraduate enrollment—once the cuts took effect. Id.

Equity in Athletics ("EIA") brought an action against the DOE, JMU and various other defendants alleging, *inter alia*, that the cuts discriminated against males in violation of Title IX. Equity II, 675 F. Supp. at 681. Specifically, EIA alleged that "men became the 'underrepresented gender' by 2% as a result of the elimination of the men's athletic teams"—making up 39.1% of JMU's undergraduate population but only 37.1% of university athletes—and that, consequently, JMU was in violation of Prong One of the Three-Part Test. Id. The district court granted JMU's motion to dismiss, stating that it was aware of no "authority to support the proposition that a disparity as low as 2% is substantially disproportionate as a matter of law"; citing cases finding that disparities in the range of 1.4% to 3% constituted substantial proportionality for Title IX purposes; and finding that the mere fact that men were underrepresented by 2% was insufficient to state a plausible claim for relief under Title IX. Id. at 683.

In affirming the dismissal, the Fourth Circuit questioned whether the disparity was 2% or 1.15% but found that substantial proportionality determinations under the first prong of the Three– Part Test are to be made on a case-by-case basis and that "the district court correctly noted that the gap created by JMU's attempts to comply with the proportionality prong of the Three–Part Test, regardless of whether it was one or two percent, was insufficient by itself to establish a violation under Title IX." Equity I, 639 F.3d at 110. The Fourth Circuit also noted that other courts had "found educational institutions to be in compliance with Title IX where the sex disparity was similar to that alleged

by EIA." Id.

In light of the foregoing, the Court cannot agree with Plaintiffs' narrow prescription with respect to substantial proportionality analysis. Relevant authority provides that substantial proportionality determinations are to be made on a case-by-case basis and does not appear to limit courts' flexibility in deciding which approach to take. The Court will therefore look at the allegations regarding Fresno State's female imputed 2020-21 participation gap from multiple angles to see what inferences emerge.

b. Substantial Proportionality Analysis Applying 2020-21 Counts

Starting with percentage disparity, allegations based on the O'Brien counts indicate females made up 60.5% of Fresno State's undergraduate population but only accounted for 58.3% of participation opportunities (excluding the three sports selected for elimination) in the 2020-21 academic year, resulting in a 2.2% disparity. In light of the Fourth Circuit's decision in *Equity in Athletics* and other cases squarely finding that disparities in this range do not show a lack of substantial proportionality, the Court cannot find that Plaintiffs have stated an effective accommodation claim based on percentage disparity. See Equity I, 639 F.3d at 110.

**\*13** Next, Plaintiffs assert that the participation gap of 27 that O'Brien imputed for the 2020-21 academic year is "large enough to sustain a viable team—namely, the very women's lacrosse team Fresno State plans to cut." Doc. No. 46 at 6:1-4. The FAC actually alleges that the women's lacrosse team had 30 members prior to the decision to eliminate it, Doc. No. 46 ¶ 129, but the numbers are close enough, in the Court's view, to support a plausible inference under Rule 8(a)(2) that a participation gap of 27 is large enough to support a viable women's team.

Finally, the FAC alleges that 27 "exceeds the average size of women's teams at Fresno State." Doc. No. 36 at 23 ¶ 143. The FAC does not specifically allege the average size of women's teams at Fresno State, but the allegation that 27 exceeds the average size of women's teams at Fresno State is plausible without reference to other parts of the record. Consistent with guidance in the 1996 Clarification stating that the average size of teams for the underrepresented sex can be used as a point of reference in making substantial proportionality determinations, the Court finds that this allegation supports a plausible inference that the female participation gap O'Brien calculated for the 2020-21 academic year is large enough

to accommodate a viable women's team and therefore evidences a Title IX violation.

For the foregoing reasons, the Court finds that Plaintiffs have adequately alleged an effective accommodation claim based on O'Brien's 2020-21 counts and participation gap calculation.

**D. Intentional Discrimination**

The Board next argues that Plaintiffs' effective accommodation claim fails because Title IX only provides a private right of action for intentional discrimination and Plaintiffs have not alleged facts showing intentional discrimination. Doc. No. 42 at 23:21-26:16. The crux of this argument is that Title IX provides no special protection to female student-athletes and that the conduct in question here—the concurrent elimination of women's lacrosse, men's tennis and men's wrestling—cannot be said to involve intentional discrimination because it affected more males than females and thus, women were (at a minimum) "treated the same" as men. Id.

In addition, the Board contends that Plaintiffs are seeking to establish a Title IX violation based on a lack of preferential protection from budget cuts for women's lacrosse and that such a claim is at odds with Section 901(b) of Title IX, Doc. No. 42 at 24:8-25:5, which states that Title IX shall not be "interpreted to require any educational institution to grant preferential or disparate treatment to the members of one sex on account of an imbalance which may exist with respect to the total number or percentage of persons of that sex participating in or receiving the benefits of any federally supported program or activity ...." 20 U.S.C. § 1681(b). The notion that Plaintiffs are seeking preferential treatment is underscored, according to the Board, by the fact that Plaintiffs are focused narrowly on the reinstatement of women's lacrosse, without regard for the interests of "female students who may wish to participate in sports other than lacrosse" or the flexibility Title IX provides to educational institutions in the management of their affairs. Doc. No. 42 at 25:5-12.

The Board's argument is not without merit. "Title IX does not establish a right to participate in any particular sport in one's college," Gonyo v. Drake Univ., 837 F. Supp. 989, 994 (S.D. Iowa 1993), and Title IX plainly allows for cutting women's teams (or, more broadly, participation opportunities allocated to the underrepresented gender) to achieve compliance, even where such cuts are expressly predicated on sex. See Neal, 198 F.3d at 770 (stating that it

would be "imprudent to argue" that Title IX bars "gender-conscious remedies"); Cohen, 991 F.2d at 898. Thus, the Court agrees with the Board that Title IX cannot be read to give the women's lacrosse team a right to remain in existence and that the mere fact that Fresno State cut the women's lacrosse team—and took sex into account in doing so—does not itself give rise to a Title IX claim.

**\*14** In the Court's view, however, it is not, strictly speaking, the elimination of women's lacrosse that constitutes the alleged violation of Title IX's effective accommodation requirement. The violation is the unequal "barrier" Fresno State has allegedly imposed to female participation in athletics by providing proportionately fewer participation opportunities for females than males. See Pederson, 213 F.3d at 871. The elimination of women's lacrosse gives Plaintiffs standing for a Title IX effective accommodation claim because it shows that they are " 'able and ready' to compete for a position on [an] unfielded team," id.; see also, Thomas v. Regents of Univ. of California, 2020 WL 3892860, at \*10 (N.D. Cal. July 10, 2020), but the Title IX effective accommodation violation alleged here arises from a program-wide imbalance in participation opportunities. See Beasley, 966 F. Supp. at 1125–26 ("Only when the institution, in a broad-spectrum inquiry, is first found to be in violation of Title IX ... does the question of individual or group causes-of-action for relief properly arise."). Moreover, reinstatement of women's lacrosse is but one of the remedies the Court could impose to ensure the proper allocation of participation opportunities between males and females should Plaintiffs prevail on their claim. See Pederson, 213 F.3d at 865 (noting that the district court ordered defendant to submit a Title IX compliance plan). Plaintiffs seek reinstatement of women's lacrosse but that remedy in particular is by no means necessitated by their claim.

The Court therefore finds that the Board's argument that Plaintiffs' claim is not a claim for intentional discrimination is without merit.

### E. Conclusion Regarding Effective Accommodation Claim

For the foregoing reasons, the motion to dismiss will be denied as to the effective accommodation claim.

## II. Equal Treatment Claim

### A. Applicable Law

As set forth above, Title IX equal treatment claims arise under 34 C.F.R. § 106.41(c)(2)-(10), which address athletics-related benefits such as equipment and supplies, per diem allowances, coaching, tutoring, locker rooms and training facilities.

The 1979 Policy Interpretation states that § 106.41(c)(2)-(10) create "general athletic program requirements" that call for "comparing the availability, quality and kinds of benefits, opportunities, and treatment afforded members of both sexes" and that "[i]nstitutions will be in compliance if the compared program components are equivalent." 44 Fed. Reg. 71,413, 71,415. In addition, the 1979 Policy Interpretation states that "identical benefits, opportunities or treatments are not required, provided the overall effect of any differences is negligible" and that "differences in particular program components will be found to be justifiable" where "sport-specific needs are met equivalently in both men's and women's programs." Id. at 71,415-71,416.

Finally, the 1979 Policy Interpretation states that compliance with 34 C.F.R. § 106.41(c) will be determined based on:

> a. Whether the policies of an institution are discriminatory in language or effect; or
>
> b. Whether disparities of a substantial and unjustified nature in the benefits, treatment, services, or opportunities afforded male and female athletes exist in the institution's program as a whole; or
>
> c. Whether disparities in individual segments of the program with respect to benefits, treatment, services, or opportunities are substantial enough in and of themselves to deny equality of athletic opportunity.

44 Fed. Reg. 71,413, 71,418.

Courts have construed 34 C.F.R. § 106.41(c)(2)-(10) and applicable regulatory guidance to mean that "equal treatment" claims under Title IX can be based on a program-wide imbalance in the allocation of benefits between sexes, or alternatively, "substantial" disparities in the treatment afforded to comparable male and female teams. See Landow v. Sch. Bd. of Brevard County, 132 F. Supp. 2d 958, 962–66 (M.D. Fla. 2000) (holding that disparities between boys' baseball and girls' softball programs violated Title IX); Daniels v. Sch. Bd. of Brevard County, 985 F. Supp. 1458, 1460–63 (M.D. Fla. 1997)

(holding that female varsity softball players were entitled to a preliminary injunction on their claim that their high school denied them the benefits given to the boys' varsity baseball team).

### B. Parties' Arguments

The Board argues that Plaintiffs' equal treatment claim should be dismissed for failure to state a claim because the pleadings compare the treatment of the women's lacrosse team to the treatment of "other varsity teams" (a category that includes women's teams as well as men's teams) without specifically comparing treatment received by women's lacrosse to treatment received by men's varsity teams. Doc. No. 42 at 28:23-29:7. Further, the Board argues that Plaintiffs' allegations are "formulaic" and "conclusory," and that Plaintiffs' "failure to provide facts concerning unfavorable treatment of any other women's team foils their claim of gender discrimination" because "[b]eing a member of the women's lacrosse team is not a protected category." Id. at 29:8-20. In other words, the Board takes the position that mistreatment of the women's lacrosse team alone is not sufficient and that "Plaintiffs must show facts demonstrating that *women's* teams have been treated less favorably as compared to men's teams" to state an unequal treatment claim under Title IX. Doc. No. 48 at 14:2-5.

### C. Discussion

**\*15** The FAC contains numerous allegations as to how women's lacrosse was treated worse than "men's teams." Specifically, the FAC alleges:

• Women's lacrosse was not provided a "return-to-play plan" in the wake of COVID, even though such plans "were provided to men's teams";

• "Unlike men's varsity teams at Fresno State," the women's lacrosse team was "forced to use outdated gear," was not "provided proper practice jerseys or gear that designate the team's sport, was limited in its participation at media day, and was not issued cold weather gear until after the season had begun";

• "[N]o men's team is required to clean ... its practice field," but women's lacrosse had to clean its practice field of "bottle caps, glass, food, and other trash" from tailgating before practice;

• "[W]omen's lacrosse [ ] struggled with [a] lack of proper coaching staff ... for many months," which did not "happen with men's teams";

• "[W]omen's lacrosse team players were kicked out of their locker room, did not receive uniforms until the season had already begun, and [we]re forced to used old, outdate equipment," even though "[n]o men's team has been treated this way";

• "[M]embers of men's varsity teams" were provided housing and three meals a day during COVID quarantine, but women's lacrosse was not; and

• "[M]en's teams were allowed to bring everyone on the team" to media day, but women's lacrosse "was permitted only to have four of its seven seniors there and no other players."

Doc. No. 36 ¶¶ 17-23, 182-87.

Reviewing these allegations, they do not appear to fall neatly into either category of "equal treatment" violations recognized by the 1979 Policy Interpretation or applicable case law, in that they do not posit a program-level imbalance between the treatment afforded to men's teams and the treatment afforded to women's teams or directly compare the treatment received by women's lacrosse to treatment received by a comparable men's team in the same "segment" of Fresno State's athletic program. Still, the allegations indicate, in several instances, that no men's team at all was subject to the mistreatment (with respect to locker room access, equipment, cleaning duties and such) inflicted on women's lacrosse. Moreover, the disparity in treatment alleged appears to be substantial. Thus, the Court finds that the allegations in the FAC are sufficient to state an equal treatment claim at the segment level since it can plausibly be inferred that male counterpart(s) to the women's lacrosse team (whatever team or teams that may turn out to be) received at least some benefits of consequence that were not furnished to women's lacrosse. See 44 Fed. Reg. 71,413, 71,418 (addressing "disparities in individual segments" of athletic programs).

The motion to dismiss will therefore be denied as to the equal treatment claim.

### III. Financial Aid Claim

#### A. Applicable Law

As noted above, 34 C.F.R. § 106.37(c)(1) states:

To the extent that a recipient [of federal funding] awards athletic scholarships or grants-in-aid, it must provide reasonable opportunities for such awards [of financial assistance] for members of each sex in proportion to the number of students of each sex participating in interscholastic or intercollegiate athletics.

**\*16** Guidance regarding this regulation is set forth in the 1979 Policy Interpretation, which states, in pertinent part, as follows:

The [DOE] will examine compliance with this provision ... primarily by means of a financial comparison to determine whether proportionately equal amounts of financial assistance (scholarship aid) are available to men's and women's athletic programs. The [DOE] will measure compliance with this standard by dividing the amounts of aid available for the members of each sex by the numbers of male or female participants in the athletic program and comparing the results. Institutions may be found in compliance if this comparison results in substantially equal amounts or if a resulting disparity can be explained by adjustments to take into account legitimate, nondiscriminatory factors.

44 Fed. Reg.71,413, 71,415.

In contrast to an effective accommodation claim, "it is irrelevant what the overall participation rates of men and women in [ ] athletic programs are, relative to their enrollment." Beasley, 966 F. Supp. at 1122 (citing 44 Fed. Reg. 71,413, 71,415). "What matters is simply whether 'the total amounts of scholarship aid made available to men and women [are] substantially proportionate to their participation rates.' " Id. The total dollar value of individual scholarships made available to men and women are not directly compared. Id. If per capita financial aid for male student-athletes exceeds per capita financial aid for female student athletes by more than 1%, there is a strong presumption of a Title IX violation that must be justified, if at all, by nondiscriminatory factors (such as the higher cost of tuition for student-athletes from out of state). See Beasley, 966 F. Supp. at 1122–23.

## B. Parties' Arguments

The Board contends that Plaintiffs' financial aid claim should be dismissed because Plaintiffs' conclusory allegations do not make a plausible showing that males receive a disproportionate amount of scholarship funding after taking into account nondiscriminatory factors such as the higher cost of tuition for out-of-state athletes. Doc. No. 42 at 27:11-28:22. Further, Defendants contend that

financial aid claims arising from events prior to February 12, 2019 are time-barred by the applicable two-year statute of limitations, id. at 28:15-22, and that Plaintiffs have failed to "plead that *they* were harmed by any alleged Title IX violation with respect to financial assistance," as required for standing. Id. (emphasis original). According to Defendants, allegations that Plaintiff Roberts receives a partial scholarship and that Plaintiff Walburger will not receive a scholarship after she finishes her undergraduate degree "are tied to the elimination of lacrosse"—not to "alleged inequities in the allocation of financial assistance"— and therefore do not provide standing for a scholarship claim. Id. at 27, n.8.

Plaintiffs contend that they have adequately stated a scholarship claim based on allegations that "Fresno State has been offering female student-athletes hundreds of thousands of dollars less than they should have received (if they were offered aid in proportion to their participation) each year for each of the last sixteen years" and allegations that the disparity between the scholarship budget for men and the scholarship budget for women is greater than 1%. Doc. No. 46 at 17:12-18:5. Further, Plaintiffs allege that "Fresno State has shorted its female athletes by more than $5.3 million in financial aid over the last sixteen years," including 2018-19 (the most recent year for which relevant data is publicly available) in which "female student-athletes at Fresno State should have received $285,000 more than they did based on their percentage representation in the athletics program; that this "unbroken pattern" is "expected to continue this year, next year, and for the foreseeable future"; and that "[t]hese problems are [ ] exacerbated by the unequal participation opportunities alleged in Count I because the inequities build on each other." Id. at 18:11-19:6.

**\*17** As to standing, Plaintiffs contend that "allegations of discrimination in financial aid allocation in the years that [they] played lacrosse for Fresno State [ ] support the inference that they, too, were harmed by these inequalities—particularly those who receive less than full scholarships and those who will have their scholarships pulled next year." Doc. No. 46 at 19:2-6. Further, Plaintiffs contend that standing can be inferred from allegations that they "receive varying degrees of financial aid, ranging from full scholarships to partial scholarships, see Doc. No. 36 ¶¶ 33, 40, 43, 55 and 65, and that "Plaintiffs would have received more in scholarship funds" and "more female athletes at Fresno State would have received financial aid" if Fresno State had complied with its Title IX obligations. Doc. No. 46 at 19:6-17. Finally, Plaintiffs allege that "Fresno State informed Plaintiff Walburger that it will not honor her scholarship after the school eliminates the lacrosse team—despite previous and express promises to do so." Doc. No. 46 at 19:7-17.

## C. <u>Discussion</u>

As an initial matter, the Court does not agree with the Board's contention that Plaintiffs' financial aid claim is time-barred because the FAC contains allegations regarding the 2018-19 academic year, at least part of which falls within the two-year statute of limitations that the Board contends is applicable to Title IX claims. See Doc. No. 48 at 12, n.10 ("Plaintiffs filed their original Complaint on February 19, 2021, after the Spring 2021 semester had commenced. Since their figures only refer to athletic aid awarded prior to the 2018-19 season, Count II is time-barred.").

The Board is correct, however, that the allegations in the FAC fail to state a scholarship claim. Plaintiffs allege, for example, that "[i]n 2018-19 ... Fresno State offered female student-athletes $285,000 less than they should have been offered based on their percentage in the athletics program." This allegation—like the allegation that female student-athletes "received over $5.3 million less in athletic financial aid ... than they should have received" from 2003-04 through 2018-19—is no more than a legal conclusion with garnish. Plaintiff must allege facts that enable the Court to conduct its own assessment and draw a plausible inference that participation-adjusted scholarship funding for male student-athletes exceeds participation-adjusted scholarship funding for female student-athletes by 1% or more in a year that falls within the Title IX statute of limitations. Slapping an aggregate dollar amount—with no point of reference—on what is otherwise a mere restatement of an essential element of a financial aid claim does not satisfy that requirement. Indeed, the allegations in the FAC do not allow the Court to make any determination regarding the percentage disparity between men's scholarship funding and women's scholarship funding, whether or not adjusted for participation. The test for a Title IX scholarship violation in applicable regulatory guidance entails dividing the male scholarship budget by the number of male student-athletes, performing the same calculation for females, and comparing the results. See 44 Fed. Reg.71,413, 71,415; Beasley, 966 F. Supp. at 1122–23. At a minimum, something allowing the Court to approximate this analysis is required to state a scholarship claim.

Further, the Court finds that the allegations in the FAC are insufficient to show standing. Title IX "affords ... no individual right to a scholarship," so standing to assert a scholarship claim hinges not only "on overall disproportionate provision of support funds to athletes of each gender" (which Plaintiffs have not adequately alleged) but also on whether a plaintiff "can show a relationship of causation" between an alleged funding disparity and the lack—or diminution—of his or her scholarship award. See Beasley, 966 F. Supp. at 1126. The FAC alleges, in pertinent part, that Anders was "awarded an athletic scholarship" to attend Fresno State, Doc. No. 36 ¶ 33; that Abbigayle Roberts was awarded a "partial scholarship for her participation on the women's lacrosse team," id. ¶ 43; that Megan Walaitis was "awarded a full scholarship to Fresno State," id. ¶ 55; and that Courtney Walburger received a four-year scholarship in her second year at Fresno State and was told she could use the fourth year toward graduate school if she remained at Fresno State to play women's lacrosse. Id. ¶ 65. Further, the FAC alleges that Walburger was recently informed that Fresno State "will not honor her scholarship once she earns here undergraduate degree" because the women's lacrosse team has been cut. Id. ¶ 69. No scholarship-related allegations are made as to the other two Plaintiffs, Hennessey Evans and Tara Weir.

**\*18** Even assuming Plaintiffs had adequately alleged an actionable sex-based imbalance in scholarship funding, the Court could not infer from these allegations which Plaintiffs, if any, were deprived of a scholarship—or which Plaintiffs, if any, received a diminished scholarship—as a result of such a Title IX violation. Indeed, without context, the fact that four of six Plaintiffs received a scholarship of some sort appears to cut against inferring a dearth of scholarship funding for women's lacrosse, and the FAC does not allege that any of the Plaintiffs was improperly deprived of scholarship funding. Moreover, while the Court does not mean to minimize the impact of losing a scholarship unexpectedly, the allegation regarding the cancellation of Walburger's scholarship following the discontinuation of lacrosse is irrelevant because, by its terms, 34 C.F.R. § 106.37(c)(1) only pertains to scholarships for students "participating in interscholastic or intercollegiate athletics."

The Court therefore finds that Plaintiffs have failed to state or allege standing for a financial aid claim under Title IX.

## <u>CONCLUSION</u>

For the foregoing reasons, the motion to dismiss the FAC will be denied as to Plaintiffs' effective accommodation claim and equal treatment claim and granted as to Plaintiffs' financial aid claim. Since the defects in the financial aid claim could be cured with additional factual allegations, the Court will grant leave to amend the

Anders v. California State University, Fresno, Not Reported in Fed. Supp. (2021)

financial aid claim. See Willden, 678 F.3d at 1005.


**ORDER**

Accordingly, IT IS HEREBY ORDERED that:

1. The motion to dismiss the First Amended Complaint (Doc. No. 42) is DENIED IN PART and GRANTED IN PART as follows:

    a. The motion is DENIED as to the effective accommodation claim and the equal treatment claim;

    b. The motion is GRANTED as to the financial aid claim;

2. Plaintiffs' are GRANTED leave to file a Second Amended Complaint amending the financial aid claim within 21 days of the date of electronic service of this order;

3. Terrence Tumey, Joseph Castro and Saul Jiménez-Sandoval are dismissed from this case by virtue of being omitted from the First Amended Complaint;

4. This case is referred back to the Magistrate Judge for further proceedings consistent with this order.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 3115867

Footnotes

1    Original pleadings are treated as "non-existent" after amendment. Ferdik v. Bonzelet, 963 F.2d 1258, 1262 (9th Cir. 1992). Thus, if an amended complaint omits or drops a defendant who was named in the original complaint, that defendant is dismissed and no longer a part of the action. Jones v. TW & Co., 2011 WL 4055721, at *2 n.1 (E.D. Cal. Sept. 12, 2011) (Ishii, J.) (collecting cases). Thus, Tumey, Castro and Jiménez-Sandoval will be dismissed from this case.

2    The Board asserts that suing Fresno State in addition to suing the Board is erroneous because the Board is "the State of California acting in its higher education capacity." Doc. No. 42 at 9:2-5. The question of who is properly named as a defendant was not briefed by the parties in any meaningful fashion and does not affect the disposition of this motion. The Court, therefore, will not address it here. For purposes of this order, the Court will use the term "Defendants" to refer collectively to Fresno State and the Board as the entities named as defendants in the FAC, and use "Fresno State" or "Board" when referring specifically to one entity or the other.

3    This section is a brief summary of allegations in the FAC. Additional allegations are addressed in sections of this order specific to each of Plaintiffs' three Title IX claims.

4    Unless otherwise specified, "Rule" as used herein refers to the Federal Rules of Civil Procedure.

5    After Title IX was passed, the Department of Health, Education, and Welfare was divided into the Department of Health and Human Services and the Department of Education ("DOE"). The latter, acting through its Office for Civil Rights ("OCR"), is now the agency charged with administering Title IX. See Roberts v. Colorado State Bd. of Agric., 998 F.2d 824, 828 n.3 (10th Cir. 1993).

6    The difference between the number of participation opportunities required for strict proportionality (which the Court sometimes refers to as the "strict proportionality threshold") and the actual number of participation opportunities provided to the underrepresented sex—in other words, "the number of participation opportunities that a school would have to add for [the underrepresented sex] to achieve actual proportionality"—is commonly referred to as the "participation gap." See Mansourian v. Bd. of Regents of Univ. of California at Davis, 816 F. Supp. 2d 869, 887 (E.D. Cal. 2011) ("Mansourian II").

Anders v. California State University, Fresno, Not Reported in Fed. Supp. (2021)

---

[7]   Page citations to documents filed with the Court electronically are to the page numbers in the CM/ECF stamp at the top of each page.

[8]   Plaintiffs set forth numerous allegations regarding Fresno State's failure to comply with Title IX prior to the elimination of women's lacrosse, but as the Court reads the FAC, these allegations are merely intended to: (i) establish that substantial proportionality under Prong One of the Three-Part Test is the only way for Fresno State to comply with Title IX; (ii) corroborate Plaintiffs' contention that female participation opportunities will not be proportionate to female undergraduate enrollment once women's lacrosse is eliminated; and (iii) show that the alleged discrimination at issue here was intentional. This reading of the FAC appears to be consistent with Plaintiffs' other filings to date, including the opposition to this motion. See Doc. No. 46 at 23:4-7 ("although it does not form the basis for any independent cause of action, [ ] historical information remains useful in assessing the plausibility of the allegations in the Amended Complaint").

---

**End of Document**                                          © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 650712
Only the Westlaw citation is currently available.
United States District Court, W.D. Michigan,
Southern Division.

Sophia BALOW, et al., Plaintiffs,

v.

MICHIGAN STATE UNIVERSITY, et al.,
Defendants.

Case No. 1:21-cv-44
|
Signed 02/19/2021

**Attorneys and Law Firms**

Brian Edward Koncius, Bogas & Koncius, Bingham
Farms, MI, Danya Keller, Jill Zwagerman, Lori Bullock,
Newkirk Zwagerman PLC, Des Moines, IA, for Plaintiffs.

Ashley N. Higginson, Scott Robert Eldridge, Miller
Canfield, Lansing, MI, Brian Mark Schwartz, Erika Lynn
Giroux, Miller Canfield Paddock & Stone PLC, Detroit,
MI, Uriel Abt, Michigan State University Office of the
General Counsel, East Lansing, MI, for Defendants.

## OPINION

HALA Y. JARBOU, UNITED STATES DISTRICT
JUDGE

**\*1** Michigan State University (MSU) announced in
October 2020 that, due to budget constraints, it would
discontinue its men's and women's varsity swimming and
diving programs after the end of the 2020-2021 season.
Plaintiffs are current members of MSU's varsity women's
swimming and diving team. They claim that MSU
discriminates against women, in violation of Title IX, 20
U.S.C. §§ 1681 et seq. Specifically, in Count I of their
complaint, Plaintiffs claim that MSU provides "fewer and
poorer athletic participation opportunities" for women than
it does for men. (*See* Compl., ECF No. 1, PageID.45.)
Plaintiffs believe that the elimination of their team would
exacerbate this problem; accordingly, they have asked the

Court for a preliminary injunction requiring MSU to
maintain its varsity women's swimming and diving team
for the duration of this lawsuit. The Court heard oral
argument on Plaintiffs' motion on February 10, 2021. For
the reasons herein, the Court will deny the motion.

## I. Preliminary Injunction Standard

" '[A] preliminary injunction is an extraordinary and
drastic remedy, one that should not be granted unless the
movant, *by a clear showing*, carries the burden of
persuasion.' " *Mazurek v. Armstrong*, 520 U.S. 968, 972
(1997) (quoting 11A C. Wright, A. Miller, & M. Kane,
*Federal Practice and Procedure* § 2948 (2d ed. 1995)).
The Court considers four factors when deciding whether to
grant a preliminary injunction:

(1) whether the movant has a "strong" likelihood of
success on the merits;

(2) whether the movant would otherwise suffer
irreparable injury;

(3) whether issuance of a preliminary injunction would
cause substantial harm to others; and

(4) whether the public interest would be served by
issuance of a preliminary injunction.

*McPherson v. Mich. High Sch. Athletic Ass'n*, 119 F.3d
453, 459 (6th Cir. 1997) (en banc).

"These factors are to be balanced against one another and
should not be considered prerequisites to the grant of a
preliminary injunction." *Leary v. Daeschner*, 228 F.3d 729,
736 (6th Cir. 2000). However, "a finding that there is
simply no likelihood of success on the merits is usually
fatal." *Gonzales v. Bd. of Med. Examiners*, 225 F.3d 620,
625 (6th Cir. 2000).

## II. Title IX

Title IX prohibits sex discrimination in the provision of
college sports programs, providing that "[n]o person in the
United States shall, on the basis of sex, be excluded from
participation in, be denied the benefits of, or be subjected
to discrimination under any education program or activity,"
including intercollegiate athletics. 20 U.S.C. § 1681(a); 34
C.F.R. § 106.41(a).

**\*2** Title IX's regulations require universities receiving federal funds to "provide equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41(c). The following factors are relevant for determining "equal opportunity":

(1) Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;

(2) The provision of equipment and supplies;

(3) Scheduling of games and practice time;

(4) Travel and per diem allowance;

(5) Opportunity to receive coaching and academic tutoring;

(6) Assignment and compensation of coaches and tutors;

(7) Provision of locker rooms, practice and competitive facilities;

(8) Provision of medical and training facilities and services;

(9) Provision of housing and dining facilities and services;

(10) Publicity.

*Id.* A school's "failure to provide necessary funds for teams for one sex" also may be indicative of sex discrimination. *Id.*

The Department of Education's Office for Civil Rights (OCR) clarified the meaning of "equal opportunity" in a 1979 policy interpretation. *See* Title IX of the Education Amendments of 1972; a Policy Interpretation, 44 Fed. Reg. 71,413 (Dec. 11, 1979). To comply with the requirement to "effectively accommodat[e] the interests and abilities of male and female athletes," institutions must "provide both the opportunity for individuals of each sex to participate in intercollegiate competition, and for athletes of each sex to have competitive team schedules which equally reflect their abilities." *Id.* at 71,417.

Compliance is assessed by the following three-part test:

(1) Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or

(2) Where the members of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or

(3) Where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

*Id.* at 71,418.

In 1996, the OCR clarified that institutions need "comply only with any one part of [this] three-part test in order to provide nondiscriminatory participation opportunities for individuals of both sexes." OCR, Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test (Jan. 16, 1996), https://www2.ed.gov/about/offices/list/ocr/docs/claric.html.

Plaintiffs have the burden of proving the first part of this test, i.e., that there is a statistically significant disparity between male and female participation opportunities. *See Horner v. Ky. High Sch. Athletic Assoc.*, 43 F.3d 265, 275 (6th Cir. 1994). If Plaintiffs meet their burden, Defendants can escape liability by proving the second part, i.e., a history and continuing practice of program expansion for female athletes. *Id.* If Defendants cannot make this showing, then Plaintiffs must prove the third part, i.e., that the interests and abilities of female students have not been "fully and effectively accommodated." *Id.*

**\*3** The parties mainly focus their arguments on the first part of the test, substantial proportionality (or lack thereof) in intercollegiate-level participation opportunities at MSU. The parties agree that the number of participation opportunities is determined by counting the number of athletic "participants," which the 1979 Policy Interpretation defines as athletes:

a. Who are receiving the institutionally-sponsored support normally provided to athletes competing at the institution involved, *e.g.*, coaching, equipment, medical and training room services, on a regular basis during a sport's season; and

b. Who are participating in organized practice sessions and other team meetings and activities on a regular basis during a sport's season; and c. Who are listed on the eligibility or squad lists maintained for each sport, or

d. Who, because of injury, cannot meet a, b, or c above but continue to receive financial aid on the basis of athletic ability.

1979 Policy Interpretation, 44 Fed. Reg. at 71,415.

Exact proportionality would be achieved if the ratio of male to female athletic participants is equal to the ratio of male to female students enrolled at the school. When the numbers are not exactly proportional, the number of participation opportunities necessary to achieve exact proportionality is known as the "participation gap." For example, if there are 100 athletic participants in a school where half of the students are men and half are women, then exact proportionality would mean 50 male participants and 50 female participants. But if there are 55 male participants and only 45 female participants, then the participation gap is 10.[2]

The first part of the three-part test does not require exact proportionality. It requires "substantial" proportionality. The OCR's 1996 clarification letter indicated that it would consider opportunities to be "substantially proportionate" when the participation gap

> ...would not be sufficient to sustain a viable team, i.e., a team for which there is a sufficient number of interested and able students and enough available competition to sustain an intercollegiate team. As a frame of reference in assessing this situation, OCR may consider the average size of teams offered for the underrepresented sex, a number which would vary by institution.

Clarification of Intercollegiate Athletics Policy Guidance (1996).

## III. Standing

MSU argues that Plaintiffs do not have "standing" to assert their claim for two reasons. First, MSU argues that "[t]here is no private right of action under Title IX to challenge a gender-neutral decision such as eliminating a combined men's and women's team[.]" (Defs.' Resp. Br. 22, ECF No. 8.) Second, MSU argues that Plaintiffs "have no standing to otherwise challenge a purported gender opportunity imbalance during a period they were swimming and diving for MSU." (*Id.*)

MSU's first argument is misplaced. First, there is no question that Title IX creates a private right of action and a remedy for discrimination on the basis of sex. *See Cannon v. Univ. of Chicago*, 441 U.S. 677, 708 (1979) ("Not only the words and history of Title IX, but also its subject matter and underlying purposes, counsel implication of a cause of

action in favor of private victims of discrimination."); *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 76 (1992) (finding that a damages remedy is available for an action to enforce Title IX).

**\*4** MSU relies on *Sandoval v. Alexander*, 532 U.S. 275 (2001), in which the Supreme Court held that there is no private right of action to enforce *disparate impact* regulations under Title VI because the part of Title VI implying a private right of action, 42 U.S.C. § 2000d, prohibited "only intentional discrimination." *Sandoval*, 532 U.S. at 282. Title IX was patterned after Title VI, substituting the word "sex" in Title IX to replace the words "race, color, or national origin" in Title VI. *See Cannon*, 441 U.S. at 695; *cf. 42 U.S.C. § 2000d* (Title VI) *with 20 U.S.C. § 1681(a)* (Title IX). Accordingly, it follows that the Supreme Court's reasoning regarding Title VI applies to Title IX as well. *See Doe v. BlueCross BlueShield of Tenn., Inc.*, 926 F.3d 235, 240-41 (6th Cir. 2019) (finding it "unlikely" that Title IX prohibits disparate-impact discrimination) (citing *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005) ("Title IX implies a private right of action to enforce its prohibition on intentional sex discrimination.")). In other words, both statutes permit a private right of action for intentional discrimination, but not for disparate impact.

Nevertheless, as other courts have held in similar situations, Plaintiffs assert a claim of disparate treatment, not disparate impact. Plaintiffs contend that MSU has intentionally treated its female athletes differently than male athletes, and that eliminating the men's and women's swimming and diving team amounts to further discrimination against the female members of that team. This is a disparate treatment claim. *See Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 97-98 (2d Cir. 2012) ("A school's decision to provide students with athletic participation opportunities through separate sports programs for each sex...necessarily raises a disparate treatment rather than disparate impact claim in that the school decides which athletic opportunities are available to particular students 'on the basis of sex.' ").

In contrast, disparate-impact claims arise when "an entity acts for a nondiscriminatory reason but nevertheless disproportionately harms a protected group." *Foster v. Michigan*, 573 F. App'x 377, 389 (6th Cir. 2014). Plaintiffs do not make such a claim. They do not contend that Defendants acted for nondiscriminatory reasons. Rather, they contend that Defendants specifically chose their team for elimination, and that this choice reflects disparate treatment. Furthermore, the regulations at issue enforce the nondiscrimination requirement of Title IX; they do not purport to regulate facially neutral decisions with disparate impacts. *See Mayerova v. E. Mich. Univ.*, 346 F. Supp. 3d

983, 991 (E.D. Mich. 2018). Thus, *Sandoval* is distinguishable.

MSU's second argument is correct, but irrelevant. As far as the preliminary injunction motion is concerned, Plaintiffs are not challenging a gender imbalance in existence during the period in which they have been members of the swimming and diving team. Instead, they seek to prevent the effects of a decision that will subject them to that imbalance. They have standing to assert this claim.

## IV. Preliminary Injunction Analysis

### A. Likelihood of Success

Plaintiffs' request for an injunction falters on the first, and most important, factor. Plaintiffs have not shown a strong or substantial likelihood of success on the merits of their claim.

A brief word about the standard for a likelihood of success. Plaintiffs rely heavily on a case with similar facts from the District of Iowa, *Ohlensehlen v. University of Iowa*, No. 3:20-cv-00080-SMR-SBJ, 2020 WL 7651974 (D. Iowa Dec. 24, 2020), in which members of the women's swimming and diving team at the University of Iowa claimed that the university's decision to eliminate their team violated Title IX. *Id.* at *1. The court in that case entered a preliminary injunction to stop the University of Iowa from eliminating the team for the duration of the lawsuit. *Id.* Among other things, the court determined that the plaintiffs had shown a "fair chance" of success on the merits of their Title IX claim. *Id.* at *5. Similarly, Plaintiffs contend that they have demonstrated a "fair chance" of success on the merits of their claim.

**\*5** Unlike courts in the Eighth Circuit, this Court does not evaluate requests for a preliminary injunction under a "fair chance" standard. The Eighth Circuit has a two-tiered standard for evaluating preliminary injunctions. The first tier, applicable in *Ohlensehlen*, required the plaintiff to show only a "fair chance of prevailing" on the merits, which permits a showing of less than a fifty percent likelihood of success. *See D.M. by Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 999 (8th Cir. 2019). The second tier, a "heightened, likely-to-prevail standard," applies where the plaintiff challenges a "duly enacted state statute." *Id.* at 1000.

This Court is bound by precedent from the Sixth Circuit, not the Eighth. Nevertheless, "[a] fixed legal standard is not the essence of equity jurisprudence"; " 'the precise wording of the standard for the likelihood of success on the merits is not as important as a realistic appraisal of all the traditional factors weighed by a court of equity. A balancing is required, and not the mechanical application of a certain form of words.' " *Roth v. Bank of Commonwealth*, 583 F.2d 527, 537-38 (6th Cir. 1978) (quoting *Metro. Detroit Plumbing & Mech. Contractors Assoc. v. HEW*, 418 F. Supp. 585, 586 (E.D. Mich. 1976)). Thus, the Court applies the Sixth Circuit's standard, but recognizes that its duty is to balance the Plaintiffs' likelihood of success against the other factors.

### 1. Plaintiffs' Evidence: Lopiano Report

To support their claim of unequal opportunity, Plaintiffs rely on an analysis conducted by their expert, Donna Lopiano, who uses publicly available data—as well as a series of inferences from that data—to offer her opinion that MSU's participation gap is too large for participation opportunities to be substantially proportionate.

### (a) Admissibility

As an initial matter, MSU contends that the Court should strike Lopiano's report because it is inadmissible. MSU argues that the report relies upon improper data, makes assumptions from that data that are unwarranted, and offers legal opinions. MSU also argues that an expert's testimony is unnecessary because the relevant calculations are straightforward and simple. Alternatively, MSU asks the Court to consider the report of its own expert.

MSU is invoking the Court's "gatekeeping" role. The Court has a duty to act as a "gatekeeper" for expert testimony by assessing its admissibility. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993); Fed. R. Evid. 104(a). This inquiry is governed in part by Rule 702, which provides,

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Ultimately, an expert's testimony will be admissible if it "both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597.

The Court will deny MSU's request to strike Lopiano's report and will consider the reports of both experts. Lopiano's resume indicates that she is qualified to render opinions relating to intercollegiate sports programs. In addition, her analysis is helpful and relevant. MSU's objections to her data and her assumptions primarily concern the weight of her conclusions rather than their reliability. To the extent *Daubert* applies at this stage, the Court can weigh MSU's concerns when assessing Lopiano's report in tandem with the report of MSU's expert.

**(b) EADA Reports**

**\*6** Lopiano begins her analysis by examining reports filed by MSU under the Equity in Athletics Disclosure Act (EADA), 20 U.S.C. § 1092(g). (*See* Lopiano Rep., ECF No. 2-14, PageID.212.) For the most recent year in which MSU's EADA data is publicly available, the 2018-2019 academic year, the EADA reports show a participation gap of 25 female participation opportunities. (*Id.*, PageID.216.)

As Lopiano acknowledges, however, the participant counts in EADA reports are not equivalent to participation opportunities under Title IX because the EADA reports "do not follow Title IX counting instructions." (*Id.*, PageID.215.) The EADA reports "were designed to make prospective students aware of an institution of higher education's commitment to providing equitable athletic opportunities." (*Id.*, PageID.213.) They were not designed to report official tallies of participation opportunities for purposes of Title IX.

For instance, the EADA requires universities to report the number of their undergraduate athletes, by team, "as of the day of the first scheduled contest for the team." 20 U.S.C. § 1092(g)(1)(B)(i). However, the number of athletes as of the date of the first scheduled contest may not be the same number of athletes who participate "in organized practice sessions and other team meetings and activities on a regular basis during a sport's season." *See* Policy Interpretation, 44

Fed. Reg. at 71,415. Some athletes who participate in the first competition might leave the team after that event, making the EADA statistics overinclusive.

Lopiano surmises that MSU's participation counts for women are systematically overinflated in the EADA reports because the 2019 instruction manual for EADA reports advises schools to count "male practice players" as participants on women's teams, even though those players would *not* count as female participants under Title IX. (Lopiano Rep., PageID.216.) However, there is no evidence in the EADA online database that MSU counted male practice players as female participants in its most recent public data. According to Lopiano, the number of male practice players would be displayed in a "caveat" field in the database. (*Id.*, PageID.218.) MSU's EADA data for 2018-2019 contains nothing in that field. Lopiano apparently believes that MSU simply left that field blank, but MSU provides an even more straightforward reason: it stopped counting male practice players as female participants in 2019. (*See* Breske Decl. ¶ 23, ECF No. 8-2.)

**(c) Web rosters**

Next, Lopiano analyzes the player rosters available on MSU's website, which Lopiano believes more closely reflect the number of participants in MSU's athletic programs for purposes of Title IX. She notes that these "web rosters" show participation numbers that are lower than those in the EADA reports. Lopiano implies that this as a sign that MSU is inflating its EADA data, but the difference is also attributable Lopiano's earlier point that EADA reports tend to overcount participants.

By Lopiano's count, the web rosters show participation gaps of 33, 37, and 35 female athletes in the seasons ending in 2018, 2019, and 2020, respectively. (*Id.*, PageID.232.) In percentage terms, these gaps are 1.8%, 2.0%, and 2.0%. (*Id.*)

**(d) Inflation**

Lopiano believes that the actual participation gaps are much larger than the numbers in the web rosters due to artificial inflation of the player rosters on several of MSU's women's teams, particularly the women's rowing, cross country, and track and field teams.

**(i) Women's rowing**

**\*7** Lopiano contends that MSU has inflated its numbers for women's rowing by including 20 to 30 "novices" on its team. (*Id.*, PageID.220.) According to Lopiano, novice rowers are freshmen who have never participated in rowing before college. Lopiano believes that novice female rowers should not be counted as participants because they do not receive "a genuine Division I varsity experience"; in contrast to other rowers, they "participate in fewer regular season events," "do not receive athletic scholarships, and do not have national championships." (*Id.*, PageID.222, 238.) However, she acknowledges that "participation in a competition is not required in order to count as a participant [under Title IX]" (*id.*, PageID.224 n.6), undermining her point that the ability to participate in season events and national championships has relevance to determining whether an athlete is a participant.

**(ii) Women's cross country and track and field teams**

Lopiano counts between 35 and 44 members of MSU's women's cross country team during the years 2012 to 2019. (*Id.*, PageID.223.) She believes those numbers are suspicious because the average size of a NCAA Division I women's cross country team is 17 runners. (*Id.*, PageID.224.) At the same time, however, she notes that the men's team is also larger than average, albeit to a lesser extent. And she acknowledges that "she cannot make an accurate participant count." (*Id.*)

Lopiano believes that MSU has improperly inflated the number of participants on its women's cross country and track and field teams because a substantial number of them do not participate in any events. Again, however, Title IX's regulations make clear that participation in an event is not required for an athlete to count as a participant.

**(e) Summary**

In short, Lopiano believes that MSU's actual participation gap is much larger than approximately 35 female participants due to her belief that MSU has improperly inflated the sizes of several of its women's teams.

Lopiano's analysis contains several shortcomings and flaws that taint her conclusions. First, as she acknowledges, she does not possess the data necessary to accurately count participant numbers. She is forced to guess the number of participants based on EADA reports that are inconsistent

with the definition of participant under Title IX, and web rosters that she speculates are more in line with that definition.

Second, to reach a participation gap higher than approximately 35 female athletes, Lopiano makes inferences that are tenuous, at best. For instance, she compares the sizes of MSU's teams to the average size of teams at similar schools. It is difficult to discern the relevance of this comparison. Nothing in Title IX compels a school to make the size of its teams comparable to that of other schools. And in any event, an average necessarily implies that other Division I schools also have teams that are larger than the average, some of which may be comparable to the size of MSU's teams.

Third, Lopiano contends that some of the female athletes on MSU's teams should not count as participants because they do not participate in competitions, but that assertion conflicts with her acknowledgement that such participation is not necessary for an athlete to count as a participant for purposes of Title IX. As summarized by the Second Circuit:

> It is not necessary for an athlete to meet minimum criteria of playing time or athletic ability to count as a participant. As OCR explained, "athletes who practice but may not compete" nevertheless "receive numerous benefits and services, such as training and practice time, coaching, tutoring services, locker room facilities, and equipment, as well as important non-tangible benefits derived from being a member of an intercollegiate athletic team." Thus, "it is necessary to count all athletes who receive such benefits when determining the number of athletic opportunities provided to men and women."...for an athlete to be counted, he or she must be afforded a participation opportunity that is "real, not illusory," in that it offers the same benefits as would be provided to other *bona fide* athletes.....

**\*8** *Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 93 (2d Cir. 2012) (citations omitted).

Fourth, Lopiano's logic is skewed in favor of a larger participation gap for female athletes. She does not apply her analysis to men's sports at MSU, such as football.[3] She does not count how many members of the men's teams never or rarely participate in a competition, and then subtract those numbers from the male side of the ledger.

**2. MSU's Evidence: O'Brien Report**

MSU responds with a report prepared by its own expert,

Timothy O'Brien, who provides details that fill in gaps in Lopiano's report. His report suggests that there is no significant participation gap at MSU.

#### (a) Counting participants

O'Brien reviewed data maintained by MSU's Director of Compliance and compared it to MSU's squad lists. (O'Brien Rep., ECF No. 8-8, PageID.429.) Because the NCAA regulates the number of hours that a student athlete can participate in athletics on a weekly basis, MSU maintains a system to track student athletic activity. (*Id.*, PageID.432.) This data includes "practices, team meetings, strength and conditioning, travel, and competition[.]" (*Id.*) O'Brien also spoke with the coaches of the women's rowing, cross country, and track and field teams to determine whether the spots on their teams represented "legitimate participation opportunities." (*Id.*, PageID.434.)

MSU's data for the 2019-2020 academic year shows a total of 895 athletic participants, 445 of which are male and 450 of which are female. (*Id.*, PageID.431.) The enrollment for that year was 17,530 male students (49.07%) and 18,192 female students (50.93%). These numbers result in a participation gap of 12 female participation opportunities.[4] (*Id.*, PageID.443.) After eliminating the men's and women's swimming and diving teams, if all else remained equal, that gap would increase to 15.[5] (*Id.*, PageID.444.)

#### (b) Women's rowing

To verify that the novice rowers on MSU's women's rowing team receive legitimate participation opportunities, O'Brien interviewed the coach of that team, Kimberly Chavers. Among other things, Chavers told O'Brien that "women's rowing is not a prominent or highly populated sport at the high school level in the Midwest"; consequently, there is a need for a collegiate program that recruits, trains, and develops skilled multi-sport female athletes to compete in rowing. (O'Brien Rep., PageID.435.)

In addition, the Big Ten Conference requires a minimum team size of 51 student-athletes in order to participate. (*Id.*, PageID.436.) Rowing is a sport with "natural attrition," so to meet the minimum, a larger squad is necessary to offset departures from the program. (*Id.*, PageID.437.)

**\*9** Most importantly, Chavers confirmed that novice rowers are treated the same as other members of the team. In other words, all the women on the rowing team–novice and otherwise– receive the same "gear, attire, uniforms, iPads, and...access to the athletic trainers, academic support, strength and conditioning, nutrition and coaching, among other things." (*Id.*, PageID.437.) And contrary to Lopiano's assertion, some novice rowers receive athletic scholarships. (Chavers Decl. ¶ 21, ECF No. 8-3.)

Furthermore, in the Big Ten Conference, novice rowers can receive points for their team at conference events because some races are reserved for novice rowers. Consequently, novice rowers are necessary for the success of the team. (O'Brien Rep., PageID.436; Chavers Decl. ¶ 10.) And as they develop, novice rowers can compete in the varsity events if their skills allow them to do so. (Chavers Decl. ¶ 9.) Indeed, one novice rower at MSU went on to compete in the Olympics. (*Id.* ¶ 3.)

#### (c) Women's cross country and track and field

The head coach of the men's and women's cross country and track and field teams, Walter Drenth, told O'Brien that he committed to larger squads in order to be competitive in the Big Ten Conference. (*Id.*, PageID.438-439.) A larger team allows him to recruit quality athletes and focus on their development over the course of four or five years. (*Id.*, PageID.439.) Part of that development involves running athletes as "unattached" at some events, which means that they are not running on behalf of MSU and do not use up a year of their eligibility. (*Id.*, PageID.440.) Drenth also confirmed that all members of the teams are "treated in the same manner and get[ ] the same level of attention and support." (*Id.*, PageID.441.)

Drenth explained that the women's teams are larger than the men's teams because the NCAA permits MSU to award more scholarships to members of the women's teams than those of the men's teams. The size of the men's teams is approximately 70% of the size of the women's teams, which roughly matches the ratio of scholarship funds available for men versus women (12.6 versus 18). (*Id.*, PageID.442; *accord* Drenth Decl. ¶ 11, ECF No. 8-5.)

#### 3. Assessing Substantial Proportionality

Based on MSU's numbers, there is a gap of 12 participation opportunities for women in the most recent academic year for which the parties can calculate such a gap, the 2019-

2020 academic year.[6] In the year before that, the gap was 27. (Breske Decl. ¶ 17.) These numbers are smaller than the average size of a women's team at MSU, which is 35 athletes. (*Id.*) Accordingly, using one of the OCR's stated criteria for proportionality, MSU's evidence indicates its participation numbers are substantially proportionate.

Plaintiffs offer a much higher calculation of the participation gap, but as discussed above, their calculation depends upon imperfect data, flawed assumptions, contradictory reasoning, and a skewed analysis. Thus, Plaintiffs have provided a shaky foundation on which to argue that MSU's participation gap is statistically significant. The cracks in that foundation become even more apparent after considering the evidence offered by MSU.

O'Brien's report, which is supported by affidavits from the coaches for the women's rowing, cross country, and track and field teams, provides facially valid reasons to justify the sizes of those teams and to explain why all the members of those teams are countable as participants under Title IX's criteria. Importantly, the evidence indicates that all members of the foregoing teams are treated equally with respect to the benefits of participation. Although it is true that novice rowers on the women's rowing team generally have less experience and compete in different events than other members of the team, the Court finds no legal support for Lopiano's or Plaintiffs' contention that the spots for these women are not genuine participation opportunities.

**\*10** Plaintiffs analogize novice rowers to female athletes at a university that downgraded several women's teams from varsity status to club status, aggravating an existing imbalance between athletic opportunities for men and women. *See Cohen v. Brown Univ.*, 991 F.2d 888, 892 (1st Cir. 1993) (*Cohen II*). That comparison is inapt.

In *Cohen*, the downgrade to club status meant that these teams lost "financial subsidies and support services routinely available to varsity teams (*e.g.*, salaried coaches, access to prime facilities, preferred practice time, medical trainers, clerical assistance, office support, admission preferences, and the like)." *Id.* Unlike the club team members in that case, there is no evidence that novice rowers do not receive the same type of subsidies and support as other rowers on the team.

The district court in *Cohen* issued a preliminary injunction requiring the university to reinstate the women's club teams to their former status as varsity teams. *Cohen v. Brown Univ.*, 809 F. Supp. 978, 1001 (D.R.I. 1992) (*Cohen I*). In response to the injunction, the school submitted a plan to add "junior varsity positions" to women's varsity teams. *See Cohen v. Brown Univ.*, 101 F.3d 155, 186 (1st Cir.

1996) (*Cohen IV*). The district court, noting that "junior varsity squads" do not qualify as "intercollegiate competition" under Title IX, concluded that the university's plan to put junior varsity positions on the varsity teams was not a "good faith" effort to comply with the injunction. *Id.*

Plaintiffs argue that a novice rower is like a junior varsity position on a varsity team. Unlike the district court in *Cohen*, however, this Court does not possess the relevant information to determine what facts distinguished a "junior varsity" position from a varsity one on the same team under the school's plan in that case. If that court was concerned that the junior varsity positions could never participate in intercollegiate competition, it would make sense for the court to conclude that those positions were not countable as genuine participation opportunities under Title IX. However, novice rowers are different. They participate in intercollegiate events specifically designated for them and earn points at those events for the benefit of the team. They can also participate in varsity races as their skills allow. In that respect, they are little different from members of any other varsity team who practice with the team regularly and receive the same institutional support as other teammates but are not yet skilled enough to compete on behalf of the school at intercollegiate events.

In short, on the present record, the Court is not persuaded that MSU has improperly inflated its participation opportunities for women, or that Plaintiffs have shown a likelihood of success on their claim to the extent it requires them to demonstrate such inflation.

Furthermore, the Court is not persuaded that a participation gap of 25 (according to Lopiano's initial estimate based on EADA data), 35 (according to Lopiano's estimate based on the web rosters), or 12 (according to MSU's most recent records) is likely to be too large for a school of MSU's size to satisfy the test for substantial proportionality. Most of these estimates are less than the average size of a women's team at MSU.

**\*11** The Court rejects Plaintiffs' contention that a participation gap as small as eight athletes would place MSU outside the OCR's proportionality "safe harbor" for demonstrating "nondiscriminatory participation opportunities." *See* Clarification of Intercollegiate Athletics Policy Guidance (1996). Although it is theoretically possible that a school like MSU could field a viable team of eight female tennis players, the OCR has made clear that it considers substantial proportionality in the context of each institution, including that institution's "specific circumstances and the *size of its athletic program*." *See id.* (emphasis added). Plaintiffs' argument does not account for the size of MSU's athletic program.

If the size of an athletic program is relevant, then the size of the participation gap in relation to the size of the athletic program should also be relevant. Indeed, the substantial proportionality test stems from the OCR's recognition that, because "natural fluctuations in an institution's enrollment and/or participation rates may affect the percentages in a particular year," "it would be unreasonable to expect an institution to achieve exact proportionality[.]" *Id.* Schools with larger athletic programs are likely to see larger fluctuations in participation numbers from year to year. Ignoring the size of the participation gap in relation to the size of the athletics program would significantly hinder the ability of schools with larger programs to maintain compliance. They would be more likely to fall outside the safe harbor due to "natural fluctuations in enrollment and participation rates" that may be somewhat large in absolute numbers but are relatively small in relation to the size of their programs.

Courts seem to recognize this point. They generally examine participation gaps *as a percentage* of the size of the athletic program at the school in question. A case cited by Plaintiffs suggests that a gap lower than 2% typically satisfies the substantial proportionality requirement:

> OCR has not established a threshold statistical figure for determining whether a school offers participation opportunities substantially proportional to its enrollment, but instead examines each school on a case-by-case basis. 1996 Clarification at 4. Courts, however, have held that a disparity within two percentage points is proof that an educational institution falls within the substantial proportionality safe harbor. *See Equity in Athletics, Inc. v. Dep't of Educ.*, 675 F. Supp. 2d 660, 682-83 (W.D. Va. 2009) (finding no case in which a disparity of two percentage points was held to constitute a lack of substantial proportionality).

*Biediger v. Quinnipiac Univ.*, 728 F. Supp. 2d 110, (D. Conn. 2010); *see also Portz v. St. Cloud State Univ.*, 196 F. Supp. 3d 963, 975 (D. Minn. 2016) (discussing cases and noting that a deviation of "10 or more percentage points...[is] very rarely substantially proportionate," whereas "a deviation of less than 3.5 percentage points typically keeps the ratios substantially proportionate").

MSU's participation gap appears to be lower than 2%. Plaintiffs have not cited, and the Court is not aware, of any case where a gap lower than 2% failed to satisfy the test for substantial proportionality. *Cf. Ohlensehlen v. Univ. of Iowa*, No. 3:20-cv-00080-SMR-SBJ, 2020 WL 7651974, at *5 (N.D. Iowa, Dec. 24, 2020) (granting preliminary injunction where participation gap was at least 2.8%); *Portz*, 196 F. Supp. 3d at 976 (granting preliminary injunction where gap was 3.5%); *Ollier v. Sweetwater*

*Union High Sch. Dist.*, 768 F.3d 843, 856 (9th Cir. 2014) (gap of 6.7% was not substantially proportionate); *Biediger*, 728 F. Supp. 2d at 111 (gap of 3.62% was a "borderline case of disproportionate athletic opportunities for women").

**\*12** Accordingly, for all the foregoing reasons, the Court finds that Plaintiffs have not shown a substantial likelihood of success.

### B. Irreparable Injury

Next, the Court considers whether Plaintiffs have shown the possibility of irreparable injury in the absence of an injunction. Plaintiffs have met their burden. Although MSU has promised to maintain Plaintiffs' athletic scholarships throughout their enrollment, the Court recognizes that the discontinuation of their team will likely have significant impacts on Plaintiffs' athletic experience and their ability to compete at an elite level in the future. Transferring to a comparable program at another school could be difficult and costly. And it might require surrendering academic credits that Plaintiffs have earned at MSU.

On the other hand, some of the damage has already been done. MSU made the difficult decision to eliminate Plaintiffs' team and is willing to defend that decision. Plaintiffs now ask the Court to keep their team on temporary life support until the outcome of the case, which is uncertain in both timing and result. MSU will likely have difficulty retaining and recruiting staff and team members in these circumstances, to the detriment of the remaining team members and their ability to compete.

In any event, Plaintiffs have demonstrated a likelihood of irreparable injury in the absence of an injunction.

### C. Substantial Harm to Others

MSU apparently contends that maintaining its women's swimming and diving team would cost approximately $1 million per year (around half the $2.07 million cost of maintaining both the men's and women's teams), not including unspecified "capital outlays" that would be necessary to upgrade and repair the swimming and diving facilities. (*See* Defs.' Resp. Br. 8.)

Plaintiffs argue that MSU will suffer no harm because it

recently received very large donations for its sports programs, which would be more than enough to cover the cost of maintaining Plaintiffs' team. However, it is not clear how much of those donations would be available to fund Plaintiffs' team. Moreover, those donations do not necessarily mitigate the impact of the Court's injunction. With or without the donations, an injunction would require MSU to allocate significant resources to the women's swimming and diving team that MSU could use elsewhere.

**D. Public Interest**

The public interest would be served by preventing discrimination in the provision athletic opportunities for women; however, Plaintiffs have not shown that they are likely to succeed on that claim. Absent such a showing, an injunction would not serve the public's interests. MSU is best positioned to steward its financial resources for the benefit of the institution and its students.

On balance, the factors weigh against the grant of a preliminary injunction. Accordingly, the Court will deny Plaintiffs' motion.

**V. Conclusion**

For the reasons stated herein, the Court will deny Defendants' motion to strike Plaintiffs' expert report. The Court will also deny Plaintiffs' motion for a preliminary injunction.

An order will enter consistent with this Opinion.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 650712

Footnotes

1    In Count II, Plaintiffs claim that MSU has not allocated its financial assistance to male and female athletes on an equal basis. In Count III, Plaintiffs claim that MSU has not allocated benefits to male and female athletes on an equal basis. The preliminary injunction motion is concerned only with Count I, i.e., MSU's alleged failure to provide equal athletic participation opportunities. (*See* Pls.' Br. in Supp. of Mot., ECF No. 2-1, PageID.85.)

2    The formula for calculating the participation gap is as follows: (number of male athletes / percentage of males in student body) - total number of athletes = participation gap for women. Using the numbers above, that calculation would be: (55 / 0.5) - 100 = 10.

3    MSU's Director of Compliance, Alexandra Breske, avers that 29 out of 121 members of the football team did not participate in a competition in 2019. (Breske Decl. ¶ 25, ECF No. 8-2.) In 2018, 40 out of 120 members did not participate in a competition. (*Id.*)

4    Using the formula in footnote 2, the calculation is: (445 / 0.4907) - 895 = 12.

5    The women's swimming and diving team has four more members than the men's team.

6    The parties agree that the Court cannot calculate a participation gap until after a season has ended. Consequently, the Court cannot calculate a gap for the 2020-2021 academic year.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**Balow v. Michigan State University, Not Reported in Fed. Supp. (2021)**

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Biediger v. Quinnipiac University, Not Reported in F.Supp.2d (2010)

2010 WL 2017773
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Stephanie BIEDIGER, Kayla Lawler, Erin
Overdevest, Kristen Corinaldesi, and
Logan Riker, individually and on behalf
of all those similarly situated; and Robin
Lamott Sparks, individually, Plaintiffs,
v.
QUINNIPIAC UNIVERSITY, Defendant.

No. 3:09cv621 (SRU).
|
May 20, 2010.

**Attorneys and Law Firms**

Alex V. Hernandez, Jonathan B. Orleans, Pullman & Comley, Bridgeport, CT, Kristen Galles, Alexandria, VA, for Plaintiffs.

Edward A. Brill, Susan D. Friedfel, Proskauer Rose, New York, NY, Jonathan Bardavid, Mary A. Gambardella,, Wiggin & Dana LLP, Stamford, CT, for Defendant.

*RULING AND ORDER ON PLAINTIFFS' MOTION FOR CLASS CERTIFICATION*

STEFAN R. UNDERHILL, District Judge.

**\*1** Plaintiffs Stephanie Biediger, Kayla Lawlor, Erin Overdevest, Kristen Corinaldesi, and Logan Riker move to certify a class of similarly situated present and future female athletes whose rights, protected under Title IX of the Educational Amendments of 1972 (20 U .S.C. § 1681 et seq.) and the regulations adopted pursuant thereto (34 C.F.R. Part 106) (collectively, "Title IX"), have been and will continue to be violated by defendant Qunnipiac University ("Quinnipiac" or the "University").[1] For the reasons that follow, that motion is granted in part and denied in part.

## I. Background

The background of this case is detailed in my May 22, 2009 ruling granting a preliminary injunction. *See Biediger v. Quinnipiac Univ.*, 616 F.Supp.2d 277 (D.Conn.2009). I restate only those facts that are relevant to deciding plaintiffs' class certification motion.

The named plaintiffs are current students at Quinnipiac University and members of the University's women's volleyball team. On March 4, 2009, Quinnipiac informed the women's volleyball team that the program would be eliminated at the end of the 2008–2009 academic year.[2] At the time Quinnipiac informed the women's volleyball team of its termination, there was a disparity between the percentage of women enrolled as undergraduates at the University and the number of varsity athletic participation opportunities available to female students. *See id.* at 280–81 (noting that 61 .7% of Quinnipiac's undergraduate enrollees in the 2008–2009 academic year were female, but, based on preliminary data, that 52.57% of the university's athletic opportunities were for women's sports). To fill the void left by women's volleyball and improve the extant gender disparity in the University's athletic program, Quinnipiac planned to elevate competitive cheer, then a club sport, to varsity status and to create new women's teams for indoor and outdoor track.

On May 22, 2009, I granted the plaintiffs' motion for a preliminary injunction that barred Quinnipiac from cancelling its women's volleyball program for the 2009–2010 academic year. I found that eliminating the women's volleyball 2009 season would cause the plaintiffs irreparable harm, and that the plaintiffs had demonstrated a likelihood of succeeding on the merits because Quinnipiac had failed to offer athletic participation opportunities in substantially proportional number to the gender composition of its enrollees. My ruling was based on evidence that Quinnipiac engaged in "roster management," that is, Quinnipiac set floors between for women's rosters and, likewise, ceilings for men's rosters in order to create the appearance of gender equity in the University's athletic program. Under roster management, women's teams would cut excess players, and men's teams would add needed players, after a team's first day of competition, the date on which Quinnipiac collected roster data for its annual Equity in Athletics Disclosure Act ("EADA") report. The apparent increased gender parity in Quinnipiac's EADA report was exactly that: an apparition of substantially proportional athletic participation

opportunities for women.

**\*2** A bench trial on the plaintiffs' action for a full injunction and damages is set for June 21, 2010. In advance of that trial, the plaintiffs have moved under Rule 23(b)(2) of the Federal Rules of Civil Procedure to certify a class defined in the following terms:

> [T]he Student Plaintiffs seek to represent a class of all present, prospective, and future female students who are harmed by and want to end [Quinnipiac University's] sex discrimination in: (1) the allocation of athletic participation opportunities; (2) the allocation of athletic financial assistance; and (3) the allocation of benefits provided to varsity athletes. They also file this action on behalf of females who are deterred from enrolling at [Quinnipiac] because of the sex discrimination in its athletic program, including its failure to offer the varsity sports in which they want to participate (despite [Quinnipiac's] failure to provide equal athletic participation opportunities to females).

Pls.' First Amended Class Action Compl. ¶ 19. Quinnipiac challenges that motion on three grounds: (1) the class is not ascertainable; (2) the class is not sufficiently numerous; and (3) the named plaintiffs are inadequate class representatives.

## II. Standard of Review
In order to succeed on their motion for class certification, the plaintiffs must prove that their proposed class meets all of the requirements set forth in Rule 23. *In re Initial Public Offering Secs. Litig.,* 471 F.3d 23, 41 (2d Cir.2006). Rule 23(a) sets forth four conditions for class certification: numerosity, commonality, typicality, and adequacy. *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.,* 546 F.3d 196, 201–02 (2d Cir.2008). In addition to those conditions, the plaintiffs must also demonstrate that the class they seek to certify is ascertainable; although that requirement is not inscribed in Rule 23(a), the need for a class to be ascertainable—i.e., the need for the class to "be readily identifiable so that the court can determine who is in the class, and thus, who is bound by the ruling"—is implicit in, and fundamental to, Rule 23's operation. *McBean v. City of New York,* 228 F.R.D. 487, 492 (S.D.N.Y.2005).

Once the conditions of Rule 23(a) have been met, the plaintiffs must demonstrate that their class satisfies Rule 23(b)(2), which requires them to show that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive

relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed.R.Civ.P. 23(b)(2). The burden remains on the plaintiffs to show that its proffered class satisfies all of the requirements of Rule 23. *McBean,* 228 F.R.D. at 492 (citing *Caridad v. Metro–N. Commuter R.R.,* 191 F.3d 283, 291 (2d Cir.1999)). Furthermore, the plaintiffs must prove that the proposed class meets those requirements by a preponderance of the evidence, regardless of whether those requirements coincide with the merits of their claims. *Teamsters,* 546 F.3d at 202.

## III. Discussion
**\*3** Although the defendants challenge only three aspects of the plaintiffs' motion to certify a class—the class's numerosity, ascertainability, and the adequacy of its representation—this court "may certify a class only after making determinations that each of the Rule 23 requirements has been met." *IPO,* 471 F.3d at 41. I therefore address of the requirements seriatim, beginning with Rule 23(a).

### A. *Rule 23(a) requirements*

#### 1. *Ascertainabiliy*
Quinnipiac argues that the plaintiffs' proposed class is not ascertainable because it includes women whose membership hinges on their future, unknowable decisions to enroll at the University. Quinnipiac also complains that the class depends on determinations of the class participants' subjective mental states, which renders the class unascertainable.

"A class is ascertainable if its members can be identified by reference to objective criteria and if such identifications can be made in an administratively feasible manner." *Taylor v. Housing Auth. of New Haven,* 257 F.R.D. 23, 28 (D.Conn.2009), *vacated on other grounds,* No. 3:09cv557 (JBA), 2010 WL 1278869 (D.Conn. Mar. 29, 2010). The purpose of the ascertainability requirement is to ensure that the class is "sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *Mike v. Safeco Ins. Co. Of Am.,* 223 F.R.D. 50, 52–53 (D.Conn.2004) (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay

Kane, *Federal Practice and Procedure* § 1760, at 120–21 (2d ed.1986)). The mere inclusion of future members does not cause a class to be unascertainable, as other Title IX cases reveal. *See, e.g., Cohen v. Brown Univ.,* 991 F.2d 888, 893 (1st Cir.1993) (describing district court's certification of "a class of 'all present and future Brown University women students and potential students who participate, seek to participate, and/or are deterred from participating in intercollegiate athletics funded by Brown' "). Indeed, a class that includes future members is permissible so long as the future members are "under imminent threat of injury." *In re Currency Conversion Fee Antitrust Litig.,* 229 F.R.D. 57, 63 (S.D.N.Y.2005); *see also Messier v. Southbury Training Sch.,* 183 F.R.D. 350, 356 (D.Conn.1998) (noting, in dictum, that "a (b)(2) class may include future members who stand to benefit from a favorable outcome in the case"); *Robertson v. Nat'l Basketball Ass'n,* 389 F.Supp. 867, 897 (S.D.N.Y.1975) (referencing other cases in which certified classes have included future members). As the plaintiffs have defined their class, any future members would be subject to such an imminent threat of injury: if future members eventually enroll at Quinnipiac, they will be harmed by the University's alleged sex discrimination in its athletics program.

Quinnipiac stands on stronger ground when it argues that the class is not ascertainable because it calls for the court to make judgments about putative members' subjective mental states. The plaintiffs' proposed class includes two potential groups, or subclasses, whose definitions include subjective components: (1) current, prospective, and future students who are harmed by and want Quinnipiac to cease its alleged sex discrimination; and (2) women who have not and will not enroll at Quinnipiac because of Quinnipiac's allegedly discriminatory athletic programming. Each subclass must be assessed separately to determine its ascertainability.

**\*4** There is no ascertainability problem with respect to the first group. Although the language of the proposed subclass contains a subjective element—namely, the members' desire that Quinnipiac comply with Title IX's mandate—that element is superfluous to the class's definition. The subclass's key constitutive feature is the objective harm caused by Quinnipiac's failure to provide substantially proportional athletic participation opportunities, financial assistance, and benefits. The plaintiffs already proved by a preponderance of the evidence at the preliminary injunction hearing that Quinnipiac will likely be found liable for sex discrimination. *See Biediger,* 616 F.Supp.2d at 296 (holding that Quinnipiac likely violates Title IX because its "practice of setting floors for women's rosters under its roster management policy does not produce sufficient genuine participation opportunities for women").

That evidence is enough to prove at the class certification stage that there is a class of female students harmed by Quinnipiac's lack of equitable athletic participation opportunities, financial assistance, and benefits. *See Teamsters,* 546 F.3d at 202 (holding that courts must find facts relevant to the requirements of Rule 23 by a preponderance of the evidence, even if such facts overlap with the merits of the case). Presumably, current, prospective, or future female students who are injured by the gender disparity in Quinnipiac's athletics offerings would want the University to remedy that imbalance. The class definition's language about its members "want[ing] to end" the University's alleged discrimination is therefore prolix; if the words were struck from the class definition, the plaintiffs' proposed class would still include the same people adversely affected by the gender disparity in Quinnipiac's athletics program, all of whom could be ascertained by objective, administratively feasible criteria. Furthermore, even if that were not true, and there were class members who did not favor the plaintiffs' suit to end Quinnipiac's alleged discrimination, that would not necessarily upset the class's ascertainability. *See Messier,* 183 F.R.D. at 356 (listing cases holding that "diversity of opinion within a class does not automatically defeat class certification"). Thus, I find that the subjective component for this first group presents no ascertainability problem.[5]

The plaintiffs' second group is more problematic. That subclass contains women who did not, or will not, enroll at Quinnipiac because of the University's gender disparity in athletic opportunity and benefits. Quinnipiac claims that this group should not constitute part of the plaintiffs' proposed class because it would require individual inquiries of potential class members to determine whether they ever seriously considered attending Quinnipiac and whether they decided not to enroll because of the University's failure to provide equal athletics participation opportunities and benefits for its female students. I agree that this subclass is not ascertainable. The second group within the plaintiffs' proposed class is sufficiently amorphous and unwieldy to upset the efficiency that a class action is supposed to achieve. Unlike the first subclass, which is composed of a definite and identifiable pool of possible members (at its broadest, all current, prospective, and future female athletes at Quinnipiac), the second subclass could conceivably be every person who decided, or who will decide, not to attend Quinnipiac. That pool would then have to be narrowed by determining the members' motivations for their decision not to enroll in the University. The plaintiffs do not offer any solution for how the class could be ascertained in an administratively feasible fashion, and I cannot imagine how the class's membership could be identified objectively and without inordinate time and expense.

**\*5** The second proposed group also suffers from at least two other deficiencies. First, the plaintiffs have introduced no evidence to establish that there is, in fact, a group of aggrieved nonstudents that would constitute this part of the class. The preliminary injunction hearing focused entirely on the discrimination that Quinnipiac's female students face; the plaintiffs submitted no evidence about how current or future non-students were affected by the University's athletic programming, other than, perhaps, testimony from volleyball players about the challenges of leaving Quinnipiac and enrolling in another institution to continue their collegiate volleyball careers. *See Biediger,* 616 F.Supp.2d at 292. Therefore, the plaintiffs have not met their burden in establishing that such a subclass exists. Second, I am concerned whether people who have not enrolled and have no plans of enrolling at Quinnipiac have standing to bring this Title IX claim. The question of standing was not briefed by either side in their submissions relating to the plaintiffs' class certification motion, and it is not necessary to my ruling; hence, a thorough analysis is not needed. Still, it seems questionable that a person who has been merely deterred from enrolling in a school has suffered an injury that Title IX can redress. *See Preyer v. Dartmouth Coll.,* 968 F.Supp. 20, 25–26 (D.N.H.1997) (holding that plaintiff lacked standing to sue under Title IX because she was not a student, and citing supporting cases). At the very least, it is clear that none of the named plaintiffs are members of this subclass: they are all students at Quinnipiac who were not deterred from enrolling. Even if one assumes that being dissuaded from matriculating at Quinnipiac constitutes a remediable injury and that non-students have standing to sue under Title IX, the named plaintiffs have not suffered the same alleged injury as the proposed subclass of non-students. They claim to have been denied equitable athletic participation and benefits; by contrast, non-students could only claim to have been denied the ability to attend their preferred school. Thus, the named plaintiffs do not appear to have the requisite standing to serve as class representatives for the proposed group of non-students deterred from enrolling at Quinnipiac. *See Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.,* 502 F.3d 91, 99 (2d Cir.2007) (" 'To have standing to sue as a class representative it is essential that a plaintiff ... be a part of that class, that is, he must possess the same interest and suffer the same injury shared by all members of the class he represents.' " (quoting *Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 216 (1974)).

For those reasons, I conclude that the class of current, prospective, and future female students who are harmed by and want to end Quinnipiac's alleged sex discrimination in its athletics program is an ascertainable class. Non-students who were deterred from enrolling at Quinnipiac may not be included in the class, however, because they, as a separate group or subclass, are not ascertainable and the plaintiffs have not met their burden to prove that they meet the Rule 23 requirements with respect to that subclass.

2. *Numerosity*

**\*6** Rule 23(a) limits certification to those classes that are "so numerous that joinder of all members is impracticable." The plaintiffs need not establish the precise number of class members in order to meet the numerosity requirement; but a class that is shown to include 40 or more people is presumptively large enough to satisfy Rule 23(a). *Robidoux v. Celani,* 987 F.2d 931, 935–36 (2d Cir.1993). In addition to sheer numbers, a court may consider other factors that would cause joinder of all members to be impracticable, such as judicial economy, the members' geographic distribution and financial resources, and "requests for prospective injunctive relief which would involve future class members." *Id.* at 936.

Quinnipiac argues that the plaintiffs have not demonstrated numerosity because they have not shown that a significantly large number of female students are harmed, and will continue to be harmed, by the University's purported sex discrimination. At the preliminary injunction hearing, however, the plaintiffs more than met their present burden to prove that the number of their putative class members will be large enough to render joinder impracticable. First, consider the group of current students who are denied equitable athletic participation opportunities—i.e., the students who are unable to participate in varsity athletics because of Quinnipiac's relatively few roster spots and sports teams for women. At the preliminary injunction hearing, the plaintiffs proved that this group, by itself, meets Rule 23(a)'s numerosity requirement. If the 2008–09 academic year is taken as a baseline, 61.7% of Quinnipiac's undergraduate population were women, while women made up only 52.57% of the University's athletes; reciprocally, that year 38.3% of Quinnipiac's undergraduate population and 47.34% of its athletes were men. *Biediger,* 661 F.Supp.2d at 280–81. Assuming that the University kept constant the number of men's roster spots at 212, the number reported in the 2008–2009 EADA report, *id.* at 286, Quinnipiac would have to add 107 additional roster spots for female students in order to create a perfectly proportional athletics department.[4] If the University cut its men's golf and outdoor track teams, thus eliminating 28 men's roster spots (as it planned to do in conjunction with cutting its women's volleyball team), *id.,* and kept constant the remainder of its men's sports teams, Quinnipiac would have to add 61 additional women's roster spots to achieve perfect proportionality.[5]

Finally, even if the University cut its men's golf and outdoor track teams and trimmed the rosters of its other men's sports as it planned to do for the 2009–2010 season, thus bringing the total number of male athletes to 165, *id.* at 290, Quinnipiac would still have to add 31 women's roster spots.[6]

Each of those calculations, when the 12 volleyball players who would lose their positions are included, establishes a class that is presumptively large enough for the purposes of Rule 23's numerosity requirement; in each hypothetical, there are 40 or more positions that female students are not being offered—or, in the case of the volleyball team, soon will not be offered—and could be filled.[7] And that is to say nothing about the entire population of Quinnipiac's current female athletes (excepting the volleyball players, who were already counted as athletes denied athletic participation opportunities) who are purportedly being harmed by the University's unequal provision of financial assistance and benefits. That population, based on the 2008–2009 EADA data, amounts to 223 players, which is surely large enough for the purposes of Rule 23(a)'s numerosity requirement. Supplementing the numbers of class members are the prospective and future female students who will be denied equal athletic participation opportunities, financial assistance, and benefits. The fact that the plaintiffs are suing for prospective injunctive relief to benefit future class members also bolsters the conclusion that the plaintiffs' proposed class is amply numerous to be certified; seeking injunctive relief on behalf of future members is a separate, additional factor militating in favor of a class's numerosity. *Robidoux,* 987 F.2d at 936. *See, e.g., Boyd v. Interstate Brands Corp.,* 256 F.R.D. 340, 358 (E.D.N.Y.2009) (holding that class was sufficiently numerous, in part, because the plaintiffs sought injunctive relief on behalf of future class members); *Shariff v. Goord,* 235 F.R.D. 563, 570 (W.D.N.Y.2006) (holding that effect of judgment on future class members contributed to decision that class was sufficiently numerous for certification).

**\*7** Altogether, then, the plaintiffs' proposed class is large enough to meet the numerosity requirement of Rule 23(a). Quinnipiac's challenge on this point is unpersuasive and fails.

### 3. *Commonality and typicality*

In order to certify a class, there must be "questions of law or fact common to the class" and "the claims or defenses of the representative parties [must be] typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(2)-(3). The commonality and typicality requirements " 'tend to merge' because 'both serve as guideposts for determining whether the named plaintiffs' claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.' " *Taylor,* 257 F.R.D. at 30 (quoting *Gen. Tel. Co. of Sw. v. Falcon,* 457 U.S. 147, 158 n. 13, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)). Quinnipiac does not dispute that the commonality and typicality requirements are met. Indeed, the two requirements are essentially built into the class definition: in order to be a class member, a person must be a female student who has been or will be harmed by Quinnipiac's alleged sex discrimination. In other words, the class definition presupposes that its members have been subjected to, and seek redress for, an identical legal wrong. The proposed class satisfies Rule 23(a)'s commonality and typicality requirements.

### 4. *Adequacy*

Rule 23(a)'s final requirement is that the class representatives "will fairly and adequately protect the interests of the class." The class representatives' adequacy generally involves a two-part demonstration: "first, that the lead plaintiffs' interests are not 'antagonistic' to the other members' interests, and second, that the plaintiffs' attorneys are 'qualified, experienced and able to conduct the litigation.' " *Haddock v. Nationwide Fin. Servs., Inc .,* 262 F.R.D. 97, 117 (D.Conn.2009) (quoting *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 222 F.3d 52, 60 (2d Cir.2000)). Quinnipiac challenges only the first part of that standard and argues that the class as currently defined creates a conflict of interest between segments of the University's population of female athletes. In particular, Quinnipiac contends that the class representatives' interests are antagonistic to the interests of female students who participate on the University's competitive cheer, outdoor track, and indoor track teams.

There is no question that there could be an adequacy problem if the plaintiffs' proposed class included those students. The class definition, however, is limited to "all present, prospective, and future female students who *are harmed by and want to end* [Quinnipiac University's] sex discrimination" (emphasis supplied). To be a class member, a person must be injured by Quinnipiac's current and planned athletic programming. By its own terms, then, the plaintiffs' proposed class presumptively excludes the competitive cheer and track participants who, the University maintains, present a conflict of interest; any students who are not "harmed" by Quinnipiac and would not "want to end" its practices, e.g., because they are likely

to benefit from the University's future athletics programming, are not class members. Therefore, there is no conflict. In the event that the "harmed by and want to end" language too vaguely stakes the class's membership, the definition may be modified later to clarify this point. *See* Fed.R.Civ.P. 23(c)(1) ("An order that grants or denies class certification may be altered or amended before final judgment."); *In re Holocaust Victim Assets Litig.,* 225 F.3d 191, 201 (2d Cir.2000) ("Rule 23 gives the District Court broad discretion to modify the definition of the class even after certification...."). In addition, any members who do not want to be represented in the class, or who believe they are erroneously included in the class, may opt out if they so choose. *See* McReynolds v. Richards–Cantave, 588 F.3d 790, 800 (2d Cir.2009) ("The right of a class member to opt-out in Rule 23(b)(1) and (b)(2) actions is not obvious on the face of the rule; however, 'the language of Rule 23 is sufficiently flexible to afford district courts discretion to grant opt-out rights in (b)(1) and (b)(2) class actions.' " (quoting *Eubanks v. Billington,* 110 F.3d 87, 94 (D.C.Cir.1997))).

**\*8** Quinnipiac does not attack the quality of the plaintiffs' attorneys, and I have no reason to doubt their ability to represent the proposed class effectively. The named plaintiffs are therefore adequate representatives and their proposed class satisfies all of the requirements of Rule 23(a).

    B. *Rule 23(b) requirements*
The plaintiffs seek to certify a class only for the purpose of obtaining declaratory and injunctive relief. *See* Pls.' First Amended Class Action Compl. ¶ 32 (describing class's entitlement to declaratory and injunctive relief). The only parties seeking damages in this case are the named student plaintiffs and Robin Lamott Sparks. Thus, the plaintiffs seek to certify their proposed class pursuant to Rule 23(b)(2), which permits certification of a class if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." *See* Robinson v. Metro–N. Commuter R.R. Co., 267 F.3d 147, 162 (2d Cir.2001) ( "The (b)(2) class action is intended for cases where broad, class-wide injunctive or declaratory relief is necessary to redress a group-wide injury."). Quinnipiac does not claim that the proposed class would be unfit for Rule 23(b)(2) classification. Nor could it. As explained above, the class definition presupposes that Quinnipiac has uniformly discriminated against the class members by failing to allocate equal athletic participation opportunities, financial

assistance, and benefits to them. Injunctive and declaratory relief against Quinnipiac would remedy the class's alleged collective harm. Hence, Rule 23(b)(2) certification is appropriate.

**IV. Conclusion**
The plaintiffs' motion for class certification (doc. # 107) is GRANTED in part and DENIED in part. It is hereby ORDERED that the following class shall be certified pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure:

> All present, prospective, and future female students at Quinnipiac University who are harmed by and want to end Quinnipiac University's sex discrimination in: (1) the allocation of athletic participation opportunities; (2) the allocation of athletic financial assistance; and (3) the allocation of benefits provided to varsity athletes.

That class is certified with respect to all factual and legal issues relating to the plaintiffs' first, second, and third claims for relief against Quinnipiac in their First Amended Class Action Complaint. Those claims seek declaratory and injunctive relief for, respectively, Quinnipiac's unequal allocation of athletic participation opportunities, unequal allocation of athletic financial assistance, and unequal allocation of athletic treatment and benefits.

The plaintiffs' proposed group of non-students who have been or will be deterred from enrolling at Quinnipiac because of the University's alleged sex discrimination shall not be certified as a part of this class. That group is not ascertainable and the plaintiffs have failed to prove that such a subclass of people exists.

**\*9** Pursuant to Rule 23(g) of the Federal Rules of Civil Procedure, the court hereby designates the following as class counsel: Alex V. Hernandez and Jonathan B. Orleans of Pullman & Comley, LLC; Kirsten Galles of Equity Legal; and David McGuire of the ACLU Foundation of Connecticut. The class representatives shall be the named student plaintiffs: Stephanie Biediger, Kayla Lawler, Erin Overdevest, Kristen Corinaldesi, and Logan Riker.

The plaintiffs shall submit a proposed class notice for the Court's approval within seven (7) days of this ruling and order.

It is so ordered.

Biediger v. Quinnipiac University, Not Reported in F.Supp.2d (2010)

**All Citations**                                    Not Reported in F.Supp.2d, 2010 WL 2017773

Footnotes

1    Robin Lamott Sparks, the Quinnipiac University women's volleyball coach, is also a named plaintiff in this case. She, however, is
     suing only on her own behalf and is not claiming to represent the putative class at issue here. Therefore, when I refer to the individual
     or named plaintiffs in this ruling, I refer only to the five students listed above, and not to Sparks.

2    The men's golf and outdoor track teams were likewise informed that they would be eliminated after the 2008–2009 academic year.

3    The first subclass essentially presents the same class that was certified in *Cohen,* 991 F.2d 888, which included all present and future
     female students who participated in, sought to participate in, or were otherwise deterred from participating in Brown University's
     varsity athletics program. The plaintiffs' rewriting of the class definition in terms of female students who are "harmed by and want
     to end" Quinnipiac's alleged discrimination appears to have been intended to cleave from the plaintiff class all female athletes who
     stand to benefit from Quinnipiac's plans for its athletic department. Those students likely include the current and future members of
     the women's competitive cheer, indoor track, and outdoor track teams.

4    There were 235 women's roster spots in the 2008–09 academic year. If the 212 male athletes were to constitute 38.3% of the
     University's total roster positions, there would have to be approximately 554 total athletes competing at Quinnipiac. That results in 342
     total women, an increase of 107 positions from Quinnipiac's 2008–2009 EADA numbers.

     Admittedly, perfect proportionality exceeds the "substantially proportionate" Title IX safe harbor for universities. *See Biediger,* 616
     F.Supp.2d at 294 (quoting *Cohen,* 991 F.2d at 897). Nonetheless, it is helpful for the purpose of gauging the approximate size of the
     plaintiff class.

5    With the 28 roster spots eliminated—8 golfers and 20 track participants—there would be 184 male athletes. In order for them to
     constitute 38.3% of the University's total roster positions, there would have to be approximately 480 total athletes competing at
     Quinnipiac. That results in 299 total women, an increase of 61 roster spots from Quinnipiac's 2008–2009 EADA numbers.

6    For 165 male athletes to constitute 38.3% of the University's total roster positions, there would have to be approximately 431 total
     athletes competing at Quinnipiac. That results in 266 total women, an increase of 31 roster spots from Quinnipiac's 2008–2009
     EADA numbers.

7    Of course, that statement assumes that there are students presently at Quinnipiac who would want to and could fill those added
     positions. Although I recognize that there may not, in fact, be students who could fill all of those roster spots at this moment, any
     partial shortage of current class members is compensated by other potential class members, such as prospective and future female
     students who would want to and could play in newly created varsity positions.

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 1198542
Only the Westlaw citation is currently available.
United States District Court, E.D. California.

Linda BROOKS, et al., Plaintiffs,
v.
DARLING INTERNATIONAL, INC.,
Defendant.

No. 1:14–cv–01128–DAD–EPG
|
Signed 03/30/2017
|
Filed 03/31/2017

**Attorneys and Law Firms**

Brandon T. Brown, Laura L. Sheets, Nicholas A. Coulson, Liddle & Dubin, P.C., Pro Hac Vice, Detroit, MI, Ingrid M. Evans, Evans Law Firm, Inc., San Francisco, CA, for Plaintiffs.

Christopher Scott Hall, Daniel S. Cho, McCormick Barstow Sheppard Wayte and Carruth LLP, Fresno, CA, Jacob D Rhode, Keating Muething & Klekamp PLL, Joseph M. Callow, Thomas F. Hankinson, Keating Muething & Klekamp PLL, Pro Hac Vice, Cincinnati, OH, for Defendant.

ORDER DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, DENYING DEFENDANT'S MOTION TO STRIKE RESIDENT DATA SHEETS, AND DENYING DEFENDANT'S MOTION TO EXCLUDE EXPERT REPORTS

Dale A. Drozd, UNITED STATES DISTRICT JUDGE

**\*1** This matter is before the court on plaintiffs' motion for class certification as well as defendant's motion to strike and exclude evidence presented in support of plaintiffs' motion, specifically resident data sheets and expert reports. A hearing on the motions was held on February 7, 2017. Attorney Nicholas Coulson appeared on behalf of plaintiffs. Attorneys Christopher Hall, Jacob Rhode, and

Joseph Callow appeared on behalf of defendant. Having considered the parties' briefs and oral arguments and for the reasons set forth below, the court will deny defendant's motion to strike the resident data sheets, deny defendant's motion to exclude the reports of plaintiffs' experts, and deny plaintiffs' motion for class certification.

**BACKGROUND**

Defendant operates an animal rendering facility at 795 W. Belgravia Avenue in Fresno, California. (Doc. No. 49 at 5.) Animal rendering involves breaking down animal waste products—generally carcasses—into usable products, such as "valuable ingredients for various soaps, paints and varnishes, cosmetics, explosives, toothpaste, pharmaceuticals, leather, textiles, and lubricants." *The Rendering Process*, NATIONAL RENDERS ASSOCIATION, http://www.nationalrenderers.org/about/process/ (last visited Aug. 29, 2016). Defendant's facility is permitted to process up to 850,000 pounds of animal material each day. (Doc. No. 47–1 at 7.) Defendant operates its plant—purportedly located in the middle of an industrial area that is also home to other industrial facilities, farms, and agriculture businesses including some involved in animal processing—"pursuant to an Odor Control Plan and under a [p]ermit issued by the [District]." (Doc. No. 49 at 5.)

On May 7, 2014, Donna Conroe, Allen Conroe, and Kimberly Tapscott–Munson ("plaintiffs") filed suit against Darling Ingredients ("defendant")—an owner and operator of a rendering plant—in the Fresno County Superior Court. (Doc. No. 1.)[1] Defendant removed the case to this court pursuant to 28 U.S.C. §§ 1332, 1441. (*Id.*) On August 13, 2014, plaintiffs filed their First Amended Complaint ("FAC"). (Doc. No. 20.) Therein, plaintiffs claim that the rendering process, combined with defendant's alleged failure to implement proper controls, has infused their neighborhood with noxious odors and "forced [them] to live with the smell of rotting death at their homes." (*Id.* at 8.)[2]

**\*2** On February 2, 2016, plaintiffs filed a motion pursuant to Federal Rule of Civil Procedure 23 to certify the class of owner/occupiers and renters of residential property who lived within 1.5 miles of defendant's plant between May 12, 2011 and the date of class certification. (Doc. No. 47.) On March 1, 2016, defendant filed its opposition to that motion. (Doc. No. 49.) Plaintiffs filed a reply on March 15, 2016. (Doc. No. 53.) In support of their motion, plaintiffs

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.   1

submitted for the court's review a trial plan (Doc. No. 47–2), a preliminary air modeling report drafted by Board Certified Environmental Engineer David Weeks, P.E. (Doc. No. 47–3), a preliminary report on odor sources and mitigation prepared by Professor of Food Process Engineering Dr. Timothy Bowser, P.E. (Doc. No. 47–4), and 160 survey responses, which plaintiffs titled "Resident Data Sheets" (Doc. Nos. 47–10, 47–11).

On March 15, 2016, defendant filed two separate motions attacking plaintiffs' evidentiary support for their motion for class certification. (Doc. Nos. 51, 52.) The first such defense motion is a motion to strike an exhibit—labeled "Resident Data Sheets"—which plaintiffs' attached to their class certification motion. (Doc. No. 51.) The second motion is a motion to exclude the reports of plaintiffs' experts. (Doc. No. 52.) Plaintiffs filed oppositions to both of defendant's motions on March 30, 2016. (Doc. Nos. 54, 55.)[3]

Below, the court will first address defendant's motions before turning to plaintiffs' motion for class certification.

## MOTION TO STRIKE THE RESIDENT DATA SHEETS

Defendant moves to strike the Resident Data Sheets submitted by plaintiffs. The Resident Data Sheet exhibit consists of seventy-two one-page surveys sent out by plaintiffs' counsel to residents in the neighborhood surrounding defendant's plant. (Doc. No. 47–10, 47–11.) The forms are marked as "advertising material" and were sent to residents in conjunction with a notice explaining that plaintiffs' counsel was "investigating the possibility of filing litigation against Darling International for the emission of noxious odors." (Doc. No. 51–2 at 3.) The survey asked the respondent if he or she owns the home or is a tenant, the length of time he or she has resided at the property, and whether he or she has "noticed odors from Darling International at [his or her] home." If the respondent answers yes to this last question, he or she is then requested to elucidate on the character, duration, effect of the offensive odors. The respondent was also asked to sign and date the survey in the designated fields, above which reads "I swear that the above answers are true and accurate to the best of my knowledge."

Defendant argues the Resident Data Sheets constitute inadmissible hearsay because they are not notarized and not signed under penalty of perjury. (Doc. No. 51–1 at 4.) Defendant also argues the Resident Data Sheets are the equivalent of a "push poll" because "[t]here was no option

on the questionnaire to indicate that odors may have emanated from a third-party source ...." (Id. at 2.) Plaintiffs contend the declarations should not be stricken because courts are not prohibited from considering inadmissible evidence at the class certification stage of litigation.

"In determining whether a class is to be certified, the [c]ourt looks to the parties' allegations and other material 'sufficient to form a reasonable judgment on each requirement.' " *Parkinson v. Hyundai Motor America*, 258 F.R.D. 580, 599 (C.D. Cal. 2008) (quoting *Blackie v. Barrack*, 524 F.3d 891, 901 (9th Cir. 1975)). Although the Ninth Circuit has not explicitly stated as much, district courts have concluded that this "other material" need not be admissible in order to be considered by the court at class certification. *See Arredondo v. Delano Farms Co.*, 301 F.R.D. 493, 505 (E.D. Cal. 2014) ("Since a motion to certify a class is a preliminary procedure, courts do not require strict adherence to the ... Federal Rules of Evidence.") (citing *Eisen v. Carlisle and Jacquelin*, 417 U.S. 156, 178 (1974)).

**\*3** On the other hand, the court "should not abandon admissibility standards entirely at the certification stage," *Parkinson*, 258 F.R.D. at 599, because it must still perform a "rigorous analysis" when determining whether a party has satisfied the burden of establishing compliance with Rule 23. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011). In this respect, district courts are left to tread the line between not enforcing the Federal Rules of Evidence at the class certification stage of the litigation while still ensuring that "[a] party seeking class certification ... affirmatively demonstrate[s] ... that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Dukes*, 564 U.S. at 350.

One question on which there has been little consensus among district courts is how to treat declarations submitted in support of class certification that are not executed under penalty of perjury. Generally, for a declaration to be admissible, the declarant must "declare ... under penalty of perjury ...." 28 U.S.C. § 1746. Some courts have found this requirement inapplicable at class certification, noting that while the declarations may be inadmissible at later stages, "strict adherence to the Federal Rules of Evidence" is not required at class certification. *Gonzalez v. Millard Mall Services, Inc.*, 281 F.R.D. 455, 459–60 (S.D. Cal. 2012) (citing *Eisen*, 417 U.S. at 178); *see also Bell v. Addus Healthcare, Inc.*, No. CO6–5188RJB, 2007 WL 2463303, at \*3 (W.D. Wash. Aug. 27, 2007) (permitting submission of declarations not executed under penalty of perjury). Other courts have been less forgiving. *See Soto v. Castlerock Farming and Transportation, Inc.*, No. 1:09–cv–00701–AWI–JLT, 2013 WL 6844377, at \*10 (E.D. Cal. Dec. 23, 2013) *report and recommendation adopted*,

Brooks v. Darling International, Inc., Not Reported in Fed. Supp. (2017)

No. 1:09–CV–00701–AWI, 2014 WL 200706 (E.D. Cal. Jan. 16, 2014) (striking declarations not signed under penalty of perjury); *Charlebois v. Angels Baseball, LP*, No. SACV 10–0853 DOC (ANx), 2011 WL 2610122, at *8 (C.D. Cal. June 30, 2011) (declining "to consider any evidence submitted by Plaintiff that comes by way of an unsigned declaration" because such evidence "lack[ed] any indicia of reliability").

Though not signed specifically under penalty of perjury, the court notes that the signed surveys at issue here cannot accurately be characterized as unsworn since the signers swore that the information was true and correct to the best of the signer's ability. In any event, strict adherence to the rules of evidence is not required at this stage of the proceedings. Additionally, the surveys are not being offered for the truth of the matters asserted therein, rather, as plaintiffs' counsel has explained, they are merely "illustrative of the resident testimony that plaintiffs will be offering at the class certification stage in conjunction with scientific expert testimony." (Doc. No. 73 at 6.) According to plaintiffs, the completed surveys "also demonstrate widespread interest in the litigation." (*Id.*) Courts that have struck declarations not signed under penalty of perjury have done so because they lacked any indicia of reliability. *See, e.g. Charlebois*, 2011 WL 2610122, at * 8 (noting that, the declarations offered were "unsigned, or were not even written by the declarants themselves, but were recounted by memory of counsel's staff after speaking with declarants.")

Here, the signed surveys submitted by plaintiffs are accompanied by some indicia of reliability: (1) the signers have themselves written out a description of the odors and how they affect their ability to use and/or enjoy their home; and (2) the surveys are signed and sworn to be true and accurate to the best of the signer's knowledge. Accordingly, the court finds that the Resident Data Sheet surveys should not be excluded at this stage of the proceedings and may be considered by the court in determining whether class certification is warranted. Therefore, defendant's motion to strike the resident data sheets will be denied.

## MOTION TO EXCLUDE THE OPINIONS OF DAVID WEEKS AND TIMOTHY BOWSER

**\*4** Defendant also moved to exclude the expert reports of Environmental Engineer David Weeks and Professor of Food Process Engineering Dr. Timothy Bowser. Defendant argues the opinions expressed in those reports are "irrelevant, unhelpful, and speculative" because plaintiffs'

experts have yet to perform any relevant testing. (Doc. No. 52–1 at 5–6.) Defendant notes that the reports posit only what testing could be performed rather than reporting results obtained from testing that has been conducted. (*Id.* at 6.) Plaintiffs argue that defendant has failed to attack the credentials of their experts or the reliability of their experts' testimony. (Doc. No. 54 at 3.) Instead, according to plaintiffs, defendant inappropriately seeks to exclude the expert reports on the grounds that they do not address the merits of plaintiffs' claims even though discovery with respect to the merits has yet to commence in this case. (*Id.* at 1.)

### a. *Legal Standard*

Generally, the admission of expert testimony is controlled by Federal Rules of Evidence 702 and the decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). "[Federal Rule of Evidence 702] consists of three distinct but related requirements: (1) the subject matter at issue must be beyond the common knowledge of the average layman; (2) the witness must have sufficient expertise; and (3) the state of the pertinent art or scientific knowledge permits the assertion of a reasonable opinion." *United States v. Finley*, 301 F.3d 1000, 1007 (9th Cir. 2002). "Prior to the evaluation of those three requirements, however, *Daubert* holds that a trial court must make 'a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.' " *Spann v. J.C. Penny Corp.*, 307 F.R.D. 508, 515– 16 (C.D. Cal. 2015) (quoting *Daubert*, 509 U.S. at 592–93). However, "at the class certification stage, district courts are not required to conduct a full *Daubert* analysis." *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 495 (C.D. Cal. 2012). The general standard by which district courts perform their gatekeeping function during the merits phase of an action is replaced at class certification with "an analysis tailored to whether an expert's opinion was sufficiently reliable to admit for the purpose of proving or disproving Rule 23 criteria, such as commonality and predominance." *Id.* "[T]he court should ask only if expert evidence is useful in evaluating whether class certification requirements have been met." *Id; see also Herron v. Best Buy Stores, LP*, No. 2:12–cv–02103–TLN–CKD, 2016 WL 1572909, at *2 (E.D. Cal. Apr. 18, 2016) (noting "robust gatekeeping of expert evidence is not required" at the class certification stage).

Here, for the reasons explained below, the court concludes that the preliminary reports by plaintiffs' experts are useful

for purposes of determining whether class certification requirements have been met as of yet.[4]

#### b. *Analysis*

##### i. *David Weeks's Report*

In his report, Environmental Engineer David Weeks concludes that potential class members' exposure to noxious odors over the duration of the proposed class period can be assessed by using the American Meteorological Society/EPA Regulatory Model ("AERMOD"), "the preferred model for short-range dispersion modeling" of the Environmental Protection Agency. (Doc. No. 47–3 at 7.) AERMOD is a proven method, and its use in creating air dispersion models has received approval from a federal regulatory agency. Defendant does not challenge this method; nor does it challenge the ability to apply AERMOD to the case at hand. Moreover, Mr. Weeks states in his report that the data needed to construct a model is available and that AERMOD can differentiate between "odor complaints originating from multiple sources." (*Id.* at 9.) Mr. Weeks concedes that AERMOD is not "100 percent accurate 100 percent of the time." Nonetheless, this is an issue the parties could contest at the merits phase of this litigation. (*Id.*) Ultimately, the Weeks report supports the notion that AERMOD can be used to show the range, frequency, and impact of the alleged odor emissions; in other words, such testing can be used to establish commonality and predominance. Accordingly, the court concludes that Mr. Weeks's expert report satisfies the requirements of *Daubert* for purposes of determining the appropriateness of class certification. Furthermore, Mr. Weeks is a licensed engineer who has experience with air dispersion modeling and is an expert under the requirements of Federal Rule of Evidence 702. Finally, the subject matter is one that is appropriate for expert opinion. Thus, as to Mr. Weeks's expert report, defendant's motion to strike will be denied.

##### ii. *Dr. Timothy Bowser's Report*

**\*5** The court also finds Dr. Timothy Bowser's report admissible for the purpose of these class certification proceedings. In his report Dr. Bowser discusses testing methods that would allow him to assess "[t]he sources within the rendering facility which are responsible for odor emissions" as well as "[t]he effectiveness of mitigation

efforts taken by [defendant], and the potential effectiveness of further mitigation efforts." (Doc. No. 47–4 at 10.) In his report, Dr. Bowser also discusses the ability to perform a systematic odor assessment and states that "[i]nternational standards are available to guide the methods and practices of odor measurement." (*Id.* at 4.) The court sees no reason not to consider this expert opinion that a method exists to trace the source and level of odor emissions. Dr. Bowser's report would appear to be helpful in addressing the requirement of commonality under Rule 23.

Dr. Bowser is a Professor of Food Process Engineering at Oklahoma State University with over 30 years of experience in the food processing industry and has written several papers and book chapters on the subject. (*Id.* at 1.) Moreover, industrial food processing engineering is a subject that lies beyond the knowledge of the average, untrained layperson. Accordingly, Dr. Bowser satisfies the requirements of Federal Rule of Evidence 702. For these reasons, the court denies defendant's motion to strike the expert report of Dr. Bowser.

### PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

#### a. *Legal Standard*

The class action is a procedural mechanism whereby the "usual rule that litigation be conducted by and on behalf of the named parties only" is swept aside so that multiple parties—unwieldly in number but possessing similar or identical claims—may pursue common redress in an efficient and economical manner. *Comcast v. Behrend*, 569 U.S. ––––, ––––, 133 S. Ct. 1426, 1432 (2013) (quoting *Dukes*, 564 U.S. at 348). *See also Abdullah v. U.S. Sec. Associates, Inc.*, 731 F.3d 952, 963–64 (9th Cir. 2013). Federal Rule of Civil Procedure 23 controls class certification and imposes a two-step process designed to ensure not only that this system of representative adjudication nets expediencies for the litigants and the judiciary, but that it does not sacrifice procedural fairness or zealous advocacy in the process of doing so.

Rule 23(a) is a hurdle that must be overcome for a case to proceed as a class action. It consists of four prerequisites, often described as: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy. If—and only if—a putative class satisfies these four requirements may the plaintiffs attempt to show that the class also satisfies one of the three subsections of Rule 23(b). The party seeking class

certification bears the burden of establishing conformity with these requirements, and must do so by producing facts "affirmatively demonstrat[ing]" that certification is warranted. *Comcast*, 133 S. Ct. at 1432; *Dukes*, 564 U.S. at 350; *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1115 (9th Cir. 2017). A court must review the merits of a party's substantive claim to the extent that they overlap with issues touching on class certification. *Dukes*, 564 U.S. at 351 ("[T]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.' [citations omitted]"); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011) ("[I]t is not correct to say a district court may consider the merits to the extent that they overlap with class certification issues; rather, a district court must consider the merits if they overlap with the Rule 23(a) requirements.") (citing *Dukes*, 564 U.S. at 350–51 and *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 509 (9th Cir. 1992)); *see also Blair v. The CBE Group, Inc.*, 309 F.R.D. 621, 625 (S.D. Cal. 2015). Only after it has conducted a "rigorous analysis" of these facts and determined they show actual, and not presumed, conformance with Rule 23(a) and (b), may a district court certify a class. *Ellis*, 657 F.3d at 980–81 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S 147, 160, 161 (1982)); *see also Comcast*, 133 S. Ct. at 1432 (extending the "rigorous analysis" requirement to Rule 23(b)); *Patel v. Nike Retail Services, Inc.*, Case No. 14–cv–4781–RS, 2016 WL 1241777, at *3 (N.D. Cal. Mar. 29, 2016) ("This 'rigorous' analysis applies both to Rule 23(a) and Rule 23(b).").[5]

**\*6** As an initial and practical matter, however, the court should first determine whether the class is ascertainable. That is a problematic question in this case, given the slim basis for the class definition proposed by plaintiffs in their pending motion, and the court turns to it below.[6]

   b. *Definiteness*
"[T]he Ninth Circuit [and] the Supreme Court [have not] explicitly acknowledge[ed] in any published opinion that 'ascertainability' or 'definiteness' is a required element of class certification that imposes obligations independent of the enumerated Rule 23 factors." *Lilly v. Jamba Juice Co.*, 308 F.R.D. 231, 236 (N.D. Cal. 2014). However, in dicta and unpublished opinions, the Ninth Circuit has suggested that a class must nonetheless be ascertainable if it is to be certified. *See id.* (citing *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1071, n.4 (9th Cir. 2014), *Pierce v. County of Orange*, 526 F.3d 1190, 1200 (9th Cir. 2008), and *Martin v. Pac. Parking Sys. Inc.*, 583 Fed.Appx. 803, 804 (9th Cir. 2014)). There are three concerns in determining

whether ascertainability is satisfied:

   (1) whether the class action can be ascertained by reference to objective criteria; (2) whether the class includes members who are not entitled to recovery; and (3) whether the putative named plaintiff can show that he will be able to locate absent class members once a class is certified.

*Ebarle v. Lifelock, Inc.*, No. 15–cv–00258–HSG, 2016 WL 234364, at *5 (N.D. Cal. Jan. 20, 2016). Determining that a class is ascertainable is "meant to ensure the proposed class definition will allow the court to efficiently and objectively ascertain whether a particular person is a class member." *Pena v. Taylor Farms Pacific, Inc.*, 305 F.R.D. 197, 206 (E.D. Cal. 2005); *see also Henry v. Home Depot*, Case No. 14–cv–4858–JST, 2016 WL 1755398, at *8 (N.D. Cal. May 3, 2016) ("[A] class definition is sufficient if the description of the class is 'definite enough so that it is administratively feasible for the court to ascertain whether an individual is a member.' ") *Vietnam Veterans of Am. v. C.I.A.*, 288 F.R.D. 192, at 211–12 (N.D. Cal. 2012) ("Where the class definition proposed is overly broad or unascertainable, the court has the discretion to narrow it.").

Defendant argues that here the proposed class definition is overbroad and not ascertainable. Specifically, defendant notes that in their complaint plaintiffs alleged a class made up of those within three miles of its facility, that they now propose a class made up of those within a 1.5–mile radius of the facility, that plaintiffs have presented no evidence showing that defendant "bears any relationship to the proposed 1.5–mile geographic area," and that the class definition incorporating that 1.5–mile radius is baseless, improper and purely speculative. (Doc. No. 49 at 12.) Additionally, defendant contends that plaintiffs have not offered any evidence indicating how owners/occupants and renters who are class members will be identified. (*Id.* at 13.) Furthermore, according to defendant, the proposed class definition includes "individuals who have not suffered any harm" because there is no evidence that all the owners, occupants, or renters within the 1.5–mile radius of the facility were affected by any odors. (*Id.* at 13–14.)

**\*7** Plaintiffs respond that the class "clearly includes two categories of persons, 'owner/occupants' and 'renters' of residential property. (Doc. No. 53 at 5.) According to plaintiffs, persons who own but do not occupy residential property within the 1.5–mile radius area are therefore outside the class definition. (*Id.*) Plaintiffs contend, however, that "while renters and owner/occupants will have differing damages, they are indeed similarly situated for purposes of this litigation." (Id. at 5–6.) While this contention may be apt for purposes of ascertaining the class members, the court finds plaintiffs' objective criteria

establishing the geographic boundaries of the class proposed for certification to be far more questionable.

An adequate basis for a proposed class definition is uniquely important in class action cases presenting toxic tort or nuisance claims based on alleged environmental harm. As one court has observed in addressing the definition of the class in such a case:

> Often an objective characterization of exposure to a particular substance defines class members. Other times, courts define classes by geographical boundaries, but in such circumstances, courts often seek a reasonable relationship between the proposed boundary and the defendants' allegedly harmful activities. Regardless, courts have rejected proposed classes where plaintiffs failed to "identify any logical reason ... for drawing the boundaries where they did." *See, e.g., Daigle v. Shell Oil Co.*, 133 F.R.D. 600, 603 (D. Colo.

1990) (holding that plaintiffs had "failed to identify a class" where the proposed boundaries did not appear to "relat[e] to the defendants' activities"). Usually, scientific or objective evidence closely ties the spread of the alleged pollution or contamination to the proposed class boundaries. *See, e.g., Boggs v. Divested Atomic Corp.*, 141 F.R.D. 58, 61 (S.D. Ohio 1991). *Brockman v. Barton Brands, Ltd.*, No. 3:06CV–322–H, 2007 WL 4162920, at *2 (W.D. Ky. Nov. 21, 2007); *Burkhead v. Louisville Gas & Electric Company*, 250 F.R.D. 287, 293 (W.D. Ky 2008) ("To be clear, the Court is not troubled by the lack of such evidence merely because the Court fears individualized or non-uniform damage calculations, but rather because without it there seems to be virtually no evidence in the record that distinguishes members of the proposed class from the general public based upon acts of LG & E."); *see also Powell v. Tosh*, 280 F.R.D. 296, 312 (W.D. Ky. 2012), *on reconsideration*, No. 5:09–CV–121, 2012 WL 2601946 (W.D. Ky. July 5, 2012) (granting class certification in a nuisance/negligence suit brought by landowners against owners of a swine barn over noxious orders after considering plaintiffs' expert report "stating that the barn produces an effect that extends 1.25 miles from the Ron Davis Hog Barn in all directions" and which supported a finding that the class as defined was definite); *O'Connor v. Boeing N. Am. Inc.*, 180 F.R.D. 359, 368 (C.D. Cal. 1997) (noting that, "[c]ourts have found that a definable class may be established by geographic boundaries[,]" and listing cases where the class was certified based on those boundaries as determined in the reports of experts).

Here, nothing in the expert reports before the court indicates any rationale behind plaintiffs' choosing of a 1.5–mile radius as the geographic boundary for the proposed class. Indeed, the only mention of the area involved appears to be in Dr. Bowser's report where it is indicated that residential areas are located within a quarter mile of defendant's facility. (Doc. No. 47–4 at 7, Ex. 3.) At oral argument on the pending motion, plaintiffs' counsel explained that the 1.5–mile radius aspect of the proposed class definition was based upon a "preponderance of the people who have contacted [the] firm either through resident data sheets or otherwise, or who have, I believe, made complaints to a governmental entity." (Doc. No. 73 at 18.) Plaintiffs' counsel also represented that the 1.5–mile radius currently includes people most severely impacted by the odor issue and is, therefore, a conservative geographic boundary. The court construes these representations as essentially indicating that plaintiffs' counsel based the definition of the class now proposed for certification, not upon any preliminary finding made by their experts or upon a thorough analysis of a detailed survey of those possibly impacted areas, but rather upon their own interpretation of the limited information available to them.

**\*8** The court in *Brockman* found a similar basis insufficient for purposes of ascertaining a class definition:

> At bottom, Plaintiffs' motion rests upon complaints of residents in the Bardstown area about various substances and odors on their property, a recital of the emissions of the Defendant's facility, and Dr. Wabeke's report that it is possible that emissions from Defendant's plant could be related to those substances. Nowhere in Plaintiffs' evidence has the Court found, for example, test results for any substances Plaintiffs allege have fallen onto their property, or any sort of analysis of where the emissions of Defendant's plant spread once they leave Defendant's smokestack. These omissions are particularly glaring given how seemingly easy it would be for Plaintiffs to have obtained such information and how frequently such information plays a key role in class certification decisions for other courts in similar cases.

*Brockman*, 2007 WL 4162920 at *4. Similarly, the undersigned concludes that plaintiffs have failed to adequately define the proposed class here. Plaintiffs argue that, in a literal sense, class members are certainly ascertainable based upon their proposed 1.5–mile radius class definition. The problem is that the 1.5–mile radius aspect of the class definition has no acceptable basis in objective fact and is therefore arbitrary. This failure would appear to be based at least in part upon plaintiffs' decision not to conduct any preliminary scientific testing, or even to undertake a thorough analysis of a detailed survey of those possibly impacted areas, for submission in support of their class certification motion and to rest instead on their argument that testing was relevant only to the merits phase of this litigation. In short, plaintiffs have failed to carry their burden of demonstrating that certification of their

Case 1:21-cv-00179-KJM-BAM   Document 167-8   Filed 11/26/24   Page 54 of 216

Brooks v. Darling International, Inc., Not Reported in Fed. Supp. (2017)

proposed class is warranted. *See Haight v. Bluestem Brands, Inc.*, Case No. 6:13–cv–1400–ORL–28KRS, 2015 WL 12830482, at *3–4. (M.D. Fla. May 14, 2015), *report and recommendation adopted*, No. 6:13–cv–1400–ORL–28KRS, 2015 WL 12835994 (M.D. Fla. June 1, 2005) (noting that, it is the plaintiffs' burden to establish ascertainability and concluding that due to their failure to present reasonably available evidence the court was unable to conclude that plaintiffs had met that burden), *report and recommendation adopted* 2015 WL 12835994 (M.D. Fla. June 1, 2015); *Groussman v. Motorola, Inc.*, Case No. 10 C 911, 2011 WL 5554030, at *7 (N.D. Ill. Nov. 15, 2011) ("Plaintiffs, as movants, had the burden to delineate an appropriate proposed class definition and have failed to do so."); *Humphrey v. Int'l Paper*, Case No. 02 C 4147, 2003 WL 22111093, at *5 (N.D. Ill. Sept. 11, 2003) ("Since it is the burden of the plaintiffs to establish all of the requirements for class certification ... the serious inadequacy of the proposed class definition is reason enough to deny the motion.").

Nonetheless, below the court will address whether the additional requirements for class certification have been met since the deficiency discussed above may be capable of being cured through the submission of results from preliminary scientific testing or other means providing some adequate basis for the proposed class definition. *See Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1124, n. 4 (9th Cir. 2017) ("[W]e have addressed the types of alleged definitional deficiencies other courts have referred to as "ascertainability" issues..., through analysis of Rule 23's enumerated requirements. *See, e.g.,* *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1136– 39 (9th Cir. 2016) (addressing claim that class definition was overbroad—and thus arguably contained some members who were not injured—as a Rule 23(b)(3) predominance issue); *Probe v. State Teachers' Ret. Sys.*, 780 F.2d 776, 780 (9th Cir. 1986) (recognizing that a class must not be vaguely defined and must be "sufficiently definite to conform to Rule 23")).[7]

c. *Rule 23(a)*

i. *Numerosity*

**\*9** Rule 23 requires a class be so numerous that joinder of all members individually is "impracticable." Fed. R. Civ. P. 23(a). This "does not mean that joinder must be impossible, but rather means only that the court must find that the difficulty or inconvenience of joining all members of the class makes class litigation desirable." *Millan v. Cascade Water Servs., Inc.*, 310 F.R.D. 593, 603 (E.D. Cal.

Oct. 8, 2015) (quoting *In re Itel Sec. Litig.*, 89 F.R.D. 104, 112 (N.D. Cal. 1981)). *See also Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909, 913–14 (9th Cir.1964); *Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580, 588 (C.D. Cal. 2008). A plaintiff seeking class certification is not required to show that the number of potential class members exceeds an established threshold. *Gen. Tel. Co. v. E.E.O.C.*, 446 U.S. 318, 330 (1980). That said, a potential class consisting of at least forty members will generally be treated as satisfying the numerosity requirement. *See Odgen v. Bumble Bee Foods, LLC*, 292 F.R.D. 620, 624 (N.D. Cal. 2013); *Collins v. Cargill Meat Solutions Corp.*, 274 F.R.D. 294, 300 (E.D. Cal. 2011) ("Courts have routinely found the numerosity requirement satisfied when the class comprises 40 or more members.").

Plaintiffs assert the proposed class here consists of "approximately 4,745 residential properties." (Doc. No. 47–1 at 12.) While this number consists of properties, and not individuals, assuming that each residence has at least one owner/occupier or renter, the proposed class would consist of close to 5,000 people. Moreover, defendant does not challenge this number. Thus, it would appear that if the deficiency with respect to the class definition discussed above were to be corrected, numerosity would likely be satisfied in this case.

ii. *Commonality*

Rule 23(a)(2) requires that there exists "questions of fact and law which are common to the class." Fed. R. Civ. P. 23(a)(2). However, "[a]ll questions of fact and law need not be common to satisfy the rule." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998). Rather, "the plaintiff [must] demonstrate that the class members 'have suffered the same injury.' " *Dukes*, 564 U.S. at 350 (quoting *Gen. Tel. Co. of Sw. Falcon*, 457 U.S. 147, 157 (1982)). Absent a showing of "common contentions," a class proceeding is not justified because common answers—capable of resolving "the validity of each one of the claims in one stroke"—cannot be generated. *Id.; see also Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012) ("[C]ommonality requires that the class members' claims 'depend upon a common contention' such that 'determination of its truth or falsity will resolve an issue that is central to the validity of each claim in one stroke.' ").

According to plaintiffs, the potential class members here all share the same contention: defendant harmed them by allegedly releasing noxious odors into the community surrounding its rendering plant. (Doc. No. 47–1 at 13.) It is

true that the two causes of action plaintiffs levy against defendant—nuisance and negligence—are both susceptible to common proof because they focus, for the most part, on defendant's behavior and not the behavior of the potential class members.

It is clear that the ascertainability and class definition issues discussed above overlap to a significant degree with the commonality determination. *See Briseno*, 844 F.3d at 1124, n. 4. For the reasons discussed above in addressing ascertainability, the court concludes plaintiffs' have failed to meet their burden of establishing commonality. Again, if this deficiency were to be cured through the submission of some evidence as to the source of the noxious order which is the subject of this action and the geographic area impacted thereby, it would appear to the undersigned that commonality could be established.

### iii. *Typicality*

**\*10** "The claims or defenses of the representative parties [must be] typical of the claims and defenses of the class." Fed. R. Civ. P. 23(a)(3). They need not be clones; rather, all that is required is that the claims or defenses are "reasonably co-extensive." *Hanlon*, 150 F.3d at 1020 (The standard is a "permissive" one and requires only that the claims of the class representatives be "reasonably co-extensive with those of absent class members; they need not be substantially identical."); *see also In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1098 (C.D. Cal. 2015). "The test of typicality 'is whether other members have the same or similar injury, whether other class members have been injured by the same course of conduct.' " *Hannon v. Dataproducts Corp.*, 976 F.2d at 508 (quoting *Schwartz v. Harp*, 108 F.R.D. 279, 282 (C.D.Cal.1985)). Typicality is not satisfied when a class representative is subject to defenses atypical to the class. *Ellis*, 657 F.3d at 984; *Hanon*, 976 F.2d at 508 (Typicality may be lacking "if 'there is a danger that absent class members will suffer [because] their representative is preoccupied with defenses unique to it.' ") (quoting *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc*., 903 F.2d 176, 180 (2d Cir. 1990)).

Plaintiffs argue that their claims are typical of the class and any differences defendant now is attempting to raise "are superficial and/or irrelevant to the typicality determination." (Doc. No. 47–1 at 14.) Plaintiffs assert that their injury and that of the class members originate from the same course of conduct attributable to the defendant and claim that "[t]he named plaintiffs are pursuing the same claims possessed by absent class members on the

same legal theories." (*Id.*) Finally, plaintiffs maintain that no further showing is required and that typicality has been satisfied. (*Id.*)

Defendant argues that plaintiffs' claims and those of the putative class arise from a multitude of events that posit different legal arguments necessary to establish defendant's liability. (Doc. No. 49 at 15.) Further, defendant contends that plaintiffs have failed to establish typicality because they do not explain "their own theory or theories of liability much less demonstrate that they share the theory with the all members of the putative class." (*Id.*) Accordingly, defendant urges the court to deny plaintiffs' motion for class certification due to the lack of supporting evidence presented. (*Id.* at 16.)

As noted above, the movant for class certification bears the burden of proving that certification is warranted. *Comcast*, 133 S. Ct. at 1432; *Dukes*, 564 U.S. at 350. The Supreme Court has not specified the burden of proof borne by the plaintiff with respect to satisfying the requirements of Rule 23 and lower courts have adopted divergent approaches with respect to that burden. *See Reyes v. Netdeposit, LLC*, 802 F.3d 469, 484 (3d Cir. 2015) (applying the preponderance of the evidence standard and rejecting the district court's application of an absolute proof standard); *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 228–29 (5th Cir. 2009) (applying a preponderance of the evidence standard); *see also Vega v. T–Mobile USA, Inc.*, 564 F.3d 1256, 1268 (11th Cir. 2009) (noting that, the burden of proof is "relatively light"). The Ninth Circuit has not explicitly adopted the preponderance of the evidence standard in this regard, though some district courts within the Circuit have recognized this as the trend. *See Smilovits v. First Solar, Inc.*, 295 F.R.D. 423, 427 (D. Ariz. 2013) (noting that, the Ninth Circuit has not adopted a particular approach, but that at least four circuits apply a preponderance of the evidence standard and observing "[t]his standard appears to be the trend in federal courts, and 'merely requires that [plaintiffs] demonstrate that it is more likely than not that a particular requirement of Rule 23 [ ] has been satisfied.' " (quoting *Shepherd v. Babcock & Wilcox of Ohio*, No, C–3–98–391, 2000 WL 987830, at \*1 n.5 (S.D. Ohio Mar. 3, 2000))).

**\*11** Assuming that the preponderance of the evidence standard applies to this inquiry, it has nonetheless been recognized that "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question," and certification is proper only if "the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Dukes*, 564 U.S. at 350–51. Thus, where plaintiffs provide a conclusory statement that their claims are typical of the class and that the injuries arise from the same course of

conduct by the defendant, the court may look to the complaint to ascertain whether typicality has been satisfied. *See Shook v. El Paso County*, 386 F.3d 863, 968 (10th Cir. 2004) (noting that, in conducting its own rigorous analysis, "the court must accept the substantive allegations of the complaint as true, although it 'need not blindly reply on conclusory allegations which parrot Rule 23' and 'it may consider the legal and factual issues presented by plaintiff's complaints.' ").

Here, the proposed class includes "all persons who were owners/occupiers and renters of residential property within 1.5–miles of Defendant's rendering plant at any point between May 12, 2011 and the date the Class is certified." (Doc. No. 47–1 at 9.) Named plaintiffs Donna and Allen Conroe and Kimberly Tapscott–Munson purportedly reside within 1.5 miles of the rendering plant. (Doc. No. 49 at 5.) While the degree and impact of the alleged injury may vary depending on where within the impacted radius each class member lives, the basic nature of the injury is likely to be the same and will have arisen from the defendant's alleged conduct involving the emission of noxious odors. Thus, were plaintiffs to cure the deficiency noted above with respect to ascertainability and class definition, the undersigned believes that typicality would likely also be satisfied at least with respect to the issue of defendant's liability.

### iv. *Adequacy of Representation*

Plaintiffs seeking class certification must also show that they "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "To determine whether named plaintiffs will adequately represent a class, courts must resolve two questions: '(1) do the named plaintiffs and their counsel have any conflicts of interest with the other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?' " *Ellis*, 657 F.3d at 985 (quoting *Hanlon*, 150 F.3d at 1020). "An absence of material conflicts of interest between the named plaintiffs and their counsel with other class members is central to adequacy and, in turn, to due process for absent members of the class." *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 959 (9th Cir. 2009) (citing *Hanlon*, 150 F.3d at 1020). Accordingly, "[c]lass certification will be inappropriate if fundamental conflicts of interest are determined to exist among the proposed class members." *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp., L.P.*, 247 F.R.D. 156, 177 (C.D. Cal. 2007).

Plaintiffs allege that they have "vigorously advanced the claims of the class and will continue to do so." (Doc. No. 47–1 at 14.) Plaintiffs assert that before bringing this case, they retained counsel with substantial experience in litigating similar cases. (*Id.*) Further, plaintiffs maintain that they have complied with discovery requests, have provided deposition testimony, and have assisted counsel with investigation in connection with this action. (*Id.*)

Defendant maintains that the named plaintiffs cannot adequately represent the putative class because they cannot identify the location of the facility "or the source, frequency, or degree of odor they purport to have suffered." (Doc. No. 48 at 16.) For example, according to defendant, "Ms. Conroe testified that she had never been to the facility, driven by it, does not know what it looks like, does not know any of the companies around it, does not know the direction of the plant from her house, or which way the wind blows from the plant, does not recall telling anyone that the odor originated from Darling." (*Id.* (citing Donna Conroe Dep. (Doc. No. 49–6) at 19:19–20:2, 23:13–24, 31:22–32:6, and 36:2–9).) Additionally, defendant points out, plaintiff Allen Conroe testified at his deposition that he had no personal knowledge or facts to support the allegation that the odors came from Darling. (*Id.* (citing Allen Conroe Dep. (Doc. No. 49–2) at 19:7–18 and 32:3– 7). Defendant contends that plaintiff Mr. Conroe could not even testify how often the odors occurred (e.g., weekly, daily, monthly) or whether the odor was better or worse or continuous or intermittent since 1981. (*Id.* at 17 citing Allen Conroe Dep. (Doc. No. 49–2) at 14:3–16, 21:20– 22:11, 25:11–25, 25:24–26:3, and 27:20–28:1). Defendant states that plaintiff Tapscot–Munson "also could not specify the details of her odor accusation." (*Id.* (citing Kimberly Tapscott–Munson Dep. (Doc. No. 49–3) at 24:22–25:4).)

**\*12** Plaintiffs respond that "the Ninth Circuit has never imposed a knowledge requirement on class representatives at the certification stage." (Doc. No. 53 at 8) (citing *Trosper v. Styker Corp.*, No. 13–cv–0607–LHK, 2014 WL 4145448, at *42 (N.D. Cal. Aug. 21, 2014)). Rather, plaintiffs maintain that where district courts within the Ninth Circuit have imposed a knowledge standard as to the named plaintiffs in a class action, the threshold has not been high and only a "rudimentary understanding" of the action and "a demonstrated willingness to assist counsel in the prosecution of the litigation" has been required. (*Id.*) (quoting and citing *Trosper*, 2014 WL 4145448, at *42, *In Re Live Concert Antitrust Litig.*, 247 F.R.D. 98, 120 (C.D. Cal. 2007) and *In re Tableware Antitrust Litig.*, 241 F.R.D. 644, 649 (N.D. Cal. 2007)). Plaintiffs maintain that "[d]efendant asks for the sort of detailed understanding of the facts of the case that named plaintiffs are not required to have." (*Id.*) Finally, plaintiffs assert that they will adequately represent the class because there are no

conflicts of interest and their counsel will vigorously litigate the case on behalf of the putative class. (*Id.*)

Although a demanding knowledge requirement on the part of named plaintiffs is not imposed, "[b]ecause class representatives serve as a guardian of the interests of the class, the representatives must have some minimal familiarity with the litigation." *In re Tableware Antitrust Litig.*, 241 F.R.D. at 649 (citing *Burkhalter Travel Agency v. MacFarms Int'l, Inc.*, 141 F.R.D. 144, 153 (N.D. Cal. 1991)); *see also Mendez v. C–Two Group, Inc.*, Case No. 13–cv–05914–HSG, 2015 WL 8477487, at \*6 (N.D. Cal. Dec. 10, 2015). The representatives cannot "blindly rely on counsel to the extent he lacks familiarity with the case." *In re THQ, Inc. Sec. Litig.*, No. CV 00–1783AHM(EX), 2002 WL 1832145, at \*6 (C.D. Cal. Mar. 22, 2002). Accordingly, class certification has been denied "in flagrant cases, where the putative class representatives display 'an alarming unfamiliarity with the suit.' " *Id.* (quoting *In re Frontier Ins. Grp., Inc. Sec. Litig.*, 172 F.R.D. 31, 46 (E.D.N.Y. 1997)).

Here, defendant maintains that the named plaintiffs have never been to the facility. However, in the court's view it cannot fairly be said that the named plaintiffs lack an understanding of where the offending odor emanates from. Specifically, the named plaintiffs demonstrated some knowledge of where defendant's plant is generally located and that the odor in question originates from there. (Doc. Nos. 49–2 at 7; 49–3 at 4.) In any event, unfamiliarity with the defendant is not the type of "alarming unfamiliarity with the suit" that would be sufficient to defeat class certification. *See In re THQ, Inc. Sec. Litig.*, 2002 WL 1832145, at \*7 (C.D. Cal. Mar. 22, 2002) (noting that, plaintiffs' unfamiliarity with the names of six of the seven defendants was not sufficient to defeat class certification). Thus, at least general knowledge of where the defendant's plant is located or where the odor stems from is sufficient.

Moreover, each of the named plaintiffs has expressed an understanding of the underlying theory of the case, that defendant's operations at the rendering plant release noxious odors into the air. (Doc. Nos. 49–2 at 4; 49–3 at 4; 49–6 at 3.) Notably, plaintiff Kimberly Tapscott–Munson testified at her deposition that, "it is such an offensive odor it makes you immediately sick to your stomach or you need to flee inside." (Doc. No. 49–3 at 3.) This is sufficient for purposes of establishing adequacy of representation. *See In re Tableware Antitrust Litig.*, 241 F.R.D. at 649– 50 (finding that, plaintiffs adequately represented the class because despite their lack of detailed understanding of the facts of the case, plaintiffs understood the underlying theory of the action: "that plaintiffs overpaid for tableware due to the exclusion of Bed, Bath & Beyond from the market.").

**\*13** Plaintiffs have also indicated that they are willing to protect the interests of the class. For example, when asked why he chose to become a plaintiff in the lawsuit, Allen Conroe testified that he wanted to be

> a representative for the ones involved in the complaint and because of the problems that we're having in our neighborhoods. As far as the smell goes and the things we have to deal with that I feel shouldn't be, that I didn't create or have any doing with creating it.

(Doc. No. 49–2 at 4.) While plaintiffs have not conducted their own investigations or filed other complaints against defendant, they have spoken with neighbors, and as indicated have complied with discovery requests, provided deposition testimony, and assisted counsel with the investigation. (Doc. No. 47–1 at 14.)

Accordingly, were the deficiencies with respect to ascertainability and class definition to be adequately addressed, on the present record the court would conclude that the named plaintiffs have sufficient familiarity with the case to serve as adequate representatives for the putative class.

#### d. *Rule 23(b)(3)*

Certification under Rule 23(b)(3) is permitted when "the questions of law or fact common to class members predominate over any questions affecting only individual members, and ... a class action is [deemed to be] superior to other available methods for fairly and efficiently adjudicating the controversy." *Dukes*, 564 U.S. at 362 (quoting Fed. R. Civ. P. 23(b)(3)); *see also Tyson Foods, Inc. v. Bouaphaeko*,——U.S. ——, ——, 136 S. Ct. 1036, 1045 (2016). "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation," *Amchem*, 521 U.S. at 622, whereas the superiority requirement demands courts "assess the relative advantages of alternative procedures for handling the total controversy" in order to determine that a "class action is the 'superior' method of resolution." Fed. R. Civ. Pro. 23(b)(3), Advisory Committee's Note; *see also Pointer v. Bank of Am. Nat'l Ass'n*, No. 2:14–cv–0525 KJM–CKD, 2016 WL 696582, at \*8 (E.D. Cal. Feb. 22, 2016). Below, the court will address these two requirements in the context of the pending motion.

i. *Predominance*

Rule 23(b)(3) requires a plaintiff to show "(1) that the existence of individual injury resulting from the alleged ... violation ... [is] capable of proof at trial through evidence that is common to the class rather than individual to its members; and (2) that the damages resulting from that injury [are] measureable on a class-wide basis through use of a common methodology." *Comcast*, 133 S. Ct. at 1430. Rule 23(b)(3)'s predominance requirement is more demanding than the commonality requirement of Rule 23(a). *Id*. at 1432; *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 963 (9th Cir. 2013). However, the rule does not demand that all issues be common, but rather only that common issues *predominate* over individual issues. *Id.* at 964. For example, where liability can be proved on a class-wide basis but proof of damages may depend on individual determinations, certification is not necessarily precluded. *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013); *see also Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1167–68 (9th Cir. 2014). When deciding if a plaintiff has satisfied Rule 23(b)(3), a court must "consider [ ] all factors that militate in favor of, or against, class certification." *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 946 (9th Cir. 2009) (citation omitted).

**\*14** Plaintiffs argue that common issues of fact and law predominate here because the two underlying causes of action—nuisance and negligence—both largely premise liability on objective standards concerning defendant's behavior. (Doc. No. 47–1 at 16–17.) Plaintiffs contend the "substantial" and "unreasonable" elements of a nuisance claim are judged against an objective standard, and thus, are independent of the idiosyncratic sensitivities of the individual potential class members. (*Id.* at 16.) Plaintiffs also assert, in regard to their negligence claim, that the issue of what duty defendant owed to potential class members is an issue of law that does not require individualized determination. (*Id.* at 17.) While defendant argues otherwise, the court agrees that such objective determinations as will be required in this action are potentially well suited for class treatment where common evidence can be presented, and that the duty of care defendant owes to the putative class members is "a question of law for the court" under California law. *Lockheed Martin Corp. v. Superior Court*, 29 Cal. 4th 1096, 1106 (2003).

Defendant argues that establishing liability in this case will require individualized proof to determine the source of the odor. Defendant also contends that the odor in question may instead come from other nearby plants or other sources or practices such as those identified by Dr. Bowser, including trucks, routes, leaks and spills, unloading operations, rendering materials, as well as drainage and rainfall.

The court is persuaded that factual inquiries required by both state law torts alleged here are potentially capable of class wide proof through the use of AERMOD air modeling. AERMOD can determine the frequency, intensity, and duration of odor contamination in particular areas. This data can be used to determine if (and when) defendant created a nuisance by modeling if odors released by defendant crossed the nuisance threshold (i.e., reached a level that would disrupt a reasonable person's enjoyment of his or her property). It is certainly very possible that the same data would also be capable of proving the causation and injury elements of a nuisance claim.

Nonetheless, for the same reasons discussed above with respect to ascertainability, the court concludes that plaintiffs have failed to satisfy their burden of establishing that Rule 23(b)(3)'s predominance requirement has been met here.[8] *See Briseno*, 844 F.3d at 1124 n.4 (citing *Torres*, 835 F.3d at 1136–39 (9th Cir. 2016) (contention that a class definition was overbroad and thus arguably contained members who were not injured addressed as an issue of predominance under Rule 23(b)(3)).

ii. *Superiority*

When deciding if a class action is a superior method of adjudicating the claims, courts consider the following factors:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

**\*15** (B) the extent and nature of any litigation concerning the controversy already begun by or against the class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing the class action. Fed. R. Civ. P. 23(b)(3).

Here, defendant argues that there is already ongoing litigation being pursued on behalf of area residents. (Doc. No. 47–1 at 24.) Plaintiffs, however, point out that the litigation commenced by "Concerned Citizens of West Fresno," although currently in mediation, has not made progress and would not compensate the area residents for the alleged nuisance caused by defendant. (Doc. No. 47–1 at 8, n.2.)

The court agrees that in this case class litigation appears potentially superior to any other forms of dispute resolution. In the event an appropriate class can be identified, each class member's claim would be too small to justify the litigation costs that would be incurred individually and the basis for the claims of each class member would be identical. It also does not appear that any one class member would have a materially greater interest in controlling the litigation. Moreover, under those circumstances, if class certification were to be denied, the only alternative for the putative class members would be to bring actions in their individual capacities, which would waste the resources of the parties and the court. Finally, individual actions would have preclusive effect only as to the individual who brought such actions. Thus, in the event that the deficiencies with respect to ascertainability and class definition were to be cured, it would appear that superiority could be established as well.

## CONCLUSION

For the reasons stated above:

> 1. Plaintiffs' Motion for Class Certification (Doc. No. 47) is denied without prejudice;
>
> 2. Defendant's Motion to Strike the Resident Data Sheets (Doc. No. 51) is denied; and
>
> 3. Defendant's Motion to Exclude the Reports of David Weeks and Dr. Timothy Bowser (Doc. No. 52) is denied.

IT IS SO ORDERED.

## All Citations

Not Reported in Fed. Supp., 2017 WL 1198542

Footnotes

1   Linda and Donald Brooks were also plaintiffs in this action when it was initiated. However, on September 18, 2015 a stipulation of dismissal as to those two plaintiffs was filed with the court pursuant to Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure. (Doc. No. 43.)

2   Plaintiffs also note defendant has been the subject of odor complaints by residents made to the San Joaquin Valley Air Pollution Control District ("the District") as well as a lawsuit brought by a citizens group. (Doc. No. 20 at 7) (citing Doc. Nos. 47–7, 47–17). However, these allegations do not appear relevant to resolution of the pending motion for class certification.

3   The hearing on the motion for class certification and the motions to strike and exclude were continued several times pursuant to the parties' stipulations. (Doc. Nos. 59, 63, 66 and 69.)

4   Although, this is the case more because of what those preliminary reports fail to establish as much, if not more, than because of what is set forth therein.

5   If a court does certify a class, it must define the class claims and issues and appoint class counsel. Fed. R. Civ. P. 23(c)(1), (g).

6   Whether one views it as an issue of ascertainability, commonality or predominance, the problem here is a definitional deficiency in plaintiffs' rationale for seeking certification of a class defined as those located within a 1.5–mile radius of defendant's facility—a definition that does not appear to be grounded upon any sufficiently supported objective justification.

7   "It is appropriate to deny a motion without prejudice where ... the plaintiffs have failed to submit sufficient evidence in support of class certification." *Newberry v. County of San Bernardino,* No. EDCV 14–2298 JGB (SPX), 2015 WL 9701153, at *7 (C.D. Cal. July 23, 2015); *see also In re Apple ipod iTunes Antitrust Litig.,* No. C 05–00037 JW, 2008 WL 5574487, at *5, 9 (N.D. Cal. Dec.

Brooks v. Darling International, Inc., Not Reported in Fed. Supp. (2017)

22, 2008).

8      Defendant argues that proving damages, or the nature and extent of any harm suffered, will require individualized proof in this case. Specifically, defendant contends that "the alleged severity of the odor is personal to each property," damages will vary depending on whether the particular plaintiff has a physical illness, and "[t]he alleged interruption of the enjoyment of property varies per claimant based on the activities he or she enjoys, whether family are involved, [and] the presence of outdoor recreational structures on the property." (Doc. No. 49 at 23.) Defendant asserts that these issues are, therefore, not conducive to class-wide proof. It may be that proving the severity or degree of impact the noxious odor has had on each member of a class could require individualized proof to account for idiosyncrasies such as illnesses, distance, wind patterns, and climate conditions to such an extent as to justify the bifurcation of liability and damages. However, because the pending class certification motion will be denied without prejudice, the court need not reach the issue at this time.

---

**End of Document**                                              © 2024 Thomson Reuters. No claim to original U.S. Government Works.

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.        

Brust v. Regents of the University of California, Not Reported in Fed. Supp. (2008)

2008 WL 11512299
Only the Westlaw citation is currently available.
United States District Court, E.D. California.

Kelsey BRUST; Jessica Bulala; Laura
Ludwig; and all those similarly situated,
Plaintiffs,
v.
REGENTS OF THE UNIVERSITY OF
CALIFORNIA; Larry Vanderhoef; and
Greg Warzecka, Defendants.

No. CIV. 2-07-1488-FCD-EFB
|
Signed 10/23/2008
|
Filed 10/24/2008

**Attorneys and Law Firms**

Monique Olivier, Duckworth Peters Lebowitz Olivier LLP, Noreen Ann Farrell, Equal Rights Advocates, Whitney Bryn Huston, Sturdevant Law Firm A Professional Corporation, San Francisco, CA, Kristen Marie Galles, Equity Legal, Alexandria, VA, for Plaintiffs.

Ayse Kuzucuoglu, Drinker Biddle & Reath LLP, San Francisco, CA, David Pontus Eugene Burkett, Law Office of Derek J. King, Michael William Pott, Nancy Joan Sheehan, Porter Scott, PC, Sacramento, CA, Lawrence John Joseph, Law Office of Lawrence J. Joseph, Washington, DC, for Defendants.

MEMORANDUM AND ORDER

FRANK C. DAMRELL, JR., UNITED STATES DISTRICT JUDGE

**\*1** This matter is before the court on plaintiffs' Kelsey Brust ("Brust"), Jessica Bulala ("Bulala"), and Laura Ludwig's ("Ludwig") (collectively, "plaintiffs") motion for class certification pursuant to Federal Rule of Civil Procedure 23.[1] Defendant Regents of the University of California ("UCD" or "defendant") oppose the motion. For the reasons set forth below, plaintiffs' motion for class certification is GRANTED.

**BACKGROUND**

Plaintiffs Brust, Bulala, and Ludwig are female students at the University of California at Davis ("UCD"). (Decl. of Kelsey Brust in Supp. of Pls.' Mot. for Class Certification ("Brust Decl."), filed Aug. 14, 2008, ¶ 1; Decl. of Jessica Bulala in Supp. of Pls.' Mot. for Class Certification ("Bulala Decl."), filed Aug. 14, 2008, ¶ 1; Decl. of Laura Ludwig in Supp. of Pls.' Mot. for Class Certification ("Ludwig Decl."), filed Aug. 14, 2008, ¶ 1). Each named plaintiff participated in high school athletics and asserts that she is interested in and has the ability to participate in college varsity athletics. (Brust Decl. ¶¶ 3-8; Bulala Decl. ¶¶ 2-5; Ludwig Decl. ¶¶ 2-7).

Plaintiff Brust began playing field hockey while in junior high and continued to play for all four years of high school. (Brust Decl. ¶ 3.) Brust played defense on the varsity team for her sophomore, junior, and senior years and was the team captain her senior year when the team won the Division II Field Hockey championships. (Id.) She currently plays field hockey at the club level at UCD, which has finished in the first or second slot in the Western Collegiate Field Hockey Conference for a number of years. (Id. ¶ 4.) Brust asserts that the UCD women's field hockey team has sought varsity status on several occasions. (Id. ¶ 7.) On or about July 2008, women's field hockey was added as an intercollegiate sport. (Am. Decl. of Greg Warzecka in Supp. of Def.'s Opp'n to Pls.' Mot. for Class Certification ("Warzecka Decl."), filed Sept. 11, 2008, ¶ 3). Competition in that sport is scheduled to start in the fall of 2009. (Id.)

Plaintiff Bulala began playing field hockey competitively in the sixth grade. (Bulala Decl. ¶ 2). She competed at the varsity level in high school for all four years. (Id.) Her teams tied at the state championships her freshman year, won the county title her sophomore year, won the county and regional titled her junior year, and won the county, regional, and state championships her senior year. (Id.) She currently plays field hockey at the club level at UCD. (Id. ¶ 3.)

**\*2** Plaintiff Ludwig has played competitive sports for many years. (Ludwig Decl. ¶ 2.) She wrestled in high school for three and a half years at the junior varsity and varsity levels. (Id.) She placed in the top ten in the national United

States Girls Wrestling Association in her junior and senior years and was named an All American during her senior year in the USA Wrestling Magazine. (Id.) During her freshman year at UCD, Ludwig was interested in participating on the varsity wrestling team, but was directed to the wrestling club team by the coach. (Id. ¶ 3.) Ludwig asserts that there were few competitive opportunities on the club team because it was unorganized and lacked a paid coach. (Id.) During her sophomore year, Ludwig played rugby at the club level. (Id. ¶ 4.) However, during the pre-season of her junior year, she was injured and unable to participate during her junior and senior year. (Id.) Ludwig asserts that because she was a club team member, she did not have access to the same medical treatment that a varsity player would receive, and that, if she had such access, she would have continued to play. (Id. ¶ 6.) Ludwig also asserts that the Davis Women's Rugby Club submitted an application in 2007 for varsity status but was not selected. (Id. ¶ 8.)

As club sport team members, plaintiffs must make a financial commitment to play by paying dues, and club teams must raise their own funds for travel, uniforms, coaches, and equipment. (Brust Decl. ¶ 5; Bulala Decl. ¶ 4; Ludwig Decl. ¶ 5.) It is plaintiffs' understanding that elevation of club teams to varsity status brings with it benefits, including (1) paid coaches; (2) paid equipment and uniforms; (3) access to health benefits and athletic training; (4) access to tutoring and other academic assistance; (5) facility and field priority; and (6) administrative and financial assistance. (Brust Decl. ¶ 6; Bulala Decl. ¶ 5; Ludwig Decl. ¶ 7.) While plaintiffs Brust and Bulala believe that field hockey is a strong candidate for varsity status and plaintiff Ludwig believes that rugby is a strong candidate for varsity status, all plaintiffs assert that they are participating in this litigation in order to obtain more varsity athletic opportunities for all female athletes at UCD. (Brust Decl. ¶ 8; Bulala Decl. ¶ 7; Ludwig Decl. ¶ 8.)

Plaintiffs request certification of the following proposed class:

> All current, prospective, and future women students at the University of California at Davis who seek to participate in and/or who are deterred from participating in intercollegiate athletics at UCD.

(Pls.' Mot. for Class Certification [Docket #53], filed Aug. 14, 2008, at 5.) On behalf of the class and themselves, named plaintiffs seek declaratory, injunctive, and monetary relief and the other judicial remedies available to them to ensure UCD's compliance with Title IX, including: (1) a declaration that UCD has violated and continues to violate Title IX; and (2) an injunction: (a) restraining defendant from engaging in sex discrimination in the administration of UCD athletic programs; (b) requiring defendant to increase varsity athletic participation opportunities for female students at UCD and to provide all corresponding benefits of varsity status; and (c) requiring defendant to increase athletic financial assistance for female athletes. (Compl., filed July 24, 2007, ¶ 4.)

## STANDARD

District courts have broad discretion in ruling on motions for class certification because "the district court is in the best position to consider the most fair and efficient procedure for conducting any given litigation." Doninger v. Pacific Northwest Bell, Inc., 564 F.2d 1304, 1309 (9th Cir. 1977). However, before certifying a class, the court must "conduct a 'rigorous analysis' to determine whether the party seeking certification has met the prerequisites of Rule 23" of the Federal Rules of Civil Procedure. Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180, 1186 (9th Cir. 2001) (citing Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 1233 (9th Cir. 1996)). "The 'rigorous analysis requirement' means that a class is not maintainable merely because the complaint parrots the language of Rule 23." Communities for Equity, 192 F.R.D. 568, 570 (citing In re Am. Med. Sys., Inc., 75 F.3d 1069, 1079 (6th Cir. 1996)).

**\*3** Under Rule 23(a), there are four threshold requirements applicable to all class actions: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of fact common to the class; (3) the claims and defenses of the representative party are typical of the claims and defenses of the class; and (4) the representative party will fairly and adequately represent the interests of the class. Fed. R. Civ. P. 23(a).

An action may be maintained as a class action where the above prerequisites are met and one of the conditions enumerated in Rule 23(b) is satisfied. Plaintiffs move for certification under Rule 23(b)(2). Certification under Rule 23(b)(2) is proper where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed. R. Civ. P. 23(b)(2).

The burden is on the party seeking to maintain the action as a class action to establish a prima facie showing of each of the 23(a) prerequisites and the appropriate 23(b) ground for a class action. Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019, 1022 (9th Cir. 1998); Mantolete v. Bolger, 767 F.2d 1416, 1424 (9th Cir. 1985).

**ANALYSIS**[2]


**A. Rule 23(a)(1): Numerosity**

The initial inquiry under Rule 23(a) is whether the class is sufficiently numerous that joinder of all members individually is "impracticable." Fed. R. Civ. P. 23(a)(1); see Communities for Equity, 192 F.R.D. at 571 ("Numbers alone are not dispositive when the numbers are small, but will dictate impracticability when the numbers are large."). "The requirement does not demand that joinder would be impossible, but rather that joinder would be extremely difficult or inconvenient." 5 Moore's Federal Practice § 23.22[1] (3d Ed. 2003).

The numerosity requirement imposes no absolute numerical limitation, but, rather, requires that the specific facts of each case be examined. General Tel. Co. v. E.E.O.C., 446 U.S. 318, 330 (1980). "Practicability of joinder depends on many factors, including, for example, the size of the class, ease of identifying its numbers and determining their addresses, facility of making service on them if joined and their geographic dispersion." Kilgo v. Bowman Transp., Inc., 789 F.2d 859, 878 (11th Cir. 1986) (upholding class certification where plaintiff identified thirty one individual class members and the class included future and deterred job applicants who were necessarily unidentifiable). Where the class is comprised of more than forty individuals, numerosity is generally satisfied. Cox v. Am. Cast Iron Pipe Co., 784 F.2d 1546, 1553 (11th Cir. 1986); see also Leyva v. Buley, 125 F.R.D. 512, 515 (E.D. Wash. 1989) (holding that class consisting of 50 individuals met numerosity requirement). If class members are unknown or unidentifiable, then joinder of all class members is likely impracticable. See Jordan v. Los Angeles County, 669 F.2d 1311, 1319-20 (9th Cir. 1982), vacated on other grounds, 459 U.S. 810 (1982) (holding that the numerosity requirement was met because "[t]he joinder of unknown individuals is inherently impracticable"); see also 5 Moore's Federal Practice § 23.22[3] (3d Ed. Supp. 2008) ("It is well established ... that the party seeking class certification need not be able to prove the exact number of members of the proposed class or to identify each class member.").

**\*4** Further, where declaratory or injunctive relief is sought, the numerosity requirement may be relaxed "so that even speculative or conclusory allegations regarding numerosity are sufficient to permit class certification." 5 Moore's Federal Practice § 23.22[3][b] (3d Ed. Supp. 2008); see also Goodnight v. Shalala, 837 F. Supp. 1564, 1582 (D.

Utah 1994).

In support of their motion for class certification, plaintiffs present evidence that there are over 600 women playing club sports at UCD and several thousand that participate in intramural sports at UCD. (See Pl.'s Ex. A:21, A:23.) Plaintiffs also present evidence that there are more than six thousand girls in California who participate in high school athletic teams that do not have varsity status at UCD. (See Pl.'s Ex. A:28.) Defendant asserts that this evidence is insufficient because it does not demonstrate that those women are necessarily interested in participating in varsity athletics at UCD. However, defendant's own evidence demonstrates that there is a high level of interest in competition at the intercollegiate level by female students. In a 2004 survey of female freshman interest in athletics (2,426 female freshman), the "best estimate" revealed that 212 female students[3] were interested in participating at the varsity level in sports that were not offered by UCD. (Def.'s Ex. P, at MAN6168.) In a similar 2005 survey, the "best estimate" revealed that 312 female students were interested in participating at the varsity level in sports that were not offered by UCD. (Def.'s Ex. Q, at MAN6933.) In a 2007 survey of female undergraduate interest in athletics (12,431 females), the "best estimate" revealed that 561 female students were interested in participating at the varsity level in sports that were not offered by UCD. (Def.'s Ex. R, at 13.) As such, this evidence sufficiently demonstrates that the proposed class meets the numerosity requirement.

Defendant also asserts that the numerosity requirement is not met because plaintiffs' proffered evidence does not include information regarding how many girls who are interested in playing at the intercollegiate level meet the minimum academic requirements for admission at UCD or to participate in intercollegiate athletics at UCD once admitted. Defendant's argument demonstrates the impracticability of joinder in this case. There are thousands of female athletes that participate in high school athletics in sports that are not offered at the varsity level at UCD. The identity of those prospective and future students who are qualified for admission and are deterred from participating in intercollegiate athletics at UCD because of it's alleged discriminatory policies is not readily ascertainable, if not impossible to discern, and thus, it is inherently impracticable to join them as parties. See Jordan, 669 F.2d at 1319-20; see also Roman v. Korson, 152 F.R.D. 101, 111 (W.D. Mich. 1993) (holding that inclusion of future class members was warranted in light of the suggestion of future violations and would avoid unnecessary harm and repetitive litigation).

**\*5** Plaintiffs have presented sufficient evidence to demonstrate that the proposed class is composed of a large

Brust v. Regents of the University of California, Not Reported in Fed. Supp. (2008)

number of current women students at UCD who are interested in participating in varsity athletics as well as a significant number of prospective and future women students who are not easily identified. Joinder of all these parties would be impracticable. Accordingly, the numerosity requirement is fulfilled.[4]

**B. Rule 23(a)(2): Commonality**

The next inquiry under Rule 23(a) is whether there exist "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "The fact that there is some factual variation among the class grievances will not defeat a class action .... A common nucleus of operative fact is usually enough to satisfy the commonality requirement of Rule 23(a)(2)." Rosario v. Livaditis, 963 F.2d 1013, 1017-18 (7th Cir. 1992). "All questions of fact and law need not be common to satisfy the rule. The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." Hanlon Corp., 150 F.3d at 1019. "[A] proposed class can consist of members with widely differing experiences as they relate to a common case but seek a common remedy for a common policy of discrimination." Parra v. Bashas', Inc., 536 F.3d 975, 978 (9th Cir. 2008); Communities for Equity, 192 F.R.D. at 572 ("In cases involving the question of whether a defendant has acted through an illegal policy or procedure, commonality is readily shown because the common question becomes whether the defendant in fact acted through the illegal policy or procedure.").

In this case, the central question is "whether UCD discriminates against women in its varsity athletics program by failing to provide equal athletic opportunities in violation of Title IX." (Pl.'s Mot. for Class Certification, filed Aug. 14, 2008, at 9.) Questions of law and fact that are common to the class may include, among others: (1) whether female varsity athletic opportunities are disproportionately few in relation to the level of female enrollment at UCD; (2) whether women's varsity athletic opportunities are disproportionately few in relation to the level of men's athletic varsity opportunities; (3) whether UCD has failed to expand female varsity opportunities for students at a rate and in a manner that is responsive to developing interests on campus; (4) whether defendant has violated Title IX in its allocation of varsity sports opportunities; and (5) whether plaintiffs are entitled to injunctive relief requiring defendant to create more varsity opportunities for female students at UCD. (Id. at 10.); see Communities for Equity, 192 F.R.D. at 572 (holding that commonality was established where the overarching

question was whether the defendant violated Title IX).[5] Accordingly, the commonality requirement is satisfied.

**C. Rule 23(a)(3): Typicality**

**\*6** Next, Rule 23(a) requires that the "claims or defenses of the class representative must be typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The test of typicality 'is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.' " Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992) (quoting Schwartz v. Harp, 108 F.R.D. 279, 282 (C.D. Cal. 1985)). "The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." Id. While this requirement seemingly merges with the commonality requirement, the inquiry under typicality focuses on potential conflict[6] between the interests of the class representatives and the interests of the absent class members that would preclude certification. See Falcon, 457 U.S. at 157 n.3 (noting that typicality tends to merge with both commonality and adequacy of representation because it serves as a guidepost for determining "whether maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately represented in their absence").

"[C]lass certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." Hanon, 976 F.2d at 508 (quoting Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 903 F.2d 176, 180 (2d Cir. 1990)). The unique defense inquiry goes to the existence of a defense, not to its validity; the party opposing certification must show some degree of likelihood that the unique defense will play a significant role at trial. 5 Moore's Federal Practice § 23.24[6][a] (3d Ed. Supp. 2008). However, a defense that has no merit will not preclude certification. Id.; see Hanon, 976 F.2d at 509 (noting that the court is "at liberty to consider evidence which goes to the requirements of Rule 23 even though the evidence may also relate to the underlying merits of the case").

As set forth above, plaintiffs have demonstrated that the claims of the named plaintiffs as well as the proposed class arise out of the systemic denial of varsity athletic opportunities and accompanying benefits due to defendant's alleged discriminatory policies. All plaintiffs'

claims are based upon the common legal issues of whether defendant's system-wide programs, policies, and practices violate Title IX. All plaintiffs' injuries arise from the denial of equal athletic participation opportunities to women students at UCD.

Defendant contends that plaintiffs Brust and Bulala's claims are not typical of the class because they are subject to the unique defense of mootness. Defendant asserts that because field hockey is in the process of being established as a varsity sport at UCD, claims relating to field hockey are no longer actionable.

While the court does not reach a conclusion with respect to the merits of defendant's asserted defense, it holds that the relative strength of the argument demonstrates that the mootness defense will not play a significant role at trial such that it precludes certification. See Riordan v. Smith Barney, 113 F.R.D. 60, 63 (N.D. Cal. 1986) ("[I]t is only when a unique defense will consume the merits of a case that a class should not be certified."). First, defendant's argument relies on a mischaracterization of plaintiffs' claims. Brust and Bulala's claim is not based upon UCD's failure to add a field hockey team, but rather, the alleged failure to provide equal athletic opportunities to interested female athletes. The lack of a varsity field hockey team when there was sufficient interest is only one alleged result of this systemic discrimination. Moreover, plaintiffs' requested injunctive relief is that UCD increase varsity athletic participation opportunities for female students at UCD, not the addition of a field hockey team or any particular varsity athletic team. Second, at present, there is no active varsity field hockey team at UCD. Finally, issues relating to voluntary cessation and broader public goals raise serious questions as to the applicability of the defense. Under these circumstances, the court does not conclude that the mootness defense defeats typicality.

*7 Defendant also contends that there is a conflict between named plaintiffs' interests in establishing varsity teams of their liking and the interest in absent members of the class who would prefer the establishment of other varsity teams. Again, defendant's argument relies on the mischaracterization that named plaintiffs seek the establishment of particular varsity teams at UCD as opposed to an increase in varsity athletic opportunities generally. Further, "[t]o the extent that the underlying issue in the case is one of unequal treatment and discrimination, the matter of whether to sanction a particular sport appears to be one relating to relief, rather than liability." Communities for Equity, 192 F.R.D. at 574.

The court is mindful that a conflict could arise at the remedy stage, if any, of the litigation due to the limited availability of resources and the choice between what

teams may be selected for varsity status.[7] Boucher v. Syracuse Univ., 164 F.3d 113, 199 (2d Cir. 1998). This conflict may be resolved by the creation of subclasses. Id. However, because the liability determination in this case is particularly well-suited to class treatment, the court believes that the appropriate course is "to defer consideration of any subclasses to the relief stage, if any, of this litigation." Communities for Equity, 192 F.R.D. at 574 (citing H. Newberg and A. Conte, 1 Newberg on Class Actions, § 3.25 (3d ed. 1992) ("Potential conflicts relating to relief issues which would arise only if the plaintiffs succeed on common claims of liability on behalf of the class will not bar a finding of adequacy and may be resolved, when the need arises, by the formation of subclasses at the relief stage.").

Accordingly, the typicality requirement is satisfied.

### D. Rule 23(a)(4): Adequacy of Representation

The final prerequisite under Rule 23(a) is that the person representing the class must be able "fairly and adequately to protect the interests" of all members in the class. Fed. R. Civ. P. 23(a)(4). This element requires: "(1) that the proposed representative [p]laintiffs do not have conflicts of interest with the proposed class, and (2) that [p]laintiffs are represented by qualified and competent counsel." Dukes v. Wal-Mart, Inc., 509 F.3d 1168, 1185 (9th Cir. 2007).

Defendant's objections to the adequacy of representation are based primarily upon the same alleged conflicts discussed under the typicality requirement.[8] As set forth above, the court finds that there is no conflict of interest arising out of the proposed addition of field hockey as a varsity sport and that any potential conflict with respect to the remedies may be cured at a later stage in the litigation through appropriate subclasses.

Defendant also argues that there is inherent conflict in the class because some women are not interested in playing varsity sports and do not want to be a member of the class. Specifically, defendant references the declarations of two female UCD students who participate in club sports or intramural sports, have no desire to compete at the intercollegiate level and do not want to be parties to the lawsuit. (Decl. of Rebecca Kwong, Def.'s Ex. Z; Decl. of Amy Cole, Def.'s Ex. AA.) As an initial matter, the proposed class purports only to represent those women who seek to participate in and/or who are deterred from participating in intercollegiate athletics at UCD. To the extent that some female students do not seek to participate in intercollegiate athletics, they are not part of the proposed

class. Further, "[i]t is not 'fatal if some members of the class prefer not to have violations of their rights remedied.' " Lanner v. Wimmer, 662 F.2d 1349, 1357 (10th Cir. 1981); see Int'l Molders' & Allied Workers' Local Union No. 164 v. Nelson, 102 F.R.D. 457, 464 (N.D. Cal. 1983) (holding that some class members' belief that the defendants' conduct was not objectionable did not defeat class certification; see also 5 Moore's Federal Practice § 23.25[2][6][iii] (3d Ed. Supp. 2008) ("[A] court will not refuse to certify a class solely because some of the class members prefer to leave their rights unremedied."); H. Newberg and A. Conte, 1 Newberg on Class Actions, § 3:30 (4th ed. 2008) ("[T]he class member who wishes to remain a victim of unlawful conduct does not have a legally cognizable conflict with the class representative.").[9]

**\*8** With respect to the appointment of class counsel, defendant does not contest the qualifications of the Sturdevant Law Firm and Equal Rights Advocates to serve as class counsel. (Def.'s Opp'n to Pls.' Mot. for Class Certification, filed Sept. 10, 2008, at 19.) However, defendant challenges the appointment of Kristen Galles of Equity Legal on the basis that there is no need to have three law firms assigned as class counsel and it will contribute to the needless inflation of attorneys' fees. The court disagrees. Ms. Galles has significant Title IX class counsel experience. (Pl.'s Ex. D.) To the extent that plaintiffs' attorneys fees become an issue for defendant in this litigation, the court can determine whether duplicative work has been performed by counsel.

Accordingly, representation is adequate.

## E. Rule 23(b)(2): Injunctive or Declaratory Relief

Under Rule 23(b)(2), class certification may be appropriate where a defendant acted or refused to act in a manner applicable to the class generally, rendering injunctive relief or declaratory relief appropriate to the class as a whole. Fed. R. Civ. P. 23(b)(2); see Molski v. Gleich, 318 F.3d 937, 950 (9th Cir. 2003). Rule 23(b)(2) generally does not

extend to cases in which the appropriate final relief relates primarily to money damages. See Arnold v. United Artists Theatre Circuit, Inc., 158 F.R.D. 439, 450-51 (N.D. Cal. 1994). However, "[c]lass actions certified under Rule 23(b)(2) are not limited to actions requesting injunctive and declaratory relief, but may include cases that also seek monetary damages." Probe v. State Teachers' Retirement Sys., 780 F.2d 776, 780 (9th Cir. 1986).

In this case, plaintiffs allege that defendant UCD acted in a manner applicable to the class generally by failing to offer equal intercollegiate athletic opportunities to women students at UCD. Plaintiffs predominately seek declaratory and injunctive relief requiring UCD to come into compliance with Title IX; such relief would apply to and benefit the class as a whole. Accordingly, certification under Rule 23(b)(2) on the issues of liability, declaratory relief and injunctive relief is appropriate.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for class certification is GRANTED. The court certifies the following class:

> All present, prospective, and future women students at the University of California at Davis who seek to participate in and/or who are deterred from participating in intercollegiate athletics at the University of California at Davis.

The court appoints Kelsey Brust, Laura Ludwig, and Jessica Bulala as class representatives. The court appoints Equal Rights Advocates, The Sturdevant Law Firm, and Equity Legal as class counsel.

IT IS SO ORDERED.

## All Citations

Not Reported in Fed. Supp., 2008 WL 11512299

## Footnotes

1    Because oral argument will not be of material assistance, the court orders this matter submitted on the briefs. See E.D. Cal. Local Rule 78-230(h). The extensive briefing and documentary evidence and affidavits filed by the parties renders an evidentiary hearing unnecessary because the court is able to probe behind the pleadings without additional evidence or argument. See Communities for Equity v. Mich. High Sch. Athletic Ass'n, 192 F.R.D. 568, 571 (W.D. Mich. 1999); cf. Gen. Tel. Co. v. Falcon, 457 U.S. 147, 160 (1982) (noting that "it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question").

Brust v. Regents of the University of California, Not Reported in Fed. Supp. (2008)

2      The court notes that both plaintiffs and defendant devote a disproportionate amount of their briefs to a discussion of the merits of their underlying claims and defenses that is irrelevant to the requirements of Rule 23. As this is before the court on a motion for class certification, the court does not address the merits of these irrelevant issues or make any binding conclusions with respect to any claims or defense. See Eisen v. Carlisle and Jacquelin, 417 U.S. 156, 178 (1974) (noting that nothing in the language of Rule 23 gives the court authority to conduct a preliminary inquiry into the merits of a suit on a motion for class certification).

3      The court notes that respondents to the surveys were able to mark their interest in more than one sport and level of participation. Therefore, of the responses, some may have been by the same student. However, the court finds that these surveys are sufficient to demonstrate interest among a large number of female freshman students.

4      The court also notes that injunctive and declaratory relief is the crux of plaintiffs' requested relief in this litigation. As such, the numerosity requirement is less stringent.

5      Defendant does not specifically argue that the commonality requirement is not met, but rather, argues that the asserted conflict among the class precludes certification. The court notes that these arguments are better addressed in the discussion of the typicality and/or adequacy of representation inquiries.

6      The inquiry into potential also implicates the requirement under Rule 23(a)(4) and under constitutional due process standards that "absent class members must be afforded adequate representation before entry of a judgment which binds them." Hanlon, 150 F.3d at 1020 (citing Hansberry v. Lee, 311 U.S. 32, 42-43 (1940)).

7      However, the court notes that if plaintiffs prevail, relief is not necessarily based upon an injunction requiring the establishment of specific varsity teams for women.

8      Defendant addressed commonality, typicality, and adequacy of representation simultaneously in its opposition.

9      Moreover, "the interests of those class members who do not consider themselves adversely affected will be adequately represented by defendant." Communities for Equity, 192 F.R.D. at 574.

---

**End of Document**          © 2024 Thomson Reuters. No claim to original U.S. Government Works.

1996 WL 328446
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Catherine E. BRYANT, Lorna Gordon, Lori Krim, Christina Chen, Hannah Newhall, Jessika Erickson, Erin M. Shoudt, Rebecca Newhall, and Allison Ridder, Individually and on Behalf of All Others Similarly Situated, Plaintiffs,
v.
COLGATE UNIVERSITY, Neil Grabois, President of Colgate University, and Mark Murphy, Athletic Director of Colgate University, Defendants.

No. 93-CV-1029.
|
June 11, 1996.

**Attorneys and Law Firms**

Seidenberg & Strunk, Syracuse, NY (Faith A. Seidenberg, Bonnie P. Strunk, of counsel), for Plaintiffs.

Hughes, Hubbard & Reed, New York City (Carla A. Kerr, George A. Davidson, of counsel), for Defendants.

DECISION AND ORDER

SCULLIN, District Judge.

Introduction

**\*1** This is an action under Title IX, 20 U.S.C. § 1681, in which ten students at Colgate University ("Colgate") who are members of the women's club ice hockey team allege that Colgate University, Colgate President Neil Grabois, and Colgate Athletic Director Mark Murphy violate Title IX by (1) failing to provide reasonable opportunities for

athletic scholarships for female and male athletes in proportion to the number of students of each gender participating in intercollegiate athletics, (2) failing to provide equivalent athletic benefits and opportunities to female athletes and male athletes, and (3) failing to effectively accommodate plaintiffs' interests in intercollegiate athletics.[1] Plaintiffs seek broad declaratory, injunctive, and monetary relief.[2] Further, they have applied for certification to proceed as a class on behalf of "all present and future Colgate University women students and potential students who participate, seek to participate, and/or are deterred from participating in Colgate's intercollegiate athletics program." Amended Complaint ¶ 16.

Presently before the Court are (1) plaintiffs' motions for class certification and publication of notice of class action, (2) defendants' cross motion for summary judgment, and (3) plaintiffs' motion for summary judgment.

Factual Background

Defendant Colgate University is a private institution of higher education located in Hamilton, New York. Defendants Neil Grabois and Mark Murphy serve as President and Athletic Director of Colgate, respectively. Colgate receives federal financial assistance, including assistance provided through student financial aid programs. Founded in 1819 as an all men's institution, Colgate admitted its first female students in 1970.

Colgate's varsity athletics program consists of eleven varsity women's sports and eleven varsity mens sports.[3] Colgate competes in Division I of the NCAA with respect to all of its varsity sports. In eight varsity sports, Colgate fields both men's and women's teams. Varsity teams are provided with full-time coaches, equipment, practice facilities, travel accommodations, and other benefits.

Colgate's club athletics program consists of twenty-three teams in fifteen sports, including women's ice hockey. Five sports have separate men's and women's teams[4] and the remainder of the teams are integrated. Club teams are student-initiated, student-run athletic teams. Although some club teams receive financial support from Colgate, the amount of such support is far less than that given Colgate's varsity athletic teams.

Women's ice hockey is a club sport at Colgate. Plaintiffs are members of the women's club ice hockey team who

contend that the team should be elevated to varsity status, with all of the benefits and opportunities of that status. In 1979, 1983, 1986, and 1988 members of the women's club ice hockey team applied to Colgate for elevation of the team to varsity status. Colgate denied each application.

**\*2** On April 10, 1990, several members of the Colgate women's club ice hockey team filed a Title IX action which was tried by consent before Magistrate Judge Hurd. Judge Hurd ruled in favor of plaintiffs, but the decision was vacated as moot by the Second Circuit. *Cook v. Colgate University,* 802 F. Supp. 737 (N.D.N.Y. 1992), *vacated as moot,* 992 F.2d 17 (2d Cir. 1993). On August 4, 1993, following the Second Circuit's decision in *Cook,* five of the plaintiffs in the case at bar[5] filed a complaint alleging that Colgate is in violation of Title IX. Shortly thereafter on October 8, 1993, plaintiffs moved for class certification. Defendants cross-moved for summary judgment on November 29, 1993. Prior to oral argument on the motion and cross-motion, plaintiffs moved for summary judgment on January 21, 1994. The Court heard oral argument on the motions on February 11, 1994, and reserved decision at that time. This Decision and Order resolves all outstanding motions.

Discussion

I. Sources of Title IX Law

A. The Statute

Title IX provides, in pertinent part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Evidence of imbalance between the number of male or female participants in an activity and the total number of persons of that sex in a university community may be considered as a factor in determining whether an institution has complied with Title IX. 20 U.S.C. § 1681(b). However, an institution cannot be found to violate Title IX solely on the basis of such evidence. *Id.*

B. The Regulations and the Policy Interpretation
In 1975 pursuant to a congressional grant of authority, the Secretary of Health, Education, and Welfare ("HEW")

promulgated regulations under Title IX that included specific provisions concerning athletic programs, 45 C.F.R. § 86.41, and athletic scholarships, 45 C.F.R. § 86.37. In 1979 the HEW Office of Civil Rights published a final Policy Interpretation ("PI") of these regulations. 44 Fed. Reg. 71413 (1979). The Department of Education adopted the HEW regulations verbatim, and the Department presently administers this portion of Title IX, primarily through its Office of Civil Rights. *Cohen v. Brown University,* 991 F.2d 888, 895 (1st Cir. 1993); *see* 34 C.F.R. §§ 106.41,[6] 106.37.[7] Where, as here, Congress has explicitly delegated authority "'to [an] agency to elucidate a specific provision of the statute by regulation'" the regulations at issue are "'given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.'" *Ahmetovic v. Immigration and Naturalization Service,* 62 F.3d 48, 51 (2d Cir. 1995) (quoting *Chevron U.S.A. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843-44 (1984)); *see also Kelley v. Board of Trustees,* 35 F.3d 265, 270 (7th Cir. 1994). The Court finds that the regulations are a reasonable interpretation of the statute, and, consequently, affords them controlling weight.

**\*3** Unlike the regulations, the Department of Education never explicitly adopted the PI. However, the PI is nonetheless entitled to consideration as an agency's interpretation of its own regulations. *Cohen,* 991 F.2d at 896-97.

> It is well established that an agency's construction of its own regulations is entitled to substantial deference. In situations in which the meaning of [[regulatory] language is not free from doubt, the reviewing court should give effect to the agency's interpretation so long as it is reasonable, that is, so long as the interpretation sensibly conforms to the purpose and wording of the regulations. Because applying an agency's regulation to complex or changing circumstances calls upon the agency's unique expertise and policymaking prerogatives, we presume that the power authoritatively to interpret its own regulations is a component of the agency's delegated lawmaking powers.

*Martin v. Occupational Safety & Health Review Comm'n,* 499 U.S. 144, 150-51 (1991) (citations and quotation marks omitted). Therefore, the Court will afford substantial deference to the PI in the analysis below where the PI reasonably interprets the regulations.

The PI is "designed specifically for intercollegiate athletics. However, its general principles will often apply to club, ... programs which are also covered by regulation."[8] 44 Fed. Reg. at 71,413. The PI reasonably separates the regulations into three categories of athletics claims under Title IX: (1) Athletic Financial Assistance

(Scholarships), 34 C.F.R. § 106.37(c); (2) Equivalence in Other Athletic Benefits and Opportunities, 34 C.F.R. § 106.41(c)(2)-(10); and (3) Effective accommodation of Student Interests and Abilities, 34 C.F.R. § 106.41(c)(1).

The regulation under the first category, "Athletic Financial Assistance (Scholarships)," seeks to ensure that institutions provide "reasonable opportunities for [athletic scholarships] for members of each sex in proportion to the number of each sex participating in ... intercollegiate athletics." 34 C.F.R. § 106.37(c)(1). The regulation under the second category, "Equivalence in Other Athletic Benefits and Opportunities," seeks to secure equality in virtually all matters concerning the operation of athletic programs at colleges and universities.[9] Finally, the regulation under the third category, "Effective Accommodation of Student Interests and Abilities," is concerned with "[w]hether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes." 34 C.F.R. § 106.41(c)(1). The analysis below is organized according to these categories.

II. Standing

Although defendants did not raise lack of standing as a defense, federal courts are under an independent obligation to examine their own subject matter jurisdiction. *U.S. v. Hays,* 115 S. Ct. 2431, 2435 (1995).

> It is by now well settled that "the irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an 'injury in fact'--an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of.... Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."

**\*4** *Hays,* 115 S. Ct. at 2435 (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992)) (citations omitted). The Court will analyze the elements of standing in light of three related prudential criteria set forth in *Golden Hill Paugussett Tribe of Indians v. Weicker,* 39 F.3d 51, 58 (2d Cir. 1994). Plaintiffs "must (1) be asserting [their] own legal rights, and not those of a third party, (2) be asserting, in addition to a redressable injury, a particularized grievance, and (3) be asserting a claim that falls within that zone of interests the statute aims to protect or regulate." *Id.* at 58. Any of these criteria may alone form the basis for dismissal of plaintiffs' claims on standing grounds. *Comer*

*v. Cisneros,* 37 F.3d 775, 787 (2d Cir. 1994). The Court is also mindful that the burden is on plaintiffs to allege facts demonstrating that they are proper parties to bring their claims. *Hays,* 115 S. Ct. at 2435.

A. Athletic Financial Assistance

With respect to their Athletic Financial Assistance claim, plaintiffs allege that they are injured by defendants' failure to budget and expend scholarship[10] money for the women's club ice hockey team while at the same time defendants provide scholarships for members of the men's varsity ice hockey team. Amended Complaint ¶¶ 36-38. As this Court construes the regulations and the PI, they do not contemplate comparison between levels of competition (i.e., club to varsity) with respect to Athletic Financial Assistance. 34 C.F.R. 106.37(c); *see* 44 Fed. Reg. at 71,415.[11] "[Institutions] must provide reasonable opportunities for ... [awards of athletic financial assistance] for members of each sex in proportion to the number of students of each sex participating in intercollegiate [i.e., varsity] athletics." 34 C.F.R. § 106.37(c).

Although "Congress may create a statutory right the alleged violation of which constitutes injury in fact," neither Title IX nor its regulations provide a right of action based on disparate treatment between club teams and varsity teams. *Heldman v. Sobol,* 962 F.2d 148, 154 (2d Cir. 1992). Plaintiffs are not varsity athletes, and it is undisputed that no club teams, whether they are male, female, or integrated, receive coach-supported athletic financial aid.[12] Murphy Aff. ¶ 13.

A claim based upon inequality in athletic financial assistance "presupposes that the claimant was a varsity athlete who was treated unequally based upon her sex." *Pederson v. Louisiana State University,* 912 F. Supp. 892, 904 (M.D.La. 1996). Plaintiffs simply have no "personal stake" in the outcome of an Athletic Financial Assistance claim. *Warth v. Seldin,* 422 U.S. 490, 498-99 (1975). They are not injured by their failure to receive athletic financial aid because as members of a club team, they are not otherwise eligible to receive such aid. Therefore, plaintiffs do not have standing to maintain a Title IX Athletic Financial Assistance claim.

B. Equivalence in Other Athletic Benefits
**\*5** With respect to their Equivalence in Other Athletic

Benefits claim, plaintiffs again allege that they are injured only through a comparison of the benefits received by the women's club ice hockey team and the men's varsity ice hockey team.[13] Amended Complaint ¶¶ 48-83. The evidence in the record proffered by plaintiffs is devoted exclusively to a comparison of the benefits provided to the men's varsity ice hockey team and those that are not provided to the women's club ice hockey team. *See* Seidenberg Aff. ¶¶ 20-36; Plaintiffs' Rule 10(j) Statement ¶¶ 33-45; Murphy Dep. [Seidenberg Aff. Ex. D] at 40, 110-12. Plaintiffs produce no evidence of injury within their level of competition.[14] While it is clear that the many of the "general principles" of the PI are applicable to an institution's varsity, club, or intramural programs, the PI does not suggest that a comparison of the benefits received by these different athletic programs is relevant, necessary, or logical. By its very nature, an institution's varsity athletic program is subject to much more administrative control and supervision than its club and intramural programs, which tend to be student-initiated and student-driven.

The Court finds that neither the regulation nor the PI contemplates comparison between levels of competition (i.e., club to varsity) with respect to athletic benefits. 34 C.F.R. 106.41(c)(2)-(10); *see* 44 Fed. Reg. at 71,415-17 (1979). As with their financial assistance claim, plaintiffs are not injured by their failure to receive athletic benefits because, as members of a club team, they are not otherwise eligible to receive such aid. Therefore, plaintiffs also lack standing to maintain a Title IX Athletic Benefits claim.

C. Effective Accommodation of Student Interests and Abilities

As to plaintiffs' Effective Accommodation of Interests and Abilities claim, it seems clear that plaintiffs do have standing. Claims within this category explicitly require the Court to consider whether students are interested and capable of participating at another higher level of collegiate athletics. *See* 34 C.F.R. § 106.41(c)(1). Plaintiffs allege and proffer evidence tending to demonstrate that, in spite of their interests and abilities, they are unable to compete in varsity women's ice hockey because defendants' have thrice refused to elevate their team from club status to varsity status. They have therefore alleged a concrete and particularized injury. In addition, the plaintiffs have satisfied the other constitutional requirements of causation and redressibility. Accordingly, the Court will proceed to evaluate the parties' motions with respect to this claim.

III. Class Certification

Plaintiffs seek to maintain this action as a class action under Fed. R. Civ. P. 23(b)(2) and move for class certification.[15] Plaintiffs therefore bear the burden of satisfying the requirements of Fed. R. Civ. P. 23(a) and 23(b)(2). Under Rule 23(a), plaintiffs must demonstrate that "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims ... of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."[16] Fed. R. Civ. P. 23(a). In addition plaintiffs must show that defendants have "acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed. R. Civ. P. 23(b)(2).

1. The Proposed Class

**\*6** Plaintiffs ask the Court to certify a class of "[a]ll present and future Colgate University women students and potential students who participate, seek to participate, and/or are deterred from participating in Colgate's intercollegiate athletics program." The Court finds that the proposed class is not an appropriate class for certification for the following reasons. First, the class is so broad that it includes student athletes who are effectively accommodated, e.g., women students who participated in Colgate's intercollegiate athletics program whose interests and abilities are satisfied by Colgate's current slate of women's varsity teams.

Second, this class does not satisfy the requirement of Rule 23(b)(2). Plaintiffs demand declaratory and injunctive relief that addresses only the alleged injuries suffered by female club ice hockey players as a result of defendants' alleged violation of Title IX. The complaint and record before the Court contain no facts or allegations that would justify declaratory or injunctive relief for any female athlete except members of the women's club ice hockey team.

Third, plaintiffs proffer no evidence that the interests and abilities of female varsity or club athletes other than members of the women's club ice hockey team are ineffectively accommodated.

Finally, even if the record contained sufficient evidence that other female athletes were ineffectively accommodated, the plaintiffs would likely be unable to satisfy the adequate representation requirement of Rule 23(a)(4).[17] In an era of static enrollment and increasing financial demands on institutions of higher learning, the resources available for intercollegiate athletic programs are finite and subject to larger budgetary concerns. *See* Murphy Aff. ¶¶ 31-32. It would seem that where the number of programs available are limited, plaintiffs' interests would be antagonistic to those of other interested and able athletes who might desire elevation of their own sport. Such circumstances could render plaintiffs' representation inadequate under Rule 23(a). *In re Joint Eastern and Southern District Asbestos Litigation,* 78 F.3d 764, 778 (2d Cir. 1996) ("To be fair and adequate, representation must meet two basic standards under Rule 23: '... Second, the class members must not have interests that are antagonistic to one another.'") (quoting *In re Drexel Burnham Lambert Group, Inc.,* 960 F.2d 285, 291 (2d Cir. 1992), *cert. dismissed,* 506 U.S. 1088 (1993)).

2. The Proper Class
"The court has broad discretion in determining whether a particular action complies with Rule 23(a). Furthermore, if plaintiff's definition of the class is found to be unacceptable, the court may construe the complaint or redefine the class to bring it within the scope of the rule." 7A Charles A. Wright et al., *Federal Practice and Procedure* § 1759, at 111-12 (1986); *Lundquist v. Security Pacific Automotive Financial Services Corp.,* 993 F.2d 11, 14 (2d Cir. 1993). The factual allegations and the evidentiary record only address the interests and abilities of female ice hockey players and the potential varsity level intercollegiate competition in women's ice hockey. Therefore, the Court finds that on the facts of this case the only class that can possibly satisfy the requirements of Rule 23(a) and (b)(2) would be a class of "all present and future female students of Colgate University who are interested in and able to play varsity ice hockey, but are unable to do because it is not a women's varsity sport." This putative class must be analyzed in light of the requirements of Rule 23.

*a. Rule 23(b)(2)*

**\*7** As stated, to maintain a class action of the type pled in the complaint, Rule 23(b)(2) requires that defendants acted on grounds generally applicable to the class, thus making

final injunctive or declaratory relief appropriate with respect to the class as a whole. If successful in their claim, both injunctive and declaratory relief would be appropriate for all members of this class, and it is undisputed that defendants have previously declined to elevate women's club ice hockey to varsity status. Therefore, the Court finds that with respect to a class of women ice hockey players, Rule 23(b)(2) is satisfied.

*b. Commonality and Typicality*
"The commonality and typicality requirements of Rule 23(a) tend to merge." *General Telephone Co. v. Falcon,* 457 U.S. 147, 157 n.13 (1982). Before a class may be certified, "questions of law or fact common to the class" must exist. Fed. R. Civ. P. 23(a)(2). In addition, the claims of the representative parties must be typical of the claims of the class. Fed .R. Civ. P. 23(a)(3); *see Jackson v. Foley,* 156 F.R.D. 538, 542 (S.D.N.Y. 1994) and *Follette v. Vitanza,* 658 F. Supp. 492, 506 (N.D.N.Y. 1987). A class limited to interested and able ice hockey players would present common questions concerning the interests of female students and potential students, the competitive capability of a women's varsity ice hockey team, and the availability of competition in the institution's normal competitive region. It is also apparent that all members of this class suffer the same alleged injury caused by the same alleged course of conduct. *Drexel,* 960 F.2d at 291. This class clearly satisfies the requirements of commonality and typicality.

*c. Adequate Representation*
The adequate representation requirement is designed to ensure that both the plaintiffs and their counsel will vigorously represent the interests of all the class members. *See Louis M v. Ambach,* 113 F.R.D. 133, 137 (N.D.N.Y. 1986). "Under Rule 23(a)(4), adequacy of representation is measured by two standards. First, class counsel must be 'qualified, experienced and generally able' to conduct the litigation. Second, the class members must not have interests that are 'antagonistic' to one another." *Drexel,* 960 F.2d at 291 (citations omitted). Defendants do not challenge the adequacy of plaintiffs' counsel, and the Court finds that plaintiffs' counsel satisfies this requirement with respect to the class at issue. *See* Seidenberg Support Aff. and Strunk Support Aff. (Docket No. 5). Further, unlike the proposed class, the members of a class composed of female ice hockey players would possess unified and consistent

interests in achieving elevation of the women's ice hockey team to varsity status.

### d. Numerosity

Although a class of female ice hockey players clearly satisfies the other requirements for class certification, whether the class can satisfy the numerosity requirement is less clear. As stated, numerosity looks to whether the class is so numerous that joinder of all members is impracticable. Other relevant considerations are the "judicial economy arising from the avoidance of a multiplicity of actions, geographic dispersion of class members, the ability of claimants to institute individual suits, and requests for prospective injunctive relief which would involve future class members." *Robidoux v. Celani,* 987 F.2d 931, 936 (2d Cir. 1993)

**\*8** Since 1989 there have been as many as twenty-eight and as few as nineteen members of the women's club ice hockey team at Colgate. Seidenberg Aff. Ex. L. However, there appears to be consistent interest in the team, and the composition of the team changes each year as seniors graduate, juniors and sophomores move up, and freshmen join. Class certification would do little for judicial economy, and the individual plaintiffs all attend college at Colgate and are not geographically dispersed. However, plaintiffs have requested prospective injunctive relief that would involve future class members.

### 3. Conclusion

The number of participants in women's club ice hockey at Colgate and the prospective nature of the injunctive relief requested by plaintiffs persuade the Court to conditionally certify the class of "all present and future female students of Colgate University who are interested in and able to play varsity ice hockey, but are unable to do because it is not a women's varsity sport." Fed. R. Civ. P. 23(c)(1). However, in order to maintain class status, plaintiffs must develop further evidence of sufficient numerosity at trial or face decertification of this class prior to the entry of judgment.

### IV. Notice to Class Members
In addition to certification of a class under Rule 23(b)(2),

plaintiffs seek an order "setting forth the requisite notice to class members." Although notice is not explicitly required in class actions under Rule 23(b)(2), the Court retains the discretion to require that notice be given to prospective class members for the "protection of the class" or the "fair conduct of the action." Fed. R. Civ. P. 23(d)(2). Given the probable moderate size of the class, the conditional nature of its certification, and the nature of class relief requested, the Court finds that notice to class members is not necessary at this time.

### V. Summary Judgment -- Effective Accommodation of Student Interests and Abilities
Under Rule 56(c), summary judgment is warranted if, when viewing the evidence in the light most favorable to the non-movant, the Court determines that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 456 (1992); *Commander Oil v. Advance Food Serv. Equip.,* 991 F.2d 49, 51 (2d Cir. 1993). A genuine issue of material fact is one that a reasonable fact finder could decide in favor of either party. *Anderson v. Liberty Lobby,* 477 U.S. 242, 250 (1986).

"A university violates Title IX if it ineffectively accommodates student interests and abilities regardless of its performance in other Title IX areas." *Cohen* 991 F.2d at 897; *Roberts v. Colorado Bd. of Agriculture,* 998 F.2d 824, 828 (10th Cir. 1993); *Kelley v. Board of Trustees,* 35 F.3d 265, 268 (7th Cir. 1994). In order to succeed in their Effective Accommodation claim, plaintiffs must plead and prove that

> **\*9** (1) intercollegiate level participation opportunities for male and female students are not provided in numbers *substantially proportionate* to their respective enrollment; and

> (2) the interests and abilities of the sex underrepresented among intercollegiate athletes have not been *effectively accommodated* by the present program.

*Cohen,* 991 F.2d at 897-98; *Roberts,* 998 F.2d at 829-31; *Kelly* 35 F.3d at 268. Even if plaintiffs bear their burden successfully, defendants may avoid liability by proving that they come within the safe harbor in that they have a history and continuing practice of program expansion that is demonstrably responsive to the developing interest and abilities of the members of the underrepresented sex. *Cohen,* 991 F.2d at 898; *Roberts* 998 F.2d at 830.

A. Substantial Proportionality

Under this first element, the Court must examine whether opportunities for female students to play intercollegiate athletics are substantially proportional to their enrollment. It is undisputed that women on the Colgate campus have been historically underrepresented among intercollegiate athletes. The student population at Colgate is approximately 2,700, 1350 (50%) of whom are men and 1350 (50%) of whom are women. Defs' 10(j) Statement ¶ 1; Plaintiffs' 10(j) Statement ¶ 10. During the 1992-93 academic year, there were a total of 440 individual students participating in varsity athletics at Colgate. Of these, 278 (63.2%) were men, and 162 (36.8%) were women. Defs' 10(j) Statement ¶ 21; Plaintiffs' 10(j) Statement ¶ 11. Thus, the disparity between the proportion of women athletes and women students at Colgate was 13.2% during the 1992-93 academic year. Calculations from available undisputed statistics from previous years indicate disparities as follows:

| Year | Disparity (%) |
| --- | --- |
| 1985–86 | 17.7 |
| 1986–87 | 15.6 |
| 1987–88 | 14.1 |
| 1988–89 | 13.9 |
| 1989–90 | 14.2 |
| 1990–91 | 13.4 |

1991–92                         10.8

On the record before the Court, the participation rates of female athletes are not substantially proportionate to the percentage of women students as a matter of law. *Cohen v. Brown University,* 809 F .Supp. 978, 991 (D.R.I. 1992), *aff'd,* 991 F.2d 888 (1st Cir. 1993) (11.6% disparity, not substantially proportionate); *Cohen v. Brown University,* 879 F. Supp. 185, 211 (D.R.I. 1995) (13.01% disparity, not substantially proportionate); *Roberts v. Colorado State Bd. of Agriculture,* 814 F. Supp. 1507, 1513 (D. Colo.), *aff'd,* 998 F.2d 824 (10th Cir. 1994) (10.6% disparity, not substantially proportionate).

Plaintiffs have proffered evidence demonstrating that there is no genuine issue of material fact on this element of their claim, and defendants have failed to produce evidence that creates a triable issue of fact as to this element. Therefore, plaintiffs will be entitled to summary judgment if they are able to demonstrate that undisputed facts entitle them to judgment in their favor on both the second element of their claim and defendants' affirmative defense.

B. Effective Accommodation of Existing Interests and Abilities

**\*10** In order to prevail on their Title IX claim, plaintiffs bear the burden of demonstrating that the interests and abilities of female athletes have not been effectively accommodated by the present varsity athletic program.[18] Evaluating the effective accommodation of athletic interests implicates complex factual issues where, as here, plaintiffs sue to force a university to upgrade the status of a club team. *Cohen,* 991 F.2d at 904; *Roberts,* 998 F.2d at 832. With regard to the selection of particular sports, Title IX does not require an institution to sponsor a varsity team for both sexes unless "[t]here is sufficient interest and ability among members of the excluded sex to sustain a viable team and a reasonable expectation of intercollegiate competition for that team." 44 Fed. Reg. at 71,418. Moreover, "[i]nstitutions are not required to upgrade [a] team[] to intercollegiate status ... absent a reasonable expectation that intercollegiate competition in that sport will be available within the institution's normal competitive regions." *Id.*

The record is replete with factual disputes under this element. First, the level of interest in varsity women's ice hockey is disputed.[19] Second, the parties sharply dispute whether the pool of women interested in ice hockey are of sufficient ability to sustain a viable, competitive intercollegiate team in Colgate's competitive region.[20] In short, with respect to this element, there are issues of fact that must be decided at trial because "they may reasonably be decided in favor of either party." *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir. 1990). Therefore, plaintiff's motion for summary judgment must be denied.

C. Continuing Practice of Program Expansion

Defendants may avoid Title IX liability for ineffective accommodation of students' athletic interests and abilities by demonstrating that the institution has a history and continuing practice of program expansion that is demonstrably responsive to the developing interest and abilities of the members of the underrepresented sex. "[S]o long as a university is continually expanding athletic opportunities in an ongoing effort to meet the needs of the underrepresented gender, and persists in this approach as interest and ability levels in its student body and secondary feeder schools rise," defendants can prevail on this defense. *Cohen,* 991 F.2d at 898.

Colgate became co-educational in 1970. In 1972 Colgate formed the Women's Sports Association Club to offer club teams for its women athletes in field hockey, tennis, volleyball, basketball, swimming, and softball. In 1973 Colgate converted the women's field hockey, tennis, volleyball, basketball, and swimming club teams into varsity teams. Colgate also formed a varsity women's lacrosse team. Also in 1973, Colgate became a member of the Association of Intercollegiate Athletics for Women ("AIAW") and the New York State Association of Intercollegiate Athletics for Women. In 1977 Colgate converted the women's club softball team into a varsity team. In 1979, Colgate entered its women's program in Division II of the AIAW.

**\*11** In 1982 Colgate converted the women's club soccer team into a varsity team. That same year Colgate left the AIAW and joined the NCAA as a Division I school.[21] In

1985, Colgate decided to convert the women's club cross-country team into a varsity team. In 1987 the women's cross-country team began competition as a varsity team. In 1989 Colgate elevated women's club indoor track and field and women's club outdoor track and field to varsity competition. Little Aff. ¶¶ 2-12.

Since becoming co-educational, Colgate has added eleven women's varsity teams: seven in the 1970s and four in the 1980s (including two in 1989). However, from 1989 until the filing of this action in late-1993 no new women's varsity teams were added. At the time the instant motions were argued, Colgate offered 11 women's varsity teams and 12 men's varsity teams, but was phasing out the men's varsity baseball team. Murphy Aff. ¶ 3.

It would appear that from 1973 to 1989 Colgate demonstrated a history of program expansion for female athletes. However, the hallmarks of this defense are continuity and persistence. In light of the alleged developing interest and abilities of the female members of Colgate's student body and its secondary feeder schools, there remains a considerable factual dispute as to whether Colgate has a "continuing practice of program expansion that is demonstrably responsive." Therefore, the Court cannot grant either plaintiffs' or defendants' motion for summary judgment on this affirmative defense.

After carefully considering the arguments of counsel, the parties' written submissions, the applicable law, and the entire file in this matter, it is hereby

ORDERED, that plaintiffs' motion for class certification is GRANTED and the class of "all present and future female students of Colgate University who are interested in and able to play varsity ice hockey, but are unable to do so because it is not a women's varsity sport" is CERTIFIED on the condition that plaintiffs proffer further evidence of sufficient numerosity at trial. It is further

ORDERED, that plaintiffs' motion for notice to the class is DENIED at this time. It is further

ORDERED, that defendants' cross-motion for summary judgment is GRANTED in part and DENIED in part. It is further

ORDERED, that plaintiffs' motion for summary judgment is DENIED. It is further

ORDERED, that the trial of this action is scheduled for August 19, 1996, at 9:30 am in Syracuse.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp., 1996 WL 328446

CONCLUSION

Footnotes

1    Plaintiffs' claims have been reordered to reflect the order that they are construed by the applicable regulations.

2    Plaintiffs seek (1) a permanent injunction ordering defendants to grant the women's club ice hockey team varsity status as a funded intercollegiate athletic team; (2) a permanent injunction ordering defendants to (a) provide equivalent athletic benefits and opportunities to female student athletes at Colgate on the women's club ice hockey team; (b) take all steps necessary for ECAC league membership for the women's ice hockey team; (c) provide equal funding and benefits for the men's and women's ice hockey teams; (3) monetary damages for the individual plaintiffs reimbursing them for past costs of playing women's club ice hockey, including costs of equipment and equipment maintenance, transportation, meals, lodging, dues, program administration, and other fees; (4) a declaration that Colgate University has engaged in a past and continuing pattern and practice of discrimination against the women who play on the ice hockey team on the basis of sex in violation of Title IX, Title IX regulations, the Official Policy Interpretation of Title IX; and (5) reasonable costs and attorneys' fees. Amended Complaint at 22-23.

3    At the time that the motions were argued, Colgate had determined to phase out its twelfth varsity men's sport (baseball).

Bryant v. Colgate University, Not Reported in F.Supp. (1996)

4       These sports are squash, rugby, skiing, rowing, and ice hockey.

5       The remaining four plaintiffs were added by the Court's February 9, 1996 Order granting plaintiffs' motion to amend the complaint. Plaintiffs filed an amended complaint on February 20, 1996.

6       In pertinent part, 34 C.F.R. § 106.41 (Athletics) provides:

(a) General. No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis.

(b) Separate teams. Notwithstanding the requirements of paragraph (a) of this section, a recipient may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport. However, where a recipient operates or sponsors a team in a particular sport for members of one sex but operates or sponsors no such team for members of the other sex, and athletic opportunities for members of that sex have previously been limited, members of the excluded sex must be allowed to try-out for the team offered unless the sport involved is a contact sport. For the purposes of this part, contact sports include boxing, wrestling, rugby, ice hockey, football, basketball and other sports the purpose or major activity of which involves bodily contact.

(c) Equal opportunity. A recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members of both sexes. In determining whether equal opportunities are available the Director will consider, among other factors:

(1) Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;

(2) The provision of equipment and supplies;

(3) Scheduling of games and practice time;

(4) Travel and per diem allowance;

(5) Opportunity to receive coaching and academic tutoring;

(6) Assignment and compensation of coaches and tutors;

(7) Provision of locker rooms, practice and competitive facilities;

(8) Provision of medical and training facilities and services;

(9) Provision of housing and dining facilities and services;

(10) Publicity.

Unequal aggregate expenditures for members of each sex or unequal expenditures for male and female teams if a recipient operates or sponsors separate teams will not constitute noncompliance with this section, but the Assistant Secretary may consider the failure to provide necessary funds for teams for one sex in assessing equality of opportunity for members of each sex.

(d) Adjustment period. A recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics at the elementary school level shall comply fully with this section as expeditiously as possible but in no event later than one year from the effective date of this regulation. A recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics at the secondary or post-secondary school level shall comply fully with this section as expeditiously as possible but in no event later than three years from the effective date of this regulation.

Bryant v. Colgate University, Not Reported in F.Supp. (1996)

7       In pertinent part, 34 C.F.R. § 106.37 (Financial assistance) provides:

(a) General. Except as provided in paragraphs (b) and (c) of this section, in providing financial assistance to any of its students, a recipient shall not:

(1) On the basis of sex, provide different amount or types of such assistance, limit eligibility for such assistance which is of any particular type or source, apply different criteria, or otherwise discriminate; (2) through solicitation, listing, approval, provision of facilities or other services, assist any foundation, trust, agency, organization, or person which provides assistance to any of such recipient's students in a manner which discriminates on the basis of sex; or (3) apply any rule or assist in application of any rule concerning eligibility for such assistance which treats persons of one sex differently from persons of the other sex with regard to marital or parental status.

(b) Financial aid established by certain legal instruments.

(1) A recipient may administer or assist in the administration of scholarships, fellowships, or other forms of financial assistance established pursuant to domestic or foreign wills, trusts, bequests, or similar legal instruments or by acts of a foreign government which requires that awards be made to members of a particular sex specified therein; Provided, That the overall effect of the award of such sex-restricted scholarships, fellowships, and other forms of financial assistance does not discriminate on the basis of sex.

(2) To ensure nondiscriminatory awards of assistance as required in paragraph (b)(1) of this section, recipients shall develop and use procedures under which:

(i) Students are selected for award of financial assistance on the basis of nondiscriminatory criteria and not on the basis of availability of funds restricted to members of a particular sex;

(ii) An appropriate sex-restricted scholarship, fellowship, or other form of financial assistance is allocated to each student selected under paragraph (b)(2)(i) of this section; and

(iii) No student is denied the award for which he or she was selected under paragraph (b)(2)(i) of this section because of the absence of a scholarship, fellowship, or other form of financial assistance designated for a member of that student's sex.

(c) Athletic scholarships.

(1) To the extent that a recipient awards athletic scholarships or grants-in- aid, it must provide reasonable opportunities for such awards for members of each sex in proportion to the number of students of each sex participating in interscholastic or intercollegiate athletics.

(2) Separate athletic scholarships or grants-in-aid for members of each sex may be provided as part of separate athletic teams for members of each sex to the extent consistent with this paragraph and § 106.41.


8       "The regulation specifically refers to club sports separately from intercollegiate athletics. Accordingly, under the Policy Interpretation club teams will not be considered to be intercollegiate teams except in those instances where they regularly participate in varsity competition." 44 Fed. Reg. at 71,413-14 n.1. In the 1989-90 athletic season, the women's club ice hockey team played a "21 game schedule including five varsity teams." Seidenberg Aff. Ex. V. During the 1993-94 season, the women's club ice hockey team scheduled twenty regular season games, four of which were against varsity teams. Bryant Dep. at 12-50; Seidenberg Aff. Ex. S; see also Murphy Aff. ¶ 36 and Murphy Supp. Aff. (Docket 26) ¶ 3. Having carefully examined the entire record, the Court finds that the evidence concerning the nature of the competition of the Colgate women's ice hockey team is insufficient to constitute regular participation in varsity competition. Therefore, based upon this record, the Court finds that the women's club ice hockey team is not entitled to be considered an intercollegiate team.


9       These include the provision of equipment and supplies; scheduling of games and practice time; travel and per diem allowance; opportunity to receive coaching and academic tutoring; assignment and compensation of coaches and tutors; provision of locker rooms, practice, and competitive facilities; provision of medical and training facilities and services; provision of housing and dining facilities and services; and publicity. 34 C.F.R. § 106.41(c)(2)-(10). The PI reasonably includes consideration of recruitment of student athletes and provision of support services in its treatment of athletic benefits and opportunities because the factors in the

Bryant v. Colgate University, Not Reported in F.Supp. (1996)

regulation are non-exclusive. 34 C.F.R. § 106.41(c).

10    Rather than offer athletic scholarships, Colgate provides need-based financial aid to its students. Some of this need based aid is in the form of "coach-supported financial aid"--financial aid designated for use by participants in most of the varsity sports at Colgate. In the 1993-94 academic year, the men's varsity ice hockey team received $ 455,550 for coach-supported athletic grants Seidenberg Aff. Ex. M. The women's club ice hockey team receives no coach supported athletic aid. Bryant Dep. at 78-78.

11    Varsity programs are "intercollegiate" athletics as distinguished from "club" athletics. 34 C.F.R. § 106.41(a) and (c).

12    As stated, this is the only form of athletic financial assistance available to Colgate students. Colgate awards only need-based coach-supported financial aid to its athletes and not traditional athletic scholarships.

13    Following explicit comparisons in each category of benefit, plaintiffs allege that "all of the named plaintiffs and the members of the class they represent have been injured by Colgate's failure to provide" the benefit to the women's club ice hockey team while defendants provide the benefit to the men's varsity ice hockey team. *See, e.g.,* Amended Complaint ¶ 55.

14    The only evidence in the record comparing the benefits received by women's club ice hockey (and other women's club teams) to men's and co-educational club teams concerns total university funding of club teams. Seidenberg Aff. Ex. M. Although such evidence has limited relevance where the specific categories of benefits are at issue, a limited examination is instructive. There are five all women's club teams and five all men's club teams at Colgate. Every academic year between 1989-90 and 1992-93 inclusive, the women's club ice hockey team received more university funding than any of the men's club teams. *Id.* In 1992-93 alone, the women's club ice hockey team received $ 267.37 more per athlete than the next most funded men's club team. *Id.* Likewise, in every academic year between 1989-90 and 1992-93 inclusive, the total university funding for women's club teams exceeded $ 3,600. In 1992-93, Colgate allocated $ 9,240 more to its all women's club teams than its all men's club teams. *Id.* Clearly, these facts cannot support a claim for disparate treatment with respect to athletic benefits allocated to club teams.

15    Plaintiffs' motion seeking certification under Rule 23(b)(2) is not affected by their individual claim for damages to compensate them for "past costs of playing women's ice hockey, including the costs of equipment and equipment maintenance, transportation, meals, lodging, dues, program administration and other fees." Amended Complaint at 22; *German v. Federal Home Loan Mortgage Corp.,* 885 F. Supp. 537, 554 (S.D.N.Y. 1995).

16    These requirements are commonly referred to as numerosity, commonality, typicality, and adequate representation.

17    The Court notes that the defendants submitted the affidavit of Courtney McGovern. Ms. McGovern was a senior at Colgate University as of November 29, 1993, and a member of the women's club crew team. McGovern Aff. ¶ 1. She avers that she is interested in participating in women's varsity crew and details her own abilities and the competitiveness of the club crew team. McGovern Aff. ¶¶ 2-11. This is the only evidence in the record of the interest and ability of female athletes who are not members of the women's ice hockey team. However, even if this evidence were to be considered in support of a broader class, such a class would fail the adequate representation requirement, as discussed.

18    On the present record, the Court need not decide whether *effective* accommodation necessarily requires the *full* accommodation of the interests and abilities of the underrepresented gender. *See Cohen,* 991 F.2d at 899.

19    Colgate has proffered the results of athletic interest questionnaires completed by incoming undergraduate students that indicate a lack of sufficient interest to merit a women's varsity ice hockey team. Murphy Aff. ¶¶ 18-19; Defs' 10(j) Statement ¶¶ 22-23. These results indicate that only eight of 342 incoming women students surveyed expressed an interest in women's ice hockey--the same number as skiing and fourteen fewer than indicated an interest in crew. Plaintiffs dispute the validity of the survey and counter defendants' evidence with plaintiffs' affidavits indicating their strong interest in varsity women's ice hockey. In addition, it is undisputed that between 1989 and 1993, the women's club hockey team had as many as twenty-eight members and no fewer than nineteen.

20    For example, the results of a survey of Colgate's incoming first year class resulted in 713 student responses, of whom 372 were from incoming women students. Only six of the eight women who indicated an interest in ice hockey played varsity ice hockey in high school. Murphy Aff. ¶¶ 18-19, 30. Other evidence submitted by defendants indicates that the high school recruiting base for women's ice hockey is much smaller than other men's and women's sports. Murphy Aff. ¶¶ 23-28.

      On the other hand, plaintiffs submit evidence that the women's club ice hockey team has been consistently successful and competitive. Seidenberg Aff. Ex. E at 38-39, Ex. F at 17, 38-39, Ex. V. Yet, several members of the team were still learning about hockey or learning to skate at the beginning of the ice hockey season. Seidenberg Aff. Ex. E at 57. In addition, the team presently plays other varsity women's teams in the Northeast. Seidenberg Aff. Exs. V, AA. In fact, there are sixteen varsity women's ice hockey teams in the Northeast. Plaintiffs' 10(j) Statement ¶ 15; Murphy Aff. ¶ 14.

21    Because Colgate's women's athletics program was relatively young, the NCAA allowed one women's varsity team (basketball) to remain in Division II.

---

End of Document                                  © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 234364
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

Napoleon EBARLE, et al., Plaintiffs,
v.
LIFELOCK, INC., Defendant.

Case No. 15-cv-00258-HSG
|
Signed 01/20/2016

**Attorneys and Law Firms**

Michael W. Sobol, Nicole Diane Sugnet, Rosemarie Maliekel, Lieff Cabraser Heimann & Bernstein, LLP, San Francisco, CA, Randall K. Pulliam, Joseph Henry Bates, III, Carney Bates & Pulliam, PLLC, Little Rock, AR, for Plaintiffs.

Luanne Sacks, Sacks, Ricketts & Case, LLP, San Francisco, CA, Cynthia A. Ricketts, Sacks, Ricketts & Case LLP, Phoenix, AZ, for Defendant.

**ORDER GRANTING MOTION FOR PRELIMINARY APPROVAL**

Re: Dkt. No. 49

HAYWOOD S. GILLIAM, JR., United States District Judge

**\*1** Pending before the Court is Plaintiffs' Motion for Preliminary Approval of Conditional Class Certification and Class Action Settlement. Dkt. No. 43. The parties appeared before the Court for a preliminary approval hearing on December 17, 2015. After careful consideration of the settlement agreement and the parties' arguments, the Court **GRANTS** Plaintiffs' motion for preliminary approval.

**I. BACKGROUND**

**A. Litigation History**

Defendant LifeLock, Inc. provides identity theft protection services to its subscribers. This action began on January 19, 2015, when Plaintiffs Napoleon Ebarle and Jeanne Stamm filed a putative class action complaint alleging that Defendant's advertisements of identity theft protection services violated Arizona's Consumer Fraud Act. Dkt. No. 1. On March 6, 2015, Defendant filed a motion to dismiss, Dkt. No. 24, and Plaintiffs filed an amended class action complaint on March 27, 2015, Dkt. No. 31. The amended complaint added Brian Litton as a Plaintiff and alleged four causes of action: (1) violation of Arizona's Consumer Fraud Act, (2) breach of contract, (3) unjust enrichment, and (4) declaratory judgment. The causes of action were based on four categories of alleged misrepresentations: (1) Defendant's promise to provide "comprehensive" services in detecting fraud, (2) Defendant's promise to provide timely and continuous alerts of potential fraud twenty-four hours a day every day of the year, (3) Defendant's promise to keep customers' personal data (credit card, social security, and bank account numbers) secure, and (4) Defendant's promise to provide a "$1 Million Total Service Guarantee," which purports to provide insurance up to $1,000,000 against identity theft.

The parties exchanged informal discovery requests before participating in settlement discussions with mediator Justice Howard Wiener on July 1, 2015. Dkt. No. 49-2 at 2. The parties did not reach a resolution at the first mediation; they continued to engage in informal discovery and participated in a second full-day mediation on August 18, 2015. *Id.* At the end of the second mediation, the parties still were unable to reach a resolution, so Justice Wiener made a mediator's proposal, which the parties accepted and memorialized in a non-binding memorandum of understanding. *Id.* During this time, the Court granted four stipulated requests to extend Defendant's time to answer the amended complaint pending mediation. Dkt. Nos. 35, 38, 40, 42.

On July 21, 2015, the Federal Trade Commission ("FTC") filed an enforcement action against Defendant in the United States District Court for the District of Arizona ("FTC Action"); the alleged violations overlap with the claims asserted in this case. Defendant negotiated a separate agreement with the FTC that provides for a $100,000,000 judgment in the FTC's favor for the purpose

Ebarle v. Lifelock, Inc., Not Reported in Fed. Supp. (2016)

of consumer redress. On December 22, 2015, the district court in the FTC Action approved the settlement between Defendant and the FTC, entered a money judgment of $100,000,000, and directed Defendant to satisfy the judgment by depositing the money in the District of Arizona's registry within five business days, Dkt. Nos. 54, 56. Pursuant to the terms of this settlement, Defendant can use the registry funds to fund the Settlement Fund here. *Id.*

**B. Overview of the Proposed Settlement**
**\*2** The parties executed a Class Action Settlement Agreement ("Settlement Agreement") on November 3, 2015. Dkt. No. 49-1, Ex. A. The key provisions of the Settlement Agreement are described below.

Settlement Funds. Defendant agrees to establish a non-reversionary Settlement Fund of $68,000,000 for the benefit of the eligible Class Members, which includes a Class and Subclass. *Id.* at ¶¶ 40, 44, 57, 58. A Subclass Fund shall be created based on the percentage of the Class that comprises the Subclass. *Id.* at ¶ 44. The Class Fund shall be the Settlement Fund less the Subclass Fund. *Id.* at ¶ 12.

Class. All members of Defendant's identity theft protection plan in the United States at any time between September 1, 2010 and the date of the preliminary approval order. *Id.* at ¶ 9.

Subclass. All individuals who enrolled in Defendant's identity theft protection plan in the United States at any time between January 1, 2012 and April 30, 2015. *Id.* at ¶ 43.

Allocation Method. Each Subclass Member will receive an automatic *pro rata* distribution from the Subclass Fund. *Id.* at ¶ 58. Additionally, each Class Member (including those who are also Subclass Members) can submit a claim for $20.00 before the Claim Deadline, which will be paid from the Class Fund. *Id.* If the number of claims submitted exceeds the Class Fund amount, then each claimant will receive a pro rata distribution from the Class Fund. *Id.* at ¶ 69. If the claims submitted do not exhaust the Class Fund, the Settlement Administrator shall distribute the remainder of the Class Fund on a *pro rata* basis. *Id.* at ¶ 70.

If money remains from uncashed checks 120 days after payment dates, a second *pro rata* distribution shall be made to Valid Claimants who cashed their initial payment checks. *Id.* at ¶ 63. If money remains from uncashed checks 120 days after the second distribution, the money shall be

deposited into the Court Registry in the FTC Action. *Id.*

Attorneys' Fees; Costs; Incentive Payments. Defendant has agreed not to oppose an application for $10,200,000 in attorneys' fees and expenses and $2,000 to each of the four Class Representatives. The Settlement Agreement provides that Defendant will pay each of these costs and awards in addition to (and not out of) the Settlement Fund.

Second Amended Complaint. As a material part of the settlement, Defendant stipulates to and does not oppose the filing of a second amended complaint ("SAC") naming Renier Jerome Ebarle as a named Plaintiff, "provided that a Preliminary Approval Order, a Final Approval Order, and Final Judgment each is entered and this Settlement Agreement becomes effective on the Final Settlement Date." *Id.* at ¶¶ 52-53. If either the preliminary approval order or the final approval or judgment is not entered or if the Settlement Agreement fails to become effective, the Agreement provides that Plaintiffs will withdraw the SAC within five days of the denial or termination. *Id.* at ¶ 54. If the Court does not allow withdrawal of the SAC, then Defendant "reserves all rights to challenge the validity of the SAC." *Id.*

Releases. The Settlement Class Members will release "any claims" that "were or reasonably could have been alleged in the Action or in any other court, tribunal, arbitration panel, commission, agency, or before any governmental and/or administrative body, or any other adjudicatory body, on the basis of, connected with, arising from, or relating to the subject matter or allegations of the Action." *Id.* at 90.

**\*3** Requests for Exclusion. Any Class Member may email or mail a written request for exclusion to the Settlement Administrator at the email or mailing address provided in the Class Notice no later than the postmarked deadline. *Id.* at 71. A Class Member who does not submit a timely written exclusion request shall be bound by all subsequent proceedings, including the release. *Id.* at 72. A Class Member who timely submits a request for exclusion shall waive and forfeit all rights the member may have to benefits of the Settlement if it is approved. *Id.* at 73.

Unclaimed Settlement Funds. The Settlement Agreement is non-reversionary. *Id.* at 58. Any residual amounts will be paid out to the members of the settlement subclasses pursuant to the allocation set forth above.

Objections. Class Members who do not opt out of the settlement may file an objection to the Settlement Agreement no later than the Objection Deadline. *Id.* at ¶¶ 75-80.

Ebarle v. Lifelock, Inc., Not Reported in Fed. Supp. (2016)

## II. CONDITIONAL CLASS CERTIFICATION

Class certification under Rule 23 is a two-step process. First, a plaintiff must demonstrate that the four requirements of Rule 23(a) are met: numerosity, commonality, typicality, and adequacy. "Class certification is proper only if the trial court has concluded, after a 'rigorous analysis,' that Rule 23(a) has been satisfied." *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 542 (9th Cir. 2013) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011)). Second, a plaintiff must establish that one of the bases for certification in Rule 23(b) is met. Here, by invoking Rule 23(b)(3), Plaintiffs must establish that "questions of law or fact common to Class Members predominate over any questions affecting only individual members, and...[that] a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The party seeking class certification bears the burden of demonstrating by a preponderance of the evidence that all four requirements of Rule 23(a) and at least one of the three requirements under Rule 23(b) are met. *See Wal-Mart*, 131 S. Ct. at 2551.

### A. Rule 23(a)(1)—Numerosity

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Defendant estimates that there are over six million Class Members, over three million of whom are in the Subclass. The Court finds that numerosity is satisfied because joinder of all the estimated Class Members would be impracticable.

### B. Rule 23(a)(2)—Commonality

A Rule 23 class is certifiable only if "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). For the purposes of Rule 23(a)(2), even a single common question is sufficient. *Wal-Mart*, 131 S. Ct. at 2556. The common contention, however, "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 2551. "What matters to class certification...is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide

proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* (citation omitted).

The Court finds that the proposed Class satisfies the commonality requirement because, at a minimum, the existence of Defendant's alleged policies and practices is an issue common to all members. This includes (1) whether Defendant's promise of "comprehensive" monitoring services was misleading and/or deceptive, (2) whether Defendant's alert notification services were subject to regular delays and/or shutdowns, (3) whether Defendant failed to maintain adequate technology and safeguards to deliver the protections as promised to related to consumers' sensitive personal data, including credit card, social security, and/or bank account numbers, which all Class Members provided to Defendant, and (4) whether Defendant misrepresented and/or misled consumers regarding the benefits of its $1 Million Total Service Guarantee.

### C. Rule 23(a)(3)—Typicality

*\*4 In certifying a class, a court must find that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed R. Civ. P. 23(a)(3). "The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Id.* (internal quotation marks omitted).

The Court finds that the named Plaintiffs are typical of the Class they seek to represent. Like the rest of the proposed settlement Class Members, they purchased the Defendant's products and services that were advertised, marketed, and sold as providing "comprehensive" monitoring services, timely and continuous alert detection and notification services, and a $1 Million Total Service Guarantee. The named Plaintiffs, like all Class Members, provided their personal data, such as credit card, social security, and bank account numbers, to the Defendant. Moreover, Plaintiff Reiner Jerome Ebarle's claims are typical of the Subclass, in particular: he purchased Defendant's service between January 1, 2012 and April 30, 2015 when Defendant was advertising and selling its products and/or services as providing "continuous, uninterrupted" alerts of potential credit or identity fraud to customers 24 hours a day, every day of the year. Therefore, the named Plaintiffs' claims

arise from Defendant's common practices and alleged misrepresentations and thus are typical of the Class Members.

#### D. Rule 23(a)(4)—Adequacy of Representation

"The adequacy of representation requirement...requires that two questions be addressed: (a) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (b) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000). The requirement " 'tend[s] to merge' with the commonality and typicality criteria of Rule 23(a)." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 626 n.20 (1997) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 158 n.13 (1982)). Among other purposes, these requirements determine whether "the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Falcon*, 457 U.S. at 158 n.13. Adequacy of representation requires two legal determinations: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).

No evidence in the record suggests that Plaintiffs or proposed class counsel have a conflict of interest with other Class Members. The named Plaintiffs, Class Members, and Subclass Members are equally interested in demonstrating Defendant's misrepresentations. Moreover, proposed class counsel has substantial experience prosecuting class actions. *See* Dkt. No. 49-1, Exs. B, C. The Court finds that proposed class counsel and Plaintiffs have prosecuted this action vigorously on behalf of the Class, and will continue to do so. The adequacy requirement is therefore satisfied.

#### E. Rule 23(b)(3)—Predominance and Superiority

*5 To certify a Rule 23 damages class, the Court must find that "questions of law or fact common to class members predominate over any questions affecting only individual members, and...[that] a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The predominance inquiry "tests whether proposed classes are sufficiently

cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Hanlon*, 150 F.3d at 1022 (citation omitted).

Here, the Court finds that—for purposes of settlement—the common questions raised by Plaintiffs' claims predominate over questions affecting only individual members of the proposed Class. Whether these allegations have a basis in fact is a common question that would largely resolve the claims of all Class Members. The predominance requirement is therefore satisfied.

Next, "[t]he superiority inquiry under Rule 23(b)(3) requires the Court to determine whether the objectives of the particular class action procedure will be achieved in the particular case." *Id.* at 1023. Here, because common legal and factual questions predominate over individual ones, and taking into account the size of the proposed class, the Court finds that the judicial economy achieved through common adjudication makes a class action a superior method for adjudicating the claims of the proposed class.

Finally, while not enumerated in Rule 23, "courts have recognized that 'in order to maintain a class action, the class sought to be represented must be adequately defined and clearly ascertainable.' " *Vietnam Veterans of Am. v. C.I.A.*, 288 F.R.D. 192, 211 (N.D. Cal. 2012) (quoting *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970)); *see also Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1071, n.4 (9th Cir. 2014) (referring, in dicta, to the "threshold ascertainability test"). "[A] class definition is sufficient if the description of the class is definite enough so that it is administratively feasible for the court to ascertain whether an individual is a member." *Vietnam Veterans*, 288 F.R.D. at 211 (internal quotation marks omitted).

Courts have considered at least three types of "ascertainability" concerns when determining whether class certification is appropriate: (1) whether the class can be ascertained by reference to objective criteria; (2) whether the class includes members who are not entitled to recovery; and (3) whether the putative named plaintiff can show that he will be able to locate absent class members once a class is certified. *See Lilly v. Jamba Juice Co.*, 2014 WL 4652283, at *3-4 (N.D. Cal. Sept. 18, 2014). The proposed Class in this case does not present any of these concerns. Defendant will provide the Settlement Administrator a list of all Class Members and Subclass Members, including their names, last known mailing address, and last known email address. Dkt. No. 49-1, Ex.

A, ¶ 65. The Settlement Administrator will update the mailing addresses through the National Change of Address Database before sending the notices and will perform a Single Skip Trace for any notice that is returned as undeliverable. *Id.* This information will allow the settlement administrator to identify and locate class members with sufficient confidence to satisfy the ascertainability requirement.

* * *

The Court **GRANTS** conditional class certification of the Class and Subclass.

## III. PRELIMINARY APPROVAL

Pursuant to Federal Rule of Civil Procedure 23(e), "[t]he claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." The Ninth Circuit maintains a "strong judicial policy" that favors the settlement of class actions. *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992). "The purpose of Rule 23(e) is to protect the unnamed members of the class from unjust or unfair settlements affecting their rights." *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1100 (9th Cir. 2008). Accordingly, before a court approves a settlement it must conclude that the settlement is "fundamentally fair, adequate and reasonable." *In re Heritage Bond Litig.*, 546 F.3d 667, 674-75 (9th Cir. 2008).

**\*6** In general, the district court's review of a class action settlement is "extremely limited." *Hanlon*, 150 F.3d at 1026. However, where the parties reach a class action settlement prior to class certification, courts apply "a higher standard of fairness and a more probing inquiry than may normally be required under Rule 23(e)." *Dennis v. Kellogg Co.*, 697 F.3d 858, 864 (9th Cir. 2012) (citation and internal quotations omitted). Courts "must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011).

At the preliminary approval stage, the Court may grant preliminary approval of a settlement and direct notice to the class if the settlement: (1) appears to be the product of

serious, informed, non-collusive negotiations; (2) has no obvious deficiencies; (3) does not improperly grant preferential treatment to class representatives or segments of the class; and (4) falls within the range of possible approval. *See In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007); Joseph M. McLaughlin, McLaughlin on Class Actions: Law and Practice § 6.6 (7th ed. 2011) ("Preliminary approval is an initial evaluation by the court of the fairness of the proposed settlement, including a determination that there are no obvious deficiencies such as indications of a collusive negotiation, unduly preferential treatment of class representatives or segments of the class, or excessive compensation of attorneys...."). The Court considers the settlement as a whole, rather than its components, and lacks the authority to "delete, modify or substitute certain provisions." *Officers for Justice v. Civ. Serv. Comm'n of San Francisco*, 688 F.2d 615, 630 (9th Cir. 1982). Rather, "[t]he settlement must stand or fall in its entirety." *Id.*

### A. Settlement Process

The first factor the Court examines is the means by which the parties arrived at the settlement. "An initial presumption of fairness is usually involved if the settlement is recommended by class counsel after arm's-length bargaining." *Harris v. Vector Mktg. Corp.*, No. 08-cv-5198-EMC, 2011 WL 1627973, at *8 (N.D. Cal. Apr. 29, 2011) (citation omitted).

Here, class counsel conducted an extended investigation into Defendant's advertising practices, its terms of service, contracts between LifeLock and its vendors, account histories for the individual plaintiffs, alert histories, identity theft protection plan cancellations, and insurance policies before filing this lawsuit. Dkt. No. 49-2 at 4-5. Before engaging in mediation, class counsel reviewed thousands of documents Defendant informally produced and deposed two employees, the Vice President of Enterprise Risk & Strategic Operations and the Senior Director of Product Management, who testified regarding Defendant's advertising and policies and practices. Dkt. No. 49-1 at 4-5, 9. Moreover, the parties reached their settlement pursuant to the proposal of mediator Justice Wiener following two full-day mediation sessions. Dkt. No. 49-2 at 2. According to Justice Wiener, the parties aggressively advocated their positions and "were fully prepared to proceed with litigation...rather than accept any unfair settlement terms." *Id.* at 2-3. This strongly suggests the absence of collusion or bad faith by the parties or counsel. *See* Dkt. No. 49-2 at 2; *see also Chun-Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848, 852 (N.D. Cal.

2010); *Satchell v. Fed. Express Corp.*, No. 03-cv-2659-SI, 2007 WL 1114010, at *4 (N.D. Cal. Apr. 13, 2007) ("The assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive.").

### B. Obvious Deficiencies

**\*7** The second factor the Court considers is whether there are obvious deficiencies in the Settlement Agreement. At the preliminary approval hearing, class counsel explained why the settlement amount of $68,000,000 was reasonable. *See* FTR 4:05-4:16. Customers paid between $10 and $30 a month to be a member of the Defendant's identity theft protection plan. Relying on similar cases, class counsel assumed a 3 to 10 percent claims rate return from Class Members. This would result in the following projected recovery: $20 a person for Class Members, between $16 and $20 a person for Subclass Members who do not submit a claim, and between $36 and $39 a person for Subclass Members who submit a claim. Accordingly, at a minimum, Class Members are projected to receive on average the amount they paid per month of service, if not slightly more for Subclass Members. Moreover, in the unlikely scenario that 100 percent of the Class submits a claim, then Class Members are still projected to recover a significant percentage of what they paid: $5 for Class Members, $10 for Subclass Members who do not submit a claim, and $15 for Subclass Members who submit a claim.

Defendant's counsel further clarified that for the FTC Action, the parties examined data showing the total number of alerts delivered and/or potentially not delivered during the Subclass time period. Defendant's counsel stated that during this time LifeLock's revenue was $504,000,000 and that 99.8 percent of all alerts were delivered. Counsel concluded that if the Court were to extrapolate, the most likely total recovery would be $10 million.

Both counsel also highlighted the difficulties in valuing the asserted potential harm for the claims. Class counsel stated that reasonable minds could differ in terms of how to calculate the value a customer received versus the harm he or she suffered. Moreover, Plaintiffs would need to show actual injury as a consequence of some non-delivery of services. According to defense counsel, any delayed alerts were very isolated instances, and that on the whole the basic impressions and expectations that consumers had of the advertising matched the delivery of services received.

Given these challenges in identifying and valuing harm, the Court concludes that the $68,000,000 settlement amount, or a likely projected recovery of a month to two months of

service, is reasonable. Thus, there are no obvious deficiencies in the Agreement.

### C. Preferential Treatment

Under the third factor, the Court examines whether the Settlement Agreement provides preferential treatment to any class member. The proposed plan of allocation provides an automatic, pro rata distribution for the Subclass Members, while the Class (including the Subclass Members) can file a claim form for a $20 settlement. The proposal appears to compensate Class Members in a manner generally proportionate to the harm they suffered on account of the services or products Subclass members in particular purchased during the January 1, 2012 and April 30, 2015 timeframe.

The Settlement Agreement authorizes each named Plaintiff to seek an incentive award of $2,000 for his or her participation as a representative. Although the Court will ultimately determine whether each Plaintiff is entitled to such an award and the reasonableness of the amount requested, the Court notes Plaintiffs, thus far, have provided no explanation for why the named Plaintiffs deserve an award 100 times greater than the settlement value of the other Class Members. Incentive awards "are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action." *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 958-59 (9th Cir. 2009). Plaintiffs must provide sufficient evidence to allow a district court to "evaluate [named plaintiffs'] awards individually, using relevant factors includ[ing] the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions,...[and] the amount of time and effort the plaintiff expended in pursuing the litigation...." *Staton v. Boeing Co.*, 327 F.3d 938, 977 (9th Cir. 2003). The Court will consider the evidence presented at the final fairness hearing as to these factors so that it can evaluate the reasonableness of the incentive awards' request.

### D. Whether the Settlement Falls Within the Range of Possible Approval

**\*8** Finally, the Court must consider whether the Settlement Agreement falls within the range of possible approval. "To evaluate the range of possible approval criterion, which focuses on substantive fairness and adequacy, courts

primarily consider plaintiffs' expected recovery balanced against the value of the settlement offer." *Vasquez v. Coast Valley Roofing, Inc.*, 670 F. Supp. 2d 1114, 1125 (E.D. Cal. 2009) (citing *Tableware*, 484 F. Supp. 2d at 1080) (internal quotations omitted). Additionally, to determine whether a settlement is fundamentally fair, adequate, and reasonable, the Court may preview the factors that ultimately inform final approval: (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of class members to the proposed settlement. *See Churchill Vill. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) (citation omitted). Although the Court undertakes a more in-depth investigation of the foregoing factors at the final approval stage, these factors inform whether the Settlement Agreement falls within the "range of possible approval."

The Court first considers the Class' expected recovery balanced against the value of the settlement offer, taking into account the strength of the Plaintiffs' case. The settlement provides for the payment of $68,000,000, and, assuming the 3 to 10 percent claims rate, each Class Member will receive on average the amount they paid per month of service, if not slightly more for subclass members. Plaintiffs argue that this is a fair compromise within the range of reasonableness given the risks of litigation, non-certification, and dismissal on the merits. Dkt. No. 49 at 15-16. Plaintiffs further contend that although the value of their claims may be a figure larger than the proposed settlement, the "tangible, immediate benefits of the Settlement" outweigh continued litigation and the uncertainty of a trial. *Id.* at 15. *See also In re Linkedin User Privacy Litig.*, 309 F.R.D. 573, 587 (N.D. Cal. 2015) ("Immediate receipt of money through settlement, even if lower than what could potentially be achieved through ultimate success on the merits, has value to a class, especially when compared to risky and costly continued litigation.").

The Court agrees. Defendant denies the allegations in the complaint, specifically contending that it did not intentionally delay alerts and that it provided comprehensive identity theft protection services during the relevant time. Dkt. No. 49-1 at 9. Moreover, Defendant asserts that any inadvertent delays in service affected only a small number of customers and that such delays did not result in any harm in the form of actual credit card fraud or identity theft; thus, Defendant contests that Class Members suffered actual injury. *Id.* at 9-10. Defendant further argues that class certification would be unlikely given "variances

in the representations that Class Members saw, whether Class Members' alerts were delayed, and whether Class Members suffered any harm." *Id.*

Second, the settlement amount is adequate given the expense, complexity, and duration of further litigation. To prevail in this action, Plaintiffs would be required to successfully move for class certification under Rule 23, survive summary judgment, and receive a favorable verdict capable of withstanding a potential appeal. There is uncertainty as to which Class Members might have actually received the benefits of the identity theft protection plan (for instance, receipt of alerts), as opposed to those Class Members who did not receive a timely alert or those who did not receive a timely alert and suffered some sort of harm (for instance, credit fraud). Given the variables that Plaintiffs might need to grapple with if there were further litigation, the Court finds that the risks and costs associated with class action litigation weigh in favor of settlement.

The third factor concerning whether class certification can be maintained through trial also weighs in favor of settlement. For the reasons discussed, certifying a Class and Subclass encompassing, based on counsel's representation, approximately 6.8[1] and 3.4 million customers, respectively, presents complex issues that could undermine certification at many different stages of the litigation.

**\*9** Fourth, the $68,000,000 settlement amount appears reasonable given the stage of the proceedings (settlement was reached before dispositive motions or trial), Defendant's intention to contest certification, and the issues with identifying and calculating actual harm. Given that Class Members likely did not suffer harm each month that they paid for services and that they did get some value (even if not the full value of the service), a settlement amount that likely results in a recovery of one to two months of service paid appears reasonable.

Fifth, the parties have undertaken sufficient discovery to inform their view of the reasonableness of the Settlement Agreement. Class counsel reviewed 10,000 documents, including exemplars of print advertisements and television commercials; account histories for individual Plaintiffs; transcripts of depositions, settlement agreements, and documents from a multi-district litigation and FTC Action; consumer surveys Defendant conducted on its advertisements; Defendant's call center scripts; the terms of service during the alleged Class Period; insurance policies underlying its $1 million guarantee; alert histories; identify theft protection plan cancellations; and the responses to FTC's requests for information. Dkt. No. 49-1 at 4-5.

Case 1:21-cv-00179-KJM-BAM   Document 167-8   Filed 11/26/24   Page 88 of 216

Ebarle v. Lifelock, Inc., Not Reported in Fed. Supp. (2016)

The sixth factor takes into account counsel's experience and their respective views of the Settlement Agreement. The Court has previously evaluated class counsel's qualifications and experience and concluded that counsel is qualified to represent the class' interests in this action. *See* Dkt. No. 50; Dkt. No. 49-1, Ex. B at 100, Ex. C at 4. Moreover, class counsel "believe[s] this is an excellent recovery for the Class and endorse the Settlement as fair, reasonable, and adequate." Dkt. No. 49-1 at 2. The Court notes that courts have taken divergent views as to the weight to accord counsel's opinions. *Compare Carter v. Anderson Merch., LP*, 2010 WL 1946784, at *8 (C.D. Cal. May 11, 2010) ("Counsel's opinion is accorded considerable weight."), *with Chun-Hoon*, 716 F. Supp. 2d at 852 ("[T]his court is reluctant to put much stock in counsel's pronouncements, as parties to class actions and their counsel often have pecuniary interests in seeing the settlement approved."). The Court finds that this factor tilts in favor of approval, even though the Court affords only modest weight to the views of counsel.

The seventh factor examines the participation of a government entity. Here, because the judgment was entered in the FTC Action, Defendant can use up to $68,000,000 from the FTC Action for the settlement fund in this case. This coordination weighs in favor of granting preliminary approval. *See In re TracFone Unlimited Serv. Plan Litig.*, No. C-13-3440 EMC, 2015 WL 4051882, at *9 (N.D. Cal. July 2, 2015), reconsideration denied, No. C-13-3440 EMC, 2015 WL 4735521 (N.D. Cal. Aug. 10, 2015).

Eighth, because the Class has not yet been formally notified of the settlement, the Court cannot undertake any evaluation of Class Members' reaction to the settlement, including the number and substance of any objections.

Having weighed these eight factors, the Court finds that the Settlement Agreement falls within the range appropriate for preliminary approval.

## IV. PROPOSED CLASS NOTICE AND NOTIFICATION PROCEDURES

The class notice in a Rule 23(b)(3) class action must comport with the requirements of due process. "The plaintiff must receive notice plus an opportunity to be heard and participate in litigation, whether in person or through counsel." *Philips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985). The notice must be "the best practicable, reasonably calculated, under all the circumstances, to apprise interested parties of the pendency

of the action and afford them an opportunity to present their objections." *Id.* (internal quotation marks omitted). "The notice should describe the action and the plaintiffs' rights in it." *Id.* Rule 23(c)(2)(B) provides, in relevant part:

> **\*10** The notice must clearly and concisely state in plain, easily understood language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

Additionally, "an absent plaintiff [must] be provided with an opportunity to remove himself from the class by executing and returning an 'opt out' or 'request for exclusion' form to the court." *Philips Petroleum Co.*, 472 U.S. at 812.

Because the FTC Action was approved after the Plaintiffs filed the motion for preliminary approval, the Court gave leave for the parties to submit a revised proposed notice reflecting the FTC Action settlement. On December 29, 2015, the parties filed a revised proposed summary notice and long-form notice, Dkt. No. 54, which the Court reviews here.

Plaintiffs propose Garden City Group, LLC ("Garden City Group") as the settlement administrator for the Class. Dkt. No. 49-1 at ¶ 37. The Garden City Group will send the summary class notice and long-form notice to the Class Members following the Court's preliminary approval order. The Settlement Administrator will (1) post the long-form notice to the settlement website, and (2) send the summary class notice to Class Members for whom an email address is available and via First Class U.S. Mail for those members for whom an email address is not available. Dkt. No. 49-1, ¶ 65.

The Court finds that the long form notice satisfies all of the requirements of Rule 23(c)(2)(B), Dkt. No. 54-4, but directs counsel to address the following deficiencies:

> ■ On page 1 in the "Summary of Your Options and Legal Rights in this Settlement" section, counsel shall change "Write to the Court if you don't like the settlement" to read: "Write to the Settlement Administrator if you don't like the settlement."

> ■ On page 2, Counsel will change the number and line formatting so that the content is easy to follow.

> ■ On page 4, under section 9, Counsel will add a

sentence to the end of the first paragraph, stating that Class Members who are not Subclass Members must submit a claim form in order to receive a cash payment.

■  On page 4, Counsel will clarify where Class Members can find the Claim ID.

The Court finds that the summary form notice fails to satisfy the requirements of Rule 23(c)(2)(B), Dkt. No. 54-2. Although the summary class notice describes the nature of the action, defines the class certified, and informs Class Members that they may appear at the final fairness hearing and hire their own attorney, it has several deficiencies. First, it fails to identify the four categories of misrepresentations underlying the lawsuit. Instead, the notice contains the following general statement: "This lawsuit challenges representations LifeLock made regarding its identity theft protection plans and information security program. LifeLock denies all allegations or that it did anything wrong." Dkt. No. 54-2. The Court finds that these two sentences are inadequate to apprise Class Members of the Class claims, issues, or defenses. Second, the summary class notice fails to inform Class Members *how* they can exclude themselves. The notice does not explain where the written request must be sent and what the written request must include in order for it to be a valid exclusion. Third, the summary class notice fails to describe the binding effects of the settlement and what it means to exclude oneself. The summary notice should include the Settlement Administrator's mailing and email addresses and indicate that claim forms, exclusions, and objections should be either emailed or mailed to that address. The summary notice also should identify where the claim form is located and include either the claim ID or explain how the claimant accesses his or her ID.

**\*11** An overly short summary notice that directs Class Members to go to the settlement website for more information can result in Class Members being unaware of basic rights. Moreover, the parties cannot rely on the long-form notice to satisfy the due process requirements, given that the long-form notice is only available on the settlement website and is not mailed directly to class members.

## V. NOTICE OF MOTION AND AWARD OF Event

## ATTORNEYS' FEES AND COSTS

The settlement notices inform class members that class counsel will ask the Court to award attorneys' fees and expenses of up to $10,200,000 and to award a $2,000 service award for each of the four class representatives in the case. To enable Class Members to review class counsel's motion, class counsel shall include language in the settlement notices indicating the deadline for filing the attorneys' fees motion, specifically stating the deadline for any class member objections to the fees motion, and informing Class Members that the motion and supporting materials will be available for viewing on class counsel's website. *See In re Mercury Interactive Corp. Sec. Litig., 618 F.3d 988, 993-94 (9th Cir. 2010)* (holding that under Rule 23(h), class members must be given a full and fair opportunity to examine and object to attorneys' fees motion). That motion shall be filed with the Court and posted on the settlement website not later than 20 days before Class Members' objections are due.

## VI. CONCLUSION

For the reasons stated, the Court grants Plaintiff's motion for preliminary approval of class action settlement, and conditionally certifies the Class and Subclass for settlement purposes. The Court grants leave for Plaintiffs to file a second amended complaint. The Court also approves the proposed Settlement Administrator Garden City Group, as well as the proposed class representatives. Pursuant to Docket No. 50, Lieff Cabraser Heimann & Bernstein, LLP and Carney Bates & Pulliam, PLLC, are class counsel.

Within five days of the date of this Order, Plaintiffs shall submit revised summary and long-form notices that address the Court's concerns. The revised notices shall include redlined or highlighted copies clearly identifying the modifications to the proposed notices.

In addition, the parties are directed to meet and confer and stipulate to a schedule of dates for each event listed below, which shall be submitted to the Court along with a proposed order within ten days of the date of this Order.

Date

| Event | Date |
| --- | --- |
| Deadline to send notice to Class Members | |

Ebarle v. Lifelock, Inc., Not Reported in Fed. Supp. (2016)

---

Filing deadline for attorneys' fees and costs motion

---

Filing deadline for incentive payment motion

---

Last date to file objections

---

Last date to submit claims

---

Filing deadline for final approval motion

---

Final fairness hearing and hearing on motions

---

**IT IS SO ORDERED.**                                        Not Reported in Fed. Supp., 2016 WL 234364

**All Citations**

Footnotes

1       At the hearing, class counsel clarified that since filing the preliminary approval motion, the parties have a better understanding of
        the number of Class Members; the class is estimated to include 6.7 million customers.

---

**End of Document**                                  © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 1188200
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

Fabrienne ENGLISH, Plaintiff,
v.
APPLE INC., et al., Defendants.

Case No. 14-cv-01619-WHO
|
Signed January 5, 2016

**ORDER DENYING MOTION FOR CLASS CERTIFICATION**

Re: Dkt. Nos. 181, 208, 211, 213-14, 217, 220

WILLIAM H. ORRICK, United States District Judge

**INTRODUCTION**

**\*1** Named plaintiff Fabrienne English accuses defendants Apple Inc., AppleCare Service Company Inc., and Apple CSC Inc. (collectively, "Apple") of various misrepresentations and omissions in connection with AppleCare+ ("AC+") and AppleCare Protection Plan ("APP"), extended service plans Apple offers to purchasers of iPhones. English's claims vary slightly, but her core complaint is that Apple misrepresents to consumers that replacement iPhones under AC+ and APP will be new, when in fact many of the replacement devices in Apple's service stock are "refurbished" or otherwise not new. She moves to certify a class and two subclasses of purchasers of AC+ and APP asserting claims under California law for violations of the Consumer Legal Remedies Act ("CLRA"), the False Advertising Law ("FAL"), the Unfair Competition Law ("UCL"), and the Secondhand Merchandize Labeling Law, Cal. Bus. & Prof.Code § 17531, and for fraud. None of her theories of liability support class certification, and she has not established

adequacy of counsel under Federal Rule of Civil Procedure 23(a)(4). Her motion is DENIED.

**BACKGROUND**

**I. FACTUAL BACKGROUND**

**A. AC+ and APP**

AC+ is a service plan offered by Apple for, among other products, the iPhone. APP is a predecessor to AC+.[1]

Apple offered APP until October 2011. Healy Decl. ¶ 3 (Dkt. No. 209–32). APP cost $99 and provided consumers with hardware repair coverage and telephone technical support for two years from the date of purchase of the iPhone.[2] *Id.*

Apple launched AC+ in October 2011. *Id.* ¶ 4. For $99, purchasers receive coverage for two accidental damage incidents. *Id.* The service fee for each incident was initially $49. *Id.* On September 10, 2013, the service fee was increased to $79. *Id.* ¶ 5. There is no service fee under AC+ for repairs not resulting from accidental damage. *Id.* ¶ 6.

From when AC+ was first launched in October 2011 until September 2013, Apple allowed customers to purchase AC+ at the time of accidental damage. *Id.* ¶ 8. Thus, during that time period, if a customer's iPhone suffered accidental damage, rather than having to pay $149 for an out-of-warranty service event or approximately $449 for a new iPhone, the customer could purchase AC+ for $99 and receive a $50 discount on the $149 out-of-warranty service event, plus the two accidental damage incidents provided under AC+. *Id.* As discussed in more detail below, English purchased her AC+ plan in this way.

A customer who brings in her iPhone for service under AC+ or APP may have the iPhone repaired or replaced, depending on the circumstances (e.g., whether a repair is feasible) and the customer's preference. When a customer decides to replace her iPhone, she receives a replacement device out of Apple's "service stock." Apple describes its service stock as consisting of three types of iPhones: (1) new iPhones; (2) remanufactured iPhones; and (3) reclaimed iPhones. *See* Opp. at 7 (Dkt. No. 208–3);

Lanigan Decl. ¶ 3 (Dkt. No. 208–17).

**\*2** New iPhones are made of all new parts and are "exactly the same" as the iPhones Apple sells in its stores. Lanigan Decl. ¶ 4. New iPhones [redacted text] *Id.* As discussed below in more detail, the evidence in this case shows that English received only new iPhones as replacement devices, not remanufactured or reclaimed iPhones.

Remanufactured iPhones are manufactured using the same process as new iPhones, but "could contain both new parts and recovered parts that have been extensively tested." *Id.* ¶ 5. Apple states that "each and every remanufactured iPhone is inspected and tested to ensure that it is equivalent to a new iPhone in performance and reliability." *Id.*

Reclaimed iPhones are iPhones that have either [redacted text] Id. ¶ 6. Apple states that "[t]hese (essentially new) iPhones undergo a testing and screening process to ensure that they are equivalent to new in performance and reliability."[3] Id.

All iPhones in Apple's service stock are shipped and stored in plain, white, unbranded boxes. *See* Williams Depo. at 210–11 (Patel Decl. Ex. T, Dkt. No. 209–21). Because all iPhones in the service stock are shipped and stored in this manner, Apple store employees do not know whether any particular replacement device is new, remanufactured, or reclaimed. *Id.* at 152–53, 231–32.

The current AC+ terms and conditions state in relevant part:

> If during the plan term you submit a valid claim ..., Apple will either (a) repair the defect at no charge, using new parts or parts that are equivalent to new in performance and reliability, or (b) exchange the [iPhone], with a replacement product that is new or equivalent to new in performance and reliability. All replacement products provided under this plan will at a minimum be functionally equivalent to the original product.

TAC Ex. B (Dkt. No. 139–2).

The AC+ and APP terms and conditions in effect until September 2013 similarly stated:

> If during the coverage period you submit a valid claim ..., Apple will either (a) repair the defect at no charge, using new or refurbished parts that are equivalent to new in performance and reliability, or (b) exchange the [iPhone] with a replacement product that is new or equivalent to new in performance and reliability, and is at least functionally equivalent to the original product.

TAC Ex. C (Dkt. No. 139–3).

## B. English's Purchase and Use of AC+

In September 2012, English obtained an iPhone 4 from Sprint in connection with signing up for Sprint wireless telephone service. English Decl. ¶ 3 (Dkt. No. 180–43). She gave the iPhone to her minor son. *Id.*

On February 15, 2013, English and her son went to an Apple store in NorthPark Center, Texas because the screen on the iPhone had cracked. *Id.* ¶ 4. English states that in discussing AC+ with an Apple employee at the store, she was told that she "would have two 'incidents' available for occurrences such as a cracked screen or water damage, and that the replacement devices would be new." *Id.* ¶ 6. She paid $99 for AC+ and another $99 to receive what the Apple employee allegedly described as a new iPhone 4. *Id.* ¶ 4; *see also* TAC Ex. E (Dkt. No. 139–5).[4]

**\*3** The replacement iPhone was presented to English in the plain, white, unbranded box in which Apple packages its replacement devices. The box did not include "any label or other writing indicating that the [iPhone] was refurbished, reconditioned, used, or contained parts that were refurbished, reconditioned, or used." TAC ¶ 40. English states that the Apple employee "took great care to unseal and open [the box] in front of [her]," and that "[w]hen he took the iPhone out of the packaging he did so in a way that made [her] think that the device was new." English Decl. ¶ 7.

English contends that the replacement iPhone she received on February 15, 2013 was not new and was in fact a "refurbished device." *Id.* ¶ 9. She states that "[h]ad [she] known that [the] iPhone was not new, [she] would not have made the purchase, and would have considered other options such as getting an upgraded phone from Sprint." *Id.* ¶ 5.

Apple contends that the replacement iPhone was new. *See* Lanigan Decl. ¶ 9. It submits a declaration from Michael Lanigan, Director of AppleCare Supplier Quality Engineering and Mail–In Operations, who [redacted text] *Id.* ¶ 1. He states that based on his research and analysis of Apple's records, the iPhone English received on February 15, 2013 was a new device. *Id.* ¶ 9.

English alleges that she "immediately started experiencing problems" with the replacement iPhone. English Decl. ¶ 11. The device "would freeze, stop working, and close without warning." *Id.* On July 22, 2013, she and her son went to an Apple store in Plano, Texas after the device

English v. Apple Inc., Not Reported in Fed. Supp. (2016)

completely stopped working and would no longer turn on. *Id.* An Apple employee there told her that the device had water damage and that she could use one of the accidental damage incidents under her AC+ plan to get a replacement. *Id.* English paid the $49.00 AC+ service fee and received another replacement iPhone 4. *Id.*; *see also* Patel Decl. Ex. E (Dkt. No. 209–6). This replacement device was again presented in a plain, white, unbranded box. English Decl. ¶ 11. According to English, the second replacement device, like her first one, was "refurbished." *Id.* According to Apple, it was also new. Lanigan Decl. ¶ 10.[5] English states that within a week of receiving the second replacement device, it began suffering from "freezing issues" like those exhibited by the first one. English Decl. ¶ 12.

Over the weekend of November 1, 2013, English met class counsel, Renee Kennedy, while shopping in Houston, Texas. *See* English Depo. at 209–212 (Patel Decl. Ex. G, Dkt. No. 209–8). The following Monday (November 4, 2013) English and two other named plaintiffs filed this lawsuit. Dkt. No. 1.

On February 28, 2014, English went back to the Apple store in NorthPark Center, Texas because the screen on her second replacement iPhone had cracked. English Decl. ¶ 13. English alleges that she was told by an Apple employee there that she had already used up both incidents allowed under her AC+ plan, and that as a result she was not entitled to another replacement device. TAC ¶ 38. She states that the employee "cited [her] initial purchase from Apple in February 2013 and the July 2013 replacement as the incidents of accidental damage replacement that [she] was entitled to under [her AC+ plan]." English Decl. ¶ 13.

### C. Initiation of this Action and Class Counsel's Experience with AC+

**\*4** As noted above, this action was filed on November 4, 2013 by three named plaintiffs: Patricia Sue Adkins, Jennifer Galindo, and English. Dkt. No. 1. At that time, both Adkins and Galindo either were working or had worked for class counsel. *See* Dkt. No. 82. Galindo was class counsel's paralegal. *Id.* Shortly before Adkins and Galindo purchased the service plans underlying their claims, class counsel gave them "monetary gifts to thank them for their excellent work." *Id.* Adkins and Galindo used these gifts to purchase AC+. *Id.* at 2. Both purchased AC+ on the same date, October 30, 2013, five days before filing this lawsuit. Dkt. No. 1. Following instructions from class counsel, Galindo brought two audio recorders with her to the Apple store on October 30, 2013 for the purpose of recording her interactions with the Apple employees

there. Galindo Depo. at 60 (Patel Decl. Ex. M, Dkt. No. 209–14) ("Q: And why did you record your transaction at the Apple store? A: Because Ms. Kennedy requested that I just record my ... whole transaction experience with Apple.").

According to Apple's records, between February 2013 and March 2015, class counsel purchased or otherwise obtained twelve different iPhones. O'Neil Decl. ¶ 6 (Dkt. No. 208–21). She purchased an AC+ plan for an iPhone 5 in March 2013 and received a replacement iPhone 5 on September 7, 2013. *Id.* ¶¶ 7–8. In September and October 2013 – the months immediately preceding Adkins and Galindo's AC+ purchases and the filing of this action – class counsel repeatedly contacted Apple regarding the camera in the replacement device she had received on September 7, 2013. *Id.* ¶ 13. She stated that she believed that the device was "inferior" and repeatedly asked to be provided with a new iPhone in an Apple-branded box. *Id.*

### II. PROCEDURAL BACKGROUND

English is the only named plaintiff remaining in this case. With the filing of the second amended complaint on January 17, 2015, Adkins and Galindo dropped out, while a new named plaintiff, Karen Lowthert, joined in. *See* Dkt. No. 116. English and Lowthert filed the TAC on March 6, 2015, alleging four causes of action against Apple based on alleged misrepresentations and omissions in connection with AC+ and APP: (1) violations of the CLRA, TAC ¶¶ 73–94; (2) violations of the FAL, TAC ¶¶ 103–111; (3) violations of the unlawful, unfair, and fraudulent prongs of the UCL, TAC ¶¶ 121–127; (4) violations of the Secondhand Merchandise Labeling Law, Cal. Bus. & Prof. Code § 17531, TAC ¶¶ 112–120; and (5) fraud, TAC ¶¶ 95–102. Shortly after the TAC was filed, on March 19, 2015, Lowthert dropped out of the case, leaving English as the only named plaintiff. *See* Dkt. No. 144.

English filed the instant motion for class certification on July 1, 2015. She seeks to represent a class defined as:

All natural persons who reside in any of the fifty United States of America, including the District of Columbia ("Persons"), who, for purposes other than resale, purchased from November 1, 2009 to the present, AppleCare Protection Plan or AppleCare+ (an "Extended Warranty") for iPhone (any of the models sold from November 2009 to present), at an Apple Store retail location, through an online purchase from Defendants, or through a telephone call to the Apple Online Store and/or to the AppleCare Contact Center,

English v. Apple Inc., Not Reported in Fed. Supp. (2016)

for personal, family or household purposes." Mot. at 13.

She also proposes two subclasses. The first is defined as "[p]ersons who purchased a replacement iPhone pursuant to a claim under an Extended Warranty and received a refurbished, remanufactured, used, or secondhand replacement iPhone." *Id.* The second is defined as "[p]ersons who purchased an Extended Warranty and had their contemporaneous purchase of an iPhone treated by Apple, Inc. (and/or treated by AppleCare Service Company, Inc. or Apple CSC, Inc.) as a replacement pursuant to an incident, such that their Extended Warranty's coverage would have only one further replacement available for purchase under their Extended Warranty." *Id.* at 14.

**\*5** I heard argument from the parties on October 14, 2015. Dkt. No. 222.[6]

## LEGAL **STANDARD**

Federal Rule of Civil Procedure 23 governs class actions. "Before certifying a class, the trial court must conduct a rigorous analysis to determine whether the party seeking certification has met the prerequisites of Rule 23." *Mazza v. Am. Honda Motor Co., Inc.,* 666 F.3d 581, 588 (9th Cir.2012) (internal quotation marks omitted). The burden is on the party seeking certification to show, by a preponderance of the evidence, that the prerequisites have been met. *See Wal–Mart Stores, Inc. v. Dukes,* 131 S.Ct. 2541, 2551 (2011).

Certification under Rule 23 is a two-step process. The party seeking certification must first satisfy the four threshold requirements of Rule 23(a) – numerosity, commonality, typicality, and adequacy. Specifically, Rule 23(a) requires a showing that

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a).

The party seeking certification must then establish that one of the three grounds for certification applies. *See* Fed.R.Civ.P. 23(b). English invokes Rule 23(b)(3) and Rule 23(b)(2).

Rule 23(b)(3) provides that a class action may be maintained where

> the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>
> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed.R.Civ.P. 23(b)(3). A(b)(3) class is appropriate "whenever the actual interests of the parties can be served best by settling their differences in a single action." *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1022 (9th Cir.1998) (internal quotation marks omitted). "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Id.* (internal quotation marks omitted).

A class action may proceed under Rule 23(b)(2) where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed.R.Civ.P. 23(b)(2). "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted – the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Dukes,* 131 S.Ct. at 2557 (internal quotation marks omitted). Rule 23(b)(2) "does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant." *Id.* (emphasis omitted). Nor "does [it] authorize class certification when each class member would be entitled to an individualized award of monetary damages." *Id.*

**\*6** In considering a motion for class certification, the

English v. Apple Inc., Not Reported in Fed. Supp. (2016)

substantive allegations of the complaint are accepted as true, but "the court need not accept conclusory or generic allegations regarding the suitability of the litigation for resolution through a class action." *Hanni v. Am. Airlines, Inc.,* No. 08–cv–00732–CW, 2010 WL 289297, at *8 (N.D.Cal. Jan. 15, 2010); *see also Jordan v. Paul Fin., LLC,* 285 F.R.D. 435, 447 (N.D.Cal.2012) ("[Courts] need not blindly rely on conclusory allegations which parrot Rule 23 requirements."). Accordingly, "the court may consider supplemental evidentiary submissions of the parties." Hanni, 2010 WL 289297, at *8; see also Blackie v. Barrack, 524 F.2d 891, 901 n.17 (9th Cir.1975).

"A court's class-certification analysis ... may entail some overlap with the merits of the plaintiff's underlying claim." *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds,* 133 S.Ct. 1184, 1194 (2013) (internal quotation marks omitted). However, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Id.* at 1194–95. "Merits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* at 1195.

**DISCUSSION**

English has not shown that class certification is appropriate here. First, for a variety of reasons, none of her theories of liability provides a viable basis for a certifiable class. Second, she has not established adequacy of counsel under Rule 23(a)(4).[7]

**I. NONE OF ENGLISH'S THEORIES OF LIABILITY PROVIDES A VIABLE BASIS FOR A CERTIFIABLE CLASS**
English asserts five basic theories of liability against Apple on behalf of class members:

(1) that Apple misrepresented to class members who purchased AC+ at the time of accidental damage and simultaneously purchased a replacement iPhone that the initial replacement would not count as one of the two incidents available under their AC+ plan;

(2) that Apple packages refurbished replacement iPhones in plain, white, unbranded boxes without any indicators that the iPhones are not new;

(3) that Apple orally misrepresents during sales interactions that replacement iPhones under the service plans will be new;

(4) that Apple misrepresents in the terms and conditions for the service plans that replacement iPhones will be "equivalent to new in performance and reliability" and "at least functionally equivalent to the original product;" and

(5) that Apple improperly omits that replacement iPhones under the service plans could be refurbished iPhones.

For the following reasons, I agree with Apple that, on this record, none of these theories provides a viable basis for a certifiable class.

**A. First theory: Apple misrepresented to class members who purchased AC+ at the time of accidental damage and simultaneously purchased a replacement iPhone that the initial replacement would not count as one of the two accidental damage incidents available under their AC+ plan**
The second putative subclass is built on this theory.[8] The theory, in turn, is founded on English's claim that when she attempted to return her second replacement iPhone on February 28, 2014, she was told that she had used up both accidental damage incidents available under her AC+ plan – one when she initially purchased AC+ while simultaneously purchasing her first replacement iPhone, and the other when returning that first replacement device and obtaining her second.[9] *See* Mot. at 10–11. English contends that Apple systematically misrepresented to consumers who purchased AC+ at the time of accidental damage in conjunction with a replacement iPhone that the initial purchase would not count against the two incidents available under the service plan, when in fact Apple "characterizes the initial purchase [as] one of the two allowed incidents ... in certain circumstances." *Id.* at 10.

**\*7** Apple does not dispute that between October 2011 and September 2013, it represented to consumers that the purchase of AC+ at the time of accidental damage along with a replacement iPhone would not count as an incident under their service plan. *See* Opp. at 13–14. To the contrary, Apple offers evidence indicating that this was its official policy at the time English purchased AC+, and that its "training materials were consistent and unambiguous on this point." *Id.* But Apple also offers evidence indicating that it followed through on this policy – i.e., that, in line with its representations to consumers, it did not count the

initial purchase of a replacement iPhone at the time of accidental damage as an incident under AC+ – and that it allowed consumers an additional two incidents under their service plans. *See* Healy Decl. ¶ 14.

With the exception of her own experience, English cites no evidence to the contrary. She vaguely asserts that "the software process was automated which would show that this would have been a consistent practice." Reply at 15. But the documents she cites in support of this assertion merely indicate that when a consumer uses an accidental damage incident under AC+, the incident is recorded through software that enables an Apple employee to check a certain menu item, thereby recording the use of the incident. *See, e.g.,* Williams Depo. at 230–31 (Parker Decl. Ex. 15, Dkt. No. 213–19). The documents do not indicate that Apple ever systematically (or even occasionally) counted the initial purchase of a replacement iPhone as an AC+ accidental damage incident, in contravention of its representations to consumers.

Simply put, English has not shown by a preponderance of the evidence that anyone other than her is in the second putative subclass. Rule 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). Because English has not satisfied this requirement, the second putative subclass, and her first theory of liability, cannot be certified.

### B. Second theory: Apple improperly packages refurbished replacement iPhones in plain, white, unbranded boxes without any indicators that the iPhones are not new

This theory of liability provides the basis for English's claims under the Secondhand Merchandise Labeling Law.[10] English also appears to rely on the theory as a basis for her CLRA, FAL, UCL, and fraud causes of action. *See, e.g.,* Reply at 4–5. She states that whether Apple's use of the plain, white, unbranded boxes "is a misrepresentation or ... is not a misrepresentation ... is a question to be decided at trial." *Id.*

**\*8** The theory fails because English is not a typical or adequate class representative to assert it. Apple presents a declaration from its Director of AppleCare Supplier Quality Engineering and Mail–In Operations stating that, according to Apple's database of replacement iPhones, both of English's replacement devices were new iPhones, not refurbished ones. *See* Lanigan Decl. ¶¶ 910. English offers no meaningful evidence in response. She points to deposition testimony from Apple indicating that a replacement iPhone is more likely to be new shortly after the particular generation of iPhone is launched, because at that point there is a more limited inventory of refurbished units or parts. *See* Reply at 13 (citing Healy Depo. at 127–128; Lanigan Depo. at 98100). But evidence regarding the *theoretical likelihood* that English's replacement iPhones would be refurbished does little to counter evidence that the replacement devices she *actually received were in fact new*. English also states in her reply brief that she "has not had the opportunity to cross-examine the factual basis for Apple's claim that [the replacement iPhones she received were] new." Reply at 13. At oral argument, however, English withdrew her request for further discovery on this issue and focused instead on a request to add an as-of-yet-unidentified additional named plaintiff who had received a refurbished replacement device.

Typicality under Rule 23(a)(3) requires that the named plaintiff's claims be "reasonably coextensive" with those of absent class members. *Hanlon,* 150 F.3d at 1020. "The test of typicality is whether other [class] members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon,* 976 F.2d at 508 (internal quotation marks omitted). The Ninth Circuit has cautioned that certification may be "inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Id.* (internal quotation marks omitted). "[C]ertification should not be granted if there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." *Id.* (internal quotation marks omitted).

Similarly, to establish adequacy under Rule 23(a)(4), a named plaintiff must show that she "will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). "To determine whether named plaintiffs will adequately represent a class, courts must resolve two questions: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Ellis v. Costco Wholesale Corp.,* 657 F.3d 970, 985 (9th Cir.2011).

The evidence that English received new iPhones renders her atypical and inadequate with respect to her second theory of liability, because it raises serious questions regarding her ability to establish standing to pursue claims based on that theory.[11] English does not explain how she can establish standing with respect to a theory based on Apple's allegedly improper packaging of refurbished replacement iPhones if she received only new replacement iPhones. The danger that the issue of her individual standing will become the focus of this litigation and will

ultimately prejudice the class makes English an atypical and inadequate class representative with respect to her second theory of liability. *See S. Ferry LP No. 2 v. Killinger,* 271 F.R.D. 653, 658–59 (W.D.Wash.2011) (finding that the named plaintiff's "uncertain standing" rendered it an atypical class representative); *see also Lierboe v. State Farm Mut. Auto. Ins. Co.,* 350 F.3d 1018, 1022 (9th Cir.2003) ("If [the named plaintiff] has no ... claim, she cannot represent others who may have such a claim, and her bid to serve as a class representative must fail."). Accordingly, on this record, the theory cannot be certified.

**C. Third theory: Apple employees orally misrepresent during sales interactions that all replacement iPhones under the service plans will be new**[12]

**\*9** This theory fails because English has not presented the sort of allegations and evidence necessary to certify a class based on alleged oral misrepresentations. In the fraud context, the Ninth Circuit has rejected a "talismanic rule that a class action may not be maintained where a fraud is consummated principally through oral misrepresentations unless those representations are all but identical." *In re First Alliance Mortgage Co.,* 471 F.3d 977, 990 (9th Cir.2006) (internal quotation marks omitted). Nevertheless, a plaintiff in this circuit seeking to bring class claims based on alleged misrepresentations must at least establish that the misrepresentations were part of a "common course of conduct." *Id.* at 990; *see also Blackie v. Barrack,* 524 F.2d 891, 902 (9th Cir.1975) ("Confronted with a class of purchasers allegedly defrauded over a period of time by similar misrepresentations, courts have taken the common sense approach that the class is united by a common interest in determining whether a defendant's course of conduct is in its broad outlines actionable."). Class treatment may thus be appropriate, despite some variance in the specific language used, where "a standardized sales pitch is employed," or where there is other evidence of a "centrally orchestrated strategy" such that "the center of gravity of the fraud transcends the specific details of [the] oral communications." 471 F.3d at 991 (internal quotation marks omitted).

In *First Alliance,* for example, the defendant's sales agents "would employ a standardized sales presentation to persuade borrowers to take out loans with high interest rates and hidden high origination fees ... and other 'junk' fees." *Id.* at 985. The sales agents were "trained ... to follow a manual and script ... which was to be memorized verbatim [and] executed as taught." *Id.* "[T]he elaborate and detailed sales presentation prescribed by the manual was unquestionably designed to obfuscate," and the sales

agents were taught to "present the ... disclosure documents in a misleading manner," and to "deflect attention away from things that consumers might normally look at." *Id.* In rejecting the defendant's argument that it was immune from class liability because there was no "specifically-worded false statement repeated to each and every borrower of the plaintiff class, traceable to a specific directive in the [manual]," the Ninth Circuit highlighted "the standardized training program for sales agents, which included a script that was required to be memorized and strict adherence to a specific method of hiding information and misleading borrowers." *Id.* at 991. This evidence of a "centrally orchestrated scheme to mislead borrowers through a standardized protocol the sales agents were carefully trained to perform" was sufficient to support the jury's finding of liability for the class.[13] *Id.*

The level of uniformity necessary to certify a class under the CLRA, FAL, and UCL based on alleged misrepresentations, oral or otherwise, is similar. *See Berger,* 741 F.3d at 1069 (affirming denial of class certification of CLRA and UCL claims where each of the defendant's allegedly misleading contracts required "an independent legal analysis to determine whether the language and design of that contract ... did or did not expose that group of customers to a potentially misleading or deceptive statement"); *Davis–Miller v. Auto. Club of S. California,* 201 Cal.App. 4th 106, 125 (2011) ("An inference of classwide reliance cannot be made where there is no evidence that the allegedly false representations were uniformly made to all members of the proposed class."); *Kaldenbach v. Mut. of Omaha Life Ins. Co.,* 178 Cal.App. 4th 830, 850 (2009) (affirming denial of class certification of UCL claims where the defendants' insurance policies were sold by independent agents who were not required to attend a training or adhere to a scripted sales presentation, such that resolution of the UCL claims would require an "inquiry into the practices employed by any given independent agent – such as whether the agent involved in any given transaction took [defendants'] training and read [defendants'] manuals or used the training and materials in sales presentations, and what materials, disclosures, representations, and explanations were given to any given purchaser"); *see also Cabral v. Supple LLC,* 608 F. Appx. 482, 483 (9th Cir.2015) (in a case involving claims under the CLRA, FAL, and UCL, citing *First Alliance* for the proposition that "some deviations from precise wording in the language of advertisements or representations might not be fatal to class certification," but stating that "[i]n a case of this nature, one based upon alleged misrepresentations in advertising and the like, it is critical that the misrepresentation in question be made to all of the class members").

**\*10** The allegations and evidence here do not establish the

level of uniformity required for class treatment. English does not identify any allegations in the TAC or any evidence on record supporting a plausible inference that Apple employees have used a "standardized protocol" of misrepresenting that all replacement devices under the service plans are new, or that Apple has otherwise perpetrated a "centrally orchestrated scheme" of oral misrepresentations to this effect. *See First Alliance,* 471 F.3d at 991. In her motion, she argues not that Apple employees are "carefully trained" to "strict[ly] adher[e]" to a specific method of informing customers that all replacement devices are new, *see id.,* but rather that Apple uses "a form of 'do it yourself / leave as you go' training" with respect to the service plans, "placing the onus on the employee to figure out what 'functional equivalent to new in performance and reliability' means."[14] Mot. at 6. She states that Apple provides no written training materials regarding the service plans, and that as a result of this "inadequate training," Apple employees "cannot define [the] term 'functional equivalent to new' – a term that Apple uses to avoid describing the refurbished nature of [the replacement devices]." *Id.* at 7.

While there might be situations in which an "inadequate training" theory is sufficient to support certification of a class based on oral misrepresentations, this case is not one of them. Even the evidence submitted by English reveals significant and material variations between the oral representations made by Apple employees when selling the service plans. Salvador Toledo, a former Apple store employee who submitted a declaration in support of class certification, testified at his deposition that he "just always show[s] the customer [the] terms and conditions atApple.com." Toledo Depo. at 113–14 (Patel Decl. Ex. I, Dkt. No. 209–10). Randel Linthicum, a current Apple store employee, testified at his deposition that when customers ask him "if the replacement device would be refurbished," he tells them that "they would receive a device that is the same exact device as the one that they are bringing in that is damaged. I would also explain to them that, no, the device would not be a new device off the floor." Linthicum Depo. at 108–09 (Patel Decl. Ex. L, Dkt. No. 209–13). Andrew Reed, another former Apple store employee who submitted a declaration in support of class certification, states in his declaration that, "I often used the word 'new,' as did other employees," to describe replacement devices under the service plans, but that "[i]f a customer asked whether their replacement was new, I was trained to respond that it could be, but that I did not know one way or the other." Reed Decl. ¶ 4 (Dkt. No. 180–24).

In her reply brief, English abandons her "inadequate training" theory and asserts instead that Apple employees are told in training that all replacement devices under the service plans are new. *See* Reply at 3. But the documents

English cites in support of this assertion do not come close to supporting it. There is no evidence that any of Apple's training materials instruct or insinuate that all replacement devices under AC+ and APP are new. At most, the documents cited by English show that Apple employees are trained to answer questions regarding the service plans by directing customers to the applicable terms and conditions or to theApple.com website. *See, e.g.,* Williams Depo. at 218 (Parker Decl. Ex. 14, Dkt. No. 214–21). Neither the terms and conditions nor theApple.com website, however, state that all replacement devices under the service plans are new.

**\*11** Further, although English seeks to include individuals who purchased AC+ or APP online and over the telephone in the putative class, *see* Mot. at 13, she offers no evidence regarding any representations made by Apple employees in connection with the sale of service plans in either of these contexts. Instead, she cites to three call logs showing what three different AppleCare agents said to customers either at the time those customers were receiving replacement devices or at some point thereafter, not at the time the customers purchased their service plans. *See* Mot. at 8. Moreover, the call logs indicate not that the agents misrepresent to callers that all replacement devices are new, but, to the contrary, that they tell callers (and that callers are aware) that replacement devices are "refurbished" or "like-new:"

> Call Log Dated 12/30/2014 (APL00027871): Customer is replacing phone for AC+ ... and has concerns about what it is being replaced with – assured customer that the replacement is not a refurbished device – assured it has not been previously owned, and has been manufactured with known-good parts – she is satisfied knowing this replacement will be like-new.

> Call Log Dated 01/23/2015 (APL00028152): [C]ustomer said that when she originally purchased the AC+ plan the rep assured customer that if any incident happened they would receive a NEW device as opposed to a refurbished device – explained to customer that our refurbished devices are just as good as new (in some cases better because they receive more testing).

> Call Log Dated 08/01/2014 (APL 000282321):[C]lient politely pleads for a new iPhone instead of a refurbished – he's had quite a few replacements already as refurbished and he states it's been a horrible 5 years with Apple.

Kennedy Decl. Ex. 32 (Dkt. No. 180–37).

There is obviously some evidence here of consumers being told that all replacement devices under the service plans will be new. *See, e.g.,* English Decl. ¶ 6; Reed Decl. ¶ 4.

But without evidence of a common course of conduct to this effect, English cannot establish predominance, as required for certification under Rule 23(b)(3).[15] *See Mazza, 666 F.3d at 596* ("A presumption of reliance does not arise when class members were exposed to quite disparate information from various representatives of the defendant.") (internal quotation marks omitted). On this record, her third theory of liability cannot be certified.

**D. Fourth theory: Apple misrepresents in the terms and conditions for the service plans that replacement iPhones will be "new or equivalent to new in performance and reliability" and "functionally equivalent to the original product"**

This theory fails because it is undisputed that English did not view or rely on the AC+ terms and conditions in making her purchase. English cannot bring claims under the CLRA, FAL, or UCL, or for fraud, based on misrepresentations she was not exposed to and did not rely on in making her purchase. *See, e.g., Cohen, 178 Cal.App. 4th at 980; Pfizer, 182 Cal.App. 4th at 634.*

English responds that she did rely on the AC+ terms and conditions in that she relied on them "vicariously through the Apple employees who told her that her replacement iPhones would be new." Reply at 13. English cites no authority for this "vicarious reliance" approach, and I am not aware of any. Moreover, she has not shown that she "vicariously relied" on the AC+ terms and conditions. Her declaration does not indicate that either of the Apple employees she spoke with in February and July 2013 used language based on or similar to the alleged misrepresentations in the terms and conditions. She states that the Apple employee in February 2013 told her "that the replacement devices would be new." *See* English Decl. ¶ 6. The terms and conditions in effect at the time, however, did not state that replacement devices would be new, but rather that they would be "new or equivalent to new in performance and reliability" and "at least functionally equivalent to the original product." TAC Ex. C. The terms and conditions currently in effect use substantially similar language. TAC Ex. B. With respect to her interaction with the Apple employee in July 2013, English does not describe what language, if any, the employee used regarding replacement devices.

**\*12** English also contends that reliance is not an element of her Secondhand Merchandize Labeling Law claims, or of her claims under the unfair prong of the UCL. *See* Reply at 10–11. But her Secondhand Merchandize Labeling Law claims have nothing to do with the terms and conditions for

the service plans. Those claims concern Apple's use of the plain, white, unbranded boxes to package its replacement devices, not the alleged misrepresentations in the terms and conditions. *See* TAC ¶ 116. The elements of a Secondhand Merchandize Labeling cause of action are irrelevant to this theory of liability.

English's contention that she is not required to establish reliance to bring claims under the UCL's unfair prong based on the alleged misrepresentations in the terms and conditions is also unpersuasive. Courts require a showing of reliance from named plaintiffs asserting UCL claims based on alleged misrepresentations irrespective of which of the UCL's prongs the claims are brought under. *See, e.g., Rahman v. Mott ' s LLP,* No. 13–cv–03482–SI, 2014 WL 5282106, at \*7 (N.D.Cal. Oct. 15, 2014) ("The reliance requirement is also applied to the UCL's unfair prong, when – as is the case here – the underlying conduct is alleged to misrepresent or deceive."); *Kane v. Chobani, Inc.,* 973 F.Supp.2d 1120, 1129 (N.D.Cal.2014) ("[T]he actual reliance requirement also applies to claims under the UCL's unfair prong to the extent such claims are based on fraudulent conduct."); *Missud v. Oakland Coliseum Joint Venture,* No. 12–cv–02967–JCS, 2013 WL 3286193, at \*20 (N.D. Cal. June 27, 2013) (dismissing claims under the UCL's unlawful, unfair, and fraudulent prongs "because plaintiffs still have not alleged that they purchased their tickets, or otherwise suffered economic injury, in reliance on any of the ... misleading advertising"); *see also* Cal. Bus. & Prof.Code § 17204 (an action for relief under the UCL may only be brought by a private individual where the individual "has suffered injury in fact and has lost money or property as a result of the unfair competition"). The fourth theory of liability does not help English.

**E. Fifth theory: Apple fraudulently omits that replacement iPhones under the service plans could be refurbished iPhones**

Although the exact contours of English's omission theory are unclear, I do not see how the theory could be reasonably construed to support her claims on behalf of the class. To the extent that English means to assert that the omission occurs when Apple employees discuss the service plans with purchasing customers, the theory fails for essentially the same reasons as English's oral misrepresentations theory – i.e., because English has not shown that the way in which Apple employees talk about the service plans is sufficiently uniform to support an inference of classwide reliance or materiality. For example, English contends that the alleged omission is material because "a warranty product that offers refurbished rather than new

replacements is ... plainly different and inferior ... from a warranty product that offers actually new replacements. Everybody would rather have a new phone than refurbished one." Reply at 5. As discussed above, however, the allegations in the TAC and the evidence on record do not support a plausible inference that putative class members have been uniformly (or even commonly) told that all replacement devices under the service plans will be new.

To the extent that English means to assert that the omission occurs in the AC+ and APP terms and conditions, the theory fails because, as stated above, English did not view or rely on the terms and conditions in making her purchase, depriving her of standing to bring the theory and rendering her an inadequate and atypical class representative with respect to it. *See Cohen,* 178 Cal.App. 4th at 980; *see also Daniel v. Ford Motor Co.,* 806 F.3d 1217, 1225 (9th Cir.2015) (under the CLRA and UCL, actual reliance can be established for the purposes of a fraudulent omission claim by showing that, "had the omitted information been disclosed, one would have been aware of it and behaved differently") (internal quotation marks omitted).

**\*13** English also contends that the replacement devices themselves improperly "omi[t] labeling that would indicate that the devices are refurbished." Mot. at 2. But the evidence that English received new devices instead of refurbished ones makes her an inadequate and atypical class representative with respect to this theory: even if Apple had labeled refurbished replacement devices as such, English would not have been viewing the labeling when making her purchase. The fifth theory of liability does not provide a viable basis for class certification.

## II. ENGLISH HAS NOT ESTABLISHED ADEQUACY OF COUNSEL

The various defects in English's theories of liability discussed above preclude certification of the putative class and subclasses. An additional reason for denying English's motion has to do with the way in which this lawsuit originated and has been litigated.

Two of the three original named plaintiffs in this case, Adkins and Galindo, either were working or had worked for class counsel at the time they purchased AC+ and filed this lawsuit. Dkt. No. 82. One of them, Galindo, was class counsel's paralegal at the time. *Id.* Both Adkins and Galindo purchased AC+ on the same date, October 30, 2013, five days before filing the lawsuit, and both purchased their service plans using the "monetary gifts"

class counsel had given them shortly before. *Id.* Following instructions from class counsel, Galindo brought two audio recorders with her to the Apple store on October 30, 2013 for the purpose of recording her "whole transaction experience with Apple." Galindo Depo. at 60.

Class counsel's prior relationship with Adkins and Galindo and her involvement in their purchase of AC+ continue to taint this case. The record strongly indicates that Adkins and Galindo purchased their AC+ plans at class counsel's direction for the purpose of initiating this lawsuit. At the very least, it is undisputed that they did so using funds class counsel had given them, and that class counsel instructed Galindo, her paralegal at the time, to record her interactions with Apple employees while making her purchase. Given these facts, there is little question that Adkins and Galindo would not have been adequate class representatives had they remained in the case, and that class counsel could not have adequately represented the class on their behalf. *See Redman v. RadioShack Corp.,* 768 F.3d 622, 638 (7th Cir.2014) (noting the concern that the lead named plaintiff was employed by a law firm for which the principal class counsel once worked, and stating that "named plaintiffs are ... charged with monitoring the lawyers who prosecute the case on behalf of the class," such that "[t]here ought ... to be a genuine arm's-length relationship between class counsel and the named plaintiffs"); *Radcliffe v. Experian Info. Sols. Inc.,* 715 F.3d 1157, 1167 (9th Cir.2013) ("The responsibility of class counsel to absent class members whose control over their attorneys is limited does not permit even the appearance of divided loyalties of counsel.") (internal quotation marks omitted); *Creative Montessori Learning Centers v. Ashford* Gear LLC, 662 F.3d 913, 918 (7th Cir.2011) ("When class counsel have demonstrated a lack of integrity, a court can have no confidence that they will act as conscientious fiduciaries of the class."); Susman v. Lincoln Am. Corp., 561 F.2d 86, 95 (7th Cir.1977) ("Even though plaintiff does not expect to share in any attorney's fees recovered in this cause, there exists the possibility that one so situated will become more interested in maximizing the 'return' to his counsel than in aggressively presenting the proposed class action."). Class counsel recognized as much when, nearly one year after filing the original complaint, she sought precertification discovery to identify class members, stating that such discovery was necessary in part because "it is understood that the Court may choose to disallow plaintiffs' counsel from representing [Adkins and Galindo]." Dkt. No. 82; *see also Adkins v. Apple Inc,* No. 14–cv–01619–WHO, 2014 WL 4618411, at *3–5 (N.D. Cal. Sept. 15, 2014) (denying motion to identify class members). The fact that Adkins and Galindo are no longer in this case, and the introduction of Kershaw Cutter & Ratinoff LLP ("KCR") as co-counsel shortly after English filed her opening brief in support of class certification, alleviate these concerns to some degree,

English v. Apple Inc., Not Reported in Fed. Supp. (2016)

but not enough to preclude them from weighing against class certification. *Cf. Sipper v. Capital One Bank, No. 01–cv–09547, 2002 WL 398769, at \*3–5 (C.D.Cal. Feb. 28, 2002)* (denying class certification due to class counsel's failure to disclose his business relationship with one of the named plaintiffs, where "neither the mere addition of different [named] plaintiffs nor of different class counsel can save this particular action from the appearance of impropriety").[16]

**\*14** Class counsel's total lack of experience with class action litigation, and her pervasive failure to comply with basic federal and local rules and with my standing orders throughout the course of this litigation, further undermine English's request for class certification. *See Sweet v. Pfizer, 232 F.R.D. 360, 370–71 (C.D.Cal.2005)* (finding class counsel inadequate based on their lack of class action experience and their poor quality representation up to that point). I agree with Apple that class counsel's "pattern of improper litigation conduct throughout the life of this case has caused unending and unnecessary distractions and delays in this litigation," Opp. at 34, prejudicing the putative class and unduly burdening Apple, its attorneys, and the Court. As with class counsel's involvement in the inception of this case, her inexperience and poor performance to date are not adequately addressed by the recent appearance of KCR as co-counsel. KCR certainly has sufficient experience and ability to serve as class counsel, and Mr. Cutter represented at the class certification hearing that his firm would be in the case for the duration. However, three different sets of co-counsel have previously made appearances in the case only to withdraw within, at most, two-and-a-half months. *See* Dkt. No. 128 (January 28, 2015 notice of appearance of Mark Mauser); Dkt. No. 146 (March 20, 2015 withdrawal of Mark Mauser); Dkt. No. 143 (March 17, 2015 notice of

appearance of Steven Weinmann); Dkt. No. 163 (June 1, 2015 withdrawal of Steven Weinmann); Dkt. No. 162 (June 1, 2015 notice of appearance of the Brandi Law Firm); Dkt. No. 171 (June 16, 2015 withdrawal of the Brandi Law Firm). Moreover, this case has always been and continues to be class counsel's; she is its source and its driver, and neither the dubious manner in which this litigation commenced nor the manifestly incompetent manner in which it has been conducted are cured at this juncture by yet another new co-counsel. English has not established adequacy of counsel under Rule 23(a)(4).

### III. ADMINISTRATIVE MOTIONS TO FILE UNDER SEAL

The parties filed several administrative motions to file under seal in conjunction with the briefing on the motion for class certification.

On August 6, 2015, I issued an order on the various sealing motions English had filed in conjunction with her opening brief. Dkt. No. 202. I conditionally granted some of the sealing requests and denied others without prejudice. *Id.* On August 13, 2015, Apple filed a revised declaration in support of sealing. Dkt. No. 205. All sealing requests in the revised declaration, as well as all sealing requests previously conditionally granted, are GRANTED.[17]

On September 9, 2015, Apple filed a sealing motion in conjunction with its opposition brief. Dkt. No. 208. Those sealing requests are decided as follows:

| Dkt. No. | Document Name | Portions Identified for Sealing | Ruling |
|---|---|---|---|
| 208-3 | Opposition Brief | 1: 6-8, 18-21, 24-28 2: 4-6, 7-9, 11-16, 16-17, 18-24 3: 2, 3, 4, 6, 8, 10 | GRANTED. |
| 208-19 | Macariola Decl. | 1: 7-8 | GRANTED. |
| 208-15 | Garbutt Decl. | 1: 8, 10-16 | GRANTED. |

| 208-21 | O'Neill Decl. | 1: 10-11, 13, 15-21, 23, 25, 27 2: 2-3, 6-10 | DENIED as to 1:18-21 and 2:6-10.<br><br>GRANTED in all other respects. |
|--------|---------------|------------------------------------------------|-----------------------------------------------------------------------|
| 208-12 | Lanigan Depo. | 94: 1-25<br><br>128: 1, 4-7, 17, 24<br><br>129: 1-25 | GRANTED. |
| 208-25 | Lall Rpt. | ¶¶ 16(c), 30-31 | GRANTED. |
| 208-5 | English Depo. Ex. 11 | Various | GRANTED. |
| 208-7 | English Depo. Ex. 13 | Various | GRANTED. |
| 208-9 | English Depo. Ex. 15 | Various | GRANTED. |
| 208-11 | Williams Depo. Ex. 120 | All | GRANTED. |
| 208-23 | O'Neill Decl. Ex. A | All | GRANTED. |
| 208-23 | O'Neill Decl. Ex. A | All | GRANTED. |
| 208-14 | Dixon Employment Records | All | GRANTED. |

Finally, on September 30, 2015 and October 1, 2015, English filed her reply brief and various accompanying documents under seal on the ground that the underlying information had been designated as confidential by Apple.

Dkt. Nos. 211, 213–14. Then, on October 12, 2015, English filed a motion for leave to file a notice of errata seeking "to correct certain clerical errors in the filing of [her] reply brief." Dkt. No. 220–10. English filed another sealing

motion in conjunction with the notice of errata, again on the ground that the underlying information had been designated as confidential by Apple. Dkt. No. 220. Apple subsequently filed a declaration in support of sealing. Dkt. No. 223; *see also* Dkt. No. 223–1 (proposed order). Those sealing requests are all GRANTED.

**CONCLUSION**

For the foregoing reasons, English's motion for class certification is DENIED WITH PREJUDICE. The parties' various administrative motions to file under seal, Dkt. Nos. 208, 211, 213–14, 220, are decided as stated above.

Apple's unopposed motion for leave to file a surreply, Dkt. No. 217, is GRANTED. English's motion for leave to file a notice of errata, Dkt. No. 22010, is also GRANTED.

A Case Management Conference is set for February 9, 2016 at 2 p.m. The parties shall file a Joint Case Management Statement by February 2, 2016 proposing a schedule to address the remaining issues in this case.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2016 WL 1188200

Footnotes

1   In her TAC and briefing, English describes AC+ and ACC as "essentially extended warranties," TAC ¶ 11, and generally refers to them as "extended warranties," not service plans. *See, e.g.,* Mot. at 1 (Dkt. No. 186–1); Reply at 2 (Dkt. No. 211–3). I use "service plans" instead of "extended warranties" in this Order unless quoting from materials submitted by English.

2   Every new iPhone comes with a one year limited warranty and 90 days of telephone technical support. *See* Patel Decl. Ex. R (Dkt. No. 209–19).

3   In her TAC and briefing, English refers to all replacement iPhones other than new replacement iPhones as "refurbished." *See, e.g.,* TAC ¶ 11; Mot. at 1; Reply at 1. For ease of reference, I do the same in this Order unless otherwise indicated.

4   According to Apple's records, English's son, as opposed to English herself, is the person associated with the iPhone and AC+ plan English purchased on February 15, 2013. *See, e.g.,* Patel Decl. Exs. B–C (Dkt.Nos.208–5, 208–7). Apple contends that this fact, and the evidence that English's son was the principal user of the iPhone, make English an atypical and inadequate class representative. *See* Opp. at 11–12. Because I find that English's motion for class certification fails on other grounds, I do not address this issue.

5   English states that she "has not had the opportunity to cross-examine the factual basis for Apple's claim that [the replacement iPhones she received were] new." Reply at 13. In support of her claim that the replacement iPhones she received were not new, she points to testimony from Apple that a replacement iPhone is more likely to be new shortly after the particular generation of iPhone is launched, because at that point there is a more limited inventory of refurbished units or parts. *See id.* (citing Healy Depo. at 127–128 (Parker Decl. Ex. 7, Dkt. No. 213–7); Lanigan Depo. at 98–100 (Parker Decl. Ex. 10, Dkt. No. 213–11)). English states that the iPhone 4 was released in 2010, approximately three years before she received her replacements in February and July 2013. *See id.*

6   Apple's unopposed motion for leave to file a surreply, Dkt. No. 217, is GRANTED. English's motion for leave to file a notice of errata, Dkt. No. 220–10, is also GRANTED. Apple's objections to the evidence submitted in conjunction with English's reply brief, Dkt. No. 219, are OVERRULED.

7   Because I deny the motion for class certification for the reasons stated in this Order, I do not address Apple's other arguments against

certification.

8    As stated above, the second putative subclass consists of persons who "purchased an Extended Warranty and had their contemporaneous purchase of an iPhone treated by Apple, Inc. (and/or treated by AppleCare Service Company, Inc. or Apple CSC, Inc.) as a replacement pursuant to an incident, such that their Extended Warranty's coverage would have only one further replacement available for purchase under their Extended Warranty." Mot. at 14.

9    The parties dispute whether English was in fact told on February 28, 2014 that her purchase of her first replacement iPhone counted as an accidental damage incident under her AC+ plan. Because I find that this first theory of liability is uncertifiable for failure to establish numerosity, I do not address this dispute.

10    The Secondhand Merchandise Labeling Law provides in relevant part:

> It is unlawful for any person, firm, or corporation, in any newspaper, magazine, circular, form letter or any open publication, published, distributed, or circulated in this state, including over the internet, or on any billboard, card, label, or other advertising medium, or by means of any other advertising device, to advertise, call attention to or give publicity to the sale of any merchandise, which merchandise is secondhand or used merchandise, or which merchandise is defective in any manner, or which merchandise consists of articles or units or parts known as "seconds," or blemished merchandise, or which merchandise has been rejected by the manufacturer thereof as not first class, unless there is conspicuously displayed directly in connection with the name and description of that merchandise and each specified article, unit, or part thereof, a direct and unequivocal statement, phrase, or word which will clearly indicate that the merchandise or each article, unit, or part thereof so advertised is secondhand, used, defective, or consists of "seconds" or is blemished merchandise, or has been rejected by the manufacturer thereof, as the case may be.

> Cal. Bus. & Prof.Code § 17531.

11    Indeed, the evidence indicates that English is not even a member of the first putative subclass, which is limited to persons who "received a refurbished, remanufactured, used, or secondhand replacement iPhone" under AC+ or APP. Mot. at 13. "Because [she] is not a member of [that] subclas[s], [she] cannot prosecute claims on [its] behalf." *Berger v. Home Depot USA, Inc.,* 741 F.3d 1061, 1067 (9th Cir.2014).

12    English also contends that Apple employees orally mislead and deceive customers by referring them to the AC+ and APP terms and conditions, or by using the "new or equivalent to new" language of the terms and conditions, when selling the service plans. *See, e.g.,* Reply at 3. The problem with this theory is that English lacks standing to bring it. English asserts that she was told "that the replacement devices would be new," not that she was referred to the terms and conditions or told language from the terms and conditions. California law does not authorize recovery for a consumer who was not exposed to the allegedly wrongful business practices at issue. *Cohen v. DIRECTV, Inc.,* 178 Cal.App. 4th 966, 980 (2009); *accord Mazza,* 666 F.3d at 595; *see also Berger,* 741 F.3d at 1068 ("class certification of UCL claims is available only to those class members who were actually exposed to the business practices at issue"); *Pfizer Inc. v. Superior Court,* 182 Cal.App. 4th 622, 634 (2010) (finding that named plaintiff lacked standing to bring FAL and UCL claims based on product labels and television commercials he did not view, where his "limited experience with respect to a particular label that he viewed is not representative of other consumers' experiences with respect to other aspects of [defendant's] [advertising] campaign").

13    The Ninth Circuit also upheld the district court's decision to try the case on a class basis. *See* First Alliance, 471 F.3d at 990–91.

14    English repeatedly uses the phrase "functional equivalent to new in performance and reliability" in her briefing to describe the alleged misrepresentations in the terms and conditions for the service plans. That phrase does not appear in the terms and conditions. To reiterate, the current AC+ terms and conditions refer to replacement products that are "new or equivalent to new in performance and

reliability," or that "will at a minimum be functionally equivalent to the original product." TAC Ex. B. The AC+ and APP terms and conditions in effect until September 2013 similarly describe replacement devices as "new or equivalent to new in performance and reliability," and "at least functionally equivalent to the original product." TAC Ex. C.

15       English also moves for certification under Rule 23(b)(2). *See* Reply at 20 n.8. I agree with Apple that certification under Rule 23(b)(2) is not appropriate here. *See Dukes,* 131 S.Ct. at 2557 (Rule 23(b)(2) does not authorize certification "when each class member would be entitled to an individualized award of monetary damages"); *Wang v. Chinese Daily News, Inc.,* 737 F.3d 538, 544 (9th Cir.2013) ("individualized monetary claims belong in Rule 23(b)(3) rather than Rule 23(b)(2)") (internal quotation marks omitted); *see also Faulk v. Sears Roebuck & Co.,* No. 11–cv–02159–YGR, 2013 WL 1703378, at *5 n.4 (N.D.Cal. Apr. 19, 2013).

16       To be clear, this is not a case where the class counsel merely solicited a person to serve as a named plaintiff. *Cf.* Newberg on Class Actions § 3:78 (5th ed.) ("There is nothing unethical about solicitation in class action cases per se; only when that solicitation violates ethical rules will it preclude a finding of adequacy."). Rather, the evidence here strongly indicates that class counsel instructed Adkins and Galindo to purchase the service plans that gave rise to their claims, and gave them the funds to do so.

17       For the reasons stated in the August 6, 2015 Order, I continue to apply the "compelling reasons" standard to the parties' sealing requests. *See* Dkt. No. 202 at 2–3; *see also Kamakana v. City & Cnty. of Honolulu,* 447 F.3d 1172, 1178–79 (9th Cir.2006).

---

**End of Document**                                   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 10621
Only the Westlaw citation is currently available.
United States District Court,
E.D. California.

Alfred GONZALES and, Kelly Gonzales,
Individually and on Behalf of All Others
Similarly Situated, Plaintiffs,
v.
COMCAST CORPORATION, and Does 1
through 10 Inclusive, Defendants.

No. 10–cv–01010–LJO–BAM.
|
Jan. 3, 2012.

**Attorneys and Law Firms**

Coby Marie Turner, Jala Arlene Amsellem, Kevin F. Ruf, Lionel Z. Glancy, Marc L. Godino, Glancy Binkow & Goldberg Llp, Los Angeles, CA, for Plaintiffs.

Bryan Alexander Merryman, Devon Anne Myers, White And Case Llp, Los Angeles, CA, Jaime A. Bianchi, Phv, Sheldon A. Philp, Phv White and Case Llp, Miami, FL, for Defendants.

# I. INTRODUCTION

FINDINGS AND RECOMMENDATIONS ON PLAINTIFF'S MOTION FOR CLASS CERTIFICATION; APPOINTMENT OF REPRESENTATIVE PLAINTIFFS AND LEAD COUNSEL

BARBARA A. McAULIFFE, United States Magistrate Judge.

**\*1** By notice filed on August 22, 2011, plaintiffs Alfred Gonzales and Kelly Gonzales ("Plaintiffs") filed a motion

to certify two putative classes in this matter. (Doc. 64.) Defendant Comcast Corporation. ("Comcast") filed an opposition on September 26, 2011. (Doc. 75.) Plaintiffs filed their Reply Brief on October 14, 2011. (Doc. 78.) The Court heard oral arguments on the matter on November 18, 2011.[1] (Doc. 83.) Having considered the moving, opposition and reply papers, the declarations and exhibits attached thereto, arguments presented at the November 18, 2011 hearing, as well as the Court's file, the Court issues the following findings and recommendations.

# II. FACTUAL AND PROCEDURAL BACKGROUND

On May 3, 2010, Plaintiffs, individually and on behalf of all others similarly situated, filed a putative class action complaint against Comcast in the Superior Court of the State of California in and for the County of Fresno. (Doc. 1, Attach. 1., the "State Court Action") On June 3, 2010, Comcast, pursuant to 28 U.S.C. §§ 1446(a) and (d), removed the State Court Action to this Court. (Doc. 1.) On May 13, 2011, Plaintiffs filed a First Amended Complaint (Plaintiffs' "FAC"), which is the operative pleading underlying the instant Motion. (Doc. 56.)

The crux of Plaintiffs' FAC, as well as their Motion for Class Certification, challenge Comcast's billing and service cancellation practices. (Pls.' Mot. Class Cert., 1: 7– 13, Doc. 64.) Specifically, Plaintiffs challenge Comcast's policies and practices relating to post-cancellation billing of consumers who seek to "port"[2] their telephone number to another service provider. (Pls.' FAC ¶¶ 23–5, Doc. 56.) Additionally, Plaintiffs allege that Comcast's policies and practices result in consumers receiving unclear and inaccurate billing statements. (Pls.' FAC ¶¶ 22, 41, Doc. 56.) Plaintiffs argue that Comcast "purposefully uses arcane and confusing final billing statements to prevent its customers from understanding its improper billing methods, such as billing past the last date of service, using inaccurate refund calculations, and delaying the last day of service past the customer's requested date in order to 'confirm' porting." (Pls.' Mot. Class Cert., 5: 3–8, Doc. 64.)

# A. Comcast's Billing and Account Cancellation Model

Gonzales v. Comcast Corp., Not Reported in F.Supp.2d (2012)

According to Plaintiffs' FAC, Comcast is the largest cable provider in the United States and conducts a substantial amount of its business in the State of California. (Pls.' FAC ¶ 1, Doc. 56.) When California consumers sign up for Comcast's services, they are required to enter into standard Residential Service Contracts.[3] (Declaration of Kevin F. Ruf ("Ruf Decl."), Ex 14, 106: 19–22, Doc. 66.) When a consumer seeks to cancel their Comcast services, the Residential Service Contract provides that consumers are responsible for all applicable fees and charges until the Contract is terminated, service is disconnected and equipment is returned. (Declaration of Bryan A. Merryman ("Merryman Decl."), Ex. A at 11, Doc. 75.)

**\*2** Comcast's billing model entails billing and collection of money in advance of Comcast's providing the services for which the customer is being billed. (Merryman Decl., Ex. T at 194–5, Doc. 75.) Because Comcast's services are billed in advance of their use—thus, often resulting in overpayments when consumers seek to cancel their Comcast account—Comcast has internal mechanisms in place for automatically generating prorated refunds to customers. (Merryman Decl., Ex. A at 11; Ex. Q at 141–44; Ex. T at 196–201; Doc. 75.)

If a Comcast customer includes a porting request when cancelling their Comcast service, Comcast does not close the customer's account until the porting has occurred. (Pls.' FAC, ¶ 23, Doc. 56; Merryman Decl., Ex. P at 138–140, Ex. T at 190–92, Doc. 75.) Accordingly, if a porting request is unresolved, even if a customer has returned Comcast's equipment and the agreed-upon cancellation date has passed, the customer will continue to be billed, because it is Comcast's policy to leave customer accounts open until the port-out is confirmed. (Ruf Decl., Ex 14, 5: 17–23; Ex. 18, 5: 11–28, Doc. 66.)

**B. Plaintiffs Alfred Gonzales' and Kelly Gonzales' Experience With Comcast**

In or around November of 2004, Plaintiffs contracted with Comcast to provide various communication and entertainment services in their home. (Ruf Decl., Ex. ¶ 4, Doc. 66.) When Plaintiffs signed up for Comcast's services, they received a Residential Services Contract (the "Contract") which provided, *inter alia,* that Plaintiffs would be responsible for all applicable fees and charges until the Contract was terminated, services were disconnected and equipment was returned. (Ruf. Decl., Ex. 24, ¶ 4, Doc. 66; Merryman Decl., Ex. A at 11, Doc. 75.) The Contract further provided that Comcast would refund all prepaid monthly service fees charged for Comcast's

services after the date of termination. (Merryman Decl., Ex. A at 11, Doc. 75.)

Sometime in 2008, Plaintiffs signed up for a service provided by Comcast called "Pay Direct," which permits Comcast's customers to establish automatic recurring payments, debited from the consumer's checking account, in making their monthly payments to Comcast. (Ruf Decl., Ex. 24 ¶ 5, Doc. 66.) The Pay Direct Agreement provides that in order to cancel the Pay Direct service or otherwise cancel the automatic billing, the customer was to give notice to Comcast—either in writing, by telephone or internet. (Merryman Decl ., Ex. B at 38–44, Doc. 75.)

Sometime between October 8, 2008 and November 6, 2008, Plaintiffs contacted Comcast to cancel their Comcast services,[4] establishing an effective cancellation date of November 6, 2008.[5] (FAC, ¶ 12, Doc. 56; Ruf Decl., Ex. 24 ¶ 7, Doc. 66.) Plaintiffs additionally requested that their telephone number be released for porting to a new service provider. (Merryman Decl., Ex. S at 171, Doc. 75.) At this time, Plaintiffs did not separately terminate the Direct Pay Agreement.[6] (Merryman Decl., Ex. S at 169–70; Ex. B at 38–44, 56–57, Doc. 75.) On November 4, 2008, an automatic payment of $174.46 was debited from Plaintiffs' checking account, representing payment for Comcast's services for the billing period of October 19, 2008 to November 18, 2008. (FAC ¶ 13, Doc. 56; Merryman Decl., Ex. E, Doc. 75.)

**\*3** On November 7, 2008, Plaintiffs returned all Comcast equipment to a Comcast retail store, and Plaintiffs were given a receipt after returning the equipment.[7] (FAC ¶ 12, Doc. 56; Ruf Decl. Ex. 24 ¶ 8, Doc. 66; Merryman Decl., Ex. F at 83, Doc. 75.) At this time, Plaintiffs' Account remained open because Comcast's records indicated the requested porting had not been completed. (Comcast's Op., 4: 13–15; Merryman Decl., Ex T at 201–02, Doc. 75.) Because Plaintiffs' account remained open, Plaintiffs' checking account was debited on December 4, 2008, in the amount of $174.46, representing the billing period of November 19, 2008 to December 18, 2008. (Comcast's Op., 4: 18–20, Doc. 75; FAC ¶ 16, Doc. 56.) Plaintiffs' Account continued to remain open and generate billing statements until at least January 9, 2009, when Plaintiffs received a bill for $351.88.[8] (Ruf Decl., Ex. 24 ¶ 13, Doc. 66.)

On April 27, 2009, Plaintiffs received a check from Comcast in the amount of $241.23, representing a refund of funds deducted from Plaintiffs' checking account via Direct Pay on November 3, 2008 and December 4, 2008; less a prorated portion for services rendered between October 19, 2008 and November 7, 2008.[9] (FAC ¶ 19, Doc. 56; Ruf Decl., Ex. 24 ¶ 15, Doc. 66; Comcast's Op., 4: 26–

Gonzales v. Comcast Corp., Not Reported in F.Supp.2d (2012)

28, Doc. 75.) In or around October of 2010, Plaintiffs re-subscribed to Comcast's services. (Comcast's Op., 2: 7–8, Doc. 75.)

### C. Plaintiffs' FAC

Plaintiffs' FAC states claims against Comcast on behalf of two proposed Classes for: (1) violations of the Unfair Competition Law, Cal. Bus. & Prof.Code § 17200 et seq. (the "UCL"); (2) violations of the Consumer Legal Remedies Act, Cal. Civ.Code § 1750 et seq. (the "CLRA"); and (3) breach of contract. (Pls.' FAC ¶¶ 39–58, Doc. 56.)

Plaintiffs plead a claim against Comcast under the Section 1770(a)(5) CLRA, arguing that Comcast's porting and billing practices are tantamount to "a representation that [Comcast's] goods or services have characteristics, uses and benefits which they did not have." Cal. Civ.Code § 1770(a)(5). Plaintiffs state two separate claims under the UCL: a claim for "unlawful" business practices and a claim for "unfair" business practices. Plaintiffs' claim for unlawful business practices under the UCL is predicated on an alleged violation of Video Customer Service Act, Cal. Govt.Code § 53088 et seq. (the "Video Act"). Specifically, Plaintiffs allege Comcast has violated Section 53088.2(f) of the Video Act by failing to render bills that are accurate and understandable. Plaintiffs also plead an "unfair" business practice claim under the UCL for Comcast's practice of leaving customer accounts open until porting has been confirmed, and for Comcast's use of inaccurate and unclear billing statements. Plaintiffs allege an additional unlawful UCL claim predicated on the above-referenced CLRA claim. Lastly, Plaintiffs plead a claim for breach of contract,[10] arguing that Comcast has "charged Plaintiffs and Class Members for more fees than were permitted under the Service Contract."

### D. Plaintiffs' Motion For Class Certification

**\*4** Plaintiff seeks to certify the following classes:

> 1) The "Cancellation Class" comprising all Comcast customers in California, who, from May 3, 2006 to the present, cancelled their Comcast services and returned their Comcast equipment but were not given an accurate billing statement upon termination that clearly stated the date of account termination, the last day of service charges incurred and/or the correct final billing credit amount [and;]

> 2) The "Porting Class" comprising all Comcast customers in California, who, from May 3, 2006 to the present, cancelled their Comcast services and returned their Comcast equipment, but whose accounts were not closed at that time.

Plaintiffs seek certification for both the Cancellation Class and the Porting Class ("collectively referred to as the "Classes") pursuant to Rule 23(b)(2) and 23(b)(3).[11] Plaintiffs' Motion for Class Certification also seeks to appoint Plaintiffs as class representatives and appointment of Plaintiffs' counsel, Glancy Binkow & Goldberg LLP, as lead counsel for the Classes. Additionally, Plaintiffs seek to assert claims for breach of contract and violations of the UCL and CLRA on behalf of both Classes.

## IV. DISCUSSION

### A. Standing

Before considering whether Plaintiffs' proposed Classes meet the requirements of Rule 23, the Court must determine whether Plaintiffs' have standing to assert their claims. In class actions, questions of standing do not generally defer until the class certification stage. LaDuke v. Nelson, 762 F.2d 1318, 1325 (9th Cir.1985) ("Standing ... is a jurisdictional element that must be satisfied prior to class certification.") It is proper for the Court to address the issue of standing before addressing the issue of class certification. See Easter v. Am. West Fin., 381 F.3d 948, 962 (9th Cir.2004).

### 1. Standing Requirements

Under Article III's standing requirement, a plaintiff must have suffered an "injury in fact" that is "distinct and palpable," the injury must be fairly traceable to the challenged action, and the injury must be likely redressable by a favorable decision. Lujan v. Defenders of Wildlife, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). In other words, the alleged injury can not be "abstract ... conjectural or hypothetical." Whitmore v. Arkansas, 495 U.S. 149, 155–56, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) (internal quotation marks omitted). "[T]he Supreme Court's precedent may be read to support a general rule of standing along these lines: If the injury is not concrete, there is no injury in fact even if the injury is particularized [.]"

Gonzales v. Comcast Corp., Not Reported in F.Supp.2d (2012)

*Covington v. Jefferson County,* 358 F.3d 626 (9th Cir.2003).

To confer standing under the UCL, as well as to serve as a class representative, plaintiff must "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., economic injury, and (2) show that the economic injury was the result of, i.e., caused by, the unfair business practice or false advertising that is the gravamen of the claim." *Kwikset Corp., v. Superior Court,* 51 Cal.4th 310, 322, 120 Cal.Rptr.3d 741, 246 P.3d 877 (Cal.2011); Cal. Bus. & Prof.Code 17204. Under the CLRA, Plaintiff must show a tangible increased cost or burden resulting from an alleged unlawful practice. Cal. Civ.Code § 1780(a); *Meyer v. Sprint Spectrum L.P.,* 45 Cal.4th 634, 643, 88 Cal.Rptr.3d 859, 200 P.3d 295 (Cal.2009).

### 2. Plaintiffs Bear The Burden of Demonstrating Standing

**\*5** Comcast argues that under Article III, the UCL and CLRA, Plaintiffs' lack standing to represent the proposed Classes. (Comcast's Op. 7–9. Doc. 75.) Specifically, Comcast argues that because Plaintiffs received a full refund for any over-billing that took place, Plaintiffs have not suffered the requisite "injury in fact" required under Article III and Plaintiffs' substantive claims. *Id.* In response, Plaintiffs argue that "Defendant has not presented any evidence to show that Plaintiffs have been fully refunded[,]" and that "[i]n the absence of any evidence proving that Plaintiffs do not have standing, [i.e., received a full refund] the well pled allegations in the Complaint should be taken as true at the class certification stage." (Pls.' Reply, 4: 6–14, Doc. 78.) Plaintiffs additionally argue they have suffered an economic injury resulting from overdraft fees imposed by Plaintiffs' bank as a result of Comcast's improper billing. (Pls.' Reply, 3: 22–25, Doc. 78).

Plaintiffs argue it is Comcast's burden to demonstrate Plaintiffs lack standing. Specifically, Plaintiffs argue that "[i]n the absence of any evidence proving that Plaintiffs do not have standing, the well pled allegations in the Complaint should be taken as true at the class certification stage." (Pls.' Reply, 4: 6–14, Doc. 78.) The Court disagrees. It is not Comcast's burden to prove Plaintiffs lack standing. On the contrary, it is axiomatic that Plaintiffs bear the burden of demonstrating their own standing. *See United States v. Hayes,* 515 U.S. 737, 743, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995) (the burden is on plaintiff "to allege facts demonstrating that [plaintiff] is a proper party to invoke judicial resolution of the dispute."); *Friendly*

*House v. Napolitano,* 419 F.3d 930, 932 (9th Cir.2005) ("Plaintiffs have not met *their* burden of demonstrating an injury-in-fact.") (emphasis added); *Caldwell v. Caldwell,* 420 F.Supp.2d 1102, 1105 (N.D.Cal.2006) ("Plaintiff also bears the burden of demonstrating that she has standing to pursue the claims alleged in the complaint."). Plaintiffs' standing, therefore, can not be presumed by the Court. Rather, Plaintiffs are required to put forward evidence demonstrating Plaintiffs *in fact* have legal standing to pursue the claims alleged in their complaint.

### 3. Plaintiffs' Individual Standing

#### i. Speculative Nature of Injury In Fact Resulting From Inadequate Refund

Plaintiffs have failed to establish an injury in fact or economic loss sufficient to confer standing under Article III, the UCL or the CLRA. With respect to Plaintiffs' claims of inadequate refunds, the Court finds Plaintiffs' claim that the refund provided by Comcast was inadequate is too speculative to plead a concrete injury in fact. *See Bernhardt v. County of Los Angeles,* 279 F.3d 862, 872 (9th Cir.2002) ("a claim for damages that is too speculative in some circumstances precludes standing.").

The Court disagrees with Plaintiffs that "Defendant has not presented any evidence to show that Plaintiffs have been fully refunded." (Pls.' Reply, 4: 6–14, Doc. 78.) The undisputed evidence before the Court demonstrates that Comcast provided a prorated refund for money debited from Plaintiffs' bank account in November and December of 2008—the time frame Comcast is alleged to have improperly take money from Plaintiffs' account. (FAC ¶ 19, Doc. 56; Ruf Decl., Ex. 24 ¶ 15, Doc. 66; Comcast's Op., 4: 26–28, Doc. 75.) In response, Plaintiffs claim that the prorated refund was less than what Plaintiffs were entitled to receive. However, Plaintiffs have failed to demonstrate, or even allege with any degree of concreteness, that the refund was inadequate. Indeed, Plaintiffs' FAC acknowledges that Comcast tendered a refund to Plaintiffs, and that "it has been virtually impossible to determine what Plaintiffs were billed for and whether their refund check compensates them for the improper charges they incurred." (FAC ¶ 20, Doc. 56.) Nowhere in the FAC does Plaintiffs actually allege the refund was inadequate.

**\*6** Looking to the evidence before the Court, Plaintiffs' evidence that the refund was inadequate is highly

speculative. First, Plaintiffs have failed to present non-speculative evidence regarding *how* Comcast calculates its refunds.[12] Rather, Plaintiffs—without the aid of experts and without any reference to Comcast's specific billing or refund practices—have devised a series of rudimentary and varying calculations based on seemingly indiscernible and ever-changing variables. The damages resulting from these varying calculations run the gamut of possibilities—anywhere from around five cents to upwards of $106.69[13] for the same period.[14] The deposition of Mrs. Gonzales demonstrates the speculative nature of Plaintiff's inadequate refund claims:

> So there's so many different ways this [the refund calculation] can be done. I know it's crazy.... (Gonzales Depo., 232: 18–19.)

> ... there would be more days from October 19th, ′08 to November 18th, 08′ than there would be in November 19th, ′08 to December 18th, ′08 .... (Gonzales Depo., 228: 1–6.)

> And the November statement, the November 9th statement is actually billed for 30 days, so if you look, they are charging me for the same amount on both statements, though one is 31 days and one is 30 days, so it's really hard to come up with a figure because if you take 174.46, this is just, it's crazy and confusing, I know, but bear with me. If you take 174.46 and you divide that by 31, well, now you get 5.63 a day. I know, crazy, but if you take the 174.46 and you divide that by 30 days, which the November statement would be for, let's go for that now. Oh, pardon me. Divided by 30 days. Now that's 5.82 per day. So I'm not really sure what they charge. Is it 5.82 per day? Is it 5.63 a day? Because they are both different amounts and look at two different things. It's really hard. It's really confusing. I don't know.... (Gonzales Depo., 233: 4–19.)

> But I would also have to say something else. Now, how are taxes done? Because, you know, if you are saying it's that much per day, well, are taxes charged per day? Are they charged per month? Because you have all these one-time charges, franchise fees, sales tax, FCC user fee, you have paid capital fee. So if we're including those and dividing, are those consistent things, or are we dividing them out? (Gonzales Depo., 234: 16–25.)

> [Counsel reading an interrogatory response from Plaintiffs into the deposition record:] However, Plaintiffs are unsure of the per diem charge of Comcast services since it's not delineated in the billing statements and are also unsure of which day billing ended. And in absence of this information from Comcast, Plaintiffs cannot formulate a precise answer to this interrogatory. Plaintiffs[,] based on their personal calculations, believe the amount of damages suffered, even discounting Comcast's eventual refund, are in the range of $20 to $90. (Gonzales Depo., 246: 1–9.)

**\*7** Even now, at the class certification stage, Plaintiffs can not explain what their damages are, and the justification for claiming those damages. Plaintiffs' Motion argues that the total refund calculation resulted in damages to Plaintiffs anywhere from five cents to $1.64, but as Plaintiffs' deposition indicates, these calculations fail to consider the many possible variables that could have gone into Comcast's refund calculation. Plaintiffs have failed to identify how Comcast incorporates these many variables into its refund calculation; a problem which would apply equally to the Class members. Considering the de minimis amount Plaintiffs allege, coupled with Plaintiffs' failure to present a reasonable basis for claiming these minimal damages, the Court does not find Plaintiffs have concretely alleged an injury in fact relating to inadequate refunds. Rather, the present claim "rests at the bottom on some abstract conception or speculative measure of harm." *Associated General,* 459 U.S. at 543.[15]

### ii. Injury In Fact Resulting From Bank Overdraw Fees

Plaintiffs have additionally argued they suffered an injury in fact in the form of overdraft fees imposed by Plaintiffs' bank when Comcast impermissibly withdrew funds from Plaintiff's checking account. (Pls. Reply, 3: 21–25, Doc. 78.). The Court believes this alleged injury sufficiently establishes a concrete injury of fact. *See Steele v. Hospital Corp. of America,* 36 F.3d 69, 71 (9th Cir.1994) (allegations of a "concrete financial loss" suffice to confer standing). Overdraft fees, if caused by Comcast's conduct, constitute a "concrete financial loss." This injury in fact stems from the same conduct of Comcast alleged to have caused the inadequate refunds. The overdraft injury sufficiently confers standing on Plaintiffs under Article III, the UCL and CLRA.[16]

### 4. Absent Class Member's Have Not Suffered An Injury In Fact Resulting From Inadequate Refunds

Putative class members need not submit evidence of

Gonzales v. Comcast Corp., Not Reported in F.Supp.2d (2012)

personal standing, however, a class must be defined in such a way that anyone within it would have standing. *Wal–Mart Stores, Inc. v. Dukes,* —— U.S. ——, 131 S.Ct. 2541, 2552, 180 L.Ed.2d 374 (2011) (*"Dukes"* ) (acknowledging the need to exclude putative class members seeking injunctive relief who were no longer employed by Wal–Mart because those absent class members "lack[ed] standing to seek injunctive or declaratory relief against [Wal–Mart's current] employment practices ."); *Amchem Prods., Inc., v. Windsor,* 521 U.S. 591, 612–13, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (instructing district courts to be "mindful that Rule 23's requirements must be interpreted in keeping with Article III constraints."); *Denney v. Deutsche Bank AG,* 443 F.3d 253, 264 (2d Cir.2006) ("[N]o class may be certified that contains members lacking Article III standing."); *Burdick v. Union Sec. Ins. Co.,* No. 07–cv–4028–ABC (JCX), 2009 WL 4798873, at \*4 (C.D.Cal., Dec. 9, 2009) ("absent class members lacking justiciable claims under Article III should be excised from the case.); *Sanders v. Apple, Inc.,* 672 F.Supp.2d 978, 991 (N.D.Cal.2009); *O'shea v. Epson America, Inc.,* No. 09–cv–8063–PSG (CWX), 2011 WL 4352458, at \*8 (C.D.Cal., Sept. 19, 2011) ("*Tobacco II* does not permit a federal class action to proceed where class members lack Article III standing"); *Aho v. AmeriCredit Financial Services, Inc.,* No. 10–cv–1373 DMS (S.D.Cal., July 25, 2011) ("The requirement that all members of the class have Article III standing makes sense. If that were not the rule, a class could include members who could not themselves bring suit to recover, thus permitting a windfall to those class members and allowing Rule 23 to enlarge substantive rights.")

**\*8** The evidence before the Court demonstrates that none of the putative Class members have suffered an injury in fact. As discussed above, to establish standing under Article III, the UCL or the CLRA, Plaintiffs must establish not just a wrongful act prohibited by those statutes, but Plaintiffs must also show that those wrongful acts resulted in an injury to Plaintiffs and the putative Class members. In other words, it is insufficient, for standing purposes, to allege that Comcast's billing statements violate the Video Act, or that Comcast's porting practices violate the UCL or CLRA. Injuries must also flow from these wrongful acts.

Plaintiffs claim that Comcast's cancellation and porting practices result in over-billing to Comcast customers. This is the sole injury alleged on behalf of the Classes. Comcast, however, has put forward evidence that Comcast maintains internal mechanisms for automatically generating refunds. Indeed, Plaintiffs received such a refund. Plaintiffs have not presented any evidence indicating that Comcast fails to generate these refunds. On the contrary, because Comcast bills for its services in advance, automatically generating

refunds would seem to be a fundamental aspect of Comcast's business model. In response, Plaintiffs argue these refunds are inadequate due to incorrect refund calculations. As discussed above, however, *see supra* Section IV.A.3.i, Plaintiffs have failed to present any non-speculative evidence that the refund calculation is incorrect or otherwise results in an injury to Plaintiffs or the absent Class members.

For the same reasons that Plaintiffs have failed to establish an injury in fact relating to their own refund, Plaintiffs have similarly failed to put forward any evidence that absent Class members have suffered any injury resulting from Comcast's alleged unlawful conduct. In other words, even assuming Comcast's billing, cancellation and porting practices violate the Video Act, UCL, CLRA and the terms of Comcast's Service Agreement, Plaintiffs have not presented any evidence indicating that any of the putative Class members have suffered an injury as a result of these practices. As a result, neither Plaintiffs nor the absent members of the Cancellation or Porting Classes have standing to assert the claims alleged in Plaintiffs' First Amended Complaint.

### B. Rule 23 Certification Analysis

The Court has found Plaintiffs failed to show they have standing. Nonetheless, even if Plaintiffs could demonstrate standing, certification of the Classes would fail.

#### 1. Legal Standard

A class may be certified only if: (1) the class is so numerous that joinder of all members is impracticable (numerosity); (2) there are questions of law or fact common to the class (commonality); (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class (typicality); and (4) the representative parties will fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a). In addition to the requirements imposed by Rule 23(a), Plaintiffs bear the burden of demonstrating that the class is maintainable pursuant to Rule 23(b). *Narouz v. Charter Commc'ns, LLC,* 591 F.3d 1261, 1266 (9th Cir.2010). In this case, Plaintiff seeks certification of both Classes under Rule 23(b)(2) and Rule 23(b)(3). Rules 23(b)(2) and 23(b) (3) are satisfied if:

**\*9** (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class; or

Gonzales v. Comcast Corp., Not Reported in F.Supp.2d (2012)

(3) the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Fed.R.Civ.P. 23(b).

Rule 23 is more than a pleading standard. "A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Dukes,* ____ U.S., at ____, 131 S.Ct., at 2552 (emphasis in original). "[A]ctual, not presumed, conformance with Rule 23(a) remains ... indispensable." *General Telephone Co. Of Southwest v. Falcon,* 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982).

When considering a motion for class certification, the Court must conduct a "rigorous analysis" to determine "the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Dukes,* 131 S.Ct. at 2551–2; *Ellis v. Costco Wholesale Corp.,* 657 F.3d 970, 980 (9th Cir.2011). Frequently "that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim." *Ellis,* 657 F.3d at 980 (citing *Dukes,* 131 S.Ct. at 2551). While the court is generally required to accept a Plaintiff's allegations as true, *Blackie v. Barrack,* 524 F.2d 891, 901, n. 17 (9th Cir.1975), a court is not required to "unquestioningly accept a plaintiff's arguments as to the necessary Rule 23 determinations." *Campion v. Old Republic Home Protection Co., Inc.,* 272 F.R.D. 517, 525 (S.D.Cal.2011) (internal citation omitted). In fact, the Court *must* probe behind the pleadings if doing so is necessary to make findings on the Rule 23 certification decision. *Ellis,* 657 F.3d at 981.

## 2. Numerosity

Rule 23(a)(1) requires the members of a proposed class to be so numerous that joinder of all of the class members would be impracticable. Fed.R.Civ.P. 23(a). "Impracticability does not mean 'impossibility,' but only the difficulty or inconvenience in joining all members of the class." *Harris v. Palm Springs Alpine Estates, Inc.,* 329 F.2d 909, 913–14 (9th Cir.1964) (quoting *Advertising Specialty Nat. Ass'n v. FTC,* 238 F.2d 108, 119 (1st Cir.1956)). Additionally, the exact size of the class need not be known so long as "general knowledge and common sense indicate that it is large." *Perez–Funez v. Dist. Dir.,* 611 F.Supp. 990, 995 (C.D.Cal.1984).

The evidence shows that Comcast currently claims to have 2.1 million customers within the State of California. (Ruf Decl., Ex 14 at 189–190, Doc. 66.) In an effort to establish numerosity of the Classes, Plaintiffs have proffered a Comcast record which categorizes various Comcast customer complaints relating to their Comcast accounts. (Ruf Decl., Ex 15, Doc. 66.) While this evidence does align with some of the allegations in Plaintiffs' FAC, the Classes Plaintiffs seek to certify relate entirely to Comcast consumers who sought to terminate their accounts. None of the information conveyed in Plaintiffs' Exhibit 15 specifically relates to Comcast consumers who sought to terminate their accounts. As such, Plaintiff's Exhibit 15 does little to aid the Court in its numerosity analysis.

**\*10** It seems self-evident, however, that the proposed Classes are sufficiently numerous. Considering Comcast has millions of customers in California alone, it is reasonable to infer that many may have, in the last five years, cancelled their Comcast service. Comcast has not provided any meaningful objection to the numerosity requirement. While Plaintiffs probably could have obtained information relating to the number of former Comcast consumers who have terminated their Comcast accounts in the relevant class period—thus providing a more accurate picture of the relative class size—the Court will infer that the proposed Classes are sufficiently numerous to meet the relatively low threshold required under Rule 23(a)(1). *See Philadelphia Electric Co. v. Anaconda Am. Brass Co.,* 43 F.R.D. 452, 463 (E.D.Pa.1968) (noting that classes of only 25 members are sufficiently large enough to justify certification); *Mazza v. Am. Honda Motor Co.,* 254 F.R.D. 610, 617 (C.D.Cal.2008) ("[a]s a general rule, classes of forty or more are considered sufficiently numerous.") Accordingly, the proposed Classes are so numerous that joinder is impracticable and the numerosity requirement is met.

## 3. Commonality

Rule 23(a)(2) requires "questions of law or fact common to the class." Historically, the requirements of Rule 23(a)(2) have "been construed permissively," and "[a]ll questions of fact and law need not be common to satisfy the rule." *Hanlon,* 150 F.3d at 1019. Indeed, "[e]ven a single [common] question" will satisfy the Rule 23(a)(2) inquiry. *Dukes,* 131 S.Ct at 2556 (internal citation omitted).

The Supreme Court's recent decision in *Dukes,* however, has undoubtedly increased the burden on class representatives by requiring that they identify *how* common points of facts and law will drive or resolve the

litigation. *Dukes,* 131 S. Ct at 2552 ("What matters to class certification ... is not the raising of common 'questions'— even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation.") (internal citations omitted.) Under this standard, it is insufficient to merely allege any common question, for example, "did Defendant's conduct violate the UCL or CLRA?" *See Ellis v. Costco,* 657 F.3d at 981; *Dukes,* 131 S.Ct. at 2551–52.

Plaintiffs argue that "common facts and questions of law abound[,]" because this case is based on standardized billing practices, service contracts and porting policies. (Pls.' Mot. Class Cert., 11: 1–11, Doc. 65.) Plaintiffs argue that the common questions which "form the core" of the Court's analysis, found in Plaintiffs' FAC and Motion, are:

> a. Whether, by the misconduct set forth in this FAC, Defendant has engaged in unfair, fraudulent or unlawful business practices with respect to the refunding, cancellation, disconnection, porting confirmation, and/or termination of Comcast services;

> **\*11** b. Whether Defendant violated the Consumer Legal Remedies Act;

> c. Whether Defendant breached their Service Contract and Recurring Payment Contract with consumers by charging them additional fees; and

> d. Whether, as a result of Defendant's misconduct as alleged herein, Plaintiffs and the Classes are entitled to damages, injunctive relief and other remedies to which Class Members are entitled as a result of Defendant's wrongful conduct, and, if so, the amount and nature of such relief.

(FAC ¶ 35, Doc. 56; Pls.' Mot. Class Cert., 16: 16–26, Doc. 65.)

Comcast argues that Plaintiffs have failed to meet the commonality requirement because Plaintiffs' common questions "merely repeat the Complaint's three counts and its prayer for relief." (Comcast's Op., 11: 14–17, Doc. 75.) Comcast cites *Dukes* in arguing that the court should "require plaintiffs to articulate not just *common questions,* but to show that there are '*common answers*' to the issues that will 'drive the resolution of the litigation' for the proposed class as a whole." (Comcast's Op. 12: 1–3, Doc. 75.) (Emphasis in original.) Comcast additionally argues that, because the primary issues driving this litigation are (1) whether each customer is entitled to a refund, and (2) whether there is a common answer regarding causation for the Cancellation Class's claims—issues that, in Comcast's opinion, can not be resolved on a class-wide basis— commonality can not be met.[17] (Comcast's Op. 13: 1–8,

Doc. 75.)

The Court agrees with Comcast. Plaintiffs' FAC and moving papers fail to properly articulate common issues of fact and law capable of generating common answers to issues that will drive resolution of this litigation. In *Dukes,* the Court presented the following hypothetical "common" questions as *in* adequate to meet the requirement of Rule 23(a)(2):

> "Do all of us plaintiffs indeed work for Wal—Mart? Do our managers have discretion over pay? Is that an unlawful employment practice? What remedies should we get? Reciting these questions is not sufficient to obtain class certification."

*Dukes,* 131 S.Ct. at 2551. These hypothetical common questions, while insufficient, nonetheless sought to answer specific, discrete factual queries that ultimately failed to "resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes,* at 131 S.Ct. at 2551. The common questions presented in Plaintiffs' FAC fall short of the hypothetically inadequate ones presented in Dukes. Plaintiffs' common questions fail to provoke a single specific, common factual inquiry. Instead, Plaintiffs' common questions do little more than rephrase Plaintiffs' causes of action and request for relief in the question form.

Despite Plaintiffs' failure to adequately articulate common questions, it is appropriate for the Court to look to the arguments of the parties and the evidence before the Court in determining whether such common questions exist. *See Dukes,* 131 S.Ct. 2551–3 (evaluating whether the plaintiffs claims "depend[ed] on a common contention"); *Delarosa v. Boiron, Inc.,* 275 F.R.D. 582, 589 (C.D.Cal.2011) (finding Plaintiff has established commonality by evaluating the pleadings and contentions as a whole, rather than looking to specifically articulated questions regarding the issue of commonality)

#### i. Common Questions Specific to the Cancellation Class

**\*12** Plaintiffs' Cancellation Class claims do not present a single common question capable of generating common answers apt to drive the resolution of this litigation. The only common fact referenced by Plaintiffs is that Comcast utilizes "only one billing system and one billing format[.]" (Pls.' Mot. Class Cert., 10: 27–7, Doc. 65.) Based on Comcast's common billing system, Plaintiffs argue, common questions are present as to whether Comcast's billing statements are "unclear" within the meaning of the Video Act, and additionally, whether Comcast's billing

Gonzales v. Comcast Corp., Not Reported in F.Supp.2d (2012)

statements are accurate with respect to final billing and refund calculations.


#### a. Unclear Billing Statements

The clarity, or lack thereof, of Comcast's billing statements do not present a common question to the Class. Such a question requires a highly subjective and individualized inquiry which would invariably differ from one Comcast customer to another, depending on factors such as knowledge, experience, intuitiveness, etc. *See In re Paxil Litigation,* F.R.D. 539, 541–42 (C.D.Cal.2003) (the plaintiff sought to certify a class of persons who suffered "severe" withdrawal symptoms after discontinuing use of the prescription drug Paxil. The Court found that the term "severe" was inherently subjective, thus failing to create a common issue.) What may be "unclear" to one Comcast customer may be perfectly clear to another, and vica versa. The Video Act does not require Comcast to construct or otherwise present their billing statements in a certain way in order to be viewed as clear or understandable. Furthermore, Plaintiffs have not explained how these billing statements should be constructed in order to be understandable from the perspective of a reasonable or average Comcast customer.[18] Without some objective measure of clarity, the Court is without any means to adjudicate this issue on a class-wide basis.


#### b. Inaccurate Billing Statements

Plaintiffs argue the "systematic" and "rampant inaccuracies" in Comcast's billing statements create a common question suitable for class-wide determination. This too, however, is not a question capable of generating common answers. Indeed, at the November 18 hearing, counsel for Plaintiffs acknowledged that there is, at present, no common means for determining whether putative Class members were in fact overcharged or received an inadequate refund on a common basis. Plaintiffs maintain that such information exists, and that a common means for ascertaining this information is possible, but Plaintiffs have nonetheless failed to identify or otherwise articulate how the inaccuracies of Comcast's billing statements can be demonstrated on a class-wide basis *See Stern v. AT & T Mobility Corp.,* No. 05–cv–8842–CAS (CTX), 2008 WL 4382796 (C.D.Cal., Aug. 22, 2008) ("there is presently no evidence from which it can be determined on a class-wide basis what services were selected and what services were provided. While such

evidence may be available, it has yet to be provided. Accordingly, the Court finds that plaintiff has at this juncture failed to meet her burden to establish a plausible class-wide method to prove [liability].") Like Plaintiffs' inability to plead a concrete injury in fact relating to inadequate refunds, Plaintiffs have failed to pose a common question to ascertain the accuracy of billing statements and refund calculations capable of generating common answers.


#### ii. Common Questions Specific to the Porting Class

**\*13** Plaintiffs argue a question common to the Porting Class relates to Comcast's practice of leaving accounts open past the agreed-upon termination date. The Court agrees with Plaintiffs that this issue presents a common question capable of resulting in common answers driving this litigation. The evidence indicates Comcast employs a standardized practice of leaving customer accounts open until porting is confirmed. The evidence further indicates that Comcast continues to bill its customers while their accounts remain open. Determining whether these common practices violate the terms of Comcast's Service Agreement or violate the UCL or CLRA is central to the validity of each one of the claims in one stroke. This single common question alone is sufficient to meet the requirements of Rule 23(a)(2) with respect to the Porting Class. *Dukes,* 131 S.Ct. at 2553. Nonetheless, as explained below, this common question to the Porting Class fails to establish an injury in fact.


#### iii. Common Questions Relating to Injury In Fact on Behalf of Both Classes

Plaintiff argues commonality exists for the type of injuries sustained by the Classes. The only two injuries arguably before the Court are inadequate refunds and bank-imposed overdraft fees.


#### a. Inadequate Refunds

Whether putative Class members have suffered an injury in fact resulting from an inadequate refund is not a question capable of generating common answers for the Classes as a whole. Discussed above, *supra* Section IV.A.3.i, Plaintiffs have failed to identify a single non-speculative

Gonzales v. Comcast Corp., Not Reported in F.Supp.2d (2012)

basis for asserting inadequate refunds on behalf of the Classes. The evidence before the Court indicates that none of the members for either Class have suffered an inadequate refund injury. Even if Plaintiffs had demonstrated an inadequate refund injury in their own right, the evidence currently before the court demonstrates a highly individualized inquiry would be required to determine whether each and every Class member had suffered an inadequate refund injury.

### b. Overdraft Injuries

Whether putative Class members have suffered an injury in the form of bank-imposed overdraft fees resulting from an improper debit on a Comcast customer account is not a question capable of generating common answers for the Classes as a whole. Plaintiffs have not presented any argument or evidence indicating a common means for ascertaining the answer to this question and, moreover, an individualized inquiry would be required to determine if a customer lacked sufficient funds in their bank account to cover a Comcast debit.

### 4. Typicality

Rule 23(a)(3) requires the claims or defenses of the representative parties be typical of the claims or defenses of the class. Rule 23(a)(3)'s typicality requirement provides that a "class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Keilholtz,* 268 F.R.D. at 337 (quotation omitted). The purpose of Rule 23(a)(3) is "to assure that the interest of the named representative aligns with the interests of the class." *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 508 (9th Cir.1992). The requirement is satisfied where the named plaintiffs have the same or similar injury as the unnamed class members, the action is based on conduct which is not unique to the named plaintiffs, and other class members have been injured by the same course of conduct. *Id.*

*14 Plaintiffs argue that typicality is met because, *inter alia,* Plaintiffs cancelled their Comcast services, returned their Comcast equipment, received "convoluted and inaccurate" billing statements and continued to be charged after cancellation due to a "porting confirmation." (Pls. Mot. Class Cert., 12: 9–21, Doc. 65.) Comcast responds that Plaintiff's claims are not typical because Plaintiffs received a complete refund and, as such, Plaintiffs claims

are subject to unique defenses, thus defeating typicality.[19] Comcast additionally argues that Plaintiffs are non-typical of the proposed Classes' claims regarding confusing and misleading billing statements because "Plaintiffs understood their bills well enough to call and protest those charges that were refunded." (Comcast's Op., 10: 23–6, Doc. 75.) Plaintiffs respond that there is no supporting evidence regarding a complete refund from Comcast and furthermore, Plaintiffs' scrutinizing of their billing statements was the result of a large overcharge, not that they understood the billing statements better than the average class member.[20] (Pls. Reply, 7: 2–10, Doc. 78.)

The parties are in disagreement as to whether Comcast has a policy "automatically" generating refunds. Plaintiffs have argued that there is "ZERO" evidence of such automatic refunds. (Pls.' Reply, 1: 17–19, Doc. 78.) Comcast, on the other hand, has cited to various portions of the evidence in asserting that refunds are generated automatically. (Merryman Decl., Ex. A at 11; Ex. Q at 141–44; Ex. T at 196–201; Doc. 75.)

In *Hanon,* the Ninth Circuit stated that "a named plaintiff's motion for class certification should not be granted if "there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." *Hanon,* 976 F.2d at 508. There, the Ninth Circuit found that the named plaintiff did not satisfy Rule 23(a)'s typicality requirement because his "unique background and factual situation require[d] him to prepare to meet defenses that [we]re not typical of the defenses which may be raised against other members of the proposed class." *Id.; See also, Ellis,* 657 F.R.D. at 984 (holding that a district court applied the incorrect standard of decision when holding that "as a generalized matter, individualized defenses do not defeat typicality .")

The Court is persuaded by the evidence at hand that Comcast does in fact have internal mechanisms for automatically generating refunds. As such, Plaintiffs' claims, i.e, that the refunds provided by Comcast are inadequate, are typical of claims that may be asserted by other putative class members.

### 5. Adequacy of Representation

Rule 23 requires that a class be certified only if "representative parties will fairly and adequately protect the interests of the class." This factor requires that (1) the proposed representatives do not have conflicts of interest with the proposed class, and (2) that the representatives and their counsel will vigorously prosecute the action on behalf

Gonzales v. Comcast Corp., Not Reported in F.Supp.2d (2012)

of the class. *Hanlon,* 159, F.3d at 120.

**\*15** Comcast does not challenge the adequacy of Plaintiffs' counsel, and there is nothing before the Court indicating Plaintiffs' counsel would not vigorously prosecute the action on behalf of the Classes. Comcast's only challenge to this aspect of Rule 23 is that Plaintiffs are not adequate representatives because they lack standing to bring their own claims. (Comcast's Op., 11: 7–10, Doc. 75.) The Court, however, has determined Plaintiffs have properly stated an injury in fact resulting from bank overdraft fees. While this type of injury does not present a common question for the Classes, it nonetheless confers standing for Plaintiffs individual claims. As such, Comcast's argument that Plaintiffs are inadequate representatives because they lack individual standing is rejected. Additionally, there is nothing in the record to suggest that Plaintiffs have any interests antagonistic to the Classes, or that Plaintiffs have not, or would not continue to vigorously prosecute the actions on behalf of the Classes. As such, the Court finds the adequacy of representation requirement satisfied.

**C. Rule 23(b)(2) Analysis**

Plaintiff's Notice of Motion and Motion for Class Certification only seek certification under Rule 23(b)(3), however, Plaintiff's Points and Authorities and arguments presented at the November 18 hearing also argue for certification pursuant to Rule 23(b)(2). Under Rule 23(b)(2), a class action may be maintained if the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole. Fed.R.Civ.P. 23(b)(2).

Plaintiffs contend that because Comcast has engaged in practices which "appl [y] across the board to all members of each Class"—practices which include all Cancellation Class members receiving the same inaccurate and confusing billing statements and Comcast's failure to comply with the termination provisions in its Service Contract-injunctive relief is necessary to eliminate these deceptive practices. (Pls. Mot. 14: 25–8, 15: 1–8, Doc. 65.) Comcast responds that certification under Rule 23(b)(2) is inappropriate because (1) the acts complained of have ceased, as Comcast has created new billing statements which cure the deficiencies alleged by Plaintiffs (Op. 16: 20–21, Doc. 75), (2) the members of both Classes, by definition, have cancelled their Comcast services and, as such, lack standing to seek injunctive relief (Op. 17: 3–13, Doc. 75), (3) Plaintiff's claims for injunctive relief are secondary to Plaintiff's claims for monetary relief (Op. 17:

14–22, Doc. 75), and (4) Plaintiffs' monetary claims require an individualized determination, which is prohibited under a Rule 23(b) (2) certification. *Id.* The Court addresses each of these arguments in turn.

**1. Whether Comcast's New Billing Statements Prevent 23(b)(2) Certification**

Comcast claims its new final bills, which include a termination date, have mooted Plaintiff's request for injunctive relief. Plaintiffs respond that the lack of termination date was just one of several problems alleged in Comcast's billing statements, and further, Comcast has not changed its policy with respect to leaving customer accounts open for "porting confirmation." (Pls.' Reply 9: 1–9, Doc. 78.)

**\*16** The Court agrees with Plaintiffs. With respect to the Porting Class, Comcast's new final bills have no bearing on the Porting Class's claims. The Porting Class's claims relate to internal procedures for leaving open accounts after an agreed-upon termination date in order to confirm that porting has occurred. The revised statements have nothing to do with the Porting Class. With respect to the Cancellation Class, Plaintiffs challenge more than just the lack of termination date. Plaintiffs also allege that the bills are confusing to the point of being incomprehendable. Comcast does not claim they have taken measures to cure all these perceived problems, and there is nothing in the record to suggest such alterations were made. As such, Comcast's new billing statements do not moot Plaintiff's request for injunctive relief.

**2. Putative Class Members Lack Standing As They Are No Longer Comcast Customers**

Comcast argues that 23(b)(2) certification is not proper because all putative class members for both Classes are, by definition, former Comcast customers and, as such, lack standing to seek injunctive relief relating to Comcast's billing statements or termination policies. (Op. 17: 3–12, Doc. 75.) In response, Plaintiffs argue that "even subscribers who have cancelled Comcast services may again be at risk for this unlawful behavior should they return as Comcast customers" and "[m]oreover, all current Comcast customers (including Plaintiffs) who may cancel in the future are at risk should the Court decline to grant injunctive relief." (Pls.' Reply, 9: 10–13, Doc. 78.)

The Court agrees with Comcast. *Dukes* presented a similar standing question which is largely dispositive of this inquiry. In *Dukes,* roughly half of the members of the proposed class were former employees of WalMart who sought injunctive relief against WalMart's current employment practices. *Dukes,* 131 S.Ct. at 2559–60. Citing the general principle that certification under Rule 23(b)(2) is appropriate when "final injunctive relief or corresponding declaratory relief is appropriate respecting the class *as a whole"* (emphasis added), *Dukes* found that "about half of the members of the class ... have no claim for injunctive or declaratory relief at all." *Id.* at 260.

Here, based on the proposed class definitions, the vast majority of class members would have no claim for injunctive relief, because they are, by definition, *former* Comcast subscribers. The only class members who would have a claim for injunctive relief are those that are identical to Plaintiff, i.e., cancelled and then re-subscribed to Comcast's services. But this would appear to be a tiny fraction of the proposed classes, and there is nothing in the evidence to suggest otherwise.

The Court is not persuaded by Plaintiffs' argument that former Comcast customers *may* someday become Comcast customers again, and eventually need relief from Comcast's current practices. Such an attenuated interest in the requested injunctive relief is entirely too speculative to confer any legitimate interest in injunctive relief. *See Whitmore,* 495 U.S. at 155–56. Additionally, the Court is equally unpersuaded by Plaintiffs' argument that current Comcast customers require the requested relief, because both Classes are defined to include only *former* Comcast customers. As such, the vast majority of current Comcast customers, nor their interests, are proposed to be represented Plaintiffs.

### 3. Plaintiffs Claims For Monetary Relief Are Not Incidental To Plaintiffs Claims For Injunctive Relief

**\*17** Comcast argues that Plaintiffs' Classes can not be certified under Rule 23(b)(2) because "this case is *solely* about monetary relief." (Op., 17: 15–17, Doc. 75) (Emphasis in original.) In *Dukes,* the Supreme Court revisited the issue of whether claims for monetary relief could be made under Rule 23(b)(2). *Dukes* concluded that such monetary claims "may not [be certified under Rule 23(b)(2) ], at least where (as here) the monetary relief is not incidental to the injunctive or declaratory relief." *Dukes,* 131 S.Ct. at 2557. In establishing the framework for this analysis, the Supreme Court cited, with approval, the Fifth Circuit's decision in *Allison v. Citgo Petroleum Corp.,* 151

F.3d 402, 415 (5th Cir.1998). *Allison* found that Rule 23(b)(2) allows for the certification of monetary relief that is "incidental to [the] requested injunctive relief," which *Allison* defined as "damages that flow directly from liability to the class as a whole on the claims forming the basis of the injunctive or declaratory relief." *Id.* In *Allison's* view, such "incidental damage should not require additional hearings to resolve the disparate merits of each individuals case; it should neither introduce new substantial legal or factual issues, nor entail complex individualized determinations." *Ibid.*

Under this standard, Plaintiffs' Classes can not be certified under Rule 23(b)(2) for two reasons. First, the putative Class members (i.e., former Comcast customers) have no interest in the requested injunctive relief (i.e., relief from Comcast's practices relating to its current customers). The monetary claims are indeed the only claims at issue. Second, the damages involved in this case do not flow directly from liability to the class as a whole. On the contrary, questions of liability and damages are wholly intertwined, both of which requiring the same individualized analysis. Therefore, Plaintiffs' claims for monetary relief are not incidental to Plaintiffs' claims for injunctive relief.

### 4. Rule 23(b)(2) Certification Is Improper As Individualized Determinations of Damages Are Required

Plaintiffs' monetary claims can not be certified under Rule 23(b) (2) because an individualized determination of damages is required. In *Dukes,* the Supreme Court, while expressing serious doubt as to whether claims for monetary relief could ever be certified under Rule 23(b)(2), clarified the circumstances in which a Rule 23(b) (2) class certification is appropriate:

> The key to the (b)(2) class is "the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." (Citation) In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant. *Similarly, it does not authorize class certification when each class member would be entitled to an individualized award of monetary damages.*

**\*18** (Internal citations omitted) (emphasis added). Similarly, in *Ellis,* the Ninth Circuit, applying the new standard enunciated in *Dukes,* clarified that under *Dukes,* the primary objective in the Rule 23(b)(2) analysis regarding claims for injunctive relief and monetary damages is whether monetary relief could be granted absent "individualized determinations." *Ellis,* 657 F.3d at 987. Here, even if there were currently a means for determining damages on a common class-wide basis, the individual class member's damages would differ from one another. As such, individual class member's damages will necessarily require "individualized determinations."

Based on the above analysis, class certification under Rule 23(b)(2) is denied. The majority of Plaintiffs' proposed class members would lack standing to assert claims for injunctive relief. Furthermore, Plaintiffs' claims for monetary relief are not incidental to Plaintiffs' claims for injunctive relief, and Plaintiffs' claims for monetary relief would require individualized determinations. Accordingly, certification of Plaintiff's monetary and injunctive claims under Rule 23(b)(2) is not appropriate.

**D. Rule 23(b)(3) Analysis**
To certify a class under Rule 23(b)(3), Plaintiff must demonstrate: 1) "questions of law or fact common to the members of the class predominate over any questions affecting only individual members" ("Predominance") and 2) a class action is "superior to other available methods for the fair and efficient adjudication of the controversy." ("Superiority"); Fed.R.Civ.P. 23(b)(3).

**1. Predominance**
When evaluating damages in the predominance inquiry, "[t]he *amount* of damages is invariably an individual question and does not defeat class action treatment." *Blackie v. Barrack,* 524 F.2d 891, 905 (9th cir.1975) (emphasis added); *see also Negrete v. Allianz Life Ins. Co. of North America,* 238 F.R.D. 482 (C.D.Cal.2002). While determining the *amount* of damages does not defeat the predominance inquiry, a proposed class action requiring the court to determine individualized *fact* of damages does not meet the predominance standards of Rule 23(b)(3). *See In re Live Antitrust Litigation,* 247 F.R.D. 98 (C.D.Cal.2007) (recognizing the distinction between demonstrating the fact of damages and the amount of damages, and determining that while the latter does not

preclude class certification, the former does.); *Catlin v. Washington Energy Co.,* 791 F.2d 1343, 1350 (9th Cir.1986) ("[T]he requirement that plaintiff prove 'both the fact of damage and the amount of damage ... are two separate proofs.' ") (internal citation omitted.)

While the Ninth Circuit does not appear to have addressed this precise issue, it is generally accepted that classes should not be certified where "not every member of the proposed classes can prove with common evidence that they suffered impact." *Blades v. Monsanto Co.,* 400 F.3d 562, 571 (8th Cir.2005); *Bell v. Atlantic Corp., v. AT & T Corp.,* 339 F.3d 294, 302–03 (5th Cir.2003) ("where fact of damage cannot be established for every class member through proof common to the class, the need to establish antitrust liability for individual class members defeats Rule 23(b)(3) predominance"); *Newton v. Merrill Lynch, Pierce, Fenner and Smith, Inc.,* 259 F.3d 154, 189 (3d Cir.2001); *In re Live Antitrust Litigation,* 247 F.R.D. 98 (C.D.Cal.2007) (citing the above-referenced cases and adopting their reasoning). Federal courts in California have often refer to this "fact of damage" inquiry as an evaluation of putative class members Article III standing. *See, e.g., Burdick v. Union Sec. Ins. Co.,* 2009 WL 4798873, *3 (C.D.Cal. Dec.9, 2009) (there must be a common means for asserting injuries in fact for all class members, i.e., there must be for Class members to assert Article III standing); *Webb v. Carter's Inc.,* 272 F.R.D. 489 (C.D.Cal.2011) (denying class certification on the ground that absent class members lacked standing because they could not show an injury in fact on a class-wide basis).

**\*19** One element common to all of Plaintiff's claims, on behalf of both Classes—one which the Court believes is the primary issue in this litigation—is whether the Class members have suffered an injury in fact. Plaintiffs argue, both at the November 18 hearing and in their moving papers, that the Classes should be certified, with Class issues of damages reserved for the post-certification merits inquiry. In support of this proposition, Plaintiffs cite *Negrete v. Allianz Life Ins. Co. of North America,* 238 F.R.D. 482, 494 (C.D.Cal.2002).

The authority cited by Plaintiffs, however, demonstrates that individual damage inquiries do not defeat certification only when plaintiffs have shown "across-the-board" impact. *Id.* at 493. In *Negrete,* the court noted that "[w]ith regard to class-wide proof of damages, plaintiffs contend that the annuities were *all* worth less than the purchase prices paid for them .... " *Id.* at 492 (emphasis added). In support of this argument, the *Negrete* plaintiffs offered the testimony of an expert who devised "a methodology to show that all of the [defendants] annuities were worth less than comparable equally safe investments." *Id.* Ultimately, *Negrete* concluded that "what is important at this stage of

the proceedings is that plaintiffs have offered a facially plausible method for showing causation and *impact across-the-board,* so that a class should be certified." *Id.* at 493 (emphasis added).

Plaintiffs have not presented the Court with an evidentiary method for showing causation and across-the-board impact. Indeed, counsel for Plaintiffs acknowledged at the November 18 hearing that no such class-wide method for ascertaining fact of damages presently was available. Furthermore, the evidence before the Court indicates that the Class members have not suffered any injury. The evidence indicates a myriad of individual inquiries are required to ascertain the fact of damages for each Class member. For example, some Class members may have executed the Direct Pay authorization such as Plaintiffs, and subsequently lost funds when they were overcharged. But for those Class members who did not use the Direct Pay program, their accounts were never automatically debited. Rather, they would merely receive a bill requesting payment. There is no evidence to suggest that these Class members, upon receiving a bill charging them for services past the cancellation date, actually took the affirmative step of tendering over-payments to Comcast. Even assuming each proposed Class member was overcharged and overpaid, Plaintiffs have not provided a common means to determine if the refunds provided by Comcast were inadequate. Just as Plaintiffs can not demonstrate a concrete injury in fact relating to their own claims of inadequate refunds, there is nothing before the Court evidencing the putative class members have suffered an injury in fact as a result of Comcast's conduct.

The damages determination at issue here is not one that merely seeks to identify the amount of damages to each putative class member. This determination, rather, is one which requires the Court to analyze whether Comcast is liable to each and every putative class member at all. Such an individualized liability determination predominates over any common issues regarding Comcast's business practices and their relation to the resolution of this lawsuit. Accordingly, Plaintiffs can not satisfy the Rule 23(b)(3) predominance inquiry for either Class.

### 2. Superiority

**\*20** The superiority requirement tests whether "class litigation of common issues will reduce litigation costs and promote greater efficiency." *Valentino v. Carter–Wallace, Inc.,* 97 F.3d 1227, 1234 (9th Cir.1996). "If each class member has to litigate numerous and substantial separate issues to establish his or her right to recover individually

a class action is not superior" *Zinser,* 253 F.3d at 1192. Rule 23(b)(3) specifies four nonexclusive factors that are "pertinent" to a determination of whether class certification is the superior method: (1) the class members' interests in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the likely difficulties in managing a class action. Fed.R.Civ.P. 23(b)(3)(A)-(D).

Assuming the first three factors weigh in favor of class certification, the fourth factor—the difficulties likely to be encountered in the management of a class action—does not. Because individualized inquiries predominate over common issues regarding Comcast's liability to the putative Classes, *see supra* Section IV.D.1, the difficulties in managing Plaintiffs' claims as a class action are substantial. The Court finds these manageability issues outweigh any other factor with respect to the superiority analysis.

### E. Ascertainability

Both parties have acknowledged that in addition to the express requirements of Rule 23, there is an implied requirement that the proposed classes be ascertainable. (Pls.' Mot., 8: 22–28, Doc. 65; Comcast's Op., 9: 10–11, Doc. 75.) "An implied prerequisite to certification is that the class must be sufficiently definite." *Mazur v. ebay Inc.,* 257 F.R.D. 563 (N.D.Cal.2009). A class is not ascertainable when the proposed definition includes individuals who were never injured by the defendant's conduct, *see id.,* or if the proposed definition would require the Court to determine whether a person is a member of the class by evaluating the merits of the individual claims. *See Rodriguez v. Gates,* 2002 WL 1162675, at *9 (C.D.Cal. May 30, 2002).

Here, Plaintiffs proposed Classes are not ascertainable for two reasons. First, even assuming there was a common means for determining the adequacy of Comcast's refunds, Plaintiffs' Class definitions are over broad and include Class members who were never injured by Comcast's conduct. For instance, only a portion of Comcast customers utilized Direct Pay, as did Plaintiffs. The evidence does not suggest that Class members who did not use Direct Pay over-paid. *See Mazur v. ebay, Inc.,* 257 F.R.D. 563, 567 (N.D.Cal.2009) (denying class certification on grounds that the class definition was over broad and not ascertainable because it included unharmed individuals);

Gonzales v. Comcast Corp., Not Reported in F.Supp.2d (2012)

*Colpinto v. Esquire Deposition Servs.,* 09–cv–07584, 2011 WL 913251, at \*4 (C.D.Cal., Mar.8, 2011) (finding no ascertainable class because definition included members who were reimbursed for payments of allegedly unlawful and deceptive charges); *Red v. Kraft Foods, Inc.,* 2011 WL 4599833 (C.D.Cal.2011) (holding that, based on the proposed class definition, it was doubtful that all members of the proposed class would have Article III standing); *Denny v. Deutsche Bank AG,* 443 F.3d 253, 264 (2nd Cir.2006); *O'Neill v. Gourmet Sys. Of Minn., Inc.,* 219 F.R.D. 445, 451–52 (W.D.Wis.2002) (Class definitions must be construed as to exclude individuals would lack standing). This basis "alone is sufficient to warrant denial of Plaintiffs Motion for Class Certification." *Colapinto,* 2011 WL 913251 at \*4. While the court has the power to modify the proposed class definitions to make them sufficiently definite, *see Hagen v. City of Winnemucca,* 108 F.R.D. 61, 64 (D.Nev.1985), this is not an instance in which the court deems such a revision appropriate because, as discussed above, the class certification motion nonetheless fails.

**\*21** Second, Comcast would only be liable to Plaintiffs and the putative Classes upon a finding of injury in fact. Plaintiffs have failed to identify a common means for establishing injury in fact. Absent a common method of establishing injury, the Court is required to determine the merits of the individual claims to evaluate whether a person is a member of the Class. Such circumstances prevent certification. *See Hanni v. Am. Airlines,* No. 08–cv–00732, 2010 WL 289297, at \*9 (N.D.Cal. Jan. 15, 2010) ("A class definition is inadequate if a court must make a determination of the merits of the individual claims to determine whether a person is a member of the class."); *Rodriguez v. Gates,* 2002 WL 1162675 at \*9 (C.D.Cal.2002) (There "is no objective way to determine who is a member of the class proposed by [the plaintiff] without first deciding the merits of each putative class member's claim."); *Brazil v. Dell,* 585 F.Supp.2d 1158, 1167 (N.D.Cal.2008) (definition which included persons

that "Dell falsely advertised" was not presently ascertainable). Therefore, the Court finds the two Classes are not ascertainable.

## CONCLUSION AND RECOMMENDATIONS

Having considered the moving, opposition and reply papers, the declarations and exhibits attached thereto, arguments presented at the November 18, 2011 hearing, as well as the Court's file, the Court RECOMMENDS that Plaintiffs' Motion for Class Certification be DENIED.

These findings and recommendations are submitted to the district judge assigned to this action, pursuant to Title 28 of the United States Code section 636(b)(1)(B) and this Court's Local Rule 304. Within fifteen (15) days of service of this recommendation, any party may file written objections to these findings and recommendations with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The district judge will review the magistrate judge's findings and recommendations pursuant to Title 28 of the United States Code section 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the district judge's order. *Martinez v. Ylst,* 951 F.2d 1153 (9th Cir.1991).

IT IS SO ORDERED.

## All Citations

Not Reported in F.Supp.2d, 2012 WL 10621

### Footnotes

1       Counsel Kevin Ruf and Coby Turner appeared for Plaintiffs. Counsel Bryan Merryman and Jaime Bianchi appeared for Comcast.

2       "Porting" is the process by which an existing telephone number is reassigned to a new telephone service provider.

3       With the exception of references to new products and services, the evidence indicates that the Residential Service Contracts are standard documents tendered to all California consumers. (Ruf Decl., Ex 14, 106: 19–22, Doc. 66.)

4      Plaintiffs state they unsuccessfully attempted to cancel their Comcast services on or about September 22, 2008. (FAC, ¶ 12, Doc. 56; Ruf Decl., Ex. 24 ¶ 6, Doc. 66.) However, this allegation does not factor into Plaintiffs' theory of liability and, as such, the Court beings its analysis with the Plaintiffs' second attempt to cancel their Comcast services.

5      The parties disagree on what the agreed-upon termination date was, as Comcast contends the termination date was November 7, 2008. (Comcast Op., 4: 10–11.) This disagreement is not critical to the Court's analysis for this Motion.

6      Ultimately, Plaintiff did not cancel their Pay Direct Authorization until sometime in December 15, 2008. Doc. 66, Ex. 24 ¶ 12; Doc. 75, 4: 23–4.

7      The Parties dispute whether this receipt was a billing statement on the account, or a receipt solely for the return of the equipment. *Compare* Doc. 66, 4: 3–10 *with;* Doc 75, 4: 10–12. This disagreement is not critical to the Court's analysis for this Motion.

8      These statements, however, reflected an account receivable, rather than a debit from Plaintiffs' checking account, as Plaintiffs had withdrawn their Direct Pay Authorization on or about December 15, 2008.

9      The Parties dispute whether the April 27 refund was a full refund of monies due to Plaintiff from the period of November 7, 2008 through December 4, 2008. This issue is discussed in greater detail below.

10      It is unclear if Plaintiffs are attempting to assert their breach of contract claim on behalf of both Classes, or just the Porting Class. However, because Plaintiffs have stated this claim applies "when customers' accounts were kept open without their knowledge or consent [,]" it would appear this claim only applies to the Porting Class.

11      While Plaintiff's Notice of Motion and Motion for Class Certification only requests certification pursuant to Rule 23(b) (3), Plaintiffs' Memorandum of Points and Authorities, as well as Plaintiffs' arguments presented at the November 18 hearing, requested certification under to Rule 23(b)(2). Accordingly, the Court will discuss whether certification is appropriate under both standards.

12      At oral argument, Plaintiffs acknowledged they had failed to determine how Comcast calculated its refunds with respect to Plaintiff or the putative Class Members.

13      Plaintiffs' estimate that the damages could be as high as $106 .69 can be rejected on its face as this calculation simply argues that Plaintiffs should be entitled to an entire refund of the November 4, 2008 debit in the amount of $174.46. Because this debit covered the billing period from October 18, 2008 to November 19, 2008, and because the agreed-upon cancellation date was November 7, 2008, it is clear Plaintiffs were not entitled to a full refund of the November 4, 2008 debit. Plaintiffs would have had to pay for Comcast's services between October 18, 2008 and November 7, 2008.

14      For example, in Plaintiffs' Motion for Class Certification, Plaintiffs state that the refund *may* have been calculated at a rate of $2.0952 per day, when in fact, Plaintiffs argue, the daily refund figure should have been 2.0964 per day—resulting in damages of twelve-one-hundredths of a cent per day. (Pls. Mot. Class Cert. 6, n. 13.) At this rate, Plaintiffs' total damages would be approximately five cents. In that same footnote, Plaintiffs suggest another calculation that would bring Plaintiff's damages claim to $1 .64. *Id.* In response to written discovery from Comcast, Plaintiffs responded that "Plaintiffs[,] based on their personal calculations, believe the amount

of damages suffered ... are in the range of $20 to $90." (Deposition of Kelly Gonzales, 246: 1–9.) In that same deposition, however, Mrs. Gonzales stated that she felt the refund check should have been $348.92, which would have resulted in a total damage claim of $106.69. (Gonzales Depo., 138: 1–8.)

15    Under Rule 23, the Court is to conduct a "rigorous analysis." *Ellis v. Costco Wholesale Corp.,* 657 F.3d 970, 980 (9th Cir.2011). The Court has found Plaintiffs lack standing for failure to show an injury in fact with respect to inadequate refunds. Nonetheless, the Court conducts the proceeding Rule 23 analysis as though Plaintiffs had sufficiently stated an inadequate refund injury in fact for standing purposes.

16    Nonetheless, the overdraft injury is not typical of the injuries alleged on behalf of the Class members. Additionally, there is no evidence indicating the determination of this type of injury could be ascertained on a common class-wide basis.

17    The Court agrees with Comcast on both of these points, however, this argument does not defeat the Rule 23(a)(2) analysis. The goal of the 23(a)(2) analysis is not to identify the *primary* issues related to class certification, but rather, to merely identify *some* common questions of fact or law, the common answers to which will drive the resolution of the litigation for the proposed class as a whole. *Dukes,* 131 S. Ct at 2552 It is not necessary, under Rule 23(a)(2), to demonstrate the *predominant* issues with respect to the Class are indeed common issues. In other words, Comcast's position is more appropriately considered under the Rule 23(b)(3) analysis, which specifically endeavors to identify the predominate issues.

18    Even if Plaintiff had undertaken this effort, it is unlikely the Court would be inclined to interpose Plaintiffs' subjective opinions regarding billing statement clarity into Comcast's billing practices.

19    This argument is inconsistent with Comcast's overall position. The majority of Comcast's briefing attempts to make the point that refunds are automatically generated and, as such, both the named plaintiffs and putative class members would not have any damages. As such, the refund to Plaintiffs, from Comcast's perspective, would not create a unique defense.

20    The Court does not accept Comcast's argument that Plaintiffs claims relating to "misleading billing statements" are atypical because they had the wherewithal to call and protest Comcast's continued billing. The evidence shows that these calls related to Comcast's continuing monthly debits after the cancellation date, rather than the clarity of Comcast's refund calculation. Furthermore, the evidence demonstrates Plaintiffs did not, and presently do not, understand the breakdown of Comcast's refund calculation.

---

**End of Document**                                       © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Gonzales v. Comcast Corp., Not Reported in F.Supp.2d (2012)

2012 WL 217708
Only the Westlaw citation is currently available.
United States District Court,
E.D. California.

Alfred GONZALES and Kelly Gonzales,
Individually and on Behalf of All Others
Similarly Situated, Plaintiffs,
v.
COMCAST CORPORATION, and Does 1
through 10 Inclusive, Defendants.

No. 1:10–cv–01010–LJO–BAM.
|
Jan. 23, 2012.

ORDER ADOPTING FINDINGS AND
RECOMMENDATIONS; DENYING PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION

LAWRENCE J. O'NEILL, District Judge.

**\*1** By notice filed on August 22, 2011, plaintiffs Alfred Gonzales and Kelly Gonzales ("Plaintiffs") filed a motion to certify two putative classes in this matter. (Doc. 64.) Defendant Comcast Corporation. ("Comcast") filed an opposition on September 26, 2011. (Doc. 75.) Plaintiffs filed their Reply Brief on October 14, 2011. (Doc. 78.) The

matter was referred to United States Magistrate Judge Barbara A. McAuliffe pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302. The Court heard oral arguments on the matter on November 18, 2011.[1]

On January 3, 2012, United States Magistrate Judge Barbara A. McAuliffe issued Findings and Recommendations recommending Plaintiffs' motion for class certification be denied. (Doc. 86.) The January 3, 2012 findings and Recommendations were served on the parties and contained notice to the parties that any objections to the Findings and Recommendations were to be filed within fifteen days of service of the Order. (Doc. 86, 31: 19–22.) The parties have not filed timely objections to the Findings and Recommendations.

In accordance with the provisions of Title 28 of the United States Code section 636(b)(1)(c), this Court has conducted a *de novo* review of the case. Having carefully reviewed the entire file, the Court finds that the Findings and Recommendations are supported by the record and proper analysis.

Accordingly, IT IS HEREBY ORDERED that:

> 1. The Findings and Recommendations, filed January 3, 2012, is adopted in full;

> 2. Plaintiffs' Motion for Class Certification is DENIED.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 217708

Footnotes

1        Counsel Kevin Ruf and Coby Turner appeared for Plaintiffs. Counsel Bryan Merryman and Jaime Bianchi appeared for Comcast.

End of Document                                     © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Jerue v. Drummond Company, Inc., Not Reported in Fed. Supp. (2023)
2023 WL 6610603

Case 1:21-cv-00179-KJM-BAM   Document 167-8   Filed 11/26/24   Page 124 of 216

2023 WL 6610603
Only the Westlaw citation is currently available.
United States District Court, M.D. Florida,
Tampa Division.

John J. JERUE (Dismissed)
and Michael J. Feist, Plaintiffs,
v.
DRUMMOND COMPANY, INC., Defendant.

Case No. 8:17-cv-587-TPB-AEP
|
Signed August 25, 2023

**Attorneys and Law Firms**

Christopher Lee Gadoury, Pro Hac Vice, Richard Daniel Meadow, Pro Hac Vice, Ryan Daniel Ellis, Pro Hac Vice, W. Mark Lanier, Pro Hac Vice, Alex Jerome Brown, Pro Hac Vice, Kenneth W. Starr, The Lanier Law Firm, Houston, TX, Christopher Thomas Nidel, Pro Hac Vice, Jonathan Barry Nace, Pro Hac Vice, Nidel & Nace, PLLC, Rockville, MD, Joel M. Rubenstein, Pro Hac Vice, Steven Jay German, German Rubenstein LLP, New York, NY, Neal L. O'Toole, Lilly, O'Toole & Brown, LLP, Bartow, FL, Thomas V. Girardi, Pro Hac Vice, Girardi & Keese, Los Angeles, CA, for Plaintiff.

Bryan O. Balogh, Pro Hac Vice, Burr & Forman, LLP, Birmingham, AL, Charles Wachter, Frederick John Grady, Joseph H. Varner, III, Holland & Knight, LLP, Tampa, FL, for Defendant.

## REPORT AND RECOMMENDATION

ANTHONY E. PORCELLI, United States Magistrate Judge

**\*1**  Plaintiffs John J. Jerue ("Jerue") and Michael J. Feist ("Feist") (collectively, "Plaintiffs")[1] initiated this action on behalf of themselves and all other individuals similarly situated against Defendant Drummond Company, Inc. ("Drummond") seeking relief for injuries associated with Drummond's phosphate mining, reclamation, and development activities in Polk County, Florida (Docs. 1; 36, at ¶¶ 1, 2). Feist is the owner of real property located in the Grasslands residential community (Doc. 36, at ¶ 29). Feist alleges that Drummond's mining and reclamation activities caused the land upon which the Oakbridge and Grasslands

developments sit to be contaminated with harmful radiation, that Drummond was aware of the contamination and risks posed to residents but developed the areas regardless, and that Drummond falsely assured the public that the former phosphate mining operations did not present a health risk (Doc. 36, at ¶¶ 2, 4, 15). Currently before the Court are Feist's Motion for Class Certification (Doc. 142), Drummond's response in opposition (Doc. 155), Feist's reply (Doc. 165), and Drummond's notices of supplemental authority (Docs. 221, 228). Feist seeks certification of three classes—the Property Class, the Medical Monitoring Class, and the Fraud Class—which apply individually to his five counts against Drummond (see Doc. 36, at 25). Also, before the Court are Drummond's motion to exclude the opinion of Feist's expert, Dr. Jeffery E. Zabel (Doc. 170), and Feist's response in opposition (Doc. 181). The Court conducted a hearing on the motions on October 7, 2022, at which both parties presented oral arguments (Doc. 222). As is more fully set out in the following analysis, after consideration, it is recommended that Feist's Motion for Class Certification (Doc. 142) be denied and Drummond's Motion to Exclude the Opinions of Plaintiff's Expert (Doc. 170) be granted.[2]

## I. Background and Procedural History

### A. From San Gully Mine to
### Planned Housing Development

Several decades ago, Drummond purchased real property in Polk County, Florida which previously housed the "San Gully Mine" (Doc. 163-7, at 283, 286). Located south of Lakeland in Central Florida, the mine has a long history, including the establishment of a now-nonexistent mining community called San Gully (Doc. 163-7, at 283). Drummond purchased 1400-acres of mining lands in Polk County, Florida, which included the San Gully mine, and engaged in secondary recovery[3] mining from 1978 until the mid-1980's when Drummond ceased mining operations and decided to develop the property (Doc. 156-5, at 5; Doc. 55, at ¶ 1; Doc. 36, at ¶¶ 16, 34). In September of 1985, Drummond, the State of Florida, the Department of Community Affairs, and the Central Florida Regional Planning Council entered into the Drummond Properties Lakeland Development Agreement (see Doc. 36, at ¶ 66; Doc. 16-2). Drummond, in advance of its application to local authorities to develop the former mine, conducted testing of the Oakbridge development and the surrounding area (Doc. 156-5, at 6). Drummond thereafter developed the reclaimed land into residential and commercial

Jerue v. Drummond Company, Inc., Not Reported in Fed. Supp. (2023)

2023 WL 6810603

Case 1:21-cv-00179-KJM-BAM   Document 167-8   Filed 11/26/24   Page 125 of 216

plots, which it began selling in 1987 (Doc. 36, at ¶¶ 42, 48, 50; Doc. 55, at ¶1; Doc. 156-5, at 6). Reclamation of Grasslands began in 1989 and development began in 1992 (Doc. 156-5, at 7).

### B. Procedural History

**\*2** Jerue initiated this purported civil class action against Drummond on March 10, 2017 (Doc. 1). In support of his allegations, Jerue cited to both a 2003 Environmental Protection Agency ("EPA") report and a Department of Energy ("DOE") report on Florida's phosphate mining and reclamation activities (Doc. 1, at ¶¶ 58–70). Both the EPA and DOE reports paid particular attention to the Oakbridge development, in addition to other Drummond plots (Doc. 1, at ¶¶ 62, 70). The EPA concluded that individuals residing in those areas may be exposed to unsafe levels of radiation (Doc. 1, at ¶ 61; Doc. 12-4). Meanwhile, the DOE, in conjunction with Argonne National Laboratories, also assessed the radiation risks posed to individuals living in communities built atop reclaimed phosphate lands in central Florida (Doc. 1, at ¶¶ 66–70). According to the DOE report, Oakbridge and other Drummond developments were "highly likely" in need of additional remedial action, as the gamma radiation levels found on the land were anywhere from 2.5 to 8 times greater than baseline background levels (Doc. 1, at ¶ 70). Jerue's original complaint accordingly asserted claims against Drummond for strict liability (Counts I and IV), negligence (Count II), and private nuisance (Count III) (Doc. 1, at ¶¶ 124–70). Jerue also sought to bring the claims in two classes: the Drummond Property Damage Class, which encompassed "[a]ny and all persons that own any real property in the Oakbridge & Grasslands Communities (collectively, the "Class Area") in Polk County, Florida" and the Medical Monitoring Class, which consisted of "[a]ll persons who ever resided on property located within the Class Area for a minimum of four years" (Doc. 1, at ¶ 103).

Drummond moved to dismiss Jerue's claims in their entirety (Doc. 10). But before the Court could issue a ruling on Drummond's motion, Jerue, then joined by Feist, filed an amended complaint (Doc. 12). Plaintiffs' amended complaint echoed the fundamental allegations levied against Drummond in Jerue's original complaint but also included new references to an October 1978 report by the Florida Radiological and Occupational Health Department and a July 1980 letter written to Drummond by a Florida Public Health Physicist on behalf of the Florida Department of Health,

both of which concluded that a significant percentage of homes built in the planned Drummond developments would have indoor gamma radiation levels above federal guidelines (Doc. 12-2, at 3; Doc. 12-3, at 2). Additionally, Plaintiffs' amended complaint reworked the asserted causes of action. The amended complaint asserted claims for strict liability pursuant to chapter 376, Florida Statutes (Count I), negligence and negligence per se (Count II), fraud and fraudulent concealment (Count III), negligent misrepresentation (Count IV), private nuisance (Count V), strict liability for an abnormally dangerous activity (Count VI), and unjust enrichment (Count VII) (Doc. 12, at ¶¶ 131–92). Plaintiffs also maintained their claims that the conditions of contamination caused a diminution in the value of their properties and necessitated medical monitoring to guard against the contraction of dangerous diseases and other health conditions (Doc. 12, at 43). Plaintiffs again sought to bring these claims on behalf of the same two classes as in the original complaint, the Drummond Property Damage Class and the Medical Monitoring Class (Doc. 12, at ¶ 109).

Drummond again moved to dismiss Plaintiffs' claims in their entirety (Doc. 16); upon review, the Court granted in part and denied in part Drummond's motion (Doc. 34). In accordance with the Court's order, Plaintiffs filed a second amended complaint—the current operative complaint—asserting the following claims: strict liability pursuant to chapter 376, Florida Statutes (Count I); negligence and negligence per se (Count II); fraud and fraudulent concealment (Count III); negligent misrepresentation (Count IV); and medical monitoring (Count V) (Doc. 36). Plaintiffs amended their class definitions and added a third class, the Fraud Class (Doc. 36, at ¶ 111). Drummond filed another motion to dismiss which was denied in total (Doc. 41; Doc. 51).

### II. *Daubert* Motion

Before considering the motion for class certification, the undersigned must address the also-pending *Daubert* motion. When an expert's report or testimony is "critical" to class certification, the court is bound to make a conclusive ruling on any *Daubert* challenge to that expert's qualifications or submissions before it may rule on a motion for class certification. 📁 *Sher v. Raytheon Co.*, 419 F. App'x. 887, 890 (11th Cir. 2011) (citing 📁 *American Honda Motor Co. v. Allen*, 600 F.3d 813 (7th Cir. 2010)). [4] This obligation applies whether the Court grants or denies certification, requiring a *Daubert* ruling on any expert opinion which touches upon

Jerue v. Drummond Company, Inc., Not Reported in Fed. Supp. (2023)
2023 WL 6810603
Case 1:21-cv-00179-KJM-BAM   Document 167-8   Filed 11/26/24   Page 126 of 216

issues critical to the Court's class certification decision.

🔖 *Messner v. Northshore University HealthSystem*, 669 F.3d 802, 814 (7th Cir. 2012).

**\*3**  In this case, the focus is on Feist's proffered expert witness on class-wide damages, Dr. Jeffrey E. Zabel. Dr. Zabel, a professor in the economics department at Tufts University and co-director of the Master's Program in Data Analytics, asserts that he is able to calculate damages to property values attributable to Drummond's alleged contamination using a hedonic regression model. Feist uses Dr. Zabel's report to show that "[t]hough not a necessary element of certifying a liability class, damages *can* be determined on a class-wide basis" (Doc. 142, at 26). Thus, prior to making any class determination, the undersigned must examine Dr. Zabel's report to determine whether the underlying methodology shows some hallmarks of reliability for purposes of ruling on the threshold *Daubert* challenge to it.

### A. Dr. Zabel's Report and Rebuttal

Dr. Zabel's report takes the form of a proposal, delineating the steps that he would take were he asked to perform the damage calculations in this case (Doc. 143-7). Dr. Zabel explains that he would use the hedonic regression method, an economic method for estimating value, to measure the impact of environmental contamination on property values (Doc. 143-7, at 4). He explains in his report that there are six standard steps for conducting this hedonic regression analysis and what he would do to build and run the model for this case, if asked (Doc. 143-7, at 6).

First, Dr. Zabel explains, he would "[g]ather information on the nature, source and extent of contamination, and the timing of public knowledge of this information" (Doc. 143-7, at 6). Dr. Zabel explains that he would form a timeline of public knowledge which will "provide information about possible changes in the impact of the contamination on house prices" (Doc. 143-7, at 6). Here, he explains, "[a]t least since March 2017 information regarding the contamination has appeared in a number of newspaper, television and on-line reports" (Doc. 143-7, at 6). Second, Dr. Zabel would "[i]dentify the areas included in the hedonic analysis" which here, is the class area composed of the Grasslands and Oakbridge communities (Doc. 143-7, at 6). As part of this, he would gather information about the housing market conditions over the duration of the timeline established in step

one and identify control areas (Doc. 143-7, at 6). Dr. Zabel explains that during a site visit in February 2020, he identified "several candidate control communities in the area (e.g., other planned developments with similar types of amenities)" (Doc. 143-7, at 6). Third, Dr. Zabel explains, he would "[c]ollect data to be used in the hedonic analysis" including "[d]ata on housing market transactions, their location, and neighborhood characteristics" for both the affected and control areas identified in step two (Doc. 143-7, at 6). Dr. Zabel would source this data from "town assessors, displayed in multiple listing services used by realtors, and compiled and offered for purchase by private vendors" and this data "may be enhanced, as appropriate, through Geographic Information Systems (GIS) to capture other characteristics of the properties' locations" (Doc. 143-7, at 6). This step, Dr. Zabel explains, captures the data "for the period established by the timeline developed in step (1)" (Doc. 143-7, at 6). According to Dr. Zabel, this is important because

> the information about the extent and level of contamination will continue to change after the initial discovery and this can affect the prices of houses in the affected area. Furthermore, the total impact on house prices may not occur immediately, as the information about the contamination takes time to become fully realized by buyers and sellers and then capitalized into house prices.

(Doc. 143-7, at 6–7). Dr. Zabel explains that this same information can also be collected from before the public knowledge timeline as established in step one "to establish a trend in house prices prior to discovery and awareness of the contamination" and the "trend should be similar for the affected and unaffected areas for the latter to qualify as a 'control' for the affected area" (Doc. 143-7, at 7). Dr. Zabel states that he has access to the necessary sales and characteristic data through CoreLogic, "a property information and analytics company that compiles public records, assessor data, and other sources to create comprehensive databases of housing transactions for the entirety of Polk County going back at least 20 years" (Doc. 143-7, at 7). In step four, Dr. Zabel would check the data for accuracy, formatting, and consider "their temporal aspect" (Doc. 143-7, at 7). In step five, Dr. Zabel explains he

Jerue v. Drummond Company, Inc., Not Reported in Fed. Supp. (2023)
2023 WL 6610603

Case 1:21-cv-00179-KJM-BAM   Document 167-8   Filed 11/26/24   Page 127 of 216

would develop the model. In logarithmic form, the formula appears as follows:

*\*4*  (1) $\log(P_{ijat}) = \beta_0 + X_{it}\beta_1 + N_{jt}\beta_2 + Z_j\beta_3 + T_a\beta_t{}^a + C_a\beta_t{}^{na} + e_{ijat}$, i = 1,..., n and t = 1,...,T

where $P_{ijat}$ is the price of the property i, in jurisdiction j, in area a (affected or unaffected) at time t, $X_{it}$ is a vector of characteristics for property i at time t, $N_{jt}$ is a vector of neighborhood amenities in jurisdiction j at time t, $T_a$ and $C_a$ are indicators of the house being in the treatment (affected) or control (unaffected) areas, respectively, and $e_{ijat}$ is a standard error term. There are n housing transactions in the sample and T time periods (typically years). Note that it is assumed that the neighborhood variables are measured at the jurisdiction level (i.e., census tract, zip code, or town) which could be different from the affected area defined by the extent of the contamination.

(Doc. 143-7, at 7). Dr. Zabel then explains how each variable works together to "measure the changes in house prices in the affected and unaffected areas over the time period that the data are observed" while also taking into account neighborhood quality, house characteristics, and neighborhood amenities (Doc. 143-7, at 8). Specifically,

> The parameters $\beta_1$ and $\beta_2$ are the values that the market places on the house characteristics $X_{it}$ and neighborhood amenities $N_{jt}$, respectively. The key parameters are $\beta_t{}^a$ and $\beta_t{}^{na}$ that measure the changes in house prices in the affected and unaffected areas over the time period that the data are observed. Generally $\beta_1{}^a$ and $\beta_1{}^{na}$ (initial time period) are each set to 100 so changes in house prices are measured relative to the base year (the first year of the sample). Then $\beta_t{}^a$ and $\beta_t{}^{na}$ constitute price indices that measure changes in house prices in the affected and unaffected areas over the sample period t = 1,..., T. So the difference, $\beta_t{}^a - \beta_t{}^{na}$, is a measure of the difference in house prices in the affected and unaffected areas at time

t. Suppose that $t^D$ is the period when the contamination is discovered. If the unaffected area is a suitable control for the affected area, $\beta_t{}^a - \beta_t{}^{na}$ should be close to zero for $t < t^D$ and $\beta_t{}^a - \beta_t{}^{na}$ for $t > t^D$ will measure the impact of contamination on house prices in the affected area.

(Doc. 143-7, at 8). In the sixth step, Dr. Zabel would use the hedonic model built in step five using the sample data, apply an error factor, and evaluate whether the data is "statistically different from zero" (Doc. 143-7, at 9). Finally, Dr. Zabel would use these estimates to calculate the total impact on all property values in the affected area (Doc. 143-7, at 9). According to Dr. Zabel, "[t]he difference in prices attributable to the contamination, typically expressed as a percentage, can then be applied to the properties in the affected area" (Doc. 143-7, at 9). Dr. Zabel explains that a "full list of all the properties in the affected area can be obtained from the local assessor's office or other local agency" (Doc. 143-7, at 9). In summary, Dr. Zabel explains, the model would capture the impact to the class as a whole "that can be applied individually to all properties (for example, as a percentage of estimated value)" (Doc. 143-7, at 9).

*\*5*  Dr. Zabel also submitted a rebuttal report in response to Drummond's experts, Dr. Henry H. Fishkind and Ms. Jennifer N. Pitts, CRE (Counselor of Real Estate), which directly addresses some of the defense experts' criticisms of his report (*see* Doc. 143-8 (Dr. Zabel's rebuttal report); Doc. 156-2 (Dr. Fishkind's expert report), Doc. 156-5 (Ms. Pitts's expert report)).

Dr. Fishkind and Ms. Pitts argue that properties in the Grasslands and Oakbridge communities are too diverse in nature to be analyzed collectively on a class-wide basis (Doc. 156-2, 13–16; Doc. 156-5, at 9). In response, Dr. Zabel notes first that the hedonic model is designed to incorporate "all manner of observable property attributes" and that, if needed, separate hedonic models can be estimated for different market segments such as single family homes versus condominiums (Doc. 143-8, at 3). Moreover, Dr. Zabel notes that data on neighborhood characteristics can readily be collected from numerous public sources beyond sale price (Doc. 143-8, at 4). For example, Dr. Zabel cites that the model can incorporate demographic data from the U.S. Census Bureau or school

*Jerue v. Drummond Company, Inc.*, Not Reported in Fed. Supp. (2023)

2023 WL 6610603

Case 1:21-cv-00179-KJM-BAM   Document 167-8   Filed 11/26/24   Page 128 of 216

district level test scores from the Florida Department of Education (Doc. 143-8, at 4).

Dr. Fishkind also criticizes the report in that "it is not the actual environmental conditions, but instead it is the perception of these conditions, including the 'fear' of potential contamination, that can potently influence home prices as measured by [the hedonic model]" (Doc. 156-2, at 18). Dr. Zabel rebuts that any model of consumer choice will incorporate perception because home buyers will interpret available information on the contamination in different ways, depending on their risk preferences (Doc. 143-8, at 5). Dr. Zabel responds that the whole point of a hedonic model is to capture the total impact of these perceptions on the overall market through a large number of property transactions (Doc. 143-8, at 5). Dr. Zabel also addresses criticisms of this "average" impact by reiterating that the average would still need to be allocated to each property (Doc. 143-8, at 5).

### B. Legal Standard

The Court must act as a gatekeeper to ensure that the admission of expert testimony is consistent with the requirements of the Federal Rules of Evidence. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 n.7 (1993). The Eleventh Circuit has adopted a three-part framework for determining whether expert testimony is admissible under *Daubert* and Federal Rule of Evidence 702. Under this analysis, expert evidence is admissible if the court finds: (1) the expert is competent and qualified to testify regarding the matters that he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable; and (3) the expert, through scientific, technical or specialized expertise, provides testimony that will assist the trier of fact to understand the evidence or determine a fact in issue. *See Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1340–41 (11th Cir. 2003) (citing *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998); *Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001).

### C. Analysis

#### i. Qualification

"Determining whether a witness is qualified to testify as an expert requires the trial court to examine the credentials of the proposed expert in light of the subject matter of the proposed testimony." *Feliciano v. City of Miami Beach*, 844 F. Supp. 2d 1258, 1262 (S.D. Fla. 2012) (internal quotation marks and citation omitted).

**\*6** As Drummond acknowledges, Dr. Zabel "is a professor in the Department of Economics at Tufts University, and holds a Ph.D. in economics" (Doc. 170, at 13). Dr. Zabel has also published research on the impacts of environmental conditions on property values and real estate markets (Doc. 170, at 3). Drummond instead argues that Dr. Zabel is "not qualified to testify as an expert on the appraised values of properties that may be impacted by environmental contamination" (Doc. 170, at 13). Feist does not dispute that Dr. Zabel is not qualified to act as an expert appraiser of property values (Doc. 181, at 19). Instead, Feist argues, Dr. Zabel's methodology involves the hedonic regression model which does not utilize appraised values[5] to calculate the damages attributable to the alleged environmental contamination (Doc. 181, at 19). As Feist notes, individual appraisals focused on the value of a specific property are incapable of determining a scientifically reliable estimate of the diminution in property value, if any, as a result of Drummond's radioactive pollution, but hedonic regression can (Doc. 181, at 20; *see also* Doc. 156-6, at 147:23–148:11 (explaining that hedonic regression can determine the diminution of property value due to an environmental disamenity across a group of properties on an average basis)). Thus, the undersigned recommends the Court find Dr. Zabel is competent and qualified to testify regarding his hedonic regression model.

#### ii. Reliability

"[W]hen expert 'testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, ... the trial judge must determine whether the testimony has a 'reliable basis in the knowledge and experience of [the relevant] discipline.' " *In re Polypropylene Carpet Antitrust Litig.*, 93 F. Supp. 2d 1348, 1352 (N.D. Ga. 2000) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999)). "[T]he Court's inquiry focuses not on whether the expert is correct, but whether the proponent of expert testimony has established by a preponderance of the evidence that the testimony is reliable in the context of the

*Jerue v. Drummond Company, Inc.*, Not Reported in Fed. Supp. (2023)

2023 WL 6810603

Case 1:21-cv-00179-KJM-BAM Document 167-8 Filed 11/26/24 Page 129 of 216

methodologies or techniques applied within the appropriate field." *Id.* at 1352–53 (citations omitted). "The Court's evaluation of the reliability of expert testimony ... does not depend upon a rigid checklist of factors designed to test the foundation of that testimony. Rather, the gatekeeping inquiry must be tailored to the facts of the case and the type of expert testimony at issue." *Id.* at 1353 (citing *Kumho Tire*, 526 U.S. at 150); *see City of Tuscaloosa*, 158 F.3d at 565–66, 566 n. 25 (discussing reliability of testimony by economic and statistical experts). To assess the reliability of an expert's testimony, courts consider: "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *See United States v. Frazier*, 387 F.3d 1244, 1262 (11th Cir. 2004) (citation and quotation omitted); *see also Kumho Tire Co.*, 526 U.S. at 150–53 (explaining that reliability requires a case-specific inquiry). Although the decision regarding the reliability of an expert opinion is within the district court's discretion, it may not "make ultimate conclusions as to the persuasiveness of the proffered evidence." *Rosenfeld v. Oceania Cruises, Inc.*, 654 F.3d 1190, 1193 (11th Cir. 2011) (quotation omitted).

Here, Dr. Zabel's report is proffered by Feist as support for the motion for class certification. Specifically, Feist uses the report to show damages may be calculated class wide. At this juncture, "[p]laintiffs need only come forward with *plausible* statistical or economic methodologies to demonstrate impact on a class-wide basis." *Klay v. Humana, Inc.*, 382 F.3d 1241, 1259 (11th Cir. 2004)*, abrogated in part on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008) (emphasis added); *see Coffey v. WCW & Air, Inc.*, No. 3:17CV90-TKW-HTC, 2020 WL 4519023 at *5 (N.D. Fla. Mar. 25, 2020). The Eleventh Circuit has framed the court's inquiry in this context as "limited to whether or not the proposed methods for computing damages are so insubstantial as to amount to no method at all." *Klay*, 382 F.3d at 1259. Indeed, "[a]t the class certification stage, all that the named plaintiffs ha[ve] to prove [is] that a reliable damages methodology exist[s], not the actual damages plaintiffs sustained." *Green-Cooper v. Brinker Int'l, Inc.*, 73 F.4th 883, 893 (11th Cir. 2023).

**\*7** Generally, "[r]egression analyses are admissible even where they omit important variables so long as they account for the 'major variables' affecting a given analysis ...." *Reed Constr. Data Inc. v. McGraw-Hill Cos., Inc.*, 49 F. Supp. 3d 385, 403 (S.D.N.Y. 2014) (quoting *Bazemore v. Friday*, 478 U.S. 385, 400 (1986)); *see also Freeland v. AT & T Corp.*, 238 F.R.D. 130, 145 (S.D.N.Y. 2006)) *aff'd*, 638 F. App'x 43 (2d Cir. 2016); *In re Disposable Contact Lens Antitrust*, 329 F.R.D. 336, 385 (M.D. Fla. 2018). However, "it is the 'proponent who must establish that the major factors have been accounted for in a regression analysis.' " *Reed Constr. Data Inc.*, 49 F. Supp. 3d at 403 (quoting *Freeland*, 238 F.R.D. at 145).

Drummond criticizes Dr. Zabel's report as lacking case-specific data collection, data analysis, model design or development, or other testable application of the hedonic method to the facts of the case (Doc. 170, at 8). This, Drummond argues, renders Dr. Zabel's report "unreliable" under *Daubert* (Doc. 170, at 9). In support, Drummond cites a number of cases from other circuits in which courts accepted *Daubert* challenges to expert reports in the class certification context for being, essentially, "so incomplete as to be inadmissible as irrelevant" (Doc. 170, at 10 n.1, 11 (citing *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 552 (D. Cal. 2014)). Drummond criticizes Dr. Zabel's lack of fact-gathering in relation to the case, complaining the report is not "tied to even the bare minimum of case-specific data collection, model development, or real property valuation analysis" (Doc. 170, at 10). As part of this challenge, Drummond also criticizes Dr. Zabel for not actually constructing or running the hedonic model that he asserts will establish class wide damages, arguing this renders his theory untestable (Doc. 170, at 11).

Drummond fails to connect its arguments to the relevant inquiry. Drummond's arguments would certainly be relevant if this motion were filed in relation to trial and Dr. Zabel's report were being offered to prove the class members' actual damages. However, at the certification stage the plaintiff's burden is only to prove "that a reliable damages methodology exist[s], not the actual damages plaintiffs sustained." *Green-Cooper*, 73 F.4th 883 at 893. Indeed, at this stage, Feist need only "come forward with *plausible* statistical or economic methodologies to demonstrate impact

Jerue v. Drummond Company, Inc., Not Reported in Fed. Supp. (2023)
2023 WL 6610603

Case 1:21-cv-00179-KJM-BAM   Document 167-8   Filed 11/26/24   Page 130 of 216

on a class-wide basis." 🚩 *Klay*, 382 F.3d at 1259 (emphasis added). Moreover, a regression model need only consider the major variables to be considered reliable. 🚩 *Reed Constr. Data Inc.*, 49 F. Supp. 3d at 403. Considering this, Dr. Zabel's report need not be excluded under *Daubert* on reliability grounds. Dr. Zabel's regression model includes variables meant to capture "values that the market places on the house characteristics ... and neighborhood amenities" (Doc. 143-7, at 8). Additionally, Dr. Zabel notes that information from the U.S. Census and even test scores from the Department of Education can be incorporated into the model (Doc. 143-8, at 4). The report goes to the plausibility of the method of calculating damages. Dr. Zabel need not have completed his analysis nor included the specific calculations that aim to capture, for example, neighborhood variables. At this point, it is enough to satisfy the *Daubert* requisites that Dr. Zabel has explained how he intends to account for those variables if the class were to be certified and if he were asked to perform the analysis. *See* 🚩 *Green-Cooper*, 73 F.4th 883 at 893.

**\*8** Drummond also challenges Dr. Zabel's report by arguing the Class Area is too heterogenous to be accurately subjected to a hedonic regression. Drummond does not dispute any specific terms or methods in Dr. Zabel's report, only that the hedonic method itself is inappropriate for the facts of this case because "hedonic models are used to give information on averages for general market outcomes, not particularized findings for specific houses" and that this "falls far below the standards required for an expert report submitted in support of class certification" (Doc. 170, at 12). Drummond argues that "[a]verages or community-wide estimations would not be probative of any individual's claim because any one class member['s property] may have an exposure level well above or below the average" and that "[n]ot all claims of property damage based on exposure are alike" (Doc. 170, at 12 (citing [6] 🚩 *Gates v. Rohm & Haas Co.*, 655 F.3d 255, 266, 271 (3d Cir. 2011)). Thus, Drummond asserts that the proposed model would not be conclusive as to individual cases.

The issues raised by Drummond regarding the heterogeneity of the Class Area bear on the weight of Dr. Zabel's opinion, not its admissibility. Dr. Zabel notes that the hedonic model is designed to incorporate "all manner of observable property attributes" and that, if needed, separate hedonic models can be estimated for different market segments such as single-family homes versus condominiums (Doc. 143-8, at 3). As Feist notes, hedonic regression is a "reliable methodology that

has been approved by courts in this Circuit, and nation-wide, to show generalized proof of injury across a class of properties and to distribute damages on a formulaic basis at the merits phase" (Doc. 181, at 5). The Eleventh Circuit itself has recognized the usefulness of hedonic regression models. *See* 🚩 *City of Miami v. Wells Fargo & Co.*, 923 F.3d 1260, 1284 (11th Cir. 2019), *cert. granted, judgment vacated sub nom, Bank of Am. Corp. v. City of Miami, Fla.*, 206 L. Ed. 2d 251, 140 S. Ct. 1259 (2020), *and cert. granted, judgment vacated sub nom, Wells Fargo & Co. v. City of Miami, Fla.*, 140 S. Ct. 1259, 1284 (2020) ("[H]edonic regression analysis has been favorably referenced and employed elsewhere and over several decades."). Indeed, Drummond's experts concede that hedonic regression can prove class wide money damages in some circumstances (*see* Doc. 156-6, at 147:23–148:11 (Ms. Pitts) (explaining that hedonic regression model can be used to "calculate an average impact ... across a group of properties"); Doc. 156-3, at 230:23–231:13 (Dr. Fishkind) (noting that some studies "suggest that hedonic modeling can measure ... environmental disamenities on a class-wide basis" so long as the dataset is sufficiently homogenous)). The Court's role at this stage is not to rule on the expert's persuasiveness. 🚩 *Rosenfeld*, 654 F.3d at 1193 (quotation omitted). Moreover, the use of averages to prove common impact to a putative class is accepted. *See* 🚩 *Tyson Foods Inc. v. Bouaphakeo*, 577 U.S. 442, 459–60 (2016) (holding that representative proof from a sample, based on an expert witness's estimation of average time that employees spent donning and doffing protective gear, could be used to show predominance of common questions of law or fact in employment class action). The heterogeneity of the class area and the extent to which the formula accounts for it are considerations which go to the persuasiveness of Dr. Zabel's opinion, not its admissibility.

Drummond compares this case to *Cotromano v. United Techs. Corp.* in which the court held that a "mass appraisal" method was unreliable and did not "fit under the facts" of the case in part because "[t]he affected community is not remarkably homogenous..., but rather includes a wide variety and scale of homes ... of various ages and sizes and conditions—diverse properties which are not logically impacted in the same way by the alleged environmental stigma." 🚩 2018 WL 2047468 at \*19 (S.D. Fla. May 2, 2018). In *Cotromano*, the court noted that the area specifically included "a wide variety and scale of homes (equestrian farms, up-scale villas, simple ranch houses) of various ages, sizes and conditions." *Id.* Here, as Dr. Zabel noted, not only

Jerue v. Drummond Company, Inc., Not Reported in Fed. Supp. (2023)
2023 WL 6810603
Case 1:21-cv-00179-KJM-BAM   Document 167-8   Filed 11/26/24   Page 131 of 216

was the development actually developed purposefully to be homogenous, but the hedonic model itself is designed to incorporate "all manner of observable property attributes" and that, if needed, separate hedonic models can be estimated for different market segments such as single-family homes versus condominiums (Doc. 143-8, at 3). Moreover, Dr. Zabel noted that data on neighborhood characteristics can readily be collected and incorporated into the model (Doc. 143-8, at 4). The undersigned agrees with Dr. Zabel that the class area in this case is not so heterogenous as that in *Cotromano* such that Dr. Zabel's report is rendered unreliable. Additionally, Drummond's reliance on *Gates* is similarly misplaced as the case stands not for a rejection of the hedonic regression model based on a lack of homogeneity but rather noted that the properties measured were contaminated by multiple disparate sources and times. *Gates*, 655 F.3d at 271 ("Single instances or simple theories of contamination may be more apt for consolidated proceedings than extensive periods of contamination with multiple sources and various pathways."). In contrast, here, Drummond does not allege Dr. Zabel's report contains these flaws but rather that the properties themselves are too disparate to have the effect of the contamination on the price of the property be measured writ large. As already noted, the heterogeneity of the class area and the extent to which the formula accounts for it go to the persuasiveness of Dr. Zabel's opinion, not its admissibility.

### iii. Assist the Trier of Fact

**\*9** An expert witnesses may only testify when the expert's "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). This prong is geared towards ensuring that the expert testimony is relevant, in addition to being reliable. *See Kumho Tire*, 526 U.S. at 152, 154. To satisfy this *Daubert* requirement, expert testimony must be relevant to an issue in the case and offer insights "beyond the understanding and experience of the average citizen." *United States v. Rouco*, 765 F.2d 983, 995 (11th Cir. 1985). "But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Rather, a "court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.*; *see also McDowell v. Brown*, 392

F.3d 1283, 1299 (11th Cir. 2004) ("Under *Daubert*, scientific testimony does not assist the trier of fact unless the testimony has a justified scientific relationship to the pertinent facts."). "[W]hen an expert's data is not directly relevant to the matter at issue in a case, the expert's testimony does not assist the trier of fact and is therefore inadmissible under *Daubert*." *Phillips v. Am. Honda Motor Co.*, 238 F. App'x 537, 540 n.2 (11th Cir. 2007); *Daubert*, 509 U.S. at 591–92 (terming this a problem of "fit," and stating that Rule 702 "requires a valid scientific connection to the pertinent inquiry").

Drummond makes no specific arguments regarding the report's assistance to the trier of fact. The undersigned nonetheless finds Dr. Zabel's report lacking. For one, Dr. Zabel's report does not explain how each class member's damages would be actually calculated following the use of the hedonic model. In Dr. Fishkind's words, "Dr. Zabel's report fails to provide any methodology or guidance concerning how to translate this [percent] average diminution in property value into individual property damages" (Doc. 156-2, at 16). Dr. Zabel defends against this accusation from Dr. Fishkind and Ms. Pitts by pointing to his sixth and seventh steps (Doc. 143-8, at 5). It is true that Dr. Zabel proposes that the model "can be applied individually to all properties (for example, as a percentage of estimated value)" (Doc. 143-7, at 9). However, Dr. Zabel neither defines the essential term *estimated value* nor does Dr. Zabel propose a method for measuring this estimated value. Like Dr. Fishkind, the undersigned is left asking "What is the [percent average diminution] applied against? The assessed value of the properties? Some metric of market value which has not been specified by Dr. Zabel?" (Doc. 156-2, at 16). Feist touches on this deficiency in his response to Drummond's *Daubert* motion and acknowledges that it must take the step to allocate the regression model's damages to properties within the class (Doc. 181, at 8 n.3). However, Feist stops short of telling the court how he intends to do so. Feist argues that appraisal is not "relevant or necessary to estimating the impact of Drummond's pollution on the diminution, if any, on home values" (Doc. 181, at 19). Yet how does Feist propose to allocate the impact of the pollution which is estimated via the hedonic regression model without some understanding of each class member's property value? The undersigned is thus unable to evaluate the workability of that method in terms of its class certification implications. In other words, the undersigned is left wondering if that method would create individual inquiries which would predominate over class wide inquiries, a gap of essential information in a certification of the type requested by Feist. Feist himself

Jerue v. Drummond Company, Inc., Not Reported in Fed. Supp. (2023)
2023 WL 6810603

Case 1:21-cv-00179-KJM-BAM   Document 167-8   Filed 11/26/24   Page 132 of 216

acknowledges that were the court to calculate damages "on an individualized basis ... it would inevitably cause undue burden and expense on the litigants by requiring 1,000 separate property evaluations at great time and expense" (Doc. 181, at 20 n.7).

For another, Dr. Zabel's report does not sufficiently explain how he proposes to frame the temporal window for the operation of his regression model. Dr. Zabel does explain that he would form a timeline of public knowledge which will "provide information about possible changes in the impact of the contamination on house prices" and that "[a]t least since March 2017 information regarding the contamination has appeared in a number of newspaper, television and online reports" (Doc. 143-7, at 6). Dr. Zabel explains this timeline is important because "the information about the extent and level of contamination will continue to change after the initial discovery" and "the total impact on house prices may not occur immediately, as the information about the contamination takes time to become fully realized by buyers and sellers and then capitalized into house prices" (Doc. 143-7, at 6–7). Thus, while recognizing its importance, Dr. Zabel fails to explain *how* he would select the timeframe for which he proposes to measure the impact of the perceived contamination. Dr. Fishkind raises this criticism in his report, a criticism to which Dr. Zabel does not specifically respond (Doc. 156-2, at 16, 24; Doc. 143–7). Accordingly, the undersigned is left questioning whether the regression model would capture this nuance or whether the model would measure only from a certain date forward. And if so, from which date would the model measure? The undersigned needs this information to determine, as later described in fuller detail, whether the class contains individuals who have not suffered an injury and thus do not have standing.

**\*10** The report—while reliable in relation to the hedonic regression model—is unmoored to the court's inquiry. Thus, Dr. Zabel's report "is not directly relevant to the matter at issue in [the] case, the expert's testimony does not assist the trier of fact[,] and is therefore inadmissible under *Daubert*." *Phillips,* 238 F.App'x at 540 n.2.

### D. Conclusion

The undersigned recommends granting the *Daubert* motion. While the regression model need not be actually carried out at this stage, the model must still be helpful to the trier of fact. The distinctions between aspects of the report which are relevant to the probative value of the report versus its admissibility are narrow but decisive. The question is not whether the court is convinced by the report that Drummond caused any particular amount of damage, rather, the report need only convince the court that the expert has a plausible method for carrying out this calculation across the class if asked to do so. The hedonic regression model proposed by Dr. Zabel may be reliable, however, Dr. Zabel does not provide enough information to connect his proposed model to the court's relevant inquiry. If not provided enough information to make that determination, Feist fails to carry the burden of proof and the *Daubert* motion should be granted. That said, as will be demonstrated in the following, the motion for class certification fails even if Dr. Zabel's report were to be admitted.

Accordingly, the undersigned recommends that the Court grant Drummond's Motion to Exclude the Opinions of Plaintiff's Expert (Doc. 170).

### III. Motion for Class Certification

In August 2021, Feist moved for class certification, requesting certification of three classes. As it relates to Count I (strict liability pursuant to chapter 376, Florida Statutes) and Count II (negligence and negligence per se), Feist seeks to certify the following class:

> **Drummond Property Damage Class ("Property Class")**: Any and all persons that own any residential real property in the Oakbridge & Grasslands Communities (collectively, the "Class Area") in Polk County, Florida.

(Doc. 142, at 17; Doc. 36, at ¶¶ 111, 133–51). As it pertains to Count III (fraud and fraudulent concealment) and Count IV (negligent misrepresentation), Feist seeks to certify the following class:

> **Fraud Class**: All persons who purchased property in the Oakbridge or Grasslands Communities within 12-years of March 10, 2017.

Jerue v. Drummond Company, Inc., Not Reported in Fed. Supp. (2023)
2023 WL 6810603
Case 1:21-cv-00179-KJM-BAM Document 167-8 Filed 11/26/24 Page 133 of 216

(Doc. 142, at 17; Doc. 36, at ¶¶ 111, 152–70). Finally, as it pertains to Count V (medical monitoring), [7] Feist seeks to certify the following class:

> **Medical Monitoring Class**: All persons who have lived in the [Class Area] for more than three cumulative years. [8]

(Doc. 142, at 17; Doc. 36, at ¶¶ 111, 171–80). In support of his motion, Feist argues the classes should be certified pursuant to Fed. R. Civ. P. 23(b)(3) for liability and damages; pursuant to Fed. R. Civ. P. 23(b)(2) for injunctive relief (remediation); pursuant to Fed. R. Civ. P. 23(b)(2) for injunctive relief (medical monitoring); and, in the alternative, pursuant to Fed. R. Civ. P. 23(c)(4) for an issues class (Doc. 142, at 8).

**\*11** As set out in the following, the undersigned recommends denying Feist's motion in its entirety.

### A. Legal Standard

District courts maintain broad discretion in determining whether to certify a class. *Rensel v. Centra Tech, Inc.*, 2 F.4th 1359, 1364 (11th Cir. 2021); *Washington v. Brown & Williamson Tobacco Corp.*, 959 F.2d 1566, 1569 (11th Cir. 1992) (citation omitted). Since the class action provides an exception to the general rule that litigation be conducted by and on behalf of the individual named parties only, to justify certification of a class, a class representative must be a member of the class and possess the same interest and suffer the same harm as the class members. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348–49 (2011) (citations omitted). The advocate of the class thus carries the burden of proof to establish the propriety of class certification. *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1233–34 (11th Cir. 2016). If the court harbors doubt about whether the party seeking class certification carries that burden, the party loses. *Id.*

In determining whether class certification is appropriate, "Rule 23 establishes the legal roadmap courts must follow." *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1187 (11th Cir. 2003). Namely, Rule 23(a) requires the moving party to demonstrate that:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a)(1)–(4). "Failure to establish any one of these four factors and at least one of the alternative requirements of Rule 23(b) precludes class certification." *Valley Drug*, 350 F.3d at 1188 (citation omitted); *see Fitzpatrick v. General Mills, Inc.*, 635 F.3d 1279, 1282 (11th Cir. 2011) ("To satisfy Rule 23, the putative class must meet each of the four requirements specified in 23(a), as well as at least one of the three requirements set forth in 23(b).") (citation omitted).

Accordingly, if a district court determines that the moving party established the numerosity, commonality, typicality, and adequacy-of-representation requirements of Rule 23(a), the court then determines whether the moving party established the requirements of one of three possible categories under Rule 23(b). *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613–14 (1997); *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012) (citations omitted). In this instance, Feist seeks certification of the class pursuant to Rule 23(b)(3) and (2).

Under Rule 23(b)(3), a class action may be maintained if Rule 23(a) is satisfied and if:

> (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently

Jerue v. Drummond Company, Inc., Not Reported in Fed. Supp. (2023)

2023 WL 6810603

Case 1:21-cv-00179-KJM-BAM Document 167-8 Filed 11/26/24 Page 134 of 216

adjudicating the controversy. The matters pertinent to these findings include:

**\*12** (A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)–(D). Under Rule 23(b)(2), a class action may be maintained if, similarly, Rule 23(a) is satisfied and if:

> the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

Fed. R. Civ. P. 23(b)(2).

In determining the propriety of a class action, the question is whether the moving party meets the requirements of Rule 23, not whether the moving party states a cause of action or will prevail on the merits. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974) (citation omitted). Though a district court should not reach the merits of a claim when considering the propriety of class certification, "this principle should not be talismanically invoked to artificially limit a trial court's examination of the factors necessary to a reasoned determination of whether a plaintiff has met her burden of establishing each of the Rule 23 class action requirements." *Love v. Turlington*, 733 F.2d 1562, 1564 (11th Cir. 1984). Instead, the district court can consider the merits of the moving party's claim at the class certification stage to the degree necessary to determine whether the moving party satisfied the requirements of Rule 23.

*Heffner v. Blue Cross & Blue Shield of Ala., Inc.*, 443 F.3d 1330, 1337 (11th Cir. 2006) (citations omitted); *see Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. at 350–51 (stating that "sometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question, ... and that certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied .... Frequently that rigorous analysis will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped. The class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.") (internal citations, internal alterations, internal quotations, omitted). In doing so, the district court does not determine whether the plaintiff will ultimately prevail on the merits; instead, the district court considers the factual record in determining whether the plaintiff satisfied the requirements of Rule 23. *Valley Drug*, 350 F.3d at 1188 n.15. A class certification ruling therefore does not adjudicate the case but rather selects the method best suited to fairly and efficiently adjudicate the controversy. *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 460 (2013). The undersigned will now address each proposed class in turn along with the claims raised.

### B. Property Class

**\*13** As it relates to Count I (strict liability pursuant to chapter 376, Florida Statutes) and Count II (negligence and negligence per se), Feist seeks to certify the following class:

> **Drummond Property Damage Class ("Property Class")**: Any and all persons that own any residential real property in the Oakbridge & Grasslands Communities (collectively, the "Class Area") in Polk County, Florida.

(Doc. 142, at 17; Doc. 36, at ¶¶ 111, 133–51). Feist alleges that common questions of law and fact among individuals in the Property Class include:

a. Whether Drummond discharged (or caused any other condition of pollution) a hazardous substance into the land or water on or under the respective Class Area;

b. Whether Drummond is strictly liable for discharging (or caused any other condition of pollution) a hazardous substance into the land or water on or under the Class Area.

c. Whether Drummond, through its acts or omissions, is strictly liable for the contamination on, in, and around the Class Area under Fl. [sic] Stat. § 376.313;

d. Whether Drummond was negligent in its polluting, contaminating, restoring or reclaiming, handling, storing, remediating, using, and disposing the presence of radioactive materials and related contamination in the Class Area;

e. Whether Drummond, through its acts or omissions, proximately caused property damage, diminution of property values, cleanup costs and health risks due to radioactive materials and related contaminants mined, deposited, released, enhanced, or abandoned in the Class Area;

f. Whether Drummond, through its acts or omissions, deprived Class Members of the free and reasonable use and enjoyment of their properties due to the contamination of neighboring properties in the Class Area;

g. Whether Class Members, through Drummond's acts, omissions and/or discharges (or other condition of pollution), have suffered damages, including but not limited to property and economic damages; and

h. Whether, as a proximate result of Drummond's conduct, Medical Monitoring Class Members are at a significantly increased risk of disease due to exposures to Drummond's radioactive materials, such that they will benefit from ongoing medical monitoring.

(Doc. 36, at ¶ 119).

### i. Claims

### 1. Count I

In Count I, Feist seeks relief against Drummond on a theory of strict liability pursuant to Fla. Stat. §§ 376.30– 376.319,

"including but not limited to" §§ 376.302(1)(a) and 376.305(1).

Section 376.313(3), Florida Statutes, creates a private cause of action "for all damages resulting from a discharge[9] or other condition of pollution" covered by §§ 376.30– 376.319. Fla. Stat. § 376.313(3); see also Curd v. Mosaic Fertilizer, LLC, 39 So. 3d 1216, 1221–22 (Fla. 2010) (noting that in Aramark Uniform & Career Apparel, Inc. v. Easton, 894 So. 2d 20 (2004), the Florida Supreme Court recognized that section 376.313(3) creates a private cause of action). Notably, section 376.313(3) provides that "in any such suit, it is not necessary for such person to plead or prove negligence in any form or manner. Such person need only plead and prove the fact of the prohibited discharge or other pollutive condition and that it has occurred." Fla. Stat. § 376.313(3). Interpreting this language, the Florida Supreme Court compared common law causes of action to this statutory cause of action and found that:

> **\*14** section 376.313(3) departs from the common law by creating a damages remedy for the non-negligent discharge of pollution without proof that the defendant caused it. The only proof required is the fact of the prohibited discharge or other pollutive condition and that it has occurred. The absence of a causation requirement in the statute cannot be viewed as a legislative oversight. In other statutes within the same scheme (sections 376.30-376.319), where the Legislature wanted to hold a party responsible only if it actually caused the contamination, it so provided. Therefore, we must assume that the omission of a causation requirement in section 376.313(3) was deliberate.

Aramark, 894 So. 2d at 24 (internal citations and quotations omitted). Additionally, plaintiffs who bring claims

Jerue v. Drummond Company, Inc., Not Reported in Fed. Supp. (2023)
2023 WL 6610603
Case 1:21-cv-00179-KJM-BAM   Document 167-8   Filed 11/26/24   Page 136 of 216

under section 376.313 need not allege any particular standard has been exceeded to state a claim. *See Adinolfe v. United Techs. Corp.*, 768 F.3d 1161, 1173–75 (11th Cir. 2014) ("[The p]laintiffs here have alleged that [the defendants] contaminated their property, thereby causing their property values to decline. This alleged injury fits within the broad statutory definition of 'loss' or 'destruction,' even if the plaintiffs have not alleged contamination above the regulatory standard.").

Feist's strict liability count was challenged twice in motions to dismiss (Docs. 16, 41). In response to the first, the Court concluded that Feist could proceed with the chapter 376 strict liability claim, as he had sufficiently pled that there had been a "discharge" of "hazardous substances into or upon the surface or ground waters of the state or lands" pursuant to sections 376.313(3) and 376.302(1)(a) (Doc. 34, at 21). The Court also rejected a statute of limitations challenge to the claim, reasoning that section 376.308 does not contain a statute of limitations defense and "it is reasonable to infer that the Florida Legislature 'deliberately omitted' any statute of limitations or statute of repose defense to a claim under Chapter 376 of the Florida Statutes" (Doc. 34, at 13). While Feist's motion for class certification was pending, Drummond filed a notice of supplemental authority citing *Pinares v. Raytheon Techs. Corp.*, No. 10-80883-CIV, 2023 WL 2868098 (S.D. Fla. Apr. 10, 2023), a case in which the Southern District of Florida held that the four-year statute of limitations applies to chapter 376 claims for alleged radiation (*see* Doc. 228). The decision cites to and specifically rejects this Court's order (Doc. 34) on this issue. *Pinares*, 2023 WL 2868098 at *8–9. However, Drummond has filed no motion for reconsideration nor made any argument on the issue beyond a citation to and parenthetical description of the *Pinares* case. Because the prior holding still stands as the law of this case and has not been directly challenged by Drummond, the undersigned recommends taking no action on the statute of limitations issue.

**\*15** Drummond again challenged the strict liability count in a motion to dismiss Feist's Second Amended Complaint on different grounds (Doc. 41). Specifically, Drummond argued that Feist's section 376 claim must be dismissed because he "failed to allege specific Florida DEP standards that have been allegedly violated" [10] (Doc. 41, at 13; Doc. 51, at 24 n.11). As Feist's attorney stated at the October 7, 2023 hearing on the motion for class certification, this interpretation of section

376 has been rejected, and plaintiffs who bring claims under section 376 need not allege any particular standard has been exceeded to state a claim. *See Adinolfe*, 768 F.3d at 1175. The Court rejected the challenge (Doc. 51).

### 2. Count II

In Count II, on theories of negligence and negligence per se, Feist seeks to recover against Drummond for "property damage, including diminution of property values, the cost of remediation of properties, as well as the cost of periodic medical examinations necessary to detect the onset of physical harm that may be caused by radioactive contaminants" (Doc. 36, ¶ 151). In Florida, negligence requires proof of four elements: (1) duty of care; (2) breach; (3) legal or proximate causation; and (4) actual damages. *Wallace v. Dean*, 3 So. 3d 1035, 1047 (Fla. 2009); *Williams v. Davis*, 974 So. 2d 1052, 1056 (Fla. 2007). To succeed on a negligence claim in this context, plaintiffs need not show a particular level of radiation to demonstrate defendants acted unreasonably; "while the applicable regulatory standard may be instructive for a trier of fact as evidence of what the government deems safe for the public[,] it does not amount to an all-purpose benchmark for determining as a matter of law how much one can reasonably contaminate another's private property...." *Adinolfe*, 768 F.3d at 1174.

The general theory of Feist's negligence and negligence per se claims is that (1) Drummond had a duty to exercise reasonable care in the use of contaminated land for residential and commercial use, (2) Drummond breached that duty by failing to adequately reclaim and restore its mining lands in such a manner, (3) Drummond's breach was foreseeable and, in fact, caused, (4) the potential class members to suffer damages in the form of diminution in value to their properties, loss of use and enjoyment of their properties, and increased risk of serious latent illness (*see* Doc. 36, at ¶¶ 15, 21, 30, 98–100, 138–39).

In response to Drummond's challenges to Feist's negligence and negligence per se claims, the Court has twice held that Feist stated a claim for negligence and negligence per se (Docs. 34, 51). As part of its order on Drummond's first motion to dismiss, the Court held Drummond owed future landowners a general duty of care and that Plaintiffs could

Jerue v. Drummond Company, Inc., Not Reported in Fed. Supp. (2023)

2023 WL 6810603

recover under negligence on a purely economic loss (Doc. 34, at 22–26). The Court also held that Florida's general four-year tort statute of limitations, section 95.11(3)(a), Florida Statutes, had not expired because pursuant to section 95.031(1), a cause of action accrues when the last element constituting the cause of action occurs and "any diminution in the value of the Plaintiffs' properties occurred much more recently, when the Plaintiffs filed this action and, in so doing, made public their allegations that the properties are contaminated with elevated levels [of] gamma radiation" (Doc. 34, at 14). Significantly, as will be developed in the following, Feist does not state specifically the date he alleges the diminution of value of the potential class members' properties occurred which renders his class definition problematic.

### 3. Forms of Relief Applicable to Property Class

**\*16** The property class members seek to recover against Drummond for property damage, diminution of property values, the cost of remediation of properties, and the cost of periodic medical examinations necessary to detect the onset of physical harm that may be caused by radioactive contaminants on and around their property (Doc. 36, at ¶ 151). In response to the Court's instructions in its order on the motion to dismiss (Doc. 34, at 33–34), the medical monitoring claim was set out as a separate claim and class (Doc. 36, at 41). Thus, certification of the medical monitoring claim will be analyzed separately and not within the analysis of the Property Class. Additionally, at the October 7, 2023 hearing, Feist's attorney withdrew any claim for actual remediation and instead sought relief only for the cost of remediation (*see* Docs. 223–27). Finally, to the extent that Feist sought to recover any damages for emotional distress, Feist's attorney also withdrew those claims (*see* Docs. 223–27). Accordingly, as it relates to the property damage class, the only forms of relief remaining are for the diminution of property values and the cost of remediation.

### ii. Standing

Prior to the certification of a class, "the district court must determine that at least one named class representative has Article III standing to raise each class subclaim." *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000); *see Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256,

1265 (11th Cir. 2009) (noting that, to certify a class action, the named plaintiffs must have standing, and the putative class must meet all of the requirements of Rule 23(a) in addition to at least one of the requirements in Rule 23(b)). Standing consists of the following three elements: (1) the plaintiff must have suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citations omitted); *see also TransUnion LLC v. Ramirez*, 141 S.Ct. 2190, 2203 (2021) ("To answer that question in a way sufficient to establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief.") (citation omitted). More simply, the plaintiff must show that the defendant harmed him, and that a court decision can either eliminate the harm or compensate him for it. *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 924 (11th Cir. 2020). The standard does not change in suits involving class-action allegations because even named plaintiffs who represent a potential class must allege and demonstrate that they personally have suffered injury, not that injury has been suffered by other, unidentified members of the class to which they belong. *Spokeo*, 578 U.S. at 338 n.6. If the named plaintiff does not claim to have suffered an injury caused by the defendant and for which the court can fashion a remedy, no case or controversy exists for a federal court to resolve. *TransUnion*, 141 S.Ct. at 2203.

Drummond raises no challenge to Feist's standing as to property damages. However, Drummond contends that Feist has no standing to impose "remediation" on the surrounding land because he does not own or control the land (Doc. 155, at 22). Feist owns real property located in the Grasslands development and has owned four different properties in the Grasslands development in the last decade (Doc. 36, at ¶ 29). Feist currently rents the property to a tenant and has since 2013 (Doc. 162-2, at 52:10–15). However, Feist's current ownership interest is in a condominium, which has no acreage other than common areas (Doc. 163-1, at ¶ 9).

The undersigned finds that standing has been established as to Feist. It is unclear from where Drummond draws support for its standing argument given that it has not cited any legal authority, and it appears that the prevailing precedent

Jerue v. Drummond Company, Inc., Not Reported in Fed. Supp. (2023)
2023 WL 6610603
Case 1:21-cv-00179-KJM-BAM   Document 167-8   Filed 11/26/24   Page 138 of 216

does not require ownership to determine standing in the environmental context. Notably, the Supreme Court has found standing where litigants have alleged even mere recreational or aesthetic injuries to property not owned by the plaintiff. *See*

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) ("The relevant showing for purposes of Article III standing, however, is not injury to the environment but injury to the plaintiff."). In *Parker*, the Eleventh Circuit held the plaintiff had standing to sue the owner of a nearby property despite the plaintiff's failure to allege an aesthetic or recreational injury or riparian ownership of the river which defendant allegedly contaminating.

*Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1004 (11th Cir. 2004). It was enough that the plaintiff owned property "near" a facility alleged to have discharged pollutants into navigable waters and the value of their property was diminished, at least in part due to the pollution.

*Id.* at 1004 n.11. Moreover, the Eleventh Circuit did not prevent the plaintiff from seeking injunctive relief; in fact, the court reasoned, "an injunction preventing the defendants from allowing such waste to migrate onto the Parker property would redress the injury." *Id.* at 1003. A decade later, the Eleventh Circuit again found a plaintiff had standing where the plaintiff alleged contamination of property it did not own. *Adinolfe*, 768 F.3d at 1172 ("[W]e summarily reject [defendant's] argument ... that the plaintiffs lack Article III standing because they have not alleged actual contamination of their properties."). The Eleventh Circuit made this finding where plaintiffs had, among other things, brought Florida common law claims under which "a tort plaintiff seeking to recover for economic harm caused by pollution or contamination need not own property that is itself polluted or contaminated." *Adinolfe*, 768 F.3d at 1178 (citing *Curd*, 39 So. 3d at 1216).

**\*17** Accordingly, the undersigned recommends finding the named plaintiff, Feist, has standing to pursue both the property damages claim and the remediation claim.

### iii. Certification

### 1. Adequately Defined and Clearly Ascertainable

Ascertainability serves as an implied prerequisite of Rule 23. *Cherry v. Dometic Corp.*, 986 F.3d 1296, 1302 (11th Cir. 2021). Before a district court can consider whether a potential class satisfies the requisites of Rule 23(a), a class representative must demonstrate that the proposed class is "adequately defined and clearly ascertainable." *Id.* (citation omitted). Class definition and ascertainability typically involve one inquiry because, without an adequate definition for a proposed class, a district court cannot ascertain who belongs in the class. *Id.* For purposes of class certification, "a proposed class is ascertainable if it is adequately defined such that its membership is capable of determination." *Id.* at 1304. Stated differently, a class can be deemed "clearly ascertainable" when a court is certain that its membership is capable of being determined. *Id.* at 1303. Conversely, "[a] class is inadequately defined if it is defined through vague or subjective criteria." *Id.* at 1302. An adequately defined class thus should be defined by objective criteria with its members identifiable. *Scoma Chiropractic, P.A. v. Dental Equities, LLC*, Case No: 2:16-cv-41-JLB-MRM, 2021 WL 6105590, at \*10–11 (M.D. Fla. Dec. 23, 2021).

As to the property class, Drummond contends that the alleged classes are not adequately defined and clearly ascertainable primarily because some residents oppose bringing claims against Drummond (Doc. 155, at 22). It is unclear the relevance this has to the question of whether the class is adequately defined. Moreover, Drummond does not cite any case law to support its position. Given that Drummond raises this argument under the adequacy of representation element of certification, the undersigned will engage in more fulsome analysis there. However, Feist's Property Class definition does suffer from several other more troubling issues.

First, the Class definition is vague in that it does not include temporal restrictions. The Property Class is defined as "[a]ny and all persons that own any residential real property in the Oakbridge & Grasslands Communities (collectively, the 'Class Area') in Polk County, Florida" (Doc. 36, at ¶ 111). It is unclear whether the class, as defined, would include "persons that own[ed]" property as of the filing date of the lawsuit, "persons that own" property currently, or "persons that own[ed]" property as of some other date based on information in the market. Even if the undersigned were to read the definition as those "persons that own" property currently, "current" is another term fraught with difficulty

Jerue v. Drummond Company, Inc., Not Reported in Fed. Supp. (2023)

2023 WL 6810603

Case 1:21-cv-00179-KJM-BAM   Document 167-8   Filed 11/26/24   Page 139 of 216

because what is considered "current" may change throughout the lifetime of the case. Does the class include property owners "current" as of certification of the class, "current" as of a finding of liability, "current" as of whatever date Dr. Zabel's calculation is performed, or "current" as of some other date? Feist's Property Class definition offers no answers to these inquiries and thus it is unclear what property owners would be included in the class.

**\*18** Additionally, as noted in the *Daubert* analysis, the trigger date has not been defined. Feist's theory of property damage is that Drummond's failed remediation harmed class members when, as a result, publication of the fact of potential or actual contamination was disseminated into the housing market and impacted their property values. As acknowledged by Dr. Zabel, "the information about the extent and level of contamination will continue to change after the initial discovery" and "the total impact on house prices may not occur immediately, as the information about the contamination takes time to become fully realized by buyers and sellers and then capitalized into house prices" (Doc. 143-7, at 6–7). Recognizing this, Dr. Zabel was vague in his report and did not use a specific "trigger" date. Meanwhile, Judge Kovachevich's [11] order on a motion to dismiss, in response to statute of limitations arguments, stated "any diminution in the value of the Plaintiffs' properties occurred much more recently, when the Plaintiffs filed this action and, in so doing, made public their allegations that the properties are contaminated with elevated levels gamma radiation" (Doc. 34, at 14). For its part, Drummond argues that information was already in the market "for decades" (Doc. 155, at 31).

But beyond the issue of vagueness lies a more fundamental problem: Regardless of the way in which the Court reads the class definition, it will inevitably include property owners who are *by definition* not injured under one of Feist's requested forms of relief. The Eleventh Circuit addressed a similar issue in *Walewski v. Zenimax Media, Inc.,* 502 F. App'x 857 (11th Cir. 2012). In *Walewski,* the plaintiff filed a class-action lawsuit against the companies that manufactured and marketed a video game asserting various claims based on an animation defect that was contrary to the representations of defendants. *Id.* at 859. The proposed class comprised "[a]ll persons or entities residing in the United States who purchased any version of the *Elder Scrolls IV: Oblivion* video game." *Id.* The district court concluded that the plaintiff had not adequately defined the class and reasoned as follows:

[T]he proposed class includes all persons or entities nationwide, who purchased any version of the game, presumably from anyone, anywhere, at any time—whether or not they ever were injured by (or experienced) the alleged [a]nimation [d]efect. This overbroad definition is not limited in any way to persons who purchased from Defendants, and therefore presumably includes persons who purchased a copy of the game—new or used—from anyone else.

...

Under the definition, for example, a video store which buys the second hand game from a consumer and resells it for more than it paid for it is included in the class, despite the fact that the entity itself never experienced the [a]nimation [d]efect (as it never played the game) and did not suffer any loss.

Even with respect to individuals only, the class definition is wanting. Under that definition, for example, if a teenager purchases a used copy from his brother, he is a class member even if he has no complaints about the game, but if his brother gives him the same game as a gift, he is not a class member, even if he experiences the [a]lleged [d]efect. [Walewski] fails to set forth a workable method for identifying which players and owners are correctly included within the class.

...

The definition is not only unworkable in terms of identifying class members, it impermissibly includes members who have no cause of action as a matter of law. For example, assuming the [c]ourt were to conclude that Maryland's consumer protection laws were, as pled, applicable to this dispute, ... [r]etailers and other business who purchased the games for resale purposes [would not have a cause of action under those statutes].

*Id.* at 861. The Eleventh Circuit held that the district court did not abuse its discretion by concluding that the class was not adequately defined or clearly ascertainable and denying class certification. *Id.* Five years later, the Eleventh Circuit again considered the adequacy of a class definition in *Ward v. EZCorp, Inc.,* 679 F. App'x 987 (11th Cir. 2017). In *Ward,* the plaintiff brought a class action alleging the defendant, a pawnshop, was violating the Florida Pawnbroking Act, which provides that a pawnbroker can assess a $2 fee if a pledgor does not present a pawn ticket when retrieving

Jerue v. Drummond Company, Inc., Not Reported in Fed. Supp. (2023)
2023 WL 6810603

Case 1:21-cv-00179-KJM-BAM   Document 167-8   Filed 11/26/24   Page 140 of 216

pledged property. *Id.* Critically, the plaintiff argued the $2 fee could be collected only if the pawnbroker has obtained a written statement of the loss, destruction, or theft of the pledgor's copy of the pawn ticket. *Id.* The Eleventh Circuit agreed with the district court that the plaintiff could not show the class was "clearly ascertainable" where the definition did not distinguish an individual "who was charged the $2 fee in connection with a missing pawn ticket from those that were charged regardless of presenting a pawn ticket." *Id.* [12]

 **\*19** Here, the Property Class definition suffers from a similar fault. No matter which way the court reads the class definition considering the vagueness discussed above, the class suffers from inclusion of members in substantially different positions. Assume for example that Feist's class consists of "persons that" *currently* "own any residential real property in the Oakbridge & Grasslands Communities" (Doc. 36, at ¶ 111). If Feist is able to prevail on his claim for remediation damages, the class would appropriately capture all current property owners who still control the property and could engage in remediation if desired. However, the class would also contain *new* property owners who obtained their property interests within the class boundaries after the "trigger" date. This is a problem because these individuals would not have suffered any property value harm; these individuals would have already benefited from a decrease in market price of the property when they acquired their property interest. As Drummond's expert Dr. Pitts explains "if there was a discount in sales at any point in time, a current owner as of today may ... have discounted the sale already if that market knowledge was available at the time of the sale...." (Doc. 156-6, at 195:5–11). Meanwhile, if the Court reads Feist's class as though it were measured as of the time of the filing of the lawsuit, the class would exclude all property owners who purchased land after the filing of the lawsuit, fixing the above-described problem but creating another. Now, the class would be appropriate as to property damages because it would only include those persons who either still own the property or may have suffered damages when they sold their property for a lower amount due to the market's reaction to the news regarding the class wide contamination. However, while the class would properly capture those entitled to compensation for property damage, the class would also include those individuals who sold their property since the filing of the lawsuit and no longer hold property interests within the class area. These class members would not be entitled to remediation damages, and indeed likely have no standing to be entitled to remediation damages, because they no longer have a special interest in the property. [13]

Regardless of any attempts to resolve the vagueness problems of Feist's Property Class definition, the class suffers from inclusion of members in substantially different positions. Under one interpretation, the class includes members who have not suffered an injury that is redressable by an award of property damages because they benefited from the alleged reduced price of the property post-filing of the case. Under the other interpretation, the class includes members who have since sold their property and no longer own property damaged by Drummond and thus, not redressable by remediation. As this Court recently described, "a class that includes persons who suffered no harm due to the actions of a defendant is not adequate." *See Nguyen v. Raymond James & Assocs., Inc.*, No. 8:20-CV-195-CEH-AAS, 2022 WL 4553068, at \*8 (M.D. Fla. Aug. 12, 2022).

For the reasons stated, not only is Feist's Property Class definition vague, but it is inadequate. However, before concluding the motion should be denied for this reason, the court must consider whether to redefine the class on Feist's behalf. "[W]here the named plaintiff has no real opportunity to request certification of subclasses after his proposed class is rejected, an obligation arises for the district court to consider subclassification." *Heaven v. Tr. Co. Bank*, 118 F.3d 735, 738 (11th Cir. 1997). Here, any adjustments that would remedy the Property Class's deficiencies would require significant alterations to Feist's pleadings. The Court would be required to strike a form of damages and impose its own temporal restrictions on the class, excising some potential class members and maintaining others. Critically, the "trigger" date is a contested issue. For the court to *sua sponte* redefine the class by deciding this contested issue would have significant downstream impacts for Feist's case. The undersigned is disinclined to engage in such line-drawing for the sake of saving Feist's motion and recommends that the Court not do so. *See Karhu v. Vital Pharms., Inc.*, No. 13-60768-CIV, 2014 WL 815253, at \*11 (S.D. Fla. Mar. 3, 2014), *aff'd*, 621 F. App'x 945 (11th Cir. 2015) ("[T]he Court declines to drastically redefine the action *sua sponte* as one only on behalf of New York consumers."); *Polo v. Goodings Supermarkets, Inc.*, 232 F.R.D. 399, 409 (M.D. Fla. 2004) (refusing to revise an overly broad class definition *sua sponte* and denying leave to amend complaint); *Walewski*, 502 F. App'x at 861 (holding district court did not abuse its discretion for failing to allow the *named plaintiff* to amend his own class definition).

Jerue v. Drummond Company, Inc., Not Reported in Fed. Supp. (2023)
2023 WL 6810603

Case 1:21-cv-00179-KJM-BAM   Document 167-8   Filed 11/26/24   Page 141 of 216

Thus, it is recommended that Feist's Property Class be rejected. Feist's definition is fatally flawed and should prohibit the certification of the Property Class. Further, as will be more fully developed in turn, Feist's unworkable property class definition causes problematic challenges to the predominance and superiority inquiries pursuant to Rule 23(b)(3).

2. **Rule 23(a)**

**\*20** Though Feist's Property Class should fail before even reaching the Rule 23 inquiry, the undersigned will nonetheless address whether Feist can establish the Rule 23 requirements for class certification.[14] Under Rule 23(a), one or more members of a class may sue as representative parties on behalf of all members only if the movant establishes the numerosity, commonality, typicality, and adequacy-of-representation requirements. Fed. R. Civ. P. 23(a)(1)–(4).

a. **Numerosity**

Initially, Feist must demonstrate that the class is so numerous that joinder of all members would be impracticable. Fed. R. Civ. P. 23(a)(1). To establish numerosity, the moving party typically must demonstrate either some evidence or a reasonable estimate of the number of purported class members. *Kuehn v. Cadle Co., Inc.*, 245 F.R.D. 545, 548 (M.D. Fla. 2007) (citation omitted); *cf. Vega*, 564 F.3d at 1267 (noting that, while mere allegations of numerosity are insufficient, a plaintiff need not show the precise number of members in the class). Though no fixed numerosity rule exists, courts generally determine less than twenty-one members of a proposed class is inadequate to establish numerosity and more than forty members of a proposed class is adequate to establish numerosity, with numbers between varying based upon other factors. *See Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986); *see Kilgo v. Bowman Transp., Inc.*, 789 F.2d 859, 878 (11th Cir. 1986) (concluding that a district court did not abuse its discretion in finding that the numerosity requirement had been met where a plaintiff identified at least 31 individual class members).

While the moving party bears a minimal burden to make *some* showing of numerosity, the party need not show the precise number of members in the class. *Vega*, 564 F.3d at 1267. Indeed, the numerosity requirement presents a "generally low hurdle." *Id.*

Drummond makes no argument pertaining to numerosity (*see* Doc. 155). The undersigned finds that the numerosity requirement is satisfied to warrant class treatment as the proposed class consists of more than 1,000 properties.

b. **Commonality**

Feist must next establish commonality, or that there exists questions of law or fact common to the class. Fed. R. Civ. P. 23(a)(2). While both the commonality and typicality requirements focus on whether a sufficient nexus exists between the legal claims of the named class representatives and those of individual class members, commonality pertains to the group characteristics of the class as a whole, whereas typicality pertains to the individual characteristics of the named plaintiff in relation to the class. *Piazza v. Ebsco Indust., Inc.*, 273 F.3d 1341, 1346 (11th Cir. 2001) (citations omitted); *Prado*, 221 F.3d at 1278. To meet the commonality requirement, the moving party must demonstrate that the class action involves issues susceptible to class-wide proof. *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1355 (11th Cir. 2009) (citation omitted). The burden of establishing commonality is "relatively light." *Vega*, 564 F.3d at 1268. Essentially, the moving party must show that the determination of the truth or falsity of a common contention will resolve an issue that is central to the validity of each of the claims in one stroke. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. at 350. Commonality therefore requires "at least one issue whose resolution will affect all or a significant number of the putative class members." *Williams*, 568 F.3d at 1355 (citation and internal quotation marks omitted). Notably, "Rule 23 does not require that all the questions of law and fact raised by the dispute be common." *Cox*, 784 F.2d at 1557 (citations omitted).

**\*21** In this instance, Feist contends that there are several common questions of law and fact because the claims arise out of Drummond's common course of conduct (Doc. 142,

Jerue v. Drummond Company, Inc., Not Reported in Fed. Supp. (2023)

2023 WL 6610603

Case 1:21-cv-00179-KJM-BAM   Document 167-8   Filed 11/26/24   Page 142 of 216

at 19). Specifically, Feist argues that Drummond's discharge of pollution in the Class Area through its mining and reclamation activities, construction of residential homes atop the pollutants, failure to disclose the pollutants to purchasers, and failure to properly remediate the Class Area properties are all common to the class (Doc. 142, at 18–19).

In opposition, Drummond argues there are no "common answers apt to drive the resolution of the litigation." (Doc. 155, at 22 (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. at 350)). Drummond points to Feist, who Drummond argues "has safe radiation levels, no dose evaluation, and no control over the outdoor area" (Doc. 155, at 22). Drummond argues it did not mine his neighborhood or discharge pollution onto Feist's condo, did not sell him the condo, and made no false representations of fact to Feist (Doc. 155, at 23). Drummond contends that this means no central common questions will prove Feist's claims as well as other residents' claims (Doc. 155, at 23). Drummond also points to dissimilarities in economic impact because Feist has failed to show even one transaction since the suit was filed has resulted in a diminished value of the property (Doc. 155, at 23).

Notwithstanding Drummond's arguments, for purpose of Rule 23(a)(2), even a single common question will do. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. at 359. This case centers on Drummond's alleged discharge of pollution in the Class Area through its mining and reclamation activities, construction of residential homes atop the pollutants, and failure to properly remediate the Class Area properties. The question of whether Drummond engaged in those activities is a factual question common to all members of the putative class. Moreover, the question of Drummond's liability for those acts is a common question that, in most respects, requires proof of the same material facts. All members of the putative class and subclass would be affected by the issues surrounding Drummond's discharge, construction, and failure to remediate. Thus, the undersigned finds the commonality requirement is satisfied because one common issue is sufficient to meet the commonality requirement of Rule 23.

### c. Typicality

Class certification also requires that the claims of the class representatives be typical of those of the class. *See* Fed. R.

Civ. P. 23(a)(3). To establish typicality, "there must be a nexus between the class representative's claims or defenses and the common questions of fact or law which unite the class." *Kornberg v. Carnival Cruise Lines, Inc.,* 741 F.2d 1332, 1337 (11th Cir. 1984). "A sufficient nexus is established if the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory." *Id.* "A class representative must possess the same interest and suffer the same injury as the class members in order to be typical under Rule 23(a)(3)." *Murray v. Auslander,* 244 F.3d 807, 811 (11th Cir. 2001). Moreover, "if proof of the representatives' claims would not necessarily prove all the proposed class members' claims, the class representatives' claims are not typical of the proposed members' claims." *Brooks v. S. Bell Tel. & Tel. Co.,* 133 F.R.D. 54, 58 (S.D. Fla. 1990) (citation omitted). "Typicality, however, does not require identical claims or defenses." *Kornberg,* 741 F.2d at 1337. "A factual variation will not render a class representative's claim atypical unless the factual position of the representative markedly differs from that of other members of the class." *Id.*

**\*22** Drummond argues that Feist has failed to prove typicality. Drummond contends "Feist's circumstances are atypical from his inflammatory allegations because he claims not to have known that the Development was built on former phosphate land, did not purchase from Drummond, and has no economic losses or health effects" (Doc. 155, at 23). Drummond does not point to record evidence which would show other class members are different from Feist in these respects. Moreover, "[e]ven relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories." *In re Checking Acct. Overdraft Litig.*, 307 F.R.D. 630, 642 (S.D. Fla. 2015). As already described in the common questions inquiry, there are common legal and factual questions among the class members and those legal theories are shared by Feist. Accordingly, the undersigned finds Feist meets the typicality requirement.

### d. **Adequacy of Representation**

Finally, Feist must satisfy the adequacy-of-representation requirement, which requires the representative party in a class action to fairly and adequately protect the interests

*Jerue v. Drummond Company, Inc.*, Not Reported in Fed. Supp. (2023)
2023 WL 6810603

Case 1:21-cv-00179-KJM-BAM   Document 167-8   Filed 11/26/24   Page 143 of 216

of those he purports to represent. 🚩 Fed. R. Civ. P. 23(a)(4); 🚩 *Valley Drug,* 350 F.3d at 1189. There are two separate inquiries under 🚩 Rule 23(a)(4): (1) whether there are any substantial conflicts of interest between the named representatives of the class and the class members; and (2) whether the representatives will adequately prosecute the action. *See* 🚩 *Busby v. JRHBW Realty, Inc.,* 513 F.3d 1314, 1323 (11th Cir. 2008) (citing 🚩 *Valley Drug Co.,* 350 F.3d at 1189). This requirement serves to uncover any conflict of interest that named parties may have with the class they represent. *See* 🚩 *Amchem Prods.,* 521 U.S. at 625. "If substantial conflicts of interest are determined to exist among a class, class certification is inappropriate." 🚩 *Valley Drug Co.,* 350 F.3d at 1189. Minor conflicts alone will not defeat class certification, the conflict must be "fundamental" to the specific issues in the case. *Id.* A fundamental conflict of interest has been found, for example, "where some [class] members claim to have been harmed by the same conduct that benefitted other members of the class," or where the economic interests and objectives of the named representatives differ significantly from the economic interests and objectives of the unnamed class members." 🚩 *Valley Drug Co.,* 350 F.3d at 1189–90. Under this section, the Court must also consider the competency and any conflicts that the class counsel may have. *See Amchem,* at 627 n.20.

Drummond argues Feist and his counsel are in conflict with the economic interests of the residents and property owners, stating property owners oppose the class and will be harmed financially by stigmatizing their neighborhood as a "contaminated site." Drummond supports this contention with twenty affidavits of residents stating that they oppose certification (Doc. 155-2, at 2–219). Feist has "lost friendships" in the development over his claims (Doc. 162-2, at 96:20). Elsewhere in Drummond's response, Drummond states that Feist has not attended any of the 22 depositions, except his own, and none of the Court hearings held in relation to this matter (Doc. 164-21, at ¶ 4). Feist states that he has not attempted to speak to, or otherwise communicate with, the residents about the lawsuit or their views of the issues (Doc. 155-2, at 2–219; Doc. 162-2, at 94:4–10).

Contrary to Drummond's contentions, Feist's interests are not fundamentally averse to the opposing residents. A disqualifying conflict would exist where the named representative's and the other class member's motivations

and economic interests differ significantly. In *Pickett,* for example, the appellate court reversed the district court decision granting class certification to plaintiffs where the class definition included cattle producers who claimed to have been harmed by contracts and marketing agreements that some of the unnamed members of the class had benefitted from, reasoning that "a class cannot be certified when its members have opposing interests or when it consists of members who benefit from the same acts alleged to be harmful to other members of the class." 🚩 *Pickett v. Iowa Beef Processors,* 209 F.3d 1276, 1280 (11th Cir. 2000). Even though the class definition presently may include potential class members who did not suffer harm from Drummond as outlined in the foregoing, Feist does not "claim to have been harmed by the same conduct that *benefitted*" those other members of the class. *See also* 🚩 *Valley Drug Co.*, 350 F.3d at 1189–90 (emphasis added).

**\*23** Disagreement and personal conflict over whether to pursue such claims are similarly unavailing. While Feist may have "lost friends" over the course of this litigation, a "conflict" for these purposes is not simply that the named plaintiffs and class members do not get along or disagree. *See Groover v. Michelin N. Am., Inc.,* 192 F.R.D. 305, 306 (M.D. Ala. 2000) ("The fact that some class members may be satisfied with the welfare benefits they are currently receiving, notwithstanding any alleged contractual violation, and would prefer to maintain the status quo and leave violations of their rights, if violations exist, unremedied is not dispositive under 🚩 Rule 23(a)."). To the extent these residents fear that they will be harmed financially by stigmatizing their neighborhood as a "contaminated site" by pursuit of this litigation, this harm has already likely been done to some extent by the initial filing of the case. In essence, the "cat is out of the bag." Moreover, news of the alleged contamination is the damaging factor, not Feist's pursuit of the litigation. And even if the litigation caused the diminution of property values by lending credence to Feist's claims, it cannot be said that his continued pursuit of this litigation is antagonistic or in substantial conflict with the rest of the class.

Finally, Feist and his counsel will adequately prosecute the action. Though Drummond criticizes Feist for not attempting to communicate with other residents about the suit and for not attending any deposition beyond his own, Feist has cooperated in discovery and attended his own deposition where he answered counsel's questions and described the nature of the claims without issue (Doc. 162-2, at 115:3–17).

*Jerue v. Drummond Company, Inc.*, Not Reported in Fed. Supp. (2023)

2023 WL 6810603

Case 1:21-cv-00179-KJM-BAM   Document 167-8   Filed 11/26/24   Page 144 of 216

Feist has also retained counsel who are qualified to pursue this class action. Further, Drummond does not challenge the qualifications of Plaintiff's counsel.

Accordingly, the undersigned finds that there are no substantial conflicts of interest between Feist and other potential class members, and that Feist and his counsel will adequately prosecute the action. *Busby,* 513 F.3d at 1323.

### 3. Certification pursuant to Rule 23(b)(3)

As noted above, Feist asserts that the putative class also meets the requirements under Rule 23(b)(3) for property damages and cost of remediation. Specifically, Feist contends that the putative class satisfies the requirements regarding predominance of common issues and superiority of the class action to other means of litigation. Fed. R. Civ. P. 23(b)(3).

#### a. Predominance

"[P]redominance ... is perhaps the central and overriding prerequisite for a Rule 23(b)(3) class." *Vega,* 564 F.3d at 1278 (citation omitted). To satisfy the predominance requirement, the moving party must demonstrate that the issues in the class action subject to generalized proof, and therefore applicable to the class, predominate over the issues subject only to individualized proof. *Babineau v. Fed. Exp. Corp.,* 576 F.3d 1183, 1191 (11th Cir. 2009); *Jackson v. Motel 6 Multipurpose, Inc.,* 130 F.3d 999, 1005 (11th Cir. 1997) (citations omitted). "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods.,* 521 U.S. at 623. The predominance inquiry thus focuses upon the legal or factual questions that qualify each class member's case as a genuine controversy and, therefore, is a far more demanding requirement than the commonality requirement under Rule 23(a). *Jackson,* 130 F.3d at 1005; *see Vega,* 564 F.3d at 1270. Predominance requires more than just the presence of common issues. The common issues must outweigh and predominate over any individualized issues involved in the litigation. *Muzuco v. Re$ubmitIt, LLC,* 297

F.R.D. 504, 518 (S.D. Fla. 2013). Common issues of fact and law will predominate where they directly impact every class member's effort to establish liability and every class member's entitlement to monetary relief. *Babineau,* 576 F.3d at 1191. If, practically speaking, the resolution of an overarching common issue breaks down into an unmanageable variety of individual legal and factual issues, common issues will not predominate. *Id.*

To determine whether a party satisfies the requirement of predominance, a court must first identify the parties' claims and defenses and their elements and then classify the issues as either common questions or individual questions by predicting how the parties will prove them at trial. *Brown,* 817 F.3d at 1234; *see Babineau,* 576 F.3d at 1191 (indicating that courts conducting a predominance inquiry must examine the claims, defenses, relevant facts, and applicable substantive law to determine the degree to which resolution of the class-wide issues will further each individual class member's claim against the defendant). In this context, an individual question asks whether members of the proposed class will need to present evidence that varies from member to member, whereas a common question asks whether the same evidence will suffice for each member to establish a *prima facie* showing or whether the issue is susceptible to generalized class-wide proof. *Tyson Foods,* 577 U.S. at 453. Importantly, the "[w]hen one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Id.* at 453–54 (citation and internal quotation marks omitted). If, however, plaintiffs must still introduce a great deal of individualized proof or argue several legal points to establish most or all of the elements of their individualized claims after adjudication of the class-wide issues, such claims do not warrant class certification under Rule 23(b)(3). *Vega,* 564 F.3d at 1270 (quoting *Klay,* 382 F.3d at 1255). Where common issues predominate over individualized issues, the addition or subtraction of any of the plaintiffs to or from the class should not substantially affect the substance or quantity of evidence offered. *Vega,* 564 F.3d at 1260 (quoting *Klay,* 382 F.3d at 1255). Stated differently, individual issues will be deemed important if the addition of more plaintiffs to a class requires the presentation

*Jerue v. Drummond Company, Inc.*, Not Reported in Fed. Supp. (2023)

2023 WL 6610603

Case 1:21-cv-00179-KJM-BAM   Document 167-8   Filed 11/26/24   Page 145 of 216

of significant amounts of new evidence, while, on the other hand, common issues will be deemed to predominate if the addition of more plaintiffs leaves the quantum of evidence introduced by the plaintiffs relatively undisturbed. *Vega*, 564 F.3d at 1260 (quoting *Klay*, 382 F.3d at 1255). Simply put, the same evidence will suffice for each member for common questions, but evidence will vary from member to member for individual questions. *Brown*, 817 F.3d at 1234.

**\*24** As already stated, the predominance determination includes questions relating to damages. *See Tyson Foods*, 577 U.S. at 453–54; *Amgen*, 568 U.S. at 460. However, "the presence of individualized damages issues does not prevent a finding that the common issues in the case predominate." *Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir. 2003). Instead, individual damages issues predominate "if computing them will be so complex, fact-specific, and difficult that the burden on the court system would be simply intolerable" or if "significant individualized questions go[ ] to liability." *Brown*, 817 F.3d at 1240 (quotations omitted). "Individualized damages issues are ... least likely to defeat predominance where damages can be computed according to some formula, statistical analysis, or other easy or essentially mechanical methods." *Sacred Heart Health Sys., Inc. v. Humana Mil. Healthcare Servs., Inc.*, 601 F.3d 1159, 1179 (11th Cir. 2010) (internal quotation marks and citation omitted). At the class-certification stage, "a model purporting to serve as evidence of damages ... must measure only those damages attributable to" plaintiffs' theory of liability in the case. *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). "And for purposes of Rule 23, courts must conduct a rigorous analysis to determine whether that is so." *Id.* (quotation omitted). As such, a court must not only evaluate whether a damages calculation "provide[s] a method to measure and quantify damages on a class wide basis," but also whether such a methodology constitutes "a just and reasonable inference" or whether it is "speculative." *Id.* Finally, in the analysis of a damages methodology based on averages, the focus is on "whether the sample at issue could have been used to establish liability in an individual action." *Tyson Foods*, 577 U.S. at 458.

Feist attempts to prove his case—and those on whose behalf he brings this action—by showing the Class Area is *entirely* afflicted by radioactive pollution. Feist's core theory of the case is that Drummond mined the land on which the Class Area sits and spread the radioactive wastes back into the stripped mine before developing the property, resulting in a somewhat uniform distribution of radioactive materials across the Class Area. Feist supports the theory that the entire Class Area is afflicted by radioactive pollution with "hundreds of thousands of actual measurements ... based on reliable methods, robust scientific and statistical proof" as well as "Drummond's own stated goal ... to achieve 'an average or uniform value' of 'radiation materials' 'over the entire site.' " (Doc. 165, at 9 (citing Doc. 147-1, at 20)). [15] Thus, were this case to proceed to a trial, Feist would attempt to prove Drummond's liability on the claims with *class wide* evidence. Said differently, Feist anticipates that he would ask the trier of fact to decide whether the Class Area is *entirely* contaminated beyond a legal threshold, or it is *entirely not* contaminated beyond a legal threshold based on Drummond's conduct toward the entire class. To put it broadly, under Feist's theory, the entire class would rise or fall together.

Drummond, on the other hand, does not view the case so generally. Drummond contends that the case would require individual inquiries into the levels of radiation at each individual's property to determine questions of dose. However, if the class were to be certified and tried as a class, Feist will either succeed by convincing the trier of fact that the whole Class Area is contaminated above a threshold or will fail because he cannot show the entire class is contaminated. Drummond does not cite any case law indicating Feist, as a matter of law, cannot prove his claim in this manner.

Drummond lists sixteen issues that it contends predominate over the common questions (Doc. 155, at 26–32). [16] Upon review, Drummond's sixteen issues related to predominance are mostly misguided. The following issues are merits questions that go to Feist's measurements of radiation:

**\*25** 1. Feist does not have harmful levels of radiation in his condo. Ex. 2, Opinions 1, 2 and § XIV, pp. 35-37. He rents his condo to a tenant. Feist's low levels illustrate the need for individual testing of each residence and negates the value of surveys or "averages."

2. Generic evidence or "averages" cannot prove individual radiation levels on any specific property or for any specific individual. Even Feist's alleged "adjusted" RadEye readings vary from 7 ur/hr. to 56 ur/hr. This is a substantial variation that requires individual testing of each location and dose assessment of each resident. Ex. 2. Drummond

disputes Feist's "adjustments" and will insist on individual testing as critical to determine dose under the Florida standards.

...

4. Plaintiff's radiation surveys only cover outdoor yards from 27 residences, not indoors. Ex. 47, pp. 61-63. Feist effectively acknowledges that indoor areas are shielded – which is critical since residents spend the vast majority of their time indoors. The EPA estimates that "Americans, on average, spend approximately 90 percent of their time indoors." Ex 52. Even outdoor activity in this Development is likely to be on a shielded surface such as an enclosed pool/patio area, garage, driveway, sidewalk, or street. Ex. 28. In addition, residents in this Development do not have vegetable gardens, grow their own food, or ingest soil, as Feist has incorrectly assumed in calculating averages under RESRAD. Id. Away from home, residents spend time at work, shopping, travelling, recreation, socializing, appointments, and other activities, which affect the amount of time spent in the Development and create potential exposure and dose from other sources. Ex. 28. Thus, each resident will have unique and different circumstances.

(Doc. 155, at 26–27). However, these issues raised by Drummond do not directly affect the predominance inquiry as it relates to liability. As discussed extensively at the hearing, Florida law does not require specific measurements to prove liability under chapter 376 or under Feist's negligence claim. See ⚑ *Adinolfe*, 768 F.3d at 1175 ("[The p]laintiffs here have alleged that [the defendants] contaminated their property, thereby causing their property values to decline. This alleged injury fits within the broad statutory definition of 'loss' or 'destruction,' even if the plaintiffs have not alleged contamination above the regulatory standard."). Accordingly, it is a jury question as to the applicable threshold beyond which liability lies. Drummond has produced no authorities to the effect that as a matter of law Feist is prevented from choosing to pursue his claim on a class wide basis. Moreover, Drummond's statement that "[g]eneric evidence or 'averages' cannot prove individual radiation levels on any specific property or for any specific individual" is incorrect as a matter of law. Indeed, the Supreme Court has permitted the use of averages to measure class wide damages in some circumstances, explaining that "[w]hether a representative sample may be used to establish class wide liability will depend on the purpose for which the sample is being introduced and on the underlying cause of action."

⚑ *Tyson Foods*, 577 U.S. at 460. Not only does chapter 376 not require contamination beyond a certain threshold, it also does not prescribe any particular methodology for quantifying contamination. Chapter 376 requires the contamination merely be "in quantities which are or may be potentially harmful or injurious to human health or welfare, animal or plant life, or property or which may unreasonably interfere with the enjoyment of life or property, including outdoor recreation." Fla. Stat. § 376.031(17). Discussion of the propriety of the methods by which radiation levels are measured is superfluous. Drummond's arguments merely cast shade on the persuasiveness of the measurements taken to support Feist's claim.

**\*26** The following additional issues raised by Drummond are primarily issues which go to the merits of Feist's damages claims as opposed to predominance:

> 7. Feist has not shown any diminished property value attributable to former mining and reclamation. Property values have increased (not decreased) since this case was filed in 2017, and will need to be evaluated by individual appraisals or actual sales transactions, not "Trial by Formula," which has been rejected by the Supreme Court. ⚑ *Wal-Mart*, 564 U.S. at 368. Ex. 5, Opinions 89-110; pp. 23-29. Home buyers have individual preferences that are unique and variable. Some may prefer location, gated community, access to shopping, recreation facilities, and so forth. Living in a community with fully reclaimed phosphate land may play no role in property values. Exs. 1, 28. Research conducted by Feist's expert (not in this Development) shows that the impact of alleged contamination can be zero, positive, negative, or temporary. Ex. 48, pp. 39, 45, 51,82.

(Doc. 155, at 28–29). Again, these issues raised by Drummond do not go to demonstrating individualized issues predominate but rather the merits of Feist's and the class

Jerue v. Drummond Company, Inc., Not Reported in Fed. Supp. (2023)
2023 WL 6610603

Case 1:21-cv-00179-KJM-BAM   Document 167-8   Filed 11/26/24   Page 147 of 216

members' purported damages. Moreover, the variables that may affect property values have been analyzed above in the context of the *Daubert* motion. To the extent there are individualized issues in the damages context, Feist's challenges with class wide damages calculation will be analyzed at length below.

Further, these following issues raised by Drummond each pertain to its affirmative defenses:

8. In addition, there have been numerous residential sale transactions after these claims were publicized in March, 2017. Ex. 5, Opinions 89 - 110. These purchasers were on notice of Feist's highly publicized claims and purchased anyway. In addition, purchasers prior to 2017 were on notice of the "well documented "presence and location of naturally occurring radiation ("NORM") in phosphate, including the Development. Ex. 43, p. 2. This knowledge supports Drummond's defenses of assumption of risk, comparative negligence, ratification, and consent that will apply individually to potential class members.

...

13. Public record information has been available for decades regarding the Development. Exs. 28, 34, 35, 36, 55. Indeed, much of Feist's case is built on 40-year old public records readily available to individual [sic]. Individual review of limitations issues is required under Florida's four year statute of limitations applicable to the alleged class claims. 🚩 Fla. Stat. § 95.11(3).

...

15. Potential class members who purchased from Drummond have enforceable mandatory arbitration provisions and class action waivers, which require individual adjudication. Ex. 28.

(Doc. 155, at 29, 31). These affirmative defenses do not cause individualized predominance issues that would preclude certification. The general rule is that "[c]ourts traditionally have been reluctant to deny class action status under 🚩 Rule 23(b)(3) simply because affirmative defenses may be available against individual members." 🚩 *Brown,* 817 F.3d at 1240–41 (quoting Newberg on Class Actions § 4:55) (quotations omitted). Like damages, affirmative defenses are often easy to resolve and district courts have several tools available to manage them. *See* 🚩 *Waste Mgmt. Holdings,*

*Inc. v. Mowbray,* 208 F.3d 288, 297 (1st Cir. 2000). At this stage, Drummond's argument that the knowledge of each class member would overwhelm the litigation is unpersuasive, at least as to the Property Class. Furthermore, the issue of statute of limitations has already been decided on a motion to dismiss (Doc. 34, at 13–4).

**\*27** Finally, Drummond argues it did not mine the land where Feist's condo is located:

> 3. Neither Drummond nor Poseidon mined the land where Feist's condo is located or discharged pollution on the site. This defeats Feist's claim for a discharge of pollution under 🚩 Fla. Stat. § 376.313. Poseidon only engaged in secondary recovery, and only on 14.4% of the 1,450 acres of the Development. The location of secondary recovery by Drummond (and any impact, if at all) must be determined on an individual property basis. Ex. 27.

(Doc. 155, at 27). 🚩 Section 376.313(3) provides that "in any such suit, it is not necessary for such person to plead or prove negligence in any form or manner. Such person need only plead and prove the fact of the prohibited discharge or other pollutive condition and that it has occurred." 🚩 Fla. Stat. § 376.313(3). Thus, chapter 376 does not require that Drummond have caused the condition of pollution. 🚩 *Aramark,* 894 So. 2d at 24 ("[S]ection 376.313(3) departs from the common law by creating a damages remedy for the non-negligent discharge of pollution without proof that the defendant caused it."). Accordingly, there would be no individual issues to consider because Drummond's location of mining is immaterial, at least as to the chapter 376 claim. [17]

On this theory of liability, at first blush, Feist presents a compelling case that no individualized issues predominate to a level that should preclude class certification as to the Property Class. [18] However, as detailed above, Feist's class definition makes Feist's Property Class unworkable. Worse, Feist's overbroad class definition as well as Feist's own experts, Dr. Zabel and Dr. Bland, illuminate the numerous

individual inquiries that would be inherent to the Property Class. Fundamentally, the class suffers from inclusion of members in substantially different positions necessitating individualized inquiries to sort out damages and standing. While Feist's general approach as to liability may be sound, the practical application of Feist's pleadings bely certification.

First, the class may be predominated by standing inquiries. While the undersigned has recommended the court find the named plaintiff, Feist, has standing, the question of whether potential class members have standing has not been addressed. The question of individual class members' standing is not one that necessarily must be answered at the certification stage; indeed, the Supreme Court recently declined to answer that question. *TransUnion*, 141 S. Ct. at 2207–08, 2208 n.4 ("We do not here address the distinct question whether every class member must demonstrate standing before a court certifies a class. *See, e.g.*, *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1277 (CA11 2019)."). While class members may not be required to establish standing at the certification stage, "[e]very class member must have Article III standing in order to recover individual damages." *TransUnion*, 141 S. Ct. at 2207–08. Important to this case, "standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *Id.* at 2207 (citations omitted); *see* *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008); *Friends of the Earth*, 528 U.S. at 185. Whether absent class members can establish standing instead may be relevant to the class certification analysis required by Rule 23. *See* *Williams*, 568 F.3d at 1358; *see also* 1 William B. Rubenstein, Newberg on Class Actions § 2:3 (5th ed. 2016) ("Most courts concerned about the standing of absent class members are in fact concerned about whether the class is properly defined .... In this sense, the problem of un-injured absent class members is a problem of Rule 23, not of Article III."). The Eleventh Circuit in *Cordoba* held that a "district court must consider under Rule 23(b)(3) before certification whether the individualized issue of standing will predominate over the common issues in the case, when it appears that a large portion of the class does not have standing ... and making that determination for these members of the class will require individualized inquiries." *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1277 (11th Cir. 2019).

**\*28** As discussed in the context of Feist's Property Class definition, regardless of the way in which the court resolves the definition's vagueness issues, it inevitably includes property owners who are *by definition* not injured under one of Feist's requested forms of relief. Under one interpretation, the class includes members who have not suffered an injury that is redressable by an award of property damages because they benefited from the alleged reduced purchase price of the property post-filing of the case. Under the other interpretation, the class includes members who have since sold their property and no longer own property damaged by Drummond and thus, have not suffered an injury redressable by remediation. It is of course true that "the presence of individualized damages issues does not prevent a finding that the common issues in the case predominate." *Allapattah*, 333 F.3d at 1261. However, individualized damages issues will predominate if "significant individualized questions go[ ] to liability." *Brown*, 817 F.3d at 1240 (internal quotation marks omitted) (citing *Klay*, 382 F.3d at 1260). The undersigned does not purport to recommend any definitive holdings regarding these hypothetical persons' standing or ability to prove damages. However, while class members may not be required to establish standing at the certification stage, every class member must eventually have Article III standing in order to recover individual damages, *TransUnion*, 141 S. Ct. at 2207–08, and each class member will have to show standing for each form of relief, property damages and remediation. *TransUnion*, 141 S. Ct. at 2207; *Davis*, 554 U.S., at 734, 128 S.Ct. 2759; *Friends of the Earth*, 528 U.S. at 185. It is apparent that individual inquiries will be required to sort out these matters in relation to Rule 23.[19] Moreover, these inquiries are wrapped up in questions of liability in the sense that standing is a jurisdictional issue that must be established at every stage of litigation. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (stating a plaintiff must demonstrate standing "with the manner and degree of evidence required at the successive stages of the litigation").

Furthermore, Feist's class certification is not saved by his proposed class wide damages methodologies; in fact, the proposed methodologies highlight the individualized inquiries that would be intrinsic to Feist's class. Feist provided the Court with a proposed common methodology for calculating (1) property damages based on Dr. Zabel's

Jerue v. Drummond Company, Inc., Not Reported in Fed. Supp. (2023)

2023 WL 6810603

Case 1:21-cv-00179-KJM-BAM   Document 167-8   Filed 11/26/24   Page 149 of 216

hedonic regression model and (2) remediation based on Dr. Bland's report. This, without more, would tend to show that individualized issues are less likely to predominate. *See Sacred Heart Health Sys.*, 601 F.3d at 1179. However, as noted in the *Daubert* analysis, Dr. Zabel's report is unhelpful to the trier of fact because it fails to explain how each class member's damages would be actually calculated and is therefore disconnected to the inquiry before the Court. Even if the Court were to deny the *Daubert* motion and accept the expert opinion into evidence, the report would not allow Feist to make the proper showing for the same reason it is unhelpful under *Daubert*: the report stops short of showing how damages would actually be allocated class wide. Thus, because Dr. Zabel's opinion is silent as to how the class members' properties would be valued, it seems that an individualized inquiry must be undertaken as to each of the 1000 properties contained in the proposed class. Feist himself acknowledges that were the Court be required to undergo these individualized inquiries "it would inevitably cause undue burden and expense on the litigants by requiring 1,000 separate property evaluations" (Doc. 181, at 20 n.7). The undersigned agrees.

Feist's remediation damages theory is similarly deficient. Feist relies predominantly on Dr. Bland's theory that remediation is required "class wide" based on the as low as reasonably achievable (ALARA) philosophy (Doc. 142, at 14). Dr. Bland states that "[g]iven the current residential use and the potential for any future unrestricted use, remediation of the Class Area is required" (Doc. 142-7, at 7). There is "widespread contamination across the class area" so such remediation, Dr. Bland states, "should be undertaken across the class area" (Doc. 142-7, at 6). Drummond's rebuttal expert, Dr. Mark Travers explained that "the determination of whether a parcel of real estate, in this case a residential lot, needs remediation is based on data collected from each individual parcel" (Doc. 159-2, at 9). Further, Dr. Bland acknowledges in his deposition that remediation may require a "property-by-property evaluation" and, if undertaken, it is very likely some properties would not require remediation at all (Doc. 164-12, at 253:2–11, 256:12–24). [20]

**\*29** As concluded above, Feist's property class must fail because it is inadequately defined. [21] The vague definition, in turn, creates uncertainty as to the nature and amount of individualized inquiries that must be addressed, and thus leaves uncertain whether the individualized inquiries

predominate. However, the class also suffers from significant predominance challenges.

### b. Superiority

For the final part of the analysis, Feist must establish that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Fed. R. Civ. P. 23(b)(3). The superiority analysis focuses upon the relative advantages of proceeding as a class action suit over any other forms of litigation that might be realistically available to a moving party. *Sacred Heart Health Sys.*, 601 F.3d at 1183–84. As noted, in determining the superiority of the class action, the court may consider (1) the class members' interests in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3)(A)–(D).

In this inquiry, the district court should consider its predominance analysis in determining whether a class action provides the superior mechanism for adjudicating the claims, as a finding of predominance of common issues tends to indicate superiority while a lack of predominance effectively ensures a lack of superiority. *Sacred Heart Health Sys.*, 601 F.3d at 1184 ("[T]he predominance analysis has a tremendous impact on the superiority analysis for the simple reason that, the more common issues predominate over individual issues, the more desirable a class action lawsuit will be as a vehicle for adjudicating the plaintiffs' claims both relative to other forms of litigation such as joinder or consolidation, and in absolute terms of manageability.") (internal quotations, internal citations, and internal alterations omitted); *Vega*, 564 F.3d at 1278 n.18 (noting that a lack of predominance effectively ensures, as a substantive matter, a lack of superiority); *Jackson*, 130 F.3d at 1006 n.12 ("The predominance and efficiency criteria are of course intertwined. When there are predominant issues of law or fact, resolution of those issues in one proceeding efficiently resolves those issues with regard to all claimants in the class.").

*Jerue v. Drummond Company, Inc.*, Not Reported in Fed. Supp. (2023)

2023 WL 6610603

Case 1:21-cv-00179-KJM-BAM   Document 167-8   Filed 11/26/24   Page 150 of 216

Accordingly, in light of the above-described concerns over the potential individualized issues, it is unclear whether the class procedure is superior to other methods of adjudication.

*See Clausnitzer v. Fed. Express Corp.*, 248 F.R.D. 647, 662 (S.D. Fla. 2008) ("In light of the determination that individual issues of law and fact predominate over issues common among class members, the class procedure is not superior to other methods of adjudication."). Notably, it is reasonable to anticipate that the problematic individualized inquires could manifest into difficulties in the administrative feasibility of managing a class action here. Administrative feasibility is relevant to Rule 23(b)(3)(D)'s "manageability" factor. *Cherry*, 986 F.3d at 1301–04. [22] If the property class were to be certified, it would be difficult to identify who is even a member of the class given the vagueness of the definition and the lack of a clear trigger date, and it will be cumbersome to complete the final calculation of the property values for each of the alleged 1,000 properties at issue. Such considerations are important in considering administrative feasibility because "[a] difficulty in identifying class members is a difficulty in managing a class action." *Cherry*, 986 F.3d at 1303–04 (citing *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1126 (9th Cir. 2017)).

### 4. Certification pursuant to Rule 23(b)(2)

**\*30**  As to the actual remediation portion of the Property Class and the Medical Monitoring Class, Feist asserts class certification should be granted pursuant to Rule 23(b)(2). Under subsection 23(b)(2), class certification is appropriate where "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief ... with respect to the class as a whole." Fed.R.Civ.P. 23(b)(2). As with classes certified under Rule 23(b)(3), a class certified pursuant to Rule 23(b)(2) must be adequately defined and clearly ascertainable as well as meet the requirements of Rule 23(a). Although this rule does not have the same superiority and predominance requirement of Rule 23(b)(3), the class proponent must still demonstrate that the claims are cohesive. *See Barnes v. American Tobacco Co.*, 161 F.3d 127, 143 (3d Cir. 1998).

"Injuries remedied through (b)(2) actions are really group, as opposed to individual injuries. The members of a (b)(2) class are generally bound together through 'preexisting or continuing legal relationships' or by some significant common trait such as race or gender." *Holmes v. Continental Can Company*, 706 F.2d 1144, 1155 (11th Cir. 1983) (quoting Note, Notice in Rule 23(b)(2) Class Actions for Monetary Relief: Johnson v. General Motors Corp., 128 U.Pa.L.Rev. 1236, 1252–53 (1980) (footnotes omitted)). Thus, "[o]pting out of a (b)(2) suit for injunctive relief would have little practical value or effect. Even class members who opted out could not avoid the effects of the judgment. A (b)(2) injunction would enjoin all illegal action, and all class members would necessarily be affected by such broad relief." *Id.* Accordingly, the class claims under this subpart "may require more cohesiveness than a [ Rule 23](b)(3) claim ... because in a Rule 23](b)(2) action, unnamed members are bound by the action without the opportunity to opt out." *Id.* Thus, a court should be hesitant to grant certification on this ground when individual issues and disparate factual circumstances are likely to overwhelm any common issues.

*See Barnes*, 161 F.3d at 143.

Feist alleges that certification of the Property Class as to actual remediation is appropriate pursuant to Rule 23(b)(2) which governs injunctive relief. As already noted, Feist withdrew his claim for actual remediation at the hearing and chooses to pursue the cost of remediation alone. However, even if the claim for actual remediation were not withdrawn, certification of the property class pursuant to Rule 23(b)(2) for property remediation would be inappropriate. As already discussed, Feist's property class definition is inadequate. Further, the property class presents potential individual issues that may be challenging to overcome. Additionally, as Drummond notes, many potential class members oppose remediation of their property and class wide relief would not be possible without infringing on some potential class members' property rights. While Feist may not be inadequate to represent the class in this respect as to the Rule 23(b)(3) portions of the Property Class, this issue is particularly acute given the lack of an opt-out right in Rule 23(b)(2) classes. However, because Feist abandoned this form of relief, the court need not address the merits.

Ultimately, the undersigned finds Feist's Property Class must fail for an inadequate class definition, which also creates

Jerue v. Drummond Company, Inc., Not Reported in Fed. Supp. (2023)
2023 WL 6810603

Case 1:21-cv-00179-KJM-BAM   Document 167-8   Filed 11/26/24   Page 151 of 216

uncertainty in clearly determining the predominance and superiority considerations. Thus, it is recommended that the Court not certify the Property Class.

### C. Medical Monitoring Class

As it pertains to Feist's Count V (medical monitoring), Feist seeks to certify the following class:

> **Medical Monitoring Class**: All persons who have lived in the [Class Area] for more than three cumulative years.[23]

**\*31**  (Doc. 142, at 17; Doc. 36, at ¶ 111). In support of his motion, Feist argues the classes should be certified pursuant to Fed. R. Civ. P. 23(b)(3) for injunctive relief in the form of a medical monitoring program (Doc. 142, at 8). Feist requests the Court exercise its "equitable powers to create, supervise, and implement" and for Drummond to fund "an appropriate medical monitoring plan" which would provide "routine medical testing, monitoring and study" of the class members for the remainder of each" class members' life (Doc. 36, at ¶ 175). Feist requests the program include:

> periodic physical examinations, clinical laboratory tests for appropriate biological markers, electrocardiograms, echocardiography, radionuclide cardiac imaging, CT Scans, MRI Scans, vascular ultra sound, lung perfusion scans, and biopsy and such other tests as to maximize the Plaintiffs and the Medical Monitoring Class Members' opportunity for early detection of such latent diseases, including cancer and thyroid disorders.

(Doc. 36, at ¶ 176).

To establish a claim for a medical monitoring fund, the plaintiffs must prove (1) exposure greater than the normal background levels; (2) to a proven hazardous substance; (3) caused by the defendant's negligence; (4) as a proximate result of the exposure, plaintiff has significantly increased risk of contracting a serious latent disease; (5) a monitoring procedure exists that makes the early detection of the disease possible; (6) the prescribed monitoring regime is different from that normally recommended in the absence of exposure; and (7) the prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.

See Petito v. A.H. Robins Co., 750 So. 2d 103 (Fla. Dist. Ct. App. 1999) (citing Barnes, 161 F.3d at 138–39).

Feist's paragraph 125 allegations mirror the elements of a Florida common law claim for medical monitoring:

a. Plaintiffs and the Medical Monitoring Class Members have each been exposed to toxic and hazardous substances, including radioactive materials, at levels greater than normal background, due to Defendants' negligence in reclaiming the land and in handling, storing, use, disposal and/or failure to properly remediate such toxic and hazardous substances.

b. The toxic and hazardous substances, including radioactive materials, at issue in this case are proven hazardous substances.

c. As a proximate result of the exposure to toxic and hazardous substances, including radioactive materials, Plaintiffs and the Medical Monitoring Class Members have a significantly increased risk of contracting serious latent diseases, including, without limitation, cancer.

d. The significant increased risk of contracting serious latent diseases, including, without limitation, cancer and thyroid diseases, makes periodic diagnostic medical examinations, testing and monitoring reasonable and necessary.

e. A monitoring procedure exists that makes early detection of these potential diseases possible.

f. The prescribed monitoring regiment is different from that normally recommended in the absence of exposure to toxic and hazardous substances.

Jerue v. Drummond Company, Inc., Not Reported in Fed. Supp. (2023)
2023 WL 6610603
Case 1:21-cv-00179-KJM-BAM   Document 167-8   Filed 11/26/24   Page 152 of 216

**\*32**  g. The prescribed monitoring regiment is reasonable and appropriate according to contemporary medical and scientific principles.

(Doc. 36, at ¶ 125). Feist argues that the medical monitoring class should be certified primarily on the theory that "[r]adiation exposure is unlike exposure to other pollutants because there is no safe exposure level, making radiation exposure especially dangerous" (Doc. 142, at 30). In other words, individual dosage inquiries would be unnecessary because "it is more likely than not that every individual living in the [Class Area] for more than two cumulative years has sufficiently increased risk necessitating medical monitoring" (Doc. 142, at 30). To support this theory, Feist cites to Mr. Bland who opined that the annual above-background dose to average residents in the Class Area is between 250 to 270 millirem (Doc. 143-2, at 30–31), which is more than six-times EPA limits and exceed Florida's much more lenient limit of 100 mrem per year (Doc. 142-7, at 6–7; Doc. 143-2, at 30–31). Feist also relied on Dr. Dean W. Felsher who opined that "anyone exposed to ionizing radiation above this significant risk level, is at significantly elevated risk for multiple forms of cancer, including leukemia and thyroid cancer" (Doc. 143-5, at 27).

First, some decisions classify medical monitoring costs as an item of damage, the traditional remedy at law, precluding Feist from certification under Rule 23(b)(2). *See* Ball v. Joy Technologies, Inc., 958 F.2d 36, 39 (4th Cir. 1991), cert. denied, 502 U.S. 1033(1992); *Hagerty v. L & L Marine Servs., Inc.*, 788 F.2d 315, 319 (5th Cir. 1986). Additionally, the relief that Feist seeks is arguably not a group remedy. The putative class is composed of thousands of individuals with individual medical needs. It is questionable whether a medical monitoring program in this context would serve the purposes of Rule 23(b)(2), a system designed to be applied in situations where, for example, an "injunction would enjoin all illegal action, and all class members would necessarily be affected by such broad relief." *Holmes*, 706 F.2d at 1155.

Setting these issues aside, Feist's medical monitoring class fails for lack of cohesiveness. In contrast to Feist's strict liability or negligence claims, for which Feist seeks property damages, a necessary element of proving liability on Feist's medical monitoring claim is *exposure*, namely, exposure to "greater than the normal background levels" of a "proven

hazardous substance." *Petito,* 750 So. 2d at 106. Feist's theory that individual dosage inquiries would be unnecessary does not meet this requirement. While it may well be true that "[r]adiation exposure is unlike exposure to other pollutants because there is no safe exposure level" (Doc. 142, at 30), each class member would still need to sufficiently demonstrate their own exposure to be successful on their claim. Even if a jury were to agree with Feist's theory, this showing would necessarily involve individual inquiry into the class member's presence in the Class Area for the requisite amount of time. Additionally, the remedy itself is not cohesive. Here, as in *Amchem Products, Inc. v. Windsor*, class members will "incur different medical expenses because their monitoring and treatment will depend on singular circumstances and individual medical histories." 521 U.S. 591, 624 (quotations and citations omitted). [24] Similarly, in *Barnes*, the court noted the many individual issues involved in determining whether a monitoring program is "different from that normally recommended in the absence of exposure" precluded a finding of cohesiveness under Rule 23(b)(2). *Barnes*, 161 F.3d at 146. [25]

**\*33**  Feist cites to two out-of-circuit district court decisions certifying classes under other states' medical monitoring common law claims: *Cook v. Rockwell Int'l Corp.*, 151 F.R.D. 378 (D. Colo. 1993), and *Yslava v. Hughes Aircraft Co.*, 845 F. Supp. 705 (D. Ariz. 1993). Not only are these cases not based on Florida claims or binding precedent, but they are also not persuasive. The court in *Cook* provides only 96 words on the issue of the individualized nature of each class member's claim, stating that "common evidence would be required to establish the level and nature of injury or disease ... and the causal connection, if any, between the release of the substances and any injuries or disease allegedly sustained." *Cook,* 151 F.R.D. at 388. The court concluded that "despite the fact that there would be some issues of individual proof, injunctive relief in the form of medical monitoring would seem appropriate to the class as a whole." *Id.* In *Ysalva*, the issue of cohesiveness is not considered at all. *See* *Yslava*, 845 F. Supp. at 713.

By contrast, none of the courts which have had occasion to consider such a class under the Florida common law medical monitoring claim have chosen to certify the class. For example, in *Rink v. Cheminova, Inc.*, this Court denied certification of a Florida medical monitoring class, reasoning

that "individualized considerations would so permeate the proof and thus work to alter and diminish the common questions that no finding of commonality is warranted." 203 F.R.D. 648, 661 (M.D. Fla. 2001). In particular, the court found the questions of (1) whether class members were exposed to greater than normal background levels and (2) whether a putative class member has a significantly increased risk of contracting a serious latent disease were individual inquiries. *Id.*; s*ee also* Zehel-Miller v. Astrazenaca Pharms.*, LP*, 223 F.R.D. 659 (M.D. Fla. 2004); *Perez v. Metabolife Int'l, Inc.*, 218 F.R.D. 262 (S.D. Fla. 2003) ("[V]arious individual factors will likely affect the level of medical monitoring, if any, that is appropriate for each specific individual.").

Accordingly, the undersigned finds Feist's Medical Monitoring Class fails for lack of cohesiveness and recommends the Court not certify this class.

### D. Fraud Class

Feist seeks certification pursuant to Fed. R. Civ. P. 23(b)(3) of a Fraud Class consisting of "All persons who purchased property in the Oakbridge or Grasslands Communities within 12-years of March 10, 2017" (Doc. 36, at ¶ 111). Within the Fraud Class, Feist asserts two counts: Count III (Fraud and Fraudulent Concealment) and Count IV (Negligent Misrepresentation) (Doc. 36, at 35, 39). While each of Feist's counts require proof of slightly different elements, the essential common thread between all three is a requirement that the class members prove that they relied on Drummond's fraudulent statements or omissions. [26]

**\*34** At the hearing on the motion for class certification, Feist's counsel recognized the difficulty of certifying a class based on allegations of fraud, noting that of the three classes he has put forth, the Fraud Class is the most difficult to certify. Indeed, Feist's motion for class certification gives short shrift to the Fraud Class, particularly as to the predominance inquiry. Feist summarily alleges that "[b]ecause the claim is based on an omission, as opposed to an affirmative misrepresentation, all class members are similarly affected, and class treatment is proper" (Doc. 142, at 25). In support, Feist cites to *Kluge v. Crews Lake Road & Bridge District*, No. 82 –933–CIV–T–15, 1985 U.S. Dist. LEXIS 22530 (M.D. Fla. 1985), a case in which the Middle District certified a

class based on this omissions theory. In that case, the court reasoned that because the primary issues "revolve around alleged omissions in standardized documents covering a bond issue... [t]he potential problem of having to demonstrate individual reliance for all individual class members has therefore been removed." *Id.* at \*2. Additionally, the court rejected the argument that individual reliance would need to be proven and therefore would create individualized issues because plaintiffs brought their claims "only upon the alleged omissions in standardized documents" and defendants did not present any evidence that "some of the bond purchasers did not receive the offering documents[.]" *Id.* at \*2–3.

*Kluge* seems to be the outlier. A decade later, another opinion in the Middle District of Florida rejected the *Kluge* rationale and refused to certify a class where the claims were based upon fraudulent omissions. *See* Butterworth v. Quick & Reilly, Inc.*, 171 F.R.D. 319 (M.D. Fla. 1997). The Second District Court of Appeals later agreed with the *Butterworth* case, holding that "[t]he fact that the instant case involves alleged omissions rather than misrepresentations is irrelevant to the issue of class certification." Humana, Inc. v. Castillo, 728 So. 2d 261, 265 (Fla. Dist. Ct. App. 1999). "Florida law imposes a reliance requirement in an omissions case, *which cannot be satisfied by assumptions*." *Id.* (emphasis added). More recently, the Florida Supreme Court explained that in the omission or concealment context, "[r]eliance means that a plaintiff has entered a transaction in whole or in part because of the defendant's fraudulent conduct" and requires the plaintiff to have "received, believed, and acted upon" a misrepresentation made by the defendant. *Prentice v. R.J. Reynolds Tobacco Co.*, 338 So. 3d 831, 838 (Fla. 2022) (citations and internal quotation marks omitted). Importantly, "there can be no reliance if the plaintiff is unaware of the defendant's misrepresentations until after the transaction is complete, or if the plaintiff would have acted the same way regardless of whether the defendant had made the misrepresentation." *Id.* (citation omitted).

Though Feist is required to prove reliance, that is not the end of the inquiry; in the Eleventh Circuit "the simple fact that reliance is an element in a cause of action is not an absolute bar to class certification." Klay, 382 F.3d at 1258. In *Kirkpatrick v. J.C. Bradford & Co.*, the plaintiffs sought class certification of their claim that various brokerage firms "disseminat[ed] materially misleading information" concerning the financial condition of a company in which the plaintiffs had purchased limited partnership interests. 827

Jerue v. Drummond Company, Inc., Not Reported in Fed. Supp. (2023)
2023 WL 6610603

Case 1:21-cv-00179-KJM-BAM   Document 167-8   Filed 11/26/24   Page 154 of 216

F.2d 718, 720 (11th Cir. 1987). The Eleventh Circuit held that "the mere presence of the factual issue of individual reliance could not render the claims unsuitable for class treatment" where "each of the complaints alleges a single conspiracy and fraudulent scheme against a large number of individuals...." *Id.* at 724–25 (quotation marks and citations omitted). In *Klay*, plaintiffs sought certification of a class to pursue federal mail and wire fraud claims where defendants repeatedly claimed they would reimburse the plaintiffs for medically necessary services they provide to the defendants' insureds. *Klay*, 382 F.3d at 1259. The Eleventh Circuit found that common issues predominated, despite the fact that the plaintiffs were required to prove reliance to succeed in their claims. *Id.* The Eleventh Circuit reasoned that the misrepresentations were "simply that the defendants repeatedly claimed they would reimburse the plaintiffs for medically necessary services ... and sent the plaintiffs various EOB forms claiming that they had actually paid the plaintiffs the proper amounts." *Id.* The Eleventh Circuit noted, "[i]t does not strain credulity to conclude that each plaintiff, in entering into contracts with the defendants, relied upon the defendants' representations and assumed they would be paid the amounts they were due." *Id.* Because a jury could reasonably draw such an inference from "the nature of the alleged misrepresentations," reliance could be shown through circumstantial evidence common to the entire class. *Id.*; *see also James D. Hinson Elec. Contracting Co. v. BellSouth Telecomms., Inc.*, 275 F.R.D. 638, 646 (M.D. Fla. 2011) (allowing common proof of reliance through circumstantial evidence where the nature of the alleged misrepresentation was defendant's inclusion of amounts on bills which it could not legally recover).

 **\*35**  However, where the reliance element is not as susceptible to common proof, courts have been unwilling to find that common questions still predominated. "[A] fraud case may be unsuited for treatment as a class action if there was material variation in the representations made or in the kinds of degrees of reliance by the persons to whom they were addressed." Fed.R.Civ.P. 23 advisory committee's note to the 1966 Amendment to subdivision (b)(3). When presented with such cases, "the Eleventh Circuit has repeatedly found class certification inappropriate." *In re Atlas Roofing Corp. Chalet Shingle Prod. Liab. Litig.*, No. 1:13-MD-2495-TWT, 2017 WL 2501755, at \*10 (N.D. Ga. 2017). Additionally, the Eleventh Circuit recently distinguished *Klay* on the basis that in *Klay* "we stressed that the transactional exchange between the physicians and the HMO hinged on the latter's payment

guarantees, which served as the 'heart of the[ ] agreements' and was the 'very consideration upon which those agreements are based.' " *Tershakovec v. Ford Motor Co., Inc.*, No. 22-10575, 2023 WL 4377585, at \*5 n.6 (11th Cir. 2023) (citations omitted). The court then reasoned that "[w]hile one who provides services in exchange for a payment guarantee relies only on the payment guarantee, a purchaser of a car may choose to rely on any of a number of marketing and branding representations." *Id.*

So too here. Feist alleges that "Drummond's failure to disclose the elevated levels of radiation blanketing the property forming the Oakbridge, Grasslands, and surrounding areas, despite knowledge of this contamination, constitutes fraud by omission" and without this, "Plaintiff Feist and the Fraud Class Members would not have purchased their property or continued to reside on this property to their detriment" (Doc. 36, at ¶ 155).[27] But "the decision to purchase real estate is a personal matter that may be based on a variety of factors." *Brinker v. Chicago Title Ins. Co.*, No. 8:10-CV-1199-T-27AEP, 2012 WL 1081182, at \*6 (M.D. Fla. Mar. 30, 2012) (distinguishing *Klay*, holding that "it cannot be concluded from each class member's decision to close that he or she relied on any omissions or misrepresentations of the closing agent"). Here, the class members made their own assessment when deciding to purchase homes in Oakbridge and Grasslands. The class members' knowledge of the alleged contamination may have differed. Moreover, potential purchasers may have weighed the alleged contamination differently. It may have precluded purchase for some; for others, it may not have affected their consideration of the home. At any rate, it cannot be said that this omission went to "the 'heart of the[ ] agreements' and was the 'very consideration upon which those agreements are based.' " *Tershakovec*, 2023 WL 4377585 at \*5 n.6. Unlike in *Klay*, the class will need to prove reliance through individual evidence. Thus, the undersigned finds that individualized issues will predominate with regard to the Feist's two fraud counts and recommends that Fraud Class not be certified.

### IV. Recommendation

For the foregoing reasons, it is hereby

RECOMMENDED:

1. Feist's Motion to Certify Class (Doc. 142) be DENIED.

*Jerue v. Drummond Company, Inc.*, Not Reported in Fed. Supp. (2023)

2023 WL 6610603

Case 1:21-cv-00179-KJM-BAM   Document 167-8   Filed 11/26/24   Page 155 of 216

2. Drummond's Motion for Miscellaneous Relief, specifically to Exclude the Opinions of Plaintiff's Expert Dr. Jeffrey E. Zabel (Doc. 170) be GRANTED.

IT IS SO REPORTED in Tampa, Florida, this 25th day of August, 2023.

### NOTICE TO PARTIES

A party has fourteen days from the date they are served a copy of this report to file written objections to this report's proposed findings and recommendations or to seek an extension of the fourteen-day deadline to file written objections. 28 U.S.C. § 636(b)(1)(C). A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. See 11th Cir. R. 3-1; 28 U.S.C. § 636(b)(1). **Should the parties wish to expedite the resolution of this matter, they may promptly file a joint notice of no objection.**

### All Citations

Not Reported in Fed. Supp., 2023 WL 6610603

---

### Footnotes

1    Initially, the case was brought by Jerue but Feist joined later with the filing of the Amended Complaint (Doc. 12). Eventually, the parties stipulated to the dismissal of Jerue as a named Plaintiff due to personal matters (*see* Docs. 121, 123). Plaintiffs moved to add additional class representatives, but the motion was denied (Docs. 110, 121). Accordingly, Feist is the sole remaining proposed class representative.

2    These matters were referred to the undersigned for issuance of a Report and Recommendation. *See* 28 U.S.C. § 636.

3    Drummond engaged in secondary recovery of previously mined phosphate land, meaning Drummond did not originally excavate the phosphate "matrix," but extracted phosphate from portions of the material remaining from previous mining operations before reclaiming the area (*see* Doc. 55, at ¶ 1). Drummond initially engaged in this mining through the Poseidon Mining Company with whom Drummond merged on March 31, 1984 (Doc. 36, at ¶ 35).

4    Unpublished opinions are not considered binding precedent but may be cited as persuasive authority. 11th Cir. R. 36-2.

5    This fact creates challenges with Dr. Zabel's report which the undersigned addresses in the below analysis. To preview, Dr. Zabel does not include any proposed methodology for applying the result of the hedonic regression model to the proposed class members. However, this issue is apart from that of qualifications as an expert. The fact remains that Dr. Zabel is not presenting evidence on appraisal values.

6    Drummond inadvertently failed to include a citation to the case (Doc. 170, at 12). Based on context, Drummond appears to be directly quoting from *Gates v. Rohm & Haas Co.*, 655 F.3d 255 (3d. Cir. 2011).

7    Feist asserts the medical monitoring class separately in his operative complaint pursuant to the Court's direction in its order regarding Drummond's second motion to dismiss (Doc. 34, at 33–4).

8    Feist explains that the Medical Monitoring Class definition has been modified to conform with his experts' opinions that all persons who have lived in the Class Area for more than three, not four, cumulative years require medical monitoring (Doc. 142, at 17 n.10).

Jerue v. Drummond Company, Inc., Not Reported in Fed. Supp. (2023)

2023 WL 6610603

Case 1:21-cv-00179-KJM-BAM   Document 167-8   Filed 11/26/24   Page 156 of 216

9   With respect to "a discharge," section 376.301(13) defines "[d]ischarge" broadly to include "any spilling, leaking, seeping, pouring, misapplying, emitting, emptying, releasing, or dumping of any pollutant or hazardous substance which occurs and which affects lands and the surface and ground waters of the state." Fla. Stat., § 376.301(13). As for the types of discharge of pollution covered by §§ 376.30–376.319, section 376.302(1)(a) provides that "[i]t shall be a violation of this chapter ... t]o discharge pollutants or hazardous substances into or upon the surface or ground waters of the state or lands, which discharge violates any departmental 'standard' as defined in [section] 403.803(13)." Fla. Stat. § 376.302(1)(a).

10  While ¶ 137 of the Second Amended Complaint alleges Drummond violated "Chapter 62-730, 62-777, 62-780, 62C-16, and/or 64E-5 of the Florida Administrative Code, Part II of Chapter 378, Florida Statutes, 40 C.F.R. § 6262.11, 42 U.S.C. § 6925(a), 40 C.F.R. Part 264, Subparts A-G, K, and CC, and/or 40 C.F.R. Part 268" these authorities are not DEP standards.

11  Judge Kovachevich was originally assigned to the case but the case was reassigned to Judge Barber in 2019 (Doc. 90).

12  The Eleventh Circuit also considered a similar issue in *Bussey* in the context of administrative feasibility. *See* Bussey v. Macon County Greyhound Park, Inc., 562 Fed.Appx. 782 (2014). Since *Bussey*, the Eleventh Circuit has held that "[p]roof of administrative feasibility cannot be a precondition for certification" nor is it an inherent aspect of ascertainability. Cherry, 986 F.3d at 1302, 1303. Though not a precondition for certification, considerations of administrative feasibility may still be relevant for the Rule 23(b)(3)(D) manageability analysis in the context of a predominance inquiry. *See* Rensel, 2 F.4th at 1361; Cherry, 986 F.3d at 1303–04.

13  This analysis differs from the question of standing for Feist himself because he still has a condominium ownership interest in the property. In this example, the hypothetical plaintiffs would no longer have any ownership interest in the property.

14  Traditionally, the inquiry would end with a finding that a class definition precludes certification. "Without an adequate class definition, a district court would be unable to evaluate whether a proposed class satisfies Rule 23(a)." Cherry, 986 F.3d at 1303. However, because this motion comes before the undersigned for a Report and Recommendation, it is necessary to analyze the remaining requisites of Rule 23.

15  Among these sources are Drummond's own surveys of radiation levels across the Class Area, submitted as part of its Application for Development Approval (Doc. 144-1, at 35 (showing no contours below 10 microrem/hr) and data from the Polk County Health Department ((*see* Doc. 146-1, at 3 (finding portions of the area unsuitable for residential development); Doc. 146-2, at 2–3 (finding radiation above background, averaging 18 uR/hr across the Class Area, and "that a significant number of the homes built on this property will probably have indoor radiation levels greater than the recommended Federal guidelines")).

16  Some issues raised by Drummond pertain to the fraud class (issue 10), the medical monitoring class (issues 5, 9, and 14), and the remediation request (issues 6, half of issue 7, and 11). Issue 12 concerns emotional distress, which Feist specifically waived at the hearing. Issue 16 does not concern predominance and is a mere summary of Drummond's arguments.

17  On the other hand, Feist's common law claim "requires proof that the defendant caused the pollution resulting in the damages." Aramark, 894 So. 2d at 23. However, Feist's theory of liability under negligence is instead that Drummond breached its duty by failing to adequately reclaim and restore its mining lands which caused

Jerue v. Drummond Company, Inc., Not Reported in Fed. Supp. (2023)

2023 WL 6610603

Case 1:21-cv-00179-KJM-BAM   Document 167-8   Filed 11/26/24   Page 157 of 216

Plaintiffs to suffer damages, not the mining itself, making the location of the mine again immaterial (*see* Doc. 36, at ¶¶ 15, 21, 30, 98–100, 138–39).

18   It should be noted that Feist's theory of liability is not without its challenges, as Drummond has asserted numerous defenses to Feist's theory of liability, to include the argument that the Florida Department of Health has disagreed with Feist's allegations of elevated levels of pollution and issued letters to residents to this effect, assuring residents that their particular home's levels were "in the range of normal Florida background" (*see generally* Doc. 164-1).

19   In *Cordoba*, as here, "[t]he record [did] not reveal much about the makeup of the [ ] class" and the court had no "indication of how many members of the ... putative class have standing to sue." *Cordoba*, 942 F.3d at 1277. Worse, the court cannot speculate given that the class definition lacks temporal constraints. In other words, the court would be unable to identify home sales after a certain point in time because that time has not been defined. As discussed already, the undersigned is disinclined to recommend the court engage in a *sua sponte* reworking of Feist's class definitions because this trigger date is a contested factual issue.

20   At the hearing, Feist abandoned his request for actual remediation damages, instead requesting only the cost of remediation. However, the inquiry as to predominance is not materially different. In the same way Feist fails to explain how he proposes to calculate remediation damages class wide, there is no information of record that speaks to Feist's proposed method of calculating the cost of remediation for each separate property.

21   In his motion, Feist also requests an issues class be certified in the alternative (Doc. 142, at 31–32). Because the property class fails for lack of ascertainability, Feist's alternative request for an issues class should also fail.

22   This inquiry is not a standalone requirement, rather the "court must weigh any manageability concerns against the advantages of proceeding as a class action." *Rensel*, 2 F.4th at 1369. It is unnecessary to weigh these concerns against the advantages of a class action given the undersigned has recommended the class not be certified based upon the class definition which is neither clearly defined or ascertainable.

23   Feist amends the years from four years in the operative complaint to three in his motion for certification (Doc. 142, at 17 n.10). Feist explains that the Medical Monitoring Class definition has been modified to conform with his experts' opinions that all persons who have lived in the Class Area for more than three cumulative years require medical monitoring (Doc. 142, at 17 n.10). Ultimately, it is irrelevant to the conclusions drawn in this report and recommendation.

24   Though *Amchem* was decided in the context of Rule 23(b)(3), class claims under Rule 23(b)(2) "may require more cohesiveness than a [Rule 23](b)(3) claim ... because in a Rule 23(b)(2) action, unnamed members are bound by the action without the opportunity to opt out." *Barnes*, 161 F.3d at 142–43.

25   Notably, the *Barnes* case involved a medical monitoring claim in Pennsylvania that required proof of the same seven elements recognized in Florida.

26   A claim for common law fraud in Florida requires proof of the following elements: "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and, (4) consequent injury by the party acting in reliance on the representation." *Jackson v. Shakespeare Foundation, Inc.*, 108 So. 3d 587, 587 n.2 (Fla. 2013). There are four elements of fraudulent misrepresentation: "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce

another to act on it; and (4) consequent injury by the party acting in reliance on the representation." 🚩*Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010). To state a claim for negligent misrepresentation, the plaintiff must allege: "(1) misrepresentation of a material fact; (2) the representor must either know of the misrepresentation, must make the representation without knowledge as to its truth or falsity, or must make the representation under circumstances in which he ought to have known of its falsity; (3) the representor must intend that the representation induce another to act on it; (4) injury must result to the party acting in justifiable reliance on the misrepresentation." 🚩*Atl. Nat. Bank of Fla. v. Vest*, 480 So. 2d 1328, 1331–32 (Fla. Dist. Ct. App. 1985).

27   Feist also alleges that Drummond's "affirmative statements of fact contained in its written marketing and promotional materials ... in sales conversations and negotiations with Plaintiff Feist and the Fraud Class Members, and the public, and in the March 22, 2017 Letter (attached as Ex. 1) constitute fraudulent misrepresentations" (Doc. 36, at ¶ 160). However, Feist's argument in support of certification is based on Drummond's alleged omission.

---

**End of Document**   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:21-cv-00179-KJM-BAM   Document 167-8   Filed 11/26/24   Page 159 of 216

Kaur v. Things Remembered, Inc., Not Reported in Fed. Supp. (2016)

2016 WL 11811049
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

Kiran KAUR, Plaintiff,

v.

THINGS REMEMBERED, INC.,
Defendant.

Case No. 14-cv-05544-VC
|
Signed April 19, 2016
|
Filed April 20, 2016

**Attorneys and Law Firms**

Jonathan Sing Lee, Katherine Ward Kehr, Stan Karas, Bevin Elaine Allen Pike, Robert Joseph Drexler, Jr., Capstone Law APC, Los Angeles, CA, Matthew Thomas Theriault, Clarkson Law Firm, P.C., Los Angeles, CA, Matthew Roland Bainer, The Bainer Law Firm, Oakland, CA, for Plaintiff.

Kimberly Lisa Gee, Marlene S. Muraco, Littler Mendelson, P.C., San Jose, CA, David P.R. Symes, Pro Hac Vice, Ogletree Deakins Law Firm, Portland, OR, Alexa L. Woerner, Littler Mendelson, Walnut Creek, CA, for Defendant.

**ORDER DENYING MOTION FOR CLASS CERTIFICATION**

Re: Dkt. No. 49

VINCE CHHABRIA, United States District Judge

**\*1** Kaur's motion for class certification is denied, because the lawyers for the plaintiff cannot be trusted to "prosecute the action vigorously" on the unnamed plaintiffs' behalf, *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998), and therefore can't be trusted to adequately represent the interests of the proposed class.

"In assessing whether class representatives and their counsel will vigorously prosecute a class action litigation, courts may consider the actual progress of the proceedings to that point." *Kandel v. Brother Int'l Corp.*, 264 F.R.D. 630, 634 (C.D. Cal. 2010). The lawyers for the named plaintiff, Kiran Kaur, have delayed to the extreme in conducting discovery. On December 21 – the day before the discovery cutoff – Kaur moved to continue this motion for class certification, citing a discovery dispute that had arisen at the beginning of September. Kaur's lawyers did not adequately explain why they waited almost four months to bring this discovery dispute to the Court's attention. Moreover, Kaur's lawyers did not actually move to compel responses to Kaur's discovery requests for another week. Kaur's lawyers apparently did not take a single deposition before the discovery cutoff.

The Court, reluctant to hold the failings of Kaur's lawyers against her, extended the discovery cutoff and the deadline for this class certification motion. But subsequent developments further indicate that Kaur's lawyers should not be trusted to represent a class of unnamed plaintiffs. Kaur's counsel agreed to let the defendant depose Kaur's co-plaintiff, Rebecca Lagassey, on January 21. In fact, however, Kaur's lawyers had lost track of Lagassey long before then. According to their January 26 case management statement, the lawyers had not communicated with Lagassey for "the last few months."[1] Despite knowing that Lagassey would not appear for her January 21 deposition, however, Kaur's lawyers did not even try to disclose this fact to the defendant until January 19. Moreover, when they belatedly sought to disclose this fact, Kaur's lawyers apparently buried it in a written filing addressed to one attorney who had left the defendant's firm and another who was on maternity leave. Counsel for the defendant thus only learned that Lagassey would not appear on January 20 – the day before her scheduled deposition.

And now, Kaur, through her lawyers, has moved to add a new named plaintiff to replace Lagassey. Kaur's lawyers filed the motion to add a new named plaintiff on the same day that they filed their motion for class certification, after the new deadline for the completion of discovery had passed (though the Court allowed the defendant to keep deposing witnesses until March 15, given the plaintiffs' earlier delays), and apparently without notifying the defendant of their desire to add a plaintiff at any point during the multi-month period after which they had lost Lagassey.

**\*2** "Delays in seeking class certification, a failure timely to prosecute the litigation," and unprofessional conduct during discovery "are factors that suggest that the class representative is inadequate." *Kandel*, 264 F.R.D. at 634. All three of these factors weigh in favor of a finding that Kaur's lawyers are inadequate. And even where all the other requirements of Rule 23 are satisfied, class treatment is inappropriate where the plaintiff's counsel is inadequate to represent the class. *See Ries v. Arizona Beverages USA LLC*, No. 10-cv-01139-RS, 2013 WL 1287416, at *9 (N.D.

Cal. Mar. 28, 2013). Accordingly, Kaur's motion for class certification is denied.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2016 WL 11811049

Footnotes

1   In a move that raises further concerns about their ability to portray basic facts accurately, Kaur's lawyers have since contradicted this statement, asserting that "[i]t was not until December, 2015, that [they] first became unable to contact" Lagassey. Dkt. No. 51-1 at ¶4. Even if that were true, however, it would not excuse the lawyers' conduct or alleviate the concern that they cannot be trusted to adequately represent a class of unnamed plaintiffs.

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## CENTRAL DIVISION
## LEXINGTON

| | |
|---|---|
| ELIZABETH NIBLOCK and ALA HASSAN, Individually and on behalf of those similarly situated, | CIVIL ACTION NO. 5:19-394-KKC |
| Plaintiffs, | |
| v. | FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| UNIVERSITY OF KENTUCKY, MITCH BARNHART, and ELI CAPILOUTO in their official capacities, | |
| Defendants. | |

**\*\*\* \*\*\* \*\*\***

Plaintiffs Elizabeth Niblock and those similarly situated allege that defendant University of Kentucky ("UK") has violated Title IX of the Education Amendments of 1972. (DE 72 Complaint ¶ 6.) Plaintiffs allege that the number of opportunities for women to participate in varsity sports at UK is not substantially proportionate to the percentage of women enrolled as students. (DE 72 Complaint ¶ 58.) Further, Plaintiffs allege that UK does not have a history or continuing practice of expanding intercollegiate athletic opportunities for female students to accommodate their existing or developing interests and abilities. (DE 72 Complaint ¶ 59.) Finally, Plaintiffs allege that UK has not fully and effectively satisfied the interests and abilities of female students in intercollegiate varsity athletic opportunities. (DE 72 Complaint ¶ 60.)

The Court conducted a three-day bench trial on the matter, at which it heard from nine witnesses and received over 100 exhibits, consisting of thousands of pages of evidence.

Case: 5:19-cv-00394-KKC-EBA   Doc #: 170   Filed: 10/28/24   Page: 2 of 31 - Page ID#:
3986
Case 1:21-cv-00179-KJM-BAM   Document 167-8   Filed 11/26/24   Page 162 of 216

The Court now issues its findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a)(1).

## I.      Title IX and the Three-Part Test

"Title IX prohibits sex discrimination under any education program or activity receiving federal funds." *Horner v. Kentucky High Sch. Athletic Ass'n*, 43 F.3d 265, 271 (6th Cir. 1994) (citing 20 U.S.C. § 1681(a)). The statute delegated to the Secretary of the Department of Health, Education, and Welfare ("HEW") responsibility for promulgating regulations implementing Title IX. 20 U.S.C. § 1682.

Title IX did not explicitly provide that it applies to athletic programs. In 1974, however, Congress enacted the Javits Amendment, which directed HEW to promulgate regulations implementing Title IX including "with respect to intercollegiate athletic activities reasonable provisions considering the nature of particular sports." *Equity In Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 95 (4th Cir. 2011) (quoting Education Amendments of 1974, Pub. L. No. 93-380, § 844 (1974)). The regulations require all educational institutions that accept federal funds and that operate or sponsor interscholastic, intercollegiate, club or intramural athletics to "provide equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41(c). This means that a recipient educational institution must provide "gender-blind equality of athletic opportunity to its students." *Horner*, 43 F.3d at 273. "[A]n institution must effectively accommodate the interests of both sexes in both the selection of the sports and the levels of competition, to the extent necessary to provide equal athletic opportunity." *Id.*

In 1979, Congress split HEW into the Department of Health and Human Services and the Department of Education ("DOE"). *Equity In Athletics,* 639 F.3d at 96 (citing 20 U.S.C. §§ 3401-3510, Pub. L. 96–88 (1979)). The DOE assumed HEW's functions regarding educational programs, including the administration of Title IX. *Id.*

There is no dispute that UK receives federal funding and is, therefore, subject to Title IX. (DE 155 Br. 8.) UK is a member of the National Collegiate Athletic Association ("NCAA"), participates as a Division 1 school, and is a member of the Southeastern Conference ("SEC"). (DE 155 Br. 8.) A varsity sport at UK is "recognized by the NCAA as a Division 1 scholarship-providing sport and recognized through a championship process." (DE 148 Tr. 78.) UK currently offers 25 varsity teams: 13 for women, ten for men, and two are co-ed. (DE 155 Br. 9; DE 156 Br. 8; Jt Ex. 70.) All UK's varsity teams except three compete in the SEC. The men's soccer team competes in the Sunbelt Conference, the coed rifle team competes in the Great American Rifle League, and the stunt team competes independent of a conference. (DE 148 Tr. 51.) Students at UK may also participate on club teams. These teams are not governed by the UK Athletic Department, and the Athletic Department does not provide club teams with any benefits or amenities. (DE 148 Tr. 77.) Varsity teams play at a higher level of competition than club teams. (DE 148 Tr. 78.)

The Title IX regulations set forth the following non-exhaustive list of factors relevant to determining whether a university like UK provides equal athletic opportunities for males and females:

(1) Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;
(2) The provision of equipment and supplies;
(3) Scheduling of games and practice time;
(4) Travel and per diem allowance;
(5) Opportunity to receive coaching and academic tutoring;
(6) Assignment and compensation of coaches and tutors;
(7) Provision of locker rooms, practice and competitive facilities;
(8) Provision of medical and training facilities and services;
(9) Provision of housing and dining facilities and services;
(10) Publicity.

34 C.F.R. § 106.41(c).

3

Case: 5:19-cv-00394-KKC-EBA   Doc #: 170   Filed: 10/28/24   Page: 4 of 31 - Page ID#:
3888
Case 1:21-cv-00179-KJM-BAM   Document 167-8   Filed 11/26/24   Page 164 of 216

Gender discrimination claims in college athletics fall into two categories based on the § 106.41(c) factors: effective accommodation claims focus on the first factor, and equal treatment claims focus on the other nine factors. *Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 92 (2d Cir. 2012); *Roberts v. Colorado State Bd. of Agric.*, 998 F.2d 824, 828 (10th Cir. 1993) ("Although § 106.41(c) goes on to list nine other factors that enter into a determination of equal opportunity in athletics, an institution may violate Title IX simply by failing to accommodate effectively the interests and abilities of student athletes of both sexes.")

Plaintiffs assert an effective accommodation claim against UK. In 1979, HEW issued a policy interpretation, providing a means to assess such a claim through a three-part test:

> (1) Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or
>
> (2) Where the members of one sex have been and are under-represented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or
>
> (3) Where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

1979 Policy Interpretation, 44 Fed. Reg. at 71,418 (Dec 11, 1979).

"The 1979 Policy Interpretation thus affords a school three safe harbors in defending against an effective accommodation claim under § 106.41(c)(1)." *Biediger*, 691 F.3d at 93. It provides universities with "three distinct opportunities to demonstrate that its sex-based treatment of athletes [is] not unlawful." *Id.* at 98. Each prong is "independently sufficient to defeat a claim of unlawful disparate treatment in accommodating athletic interests of both

4

male and female students." *Id*. Universities must comply with only one prong of the three-part test. *Mayerova v. E. Michigan Univ*., 346 F. Supp. 3d 983, 989 (E.D. Mich. 2018) (quoting Office for Civil Rights, U.S. Dep't of Educ., *Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test* (Jan. 16, 1996), https://www2.ed.gov/about/offices/list/ocr/docs/clarific.html, (the "1996 Clarification")).

Plaintiffs allege that UK fails to meet each of the three prongs. (DE 72, Complaint, ¶ 108.) They bear the burden of proving that UK fails to meet Prong One: "showing statistical disparity." *Horner*, 43 F.3d at 275. If Plaintiffs fail to meet that burden, then their Title IX claim fails (since a university must comply with only one of the three prongs). If, however, Plaintiffs show a statistical disparity under Prong One, UK has the burden on Prong Two of proving a history and continuing practice of program expansion. *Id*. If UK meets that burden, then Plaintiffs' Title IX claim fails. But if the university fails to meet its burden on Prong Two, then Plaintiffs may prevail by proving under Prong Three "an unmet interest on the part of the underrepresented sex." *Id*.

UK spends a good portion of its 99-page opening brief arguing that the Court should not apply the three-part test. (DE 155 Br. 34-78.) The Court addressed the applicability of the three-part test in a prior opinion in this case. (DE 134.) There, the Court explained that it would follow well-established Sixth Circuit precedent applying the test. *See, e.g, Miami Univ. Wrestling Club v. Miami Univ*., 302 F.3d 608, 615 (6th Cir. 2002); *Horner*, 43 F.3d at 274 -75. The Court further explained that the Sixth Circuit had applied the three-part test even after the Supreme Court's decision in *Kisor v Wilkie*, 139 S.Ct. 2400 (2019). *See Balow v. Michigan State Univ*., 24 F.4th 1051, 1054 (6th Cir. 2022).

Moreover, the Court determined that, even under *Kisor*, the three-part test is entitled to deference because the term "equal athletic opportunity" in 34 C.F.R. § 106.41(c)

5

is inherently ambiguous; the three-part test is reasonable; and Congress expressly

delegated to the agency the task of issuing implementing regulations for Title IX, including

regulations applicable to athletic programs.

Finally, the Court found in its prior opinion that the three-part test does not

implicate the major questions doctrine as UK continues to argue in its post-trial brief. (DE

155 Br. 44-51.) This is because Congress explicitly delegated to an administrative agency

the task of prescribing standards for athletic programs under Title IX, and the three-part

test does not create new rights, impose new obligations or change existing law. Instead, it

simply "supplie[d] crisper and more detailed lines than the authority being interpreted."

*Equity In Athletics, Inc*, 639 F.3d at 106.

As to whether the three-part test violates Title IX itself, UK relies on the following

portion of § 1681(b), which prohibits certain preferential and disparate treatment in

applying Title IX:

> Nothing contained in subsection (a) of this section shall
> be interpreted to require any educational institution to
> grant preferential or disparate treatment to the members
> of one sex on account of an imbalance which may exist
> with respect to the total number or percentage of persons
> of that sex participating in or receiving the benefits of
> any federally supported program or activity, in
> comparison with the total number or percentage of
> persons of that sex in any community, State, section, or
> other area.

20 U.S.C. § 1681(b).

The three-part test does not violate this provision "because the test does not *require*

preferential or disparate treatment for either gender." *Cohen v. Brown Univ*., 101 F.3d 155,

175 (1st Cir. 1996) ("*Cohen II*"). The test "does not. . . mandate statistical balancing." *Kelley*

*v. Bd. of Tr., Univ. of Ill*., 35 F.3d 265, 271 (7th Cir. 1994.) "[A] court assessing Title IX

compliance may not find a violation *solely* because there is a disparity between the gender

6

composition of an educational institution's student constituency, on the one hand, and its athletic programs, on the other hand." *Cohen v. Brown Univ.*, 991 F.2d 888, 895 (1st Cir. 1993) ("*Cohen I*").

"Rather, the policy interpretation merely creates a presumption that a school is in compliance with Title IX and the applicable regulation when it achieves such a statistical balance." *Kelley*, 35 F.3d at 271. "The question of substantial proportionality under the Policy Interpretation's three-part test is merely the starting point for analysis, rather than the conclusion; a rebuttable presumption, rather than an inflexible requirement." *Cohen II*, 101 F3d at 171.

In assessing a Title IX claim, nothing in Section 1681(b) prohibits the Court from considering "whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments" pursuant to Prong One of the three-part test. UK's argument ignores the proviso in § 1681(b), which explicitly permits the Court to consider "statistical evidence tending to show that such an imbalance exists with respect to the participation in, or receipt of the benefits of, any such program or activity by the members of one sex." The proviso "makes clear, the statute expressly allows for consideration of sex-based statistical imbalances in the course of enforcement proceedings." *Equity In Athletics, Inc.*, 639 F.3d at 102.

UK has also recently filed a motion to reconsider (DE 167) the Court's prior opinion that the three-part test will apply in this case. UK now argues that the Court should find the test inapplicable considering *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), a Supreme Court decision overruling *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). *Chevron* "sometimes required courts to defer to 'permissible'

agency interpretations of the statutes those agencies administer – even when a reviewing court reads the statute differently." *Loper Bright*, 144 S.Ct. at 2254.

UK argues that, pursuant to *Loper Bright*, the Court must itself resolve any statutory ambiguities in Title IX instead of deferring to the agency's interpretation. UK points out that 34 C.F.R. § 106.41(c), set forth above, lists ten factors relevant to determining whether a university provides equal athletic opportunities for males and females. It argues that nothing in the regulatory text suggests that a university violates Title IX by simply failing to abide by the first factor: effectively accommodating the interests and abilities of females.

The Court will deny the motion to reconsider. As discussed, the Sixth Circuit has applied the three-part test in multiple cases, and those cases remain good law. In *Loper Bright*, the Supreme Court made this clear, stating:

> [W]e do not call into question prior cases that relied on the *Chevron* framework. The holdings of those cases that specific agency actions are lawful . . . are still subject to statutory *stare decisis* despite our change in interpretive methodology. Mere reliance on *Chevron* cannot constitute a "special justification" for overruling such a holding, because to say a precedent relied on *Chevron* is, at best, just an argument that the precedent was wrongly decided. That is not enough to justify overruling a statutory precedent.

*Loper Bright*, 144 S. Ct. at 2273 (internal quotation marks and citations omitted).

Further, *Kisor*, not *Loper Bright*, controls UK's challenge to the three-part test. *Loper Bright* applies when a plaintiff challenges an agency regulation interpreting a statute. UK does not challenge the Title IX regulations. It challenges the three-part test, which interprets a regulation. Thus, *Kisor* governs.

For all the reasons stated here and in the Court's prior opinion (DE 134), the Court will apply the three-part test in this case.

8

Case: 5:19-cv-00394-KKC-EBA   Doc #: 170   Filed: 10/28/24   Page: 9 of 31 - Page ID#:
3993
Case 1:21-cv-00179-KJM-BAM   Document 167-8   Filed 11/26/24   Page 169 of 216

**A. Prong One – Plaintiffs proved that UK does not provide female students with varsity participation opportunities that are substantially proportionate to female student enrollment.**

Under the three-part test, the first benchmark is "whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments." *Balow*, 24 F.4th at 1054 (quoting 44 Fed. Reg. 71,418). "[A] university which does not wish to engage in extensive compliance analysis may stay on the sunny side of Title IX simply by maintaining gender parity between its student body and its athletic lineup." *Cohen I*, 991 F.2d at 898.

When determining whether participation opportunities and student enrollment are substantially proportionate, the focus is on the "number" of participation opportunities. *Balow*., 24 F.4th at 1057. Thus, the Prong One analysis "begins with a determination of the number of participation opportunities afforded to male and female athletes in the intercollegiate athletic program." *Biediger*, 691 F.3d at 93 (quoting the 1996 Clarification at 2-3). The Court then considers whether "the numbers are substantially proportionate to each sex's enrollment." *Id*. at 94; *see also Mayerova*, 346 F. Supp. 3d at 992.

At the bench trial, Sandra Bell, who is the executive associate athletic director in UK's Athletic Department and the person at UK in charge of Title IX compliance (DE 149 Tr. 94, 96, 102), conceded that UK did not meet substantial proportionality if it requires a comparison between female athletic participation opportunities and female student enrollment. (DE 149 Tr. 133, 134-35.) UK's counsel conceded the same in arguments after trial. (DE 150T r. 187.) Bell has been responsible for Title IX compliance at UK since 2012. (DE 149 Tr. 100.) She testified that, during that time, UK has never complied with Prong One. (150 Tr. 79-80.)

The parties agree that, during the 2022-23 academic year, UK's total student enrollment was 20,790 students. The female undergraduate enrollment was 12,009

9

students or 57.76 percent of the student enrollment. The male undergraduate enrollment was 8,743 students or 42.05 percent. (DE 155 Br. 12-13; DE 161 Response at 4; Jt. Ex. 83 at 1.)

As to the number of female varsity participation opportunities, there is a dispute as to whether that number should include the opportunities provided by the cheer, dance and junior varsity ("JV") soccer teams. The Court will address that issue later. Plaintiffs have shown, however, that, even including the cheer, dance and JV soccer teams, UK fails to meet Prong One.

If the cheer, dance, and JV soccer teams are included, the parties agree the total number of varsity participation opportunities during the 2022-23 school year was 770, of which 420 were allocated to females, or 54.55 percent of the opportunities. (Jt. Ex. 83 at 1; DE 155 Br. 13.) If cheerleading, JV soccer, and dance are not included, the parties agree that UK provided 661 varsity participation opportunities, with 333 of those allocated to females, or 50.38 percent. (Jt. Ex. 83 at 2.) Thus, there was a gap of either 3.21 percentage points or 7.38 percentage points between the percentage of females in the student enrollment and percentage of varsity participation opportunities allocated to female students. (Jt. Ex. at 1-2.)

Title IX does not require, however, that the percentage of female varsity opportunities be exactly equal to the percentage of female students. *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 856 (9th Cir. 2014). The three-part test requires only that those two numbers be "substantially proportionate." Opportunities are substantially proportionate "when the number of opportunities that would be required to achieve proportionality would not be sufficient to sustain a viable team." *Balow*, 24 F.4th at 1060 (quoting the 1996 Clarification). A "viable team" is "a team for which there is a sufficient number of interested and able students and enough available competition to sustain an

10

intercollegiate team." *Id.* at 1060 (quoting the 1996 Clarification). "As a frame of reference in assessing this situation, [the DOE's Office for Civil Rights ("OCR")] may consider the average size of teams offered for the underrepresented sex, a number which would vary by institution." *Id.* (quoting the 1996 Letter).

The parties agree that, even including the participation opportunities offered by cheer, dance, and JV Soccer, UK would need to offer 59 additional female athletic opportunities for the percentage of female varsity athletic opportunities to equal the percentage of female student enrollment. (Jt. Ex. 83 at 1.) That number is 116 if cheerleading, dance, and JV soccer are not included. (Jt. Ex. 83 at 2.)

UK calculates that the average size of its women's varsity teams is 32. (DE 161 Resp. 13, n. 54.) Using that number as a "frame of reference," since at least the 2012-13 academic year, there has been a participation gap sufficient to field at least one female varsity team even including cheer, dance, and JV soccer participation opportunities. *See Biediger v. Quinnipiac Univ.*, 728 F.Supp.2d 62, 112 & n. 27 (D. Conn. 2010) (determining that a participation gap of 38 positions and the fact that each of the university's varsity teams had 30 or few spots made it certain that the participation gap was large enough to field a viable new team). Most years between 2012-13 to 2022-23, the participation gap at UK was large enough to field several female varsity teams.

In *Balow*, however, the Sixth Circuit found that, in determining substantial proportionality, it is improper to compare the participation gap to the average team size at the university rather than the size of a "viable team." 24 F.4th at 1060. In doing so, it cited *Lazor v. Univ. of Connecticut*, 560 F. Supp. 3d 674, 682 (D. Conn. 2021), a case in which the district court also rejected using the average team size of the women's teams at the university to determine whether the University of Connecticut achieved substantial proportionality, noting that "a participation gap large enough to field a viable team – not

11

the average team size – is the benchmark for determining substantial proportionality." *Id*. There, in determining whether the university achieved substantial proportionality, that court looked at the participation gap and evidence regarding the average roster sizes of certain NCAA women's teams. *Id*.

Under that measure also, UK fails to meet substantial proportionality. The only women's varsity teams that Plaintiffs here have argued are viable that do not exist at UK are lacrosse, field hockey, and equestrian. The average roster size for a Division 1 varsity team is 40 for equestrian; 34 for lacrosse; and 25 for field hockey. (Pl. Ex. 27 at 8, Pl. Ex. 55 at 88.) Thus, using the average roster size of these NCAA female teams, since at least the 2012-13 academic year, there has been a participation gap sufficient to field at least one of these teams. Most years, the participation gap was large enough to field all three teams.

As discussed, at the bench trial, UK conceded that it does not meet Prong One.[1] In its post-trial briefing however, UK argues that "the Court may rely on the population in

---

[1]    In *Balow*, the Sixth Circuit indicated that no "strict numerical formulas" should be used to determine substantial proportionality. 24 F.4th at 1061. For this reason, the court rejected determining substantial proportionality by comparing the participation gap at a university to the average-size team at the university. *Id*. & n.6. The Sixth Circuit noted that participation opportunities are "substantially proportional" when the participation gap is not enough students to sustain a "viable team" and that a viable team is a team "for which there is a sufficient number of interested and able students and enough available competition to sustain an intercollegiate team." *Id*. (quoting the 1996 Clarification). Thus, the court held that, in assessing substantial proportionality under Prong One, a court must look at qualitative factors like "interest and ability." *Id*. at 1061.

This indicates that plaintiffs must prove under Prong One, not just a participation gap large enough to field the average roster in a sport, but also that there are enough "interested and able" students at the university to form a viable team in the sport. *Id* The Sixth Circuit stated that the "average team size at institutions" should be used to determine substantial proportionality only "[i]n circumstances in which there is no information about interest, ability, and competition." *Id*. at 1060 n.6. On remand, to determine whether the participation gap was large enough to field a viable varsity swimming and diving team as the plaintiffs argued, the district court started with the smallest such team in the Big Ten Conference (21 members). *Balow v. Michigan State Univ.*, 620 F. Supp. 3d 694, 708 (W.D. Mich. 2022). In determining there was sufficient interest and ability among the university's female students to form a viable varsity team of that size, the court considered that a women's varsity swimming and diving team had existed in the recent past at the university; affidavits by 12 former team members who were still students stating they were interested in a varsity team; and the fact that a club swimming and diving team at the university won the national championship the prior year. *Id*.

In the post-trial briefs in this case, however, neither party addressed interest and ability under Prong One. Both addressed them under Prong Three. The Court followed that pattern in these findings and conclusions. Under Prong Three, the Court finds that Plaintiffs have not proved there is sufficient interest and ability among UK's female students to field a viable varsity team in the only sports Plaintiffs have proposed: lacrosse, field hockey, and

Kentucky and Fayette County to assess substantial proportionality because the statute

says it can." (DE 161 Br. 9.) And the statute that UK relies on for this argument is Section

1681(b) of Title IX discussed above. That is the provision that prohibits a court from

requiring that a university "grant preferential or disparate treatment to the members of

one sex on account of an imbalance which may exist with respect to the total number or

percentage of persons of that sex participating in or receiving the benefits of any federally

supported program or activity, in comparison with the total number or percentage of

persons of that sex in any community, State, section, or other area." 20 U.S.C.A. § 1681(b).

UK's argument that this provision means that the comparison population for Prong

One purposes is the state or community seems to be a variation of UK's argument discussed

above that the three-part test violates Section 1681(b)'s "prohibition on quotas." (DE 155

Br. 35.) UK argues that it cannot be required to allot more than 50 percent of varsity

participation opportunities to females because that exceeds the female population

percentage of Kentucky and Lexington. (DE 155 Br. 80-81.) As discussed, however, the

three-part test does not establish a quota. The test, on its face, is entirely consistent with

§ 1681(b) because the test does not require preferential or disparate treatment for either

gender. *See Cohen II*, 101 F.3d at 175 ("Neither the Policy Interpretation's three-part test,

nor the district court's interpretation of it, mandates statistical balancing; "[r]ather, the

policy interpretation merely creates a presumption that a school is in compliance with Title

IX and the applicable regulation when it achieves such a statistical balance."(quoting

*Kelley*, 35 F.3d at 271.))

---

equestrian. Under *Balow*, that would mean that Plaintiffs have failed to meet their burden under Prong One because, even though the participation gap at UK consists of enough students to field a viable varsity team of average roster size in all three sports, Plaintiffs have not proved that there are enough interested and able students at the university to fill the roster in any of the three.

UK cites no cases holding that the comparison population for Prong One should be anything other than the student enrollment at the university under scrutiny. In contrast, every case the Court has reviewed has used the student enrollment as the comparison, including the Sixth Circuit in *Balow* and *Horner*.

For these reasons, the Court finds that Plaintiffs have proved that UK does not provide females students with intercollegiate varsity participation opportunities in numbers substantially proportionate to their respective enrollment.

### B. Prong Two – UK has failed to prove a history and continuing practice of program expansion that is demonstrably responsive to the developing interest and abilities of female students.

Of course, failing to provide substantially proportionate participation opportunities to females under Prong One is not by itself a Title IX violation. UK is entitled to a "safe harbor" if it satisfies Prong Two. *Mayerova*, 346 F.Supp.3d at 992. This prong "looks at an institution's past and continuing remedial efforts to provide nondiscriminatory participation opportunities through program expansion." *Ollier*, 768 F.3d at 857 (quoting the 1996 Clarification).

Under Prong Two, "so long as a university is continually expanding athletic opportunities in an ongoing effort to meet the needs of the underrepresented gender, and persists in this approach as interest and ability levels in its student body and secondary feeder schools rise, benchmark two is satisfied." *Cohen I*, 991 F.2d at 898. An institution must demonstrate *both* a history of *and* continuing practice of program expansion. *See Roberts*, 998 F.2d at 830.

UK argues that it has a history of program expansion, relying on the following:

- **Teams added**: UK has added three women's varsity teams since 1992: soccer in 1992, softball in 1998, and stunt in 2021. (DE 155 Br. 84; DE 161, Br. 11.)

- **Increased Participation Opportunities**: From the 2012-13 academic year to the 2022-23 academic year, including cheer, dance and JV soccer, the number of participation opportunities increased from 212 to 420, an increase of 208 participation opportunities. (DE 155 Br. 85; Jt. Ex. 83 at 1.) During that same timeframe, excluding the cheer, dance and JV soccer teams, the number of participation opportunities for females increased from 212 to 333, an increase of 121 participation opportunities. (Jt. Ex. 83 at 2; DE 161 Resp. 9, 13.)

The parties provided data regarding the number of female varsity athletic participation opportunities from the 2012-13 school year to the 2022-23 school year along with the numbers of females making up the student enrollment. In analyzing UK's history of adding female athletic opportunities, it is helpful to first look at the expansion that occurred prior to this lawsuit being filed at the beginning of the 2019-20 school year.

From the 2012-13 school year to the 2019-20 school year, female participation opportunities went up and down. There was growth for the first two years; followed by three years of decline; followed by two years of growth. (Jt. Ex. 83 at 1, 2.) During those years, UK consistently needed to add well over 150 female athletic participation opportunities to fill the participation gap with the number reaching as high at 203 women. (Jt. ex. 83 at 1, 2.)  Meanwhile, the percentage of female undergraduate student enrollment steadily increased every year from 50.75 percent in 2012-13 to 56.21 percent in 2019-20. (Jt. Ex. 83 at 1.)

After this lawsuit was filed, however, UK took three actions that led to significant leaps in the number of females it counted as varsity student athletes. In the 2020-21 school year, UK brought the cheer and dance teams, which already existed at UK, into the Athletic Department and counted those positions as varsity athletic positions. In the 2021-22 school year, UK added a women's JV soccer team and counted those positions as varsity

positions; and that same year, UK added a new women's varsity stunt team. (DE 149 Tr. 145-46; DE 155 Br. 10.)

Below is a chart depicting the female student enrollment and varsity participation opportunities including the cheer, dance, and JV soccer teams in the count, which shows the substantial leap in female student athletes beginning with the inclusion of the cheer and dance positions in 2020-21 and then the addition of JV soccer and varsity stunt in 2021-22:

| Participation Gap: UK Participation Counts Including Cheer, Dance, and JV Soccer | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Univ. of Kentucky Full-Time Undergrad Enrollment | | | | | Univ. of Kentucky Student-Athlete Participation | | | |
| Year | Male | Female | Total | % female | Male Student-Athletes | Female Student-Athletes | % of Female Student-Athletes | Participation Gap |
| 2012-13 | 9,445 | 9,733 | 19,178 | 50.75% | 354 | 212 | 37.46% | 153 women |
| 2013-14 | 9,627 | 10,258 | 19,885 | 51.59% | 397 | 225 | 36.17% | 198 women |
| 2014-15 | 9,857 | 10,833 | 20,690 | 52.36% | 385 | 239 | 38.30% | 184 women |
| 2015-16 | 9,860 | 11,339 | 21,199 | 53.49% | 352 | 237 | 40.24% | 168 women |
| 2016-17 | 9,446 | 11,387 | 20,833 | 54.66% | 363 | 235 | 39.30% | 203 women |
| 2017-18 | 9,238 | 11,419 | 20,657 | 55.28% | 331 | 226 | 40.57% | 183 women |
| 2018-19 | 9,042 | 11,442 | 20,484 | 55.86% | 338 | 257 | 43.19% | 171 women |
| 2019-20 | 9,031 | 11,591 | 20,622 | 56.21% | 354 | 280 | 44.16% | 174 women |
| 2020-21 | 8,688 | 11,551 | 20,239 | 57.07% | 399 | 355 | 47.08% | 175 women |
| 2021-22 | 8,469 | 11,360 | 19,829 | 57.29% | 388 | 428 | 52.45% | 92 women |
| 2022-23 | 8,743 | 12,009 | 20,790 | 57.76% | 350 | 420 | 54.55% | 59 women |

*In 2022-23, 38 full-time undergraduate students identified as not male or female.

**Athletic Participation Numbers for 2012-13 to 2019-20 are UK's self reported numbers to the NCAA for participants. (UK809-10, UK874, UK948-49, UK1028-29, UK1109-10, UK1190-91)

***UK includes in its count of "Female Student-Athletes" the Cheer, Dance, and a junior varsity soccer team. The participation gap calculated for 2020-21 to 2022-23 in this chart use the participation counts Univ. of Kentucky provided. (UK5077. UK5078. UK5206)

(Jt. Ex. 83 at 1.)

The cheer and dance team positions, however, should not be included in the count for UK's female varsity athletic positions. Neither cheer nor dance is sponsored by the NCAA. (DE 150 Tr. 43 (Bell stating cheer and dance are governed by U.S.A. Cheer); Pf. Ex. 55 at 88). Further, the DOE has never recognized cheerleading as a sport. *Biediger*, 691 F.3d at103. The Court has located no cases that count cheer or dance as a varsity sport for Title IX purposes. These teams perform their activities on the sidelines or at halftime at

16

Case: 5:19-cv-00394-KKC-EBA   Doc #: 170   Filed: 10/28/24   Page: 17 of 31 - Page ID#:
3901
Case 1:21-cv-00179-KJM-BAM   Document 167-8   Filed 11/26/24   Page 177 of 216

varsity competitions involving other teams. (DE 150 Tr. 19, 22.) This is not true of any
varsity sport. (DE 150 Tr. 36.) Most importantly, cheer and dance are not offered the same
competitive opportunities as the varsity sports teams at UK. Neither team has a regular
competition season. (DE 150 Tr. 18, 22.) Both teams compete in only one competition each
year, which is the national championship run by U.S.A. Cheer, one of the governing bodies
of college cheer. (DE 150 Tr. 18, 22, 43.) No varsity sport at UK is provided only one
competition opportunity. (DE 150 Tr. 22-23.) Every varsity sport has a regular season and
then has the opportunity to compete in both a conference and national championship, with
their ability to do so depending on their performance during the regular season. (Pf. Ex. 38.)

Nor is it appropriate for UK to count the positions on its *junior* varsity soccer team
as *varsity* female athletic opportunities. "The number of 'participation opportunities' for
women is defined by the number of female athletes who actually participate in varsity
athletics . . . ." *Mansourian v. Regents of Univ. of California*, 602 F.3d 957, 965–66 (9th Cir.
2010). UK provides no scholarships to the JV soccer players. (DE 149 Tr. 180) None of the
members of the UK JV soccer team have ever moved up to the varsity team. (DE 150 Tr.
15.) Members of the JV team are not eligible to participate in any championship game, and
they do not compete against any of the SEC varsity teams that the varsity team competes
against. (DE 149 Tr. 179.) The JV team is not always coached by the varsity team coach. It
has been coached by a "volunteer coach" and by two varsity assistant coaches. (DE 149 Tr.
178)

If junior varsity opportunities counted as varsity opportunities for Title IX purposes,
then a university could comply with Title IX by providing only junior varsity teams to
women while providing men with the only varsity teams. This would clearly violate Title
IX. "Counting new women's junior varsity positions as equivalent to men's full varsity
positions flagrantly violates the spirit and letter of Title IX; in no sense is an institution

17

providing equal opportunity if it affords varsity positions to men but junior varsity positions to women." *Cohen II*, 101 F.3d at 186 (quoting district court opinion).

Below is a chart depicting the female student enrollment and varsity participation opportunities when cheer, dance and JV soccer are not included in the count:

| **Participation Gap: UK Participation Counts w/o Cheer, Dance, and JV Soccer** | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Univ. of Kentucky Full-Time Undergrad Enrollment** | | | | | **Univ. of Kentucky Student-Athlete Participation** | | | |
| Year | Male | Female | Total | % female | Male Student-Athletes | Female Student-Athletes | % of Female Student-Athletes | Participation Gap |
| 2012-13 | 9,445 | 9,733 | 19,178 | 50.75% | 354 | 212 | 37.46% | 153 women |
| 2013-14 | 9,627 | 10,258 | 19,885 | 51.59% | 397 | 225 | 36.17% | 198 women |
| 2014-15 | 9,857 | 10,833 | 20,690 | 52.36% | 385 | 239 | 38.30% | 184 women |
| 2015-16 | 9,860 | 11,339 | 21,199 | 53.49% | 352 | 237 | 40.24% | 168 women |
| 2016-17 | 9,446 | 11,387 | 20,833 | 54.66% | 363 | 235 | 39.30% | 203 women |
| 2017-18 | 9,238 | 11,419 | 20,657 | 55.28% | 331 | 226 | 40.57% | 183 women |
| 2018-19 | 9,042 | 11,442 | 20,484 | 55.86% | 338 | 257 | 43.19% | 171 women |
| 2019-20 | 9,031 | 11,591 | 20,622 | 56.21% | 354 | 280 | 44.16% | 174 women |
| 2020-21 | 8,688 | 11,551 | 20,239 | 57.07% | 374 | 288 | 43.50% | 209 women |
| 2021-22 | 8,469 | 11,360 | 19,829 | 57.29% | 363 | 348 | 48.95% | 139 women |
| 2022-23 | 8,743 | 12,009 | 20,790 | 57.76% | 328 | 333 | 50.38% | 116 women |

*In 2022-23, 38 full-time undergraduate students identified as not male or female.

**Athletic Participation Numbers for 2012-13 to 2019-20 are UK's self reported numbers to the NCAA for participants. (UK809-10, UK874, UK948-49, UK1028-29, UK1109-10, UK1190-91)

***UK includes in its count of "Female Student-Athletes" the Cheer, Dance, and a junior varsity soccer team. The participation gap calculated for 2020-21 to 2022-23 in this chart use the participation counts Univ. of Kentucky provided without those teams included in the total number of student athletes. (UK5077, UK5078, UK5206)

While the percentage of females in the student enrollment continually increased for the 11 years depicted on the chart, the participation gap persisted, even increasing some years. Moreover, the number of female student athletes went up and down through the years, as did the female percentage of varsity athletes. From the 2021-22 school year to the 2022-23 school year (the most recent years on the chart), the number of female student athletes decreased. This does not depict a history of program expansion for women.

Moreover, until the addition of stunt in the 2021-22 school year, the increase in the numbers of female student athletes for the years depicted on the chart came through adding positions to already existing varsity teams. UK does not explain how that was "demonstrably responsive to the developing interest and abilities" of its female students.

*See Mayerova*, 346 F. Supp.3d at 995 ("EMU has not, for example, explained how its goal to increase track rosters is responsive to the developing interests and abilities of women.") In the past 25 years, UK has added only one female varsity team despite a participation gap now large enough for at least triple that number. That itself suggests something short of a history of program expansion.

As to whether UK has demonstrated a continuing practice of program expansion that is demonstrably responsive to the interests and abilities of its female students, the Court will look at whether UK has a plan for program expansion that is responsive to developing interests and abilities. *Id.*

Since at least 2017, UK has had a procedure in place for monitoring the interests and abilities of its female students and for adding female varsity participation opportunities. Central to that procedure is the Sports Review Committee established in 2017. (DE 149 Tr. 158; Jt. Ex. 51.)  The committee is made up of five UK officials, including Bell, who is the chair. (DE 149 Tr. 155.)  The committee makes the initial determination as to whether a varsity sport should be added at the university. If the committee decides that the university should add a sport, then it makes that recommendation to university UK President Eli Capilouto and Director of Athletics Mitch Barnhart. (DE 150 Tr. 51; DE 149 Tr. 155; Def. Ex. 9.)

Also central to UK's procedure for monitoring interest and ability is an annual survey UK has conducted since 2006 and amended to its current form in 2017. (DE 150 Tr. 49-51; DE 149 Tr. 233-34, 237.) Students are asked on the survey if they have a "serious interest in competing in any sport(s) at a Division 1 level at UK, whether or not a varsity team for that sport currently exists." (Jt. Ex. 80 at 1.) If the student answers "yes" to that question, she is asked to select from a list of varsity sports those sports in which she has an

interest. In 2023, for example, the survey set forth a list of 27 sports. UK offers a varsity team in some of the sports listed, but not all.

If a student indicates a "serious interest in" participating in a particular sport, then the survey directs her to questions about her ability to do so. The survey first asks the student if the student herself believes she has the ability to compete at the Division 1 varsity level in her chosen sport. (Jt. Ex. 80 at 3; DE 149 Tr. 242.) If the student answers, "yes," then the survey asks the student to indicate "all the credentials, accomplishments, and experiences below that objectively demonstrate your ability to compete at UK's Division 1 varsity level." (Jt. Ex. 80 at 3.)

Here, the survey asks the student if she was recruited by another Division I school to compete in that sport or if she previously competed at the varsity level in that sport. (Jt. Ex. 80 at 3.) Students are then asked to indicate whether they achieved certain credentials or accomplishments in the sport, such as being nationally or regionally ranked or being otherwise recognized at a national or regional level. For example, for lacrosse, the student is asked if she was recognized as a United States Lacrosse All-American or international equivalent. (Jt. Ex. 80 at 11-12.) For equestrian, the student is asked if she was nationally ranked; or placed or won at year-end industry finals or a national event or other international equivalent. (Jt. Ex. at 8.) And for Field hockey the student is asked if she participated on the U.S. National team (or international equivalent), participated in FUTURES – USA Field Hockey Olympic Development Program, was an All-State Field Hockey Player, or an international equivalent to any of these.  (Jt. Ex. 80 at 9.)

For some sports, students are also asked if they have certain skills in the sport. For example, for lacrosse, the student is asked if she can run a 40-yard dash in under five seconds, run a mile in under five minutes, and run two miles in under 12 minutes. (Jt. Ex. 80 at 12.) For equestrian, the student is asked if she can ride multiple horses in competitive

settings and if she has a high level of success jumping fences over 3 feet 6 inches tall. (Jt. Ex. 80.)

Students indicating that they have the credentials and skills to compete at the Division 1 varsity level are asked if they would be willing to comply with a list of UK, SEC, and NCAA regulations. (Jt. Ex. 80 at 20.)  The student is then asked if she "were selected for varsity competition in the [27 listed] sport(s). . . and there were no scholarship funds available, would you still compete without funding?" (Jt. Ex. 80 at 20-21.) Finally, students are directed to leave contact information if they want the "UK Athletic Department to consider your information." (Jt. Ex. 80 at 21.)

UK employs various methods to ensure a high response rate on the survey. UK launches the survey each February and students have at least seven weeks to complete it. (DE 150 Tr. 179; DE 149 Tr. 164.) For a period of time, all students other than seniors are unable to register for classes until they complete the survey. (DE 150 Tr. 150, 174; Jt. Ex. 65.) The survey is not time-consuming. For most students, it takes a maximum of eight minutes to complete. (DE 150 Tr. 149-50.) Students meet with an advisor prior to registering for classes. UK instructs advisors to remind students of the need to complete the survey to lift the hold on their registration. (DE 150 Tr. 180.) UK also e-mails students to remind them that they must complete the survey to register. (Jt. Ex 78.) As a result of these measures, seventy to eighty percent of students respond to the survey prior to their individual class registration window opening. (DE 150 Tr. 179.)

UK proved that the survey is a nondiscriminatory assessment of developing interests and abilities. *See* 1996 Clarification. Plaintiffs disagree with some of the survey content. They argue that some of the skills and credentials listed on the survey are not actually required for the sports at issue. They also argue that the criteria are more demanding for some sports than others. (DE 156 Br. 39.) However, the credentials and

skills were derived from two sources. If UK has a varsity team in the sport, then those coaches provided the credentials and skills; if UK does not have a varsity team in the sport, then the credentials and skills were provided by the sport's national governing body. (DE 149 Tr. 243-44, 246.) UK reasonably relied on the judgments of these professionals.

The problem with UK's plan of program expansion is not with the content of the survey. The problem is that the Sports Review Committee relies on the survey to the exclusion of other measures of interest and ability. The committee meets only once per year – in the summer, after the survey ends in May. (DE 149 Tr. 155-56.) Members receive a survey report sometime in late July and then have the meeting in August. (DE 149 Tr. 156.)

Bell's explanation of the committee's purpose made at a committee meeting in August 2022 illustrates the centrality of the survey results to its work. She explained, "the purpose of the Committee was to analyze the survey results and engage. . . in a meaningful discussion about how those results might impact the competitive sports structure at UK." (Def. Ex. 9.) The notes from the committee meetings confirm its reliance on the survey results when deciding whether to recommend the addition of new varsity women's teams. (Jt. Ex. 53, 55, 56; Def. Ex. 9.)

In fact, the committee's decision as to whether to add a varsity sport rests primarily on one number from the survey: the number of students who self-report interest and ability in the sport and leave contact information. When students from the club equestrian and field hockey teams requested that UK establish varsity teams in those sports, members of the committee met with students. Those meetings took place in June 2017 for field hockey and January 2023 for equestrian. (DE 148 Tr. 146-47; DE 149 Tr. 218, 221-22.) Bell ended both meetings, telling the students that the committee would need to review the upcoming survey results. (DE 148 Tr. 156; DE 149 Tr. 73.) Bell's later e-mail to the students explaining why the committee would not recommend that UK sponsor a varsity team in

either sport relied entirely on the fact that the number of students who left their contact information was not sufficient to field a viable team. (Pf. Ex. 11; Pf. Ex. 28; Jt. Ex. 73.; Jt. Ex. 53; DE 149 Tr. 253.) The committee notes confirm that it is the number of students who leave contact information that the committee focuses on in assessing developing interest and ability. (Jt. Ex. 53 (stating "only 18 of the [students] provided contact information" and the committee "is focused on the 18 individuals.") Bell also confirmed this at trial. (DE 149 Tr. 253.)

UK's focus on the number of students who leave contact information ignores the other data the survey provides regarding developing interests and abilities. If many students report they were recruited by another Division 1 school in any varsity sport, that data should provoke additional research into the viability of a team in that sport, no matter the number of students who left contact information. For example, from 2019 to 2023, from 28 to 46 students who were seriously interested in competing in equestrian at the varsity level indicated they had been recruited by another Division 1 varsity program to ride equestrian. (Jt. Ex. 73.) The average varsity equestrian team is just 40 members. (Pf. Ex. 27 at 8.) These results indicate a general interest in and ability to compete at the varsity level in equestrian that would be expected to provoke additional research into the viability of a varsity equestrian team, regardless of the number of students who left contact information.

The focus on students who provide contact information to the exclusion of the other data on the survey makes sense if the purpose of the survey is not to assess general developing interest and ability but to place students on a new varsity team. In that case, the university must be able to contact the students. But a university cannot use written survey responses to decide eligibility to play a varsity sport. Instead, the university should

use the survey for what it can effectively provide: one measure among many of the developing interests and abilities of its female student body.

Since it was created, the committee has recommended only one female varsity team: the stunt team. It did not make that recommendation based on the survey results alone. Bell testified that, years before stunt was even added to the survey, the committee "did a lot of research" (DE 150 Tr. 2, 65), which included attending the 2019 stunt National Championship in Oklahoma; engaging in discussions with U.S.A. Cheer, stunt's governing body; (Def. Ex. 10; DE 150 Tr. 65; Jt. Ex. 55); meeting with the stunt club team president; (Def. Ex. 10 at 14; DE 150 Tr. 63-64); reviewing the number of high schools that were adding stunt teams across the country (DE 150 Tr. 65; Jt. Ex. 55); reviewing stunt's status in Kentucky high schools through communications with the Kentucky High School Athletic Association ("KHSA") (DE 150, Tr. 65-66; Jt. Ex. 55); talking to stunt coaches at other universities, including the coach of the reigning national champion (DE 150 Tr. 65); and reviewing stunt's status with the NCAA. (Jt. Ex. 55.)

UK cites instances of Bell sporadically considering one or another indicator of ability and interest other than the survey for field hockey, lacrosse, equestrian, and other sports. (DE 155 Br. 21-23 ¶ 55.) But it does not present evidence of a plan of program expansion pursuant to which the committee regularly reviews multiple measures of developing interest and ability, like those reviewed for stunt, to expand its varsity participation opportunities for females. For example, Bell testified that the last time she looked at any high school participation data for women's sports was three or four years ago. (DE 149 Tr. 191.)

For these reasons, UK has not proved either a history or a continuing practice of program expansion that is demonstrably responsive to the developing interests and abilities of its female students.

## C.  Prong Three: Plaintiffs have failed to show sufficient unmet interest and ability among UK female students.

Thus, Plaintiffs have proved that UK is not providing female students with varsity athletic participation opportunities in numbers substantially proportionate to their enrollment. UK has failed to prove that it has a history and continuing practice of program expansion that is demonstrably responsive to the developing interests and abilities of its students. Even where the evidence shows that a university falls short under Prongs One and Two, however, "the mere fact that there are some female students interested in a sport does not ipso facto require the school to provide a varsity team in order to comply with the third benchmark." *Cohen I*, 991 F.2d at 898. "Rather, the institution can satisfy the third benchmark by ensuring participatory opportunities at the intercollegiate level when, and to the extent that, there is 'sufficient interest and ability among the members of the excluded sex to sustain a viable team and a reasonable expectation of intercollegiate competition for that team . . . .'" *Id*. (quoting 44 Fed. Reg. at 71, 418.)

This prong of the three-part test "sets a high standard: it demands not merely some accommodation, but full and effective accommodation. If there is sufficient interest and ability among members of the statistically underrepresented gender, not slaked by existing programs, an institution necessarily fails this prong of the test." *Horner*, 43 F.3d at 275 (quoting *Roberts*, 998 F.2d at 831-32). On the other hand, "[w]hile the institution's burden under subsection (3) is an exacting one, an institution is not required to field a team in response to, e.g., the pleas of 'one talented softball player,' if sufficient numbers of individuals to form teams to compete do not exist." *Id*. at 275, n.9 (citing *Roberts*, 998 F.2d at 831 n.10 and *Cohen I*, 991 F.2d at 898).

As with Prong I, the focus here is again on the numbers. Under this prong, "institutions are not required to create an intercollegiate team or elevate a club team to

intercollegiate status unless there are a sufficient number of interested and able students to sustain a team." 2010 Letter at 12. "Title IX does not require an institution to create a new team unless there is interest, ability, and a reasonable expectation of competition for that team." *Wieker v. Mesa Cnty. Valley Sch. Dist. #51*, No. CIVA05CV806-WYD-CBS, 2007 WL 595629, at *6 (D. Colo. Feb. 21, 2007).

Plaintiffs argue that the interests and abilities that are unmet at UK are in varsity lacrosse, field hockey, and equestrian. They ask that the Court "order UK to elevate to varsity status" a team in at least one of these sports. (DE 156 Br. 51) Thus, Plaintiffs must point to evidence that there are enough female students interested in competing and able to compete at the varsity level in these sports to form a team. Plaintiffs note in their brief, such evidence of interest may include:

- requests by students and admitted students that a particular sport be added;
- requests for the elevation of an existing club sport to intercollegiate status;
- participation in club or intramural sports;
- interviews with students, admitted students, coaches, administrators and others regarding interests in particular sports;
- results of surveys or questionnaires of students and admitted students regarding interests in particular sports;
- participation in interscholastic sports by admitted students; and
- participation rates in sports in high schools, amateur athletic associations, and community sports leagues that operate in areas from which the institution draws its students

(DE 156 Br. 27 citing OCR, U.S. DOE, Dear Colleague Letter, (Apr. 20, 2010) ("2010 Letter"); https://www.ed.gov/sites/ed/files/about/offices/list/ocr/letters/colleague-20100420.pdf.

Plaintiffs note that evidence of unmet ability may include:

- the athletic experience and accomplishments—in interscholastic, club or intramural competition—of underrepresented students and admitted students interested in playing the sport;
- opinions of coaches, administrators, and athletes at the institution regarding whether interested students and admitted students have the potential to sustain an intercollegiate team;

- if the team has previously competed at the club or intramural level, whether the competitive experience of the team indicates that it has the potential to sustain an intercollegiate team;
- participation in other sports, intercollegiate, interscholastic or otherwise, that may demonstrate skills or abilities that are fundamental to the particular sport being considered; and
- tryouts or other direct observations of participation in the particular sport in which there is interest.

(DE 156 Br. 27-28 (citing 2010 Letter).)

Plaintiffs easily meet the burden of proving unmet interest pointing to the survey results. (DE 156 Br. 42-43.) From 2019 to 2023, the survey consistently revealed that female students well beyond the number needed to field viable teams were seriously interested in competing on varsity field hockey, lacrosse, and equestrian teams. For field hockey, that number ranged from 44 to 72. For equestrian, that number ranged from 195 to 244. For lacrosse, the number ranged from 111 to 146. (Jt. Ex. 73.) Thus, Plaintiffs have proved a sufficient number of female students currently enrolled at the UK are interested in competing at the varsity level in lacrosse, field hockey, and equestrian to field a varsity team in each sport.

The next issue is whether Plaintiffs have produced sufficient evidence that there are enough female students at UK who can compete at the varsity level in field hockey, lacrosse, or equestrian to field a team. This is not a case where a university recently eliminated a successful varsity team. In those cases, proving that sufficient interest and ability exist on campus to field a team is likely not difficult to prove. *Cohen I*, 991 F.2d at 904. Proving interest and ability is more complicated where, as here, the plaintiffs seek to force a university to create a completely new varsity team. *Id*. *See also Cohen II*, 101 F.3d at 180; *Roberts*, 998 F.2d at 832 ("Questions of fact under this third prong will be less vexing when plaintiffs seek the reinstatement of an established team rather than the creation of a new one.")

As proof that enough female students have the ability to compete at the varsity level in lacrosse, field hockey, and equestrian, Plaintiffs point to the survey results. As discussed, the survey provides only an annual snapshot of students' self-reported interest and ability. The results can be relied on as a measure of student interest because a student is the person best able to assess her own interest in a sport. Whether a student has the actual physical ability to be placed on a varsity team at UK, however, cannot be determined by the student's responses to a written survey. UK would not be expected to place any student on a varsity team or find any student qualified to play a varsity sport based on the student's survey responses alone. Nor can the Court do that.

The OCR recognizes the limitation in the usefulness of a written survey for measuring individual physical ability under Prong Three. The 2010 Letter states that survey questions about a student's "experience in sports generally is one indicator of ability." 2010 Letter at 9 & n.19. But a university cannot be expected to find a student able to compete at the varsity level based on that one indicator.

If, on the other hand, a university is expected to use the survey responses to identify able players to be placed on a new varsity team, then the contact information becomes crucial. UK cannot form a new team based on anonymous responses. It needs real players who it can contact. From 2019 to 2023, not nearly enough students who indicated an interest and ability in equestrian, field hockey, or lacrosse provided contact information to field a team in any of those sports. In equestrian, at most 9 students left contact information during that timeframe. In field hockey, the highest number was three. In lacrosse, it was 2. The average roster size is 40 for equestrian, 25 for field hockey, and 34 for lacrosse. (Jt. Ex. 73; Pl. Ex. 27 at 8; Pl. Ex. 55 at 88.)

As evidence of students with the ability to compete at the varsity level, Plaintiffs point to the three current or former UK students who testified at the bench trial. (DE 156

Br. 29-33.) Ala Hassan testified that she has the ability to compete at the Division 1 level in lacrosse (DE 148 Tr. 205.) Elizabeth Niblock testified that she was recruited by five to ten schools to play varsity lacrosse and played one semester of Division 1 varsity lacrosse at Furman University before transferring to UK. (DE 149 Tr. 5-6.) Georgia Murray is president of the hunt seat equestrian club team. (DE 149 Tr. 53.) While in high school, she won state championships and placed third in the country at the National College Equestrian Association Midwest junior hunter finals. (DE 149 Tr. 49.) But even if there is evidence that all three students are able to compete at the varsity level, that would not make a viable team in any of the three sports.

Plaintiffs also point to the numbers of female students on the lacrosse, hunt seat equestrian, and field hockey club teams since the 2019-20 season. (DE 156 Br.34). These numbers may prove an interest in various sports, but they are not evidence of the numbers of female students at UK who can play at the varsity level or even have the interest in doing so. Not all members of a club team have the ability for or interest in varsity competition. For example, Bell testified that several members of the stunt club team joined the sunt varsity team at its formation but dropped out because it was "too hard," "took too much time," or was "too competitive for their ability level." (DE 140 Tr. 174-75, Def. Ex. 9.)

Neither the club lacrosse nor field hockey club teams has won any championships or otherwise obtained recognition for the skill level of the team or its individual players. Mark Lattin, who oversees club sports at UK, testified that "over the years, field hockey has not been particularly well organized." (DE 150 Tr. 98) As to the club lacrosse team, Plaintiff Niblock testified that "it seemed very lackadaisical" and was "less of a commitment than high school." (DE 149 Tr. 23.)

The club equestrian team, on the other hand, has placed in the top ten teams at nationals and includes members who have won individual national championships while on

the club team. (DE 149 Tr. 66; Pf. Ex. 27 at 4.) As Bell explained, however, the club equestrian teams accept "people who have never ridden a horse before or who are beginning riders." In the hunt seat discipline of equestrian, club teams must have beginner, intermediate, and advanced level riders. (DE 149 Tr. 91-92, 223, 227-28.) Everyone on a varsity college equestrian team, in contrast, is at the "expert level." (DE 149 Tr. 223.) Thus, most of a club equestrian team's members necessarily fall below the skill level required for a varsity team. The hunt seat coach confirmed this, telling Bell a maximum of three members of the club team could compete at the varsity level. (DE 150 Tr. 69-70; DE 149 Tr. 228.)

The accomplishments of the club equestrian team and the survey numbers indicating significant interest and self-reported ability to compete at the varsity level in the sport should motivate the committee to research the viability of a varsity hunt seat equestrian team. Bell testified that she would present the committee with the latest survey numbers, and it would decide whether to recommend the addition of a varsity equestrian team based on that evidence. (DE 150 Tr. 71.)  As discussed, the committee's research should include measures of interest and ability beyond the survey.

Under Prong Three, however, the question is not whether there is sufficient evidence of interest and ability to merit further research by UK into the viability of a new team. The question under Prong Three is whether UK is meeting "the *actual* interests and abilities of its students and admitted students." 2010 Letter at 6, n. 15. Plaintiffs must prove that there are female students actually able to compete at a varsity level in a sport and that there are enough of them to form a team. Plaintiffs confine their argument to field hockey, lacrosse, and equestrian. For the reasons stated, Plaintiffs have failed to meet their burden in any of these particular sports at this time.

## II.     Equal Protection Claim

In their complaint, Plaintiffs asserted a claim for violation of their equal protection rights against UK President Eli Capilouto and UK Director of Athletics Mitch Barnhart in their official capacities. This was the sole claim asserted against Capilouto and Barnhart. At the bench trial and in their post-trial brief, however, Plaintiffs withdrew this claim. (DE 150 Tr. 185-86; DE 156 Br. 4, n.1.)  Accordingly, the Court will dismiss this claim.

## III.    Conclusion

For all these reasons, the Court hereby ORDERS and ADJUDGES as follows:

1) Plaintiffs have failed to prove that the selection of sports and levels of competition at UK do not effectively accommodate the interests and abilities of UK's female students;

2) Judgment will be entered in favor of UK on Plaintiffs' Title IX claim;

3) Plaintiffs' Equal Protection claim against Mitch Barnhart and Eli Capilouto in their official capacities is DISMISSED with prejudice; and

4) UK's motion to reconsider (DE 167) is DENIED.

This 28th day of October, 2024.

KAREN K. CALDWELL
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF KENTUCKY

1999 WL 35808359
Only the Westlaw citation is currently available.
United States District Court, D. New Mexico.

Galen PATON, individually, et al.,
Plaintiffs,
v.
NEW MEXICO HIGHLANDS
UNIVERSITY, et al., Defendants.

CIV 97-1360 JC/DJS
|
Signed 10/18/1999

**Attorneys and Law Firms**

Counsel for Plaintiffs: Kristen M. Galles, Equity Legal, Alexandria, VA, Nancy Long, Herrera, Long & Pound, P.A., Santa Fe, NM.

Counsel for Defendants: Timothy White, Atwood, Malone, Turner & Sabin, Albuquerque, NM.

**MEMORANDUM OPINION AND ORDER**

JOHN E. CONWAY, CHIEF UNITED STATES DISTRICT JUDGE

**\*1** THIS MATTER came on for consideration of Student Plaintiffs' Motion for Class Certification, filed August 25, 1999 *(Doc. 46)*, Defendants' Response to Plaintiff's [sic] Motion, filed September 24, 1999 *(Doc. 59)*, and Plaintiffs' Reply to Defendants' Opposition to Class Certification, filed October 5, 1999, *(Doc. 64)*. The Court has reviewed the motion, the memoranda and exhibits submitted by the parties, and the relevant authorities. The Court finds that Plaintiffs' Motion is well taken in part, and will be **conditionally granted**.

*Discussion*

Plaintiffs move this Court for class action certification of Student Plaintiffs' claims pursuant to Rule 23 of the Federal Rules of Civil Procedure. The factual background of this case does not bear repetition here.

*Class Definition*
Plaintiffs define the proposed class as "all present and future female students enrolled at NMHU who participate, seek to participate, or are deterred from participating in intercollegiate athletics as a result of the discriminatory practices of the NMHU." Student Plaintiffs' Mot. for Class Certification at 2 *(Doc. 46)*. "The fact that the class includes future members does not render the class definition so vague as to preclude certification."¹ *Probe v. State Teachers' Retirement Sys.*, 780 F.2d 776, 780 (9th Cir. 1986). However, it is improper to define a class based on subjective criteria such as a class member's state of mind. *See Simer v. Rios*, 661 F.2d 655, 669 (7th Cir. 1981) (class included members who were discouraged from applying for federal assistance). Determining class members who "*seek* to participate, or are *deterred* from participating in intercollegiate athletics" depends on ascertaining the member's state of mind. Because these criteria improperly base class membership on state of mind, I will delete these criteria from the proposed class definition.

I further find that the description of students "participating in intercollegiate athletics" is an inadequately vague definition of class membership. Plaintiffs' definition might demand a case-by-case determination of what constitutes "participation" in intercollegiate athletics. *See Davoll v. Webb*, 160 F.R.D. 142, 144 (D. Colo. 1995) (finding the term "disability" to be an inadequate class definition). Because all of Plaintiffs' named representatives were named in their capacity as student athletes I find that "participation" describes those who participate as student athletes. Therefore, Plaintiffs' class definition as modified by this Court consists of "present and future female students enrolled at NMHU who participate as athletes in intercollegiate athletics."

*Mootness*
Defendants point out that none of the Student Plaintiffs' named representatives currently participate as athletes on

Paton v. New Mexico Highlands University, Not Reported in Fed. Supp. (1999)

an intercollegiate sports team at NMHU.[2] Generally, an entire class action is mooted if the named plaintiffs' claims become moot prior to certification. *See Board of School Commissioners v. Jacobs*, 420 U.S. 128, 130 (1975). However, certain circumstances allow a district court to "apply a 'relation back' theory and grant late certification in an otherwise moot case." *Milonas v. Williams*, 691 F.2d 931, 937 (10th Cir. 1982) (citing *Sosna v. Iowa*, 419 U.S. 393, 402 n.11 (1975)). In this case, Plaintiffs initially filed a motion for class certification on May 7, 1998 *(Doc. 14)*, at which time one or more of the Student Plaintiffs appeared to have valdi class claims as NMHU student athletes. Defendants did not file a response to Plaintiffs' motion until September 24, 1999 *(Doc. 59)*. The court in *Lusardi v. Xerox Corp.*, 975 F.2d 964 (3d Cir. 1992) recognized the situation in which a defendant could "afford to 'pick off' successive plaintiffs and forestall the formation of a class." *Id.* at 981-82. Under these circumstances, the relation back exception can salvage an otherwise mooted claim. *See id.* at 982 (citing *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1050 (5th Cir. 1981)).

**\*2** At least in part, the Defendants' delay in responding to the Student Plaintiffs' motion to certify contributed to the overall delay in considering class certification. I therefore find that Plaintiffs' current motion to certify, filed August 25, 1999, relates back to Plaintiffs' motion to certify filed on May 7, 1998. Plaintiffs argue that the motion to certify should relate back to the date of the Complaint. However, under this exception there is not "a single case holding that a district court has subject matter jurisdiction to hear a *motion to certify* filed by named plaintiffs *whose personal claims have expired.*" *Id.* (emphasis added). In other words, the validity of the named representatives' class claims on the date the Complaint was filed is irrelevant under this analysis. Accordingly, should this Court determine that no Student Plaintiff had a valid class claim on May 7, 1998, Plaintiffs' class action claims must necessarily be dismissed as moot. Because the status of the named Student Plaintiffs as of May 7, 1998 is unclear, I will grant the parties fourteen (14) days from the date that this order is entered to submit memoranda on this issue.

### Class Action Requirements

In order to certify a class action Plaintiffs must demonstrate that the requirements of Fed.R.Civ.P. 23 are satisfied. *See Sollenbarger v. Mountain States Tel. and Tel. Co.*, 121 F.R.D. 417, 423 (D.N.M. 1988) (citations omitted). The named students may bring a suit as representative parties on behalf of a class only if the following prerequisites are met:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the ... class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). In order to maintain the class action Plaintiffs must also meet one of three conditions under Fed. R. Civ. P. 23(b). Plaintiffs claim that Defendant NMHU has "acted in a discriminatory manner with respect to all class members," therefore justifying injunctive relief regarding the class as a whole and meeting the requirements of 23(b)(2).[3]

### Numerosity / Impracticability of Joinder

Plaintiffs correctly assert that the presence of future class members may render joinder impracticable. *See Phillips v. Joint Legislative Comm. on Performance and Expenditure Review*, 637 F.2d 1014, 1022 (5th Cir. 1981) (class included unidentifiable future members); *Krislov v. Rednour*, 946 F. Supp. 563, 568 (N.D. Ill. 1996) (numerosity satisfied where class included future members in addition to 50 present members). Because the presence of unidentifiable future class members in addition to all current members makes joinder difficult and inconvenient, I find that Plaintiffs have met this requirement under Fed. R. Civ. P. 23(a)(1). *See Castano v. American Tobacco Co.*, 160 F.R.D. 544, 550 (E.D. La. 1995), *overruled on other grounds*, 84 F.3d 734 (1996) (impracticable does not mean impossible).

### Commonality and Typicality

In civil rights cases, the elements of "commonality" and "typicality" may be assessed together. *See Milonas v. Williams*, 691 F.2d 931, 938 (10th Cir. 1982). Plaintiffs were subjected to essentially the same course of conduct on the part of Defendants, and Plaintiffs assert the same legal theories on behalf of the representatives and the class. Consequently, I find that Plaintiffs have satisfied the requirements of "commonality" and "typicality" under Fed. R. Civ. P. 23(a).

*Fair and Adequate Class Representation*

Defendants oppose certification of the proposed class on the ground that the named Student Plaintiffs will not fairly and adequately protect the interests of the class. Defendants contend that the named representatives' interests conflict with those of other members of the class. For a conflict to result in the inadequacy of a named representative, it must be based on more than speculation. *See Alvarado Partners, L.P. v. Mehta*, 130 F.R.D. 673, 676 (D. Colo. 1990). Moreover, the conflict must relate to the subject matter of the litigation. *See id.* The mere fact that the class representatives seek monetary relief as individuals and only declaratory and injunctive relief on behalf of the class does not constitute a fatal conflict of interest. *See Stewart v. Winter*, 669 F.2d 328, 335 (5th Cir. 1982); *Hispanics United v. Village of Addison*, 160 F.R.D. 681, 689-90 (N.D. Ill. 1995); *Roe v. Operation Rescue, Inc.*, 123 F.R.D. 500, 504 (E.D. Pa. 1988). In this case, Defendants presented no evidence of dissent or conflict regarding this litigation between the named representatives and any other members of the proposed class.

**\*3** Defendants further contend that the named Student Plaintiffs' lack of knowledge and interest in this lawsuit renders them unable to fairly and adequately protect the interests of the class. Defendants are correct in that the representatives' conduct must not result in abdication of the case to their attorneys. However, "in a class action, it cannot be expected that all class members will be interested to the same degree." *In re United Energy Corp. Solar Power Modules Tax Shelter Inv. Sec. Litig.*, 122 F.R.D. 251, 258 (C.D. Cal. 1988). Although *United Energy* involved a securities case, the court's declaration that "the class device serves ... important public and private interests" is no less true in this case. *Id.*

Jodie Roberts described a class action as a situation in which a "group of people ... are being affected by something, and a group of people need to be helped," and involving "somebody like me that is willing to stand up and speak for everyone else or take care of everyone else." Roberts Dep. at 96:10-16, 97:3-9, Ex. 1 to Defs.' Resp. Erica Travelstead sees a class action as a means to protect incoming female athletes should the lawsuit be "drawn out after I've graduated." Travelstead Dep. at 87:18-24, Ex. 3 to Defs.' Resp. Randa Barber understands that she may bear a personal responsibility for legal costs. *See Barber* Dep. at 90:24-91:7, Ex. 2 to Defs' Resp. Like the plaintiffs of *United Energy*, at least some of the Student Plaintiffs in this case have demonstrated an understanding and interest in the proceedings. They have participated in depositions, communicated with their attorney by telephone or mail, and attended settlement hearings. At least two Student Plaintiffs who are currently attending school or working out-of-state gave depositions this past summer in New

Mexico. Not one of the named students has withdrawn from the case. "[T]o require more [on the part of class representatives] could well prevent the vindication of the legal rights of the absent class members." *United Energy*, 122 F.R.D. at 258.

I find that Plaintiffs have sufficiently demonstrated the adequacy of the named Student Plaintiffs to act as representatives for this class. However, it is the Court's responsibility to continually monitor the adequacy of representation in a class action. *See Key v. Gillette Co.*, 782 F.2d 5, 7 (1st Cir. 1986). Should the representatives demonstrate an inability to fairly and adequately protect the interests of the class the Plaintiffs will no longer be in compliance with Fed. R. Civ. P. 23(a)(4) and class certification will be withdrawn.

***Conclusion***

The Student Plaintiffs' class definition, as modified by this Court, consists of "present and future female students enrolled at NMHU who participate as athletes in intercollegiate athletics." The Student Plaintiffs' Motion for Class Certification, based on this modified class definition, will be conditionally granted. The Court will grant the parties fourteen (14) days from the day this Order is entered to file memoranda addressing whether the Student Plaintiffs were valid members of the modified class as of May 7, 1998. Finally, should Plaintiffs fail to timely file a memorandum as directed, Plaintiffs' Motion for Class Certification will be denied.

Wherefore,

**IT IS ORDERED** that the Student Plaintiffs' class definition is modified to consist of "present and future female students enrolled at NMHU who participate as athletes in intercollegiate athletics."

**IT IS ORDERED** that Student Plaintiffs' Motion for Class Certification, based on the modified class definition, is **conditionally granted**.

**\*4 IT IS ORDERED** that the parties are granted fourteen (14) days from the date this order is entered to file a memorandum addressing whether one or more of the named representative Student Plaintiffs were valid members of the modified class as of May 7, 1998.

**IT IS FURTHER ORDERED** that should Plaintiffs fail to timely file the memorandum as directed, Plaintiffs' Motion for Class Certification is **denied**.

Paton v. New Mexico Highlands University, Not Reported in Fed. Supp. (1999)

Not Reported in Fed. Supp., 1999 WL 35808359

**All Citations**

Footnotes

1   This is especially true where, as here, the plaintiffs seek injunctive and declaratory relief under Fed. R. Civ. P. 23 (b)(2). *See* Moore's
    Federal Practice 3d § 23.21[6] (1999) (precision of class definition is much less important when certifying actions under 23(b)(2)).

2   Three of the four named Student Plaintiffs no longer attend NMHU. The fourth student, Erica Travelstead, was cut from the volleyball
    team, but apparently continues to attend NMHU as a student and functions as an athletic trainer.

3   A 23(b)(2) action is one in which "the party opposing the class has acted or refused to act on grounds generally applicable to the
    class, thereby making appropriate final injunctive relief ... with respect to the class as a whole." Fed. R. Civ. P. 23(b)(2).

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 8755114
Only the Westlaw citation is currently available.
United States District Court, C.D. California.
PHYSICIANS HEALTHSOURCE, INC.

v.

MASIMO CORPORATION, et al.

Case No.: 8:14-00001 DOC (ADSx)
|
Filed 07/30/2019

**Attorneys and Law Firms**

Eduardo Martorell, Harry Alfredo Abraham, Jean-Paul Le Clercq, Martorell Law APC, Megan K. Atkinson, Bordin Martorell LLP, Los Angeles, CA, for Physicians Healthsource, Inc.

Michael Jay Larin, Lynberg and Watkins, Los Angeles, CA, William J. Brown, Jr., Brown Wegner LLP, Irvine, CA, Gregory A. Bedell, Pro Hac Vice, Knabe and Bedell, Chicago, IL, for Masimo Corporation, et al.

**Proceedings: (IN CHAMBERS) ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO COMPEL**

The Honorable Autumn D. Spaeth, United States Magistrate Judge

**\*1** On June 19, 2019, the Court heard the Motion to Compel filed by defendants Masimo Corporation and Masimo Americas, Inc. ("Masimo"). [Dkt. No. 220]. Masimo seeks an order compelling amended responses and production of documents from Plaintiff Radha Geismann M.D. P.C. ("Geismann"). Having considered the Motion to Compel, the Joint Stipulation and all related filings by the parties, and the arguments of counsel during the hearing, the Court grants in part and denies in part the Motion to Compel.

**A. Request for Production Nos. 41-42, 44-50 and**

**Interrogatory No. 10**
The Court finds Requests for Production ("RFPs") 41-42 and Interrogatory No. 10 substantively similar to RFPs 83-84 and Interrogatory No. 9 served on Plaintiff Physician's Healthsource ("PHI") that the Court considered and ruled on in November 2018. See [Dkt. No. 112, pp. 47-48]. The Court finds no difference between this plaintiff and PHI that would justify the Court altering its prior determination as to the scope of discovery or its prior rulings. Consistent with the Court's November 14, 2018 order, the Court grants the Motion to Compel as to RFPs 41-42 to the extent Masimo seeks settlement agreements. The Motion to Compel is also granted as to Interrogatory No. 10 to the extent Masimo seeks responses related to settlement agreements. For confidential settlement agreements, Geismann is ordered to follow up with counsel for Masimo regarding the process required by the agreements for their production. To the extent a court order is required, this Order should serve as such.

RFPs 44-48 are substantively similar to RFPs 87-89, 91, and 96 that were served on Plaintiff Physician's Healthsource ("PHI") that the Court considered and ruled on in November 2018. As such, consistent with the Court's prior orders, Geismann is ordered to produce documents in its possession or in possession of its counsel that are responsive to these RFPs and are not available on PACER, for example deposition transcripts, expert reports, and discovery responses. See [Dkt. No. 112, pp. 51, 60, 63; Dkt. No. 186, p. 47-48].

RFPs 49-50 are substantively similar to RFPs 94-95 served on PHI that the Court considered and ruled on in November 2018. As such, consistent with the Court's prior orders, the Motion to Compel is granted as to RFPs 49-50 to the extent Masimo seeks briefing and orders regarding class certification from Geismann's other TCPA cases. See [Dkt. No. 112, pp. 66-67].

**B. Interrogatory Nos. 15-16**
Masimo has withdrawn the Motion to Compel as to Interrogatory Nos. 15-16. [Dkt. No. 234, p. 1 n.1]. The Court therefore does not rule on these interrogatories.

**C. Request for Production Nos. 24, 60, 65, 78-82,**

**Interrogatory No. 19, and Request for Admission Nos. 52-78**

Under Ninth Circuit case law, Geismann's retainer agreements may be relevant to the issue of adequacy in class certification. See Rodriguez v. West Publ'g Corp., 563 F.3d 948, 957 (9th Cir. 2009) (finding incentive agreements agreed to as part of initial retention between counsel and certain named plaintiffs "plainly relevant" where agreements "put class counsel and the contracting class representatives into a conflict position from day one"); see also Gusman v. Comcast Corp., 298 F.R.D. 592, 600 (S.D. Cal. 2014) ("Plaintiff's retainer and fee agreement with counsel in this case is relevant to the Rule 23(a)(4) analysis of whether Plaintiff is an adequate representative of the class.").

**\*2** The Ninth Circuit has repeatedly held retainer agreements are not protected by the attorney-client privilege or work product doctrine. See Ralls v. United States, 52 F.3d 223, 225 (9th Cir. 1995); accord United States v. Blackman, 72 F.3d 1418, 1424 (9th Cir. 1995) ("As a general rule, client identity and the nature of the fee arrangement between attorney and client are not protected from disclosure by the attorney-client privilege."); In re Michaelson, 511 F.2d 882, 887 (9th Cir.1975) ("[I]t has generally been held that information concerning the fee arrangement between an attorney and his client, or the existence of the attorney-client relationship is not privileged or protected by the attorney-client privilege."); see also White v. Experian Info. Solutions, Inc., 2010 WL 11526818, at *3 (C.D. Cal. Sept. 30, 2010). Communications concerning "the identity of the client, the amount of the fee, the identification of payment by case file name, and the general purpose of the work performed are usually not protected from disclosure by the attorney-client privilege." Clarke v. Am. Commerce Nat'l Bank, 974 F.2d 127, 129 (9th Cir. 1992); see also Paul v. Winco Holdings, Inc., 249 F.R.D. 643, 654 (D. Idaho Feb. 27, 2008), Gaines v. Law Office of Patenaude & Felix, A.P.C., 2014 WL 3894348, at *5 (S.D. Cal. June 12, 2014)).

RFPs 65 and 82 seek the engagement agreement and retainer agreement between Geismann and counsel in this action. This information is relevant to the issues of class certification in this case because Masimo has raised concerns regarding the nature of the fee agreement and plaintiffs' counsel's conduct in discovery, both of which bear on whether Geismann is an adequate class representative. See Haghayeghi v. Guess?, Inc., 2016 WL 9526465, at *2 (S.D. Cal. Mar. 21, 2016) (finding retainer agreement relevant to class certification where Defendants sought "documents in advance of Plaintiff's deposition to discover whether Plaintiff may adequately represent the class or if a conflict of interest exist[ed]."). Further, RFPs 65 and 82 seek non-privileged information. See White v. Experian Info. Solutions, Inc., 2010 WL 11526818, at *3 (C.D. Cal. Sept. 30, 2010) (finding privilege did not protect retainer agreement from production). The Motion to Compel is therefore granted as to RFPs 65 and 82.

The Motion to Compel is denied as to RFPs 24, 60, 78-81, Interrogatory No. 19, and Request for Admission Nos. 52-78. The Court finds these to be overbroad, unduly burdensome and not proportional to the needs of the case.

This Court has communicated with the assigned District Judge, and he has authorized the discovery cut-off date to be extended for the limited purpose of these responses and the production of documents. Amended responses and production for nonconfidential documents are due no later than August 13, 2019. For confidential settlement agreements, production is due by no later than August 20, 2019.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2019 WL 8755114

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 4899098
Only the Westlaw citation is currently available.
United States District Court, D. Utah, Central
Division.

S.G., BY AND THROUGH her general
guardian, Brent GORDON, et al.,
Plaintiffs,
v.
JORDAN SCHOOL DISTRICT, et al.,
Defendants.

Case No. 2:17-CV-00677
|
Signed 10/09/2018

**Attorneys and Law Firms**

Mark L. Smith, Smith Washburn LLP, Los Angeles, CA,
Brent Gordon, Idaho Falls, ID, D. Loren Washburn, Jacob
L. Fonnesbeck, Smith Washburn LLP, Salt Lake City, UT,
for Plaintiffs.

Darin B. Goff, Philip S. Lott, Rachel G. Terry, Utah
Attorney General'S Office, D. Craig Parry, Michael S.
Lehr, Parr Brown Gee & Loveless, Mark O. Van Wagoner,
Savage Yeates & Waldron PC, Salt Lake City, UT, for
Defendants.

**MEMORANDUM DECISION AND ORDER
GRANTING IN PART PLAINTIFFS' MOTION TO
CERTIFY CLASS**

ROBERT J. SHELBY, United States District Judge

**\*1** This case involves a group of female students who want
more athletic opportunities, including a girls' football
team, at their high schools. Plaintiffs originally sought to
certify a class of all present and future female high school
students, including those who seek to participate "in girls-
only football teams, or in other sports or teams not offered
at the Districts' high schools."[1] Plaintiffs' counsel made an
oral motion to withdraw the Motion to Certify during a
hearing on February 13, 2018.[2] The court granted the oral

motion to withdraw and allowed Plaintiffs an opportunity
to amend their Complaint. Plaintiffs amended their
Complaint, and now seek to certify a class of female
students seeking more athletic opportunities and a subclass
of female students seeking a girls' football team. For the
reasons stated below, the Motion to Certify Class is granted
in part and denied in part.[3]

**BACKGROUND**

Plaintiffs are seven minor female students, by and through
their guardians, who attend or will attend high schools in
Jordan, Granite, or Canyons school districts. The lead
Plaintiff, S.G., helped start a recreational girls-only tackle
football league in 2015.[4] The recreational league started
with 50 participants but quickly grew to approximately 200
by spring 2017.[5] Plaintiffs allege the majority of girls who
play in the recreational league "reside within the Districts'
boundaries and either attend or will attend high school at
one of the Districts' high schools."[6]

Plaintiffs allege female students in the Districts also want
more athletic opportunities in general. Based on public
records requests, Plaintiffs allege high schools in the
Districts "provided an average of 2,260 more participation
opportunities to boys than girls" for each of the three years
before they filed this action.[7]

Plaintiffs sued the Districts and their superintendents
(collectively, the Districts), together with the Utah High
School Activities Association, alleging three violations of
Title IX and one violation of the Equal Protection Clause.

Based on the allegations in their Second Amended
Complaint,[8] Plaintiffs now seek to certify two classes: (1)
a "female athletes" class of "[a]ll present and future Jordan,
Canyon, and Granite school district female high school
students who seek to participate and/or are or were deterred
from participating in athletics," and (2) a "football
subclass" of "[a]ll present and future Jordan, Canyon, and
Granite school district female high school students who
seek to participate and/or are or were deterred from
participating on girls high school football teams."[9]
Plaintiffs seek to certify both the female athletes class and
the football subclass for their Title IX equal
accommodation claim, and to certify only the football
subclass for their Title IX contact sports claim, Title IX
equal treatment claim, and Equal Protection Clause claim.[10]

## ANALYSIS

**\*2** Class certification is appropriate only if the moving party satisfies the four requirements of Federal Rule of Civil Procedure 23(a) and one of the requirements of Rule 23(b).[11]

### I. Rule 23(a) requirements

Under Rule 23(a), class certification is appropriate only if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."[12] The party seeking class certification must "affirmatively demonstrate" compliance with Rule 23(a) by proving "that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc."[13] The district court "has an independent obligation to conduct a rigorous analysis before concluding that Rule 23's requirements have been satisfied."[14]

### A. Adequacy

The court begins the Rule 23 analysis with adequacy because it will determine how each class proceeds. The adequacy requirement has two components: (1) "the proposed class representative must have an interest in vigorously pursuing the claims of the class," and (2) the representative "must not have interests antagonistic to the interests of other class members."[15]

Defendants ask the court to deny certification based on a failure of the second component because the class and subclass seek conflicting remedies. As Defendants note, "If the Districts implemented girls football today, it is unclear whether the named Plaintiffs would continue to represent the Female Athlete Class at all."[16] The court agrees that the remedies the class and subclass seek could conflict with each other in a way that would render their representation inadequate.[17]

In their Reply in support of the Motion to Certify, Plaintiffs ask the court to redefine the classes or certify only a football class if the court finds a failure with one of the proposed classes.[18] Where a proposed class has potential conflicts between members, the court may instead certify

two separate subclasses.[19] Each subclass is then treated as its own class, "meaning it has its own independent class representative who is a member of that subclass and its own independent counsel."[20] Splitting the female athletes class and football subclass into two separate classes—each with its independent representative and counsel—would resolve the conflict presented. The court thus will split the classes and analyze whether each independently satisfies the remaining Rule 23(a) factors.[21]

### B. Numerosity

**\*3** For each class, the moving party must show that "the class is so numerous that joinder of all members is impracticable."[22] This requires setting forth "ascertainable numbers constituting the class in order to satisfy even the most liberal interpretation of the numerosity requirement."[23] There is no "set formula" to determine whether a proposed class is so numerous that joinder of all members is impracticable. Instead, "[a] number of factors are relevant in determining whether joinder is impracticable, including the class size, the geographic diversity of class members, the relative ease or difficulty in identifying members of the class for joinder, the financial resources of class members, and the ability of class members to institute individual lawsuits."[24] In other words, whether joinder is impractical turns on the particular circumstances of the case. "The duty of establishing those particular circumstances rests with the party who asserts the existence of the class and that party must produce some evidence or otherwise establish by reasonable estimate the number of class members who may be involved."[25]

### 1. Female athletes numerosity

For the female athletes class, Plaintiffs allege the Districts provided an average of 2,260 more athletic participation opportunities to boys than girls each year, which they argue is evidence of how many girls were deterred from participating in athletic opportunities. Plaintiffs also argue it is difficult to identify how many other girls are interested in playing new sports, pointing to anecdotal evidence showing that the number of girls who joined high school golf teams when offered far exceeded schools' expectations. Finally, Plaintiffs seek to include future students and contend that because future class members are "necessarily unidentifiable," joinder is impracticable.

Defendants insist none of this provides an ascertainable

number of class members. Defendants insist the smaller number of athletic opportunities for girls does not show numerosity because it does not prove how many girls were deterred by the lack of opportunities. Defendants also argue the evidence of how many girls participated in golf is irrelevant to the question of how many girls seek to participate in other sports.

The court concludes Plaintiffs have not met the numerosity requirement for the female athletes class. Plaintiffs have not produced any competent evidence or reasonable estimate of how many girls "seek to participate and/or are or were deterred from participating in athletics." The evidence about how many girls joined golf teams years ago does not provide persuasive evidence or a reasonable estimate of how many girls are still deterred from participating in athletics. It may indeed be difficult to determine how many girls will join a team before that team is available; however, Plaintiffs did not even provide relatively accessible evidence, such as survey responses from students indicating that a given student would play a given sport, if offered by their District. And even if such survey evidence was somehow inaccessible, that would not change Plaintiffs' burden under Rule 23(a) "to prove that there are *in fact* sufficiently numerous parties."[26] Plaintiffs' arguments about golf serve only to show that the number of girls who express interest before a team exists may be much lower than the number of girls who end up participating. But Plaintiffs have not provided any evidence pointing to the first part of this conclusion—that a number of girls have expressed interest in more athletic opportunities in the Districts. Without such evidence, the court cannot conclude that Plaintiffs have established the number of girls who seek more athletic opportunities is so large that joinder is impracticable.[27]

**\*4** The addition of future members in the proposed class also does not satisfy the numerosity prong because Plaintiffs have still provided no reasonable estimate or basis for the court to extrapolate how many future members of the class would actually seek to participate or are deterred from participating in athletics.

Plaintiffs have failed to show numerosity exists for the female athletes class. Because the class fails on this prong, it is not necessary to address commonality or typicality. The Motion for Class Certification for the female athletes class is denied.

## 2. Football class numerosity[28]

For the football class, Plaintiffs point to the fact that a

recreational girls' football league has grown in recent years from 50 to more than 200 participants, representing a rapid upward trend in interest and participation. Plaintiffs argue even more girls would play for a high school team, which would provide opportunities for school support, awards and recognition, regional and state competitions, and school credit.[29] Defendants argue Plaintiffs have not shown that all the 200 participants on the recreational league will be eligible to play on a high school team and would choose football over other sports.

The court rejects Defendants' suggestion that it should require evidence that female students would choose to play football over other sports. The proposed class is for female students "who seek to participate and/or are or were deterred from participating on girls girls high school football teams." The court need not look into whether proposed class members would seek to play other sports to determine whether they seek to participate in football.

Nevertheless, the court is troubled by the paucity of evidence Plaintiffs have provided. The court notes that Plaintiffs could almost certainly acquire evidence demonstrating the interest and eligibility of the 200 recreational league participants because at least some of the Plaintiffs helped form the league and presumably know the identities of its participants. It seems Plaintiffs could easily have submitted questionnaires or surveys from the 200 participants regarding their interest and eligibility for playing on a high school team in the Districts.[30]

Such evidence would have been helpful in this case; without it, the court must infer that an unknown but substantial number of the recreational league participants desire to play on a high school team and are eligible to do so. And in another context, the court would hold Plaintiffs' evidentiary showing insufficient. However, in cases seeking only injunctive relief, Tenth Circuit law instructs that such evidence is not always necessary.[31]

**\*5** Notably, the Tenth Circuit has drawn similar inferences as the ones Plaintiffs urge the court to draw here. For example, in *Colorado Cross Disability Coalition*, the defendant, which operated Hollister stores nationwide, argued that Colorado Cross Disability Coalition (CCDC), a group suing on behalf of disabled customers, had failed to meet the numerosity requirement because it had presented no evidence about the size of the proposed class.[32] In reviewing the evidence submitted before the district court, the Tenth Circuit noted there were nearly 250 Hollister stores with allegedly inaccessible porches in over 40 states, and five proposed class members stated in declarations that they shop at malls where Hollister stores are located.[33] That evidence, combined with the court's judicial notice of the fact that millions of Americans have

disabilities, created a reasonable inference that "a substantial number of disabled people live in the 40 states where Hollister stores are located; that these people, like CCDC members and many Americans, shop at malls, including the 250 malls with porched Hollisters; and that joining all of these people in one suit would be impracticable."[34] Thus, the Tenth Circuit held, the district court had not abused its discretion in finding the plaintiffs satisfied the numerosity requirement.[35]

Other circuits have reached similar conclusions. For example, in *Pederson v. Louisiana State University*, the Fifth Circuit addressed numerosity for a class of college athletes.[36] In that case, the district court provisionally certified a class of "[t]hose who have sought or seek to participate in varsity intercollegiate athletics at LSU but who are or were not allowed such participation due to LSU's failure to field teams in said female varsity athletics."[37] The district court later concluded the plaintiffs had failed to satisfy the numerosity requirement and decertified the class.[38] On appeal, the Fifth Circuit held the district court abused its discretion in decertifying the class, stating that "[o]ur independent review of the record satisfies us that the numerosity prong has been satisfied."[39] The Fifth Circuit noted that even though only eight women attended varsity soccer tryouts, "well over 5,000 young women were playing soccer or fast-pitch softball at the high school level in Louisiana."[40] The Court also noted that former members of a Louisiana soccer club had received scholarships to play soccer at other colleges.[41] Although those women were not students at Louisiana State University and therefore could not be members of the class, the Court considered the evidence relevant to "the talent pool in Louisiana" and therefore appropriate to consider for class certification purposes.[42]

The inferences Plaintiffs urge the court to draw in this case (at least for the football class) are similar to those in *Colorado Cross Disability Coalition* and *Pederson*. Plaintiffs have presented evidence of 200 girls who play girls' football and will attend high schools in the Districts.[43] It is reasonable to infer that a substantial number of the girls who play in the recreational league will also want to play on a high school team. Additionally, even assuming some of the girls on the recreational league are ineligible to play on a high school team, common sense leads to the conclusion that the remaining athletes would constitute a number too great for joinder.[44] In this limited context, Plaintiffs have satisfied the numerosity requirement for the football class.

**C. Commonality**

The party seeking class certification must also show "there are questions of law or fact common to the class."[45] This requires a demonstration that the proposed class members "have suffered the same injury" that is based on a "common contention," i.e., "that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."[46]

**\*6** Plaintiffs argue a common question of law and fact exists for three claims. For their Title IX equal accommodation claim, Plaintiffs assert the court must determine "whether the Districts' failure to provide substantially equal participation opportunities to girls 'is the result of girls' lack of interest in athletics.' "[47] Second, Plaintiffs contend the court is faced with a common question of law and fact for the Title IX contact sports claim—namely, whether "opportunities for girls have historically been limited and there is sufficient interest and ability among girls to sustain viable teams and reasonable expectation of competition for the teams."[48] Finally, Plaintiffs assert a common question of law exists for the Equal Protection Clause claim because the court must look to whether the Equal Protection Clause requires girls' football teams if schools offer boys' football teams.

The Title IX claims do not involve a common question that is capable of classwide resolution. First, to determine "whether the Districts' failure to provide substantially equal participation opportunities to girls 'is the result of girls' lack of interest in athletics,' " the court would need to look to whether female students in each of the three Defendant school districts lack interest in athletics. This is necessarily an individualized assessment, and the determination of its truth or falsity in each District will not necessarily resolve the issue for all proposed class members (drawn collectively from all three districts) in one stroke.

The second Title IX claim does not satisfy commonality for the same reason. The court cannot determine whether "there is sufficient interest and ability among girls to sustain viable teams and reasonable expectation of competition for the teams" without looking to facts specific to the schools within each District. If there is sufficient interest and ability among girls to sustain teams at some schools but not others, the court cannot resolve the issue in one stroke.

Thus, Plaintiffs have failed to show commonality for both Title IX claims.[49]

However, the Equal Protection claim presents a common question of law: whether the Defendants discriminate on the basis of sex by providing football teams for boys but not for girls. Unlike the school or district specific inquiries

S.G. by and through Gordon v. Jordan School District, Not Reported in Fed. Supp. (2018)

presented by Plaintiffs' Title IX claims, the Equal Protection claim presents a legal question common to all District Defendants, as it is stipulated that girls' football is offered in none of the districts while boys' football is offered in each. In light of this, a determination that the Defendants discriminate on the basis of sex would resolve a common question of law for the entire football class as to all District Defendants. Other factual issues may remain, but commonality does not require the resolution of all issues in one fell swoop. It requires only that the court's determination on a common question "will resolve an issue that is central to the validity of each one of the claims in one stroke."[50] The legal question presented by the Equal Protection claim satisfies this requirement.

Thus, the proposed football class satisfies the commonality requirement only as to the Equal Protection claim.

## D. Typicality

Next, the class proponent must establish "the claims or defenses of the representative parties are typical of the claims or defenses of the class."[51] This requirement is satisfied if "all class members are at risk of being subjected to the same harmful practices, regardless of any class member's individual circumstances."[52]

**\*7** Focusing on the proposed class and claim remaining, Plaintiffs argue their claims are typical of the claims of the whole football class because each girl attends a high school in a District that violates the Equal Protection Clause. Plaintiffs have shown they are subjected to the same practice—the Defendants' refusal to establish school-sponsored girls' football teams—as any other class member would be. For this reason, the court concludes Plaintiffs satisfy the typicality requirement.

## II. Rule 23(b)

Because Plaintiffs have met all four requirements for class certification of the football class under Rule 23(a), the court must also assess whether they satisfy one of the requirements of Rule 23(b). Plaintiffs argue they satisfy Rule 23(b)(2), which requires showing that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."[53]

The requirements of general applicability and appropriateness of injunctive relief for the class as a whole are "independent but related" parts.[54] Taken together, the two parts require "cohesiveness among class members with respect to their injuries."[55] To show cohesiveness, the party seeking certification must illustrate that classwide injunctive relief would "state its terms specifically and describe in reasonable detail ... the act or acts restrained or required," and that "class members' injuries are sufficiently similar that they can be remedied in a single injunction without differentiating between class members."[56]

Plaintiffs persuasively contend they satisfy both requirements. They argue the Districts have refused to institute girls-only football as to the entire football class and injunctive relief for the class as a whole is appropriate.[57] Plaintiffs outline six possible injunctions, any of which would provide relief without differentiating between class members.[58] Therefore, Plaintiffs have met the requirements of Rule 23(b)(2).

Because Plaintiffs have satisfied the requirements of Rule 23(a) and Rule 23(b)(2), the court concludes that class certification is appropriate for the football class on the Equal Protection claim.

### III. Standing for Equal Protection claim

The Districts argue Plaintiffs lack standing for their Equal Protection claim because they are not members of a varsity team that has been discriminated against on the basis of sex. The Districts point to *Pederson v. Louisiana State University*, in which the Fifth Circuit held that plaintiffs who were not members of a varsity team did not have standing "to challenge the treatment of existing varsity athletes."[59] But Plaintiffs in this case do not seek relief on behalf of existing varsity athletes. They seek relief only on behalf of themselves and similarly situated female students on the ground that they have been discriminated against on the basis of sex. Plaintiffs have standing for their Equal Protection claim.

### IV. Conclusion

Plaintiffs' Motion to Certify Class is GRANTED in part and DENIED in part.[60] It is ORDERED that the following class shall be certified under Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure:

**\*8** All present and future Jordan, Canyon, and Granite school district female high school students who seek to participate and/or are or were deterred from participating on girls high school football teams.

That class is certified with respect to all factual and legal issues relating to the Plaintiffs' Equal Protection Claim against Defendants.

Because Plaintiffs failed to provide the court an evidentiary basis from which to infer that Rule 23(a)'s numerosity requirement was satisfied with respect to the female athletes class, the court DENIES certification of that class.

Although mindful of the arguments made by Defendants in their motion to file a joint supplemental memorandum in opposition to Plaintiffs' Motion to Certify Class, those arguments would not change the court's analysis

concerning adequacy or numerosity. Accordingly, the Defendants' Motion is DENIED.[61]

After the benefit of the parties' briefing and careful consideration of the Rule 23(g) factors, the court hereby designates the following as class counsel: D. Loren Washburn, Mark Smith, and Jacob Fonnesbeck. The court declines to appoint Brent Gordon as counsel because he is likely to be a necessary witness. The class representatives shall be the named student plaintiffs: S.G., L.D., B.S., M.C., D.R., I.N., and I.C.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 4899098

Footnotes

1        Dkt. 33 at i–ii.

2        Dkt. 44.

3        Dkt. 67.

4        Dkt. 76, ¶ 202.

5        *Id.* ¶ 203.

6        *Id.* ¶ 204.

7        *Id.* ¶ 49.

8        Plaintiffs' First Amended Complaint added another female student as a plaintiff but did not otherwise alter the original allegations.

9        Dkt. 67, at 2.

10       Dkt. 76 at 46–47; Dkt. 67 at 2–3.

Case 1:21-cv-00179-KJM-BAM   Document 167-8   Filed 11/26/24   Page 204 of 216

S.G. by and through Gordon v. Jordan School District, Not Reported in Fed. Supp. (2018)

11    *DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1194 (10th Cir. 2010).

12    Fed. R. Civ. P. 23(a).

13    *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

14    *Wallace B. Roderick Revocable Living Tr. v. XTO Energy*, 725 F.3d 1213, 1217 (10th Cir. 2013) (internal quotation marks omitted).

15    *Certification of subclasses under Rule 23(c)(5)*, 1 McLaughlin on Class Actions § 4:45 (14th ed.).

16    Dkt. 86, at 7.

17    Another district court faced with similar circumstances found "an inherent conflict" between a class that included students seeking a women's rowing team and a class of all participants in women's athletics. The conflict arose because "compliance could conceivably be achieved, in part, by taking away the allegedly paltry resources allocated to women's rowing, and bestowing them along with new resources on other women's varsity sports, a prospect to which the representatives would not likely be amenable." *Miller v. Univ. of Cincinnati*, 241 F.R.D. 285, 290 (S.D. Ohio 2006).

18    Dkt 91, at 10.

19    *Boucher v. Syracuse Univ.*, 164 F.3d 113, 119 (2d Cir. 1999); *see also* 32B Am. Jur. 2d *Federal Courts* § 1718.

20    *Conflict subclasses and their requirements*, 3 Newberg on Class Actions § 7:31 (5th ed.).

21    Although mindful of the arguments made by Defendants in their motion to file a joint supplemental memorandum in opposition to Plaintiffs' Motion to Certify Class (Dkt. 103), those arguments would not change the court's analysis concerning adequacy or numerosity. Accordingly, the Defendants' motion is DENIED.

22    Fed. R. Civ. P. 23(a)(1).

23    *Rex v. Owens ex rel. Oklahoma*, 585 F.2d 432, 436 (10th Cir. 1978).

24    *Colorado Cross-Disability Coal. v. Taco Bell Corp.*, 184 F.R.D. 354, 357 (D. Colo. 1999); *see* Robert Newburg, Newberg on Class Actions § 3:11 (5th ed. 2018). Because the court ultimately finds that the Plaintiffs failed to provide the court with any evidence

from which it could reasonably estimate the proposed size of the female athletes class, it is unnecessary to consider any factors beyond size for that class.

25    *Rex.,* 585 F.2d at 436. The court acknowledges that the Tenth Circuit has favorably cited cases holding that where a suit seeks only injunctive relief, "even speculative and conclusory representations as to the size of the class are sufficient." *Horn v. Associated Wholesale Grocers, Inc.,* 555 F.2d 270, 275–76 (10th Cir. 1977); *see also Goodnight v. Shalala,* 837 F. Supp. 1564, 1582 (D. Utah 1993) (citing *Horn*). *But see DG ex rel. Stricklin v. Devaughn,* 594 F.3d 1188, 1194 (10th Cir. 2010) ("In deciding whether the proposed class meets these requirements, the district court must accept the substantive allegations of the complaint as true, though it need not blindly rely on conclusory allegations of the complaint which parrot Rule 23 and may consider the legal and factual issues presented by plaintiff's complaints.") (citation omitted) (internal quotation marks omitted). Absent clear guidance, the court declines to depart from the well-established rule that the party seeking certification must provide evidence from which a court can reasonably infer class size.

26    *Dukes,* 564 U.S. at 350.

27    Although it is true that courts have sometimes made inferential leaps to find that joinder was impracticable, Plaintiffs ask for an inferential leap that is both unprecedented and unsupported by evidence. Take for example, *Colorado Cross Disability Coalition v. Abercrombie & Fitch,* 765 F.3d 1205, 1215 (10th Cir. 2014). That case involved millions of Americans with disabilities; whereas, this case involves a few thousand students. Where there are millions of potential class members, it takes a short inferential leap to conclude that "the class is so numerous that joinder of all members is impracticable." If just 0.1 percent of 1 million potential class members are, in fact, class members, the class would consist of 1,000 members. But if 0.1 percent of 2,260 potential class members are members, the class would consist of no more than 3 members (excluding any named plaintiffs). Plaintiffs thus ask the court to make an inferential leap several magnitudes greater than that made in *Colorado Cross Disability Coalition,* and the court hesitates to make such a leap on the facts presented in this case. More fundamentally, Plaintiffs have provided no evidentiary basis from which a court could make *any* reasonable inferential leap. Unlike in *Colorado Cross Disability Coalition,* where Plaintiffs "submitted declarations from five of its members who averred that they shop at malls where Hollister stores are located," Plaintiffs here have not provided even a single student statement that they have been deterred from playing sports by lack of opportunity. *Id.* at 1215.

28    Plaintiffs conceded at oral argument that a girls football class was necessary because its members were distinct from the female athletes class. Specifically, the conceded distinction was that the girls football class's members would play high school girls football (if offered by the Districts) at the exclusion of any other sport. Because the court understands that the members of the girls football class do not seek more athletic opportunities in general but instead a girls football team, the court concludes that the members of the girls football class cannot count towards the female athletes' numerosity requirement.

29    Dkt. 76, ¶ 206.

30    *See Foltz v. Del. State Univ.,* 269 F.R.D. 419, 422 (D. Del. 2010) (noting that "questionnaires, letters, and emails from 54 prospective student athletes" were helpful when analyzing numerosity).

31    *Horn,* 555 F.2d at 276 ("In summary then, where, as here, the class is composed of a substantial number, no great need is present to identify each and every one. Since injunctive relief is the main goal of the action, all of the requirements are satisfied, and the equities favor the plaintiff and the class he represents, it is inappropriate to become stymied by the concept of very large numbers .... Injunctive relief is no less proper or practical because the number is 41 or 46 rather than some other number.").

32      765 F.3d at 1215.

33      *Id.*

34      *Id.*

35      *Id.*

36      213 F.3d 858 (5th Cir. 2000).

37      *Id.* at 867.

38      *Id.*

39      *Id.* at 868.

40      *Id.*

41      *Id.*

42      *Id.*

43      Unlike the lack of evidence about subjective mental state of the proposed female athletes class, Plaintiffs have presented an evidentiary basis from which the court can make reasonable inferences—i.e., inferences resting on evidence and not merely speculation—about the number of football class members.

44      *See Rex*, 585 F.2d at 436 ("Class actions have been deemed viable in instances where as few as 17 to 20 persons are identified as the class.").

45      Fed. R. Civ. P. 23(a)(2).

46      *Dukes*, 564 U.S. at 349–50.

47       Dkt. 67 at 7 (quoting *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 858 (9th Cir. 2014) ).

48       *Id.* at 8.

49       Plaintiffs' Motion to Certify does not address commonality for their equal treatment claim under Title IX. In any case, the court
         concludes the class would lack commonality for that claim for the same reasons as the other Title IX claims.

50       *Dukes*, 564 U.S. at 350.

51       Fed. R. Civ. P. 23(a)(3).

52       *DG ex rel. Stricklin*, 594 F.3d at 1199.

53       Fed. R. Civ. P. 23(b)(2).

54       *Shook v. Board of County Commissioners*, 543 F.3d 597, 604 (10th Cir. 2008).

55       *Id.*

56       *DG ex rel. Stricklin*, 594 F.3d at 1200 (alteration in original) (internal quotation marks omitted).

57       Dkt. 76, ¶ 105.

58       Dkt. 76 at 46.

59       213 F.3d at 872.

60       Dkt. 67.

61       Dkt. 103.

**S.G. by and through Gordon v. Jordan School District, Not Reported in Fed. Supp. (2018)**

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:21-cv-00179-KJM-BAM   Document 167-8   Filed 11/26/24   Page 209 of 216

Varela v. Industrial Professional and Technical Workers, Not Reported in Fed. Supp....

2009 WL 10670788
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

Richard VARELA, et al., individuals,
Plaintiffs,
v.
INDUSTRIAL PROFESSIONAL AND
TECHNICAL WORKERS, et al.,
Defendants.

CV 08-1012 SVW (RZx)
|
Signed 10/28/2009

**Attorneys and Law Firms**

Ellyn Moscowitz, Ellyn Moscowitz Law Offices, Pasadena, CA, for Plaintiffs.

Howard Z. Rosen, Jason Christopher Marsili, Posner and Rosen LLP, Los Angeles, CA, Scott K. Dauscher, Atkinson Andelson Loya Ruud and Romo, Cerritos, CA, for Defendants.

ORDER DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION [87]

STEPHEN V. WILSON, UNITED STATES DISTRICT JUDGE

**I. INTRODUCTION**

**\*1** Plaintiffs have submitted a Motion for Class Certification. Defendants challenge the Motion on two grounds: (1) it was not filed in the 90-day window required by Local Rule 23-3, and (2) Plaintiffs' counsel is inadequate on account of having been disqualified from representing a similar class in a related state-court action.

Defendants' first ground is meritless. The second ground is

sufficient to defeat Plaintiffs' request for class certification.

**II. PROCEDURAL HISTORY**

**A. Plaintiffs' Claims**
Defendant IPTW is a union that represents workers for Brinderson Constructors, Inc. ("Brinderson"). Plaintiffs are members of IPTW and employees at Brinderson.[1]

On August 1, 2008, Plaintiffs filed their initial Motion for Class Certification. The Court refrained from ruling on the Motion until it had decided Defendants' Motion for Summary Judgment. After a number of orders that clarified the scope of Plaintiffs' claims, the Court held on August 7, 2009 that certain of Plaintiffs' claims could go forward. In this August 7, 2009 ruling, the Court held that Plaintiffs' then-pending Motion for Class Certification was moot in light of the various changes in Plaintiffs' claims.

**B. The Court's August 7, 2009 Summary Judgment Order**
In the August 7, 2009 Order, the Court held that Plaintiff had stated a valid claim under 29 U.S.C. § 411(a)(1): "IPTW had been giving members who worked for other non-Brinderson employers the right to vote on their collective bargaining agreements. IPTW had not been giving Plaintiffs, as employees of Brinderson, however, that same right." Plaintiffs' evidence showed a triable issue as to whether "the failure to give Plaintiffs the same rights as other bargaining units constituted a violation of 29 U.S.C. § 411(a)(1)."

The Court also held that Plaintiff had a triable claim "for failure to inform IPTW members of their rights under the Labor-Management Reporting and Disclosure Act of 1959," 29 U.S.C. § 415.

**C. August 7, 2009 Order for Further Briefing**
In the August 7, 2009 Summary Judgment Order, the Court

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:21-cv-00179-KJM-BAM   Document 167-8   Filed 11/26/24   Page 210 of 216

Varela v. Industrial Professional and Technical Workers, Not Reported in Fed. Supp....

noted that the Labor-Management Reporting and Disclosure Act of 1959 contains an exhaustion provision that applies to Plaintiffs' claims for violation of § 411(a)(1) and § 415. The Court was concerned that Plaintiffs might have been required to exhaust their internal union remedies, and the Court ordered further briefing on this issue. The Court ordered Defendants to file an opening brief on September 21, 2009, Plaintiffs to file an opposition brief on September 28, 2009, and Defendants to file a reply brief on October 5, 2009.

Defendants never filed an opening brief or a reply. Plaintiffs filed their brief explaining that internal remedies would have been unavailable and/or futile.[2]

#### D. Class Certification

**\*2** Plaintiffs now seek to certify a class consisting of: "All persons who are, have been, or were members of IPTW while employed by Brinderson Constructors, Inc. as non-exempt employees providing on-site construction services at a refinery or power plant in California on any date between June 2, 2005 to the present."

### III. CLASS CERTIFICATION

Plaintiffs establish that they have satisfied the basic criteria for certifying a class under Rule 23(a)[3] and all of the theories available in Rule 23(b)(1)-(3).[4] Plaintiffs have also established that counsel satisfies the basic requirements of Rule 23(g)(1)(A): they have diligently identified and investigated potential claims, they have solid experience, knowledge of labor law, and resources to prosecute the action.

Defendants do not oppose any of Plaintiffs' assertions on these issues.

However, Defendants challenge the Motion for Class Certification on two grounds: (1) it was not filed in the 90-day window required by Local Rule 23-3, and (2) Plaintiffs' counsel is inadequate under Rule 23(a)(4) on account of having been disqualified from representing a similar class in a related state-court action.

#### A. Local Rule 23-2

At the outset of litigation, Defendants apparently agreed to extend the window in which Plaintiffs could file their Motion for Class Certification.

Plaintiffs satisfied their requirements under the stipulated filing window by filing this initial Motion for Class Certification. However, this initial Motion for Class Certification was denied as Moot in the Court's August 7, 2009 Summary Judgment Order. The Court gave Plaintiffs leave to file a new Motion for Class Certification by September 22, 2009. The present Motion was filed in that time frame.

Plaintiffs have filed in a timely manner.[5]

#### B. Sufficiency of Counsel

#### 1. Legal Standard

Under Rule 23(a)(4), class representatives must "fairly and adequately protect the interests of the class." In addition, under Rule 23(g)(1)(B), class counsel "must fairly and adequately represent the interests of the class." The Court has discretion regarding the decision to appoint class counsel under Rule 23(g). The Court may "consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(2).[6]

**\*3** The Court's general discretion includes the power to not appoint counsel as class counsel or even to reject the request for class certification. See Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180, 1186, amended, 273 F.3d 1266 (9th Cir. 2001) ("[T]he trial court has broad discretion to certify a class."). If "the court determines that none would be satisfactory class counsel, it may 'deny class certification, reject all applications, recommend that an application be modified, invite new applications, or make any other appropriate order regarding selection and appointment of class counsel.' " Wright & Miller, 7B Federal Practice and Procedure § 1802.3 (quoting Committee Note to the 2003 amendments to Rule 23).

Generally, when counsel is deemed inadequate, one view is that the class may be certified under Rule 23(a) and counsel will not be appointed as class counsel under Rule 23(g). These courts disfavor denial of class certification on the basis of counsel's adequacy. As stated by the court in Busby v. JRHBW Realty, Inc.:

'[O]nly the most egregious misconduct on the part of plaintiffs' lawyer could ever arguably justify denial of class status.' In the event that class counsel does act improperly, '[t]he ordinary remedy is disciplinary action against the lawyer and remedial notice to class members,' not denial of class certification. Busby, 513 F.3d 1314, 1323-24 (11th Cir. 2008) (quoting Halverson v. Convenient Food Mart, Inc., 458 F.2d 927, 932 (7th Cir. 1972)).[7]

Despite that view, in this Circuit, adequacy of counsel is a valid and relevant basis for denying a motion for class certification. See Wrighten v. Metropolitan Hospitals, Inc., 726 F.2d 1346, 1352 (9th Cir. 1984); Fendler v. Westgate-California Corp., 527 F.2d 1168, 1170 (9th Cir. 1975); Mazza v. American Honda Motor Co., 254 F.R.D. 610, 619 (C.D. Cal. 2008) (Fairbank, J.); Sweet v. Pfizer, 232 F.R.D. 360, 370-71 (C.D. Cal. 2005) (Phillips, J.).[8] Courts in this Circuit have essentially mapped the Rule 23(g) requirements for adequacy of counsel onto the Rule 23(a)(4) requirements for adequacy of class representatives. Without any contrary authority in this Circuit, the Court believes that Plaintiffs are required to establish adequacy of counsel as a threshold requirement in order to have the class certified. Plaintiffs' failure to show adequacy of counsel under Rule 23(g) is effectively a failure to meet the adequate representation requirement of Rule 23(a)(4) for class certification.

**2. Analysis**

**\*4** Here, Defendants challenge Plaintiffs' counsel's ability to represent the class on account of counsel's disqualification from a related state court action.

In December 2004, employees of Brinderson filed a wage and hour class action lawsuit in California state court, Small v. Brinderson, No. 04CC00717 (the "Small" suit). The named plaintiffs in this action are also members of the class in the Small suit. The attorney for Plaintiffs in this action, Ellyn Moscowitz, also represented the plaintiffs in the Small suit until October 2008. Moscowitz is also representing a competing union, the Los Angeles Orange Counties Building and Construction Trades Council ("Building Trades Council"), which has been engaged in an ongoing effort to decertify the IPTW.

Notably, Moscowitz was disqualified from representing the plaintiffs in the Small suit in October 2008. The state trial court determined that Moscowitz's actions had "rais[ed] a number of significant concerns regarding her continued representation of plaintiffs." The court held that

Moscowitz had filed "large numbers of inadmissible declarations and a number of inconsistent declarations." In particular, the declaration of one witness, Inocencio Guardado, contained two paragraphs that were added to the declaration after he had signed it. In addition, Moscowitz had filed a number of "unsworn questionnaires" that were inadmissible and, in the court's view, were "an attempt to mislead the court." The court also noted that Moscowitz had filed a number of declarations in which the declarant made statements inconsistent with statements contained in that declarant's previous declaration. The court deemed this "tactic" to be yet another "attempt to mislead this court." (Rosen Decl., Ex. A.)

Obviously, Moscowitz's conduct in the state proceedings raises serious questions about her ethical standards. Her actions could very well lead to discipline by the State Bar (if they haven't already). Her conduct is even more troubling in light of the fact that Moscowitz *did not disclose to this Court* anything regarding her disqualification until her *Reply* to Defendants' Opposition. (See Moscowitz Reply Decl., ¶ 11.) Moscowitz's initial Declaration in Support of the Motion proudly stated that her firm represented the plaintiff class in the Small litigation through October 2008. (See Moscowitz Decl., ¶ 5.) She even attached a copy of the state court's order granting the motion for class certification in that case. (See Moscowitz Decl., Ex. A.) However, her initial Declaration said *nothing* about the fact that the state court disqualified her firm. Nor did the Declaration say anything about the state court's reasons for disqualifying the firm.

Moscowitz's Reply Declaration disputes the State Court's reasons for disqualifying the firm. (Moscowitz Reply Decl., ¶ 11.) The Court believes that it may rely on the State Court's findings when examining counsel's qualifications. In any event, to the extent that Moscowitz believed the State Court ruling to be in error, Moscowitz should have said so in her *opening* Declaration, not her *reply* Declaration. The time has passed for making excuses to this Court. Cf. Sweet v. Pfizer, 232 F.R.D. 360, 364 n.7 (C.D. Cal. 2005) ("[T]he moving party in a motion cannot submit new information as part of its Reply.")

**\*5** In addition to Moscowitz's actions in the State Court, this Court is even more troubled by the fact that Moscowitz did not come clean in her initial moving papers before the Court. As part of her duties under Rule 11(b), Moscowitz was obligated to inform this Court about the legal and factual bases of her assertions. Her failure to provide full disclosure raises serious questions about her candor to this Court. Her opening Declaration's attempt to whitewash her dismissal from the Small litigation appears to be yet another "tactic" deployed in "an attempt to mislead this court." See Small v. Brinderson, No. 04CC00717 (Cal.

Sup. Ct. Oct. 15, 2008).

The Court is troubled, to say the least, by the evidence of Moscowitz's ethical breaches in the Small suit. The Court is even more troubled by Moscowitz's failure to make full and adequate disclosure to this Court about those ethical breaches.

Accordingly, the Court DENIES Plaintiffs' Motion for Class Certification without prejudice.

The Court grants Plaintiffs leave to decide whether to proceed as individuals represented by Moscowitz and her firm, or whether to proceed as a putative class represented by Plaintiffs' choice of counsel. If Plaintiffs choose to retain Moscowitz, each individual Plaintiff is ORDERED

to file a Declaration by Monday, November 16, 2009 stating that he is aware of this Order and wishes to retain Moscowitz as counsel. If Plaintiffs choose to proceed as a putative class, Plaintiffs are ORDERED to file a renewed Motion for Class Certification by Monday, November 16, 2009. The renewed Motion for Class Certification must be filed by counsel that is not affiliated with Moscowitz or her firm, or subject to her direction or control in any way.

IT IS SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2009 WL 10670788

Footnotes

1    The named plaintiffs are Richard Rojas, Jesse Clark, Edwin Whitford, Andre Price, Miguel Vazquez, Larry Broderick, Arturo Torres, and Cesar Cabrera. Richard Varela voluntarily dismissed his claim on June 16, 2008. (Docket No. 21.)

2    Under Local Rule 7-12 provides that "[t]he failure to file any required paper, or the failure to file it within the deadline, may be deemed consent to the granting or denial of the motion." The Court concludes that Defendants have conceded this issue.

3    Numerosity, commonality, typicality, and adequacy of representation by named parties.

4    The proposed class satisfies the requirements of a class that prevents a multiplicity of litigation with potentially inconsistent results, Rule 23(b)(1)(A); an injunctive class (with incidental damages claims), Rule 23(b)(2); and a class with common questions of law or fact, Rule 23(b)(3).

5    In any event, the Local Rules do not establish the appropriate sanction for failing to file a class certification motion within 90 days of the initiation of the action. Automatic denial of a late-filed motion might be a drastic remedy. See Gray v. Greyhound Lines, East, 545 F.2d 169 n.11 (D.C. Cir. 1976) ("It is not clear that dismissal of the class allegations for failure to comply with the local time limit is consistent with Rule 23(c)(1), Fed. R. Civ. P., which may require the court to determine the merits of the claim to representative status.")

6    Rule 23(g) was added in 2003. See Wright & Miller, 7B Federal Practice and Procedure § 1802.3, Appointment of Class Counsel (2009).

7    See also 7A Wright & Miller, § 1769.1 ("Another issue that has been addressed by some courts is whether, if it is found that class counsel has engaged in some unethical or improper activity, the class action should be dismissed because of a failure to satisfy Rule 23(a)(4). To do so effectively penalizes the absent class members who, if they did not knowingly participate in the conduct, may have been adequately represented by their named representatives. Thus, it has been suggested that if the court finds that the attorneys involved have engaged in some misconduct, such as soliciting potential class members, the action should not be dismissed to the prejudice of the rights of their clients because of a lack of adequate representation; other less drastic means should be taken to cure the problem. For example, if solicitation is the difficulty, disciplinary action might be taken against the lawyer and a remedial notice

sent to the class members.") (internal citations omitted).

8        See also Joseph M. McLaughlin, McLaughlin on Class Actions § 4:38 (5th ed. 2009) ("Counsel will be judged in part on their performance in the case at hand, and if counsel's performance in the case engenders doubt as to counsel's competence or commitment, courts have not hesitated to intervene. There is authority ... for *denying certification* based on class counsel's mishandling of prior putative class actions.") (citations omitted) (emphasis added).

---

**End of Document**                                          © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 8575138
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

Steve ZUEHLSDORF
v.
FCA US LLC

Case No. EDCV 18-1877-JGB (KKx)
|
Filed 12/15/2020

**Attorneys and Law Firms**

Cody R. Padgett, Mark A. Ozzello, Tarek H. Zohdy, Trisha Kathleen Monesi, Steven R. Weinmann, Capstone Law APC, Los Angeles, CA, for Steve Zuehlsdorf.

Kathy A Wisniewski, Pro Hac Vice, Thompson Coburn LLP, Stephen A. D'Aunoy, Pro Hac Vice, Thomas L. Azar, Pro Hac Vice, St. Louis, MO, Ryan E. Cosgrove, Nelson Mullins Riley and Scarborough LLP, Torrance, CA, for FCA US LLC.

**Proceedings: Order Granting Defendant's Motion to Compel Production of Documents [Dkt. 72]**

The Honorable KENLY KIYA KATO, UNITED STATES MAGISTRATE JUDGE

**\*1** On November 13, 2020, Defendant FCA US LCC ("Defendant") filed a Motion to Compel Production of Documents ("Motion to Compel") along with a Joint Stipulation pursuant to Local Rule 37-2 prepared by Defendant and Plaintiff Steve Zuehlsdorf ("Plaintiff"). ECF Docket No. ("Dkt.") 72. For the reasons set forth below, Defendant's Motion to Compel is GRANTED.

**I.**

**BACKGROUND**

On August 31, 2018, Plaintiff initiated this putative nationwide class action against Defendant for claims arising out of defects alleged to exist in vehicles equipped with a Jatco JF011E Continuously Variable Transmission ("Class Vehicles") designed, manufactured, marketed, distributed, sold, warranted, and/or served by Defendant. Dkt. 1, Compl. The operative Third Amended Complaint ("TAC") asserts the following causes of action: (1) violation of the California Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, et seq.; (2) violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, et seq.; (3) breach of implied warranty pursuant to the Song-Beverly Consumer Warranty Act, Cal. Civ. Code §§ 1792 and 1791.1, et seq.; and (4) breach of implied warranty under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2303, et seq. Dkt. 43.

On August 21, 2019, Defendant filed an amended answer to the TAC. Dkt. 54.

On November 4, 2019, the Court issued its original civil trial scheduling order. Dkt. 62. The court subsequently issued an order modifying the dates and setting a discovery cut-off of May 31, 2021, a dispositive motion hearing cut-off of August 23, 2021, and a jury trial for October 26, 2021. Dkt. 71. The Court also ordered Plaintiff to file his Motion for Class Certification on or before April 21, 2021, Defendant's Opposition on or before June 7, 2021, and Plaintiff's Reply on or before July 6, 2021. Id.

On June 10, 2019, Defendant served its First Set of Requests for Production Directed to Plaintiff. Dkt. 72-1, Declaration of Thomas L. Azar, Jr. ("Azar Decl."), ¶ 6, Ex. E. Request for Production ("RFP") No. 58 seeks:

All DOCUMENTS that relate to the payment of attorneys' fees and/or costs in this case, including all attorney fee agreements YOU signed for representation in this case.

Id.

On December 4, 2019, Plaintiff served Responses to Defendant's First Set of Requests for Production, in which Plaintiff refused to produce any documents in response to RFP No. 58 and objecting as follows:

Plaintiff objects to the request on the grounds and to the extent it is overbroad, vague, and ambiguous. Also, Plaintiff objects that the request is not relevant nor proportional to the needs of the case. Plaintiff objects to the request on the grounds and to the extent it seeks information that Defendant has in its possession or which may be obtained through other means that are

more convenient, less costly, and less burdensome, including other means of discovery such as interrogatories. Plaintiff objects to the request on the grounds and to the extent that it seeks information that is not or no longer within Plaintiff's possession, custody, or control. Plaintiff objects to the request on the grounds and to the extent it seeks information protected by the attorney-client privilege and/or work product doctrine. Further, the requested documents are neither relevant nor likely to lead to the discovery of admissible evidence.

**\*2** Id., ¶ 7, Ex. F.

On October 1, 2020, Defendant's counsel sent Plaintiff's counsel a letter via email and U.S. Mail seeking to meet and confer regarding Plaintiff's refusal to produce responsive documents to RFP No. 58. Id., ¶ 8, Ex. G.

On October 15, 2020, Defendant's counsel and Plaintiff's counsel met and conferred via telephone but were unable to reach an agreement. Id., ¶ 9.

On November 13, 2020, Defendant filed the instant Motion along with a Joint Stipulation pursuant to Local Rule 37-2. Dkt. 72. In the Motion, Defendant seeks production of Plaintiff's retainer/fee agreements with his counsel. Id. On November 25, 2020, Defendant filed a supplemental brief in support of the Motion. Dkt. 73. The matter thus stands submitted.

## II.

## DISCUSSION

### A. APPLICABLE LAW

Federal Rule of Civil Procedure 26(b) provides that parties may obtain discovery regarding:

> any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Fed. R. Civ. P. 26(b)(1). Relevant information "need not be admissible in evidence to be discoverable." Id. A court "must limit the frequency or extent of discovery otherwise

allowed" if "(i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1)." Fed. R. Civ. P. 26(b)(2)(C).

Federal Rule of Civil Procedure 34 governs requests for production of documents. See Fed. R. Civ. P. 34. "The party to whom the [Request for Production] is directed must respond in writing within 30 days after being served." Fed. R. Civ. P. 34(b)(2)(A). The requesting party "is entitled to individualized, complete responses to each of the [Requests for Production] ..., accompanied by production of each of the documents responsive to the request, regardless of whether the documents have already been produced." Louen v. Twedt, 236 F.R.D. 502, 505 (E.D. Cal. 2006).

"[G]eneral or boilerplate objections such as 'overly burdensome and harassing' are improper – especially when a party fails to submit any evidentiary declarations supporting such objections." A. Farber & Partners, Inc. v. Garber, 234 F.R.D. 186, 188 (C.D. Cal. 2006) (faulting defendant for making "boilerplate objections to almost every single request for production, including broad relevancy objections, objections of 'overly burdensome and harassing,' 'assumes facts not in evidence,' privacy, and attorney-client privilege/work product protection").

"A party seeking discovery may move for an order compelling an answer, ... production, or inspection." Fed. R. Civ. P. 37(a)(3)(B)(iii), (iv). "[A]n evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer or respond." Fed. R. Civ. P. 37(a)(4).

**\*3** "The party moving to compel bears the burden of demonstrating why the information sought is relevant and why the responding party's objections lack merit." Bluestone Innovations LLC v. LG Elecs. Inc., No. C-13-01770 SI (EDL), 2013 WL 6354419, at \*2 (N.D. Cal. Dec. 5, 2013). In addition, "[r]elevancy alone is no longer sufficient to obtain discovery, the discovery requested must also be proportional to the needs of the case." Centeno v. City of Fresno, No. 16-CV-653 DAD (SAB), 2016 WL 7491634, at \*4 (E.D. Cal. Dec. 29, 2016) (citing In re Bard IVC Filters Prod. Liab. Litig., 317 F.R.D. 562, 564 (D. Ariz. 2016)).

## B. ANALYSIS

As a preliminary matter, Plaintiff appears to abandon all objections except those based on relevance and privilege. See dkt. 72-3, JS at 12-18; see also Azar Decl., ¶ 9. The Court nonetheless finds any other unsupported, boilerplate objections meritless and thus, such objections are OVERRULED.

Plaintiff also concedes the instant discovery dispute is "largely within the Court's discretion." JS at 8. For the reasons that follows, the Court finds the requested discovery subject to production.

First, the documents requested in RFP No. 58 are relevant to the claims and defenses in this lawsuit. "Relevance for purposes of discovery is defined very broadly." Garneau v. City of Seattle, 147 F.3d 802, 812 (9th Cir. 1998) (citation omitted). Here, Plaintiff seeks to be appointed as class representative in a putative nationwide class action. Under Federal Rule of Civil Procedure 23(a)(4), Plaintiff must, therefore, establish he "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "[U]ncovering conflicts of interest between the named parties and the class they seek to represent is a critical purpose of this adequacy inquiry." Rodriguez v. West Publ'g Corp., 563 F.3d 948, 959 (9th Cir. 2009). Plaintiff's retainer and fee agreement with counsel may, among other things, reveal potential conflicts of interest between himself and the class he seeks to represent. The documents sought in RFP No. 58 are, therefore, relevant to this analysis of whether Plaintiff is an adequate representative of the class. See, e.g., Physicians Healthsource, Inc. v. Masimo Corp., No. 8-14-001-DOC (ADSx), 2019 WL 8755114, *2 (C.D. Cal. July 30, 2019); Gusman v. Comcast Corp., 298 F.R.D. 592, 600 (S.D. Cal. 2014). Accordingly, Plaintiff's objection on the basis of relevance is OVERRULED.

Second, the documents requested in RFP No. 58 are not privileged under applicable federal privilege law. Plaintiff claims the documents are protected by the attorney-client privilege. JS at 12–18. As the party asserting privilege, Plaintiff bears the burden of establishing the privilege applies. U.S. v. Ruehle, 583 F.3d 600, 609 (9th Cir. 2009). While Plaintiff asserts the Court should apply state privilege law, the only class claim asserted on behalf of the putative nationwide class is a federal claim under the Magnuson-Moss Warranty Act. TAC at ¶¶ 68, 117-128. The Court is not persuaded by Plaintiff's various arguments as to why this Court should nonetheless apply California law. The Court, thus, finds in a case involving both federal and state claims such as this, federal privilege law applies. Wilcox v. Arpaio, 753 F.3d 872, 876–77 (9th Cir. 2014).

Applying federal privilege law, the documents sought in RFP No. 58 are not privileged. "The Ninth Circuit has repeatedly held retainer agreements are not protected by the attorney-client privilege or work product doctrine." Hoot Winc, LLC v. RSM McGladrey Fin. Process Outsourcing, LLC, No. 08-CV-1559 BTM (WMC), 2009 WL 3857425, at *1–2 (S.D. Cal. Nov. 16, 2009) (citing Ralls v. United States, 52 F.3d 223, 225 (9th Cir. 1995); U.S. v. Blackman, 72 F.3d 1418, 1424 (9th Cir. 1995); In re Michaelson, 511 F.2d 882 (9th Cir.1975)); see also Carrizosa v. Stassinos, No. C 05-2280 RMW RS, 2006 WL 2529503, at *1 (N.D. Cal. Aug. 31, 2006) (stating that under Ninth Circuit law, fee agreements generally fall outside the scope of the attorney-client privilege (citations omitted)). Accordingly, Plaintiff's objection on the basis of privilege is OVERRULED.

## III.

## ORDER

**\*4** Based upon the foregoing reasons, **IT IS THEREFORE ORDERED** that Defendant's Motion to Compel is GRANTED. **Within fourteen (14) days of the date of this Order**, Plaintiff shall produce documents responsive to RFP No. 58 (i.e., Plaintiff's retainer/fee agreements with his counsel).

## All Citations

Not Reported in Fed. Supp., 2020 WL 8575138

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.